**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **MELANIE DAVIS**, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>**POST UNIVERSITY, INC.,**<br><br>               Defendant. | Civil Case No.: 18-cv-81004-RKA<br><br>Judge: Hon. Roy K Altman<br>Magistrate Judge: Hon. Dave Lee Brannon |

**Plaintiff's Memorandum in Support of Plaintiff's Motion for Class Certification**

## Contents

**BACKGROUND** ....................................................................................................... **3**

**I.   Relevant Provisions of the TCPA.** ........................................................... **3**
    a.   47 U.S.C. § 227(c) ...................................................................................... 3
    b.   47 C.F.R. § 64.1200(d) ............................................................................... 4
        i.   Overview and Elements ........................................................................ 4
        ii.  Consent Does Not Matter to a Claim Under § 64.1200(d). .................. 5

**II.  Facts Applicable to All Putative Class Members.** ................................... **8**

**III. Facts Applicable to Plaintiff Davis** ........................................................ **10**

**DISCUSSION** ........................................................................................................ **11**

**I.   Legal Standard** ......................................................................................... **11**

**II.  The Proposed Class Satisfies Rule 23(a)** ............................................... **12**
    a.   Article III Standing ................................................................................... 12
    b.   Numerosity ................................................................................................ 14
    c.   Commonality .............................................................................................. 16
    d.   Typicality ................................................................................................... 16
    e.   Adequacy ................................................................................................... 17
    f.   Ascertainability ......................................................................................... 19

**III. The Proposed Class Satisfies Rule 23(b)(3)** ......................................... **21**
    a.   Predominance ............................................................................................ 21
        i.    Policies and Procedures ..................................................................... 21
        ii.   Receipt of Calls ................................................................................. 21
        iii.  The Purpose of the Calls. .................................................................. 22
        iv.   "Consent" Does Not Create Individualized Questions. ..................... 24
    b.   Superiority ................................................................................................. 25

**CONCLUSION** ..................................................................................................... **25**

**Cases**

*Abdullah v. Am. Express Co.*
  2012 U.S. Dist. LEXIS 184592 (M.D. Fla. Dec. 19, 2012) .................................................... 15

*Alderman v. GC Servs. L.P.*
  2018 U.S. Dist. LEXIS 10205 (S.D. Fla. Jan. 19, 2018) ...................................................... 21

*Allard v. SCI Direct, Inc.*
  2017 U.S. Dist. LEXIS 107106 (M.D. Ten. July 10, 2017) ................................................. 5, 7

*Amchem Prods., Inc.*
  521 U.S. 591 (1997) .............................................................................................................. 21

*American Boat Co., Inc. v. Unknown Sunken Barge*
  418 F.3d 910 (8th Cir. 2005) ............................................................................................... 15

*Appleton Elec. Co. v. Advance – United Expressways*
  494 F.2d 126 (7th Cir. 1974) ............................................................................................... 24

*Birchmeier v. Caribbean Cruise Line, Inc.*
  302 F.R.D. 240 (N.D. Ill. 2014) ........................................................................................... 21

*Byrd v. Aaron's Inc.*
  784 F.3d 154 (3d Cir. 2015) ................................................................................................. 20

*Carmichael v. Nissan Motor Acceptance Corp.*
  291 F.3d 1278 (11th Cir. 2002) ............................................................................................. 7

*Carriuolo v. Gen. Motors Co.*
  823 F.3d 977 (11th Cir. 2016) ....................................................................................... 16, 19

*Chapman v. Wagener Equities, Inc.*,
  2014 U.S. Dist. LEXIS 16866 (N.D. Ill. Feb. 11, 2014) ................................................. 12, 18

*Chesbro v. Best Buy Stores, L.P.*
  705 F.3d 913 (9th Cir. 2012) ............................................................................................... 22

*Cordoba v. DIRECTV, LLC*
  320 F.R.D. 582 (N.D. Ga. 2017)................................................................................... 5, 12, 14

*Cox v. Am. Cast Iron Pipe Co.*
  784 F.2d 1546 (11th Cir. 1986) ........................................................................................... 15

*Evankavitch v. Green Tree Servicing, LLC*
  793 F.3d 355 (3d Cir. 2015).................................................................................................... 5

*Harris v. Garner*
  216 F.3d 970 (11th Cir. 2000) ............................................................................................... 8

*In re Disposable Contact Lens Antitrust*
  329 F.R.D. 336 (M.D. Fla. 2018)..................................................................... 19

*In re Polypropylene Carpet Antitrust Litig.*
  178 F.R.D. 603 (N.D. Ga. 1997)..................................................................... 12

*Kernats v. Comcast Corp.*
  2010 U.S. Dist. LEXIS 112071 (N.D. Ill. Oct. 20, 2010)................................. 21

*Kornberg v. Carnival Cruise Lines, Inc.*
  741 F.2d 1332 (11th Cir. 1984) ................................................................. 16, 17

*Krakauer v. Dish Network L.L.C.*
  311 F.R.D. 384 (M.D.N.C. 2015) ............................................................... 12, 25

*Krakauer v. Dish Network, L.L.C.*
  2019 U.S. App. LEXIS 16111 (4th Cir. May 30, 2019)...................................... 14

*Kron v. Grand Bahama Cruise Line, LLC*
  328 F.R.D. 694 (S.D. Fla. 2018)..................................................................... 25

*Legg v. Voice Media Group, Inc.*
  990 F. Supp. 2d 1351 (S.D. Fla. 2014) ............................................................ 7

*London v. Wal-Mart, Inc.*
  340 F.3d 1246 (11th Cir. 2003) ...................................................................... 17

*Meadows v. Franklin Collection Serv.*
  414 Fed. Appx. 230 (11th Cir. 2011)............................................................... 24

*Mohamed v. Off Lease Only, Inc.*
  320 F.R.D. 301 (S.D. Fla. 2017)..................................................................... 12

*Moore v. Walter Coke, Inc.*
  294 F.R.D. 620 (N.D. Ala. 2013)..................................................................... 19

*Muransky v. Godiva Chocolatier, Inc.*
  922 F.3d 1175 (11th Cir. 2019) ................................................................. 13, 14

*Navelski v. Int'l Paper Co.*
  244 F. Supp. 3d 1275 (N.D. Fla. 2017)............................................................ 22

*Newhart v. Quicken Loans, Inc.*
  2016 U.S. Dist. LEXIS 168721 (S.D. Fla. Oct. 12, 2016).............................. 23, 24

*Ocwen Loan Servicing, LLC v. Belcher*
  2018 U.S. App. LEXIS 18088 (11th Cir. June 29, 2018)................................... 19

*Osorio v. State Farm Bank, F.S.B.*

746 F.3d 1242 (11th Cir. 2014) ......................................................................... 7

*Owens v. Metro. Life Ins. Co.*
323 F.R.D. 411 (N.D. Ga. 2017) ....................................................................... 20

*Parker v. Universal Pictures*
2019 U.S. Dist. LEXIS 59806 (M.D. Fla. Feb. 28, 2019) ...................................... 25

*Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*
2014 U.S. Dist. LEXIS 177222 (S.D. Fla. Dec. 23, 2014) ..................................... 18

*Reyes v. BCA Fin. Servs.*
2018 U.S. Dist. LEXIS 106449 (S.D. Fla. June 26, 2018) ............................... 7, 25

*Rutstein v. Avis Rent-A-Car Sys.*
211 F.3d 1228 (11th Cir. 2000) ................................................................... 21, 22

*Schweitzer v. Comenity Bank*
866 F.3d 1273 (11th Cir. 2017) ......................................................................... 13

*Spokeo, Inc. v. Robins*
136 S. Ct. 1540 (2016) ....................................................................................... 13

*Susinno v. Work Out World Inc.*
862 F.3d 346 (3d Cir. 2017) ............................................................................... 14

*United States v. Dish Network, LLC*
75 F. Supp. 3d 942 (C.D. Ill. 2014) ................................................................. 5, 8

*Valley Drug Co. v. Geneva Pharms., Inc.*
350 F.3d 1181 (11th Cir. 2003) ......................................................................... 17

*Van Patten v. Vertical Fitness Group, LLC*
847 F.3d 1037 (9th Cir. 2017) ........................................................................... 14

*Vega v. T-Mobile USA, Inc.*
564 F.3d 1256 (11th Cir. 2009) .............................................................. 12, 15, 16

Venerus v. Avis Budget Car Rental, LLC
723 Fed. Appx. 807 (11th Cir. 2018) ................................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. 338 (2011) ........................................................................................... 16

*Wick v. Twilio, Inc.*
2016 U.S. Dist. LEXIS 151482 (W.D. Wash. Nov. 1, 2016) ................................. 23

*Williams v. Mohawk Indus., Inc.*
568 F.3d 1350 (11th Cir. 2009) ......................................................................... 16

iv

*Young v. Nationwide Mut. Ins. Co.*
   693 F.3d 532 (6th Cir. 2012) ................................................................ 20

## Statutes

105 Stat. 2394 ................................................................................................ 13

47 C.F.R. § 64.1200(d) ........................................................................... passim

47 C.F.R. § 64.1200(d)(1) .............................................................................. 5

47 C.F.R. § 64.1200(d)(2) .............................................................................. 5

47 C.F.R. § 64.1200(d)(3) .............................................................................. 5

47 C.F.R. § 64.1200(e) ................................................................................... 4

47 C.F.R. § 64.1200(f)(12) ............................................................................ 6

47 C.F.R. § 64.1200(f)(14) ............................................................................ 6

47 CFR § 64.1200(c)(2)(ii) ............................................................................ 6

47 U.S.C. § 227(c) ............................................................................... 1, 3, 10

47 U.S.C. § 227(c)(1) ..................................................................................... 3

47 U.S.C. § 227(c)(1)(A) ............................................................................... 3

47 U.S.C. § 227(c)(1)(E) ............................................................................... 3

47 U.S.C. § 227(c)(5) ..................................................................................... 4

## Rules

Fed. R. Civ. P. 23(a)(1) ............................................................................... 15

Fed. R. Civ. P. 23(a)(2) ............................................................................... 16

Fed. R. Civ. P. 23(a)(3) ............................................................................... 16

Fed. R. Civ. P. 23(a)(4) ............................................................................... 17

Fed. R. Civ. P. 23(b)(3) ............................................................................... 25

## Regulations

18 FCC Rcd. 14014 (July 3, 2003) ........................................................... 4, 6

7 FCC Rcd 8752 (Oct. 16, 1992) .............................................................. 4, 5

*At Post, the implication was to enroll anyone who could be forced into it.*

–Former Post University employee in departure letter to Human Resources.

Defendant Post University, Inc. ("PU") is a for-profit college that uses an aggressive-solicitation business model to procure students. In doing so, it has disregarded and run afoul of the Telephone Consumer Protection Act ("TCPA"), which requires companies like PU to implement, prior to making any telemarketing calls, a written do-not-call policy, training on this policy, and policies and procedures to document and honor do-not-call requests. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d). PU did none of these things. Instead, PU's attitude toward the TCPA (and prospective students) is summed up in the following March 2018 exchange between two of its employees responsible for outreach:

> **Admissions Counselor Erica Perez**: "This b\*\*ch just answered and said 'PUT THIS[sic] ON THE DO NOT CALL LIST AND DO NOT CALL ME BACK' …."
>
> **Admissions Counselor Mary Yatcko**: "Text her? Hey! I just received your initial Post inquiry through our website! Play stupid?"
>
> **Erica Perez**: "lol I was going to[.] Crazy lady."
>
> **Mary Yatcko**: "Can't hurt!"

Ex. A. PU considers Ms. Yatcko to be a well-trained employee. Ex. B (Post Depo. Tr. 171:8-15).

This attitude was not limited to PU's intra-office chats. It led to PU ignoring and deleting do-not-call requests—as in Plaintiff's case—and it led to PU threatening prospective students who made such requests. For example, discovery revealed two situations where prospective students asked PU to stop contacting them, but PU threatened those prospective students with fees if they did not continue. Ex. C. In the words of one of PU's employees:

> I'm very concerned that the student only participated because she was misled and pressured by her Admissions Counselor…. [Student] stated that she was not planning to attend Post, and asked that we stop contacting her. The reply she received from the AC was that if she did NOT participate, she would be charged the full cost of the course, which is incorrect information.

1

*Id.*

Such lapses in integrity are particularly concerning here, as PU exists in an industry often accused of preying on vulnerable segments of the population, including veterans,[1] minorities,[2] and single mothers.[3] Consistent with such criticisms, in January 2017, one of PU's employees wrote a letter to PU's HR department expressing concerns that:

- "I find that Post University has no mission other than being profitable."

- "I find myself working in a call center, being told to manipulate uneducated people into taking thousands of dollars in student loans after a 20 minute conversation."

- "At Post, the implication was to enroll anyone who could be forced into it."

Ex. D (Markham Decl., ¶¶ 50a-c).

And consider two separate lawsuits filed in 2017. In one, PU's former Director of Main Campus Admissions claimed that PU sought to (and eventually did) set up a scheme where its employees would go to local high schools and "gain entrance to the school by any means necessary", and then wander the hallways until they found a teacher willing to let them speak directly to students about Post. Ex. E (Reilly Compl. ¶¶ 14, 19-20, 28). In the other, PU's former Chief Regulatory Officer claimed that PU was enrolling economically and socially disadvantaged persons without requiring them to produce a high school transcript. Ex. F (Sweeney Compl. ¶¶ 23-24). PU would not tell these students that the lack of a high school transcript prevented those students from obtaining federal financial aid. *Id.* at ¶ 24. PU would then remove these students from classes after one or two semesters, leaving those students owing tuition, but with no way to pay because they could not get financial aid. *Id.* As alleged, according to Chief Operating Officer

---

[1] https://bit.ly/2Yd8SFf (CNN Money, "How For Profit Colleges Target Military Veterans", 2014)
[2] https://bit.ly/2NiXbfo (Harvard Law Review Blog, "For Profit Schools' Predatory Practices and Students of Color: A Mission to Enroll Rather than Educate", July 30, 2018)
[3] https://bit.ly/2LmUCGu (Institute for Women's Policy Research Report, "Single Mothers Overrepresented at For-Profit Colleges", September 6, 2017).

Bobby Reese, this was done because "it is all about the numbers." *Id.* at ¶¶ 11, 18.

This "all about the numbers" mentality pushed some of PU's business practices across the line from unethical to illegal. Specifically, despite a robust and persistent telemarketing operation, PU had no policies or procedures in place to allow call recipients to stop further calls. PU admitted that it did not maintain a written do-not-call policy as the TCPA requires. Ex. G (Post Depo. Tr. 209:17-19). And though PU claims that it documented do-not-call requests and trained its telemarketers on how to do so, its only evidence in support of these claims is its self-serving deposition testimony. PU does not know of a single document that supports its claims. Ex. H (Post Depo. Tr. 266:21-268:1; 294:19-295:3). The sworn statements of two former employees outright contradict them. Ex. D (Markham Decl., ¶¶ 15-16); Ex. I (Shigo Decl., ¶¶ 20-21).

Accordingly, Plaintiff now moves under Rule 23 to certify a Class of persons defined as:

> From July 30, 2014 through July 30, 2018, all persons within the United States who, on their residential or cellular telephone number, received more than one telephone call from Defendant in a 12-month period, while the entry or file in Defendant's CRM system associated with that person was marked as, flagged as, or considered a "Rejected Lead" or "Opportunity Lost".

## BACKGROUND

**I.   Relevant Provisions of the TCPA.**

**a.   47 U.S.C. § 227(c)**

When the TCPA was enacted, § 227(c) compelled the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems' … )" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section." *Id.* at (c)(1)(A) and (E). Section 227(c) contains a private

right of action, allowing "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" to bring an action to recover $500 to $1,500 per call. 47 U.S.C. § 227(c)(5).

The FCC promulgated several regulations under § 227(c). Only one is presently at issue. Currently codified at 47 C.F.R. § 64.1200(d), this regulation requires companies to implement certain minimum policies and procedures for maintaining an internal do-not-call list and honoring do-not-call requests *before* making any telemarketing telephone calls.

**b. 47 C.F.R. § 64.1200(d)**

  i.  Overview and Elements

The rule requiring companies to implement minimum policies and procedures for maintaining an internal do-not-call list prior to making any telemarketing call was first put into place in the TCPA's implementing regulation. 7 FCC Rcd 8752, 8753 (Oct. 16, 1992) ("TCPA Implementation Order"). The FCC found that "the company-specific-do-not-call list … is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *TCPA Implementation Order* at 8765, ¶ 23. It "mandate[d] procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24. This regulation was amended in 2003 to require the policies and procedures to be implemented prior to making "any call for telemarketing purposes." 18 FCC Rcd. 14014, 2003 FCC LEXIS 3673, *150 ¶ 96 (July 3, 2003) The rule, as currently codified, states:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber[4] unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

---

[4] In 2003, this was expanded to include calls to cellular telephones. 47 C.F.R. § 64.1200(e).

47 C.F.R. § 64.1200(d). These procedures "must meet" minimum standards. Companies making telemarketing calls must maintain a written policy for maintaining a do-not-call list; train and inform personnel engaged in any aspect of telemarketing on the existence and use of the do-not-call list; record do-not-call requests when made; and honor do-not-call requests. *Id.* at (d)(1), (2) , (3) , (6). These policies and procedures *must* be implemented prior to making telemarketing calls. *Id.* Telemarketers are "ultimately responsible … and fully accountable for any problems arising in the maintenance and accuracy of the list." *TCPA Implementation Order*, 7 FCC Rcd. at 8766 ¶ 24. "[I]f [the procedures in 47 C.F.R. § 64.1200(d)] are not implemented, each call made by a telemarketer constitutes a violation of the TCPA and the FCC regulations[.]" *Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 587 (N.D. Ga. 2017); *see also, e.g.*, *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1014 n.21 (C.D. Ill. 2014); *Allard v. SCI Direct, Inc.*, Case No. 16-cv-1033, 2017 U.S. Dist. LEXIS 107106, *14-17 (M.D. Ten. July 10, 2017).

Distilled, for Plaintiff to prevail on claim under § 64.1200(d), she must show 1) she received from Defendant 2) more than one call 3) that constitutes telemarketing. The final element—that Defendant lacked any of the policies and procedures required to be implemented prior to making telemarketing calls—is most appropriately treated as an affirmative defense, given the introduction of those requirements with an "unless" clause, which is considered to be "telltale language … indicative of an affirmative defense." *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 362 (3d Cir. 2015). For the purposes of this Motion, however, Plaintiff will presume that she has the burden on this element.

## ii.   Consent Does Not Matter to a Claim Under § 64.1200(d).

Neither a call recipient's consent to calls, nor an "established business relationship" ("EBR"), is relevant to § 64.1200(d). A contrary position disregards the plain language and purpose of the statute.

First, neither the regulation nor the definition of telemarketing incorporates "consent" or an EBR. By its terms, § 64.1200(d) applies to calls for "telemarketing"—a defined term meaning "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). A "telephone solicitation", on the other hand, is a separately defined term, meaning a telemarketing call made *without* consent or an EBR. 47 C.F.R. § 64.1200(f)(14). But "telephone solicitations" are not at issue in § 64.1200(d). There is no ambiguity.

The FCC's decision to omit any notion of "consent" from the term "telemarketing" and the current iteration of § 64.1200(d) was intentional. When the regulation was first implemented, it *did* only require the policies, procedures, and training to be implemented prior to making "telephone solicitations." But in 2003, the FCC specifically amended this provision to apply more broadly to *all* telemarketing calls, writing "we amend the company-specific do-not-call rules to apply to any call for telemarketing purposes." 18 FCC Rcd. 14014, 2003 FCC LEXIS 3673 at *150 ¶ 96. In that same order, the FCC first created and codified the definition of "telemarketing" used in the current regulation. The FCC found that this amendment was necessary, in part, because the original version failed to protect the rights of those consumers who did not make a do-not-call request. *Id.* at 142-43 ¶ 91 ("In addition … many … consumers do not even have the opportunity to make a do-not-call request."). The FCC was explicit that "[t]he 'established business relationship' … is not an exception to the company-specific do-not-call rules." *Id.* at *170 n.351.

Notably, "prior express invitation or permission" *is* explicitly a defense to another type of claim under § 227(c) related to the failure to honor the *national* "Do Not Call" list (which is not at issue here). 47 CFR § 64.1200(c)(2)(ii). Congress and the FCC were therefore capable of allowing for a "consent" defense yet chose not to do so for § 64.1200(d).

The only court to address this issue directly also found that consent is irrelevant. *Allard*, 2017 U.S. Dist. LEXIS 107106. There, the court denied a defendant's motion for summary judgment in a § 64.1200(d) TCPA case, rejecting its consent argument by holding "[t]he Court cannot disregard the plain language of 47 C.F.R. § 64.1200(d) …. [E]ven if [defendant] only initiates telemarketing calls to customers who have given permission to receive such calls, it would still be required to maintain a do-not-call list to permit those customers to opt-out of getting telemarketing calls if they so desire." *Id.* at *16-17.

Imputing a consent inquiry into § 64.1200(d) would also contravene the purpose of the statute. The TCPA is a consumer protection statute which is remedial in nature and must be construed liberally. *See Legg v. Voice Media Group, Inc.*, 990 F. Supp. 2d 1351 (S.D. Fla. 2014); *accord Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002). Consumers have the right to revoke consent. *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1254-56 (11th Cir. 2014). The purpose of § 64.1200(d) is to ensure companies implement policies and procedures to protect that right. *TCPA Implementation Order*, 7 FCC Rcd. at 8767, ¶ 24. An unwritten "consent" defense turns the statute on its head. As a court in this district recently wrote:

> [Defendant] is essentially arguing that the contours of the class should be defined by its own recordkeeping. But that would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct.

*Reyes v. BCA Fin. Servs.*, Case No. 16-24077, 2018 U.S. Dist. LEXIS 106449, *38-39 (S.D. Fla. June 26, 2018). If "consent" is a defense, or revocation of consent is a prerequisite, to a claim under § 64.1200(d), a defendant "avoids legal responsibility for the full scope of its illegal conduct" by doing exactly what the statute prohibits: making telemarketing calls while intentionally keeping no records of who gave or revoked consent.

In the end, the statute means what it says: any company making any telemarketing call

must implement the required policies, procedures, and training *prior* to making that call. When a statute is clear, "the role of the judicial branch is to apply statutory language, not to rewrite it." *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000).

PU may claim that this is unfair, and that Plaintiff and the other examples provided are outliers. Maybe they are. Or maybe every single person who made a do-not-call request had that request ignored, or was threatened, or worse. Plaintiff only discovered these other examples because documents about them contained key words responsive to Plaintiff's discovery requests. Imagine what other examples are out there. Better yet, imagine what examples have been lost to PU's failure to implement the required policies and keep the required records. Is PU just unlucky? Or is it more likely that PU's culture—to enroll anyone who could be forced into it because "it's all about the numbers"—led to a systematic disregard of and disdain for do-not-call requests?

PU's failure to implement the policies and procedures required to track and honor do-not-call requests deprived us of the ability to definitively answer these questions, while also making the latter scenario more likely. It is that failure that forms the basis of the claim here. "We have no records of that" is not a defense to a claim that "you had no policies and procedures to keep records of that."[5] As another court put it: "If [defendant] … asserts that its internal do-not-call list is not properly maintained … all of its … outbound telemarketing calls violate [the] TCPA …[.]").*United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1014 n.21 (C.D. Ill. 2014).

## II.  <u>Facts Applicable to All Putative Class Members.</u>

PU is a for-profit university. To attend PU, students pay tuition. As PU testified, this tuition is the payment to purchase educational services from PU. Ex. J (Post Depo. Tr. 46:12-47:5). As part of selling these educational services to prospective students, PU conducts outbound telephone

---

[5] If Bob's job is to take notes on a meeting, and Bob does not take notes on the meeting, it is not proof that the meeting did not happen—it is proof Bob did not do his job.

calls. Ex. K (Post Depo. Tr. 141:9-142:2).

PU categorizes prospective students into "Leads" and "Opportunities". "Leads" and "Opportunities" are tracked in PU's CRM system. Ex. L (Post Depo. Tr. 60:8-12). PU differentiates a "Lead" from an "Opportunity" according to the progress made in the enrollment process. Ex. M (Post Depo. Tr. 107:5-8). "Leads" can be marked as "Rejected" and "Opportunities" can be marked as "Lost" or "Deferred." *Id.* (Post Depo. Tr. 107:9-109:16). "Rejected Leads" are those who were put into PU's CRM system but either expressed disinterest or never confirmed their interest in the first place, while "Lost Opportunities" are those persons who initially confirmed interest but then gave PU some reason to believe they were no longer interested or able to attend. *Id.*; Ex. N (Post Depo. Tr. 115:23-116:5; 119:13-22). "Deferred Opportunities" are those who indicated that they were not currently interested or able to attend school but invited PU to contact them in the future.[6] *Id.* (Post Depo. Tr. 113:23-115:22).

PU made telephone calls to "Rejected Leads" and "Lost Opportunities" to re-engage these once-prospective students and convert them into tuition paying students. Ex. O (Meehan Depo. Tr. 85:9-13); Ex. P (Post Depo. Tr. 164:13-166:16; 167:9-169:5; 186:4-187:12; 192:13-193:4 195:4-18; 200:22-201:5; 207:4-208:25, 289:21-291:14); Ex. D (Markham Decl., ¶ 44); Ex. I (Shigo Decl., ¶ 50). As a result, these calls share a uniform purpose. Because the proposed Class is restricted to those who received a call while they were marked as a "Rejected Lead" or "Lost Opportunity", the calls to Class members all share this uniform purpose. If that purpose is ultimately found to be telemarketing, PU was required to have in place a written do-not-call policy and related policies, procedures, and training before making these calls.

Defendant did not have a written do-not-call policy in place. Ex. G (Post Depo. Tr. 209:17-

---

[6] "Deferred Opportunities" are not included in the Class definition.

19). It also did not have training on any such policy or on how to document and honor do-not-call requests. Ex. D (Markham Decl., ¶¶ 15-16); Ex. I (Shigo Decl., ¶¶ 20-21). Though PU testified to the contrary, PU does not know of (nor has it produced) a single document supporting the existence of this training. Ex. H (Post Depo. Tr. 266:21-268:1; 294:19-295:3). Accordingly, if the calls were telemarketing, the calls to Class members violated § 227(c) through § 64.1200(d).

### III. Facts Applicable to Plaintiff Davis

Plaintiff called PU on August 9, 2017. [Second Am. Compl., Dkt. 67, ¶ 23.] On this call, Plaintiff inquired about enrolling at PU. *Id.* at ¶¶ 24. Plaintiff placed this telephone call from her cell phone number ending in 4599. *Id.* at ¶ 25. On August 11, 2017, PU called Plaintiff on her cell phone to follow up on previously sent financial aid paperwork. *Id.* at ¶ 28. On August 13, 2017, Plaintiff wrote an email to PU's employees Rita Francisco and Victoria Meehan stating she would no longer be able to move forward with attending Post. *Id.* at ¶ 29. Victoria Meehan is one of PU's Assistant Directors of Admissions. *Id.* at ¶ 30. On August 15, 2017, PU called Plaintiff on her cell phone and acknowledged receipt of the August 13 email, but stated that they had proceeded "so far in the process" that PU was "reluctant to close out" Plaintiff's file. *Id.* at ¶ 31. Plaintiff did not return this call. *Id.* at ¶ 32. On August 16, 2017, PU marked Plaintiff's file as "Opportunity Lost" in its CRM system. *Id.* at ¶ 33. Despite this, PU shortly resumed contacting Plaintiff via email and on her cell phone. *Id.* at ¶ 35. All communications after Plaintiff was marked as "Opportunity Lost" were attempts to get Plaintiff to "re-engage" with PU and enroll at PU. *Id.* at ¶ 36.

PU texted Plaintiff on August 25, 2017 and August 30, 2017. *Id.* at ¶¶ 39-40. On October 11, 2017, in response to an email encouraging enrollment, Plaintiff wrote PU an email stating "[p]lease stop emailing, texting, sms, calls, and voicemail! This is the third or fourth time I am asking to be removed from all of your lists." *Id.* at ¶¶ 51-54. Plaintiff made at least five other similar requests: on November 8, 2017 ("I have asked you and your colleagues to stop calling …

10

Please let this be the last communication regarding your school."), January 4, 2018 ("Please stop contacting me! Not interested!!"), January 11, 2018 (on an inbound phone call), April 4, 2018 (threatening legal action if contact did not stop), June 6, 2018 ("I'm not interested anymore! I have told everyone who has contacted me by phone and email!!"), and July 17, 2018 ("Please do not contact me regarding enrollment to Post University.") *Id.* at ¶¶ 63, 71, 75, 79, 88.

Nevertheless, in addition to the two texts mentioned above, PU called or texted Plaintiff on October 18, 2017, January 11, 2018, and July 17, 2018 and sent Plaintiff at least 11 marketing emails. *Id.* at ¶¶ 41-98. Plaintiff received these communications. These communications were attempts to get Plaintiff to enroll at Post University. All of the aforementioned communications occurred after Plaintiff's numerous do-not-call requests. The July 17 texts came after Plaintiff had specifically threatened legal action if the communications continued. During the July 17 text exchange, Plaintiff asked for PU's do-not-call policy. Instead of providing this information, PU wrote that it does not disclose student information, and that Plaintiff would not be contacted again. *Id.* at ¶ 88. Subsequently, Plaintiff placed a telephone call to PU's main office to ask for its do-not-call policy. *Id.* at ¶¶ 90-91. PU offered to email the policy to Plaintiff if it existed, but to date, Plaintiff has received no such policy. *Id.* at ¶ 94-96.

Remarkably, PU continued to contact Plaintiff by email ***after this lawsuit was served***. *Id.* at ¶¶ 97-98. Such persistence is PU's *modus operandi*. As both declarants swore, "no matter what a lead said or did, they were never truly free of [PU's] attempts to contact them and convince them to enroll at Post University." Ex. D (Markham Decl., ¶ 45); Ex. I (Shigo Decl., ¶ 51).

## DISCUSSION

### I. Legal Standard

"For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure

23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). Rule 23(a) requires that a putative class satisfy the prerequisites of "numerosity, commonality, typicality, and adequacy of representation." *Id.* For certification under Rule 23(b)(3), a putative class must satisfy the requirements "(1) that common questions of law or fact predominate over questions affecting only individual class members ('predominance'); and (2) that a class action is superior to other available methods for adjudicating the controversy ('superiority')." *Id.*

"Class certification is normal in litigation under § 227." *Chapman v. Wagener Equities, Inc.*, Case no. 09-cv-07299, 2014 U.S. Dist. LEXIS 16866, *9 (N.D. Ill. Feb. 11, 2014) (collecting cases certifying TCPA class actions at p. 55 n. 11). Numerous courts have certified actions alleging violations of § 64.1200(d). *See, e.g.*, *Cordoba*, 320 F.R.D. 582; *Allard v. SCI Direct, Inc.*, Case No. 16-cv-1033, 2017 U.S. Dist. LEXIS 120093 (M.D. Tenn. July 31, 2017); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015).

## II. <u>The Proposed Class Satisfies Rule 23(a)</u>

### a. **Article III Standing**

In a class action, only the named plaintiff needs standing. *See, e.g.*, *Venerus v. Avis Budget Car Rental, LLC*, 723 Fed. Appx. 807, 813 (11th Cir. 2018); *Vega*, 564 F.3d at 1265; *Mohamed v. Off Lease Only, Inc.*, 320 F.R.D. 301, 310 n.3 (S.D. Fla. 2017) ("We reject Defendant's contention that absent class members must have … standing.").

"The amount of proof required to establish standing varies depending on the stage of the litigation at which the standing issue arises." *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 609 (N.D. Ga. 1997). At the class certification stage, "the court looks beyond the pleadings but does not inquire into the merits of the case" and views the evidence "in the light most favorable to Plaintiffs." *Id.*

For Plaintiff to have Article III standing, she "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).

Where an intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit, "a plaintiff may show injury in fact by alleging [that] the violation of a procedural right granted by statute poses a 'risk of real harm' to a concrete interest." *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1186 (11th Cir. 2019) (citing *Spokeo*, 136 S. Ct. at 1549). "[A] great risk is not necessary to satisfy Article III's minimal demand for an identifiable trifle." *Id.* at 1188. "If Congress adopts procedures designed to minimize the risk of harm to a concrete interest, then a violation of that procedure that causes even a marginal increase in the risk of harm to the interest is sufficient to constitute a concrete injury." *Id.*

That is precisely what Congress did here. The TCPA is a statute related to the traditionally recognized tort of invasion of privacy. Privacy interests in the home and intrusions upon seclusion were long recognized in tort law. *See, e.g.* Restatement (Second) of Torts, § 652B. Intrusions could be made via telephone calls. *Id.* In Congressional findings accompanying the TCPA, Congress found that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy[.]" 105 Stat. 2394, § 2, ¶ 5; *see also Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) ("The TCPA was enacted to address certain invasive practices related to 'unrestricted telemarketing[.]'"). The policies and procedures found in § 64.1200(d) are meant to minimize the risk of invasion of privacy. PU's failure to implement those polices and procedures, at minimum, increased the risk that a call recipient's privacy would be invaded.

As a result, courts nationwide have found that receipt of a call made in violation of the TCPA is sufficient for Article III standing. *See, e.g.*, *Krakauer v. Dish Network, L.L.C.*, 2019 U.S.

App. LEXIS 16111, *15 (4th Cir. May 30, 2019) (finding standing in a § 227(c) case and writing "[t]he straightforward application of *Spokeo* … resolves this matter[.]"); *Cordoba*, 320 F.R.D. 582; *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351-52 (3d Cir. 2017); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).

The evidence here shows that Plaintiff received, more than one call from PU in a 12-month period. Ex. Q (Plaintiff's Inbound Call Logs, p. 1; Text Screenshots, pp. 8-11); Ex. R (Defendant's Log; Defendant's Responses to Interrogatory 10 and Request for Admission 20). These calls—October 18, 2017, January 11, 2018, and July 17, 2018 were received after Plaintiff was marked as a "Lost Opportunity" on August 16, 2017. Ex. R (Page 1, Row 3). As the purpose of calls to "Lost Opportunities" was to convert those persons into enrolled, tuition-paying students, the calls were telemarketing. PU has admitted to failing to implement, prior to making its calls, at least some of the policies and procedures required under the TCPA to ensure do-not-call requests are properly documented and honored. Ex. G (Post Depo. Tr. 209:17-19). These failures created a risk of real harm that Plaintiff's privacy would be invaded and that she would suffer a nuisance. Far from being speculative, these risks came to pass. Plaintiff made numerous explicit do-not-call requests, including as early as October 11, but continued to receive calls from PU. Ex. S (Plaintiff's written do-not-call requests, pp. 3, 8, 12, 16, 20).

While unnamed Class members do not need to show standing, the same logic applies to them. PU's failures led to the *actual* invasion of privacy of those Class members who received calls after making a do-not-call request and increased the risk of such invasion for everyone else.

Finally, the ability of a court to award statutory damages establishes redressability. *See Muransky*, 922 F.3d at 1185. Accordingly, Plaintiff has Article III standing.

   **b. Numerosity**

A class is sufficiently numerous if "joinder of all parties is impractical." Fed. R. Civ. P.

23(a)(1). Numerosity is a "generally low hurdle", and "a plaintiff need not show the precise number of members in the class." *Vega*, 564 F.3d at 1267 (citations omitted). Generally, less than twenty-one class members is inadequate, and more than forty is adequate. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

Numerosity is met, but the Class size depends on the definition of "received". Data analysis indicates approximately 36,000 Class members, using a definition of "received" that only includes the call being answered or a voicemail being reached, and excludes sent texts. These persons received an estimated 140,000 calls. This is based on PU's review of 750 randomly selected files out of 95,383 files marked as a "Lost Opportunity" (52 of 750 are Class members, or $6,613 \pm 235$ across the full dataset), and 750 randomly selected files out of 859,872 marked as "Rejected Lead" (26 of 750 are Class members, or approximately $29,809 \pm 1,067$ across the full dataset).[7]

However, this definition of "received" is too narrow. The factfinder should be permitted to infer that a successfully transmitted call or text was received. As the Eighth Circuit has held:

> A jury is generally permitted to infer that information sent via a reliable means such as the postal service or a telegram was received…. There is no principled reason why a jury would not be able to make the same inference regarding other forms of communication—such as facsimiles, electronic mail, and in-house computer message systems—provided they are accepted as generally reliable and that the particular message was properly dispatched.

*American Boat Co., Inc. v. Unknown Sunken Barge*, 418 F.3d 910, 914 (8th Cir. 2005); *see also Abdullah v. Am. Express Co.*, Case No. 12-cv-1037, 2012 U.S. Dist. LEXIS 184592, *13-14 (M.D. Fla. Dec. 19, 2012). Using this definition of "received", the estimated Class size increases to

---

[7] The raw results with Class members highlighted and phone numbers partially redacted are attached as Ex. T. Though the call dispositions therein often use abbreviations and shorthand, Ms. Shigo clarified these terms in her declaration: "SW" and "SWS" meant "spoke with student", "LM", "LVM", "VM", and "Left VM" all typically meant that a "VM" (i.e. voicemail) was left, and "NML" meant "No Message Left". Ex. I (Shigo Decl. ¶¶ 56-58). Calls marked "No Message Left" are considered "received" because this designation was used when a voicemail was reached but the caller did not leave a message. Ex. D (Markham Decl. ¶¶ 60-61).

approximately 40,000 persons who received approximately 170,000 calls and texts.

### c. Commonality

Commonality requires that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). In other words, it requires that claims of putative class members "depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Even a single common question will do." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 359). This presents a low hurdle for plaintiffs. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

The common questions for the Class include (i) whether during the Class period PU had a written policy for maintaining a do-not-call list; (ii) whether during the Class period PU trained its personnel engaged in any aspect of telemarketing on the existence and use of the do-not-call list; (iii) whether the uniform purpose(s) of the calls PU placed to Class members qualify those calls as telemarketing; (iv) and whether PU had policies and procedures in place to document and honor do-not-call requests. The resolution of any of these questions will affect all Class members. Accordingly, Rule 23(a)(2)'s commonality requirement is met.

### d. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). There must be a "sufficient nexus … between the claims of the named representatives and those of the class at large." *Vega*, 564 F.3d at 1275. This "is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Typicality is satisfied here.

16

Plaintiff received more than one call from PU in a 12-month period. These calls were received by Plaintiff after she had been marked as a "Lost Opportunity." Plaintiff's theory is that these calls were telemarketing and that at the time of the calls, PU did not have the policies, procedures, or training required under 47 C.F.R. § 64.1200(d). This is identical to the Class claim.

Any factual differences between Plaintiff and Class members are minor, and factual variations do "not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the Class." *Kornberg*, 741 F.2d at 1337. For example, it does not matter that Plaintiff may have come into PU's system via an inbound call instead of an internet form. A § 64.1200(d) claim does not hinge on supposed consent (or how that supposed consent was given). It also does not matter that Plaintiff, who made several do-not-call requests, may have arguably suffered greater damages than other Class members. "Differences in the amount of damages between the class representative and other class members do[] not affect typicality." *Kornberg*, 741 F.2d at 1337. Such variations do not impact the pattern and practice underpinning Plaintiff's theory, which is identical to that of the Class.

### e. **Adequacy**

To satisfy the adequacy of representation requirement of Rule 23(a)(4), the representative parties must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement extends to the named plaintiff and her counsel. *London v. Wal-Mart, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003). This requirement involves "two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy." *Id.* at 1189.

17

Plaintiff and her counsel satisfy both inquiries. Plaintiff and her counsel have prioritized the Class over themselves. Plaintiff's counsel has taken multiple depositions in Connecticut; located, identified, and obtained declarations from witnesses; served more than 50 requests for admission, 29 requests for production, and 15 interrogatories; reviewed nearly 18,000 pages of documents; and generally conducted this litigation in a thorough manner.

Furthermore, Attorney Glapion has been found to be adequate (and never inadequate) in other TCPA class actions. Attorney Glapion was appointed co-lead counsel in *Willis et al. v. iHeartMedia, Inc.*, 16-CH-02455 (Cook County Cir. Ct, Ill., 2016), which dealt with a novel issue of law under the TCPA and resulted in an $8.5 million settlement. Attorney Glapion was appointed lead counsel in *Strache v. SCI Direct, Inc.*, 17-cv-4692 (N.D. Ill.), which resulted in a $15 million settlement and remains one of the largest § 64.1200(d) TCPA settlements. Attorney Glapion was appointed co-lead counsel in *Griffith v. ContextMedia Health, Inc.*, 16-cv-2900 (N.D. Ill.), which resulted in one of the largest per-class-member recoveries in the history of the TCPA, with an average check amount of over $7,500. *See generally* Declaration of Jeremy M. Glapion.

While Plaintiff's counsel's adequacy in previous cases is not dispositive, it is a factor to be considered. *See, e.g.*, *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, Case No. 12-22330, 2014 U.S. Dist. LEXIS 177222, *16-17 (S.D. Fla. Dec. 23, 2014) (S.D. Fla. Dec. 24, 2014); *Chapman v. Worldwide Asset Mgmt., L.L.C.*, Case No. 04-cv-7625, 2005 U.S. Dist. LEXIS 18881, *15 (N.D. Ill. Aug. 30, 2005) ("That counsel has been found adequate in other cases is persuasive evidence they will be found adequate again.").

Attorney Sohn is also more than adequate to be appointed class counsel. Attorney Sohn has worked closely with Attorney Glapion in other TCPA matters. In addition, he has performed important, common benefit work in national class actions, most notably in MDL No. 2323 (*In re*

18

*NFL Football Players' Concussion Injury Litigation*), along with working closely with the court on opt-out litigation. Attorney Sohn has also achieved impressive results as trial counsel in a number of complex cases, including *Engle* progeny actions, medical negligence, and wrongful death cases. *See generally* Declaration of Brad R. Sohn.

For her part, Plaintiff has remained active, interested, and involved throughout this case. She has maintained constant and quick communication with her counsel, has asked incisive questions, has timely provided all requested documents and information, has reviewed case material, and has stayed attentive to the case status. She has done everything one would expect from a class representative. Plaintiff understands her duty to the Class and has, and will continue to, place the interests of the Class ahead of her own individual interests. *See generally* Declaration of Melanie Davis. Accordingly, Plaintiff and her counsel satisfy the adequacy requirement.

### f. Ascertainability

Courts have read Rule 23 to contain an implicit requirement that a proposed class be "adequately defined and clearly ascertainable." *Ocwen Loan Servicing, LLC v. Belcher*, 2018 U.S. App. LEXIS 18088, *7 (11th Cir. June 29, 2018) (citing *Carriuolo*, 823 F.3d at 984). Courts are split on whether this means a plaintiff must demonstrate an 'administratively feasible' method for determining class membership over and above Rule 23's express requirements. *Id.* A class does not need to be ascertained prior to class certification—it only needs to be ascertainable at some stage in the proceeding. *See, e.g. In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 403 (M.D. Fla. 2018); *Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 625 (N.D. Ala. 2013).

Here, the circuit split does not matter. The Class definition references objective criteria and it is administratively feasible for the Court to identify Class members. PU maintains records on which "Rejected Leads" and "Lost Opportunities" it called, when and how many times it called them, and the dispositions of its calls. For example, in an area of a prospective student's file called

the "Activities List", PU logs the "Type" of activity taken toward that prospective student. Ex. R; Ex. T. When the activity is "Call", PU notes the disposition of that call including, for example, if the prospective student or their voicemail was reached. *Id.* This was trained behavior. Ex. D (Markham Decl. ¶ 57.); Ex. U (Post Depo. Tr. 202:4-16.) In addition, PU maintains a drop-down menu which allows calls to be uniformly dispositioned as "Left Voicemail", "No Answer", "No Message Left", "Left Message With Someone Else", and "Hang Up", among others. Ex. T; Ex. V.

Indeed, PU has already conducted a small-scale review of its files to determine an estimated Class size, confirming that the necessary data is available. Ex. T. While Plaintiff understands that PU will have to undertake a review of more than 900,000 files to identify Class members, "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539-40 (6th Cir. 2012); *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015); *Owens v. Metro. Life Ins. Co.*, 323 F.R.D. 411, 416 (N.D. Ga. 2017).

PU also maintains address information for prospective Class members. The exemplar form PU provided to Plaintiff in response to an interrogatory asking PU to describe all sources through which PU obtains contact information shows that address, city, state, and zip are required fields. Ex. W (Response to Interrogatory No. 2).

Finally, there is no issue determining whether a number is a residential telephone number or a cell phone number. Logically speaking, very few—if any—of the Class member phone numbers are going to be business lines. Businesses do not typically apply to school, and if a number was provided to PU to discuss potential enrollment, it was being used for personal purposes. If this is a concern, it is possible to take a list of telephone numbers and determine the requisite subscriber information (including address information, if necessary). Ex. X (Verkhovskaya Decl., ¶¶ 25-34.)

Plaintiff can also obtain information from carriers. This process has been approved and used in similar circumstances. *See, e.g.*, *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245-50 (N.D. Ill. 2014) (900,000-plus member class ascertainable where reverse lookups and obtaining contact information from carriers were the proposed methods).

**III.** **The Proposed Class Satisfies Rule 23(b)(3)**

    **a.** **Predominance**

    "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Alderman v. GC Servs. L.P.*, Case No. 16-cv-14508, 2018 U.S. Dist. LEXIS 10205, *17 (S.D. Fla. Jan. 19, 2018) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)). It "focuses on the 'legal or factual questions that qualify each class member's case as a genuine controversy[.]'" *Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1233 (11th Cir. 2000). Not all questions must be common, but the common questions must predominate. *Klay*, 382 F.3d at 1254. Where "a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation." *Kernats v. Comcast Corp.*, Case No. 09-cv-3368, 2010 U.S. Dist. LEXIS 112071, *23 (N.D. Ill. Oct. 20, 2010). Predominance is met here.

        i.   Policies and Procedures

    The core of the Class claim is whether PU, prior to making its calls to Class members, had implemented the required policies and procedures. PU's policies and procedures are subject to generalized proof and predominate over individualized questions. If those policies and procedures were inadequate or non-existent during the Class period, they were inadequate or non-existent during all calls to Class members.

        ii.   Receipt of Calls

    There is no predominance issue regarding receipt of calls. By definition, everyone in the

Class "received" the calls and Defendant's own records demonstrate receipt. Ex. T.

       iii.  <u>The Purpose of the Calls.</u>

Whether the calls to Class members had a telemarketing purpose does not create individualized inquiries or defeat predominance. The predominance inquiry focuses on the *questions* underlying the issues in a given case—i.e. does the purpose of the calls qualify them as telemarketing?—and whether these questions can be answered on a class-wide basis. *See, e.g.*, *Rutstein*, 211 F.3d at 1233 (11th Cir. 2000).

With that in mind, the Class is restricted to those marked as a "Rejected Lead" or "Lost Opportunity" at the time of the calls. As PU testified, a file being marked as a "Rejected Lead" or a "Lost Opportunity" indicates that PU no longer considered the person to be in its enrollment pipeline. Ex. N (Post Depo. Tr. 115:23-116:5). As stated plainly by PU's employee Constance Reilly, a "Rejected Lead" means "it is a no." Ex. Y (Reilly Depo. Tr. 53:23-54:4).

Nevertheless, PU testified that it considered "Rejected Leads" and "Lost Opportunities" potential new enrollments. Ex. N (Post Depo. Tr. 117:5-16). It further testified that the reason for *all* calls to "Rejected Leads", and the sole trained reason for calls to "Lost Opportunities", were to re-engage those persons, see if they had any renewed interested in purchasing PU's education services, and to ultimately convert them into enrolled, tuition-paying students.[8] Ex. P (Post Depo. Tr. 164:13-166:16; 167:9-169:5; 186:4-187:12; 192:13-193:4 195:4-18; 200:22-201:5; 207:4-

---

[8] PU testified that "extremely infrequent[ly]" calls were made to "Lost Opportunities" that did not have these purposes. Ex. P (Post Depo. Tr. 164:23-165:16; 193:19-195:25). PU's witness could not provide any examples and referred to them as "outliers." *Id.* at 199:6-200:15. This testimony is contradicted by the two declarants. Ex. D (Markham Decl., ¶ 44); Ex. I (Shigo Decl., ¶ 50). Further, whether a call is telemarketing should be approached "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). A for-profit business is not making calls to former prospective students just to check up on them. In any event, this testimony is insufficient to defeat predominance. *See Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1309 n.35 (N.D. Fla. 2017),

208:25, 289:21-291:14). In addition, PU's Assistant Director of Admissions testified that Post would call "Closed Opportunities" because that person "could change their mind." Ex. O (Meehan Depo. Tr. 85:9-13). Both declarants also swore that the only reason to call "Rejected Leads" or "Lost Opportunities" would be to re-engage them and to convince them to attend Post. Ex. D (Markham Decl., ¶ 44); Ex. I (Shigo Decl., ¶ 50).

In other words, PU would call once-interested persons that it had come to subjectively believe were no longer interested to see if those persons had changed their mind and to move them through the enrollment/sales process. If the calls to "Rejected Leads" and to "Lost Opportunities" shared these purposes, then whether these purposes qualify the calls as telemarketing can be answered on a class-wide basis. This uniformity is what matters for predominance.

This uniformity also distinguishes this case from *Newhart v. Quicken Loans, Inc.*, Case No. 15-cv-81250, 2016 U.S. Dist. LEXIS 168721 (S.D. Fla. Oct. 12, 2016). In *Newhart*, the court held that because the purpose of the calls indisputably varied between putative class members, they were "not uniform in purpose" and therefore "the telemarketing issue cannot be resolved by common, classwide evidence." *Id.* at *11. For example, some calls were to complete a previously agreed transaction. *Id.* at *9-10; *see also Wick v. Twilio, Inc.*, Case No. 16-cv-914, 2016 U.S. Dist. LEXIS 151482 (W.D. Wash. Nov. 1, 2016).

These issues are not present here. The calls here were uniform: they were made to re-engage once-prospective students and to move them through the enrollment/sales process. Because of the objective restrictions in the Class definition, there are no issues sorting through calls to, for example, complete a transaction. If a "Lead" or "Opportunity" reached the point where they were simply completing a transaction (i.e. enrolling), they would not remain marked as "Rejected" or "Lost", and calls made at that point would not qualify them for Class membership. Ex. Z (Post

23

Depo. Tr. 278:11-279:3). Put another way, everyone marked as "Rejected" or "Lost" still needed to be convinced to buy PU's services, and PU made calls to those persons with that goal in mind.

iv.  <u>"Consent" Does Not Create Individualized Questions.</u>

Though consent is not relevant, as discussed on pages 5-8, PU is likely to raise it anyway. For its position, PU may cite to a series of cases with no relevance. For example, in an unpublished 11th Circuit case, the court wrote in passing that § 227(c)(5) prohibits an entity from making more than one "telephone solicitation" to the same person within a 12-month period. *Meadows v. Franklin Collection Serv.*, 414 Fed. Appx. 230, 235 (11th Cir. 2011). Besides being an unpublished and non-binding, opinion, this issue was neither briefed nor presented to the court. Instead, the court was focused on the fact that the calls were plainly not solicitations or telemarketing—they were debt collection calls. *Id.* at 236. The court even defined "telephone solicitation" using the definition for "telemarketing" found at § 64.1200(f)(12), rather than the definition of "telephone solicitation" at (f)(14). *Id.* at 236. It is more likely that the court paid no mind to the distinction between the two terms because the distinction was irrelevant to the case than it is that the court *sua sponte* chose to impute a consent requirement into the definition of "telemarketing".

Other cases have found that "invited calls" do not constitute "unsolicited telemarketing calls." *See, e.g.*, *Newhart*, 2016 U.S. Dist. LEXIS 168721. Besides being common sense, all such cases deal with § 227(b) of the TCPA, which expressly makes lack of consent an element of the claim. In other words, these cases would only be relevant if consent were relevant here. It is not.

Even if it were, consent could only create individualized inquiries if PU did not consistently document who made a do-not-call request—which would be a violation of the law at issue. PU cannot rely on its violations of the law to avoid liability to a class alleging those very violations. *Cf., e.g. Appleton Elec. Co. v. Advance – United Expressways*, 494 F.2d 126, 139 (7th Cir. 1974) ("[C]lass actions cannot be defeated by destroying records."). Otherwise, companies would be

incentivized to violate the TCPA *en masse. Reyes*, 2018 U.S. Dist. LEXIS 106449 at *38-39; *see also, e.g. Krakauer*, 311 F.R.D. at 393.

**b. Superiority**

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The more common issues predominate over individual issues, the more desirable a class action lawsuit will be[.]" *Klay*, 382 F.3d at 1269. Courts should also consider "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). A class action is superior here.

As discussed, common issues predominate. Further, no one has brought an individual case involving the same set of facts and legal issues presented here, and there is nothing to suggest that class members have a strong interest in controlling the prosecution of their individual claims. *See, e.g.*, *Parker v. Universal Pictures*, 2019 Case No. 16-cv-1193, U.S. Dist. LEXIS 59806, *22 (M.D. Fla. Feb. 28, 2019). To the contrary, given the large number of potential individual claims, and the relatively small amount of statutory damages, a class action is in the best interests of putative class members and the judicial system. *See Kron v. Grand Bahama Cruise Line, LLC*, 328 F.R.D. 694, 702 (S.D. Fla. 2018). Finally, as the Class claim deals with PU's policies and procedures, a class action avoids the risk of creating separate and conflicting standards to which PU must adhere. *Id.*

## CONCLUSION

Plaintiff Davis respectfully asks the Court for an order (i) certifying the Class, (ii) appointing Plaintiff as representative of the Class, (iii) appointing Jeremy M. Glapion and Bradford R. Sohn as lead counsel for the Class; and (iv) granting such further relief as the Court deems just.

**Dated:** July 5, 2019

s/ Bradford R. Sohn_____
Bradford R. Sohn
Fla. Bar. No. 98788
**THE BRAD SOHN LAW FIRM PLLC**
2600 South Douglas Rd, Suite 1007
Coral Gables, Florida 33134
Tel: 786.708.9750
Fax: 305.397.0650
brad@sohn.com

s/ Jeremy M. Glapion_____
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.965.8006
jmg@glapionlaw.com
(*Pro Hac Vice*)