# EXHIBIT D

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **MELANIE DAVIS**, on behalf of herself and all others similarly situated,<br><br>　　　　　　　　Plaintiff,<br>v.<br><br>**POST UNIVERSITY, INC.,**<br><br>　　　　　　　　Defendant. | Civil Case No.: 18-cv-81004<br><br>Judge: Hon. Roy K Altman<br>Magistrate Judge: Hon. Dave Lee Brannon |

## <u>DECLARATION OF SARAH MARKHAM</u>

1. My name is Sarah Markham and I declare, under penalty of perjury, that the following is true and correct.

2. I further declare that the following is based on my own personal knowledge.

3. I further declare that I am competent to state the following, that I have not made the following statements under any duress or coercion, that I am of legal age and sound mind, and that I am not under the influence of any substances or conditions that would impair my memory or ability to make the below statements.

4. From approximately May 2016 to January 2017, I was an employee at Post University.

5. During my employment, my title was ADP Admissions Counselor.

6. ADP stands for Accelerated Degree Program.

7. Admissions Counselors were broken into "teams" of admissions counselors, which would consist of approximately 10-15 Admissions Counselors and an Admissions Team Lead.

8. My job responsibilities included making telephone calls to encourage and convince prospective students to enroll at Post University, interview prospective students, and ensure and pressure interested students complete the admissions process.

9. As part of my job, I would make 80 to 100 calls per day, which was in line with my understanding of Post's expectations.

10. I would characterize most of my calls to prospective students as attempts to "sell" those prospective students on Post University and to convince them to attend.

11. During my time at Post, I was essentially a telemarketer.

12. I was also expected to conduct 3-4 interviews per day with prospective students, which could take forty-five minutes or more.

13. The expected number of calls and interviews would fluctuate with each "module", which is essentially a fresh calling period where metrics and expectations would be re-calibrated and re-set depending on the success of the previous modules and needs of the school.

14. From the time I first reached out to a lead up until that lead officially registered in classes, I was expected to continue to "sell" to them and encourage them to take the necessary steps to enroll.

15. At no point during my time at Post University was I trained on or made aware of any company-wide "do not call" policy.

16. To the best of my knowledge, there was no "do not call" policy, written or otherwise, at the company.

17. Whether and how to document a "do not call" request was, to the best of my knowledge, left to the discretion of individual Admissions Counselors or individual teams.

18. At no point during my time at Post University was I trained on or made aware of any access to the national "do not call" registry or trained on or made aware of how to confirm telephone numbers to which I made telephone calls were not on that registry.

19. To the best of my knowledge, there was no way to filter out leads that had asked not to be called or were on the national "do not call" list.

20. I was specifically told to call a lead at least ten times.

21. This ten-call requirement applied regardless of a "do not call" request or a call recipient saying they were not interested.

22. On numerous occasions, I reached an individual who had claimed to have previously asked us not to call him or her.

23. I was taught how to overcome "objections" and how to convince reluctant or disinterested prospective students to change their minds.

24. When a call or other interaction with a prospective student concluded, I was able to document the interaction or create a task based on that interaction, either by selecting a pre-created item from a list, by manually typing in notes, or both.

25. While there were several pre-created items, there was no "Do Not Call" pre-created item.

26. If an Admissions Counselor like myself wanted to flag a lead as "Do Not Call", we could do this either by manually typing "Do Not Call" into the notes for that call or by rejecting the lead.

27. If the lead had become an opportunity, we could also mark that file as "Opportunity Lost".

28. To the best of my recollection, a "lead" became an "opportunity" when that lead was successfully contacted and seemed receptive to attending Post.

29. The "Opportunity Lost" and similar designations were "catch-all" designations for those leads who had progressed far enough into the process to become an "Opportunity" but who,

for one reason or another, were unable to do so (for example, changed mind, did not complete all of the required documents, were not qualified).

30. To the best of my recollection, Admissions Counselors at Post often used "Opportunity Lost" to flag "do not call" requests made by opportunities.

31. Just because a person was marked as a "Rejected Lead" or "Opportunity Lost" does not mean, however, that the person would no longer be called.

32. In fact, lost opportunities and other old or rejected leads would be called as each new class session approached, in hopes of re-engaging the lost opportunity and convincing them to enroll in the upcoming class session.

33. Lost opportunities and other old or rejected leads would also be called by Admissions Counselors who needed calls to meet their daily expected call volume.

34. This frequently occurred given the expectations of interviews and call volume.

35. For example, if I were to conduct three 45-minute interviews during a day, I still felt pressured to make the other 80-100 calls despite the shortened amount of time to do so.

36. When I was faced with such a time crunch, I would often call old leads, wrong numbers, or dead numbers, knowing that those leads would either not pick up the phone or would hang up the phone quickly.

37. I am aware of other Admissions Counselors doing the same.

38. I am not aware of anyone being reprimanded for doing so.

39. In addition, supervisors would pull leads or opportunities that were old, rejected, or lost opportunities and circulate those leads to all the different "teams" of Admissions Counselors.

40. All of these leads were expected to be called during what was known as a "Power Hour."

41. The persons to be called during these "Power Hours" were provided on a list separate from the CRM system.

42. We could, and were expected to, look up these persons in the CRM system before calling them.

43. However, we were obligated to call them regardless of what the previous call dispositions stated, including if they had been noted as someone not to call.

44. The purpose of every call to a "lost opportunity" or otherwise previously-rejected lead was to "get them back" or, in other words, re-engage that person with Post University and to encourage them to apply to and/or enroll at Post University.

45. My general impression is that no matter what a lead said or did, they were never truly free of our attempts to contact them and convince them to enroll at Post University.

46. In addition, during our interviews with prospective students, we were expected to ask for "references."

47. We then made files for each of the references provided and treated those references as leads.

48. The high-pressure approach outlined above is the primary reason I left Post University.

49. I documented, in general terms, my concerns about Post's high-pressure tactics to Post University upon my departure.

50. In a January 5, 2017 letter to Post University's Human Resources department, I wrote, among other things:

   a. "I find that Post University has no mission other than being profitable."

    b. "I find myself working in a call center, being told to manipulate uneducated people into taking thousands of dollars in student loans after a 20 minute conversation."

    c. "At Post, the implication was to enroll anyone who could be forced into it."

    d. "I still was pressured to get documents just for the sake of getting them in. How many times did I hear 'We only have one ITE on the day!'" (ITE means an "intent to enroll" form.)

51.    In addition to calls, we would also communicate with leads and opportunities (new or old) via email.

52.    Many of the emails that were sent out were sent out in bulk using a "mail merge."

53.    We were never trained to or, to the best of my knowledge, expected to keep emails.

54.    I deleted my emails as I saw fit.

55.    For example, if I was "done" with a prospective student, or if I needed to clean up my inbox, I would delete emails.

56.    To the best of my knowledge, this was the standard practice among employees.

57.    When calls or texts were made to prospective students, including rejected leads and lost opportunities, I was instructed to document that a call or text was made, as well as the disposition of that call (such as a summary of the call content if a person was reached, whether a voicemail was reached or left, whether the called person promptly hung up, and various other possibilities).

58.    It is my understanding that other Admissions Counselors were instructed to do the same.

59. For calls, I could type in the result or disposition of a call manually and/or I could select a pre-created disposition from a dropdown menu.

60. These included self-explanatory pre-created dispositions such as (or similar to) "Left Voicemail" (which I understood should be used when I placed a call and left a voicemail), "Hang Up" (which I understood should be used when I placed a call, it was answered, but the line hung up), "Voicemail Full" (which I understood should be used when I placed a call, reached a voicemail, but was unable to leave a message because the voicemail was full), and "Voicemail not set up" (which I understood should be used when I placed a call and reached a message saying that the voicemail had not been set up).

61. Another pre-created disposition was "No Message Left", which I understood should be used when I placed a call, reached a voicemail, but chose not to leave a message.

62. I would estimate that at least half of my calls to rejected leads or lost opportunities were picked up or reached the dialed number's voicemail system.

63. While I do not recall exactly how many unique rejected leads or lost opportunities I reached more than once (either by someone picking up or my call reaching their voicemail), it was in excess of 40.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 19, 2019 (date).

_Sarah Markham_
Sarah Markham