# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| **KATHRYN REILLY,**<br>    **Plaintiff**<br><br>V.<br><br>**POST UNIVERSITY, INC.,**<br>    **Defendant** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:       OCTOBER 10, 2017 |

## COMPLAINT

### INTRODUCTION

1.  This is an action to redress gender and disability discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as Amended, 42 U.S.C. § 2000e *et seq*, the Americans with Disabilities Act ("ADA"), 42 USC § 12101 *et seq.*, § 31-51(q) of the Connecticut General Statutes, and the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statutes § 46a-60(a)(1) *et seq.*

### JURISDICTION

2.  Jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. § 1332. Supplemental jurisdiction over Plaintiff's state law claims is based on 28 U.S.C. § 1364. Plaintiff filed her claims with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC") on or about February 6, 2017. Plaintiff received a release of jurisdiction from the EEOC on September 17, 2017 and the CHRO on August 31, 2017.

### PARTIES

1

3. Plaintiff, Kathryn Reilly, is an individual who resides at 1275 Winsted Road, Unit 314, Torrington, Connecticut 06790.

4. The Defendant, Post University, Inc. is a Delaware corporation with its principal place of business located at 800 Country Club Road, Waterbury, Connecticut 06723.

**FACTS**

5. Plaintiff is a female with 18 years of experience in academia.

6. In September 2014, Plaintiff was hired by Defendant as the Director of Main Campus Admissions. Plaintiff officially began full-time employment on October 6, 2014.

7. As Director of Main Campus Admissions, Plaintiff reported directly to the President of the University, Dr. Don Mroz.

8. During Plaintiff's employment, she oversaw the complete operations of the Main Campus Admissions office, including all planning, budgets, staff supervision and training, and coordinated all recruitment and enrollment activities. Plaintiff directed a staff of 12.

9. In addition, Plaintiff led the implementation of Main Campus Admissions CRM, established new merit scholarship award scales, increased the application pool and managed an annual operating budget in excess of $270,000.

10. Plaintiff's performance was favorably received and she was well liked by her subordinates, peers and superiors.

11. In January of 2016, Post University hired a new CEO, John Hopkins. In March of 2016, Hopkins hired a Chief Enrollment Services Officer, Bobby Reese.

12. In April 2016, Troy Harris from Enrollment Management Consultants was hired as a consultant to focus on online enrollment.

13. In May 2016, Mr. Reese advised Plaintiff that she would no longer report to Dr. Mroz, but would report directly to Mr. Reese. This change was supposedly made to maintain consistency in the enrollment procedures. Plaintiff was assured that her position was not changing.

14. During June of 2016 Mr. Reese and Mr. Harris discussed with Plaintiff setting up a scheme to recruit students. The proposed scheme would involve sending employees from the Admissions department, which Plaintiff managed, to local high schools, and having them gain entrance to the school by any means necessary, such as falsely stating that they had an appointment with the school guidance counselor or teacher. Under the scheme, once inside, the staff members were to wander through the school hallways until they found a teacher willing to let them speak directly to students, at which point they would talk to the students and attempt to persuade them to apply to and attend Post University. This was not to be a system of "cold calling"; staff members were to do their research ahead of time and know the specific names of guidance counselors and teachers so their statements that they had appointments would sound credible. Plaintiff was surprised and dismayed by this suggestion.

15. Plaintiff advocated against the implementation of any such scheme. She stated that this scheme directly conflicts with the processes that local high schools already had in place to allow universities to recruit students, such as college fairs and student visits to campuses. Plaintiff also pointed out that this scheme was unethical and inappropriate in that it embraced trespassing, intentionally making false statements, and breaching school safety / security procedures. Plaintiff reminded them that school safety has become very important in recent years, and that schools have implemented their safety procedures to protect against the very type of trespass that Mr. Reese and Mr. Harris were suggesting. Plaintiff also stated that this scheme

3

would place employees at risk as they could be arrested. Plaintiff stated that it would be improper to encourage employees to engage in illegal behavior.

16. Thereafter, while Plaintiff was on vacation from June 27 through July 2, 2016, Mr. Reese waged a concerted campaign to find fault with her job performance. He conducted regular meetings with her staff where he questioned the quality of Plaintiff's leadership and performance. Plaintiff's staff later reported that the process made them uncomfortable.

17. Also during Plaintiff's absence, Mr. Reese made enormous substantive changes to Plaintiff's department without her input or approval. This included meeting schedules, training schedules, international scholarship criteria, and decisions relating to test scores.

18. On July 11, 2016, Plaintiff met with Mr. Reese, Mr. Harris and her entire staff. During the course of the meeting, Mr. Harris made derogatory and unfounded comments regarding Plaintiff's performance, and called into question the scholarship scale she had implemented. This meeting was clearly designed to embarrass Plaintiff and further undermine her position with her staff.

19. On August 17, 2016, Plaintiff met with Mr. Harris and Mr. Reese to discuss various admissions policies. In this meeting, they forcefully stated that the scheme as they had previously described "would be happening". Plaintiff reiterated her concerns including those regarding legality and ethics related to the scheme. Plaintiff's comments were disregarded and dismissed. During the meeting Mr. Harris became increasingly hostile, disrespectful and condescending toward Plaintiff. This included speaking to Plaintiff in a demeaning manner, and calling into question everything and anything Plaintiff said.

20. On August 18, 2016, Mr. Harris and Mr. Reese met with Plaintiff again. They stated in an even more aggressive manner that the scheme would move forward and directed her

4

to implement it. When Plaintiff stated that she could not put employees at risk and encourage them to engage in unethical and illegal behavior, they responded that if she did not follow their directives she would be singlehandedly responsible for forcing the "closing of the university." Mr. Harris and Mr. Reese were again disrespectful and condescending to Plaintiff. They even attempted to intimidate her. In this meeting, they accused her of deficient performance and made false statements to support their comments.

21. In this meeting, Mr. Harris also adamantly stated several times that Plaintiff had to adopt an open enrollment policy at Post Main campus. Plaintiff stated that the University had made a decision by Committee in the Spring of 2016 that Post Main campus would become test optional but not that it would be open enrollment, and explained that these are two separate and distinct things. She informed Mr. Harris about the University's prior open enrollment policy as of 2011 that had been changed due to adverse consequences to the University as a result thereof. Mr. Harris insisted that he was not interested in the prior practice and that since the Committee had adopted a test optional policy, Plaintiff had to implement an open enrollment policy. Mr. Hopkins came in and out of the meeting but did not make any comments on the substantive issues.

22. During the week of August 22, 2016, while attending a meeting with Mr. Reese, he mentioned that he had doctor's appointments scheduled and then described the medical issues that required the appointments. At this time, Plaintiff disclosed that she also had doctor's appointments scheduled due to an ongoing issue with her thyroid. Plaintiff also shared with him that her disability had caused multiple and significant complications with her health, including significant weight gain. Plaintiff stated that if he could have seen how she looked a year ago, he wouldn't recognize her because of the weight gain. Mr. Reese responded, "Yeah, I've heard."

5

23. A group meeting with leaders of several of Defendants' departments was scheduled for August 25, 2017. Prior to the meeting, Plaintiff repeatedly asked Mr. Reese what she needed to do to prepare for the meeting. He repeatedly responded that Plaintiff would not be presenting at the meeting and that there was nothing specific she needed to do to prepare for the meeting.

24. During the course of the meeting, various attendees spoke regarding their area of management and expertise. It was clear that they had a presentation prepared and were advised prior to the meeting that they would be expected to present and they were prepared to do so.

25. During the meeting, Mr. Reese asked Plaintiff to present the enrollment numbers. Plaintiff was completely blindsided, as she had been specifically advised numerous times prior to the meeting that she would not be asked to present anything. Prior to the meeting, Mr. Reese and Plaintiff had agreed to 350 students as the goal for enrollment numbers for the Fall of 2017. During the meeting, Mr. Reese modified his position and advocated for the goal to be set at 500, something that everyone involved, including Mr. Reese, knew was impossible to achieve. Mr. Reese was setting Plaintiff up to fail. He knew that Plaintiff would not be able to agree to the unrealistic number and that this would become a negative focus in the meeting. He was attempting to cast Plaintiff in a negative light before the attendees at the meeting.

26. On September 7, 2016, Mr. Reese came to Plaintiff's office, accompanied by Don Kelly, Vice President of Human Resources, and advised Plaintiff that her employment was being terminated.

27. On September 8, 2016, the University hired a less qualified male replacement for Plaintiff's position. This individual has virtually no traditional Main Campus experience.

6

28. Upon information and belief, the recruiting scheme described above wherein members of Plaintiff's former staff were to go to high schools, gain entrance into the school by making false statements, and then roam the school until they found a teacher willing to let them talk to students was actually implemented after the termination of Plaintiff's employment.

29. Upon information and belief, on several occasions Plaintiff's former staff members were caught by school administrators and were escorted off the property by school officials.

30. Upon information and belief, the goal for student enrollment was reset to 350 after Plaintiff's departure. Mr. Reese advocated for the 500 number in order to cast Plaintiff in a negative light and knowing that she would not be able to agree to such an unrealistic goal.

**COUNT ONE:     RETALIATION – C.G.S. § 31-51(q)**

1-30. Paragraphs 1-30 from above are incorporated herein as Paragraphs 1-30 of Count One as if fully set forth herein.

31. Plaintiff expressed opposition to the unethical recruitment scheme Defendant sought to implement, which scheme would have required Defendant's staff to trespass, make false statements to public school officials and risk the possibility of being arrested.

32. The scheme would violate the group meeting format in the way of college fairs that had been adopted by public schools.

33. Plaintiff's speech opposing the scheme as described above involved public safety as well as the safety of Defendant's employees. Making false statements to public school officials to gain entry into public schools involves breaching their security protocols. Plaintiff's speech was based on expressing concerns regarding unethical and illegal conduct.

7

34. Plaintiff's speech was an exercise of free expression, and was guaranteed by the First Amendment to the United States Constitution and Section 3, 4 and 14 of the First Article of the Constitution of the State of Connecticut.

35. Defendant retaliated against Plaintiff for her speech based on a matter of public concern. Defendant subjected Plaintiff to retaliatory discipline and discharge.

36. Defendant's conduct in subjecting Plaintiff to discipline and discharge constitutes a violation of § 31-51(q) of the Connecticut General Statutes.

37. As a result of Defendant's conduct, the Plaintiff has and continues to suffer damages including but not limited to mental anguish, severe emotional distress, humiliation, embarrassment and loss of enjoyment of life.

**COUNT TWO:** **TITLE VII - GENDER DISCRIMINATION**

1-30. Paragraphs 1-30 from above are incorporated herein as Paragraphs 1-30 of Count One as if fully set forth herein.

31. Plaintiff was bullied and harassed after her reporting structure changed.

32. The intimidation and harassment Plaintiff experienced from Mr. Reese and Mr. Harris was inconsistent with the manner in which Mr. Reese and Mr. Harris interacted with males.

33. Plaintiff's sex was a factor in the manner in which Mr. Reese and Mr. Harris treated Plaintiff, and in particular the aggressive posture they took with her.

34. Defendant's conduct constitutes a violation of Title VII.

32. Based on Defendant's conduct, Plaintiff has suffered damages including economic damages, loss of enjoyment of life, emotional distress and attorneys' fees and costs.

**COUNT THREE**: **ADA – DISABILITY DISCRIMINATION**

8

1-30. Paragraphs 1-30 from above are incorporated herein as Paragraphs 1-30 of Count One as if fully set forth herein.

31. Based on the above, Plaintiff was subjected to discrimination based on her disability in violation of the ADA.

32. Plaintiff's thyroid abnormality constitutes a disability under the ADA.

33. Defendant's representatives bullied and harassed Plaintiff, and attempted to intimidate her, because they perceived her as someone who was weak due to her disability.

34. Based on Defendant's conduct, Plaintiff has suffered damages including economic damages, loss of enjoyment of life, emotional distress and attorneys' fees and costs.

**COUNT FOUR:** **CFEPA – DISCRIMINATION - Gender**

1-33. Paragraphs 1-30 of Count Two from above are incorporated herein as Paragraphs 1-33 of Count Four as if fully set forth herein.

34. Plaintiff was subjected to discrimination based on her sex / gender in violation of the CFEPA.

35. Based on Defendant's conduct, Plaintiff has suffered damages including economic damages, loss of enjoyment of life, emotional distress and attorneys' fees and costs.

**COUNT FIVE:** **CFEPA – DISCRIMINATION - Disability**

1-30. Paragraphs 1-30 from above are incorporated herein as Paragraphs 1-30 of Count Five as if fully set forth herein.

31. Plaintiff was subjected to discrimination based on her disability in violation of the CFEPA.

32. Plaintiff's thyroid abnormality constitutes a disability under the CFEPA.

33. Defendant's representatives bullied and harassed Plaintiff, and attempted to intimidate her, because they perceived her as someone who was weak due to her disability.

34. Based on Defendant's conduct, Plaintiff has suffered damages including economic damages, loss of enjoyment of life, emotional distress and attorneys' fees and costs.

**WHEREFORE**, Plaintiff demands a trial by jury and judgment against Defendant as follows:

1. Economic damages including, but not limited to: lost wages and benefits such as pension, 401k, stock, restricted stock and stock options, deferred compensation, bonuses, health, dental, life and disability benefits with interest from the date said sums were due;

2. Non-economic compensatory damages for emotional distress, harm to reputation, and loss of enjoyment of life and equitable relief pursuant to 42 U.S.C. § 1981a, the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, and Connecticut General Statutes §§46a-104 and 31-51q;

3. Attorneys' fees and costs of this action, including litigation costs and expert fees, pursuant to 42 U.S.C. § 1981a, the Americans with Disabilities Act, as amended, 42 U.S.C. §12101 and Connecticut General Statutes §§46a-104 and 31-51q;

4. Punitive damages pursuant to 42 U.S.C. § 1981a and Connecticut General Statutes § 31-51(q);

5. Interest pursuant to Connecticut General Statutes § 37-3a; and

6. Such other further monetary or injunctive relief as this Court deems necessary and proper.

PLAINTIFF

By: /s/ Heena Kapadia 11869
      Heena Kapadia (ct11869)
      Law Office of Heena Kapadia
      572 White Plains Road
      Trumbull, CT 06611
      Phone: 860-913-1199
      *hkapadia@heenakapadialaw.com*