# EXHIBIT I

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **MELANIE DAVIS**, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br>v.<br><br>**POST UNIVERSITY, INC.**,<br><br>                    Defendant. | Civil Case No.: 18-cv-81004<br><br>Judge: Hon. Roy K Altman<br>Magistrate Judge: Hon. Dave Lee Brannon |

## DECLARATION OF SUSANNA SHIGO

1. My name is Susanna Shigo and I declare, under penalty of perjury, that the following is true and correct.

2. I further declare that the following is based on my own personal knowledge.

3. I further declare that I am competent to state the following, that I have not made the following statements under any duress or coercion, that I am of legal age and sound mind, and that I am not under the influence of any substances or conditions that would impair my memory or ability to make the below statements.

4. From approximately October 2016 to May 2017, I was an employee at Post University.

5. During my employment, my title was ADP Admissions Counselor.

6. ADP stands for Accelerated Degree Program.

7. Admissions Counselors were broken into "teams" of admissions counselors, which would consist of approximately 8-14 Admissions Counselors, Team Lead and an Assistant Director.

8. My job responsibilities included making telephone calls to encourage prospective students to enroll at Post University, interview prospective students and ensure that those interested prospective students complete the admissions process. I also assisted enrolled students with logging in and completing their first assignment.

9. I was often expected to make 100 calls per day, even if I had an interview that lasted over an hour or was in the office for a shortened period of time.

10. This 100-call-per-day expectation was pushed by my team's Assistant Director, Jennifer Peffers and Team Lead, Christine Hagan Cappiello.

11. Approximately three times per day, Jennifer Peffers, Christine Hagan Cappiello, or a different Assistant Director, would send out a call report of everyone in the office, containing information such as number of outbound calls made, number of inbound calls received, and average call lengths.

12. Jennifer Peffers would also often send out ITE (intent-to-enroll) and PCAS (interview) reports to the team to show who received an ITE that day and who conducted a PCAS.

13. Eventually, there was a whiteboard on the wall tracking these statistics, so everyone could see how the rest of the team was doing.

14. When accreditors came to the office to make sure things were going okay, we were instructed to take down this white board tracker.

15. My understanding of the purpose of these emails and the whiteboard was to promote competition and encourage team members to make more calls.

16. Every eight weeks our team would sit down with Jennifer Peffers and Christine Hagan Cappiello, where they would set the expected call volume, regardless of how long the calls

ran, how many students we were expected to enroll during that module, and how many calls per day we were expected to make for that module.

17. I would characterize most of my calls to prospective students as attempts to pitch Post University and to convince those prospective students to attend.

18. From the time I first reached out to a lead up until that lead registered, became a student, and logged in and participated in classes, I was expected to continue to "sell" to them and encourage them to take the necessary steps to enroll, log in, and participate in the classes they registered for.

19. Employees were reprimanded for not hitting the target number of calls or enrollments.

20. At no point during my time at Post University was I trained on or made aware of any company-wide "do not call" policy, or trained on any proper or standard way to interpret, document, or note "Do Not Call" requests.

21. To the best of my knowledge, there was no "do not call" policy, written or otherwise, at the company.

22. Whether and how to document a "do not call" request was, to the best of my knowledge, left to the discretion of individual Admissions Counselors or individual teams.

23. At no point during my time at Post University was I trained on or made aware of any access to the national "do not call" registry or trained on or made aware of how to confirm telephone numbers to which I made telephone calls were not on that registry.

24. To the best of my knowledge, there was no way to filter out leads that had asked not to be called or were on the national "do not call" list.

25. I was specifically told to call a lead at least ten times regardless of whether the call recipient made his or her disinterest clear or asked us to stop calling.

26. On numerous occasions, I reached an individual who had claimed to have previously asked us not to call him or her.

27. If a lead was "rejected" after fewer than ten attempts, employees would be questioned by an Assistant Director as to why.

28. Only a "valid reason" would justify rejecting a lead before ten attempts.

29. Even if a number was not in service, we would have to call it ten times before rejecting the lead.

30. Valid reasons included being unfit to attend (e.g. severe disability or did not graduate high school or possess a GED).

31. A call recipient's stated lack of interest or do not call request was generally not treated as a valid reason to reject the lead, because, as we were often told, students "could change their minds."

32. If a lead said "do not call" within the first ten calls, we were expected to continue to call that lead until we hit ten calls.

33. When a call or other interaction with a prospective student concluded, I was able to document the interaction or create a "to do" item based on that interaction, either by selecting a pre-created item from a list, by manually typing in notes, or both.

34. While there were several pre-created items, such as "left message" and "not in service", there was no "Do Not Call" (or similar) pre-created item.

35. If an Admissions Counselor wanted to flag a lead as "Do Not Call", we had to manually type "Do Not Call" (or similar) into the notes for that call.

36. If an Admissions Counselor wanted to flag an opportunity as "Do Not Call", we would need to mark it as "Opportunity Lost" and then manually type in the reason.

37. To the best of my recollection, a "lead" became an "opportunity" when that lead had completed most of a PCAS to qualify the lead or had completed an intent to enroll form.

38. There were separate screens and "groups" within Oracle, which was our CRM system, for tracking brand new leads, leads who had completed an interview, and opportunities.

39. The "Opportunity Lost" and similar designations were "catch-all" designations for those leads who had progressed far enough into the process to become an "Opportunity" but who, for one reason or another, were unable to do so.

40. To the best of my recollection, we could manually type in a reason why we marked a lead as "Opportunity Lost".

41. To the best of my recollection, Admissions Counselors at Post would sometimes use "Opportunity Lost" to flag "do not call" requests.

42. Just because a person was marked as "Opportunity Lost" does not mean, however, that the person would no longer be called.

43. Lost opportunities and other old or rejected leads would be called as each new class session approached, in hopes of re-engaging the lost opportunity and convincing them to enroll in the upcoming class session.

44. Assistant Directors would often pull lost opportunities or rejected leads and re-circulate those leads among all the teams.

45. During these "power hours", all of these leads were expected to be called, regardless of history with the lead, and regardless of whether our discretion told us not to call them.

46. Similarly, when I first started at Post, during my two-week training with Shannon Madore we were provided stacks of old leads and instructed to make calls to those old leads no matter what.

47. These training lists contained leads over two years old and were often called by different new hires.

48. Lost opportunities and other old or rejected leads would also be called by Admissions Counselors who needed calls to meet their daily expected call volume.

49. Admission's Counselors would often call old leads, numbers that were not in service, or rejected leads.

50. A purpose of every call to a "lost opportunity" or otherwise previously-rejected lead was to re-connect with someone previously interested and to convince them to attend Post University.

51. My general impression is that no matter what a lead said or did, they were never truly out of our system, and would eventually begin receiving calls again.

52. In addition to calls, we would also communicate with leads and opportunities (new or old) via email.

53. Many of the emails that were sent out were sent out in bulk using a "mail merge."

54. We were never trained to or, to the best of my knowledge, expected to keep emails.

55. When an Admissions Counselor like myself would manually note an interaction with a prospective student or the result of a call or text to that prospective student, we would often use shorthand and abbreviations.

56. For example, "SW" and "SWS" typically meant "spoke with student" (i.e. the call reached the lead, opportunity, or student it was meant to reach, and we spoke with them).

57. "LM" ("Left Message"), "LVM" ("Left Voicemail"), "VM" ("Voicemail"), and "Left VM" all typically meant that a voicemail message was left ("VM" is short for voicemail).

58. "NML" meant "No Message Left."

I declare under penalty of perjury that the foregoing is true and correct. Executed on ____6/24/2019____ (date).

DocuSigned by:
Susanna Shigo
17D430B33EBB423...
Susanna Shigo