# EXHIBIT N

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3    ------------------------------)
 4    MELANIE DAVIS,                )   CASE NO.:
 5             Plaintiff,           )   18-81004-CIV
 6        vs.                       )
 7    POST UNIVERSITY, INC.,        )
 8             Defendant.           )
 9    ------------------------------)
10
11
12        DEPOSITION OF SEAN COOLEY, INDIVIDUALLY
13    AND AS DESIGNATED REPRESENTATIVE OF POST UNIVERSITY
14               DATE:  APRIL 11, 2019
15                    HELD AT:
16                WYNDHAM SOUTHBURY
17               1284 Strongtown Road
18              Southbury, Connecticut
19
20
21
22
23
24    Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74
25
```

Page 113

1  about the admissions process, I believe it is the
2  documents that are provided to the admissions during
3  that training process.
4      Q.   Is it your understanding of this flowchart
5  that it captures the enrollment process?  Sorry, not
6  this 11106.
7           Is it your understanding of the flowchart
8  that's provided to admissions counselors that that
9  flowchart captures the admissions process?
10     A.   Right.  And I believe a lot of these
11 categories and stages would be omitted from that
12 because it's not part of their topical lens on what
13 they are looking at in a student during the Oracle
14 time.
15          MR. GLAPION:  And I'll ask you,
16 Adam, because that has not been produced.  We've
17 asked for all training documents multiple times so
18 if there is a flowchart that reflects something that
19 is provided in training, I would like that provided
20 fairly soon.
21          MR. BOWSER:  Okay, we can look.
22 BY MR. GLAPION:
23     Q.   Have you ever heard the term "deferred
24 opportunity"?
25     A.   Yes.

1  Q. Under what circumstances would an
2  opportunity be deferred?
3  A. It was just another way to close a student
4  in the system. It was intended to be used for when
5  somebody had expressed interest at a later time,
6  deferring them to another -- for another time, but
7  Closed/Lost was the common practice which is why
8  it's not even on here.
9  Q. Were admissions counselors trained on best
10 practices in terms of marking an opportunity
11 lost/closed or deferred?
12 A. I think that was probably on a case by
13 case, by I know that closed/lost was the common
14 practice. Closed/deferred was seldom used,
15 regardless of the student suggesting that they might
16 move forward at another juncture.
17 Q. I recognize your testimony that it was
18 seldom used. What was the proper way to mark
19 someone who expressed interest at a later date?
20 A. Close/deferred.
21 Q. But it just -- you know, as things
22 happened, it became sort of practice to just
23 lost/close everything is what you are saying;
24 correct?
25 A. Right.

Page 115

```
 1      Q.   So what is the proper way to mark someone
 2   who is an opportunity that said they are not
 3   currently interested, but Post could continue to
 4   contact them because they may be interested in the
 5   future?
 6      A.   I'm sorry, can you repeat the question?
 7      Q.   Sure.  What is the proper way to mark an
 8   opportunity that says the following:  I am not
 9   currently interested, but you can continue to
10   contact me because I may be interested in the
11   future?
12      A.   I believe there would be a reject reason
13   available for that in the closed/reject code.
14      Q.   Would they be properly marked as
15   lost/closed or lost/deferred?
16      A.   Closed.  Yeah, they would be
17   closed/deferred, yes.  But they could be closed/lost
18   as well.
19      Q.   But the technically proper way is
20   closed/deferred?
21      A.   The technically proper way would be
22   closed/deferred.
23      Q.   Are closed and -- don't mind me while I
24   find another exhibit -- but are closed and lost
25   opportunities considered part of the pipeline that
```

```
 1   we discussed previously?
 2        A.    No.
 3        Q.    Are rejected leads considered to be part
 4   of the pipeline that we discussed previously?
 5        A.    No.
 6        Q.    Are rejected leads considered, even after
 7   rejected, potential new enrollments?
 8        A.    They could be.
 9        Q.    I'm asking not whether they could end up
10   as new enrollments; I'm asking are they considered a
11   category from which new enrollments could be mined,
12   if you will?
13        A.    Is the question could?
14        Q.    Did Post view rejected leads as a category
15   of potential new enrollments even after they were
16   marked as rejected?
17        A.    They could, yes.
18        Q.    Who could?
19        A.    You can procure an enrollment out of a
20   rejected lead.
21        Q.    I understand.  I'm trying to clarify your
22   answer.
23              So you are saying a rejected lead could
24   eventually become an enrolled student?
25        A.    Yes.
```

1    Q.   I'm asking at the time a lead is rejected,
2    are they still considered a potential new enrollment
3    by Post?
4    A.   I guess I don't understand the question.
5    Q.   There are a lot of rejected leads; is that
6    fair to say?
7    A.   Yes.
8    Q.   In that lot of rejected leads, does Post
9    view those as still an avenue to potentially obtain
10   new enrollments?
11   A.   Yes.
12   Q.   Same question with respect to lost/closed
13   and lost opportunities.  After they are marked as
14   closed/lost, are they still considered a potential
15   avenue for new enrollments?
16   A.   Yes.
17              MR. GLAPION:  Can we mark this as --
18   what are we on -- 18, and please hand it to the
19   witness when you can.
20                (Exhibit 18, Emails, Bates Numbers
21                PU00000062 through 64, marked for
22                identification.)
23   BY MR. GLAPION:
24   Q.   Have you seen this document before?  If
25   you need time to look at it still, that's fine.

Page 118

1   A.   Yes.
2   Q.   What is this email or, excuse me, what
3   does this document appear to be?
4   A.   An email.
5   Q.   From who?
6   A.   From Melanie Davis.
7   Q.   To whom?
8   A.   Carissa Valluzzo.
9   Q.   Who is Carissa Valluzzo?
10  A.   Admissions counselor at Post.
11  Q.   Is she still an admissions counselor at
12  Post.
13  A.   Yes.
14  Q.   The email you see at PU 62 from Melanie
15  Davis to Carissa Valluzzo states, Thank you for
16  following up with me.  I am unable to attend school
17  at time -- I believe that was a typo -- but at time.
18  I was very interested at the time I contacted your
19  school.  Shortly afterwards, my life was interrupted
20  by unpleasant events and I am no longer able to
21  continue my plan for school.
22       Do you see that?
23  A.   Yes.
24  Q.   And then it says, You may close my file.
25       Do you see that?

Page 119

1  A.  Yes.
2  Q.  What is the technically proper way that
3  Melanie Davis's file should have been marked after
4  this email was received?
5  A.  Closed/deferred I would think, but again,
6  anything, closed/lost.
7  Q.  I understand your testimony that
8  closed/lost was primarily used, but based on the
9  wording of this email, the technically proper way,
10 your testimony is that it would be closed/deferred;
11 correct?
12 A.  Yes.
13 Q.  Is it fair to categorize rejected leads
14 and lost/closed opportunities as people who were
15 once in the enrollment pipeline and are no longer in
16 the enrollment pipeline?
17 A.  For closed opportunities?
18 Q.  Closed opportunities, yes.
19 A.  Yes.
20 Q.  And the same for rejected leads?
21 A.  The leads never made it to the pipeline,
22 but yes.
23 Q.  When a lead or opportunity expressed
24 disinterest when you -- actually, let's do a lead.
25     When a lead said, you know what, I'm no