# EXHIBIT P

Page 1

1             UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF FLORIDA

3    -----------------------------)

4    MELANIE DAVIS,                )   CASE NO.:

5              Plaintiff,          )   18-81004-CIV

6          vs.                     )

7    POST UNIVERSITY, INC.,        )

8              Defendant.          )

9    -----------------------------)

10

11

12        DEPOSITION OF SEAN COOLEY, INDIVIDUALLY

13   AND AS DESIGNATED REPRESENTATIVE OF POST UNIVERSITY

14              DATE:  APRIL 11, 2019

15                  HELD AT:

16               WYNDHAM SOUTHBURY

17              1284 Strongtown Road

18              Southbury, Connecticut

19

20

21

22

23

24   Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

25

Page 164

1    record.  Post is a for-profit business; correct?

2        A.    Correct.

3        Q.    And your testimony right now is that Post

4    would place telephone calls to people that are no

5    longer in the pipeline, don't have potential in the

6    pipeline, out of the goodness of its heart?

7                  MR. BOWSER:  Objection to form.

8        Q.    You can answer.  Is that your testimony?

9        A.    What I had mentioned is that not every

10   call that's placed to a closed opportunity is made

11   with the sole intention of bringing that person back

12   into the Exhibit 16 funnel.

13       Q.    Okay, good.  Now we have a lot to unpack

14   with that answer.

15             Does every call made to a lost opportunity

16   include the intention of reestablishing a

17   relationship with that lost opportunity, not the

18   sole opportunity, is that one of the purposes of the

19   call to a lost opportunity?

20                  MR. BOWSER:  Objection to form.

21       A.    I'm sorry, you began with is that the

22   only.

23       Q.    I didn't, but I'll correct it.  Is every

24   call made to a lost opportunity made with one of the

25   purposes of that call being to reestablish a

Page 165

1   relationship with Post University?

2       A.    Not every call.

3       Q.    Would you say the majority of calls?

4       A.    Yes.

5       Q.    The vast majority of calls?

6       A.    Yes.

7       Q.    Would you say 90 percent of the calls?

8       A.    Yes.

9       Q.    95 percent of the calls?

10      A.    I can't say with certainty, but --

11      Q.    But on occasion someone will --

12      A.    The majority, the majority of calls that

13  are made to a closed opportunity or a closed lead

14  would be to see if someone is interested, if now is

15  a better time for someone to move forward with their

16  education with us.

17      Q.    And we established that a closed

18  opportunity was no longer in that process we talked

19  about in Exhibit 16; correct?

20      A.    Correct.

21      Q.    So when you say to see if someone is

22  interested, if now is a better time for someone to

23  move forward with their education with us, to see if

24  you can get them back into that enrollment process;

25  is that correct?

1      A.    Correct.

2      Q.    And I know you can't give me an exact

3  figure, but on occasion, it seems to be a very small

4  on occasion, someone who developed a really strong

5  relationship just might call to say, hey, how are

6  you, but I want to be clear that the expected use of

7  those calls to lost opportunities was to attempt to

8  reengage them with the enrollment process; is that

9  correct?

10     A.    The ones that they are reaching out to,

11 because again, that's contingent on why they were

12 rejected, but yes, that's the majority purpose of

13 attempting to make contact.

14     Q.    And you said upwards probably of

15 90 percent; is that fair?

16     A.    That's fair.

17     Q.    In terms of rejected leads, because we've

18 been focused on opportunities, would rejected leads

19 continue to be called?  Excuse me.  Let me rephrase.

20     A.    Excuse me, pardon me.

21     Q.    Do you need more water?

22     A.    I might actually.

23                    (Pause.)

24            THE WITNESS:  I'm not sure if you

25 asked a question.

Page 167

```
 1              MR. GLAPION:  I don't remember -- I
 2    can't remember anything.  That's why I have the
 3    realtime.
 4    BY MR. GLAPION:
 5       Q.    In terms of rejected leads, because we've
 6    been focused on opportunities, would rejected leads
 7    be called by the admissions department?
 8       A.    It depends which ones.
 9       Q.    But at least some of the rejected leads
10    would be called by the admissions department;
11    correct?
12       A.    Correct.
13       Q.    And the calls to the rejected leads, did
14    they have that same purpose we discussed with --
15    excuse me -- did the majority of them have the same
16    purpose we discussed with lost opportunity, to
17    reengage them with the sales process, or excuse
18    me --
19       A.    It should be probably all of them because
20    if they never made it to the opportunity phase, then
21    there was no conversation that transpired, so how
22    could rapport be established at that juncture.
23       Q.    So the goal of calling a rejected lead was
24    to --
25       A.    To see if --
```

Page 168

1      Q.    -- I don't even want to say reengage, to

2   engage them with the process outlined in 16?

3      A.    The goal of calling a rejected lead is to

4   see if a prospective student that had once filled

5   out a request for information about going to school

6   with us, that we were unable to connect to in a

7   timely manner in the past, due to reasons we were

8   unable to identify, to see if now is the better

9   time.

10     Q.    To see if they are still interested;

11  correct?

12     A.    Correct.

13     Q.    In purchasing education services from

14  Post; correct?

15     A.    In moving forward with their education

16  with Post, correct.

17     Q.    Is there a difference between what you

18  said and I said?

19           I know we keep fighting on this, I don't

20  like it either, but is there a difference between

21  what you said and I said besides the words?

22     A.    We are providing a service and the service

23  has a fee attached to it so, we can call it whatever

24  we'd like.

25     Q.    So when you say it's correct that the

Page 169

1    calls were to see if they are still interested, is

2    it fair to say you are seeing if they are still

3    interested in obtaining the service that Post

4    provides that has a fee attached to it?

5         A.    Yes.

6         Q.    Thank you.  It's A little tortured, but we

7    got there.

8               Who is Kimberly Williams?

9         A.    She is now an assistant director in the

10   admissions department.

11        Q.    Does Post consider her to be a good

12   employee?

13        A.    Yes.

14        Q.    And do you believe or does Post believe,

15   excuse me, that she has an understanding of her

16   expectations in her job?

17        A.    Absolutely.

18        Q.    And personally, do you believe she is a

19   good employee?

20        A.    Yes.

21               MR. GLAPION:  Can this be marked as

22   Exhibit 21 please.

23                    (Exhibit 21, Email, Bates Number

24                    PU00008459, marked for

25                    identification.)

Page 186

1    experience is like being a Post University eagle.

2         Q.    Okay.

3         A.    That is what I deduce from this email.

4         Q.    Fair enough.  Going back to what we

5    discussed -- we are done with this document for

6    now -- I believe you said that with respect to

7    rejected leads, all of the calls to rejected lead

8    would be an attempt to begin the process outlined in

9    Exhibit 16; is that accurate?  We are talking about

10   rejected leads.

11        A.    Yes.

12        Q.    And this process is -- I'm not going to

13   ask that again, I don't even want to go there again.

14             These calls then were ultimately part of

15   efforts by Post to enroll students at Post

16   University; is that fair?

17        A.    These efforts were put in place to provide

18   information to a prospective student that had

19   requested information that we were unable at that

20   point -- up until that point to provide them with.

21        Q.    To begin this process?

22        A.    To begin that process.  I just wanted to

23   preface it with that first part.

24        Q.    And this process is the process by which

25   students are enrolled?

Page 187

1      A.    Correct.

2      Q.    So these calls are necessarily then part

3    of an effort to enroll students?

4      A.    Yes.

5      Q.    And was one of the purposes to convert

6    someone who was previously rejected into an enrolled

7    student?

8      A.    Yes.  I'm confused.

9      Q.    Was one of the purposes of the calls to

10   rejected leads to convert them ultimately into an

11   enrolled student?

12     A.    Yes.

13     Q.    Did Post track rejected leads that were

14   subsequently converted into enrolled students?

15     A.    Not to the granularity that they probably

16   should.

17     Q.    Did you track rejected leads that were

18   converted into enrolled students?

19     A.    No.

20            MR. BOWSER:  Can we go off the record

21   for a second?

22            MR. GLAPION:  Sure.

23     (Recess taken from 1:07 p.m. to 1:09 p.m.)

24   BY MR. GLAPION:

25     Q.    Before the break, I asked if you had

Page 192

1    that email or, excuse me, this information?

2        A.    I'm assuming that he did.

3        Q.    But you don't actually remember, you are

4    assuming just because of who you sent it to;

5    correct?

6        A.    Correct.

7        Q.    You don't remember what is meant by

8    converted in this email; correct?

9        A.    Right.  It could be any number of those

10   things.  It's probably converted into opportunity

11   or -- yeah, I mean, I can't say with any certainty,

12   so it would only be speculatory.

13       Q.    I asked a moment ago whether the purpose

14   of calling rejected leads were part of Post's

15   efforts to enroll students, and I think we agreed

16   that because it's to start them on the process that

17   it was?

18       A.    Of course.

19       Q.    And same with respect to lost/closed

20   opportunities, I know you said there were some calls

21   that were more checkup calls, but --

22       A.    The majority.

23       Q.    The 90 percent plus majority were part of

24   Post's efforts to enroll students; is that correct?

25       A.    Correct.

Page 193

1      Q.    And to essentially reengage those lost

2   opportunities with Post, I'm talking about the

3   90 percent for now; is that fair?

4      A.    That's fair.

5      Q.    And with respect to the 10 percent of

6   calls, was there any business purpose to those

7   10 percent of calls?  And I'm saying 10 percent, I

8   know it's fuzzy there, but just for ease of

9   communication, for those 10 percent of calls, was

10   there any business purpose for Post just calling a

11   student or, excuse me, a former prospective student

12   just to check up on them?

13      A.    A former opportunity?

14      Q.    Let me say that again.  Was there any

15   business purpose to calling a lost opportunity in

16   those 10 percent of calls you said were just to

17   check up on them?

18      A.    I'm sorry, can you rephrase that.

19      Q.    Was there any business purposes to calling

20   a lost opportunity for those small subset of calls

21   which we said was probably 10 percent or less that

22   was just to sort of check up on them?

23      A.    No.

24      Q.    No business purpose?

25      A.    Right.  The 10 percent is probably high,

Page 194

1    but no.  Again, it's a checkup call, it's the

2    minority.

3        Q.    Did admissions counselors have discretion

4    on when to just do one of those checkup calls?

5        A.    Again, it was extremely infrequent.  It's

6    nothing outlined in any of the process.

7        Q.    Was it encouraged for them to make these

8    checkup calls to those lost opportunities that they

9    did not intend or hope to enroll?

10       A.    I can't speak to that.  I don't know.

11       Q.    Were they trained to do that?

12       A.    No.

13       Q.    So it's sort of -- it wasn't a policy to

14   do that is what you are saying; correct?

15       A.    Was calling an old -- a closed opportunity

16   because something mitigating happened in their life

17   and a rapport was established and you are calling

18   them to see how they are doing, not necessarily with

19   the intent of moving them through Exhibit 16 again,

20   is that a trained process?  No.

21       Q.    And that process you just described where

22   a call is made to a closed opportunity without an

23   intent of moving them through Exhibit 16 happened

24   very infrequently, as you said?

25       A.    Yes.  These are leads more than likely.

1       Q.    I'm off of this document, I'm sorry.

2       A.    Okay, I'm still looking at this; I'm

3   trying to put the pieces together.

4       Q.    I'm just back to those particular calls to

5   opportunities now, because we've established that

6   calls to rejected leads were part of getting them on

7   to this Exhibit 16 process.

8             I'm asking now about lost and closed

9   opportunities.  Almost always the calls were -- one

10  of the goals of the calls were to get them back onto

11  the process in Exhibit 16; is that fair to say?

12      A.    Yes.

13      Q.    Very infrequently is the process you just

14  described where there was a call without that

15  intent; correct?

16             MR. BOWSER:  Objection, asked and

17  answered.

18      A.    Yes.

19      Q.    And that those infrequent calls, that was

20  not a trained policy?  I'm just trying to establish

21  whether they were trained to do that or if it was

22  something sort of an admissions counselor did on

23  their own.

24      A.    To my knowledge, it wasn't part of the

25  training process whatsoever.

Page 199

1    I'm asking, and that's why I want to parse through

2    it because my question is related to calling lost

3    opportunities, and the story you gave was about

4    calling an enrolled student and then getting someone

5    who had never requested information.

6         A.    I know and I appreciate that they are not

7    perfectly aligned.  My story that I provided for you

8    does not completely align with your original ask,

9    and I understand what your original ask was, but

10   that was -- it's been a long time since I've been in

11   that position, so I can't really give you any other

12   real examples of me doing that besides making a

13   story up.  That one resonated with me, so I can

14   reflect on it as if it was last month rather than

15   eight years ago.

16        Q.    I understand.

17        A.    So that's why I went in that direction.

18        Q.    I appreciate that.  And it's sort of these

19   relatively unique circumstances, I guess I'll call

20   them, that in your opinion would lead to

21   non-enrollment related calls to lost opportunities;

22   is that fair?

23        A.    Forgive me.

24        Q.    These are relatively sort of extreme and

25   unique circumstances that would necessitate those

Page 200

1    calls?

2         A.    Right.  They are the outliers for sure.

3         Q.    And I know you can't give me an exact

4    number, and I wouldn't expect you to give me an

5    exact number; you thought 10 percent -- you said

6    might be high.  I mean, how many calls does Post's

7    admissions counselors make in a given day?

8         A.    I am not certain.  I don't have those

9    figures.  I mean, making an outreach to a once open

10   opportunity that was now closed because something

11   mitigating happened in their life and you are

12   checking up on them, it's not an everyday

13   occurrence.  It's not an every admissions counselor

14   occurrence.  It's just something that some people do

15   based on the unique circumstance of the prospect.

16        Q.    Okay.  I think we've established sort of

17   what I was trying to in terms of, there is always

18   going to be outliers in any call?

19        A.    Of course.

20        Q.    Theoretically, a rejected lead you can

21   have an outlier where someone placed --

22        A.    The original question, the reason why I

23   answered it as such is you said, is the only reason

24   to make a contact an opportunity, which is why we

25   arrived here, is with the intention of reengaging

Page 201

1    them and bringing them back into this process, and I
2    wanted to provide you that that is not the sole
3    reason for an outreach to a closed opportunity.
4         Q.    Is that the sole trained reason?
5         A.    Yes.
6         Q.    Were all rejected leads intended to be
7    called again?
8         A.    No.
9         Q.    And similarly, were all lost or closed
10   opportunities intended to be called again?
11        A.    No.
12        Q.    Between July 30th, 2014 and July 30th,
13   2018, were admissions counselors permitted to use
14   third-party services in connection with their
15   communication with the leads and opportunities?
16        A.    Can you provide the dates for me once more
17   please.
18        Q.    July 30, 2014 and July 30, 2018.
19        A.    Yes.
20        Q.    Did this include Google Voice?
21        A.    Yes.
22        Q.    What about TextNow?
23        A.    Yes.
24        Q.    Are there any others that you can think of
25   in that vein?

Page 207

1      Q.    And there are multiple stages in general

2   in the admissions process at Post; correct?

3      A.    Correct.

4      Q.    So once a rejected lead now moves into the

5   process on Exhibit 16, would you characterize one of

6   the roles of an admission counselor to encourage

7   them to complete the steps necessary to move through

8   those steps?

9      A.    I would use the word "nurture" them versus

10  encourage, but yes, that is the objective.

11     Q.    Is nurture to you broader or narrower than

12  encourage?

13     A.    Again, the admissions counselors' scope of

14  their job is outside of just the documentation.

15  It's to provide the information to the student,

16  conduct a PCAS, and then help them, nurture them

17  through the additional steps that are needed in

18  order to complete their enrollment file.

19     Q.    And nurture also could or does nurture

20  also include encouragement, hey, complete this step

21  or you are close, do this step, that kind of thing?

22     A.    Sure, yes.

23     Q.    So there is an encouragement element to

24  nurturing would you say?

25     A.    Absolutely.

1    Q.    And not only is there encouragement, there

2  is actual help with the actual documentation and

3  helping to fill it out; correct?

4    A.    That depends.

5    Q.    If they have questions about how to do

6  something, the admissions counselor is there to

7  help?

8    A.    That depends.

9    Q.    So admissions counselors are there really

10  to confirm interest to start; correct?

11    A.    (Nodding in the affirmative.)

12    Q.    Yes?

13    A.    Sorry, yes.

14    Q.    The court reporter cannot get head nods.

15          And then sort of, as you said, nurture

16  them through the process once the interest is

17  confirmed; correct?

18    A.    Yes.

19    Q.    And part of that may include assisting

20  with questions; correct?

21    A.    Yes.

22    Q.    And part of that includes encouragement to

23  complete the various steps required at each stage;

24  correct?

25    A.    Correct.

Page 209

```
 1      Q.    And it's the same thing with respect to
 2  lost opportunities; correct?  There's a lot of
 3  questions I asked so let me try again.
 4            A lost opportunity is reached; an
 5  admissions counselor is gauging if they are
 6  interested or capable of now continuing the process
 7  that they previously started; correct?
 8      A.    Most of the times, yes.
 9      Q.    That's the 90 plus percent versus the
10  small subset we discussed; correct?
11      A.    Yes.
12      Q.    And those admissions counselors then, they
13  take sort of the same role as we just discussed;
14  they nurture those prospective students through the
15  process in 16?
16      A.    Yes.
17      Q.    Between July 30th, 2014 and July 30th,
18  2018, did Post have a written Do Not Call policy?
19      A.    No.
20      Q.    Between July 30th 2014 and July 30, 2018
21  if someone requested Post's written Do Not Call
22  policy, what would be provided?
23      A.    I don't know.  I'm not certain.
24      Q.    Did anyone ever request -- to the best of
25  your knowledge, did anyone ever request the Do Not
```

Page 289

1    were unable to do so when they originally requested,

2    and we are hoping to catch them and provide them

3    with that information regarding our institution like

4    they had originally asked for.

5         Q.    But that is captured on this chart;

6    correct?

7         A.    I don't understand the question.

8         Q.    That providing information to a rejected

9    lead or -- excuse me, providing information that was

10   requested is captured on the flowchart in

11   Exhibit 16; correct?

12        A.    If we are calling the interview part of

13   that providing the information, which I think we

14   discovered before, then yes, that is captured on the

15   chart.

16        Q.    I believe your testimony was that

17   providing the information is part of the PCAS.

18        A.    Yes.

19        Q.    So that's captured on this chart?

20        A.    Correct.

21        Q.    So the goal when contacting rejected leads

22   is to put them back into this process; correct?

23        A.    The goal is to provide -- yes, to put them

24   back in this process so that we can provide the

25   information that they had requested, yes.

Page 290

1      Q.      Which is part of the process?

2      A.      Which is part of the process.

3      Q.      And same with respect to opportunities,

4   lost opportunities, Post calls or texts some

5   categories of lost opportunities; correct?

6      A.      Correct.

7      Q.      And the goal with contacting those

8   categories of lost opportunities is to get them into

9   or back into this process, correct, for the

10  majority, the vast majority of those calls?

11     A.      Correct.

12     Q.      And as part of the communication with

13  rejected leads, one of the roles is to encourage or,

14  excuse me, your word was "nurture," is to nurture

15  them through this process; correct?

16     A.      Correct.

17     Q.      And part of nurturing those rejected leads

18  or now converted leads through this process is to

19  encourage them at the various steps; correct?

20     A.      Yes.

21     Q.      And with respect to opportunities and lost

22  opportunities, once they enter back into this

23  process, the goal is to continue to nurture them

24  through this process; correct?

25     A.      Correct.

Page 291

1      Q.    And part of nurturing is encouraging;

2    correct?

3      A.    Where needed, yes.

4      Q.    And that ultimately, encouraging them

5    through this process or nurturing them through this

6    process, will potentially lead to enrollment;

7    correct?

8      A.    It could.

9      Q.    So this process that we are describing

10   that we are nurturing leads and opportunities

11   through, is it fair to say that Post is trying to

12   nurture them from being a new lead into an enrolled

13   student?

14     A.    Yes.

15     Q.    Last couple of questions.  Post does not

16   have a -- excuse me.

17           During the time period July 30, 2014 to

18   July 30, 2018, Post did not have a written Do Not

19   Call policy; correct?

20     A.    To my knowledge, there is not a written Do

21   Not Call policy.

22     Q.    And in your capacity as Post's corporate

23   designee, does Post have a written Do Not Call

24   policy?  Did it -- excuse me, did Post have a

25   written Do Not Call policy between those dates?