## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **MELANIE DAVIS**, on behalf of herself and all others similarly situated,<br><br>                 Plaintiff,<br>v.<br><br>**POST UNIVERSITY, INC.,**<br><br>                 Defendant. | Civil Case No.: 18-cv-81004-RKA<br><br>Judge: Hon. Roy K Altman<br>Magistrate Judge: Hon. Dave Lee Brannon |

**Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment**

Contents

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

   I.   RELEVANT LAWS ........................................................................................................ 1

      *a.*   *47 U.S.C. § 227(c)* .............................................................................................. 1

      *b.*   *47 C.F.R. § 64.1200(d)* ...................................................................................... 2

      *c.*   *Consent and/or an Established Business Relationship are Irrelevant to a Claim Under § 64.1200(d)* ....................................................................................................... 3

   II.   BACKGROUND FACTS ................................................................................................. 6

      *a.*   *PU's Business.* ...................................................................................................... 6

      *b.*   *"Leads" and "Opportunities".* ............................................................................. 6

      *c.*   *PU's Communications with Plaintiff, and Plaintiff's "Do-Not-Call" Requests.* ........... 7

LEGAL STANDARD ....................................................................................................... 10

DISCUSSION .................................................................................................................. 10

   I.   ELEMENTS ................................................................................................................. 10

   II.   PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ............................................. 11

      *a.*   *Plaintiff's Telephone Number Ending in 4599 is a Cellular Telephone Number.* ......... 11

      *b.*   *Plaintiff Received More Than One Call in a 12-Month Period from PU.* .................... 11

      *c.*   *PU's Calls to Plaintiff Were Telemarketing.* ........................................................ 11

         i.   Definition of Telemarketing. ....................................................................... 12

         ii.   PU's Calls to "Rejected Leads" and "Lost Opportunities." ............................ 14

         iii.   PU's Calls to "Rejected Leads" and "Lost Opportunities" are Telemarketing. ........ 16

         iv.   PU's Calls to Plaintiff. ............................................................................... 18

CONCLUSION ................................................................................................................ 19

## INTRODUCTION

Defendant Post University, Inc. ("PU") is a for-profit university which generates revenue primarily from tuition paid by enrolled students. As part of its efforts to increase enrollment (and thus revenue), PU places telephone calls to prospective and once-prospective students. This includes calls to persons like Plaintiff and absent class members, who, at the time of the calls, had previously given PU reason to believe they were no longer interested or able to enroll. PU testified as follows about the purpose of such calls:

> Q. Was one of the purposes of the calls to rejected leads to convert them ultimately into an enrolled student?
>
> A. Yes.
>
> ***
>
> Q. I'm asking now about lost and closed opportunities. Almost always the calls were – one of the goals of the calls were to get them back onto the [enrollment process]; is that fair to say?
>
> A. Yes.

Central to this case is whether these purposes qualify the calls as telemarketing, defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" They do. As the above (and other) testimony, the record, and common sense show, the calls were telemarketing. Accordingly, Plaintiff moves for summary judgment on this issue and the less disputed issues that Plaintiff's number is a cellular telephone number and that she "received" more than one call from PU in a 12-month period.

## BACKGROUND

### I.     Relevant Laws

### a.     47 U.S.C. § 227(c)

The TCPA is intended to protect consumers from invasions of privacy caused by unrestricted telemarketing. *Congressional Findings Accompanying TCPA*, 105 Stat. 2394, § 2, ¶ 5

("Unrestricted telemarketing … can be an intrusive invasion of privacy[.]"); *see also Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) ("The TCPA was enacted to address certain invasive practices related to 'unrestricted telemarketing[.]'). The TCPA accomplishes this by mandating certain practices, compelling the FCC to enact various regulations, and creating private rights of action for enforcement of its provisions.

Most relevantly, when enacted, § 227(c) of the TCPA compelled the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object"; to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems' … )"; and to "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(A, E). Section 227(c)'s private right of action gives these regulations teeth, allowing "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" to bring an action to recover $500 to $1,500 per call.

The FCC has prescribed several regulations under § 227(c), including 47 C.F.R. § 64.1200(d), the regulation at issue here.[1] Section 64.1200(d) requires companies to implement minimum policies and procedures for maintaining an internal, company-specific do-not-call list *before* making any telemarketing telephone calls.

### b.    47 C.F.R. § 64.1200(d)

Section 64.1200(d) was first enacted in 1992 (and was then codified at § 64.1200(e)). 7 FCC Rcd 8752, 8753 (Oct. 16, 1992). The FCC, pursuant to § 227(c)'s mandate, found that "the

---

[1] This was briefed at length in Plaintiff's Opposition to Defendant's Motion to Dismiss. [Dkt. 71, pp. 5-12.]

company-specific-do-not-call list … is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." 7 FCC Rcd at 8765, ¶ 23. It "mandate[d] procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24. The regulation, now found at § 64.1200(d), states:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber[2] unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

These procedures "must meet" minimum standards. Companies making telemarketing calls must maintain a written policy for maintaining a do-not-call list; train and inform its telemarketers on the existence and use of the do-not-call list; record do-not-call requests when made; and honor do-not-call requests. *Id.* at (d)(1), (2) , (3) , (6). These policies and procedures *must* be implemented prior to making telemarketing calls. *Id.* "[I]f [the procedures in 47 C.F.R. § 64.1200(d) are not implemented, each call made by a telemarketer constitutes a violation of the TCPA and the FCC regulations[.]" *Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 587 (N.D. Ga. 2017); *see also, e.g.*, *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1014 n.21 (C.D. Ill. 2014).

### c.    Consent and/or an Established Business Relationship are Irrelevant to a Claim Under § 64.1200(d)[3]

PU has repeatedly argued that because it only calls persons who once provided consent for it to call, only those persons who can demonstrate they made a do-not-call request have a claim under § 64.1200(d). The reality is that PU has no idea which of its calls were made to persons after that person made a do-not-call request because PU did not maintain the required policies and procedures for tracking such requests. All it can plausibly say is that it called people who *once*

---

[2] In 2003 the FCC expanded this to cover calls to wireless numbers. 47 C.F.R. § 64.1200(e).
[3] This section is largely duplicative of pages 5-8 of Plaintiff's Motion for Class Certification [Dkt. 68-1.]

gave consent. PU knows this. It continues to raise this argument in hopes that the Court will require absent class members to have made a do-not-call, in which case PU will seek to use its failure to keep the required records as a sword to attack ascertainability and predominance. But PU's argument disregards the plain language and purpose of the statute. Neither a call recipient's consent to calls, nor an "established business relationship" ("EBR"), is relevant to § 64.1200(d).

"Statutory interpretation begins and ends with the text of the statute so long as the text's meaning is clear." *Reeves v. Astrue*, 526 F.3d 732, 734 (11th Cir. 2008). By its terms, § 64.1200(d) clearly applies to "call[s] for telemarketing purposes." "Telemarketing" is a defined term meaning "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). "Telephone solicitation", on the other hand, is a separately defined term, meaning a telemarketing call made *without* consent or an EBR. 47 C.F.R. § 64.1200(f)(14). In other words, a call to encourage the purchase of services is always "telemarketing." If such a call is made without consent or an "EBR", it becomes a "telephone solicitation."

Significantly, when the regulation was first implemented, it *did* only require the policies and procedures to be implemented prior to making "telephone solicitations." But In 2003, the FCC specifically amended the regulation to apply to any call for "telemarketing purposes". *2003 TCPA Order*, 18 FCC Rcd. 14014 at ¶ 96. In that same order, the FCC first created the definition of "telemarketing" used in the current regulation. The FCC found that this amendment was necessary, in part, because the original version failed to protect the rights of those consumers who did not make a do-not-call request. *Id.* at 142-43 ¶ 91 ("In addition … many … consumers do not even have the opportunity to make a do-not-call request."). It would make no sense for the FCC to amend § 64.1200(d) to protect those persons who do not have a chance to make a do-not-call

4

request if it intended for making such a request to be a pre-requisite to a claim under § 64.1200(d). Indeed, the FCC **_explicitly stated_** that an "'established business relationship' … **_is not an exception_** to the company-specific do-not-call rules." *Id.* at *170 n.351.

PU's argument is also illogical and would contravene the purpose of the regulation. The TCPA is a consumer protection statute which is remedial in nature and must be construed liberally. *See Legg v. Voice Media Group, Inc.*, 990 F. Supp. 2d 1351 (S.D. Fla. 2014); *accord Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002). Consumers have the right to revoke consent. *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1254-56 (11th Cir. 2014). Section § 64.1200(d) is meant to protect that right. *TCPA Implementation Order*, 7 FCC Rcd. at 8767, ¶ 24. If a company which makes calls only to persons who once gave consent does not have to implement the policies and procedures to track and honor revocations of that consent, then the right to revoke consent is abrogated by a company doing exactly what the statute prohibits: making telemarketing calls without tracking who revoked consent. As courts have held in similar circumstances, this "would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct." *See Reyes v. BCA Fin. Servs.*, Case No. 16-24077, 2018 U.S. Dist. LEXIS 106449, *38-39 (S.D. Fla. June 26, 2018) (quoting *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014)).

The only court to address the consent issue directly also found it to be irrelevant. *Allard v. SCI Direct, Inc.*, Case No. 16-cv-1033, 2017 U.S. Dist. LEXIS 107106, *16-17 (M.D. Ten. July 10, 2017) There, the court denied a defendant's motion for summary judgment in a § 64.1200(d) TCPA case, rejecting its consent argument by holding "[t]he Court cannot disregard the plain language of 47 C.F.R. § 64.1200(d) …. [E]ven if [defendant] only initiates telemarketing calls to

customers who have given permission to receive such calls, it would still be required to maintain a do-not-call list to permit those customers to opt-out of getting telemarketing calls if they so desire." *Id.* at *16-17; *cf. Dish Network, LLC*, 75 F. Supp. 3d at 1014 n.21.

## II.   <u>Background Facts</u>

### a.   **PU's Business.**

PU runs a for-profit university, Post University. [Plaintiff's Statement of Facts ("SOF"), ¶ 1.][4] Its customers are its students and its revenue primarily comes from their enrollment and tuition. *Id.* at ¶ 2. Stated differently, PU sells for-profit educational services to student-consumers who pay tuition money to PU to attend. *Id.* at ¶ 3. PU's enrollment/sales process for most of its students is shown in Exhibit A.[5] *Id.* at ¶ 4. This is the process by which the majority of PU's prospective students purchase PU's educational services. *Id.* at ¶ 5. While there are variations for other student groups, those variations primarily relate to how payment will be made. *Id.* at ¶ 6.

PU's Admissions Counselors are its sales force and are primarily responsible for handling outreach to prospective students. *Id.* at ¶ 7. Admissions Counselors are evaluated, in part, on how well they move prospective students through the enrollment/sales process. *Id.* at ¶ 8.

### b.   **"Leads" and "Opportunities".**

PU categorizes prospective students into "Leads" and "Opportunities". *Id.* at ¶ 9. "Leads" and "Opportunities" are tracked in PU's CRM system. *Id.* at ¶ 10. PU differentiates a "Lead" from an "Opportunity" according to the progress made in the enrollment/sales process. *Id.* at ¶ 11.

"Leads" can be marked as "Rejected" and "Opportunities" can be marked as "Lost". *Id.* at ¶¶ 12-13. "Rejected Leads" are those who were put into PU's CRM system but either never

---

[4] Plaintiff cites primarily to the SOF, which contains the exhibit cites supportive of that fact. When Plaintiff quotes only part of an exhibit, Plaintiff will indicate in the parenthesis from which exhibit the quote comes.
[5] Any direct exhibit cites are to the exhibits attached to the Declaration of Jeremy M. Glapion.

confirmed their interest or indicated they were not interested, while "Lost Opportunities" are those persons who initially confirmed interest but then gave PU some reason to believe they were no longer interested or able to attend. *Id.* at ¶¶ 14-15.

c.      **PU's Communications with Plaintiff, and Plaintiff's "Do-Not-Call" Requests.**

On August 9, 2017, Plaintiff called PU to inquire about enrolling at Post University. *Id.* at ¶ 16. Plaintiff placed this telephone call from her personal telephone number ending in 4599. *Id.* at ¶ 17. This telephone number is, and was at the time, attached to a cellular telephone. *Id.* at ¶ 18.

On August 13, 2017, Plaintiff emailed PU's employees Rita Francisco and Victoria Meehan writing, in part, she would no longer be able to move forward with attending Post. *Id.* at ¶ 19. Victoria Meehan was, at the time, one of PU's Assistant Directors of Admissions. *Id.* at ¶ 20.

On August 16, 2017, PU marked Plaintiff's file as "Opportunity Lost" in its CRM system. *Id.* at ¶ 21. Despite this, PU shortly resumed contacting Plaintiff via email and on her cell phone.

On August 25, 2017, PU sent Plaintiff a text message stating "Class starts next week for Post U's Online Degree Program! There's still time to get started: call 203-568-1652." *Id.* at ¶ 22.

On August 30, 2017, PU sent Plaintiff a text message stating, in part, "Post University has not received your 2017/2018 FAFSA … Class begins this week, so if you need assistance, please call us at 203-568-1652." *Id.* at ¶ 23. Plaintiff replied "STOP" to this message. *Id.* at ¶ 24.

On September 21, 2017, PU sent Plaintiff an email to gauge her interest in attending an upcoming class session. *Id.* at ¶ 25. Plaintiff responded to this email by writing, in part, "[y]ou may close my file." *Id.* at ¶ 26.

On October 11, 2017, PU, through Victoria Meehan, sent Plaintiff an email inviting Plaintiff to reply to "discuss [her] FAFSA and possibly get started in [Post's] October 23rd session." *Id.* at ¶ 27. Plaintiff responded to this email by writing, in part, "[p]lease stop emailing, texting, sms, calls and voicemail!!! This is the third or fourth time I am asking to be removed from

all of your lists!! Thank you!" *Id.* at ¶ 28. PU considers this to be a "do-not-call" request. *Id.* at ¶ 29. PU did not document this request. *Id.* at ¶ 30.

On October 18, 2017, PU called Plaintiff at her telephone number ending in 4599 and left a voicemail. *Id.* at ¶ 31. A few hours later, PU's Assistant Director of Admissions followed up by email with the subject line "It's Not Too Late *Please Reply*" and invited Plaintiff to reply to get started in Post's October 23 class session. *Id.* at ¶ 32.

On November 8, 2017, PU sent Plaintiff an email with the subject "New Year, New You-Classes now forming at Post University!" *Id.* at ¶ 33. This email informed Plaintiff that Post University was registering students for classes beginning on January 8, 2018, provided facts on Post University, invited Plaintiff to get started by completing her FAFSA, and encouraged her to not wait "another year to begin working on your dreams!" *Id.* at ¶ 34. At the bottom, it stated "[i]f you are no longer interested in completing your degree, please respond to this email and I will update our records." *Id.* at ¶ 35. Plaintiff did exactly this, writing back "I am no longer interested in applying to attend Post University! Please let this be the last communication regarding your school." *Id.* at ¶ 36. PU considers this to be a "do-not-call" request. *Id.* at ¶ 37. PU did not document this request. *Id.* at ¶ 38.

On December 7, 2017, PU emailed Plaintiff with the subject "New Year, New You, Don't Miss Out!" and encouraged Plaintiff to enroll in classes beginning on January 8th. *Id.* at ¶ 39.

On January 4, 2018, PU, through Victoria Meehan, sent Plaintiff an email with the subject "Snowed In? We Can Help with Your FASFA[sic]!" *Id.* at ¶ 40. This email offered to help Plaintiff complete her FAFSA, because "[c]ompleting your FAFSA is a very important step in the admissions process and we don't want you to miss out on classes that start on January 8, 2018!" *Id.* at ¶ 41 Plaintiff wrote back yet again, stating "Please stop contacting me! Not interested!!" *Id.*

8

at ¶ 42. PU considers this to be a "do-not-call" request. *Id.* at ¶ 43. PU did not document this request. *Id.* at ¶ 44.

On January 11, 2018, PU called Plaintiff at her telephone number ending in 4599. *Id.* at ¶ 45. On this call, Plaintiff made another "do-not-call" request. *Id.* at ¶ 46.

On April 4, 2018, PU sent Plaintiff an email with the subject "Post University would love to reconnect with you!" *Id.* at ¶ 47. This email stated, in part, "Post University would love to reconnect with you regarding starting online classes" and invited Plaintiff to reply if she was interested. *Id.* at ¶ 48. Plaintiff replied by writing, in part, "…I have asked Post representatives to stop contacting me. Please close my file!!! I will be forced to obtain legal action." *Id.* at ¶ 49.

PU persisted. On June 6, 2018, it emailed Plaintiff with the (ironic) subject "Post U has not forgotten about you!" and invited Plaintiff to reply to get started in its June 25, 2018 class session. *Id.* at ¶¶ 50-51. Plaintiff replied by writing, in part, "[p]lease stop emailing me! I'm not interested anymore! I have told everyone who has contacted me by phone and email!!!" *Id.* at ¶ 52.

On July 17, 2018, PU sent Plaintiff a series of text messages at her telephone number ending in 4599, writing, in part, "Are you still interested …?" and "We'd love to help you get back on track towards your educational and career goals. Reply back to this text message to discuss enrollment options for Fall 2018." *Id.* at ¶¶ 53-54. A PU employee sent these texts on PU's behalf. *Id.* at ¶ 55. Plaintiff replied "do not contact me regarding enrollment to Post University! Any further communication from Post will allow me to file a complaint for harassment." *Id.* at ¶ 56. Plaintiff then asked for a copy of Post's do-not-call policy. *Id.* at ¶ 57.

Plaintiff subsequently called PU to ask again for its written do-not-call policy. *Id.* at ¶ 58. To date, no policy has been produced in response to this request or in discovery. *Id.* at ¶ 59.

This lawsuit was filed on July 30, 2018. On September 7, 2018, PU emailed Plaintiff and invited her to submit her FAFSA to see what her award would be prior to enrolling. *Id.* at ¶ 60.

## LEGAL STANDARD

"Summary judgment is appropriate when there is no genuine issue of material fact and the evidence on file shows that the moving party is entitled to judgment as a matter of law." *Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1154 (11th Cir. 2018). The evidence should be considered in the light most favorable to the nonmovant, and all reasonable inferences should be drawn in that party's favor. *Id.* Once the movant submits a properly supported motion for summary judgment, "the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321 (11th Cir. 2014).

The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Transcon*, 910 F.3d at 1154. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (citations omitted).

## DISCUSSION

### I.   Elements

To succeed on a claim under § 227(c)(5) of the TCPA, a plaintiff must show "(1) receipt of more than one telephone call within any 12-month period (2) by or on behalf of the same entity (3) in violation of the regulations promulgated by the FCC" under section 227(c). *Wagner v. CLC Resorts & Devs., Inc.*, 32 F. Supp. 3d 1193, 1197 (M.D. Fla. 2014); 47 U.S.C. § 227(c)(5).

Section 64.1200(d) prohibits companies from initiating any call for telemarketing purposes to a residential or cellular telephone subscriber unless the company implements certain specified policies and procedures. For Plaintiff to prevail on claim under § 64.1200(d), then, she must show that 1) at her residential or cellular telephone number 2) she received more than one call by or on

behalf of PU in a 12-month period 3) that constitutes telemarketing. The final aspect of §
64.1200(d)—the presence or absence of any of the required policies and procedures—should be
treated as an affirmative defense.[6] Plaintiff, however, does not seek summary judgment on the
presence or absence of PU's policies and procedures, so this need not be decided here. At issue in
this Motion are the other three elements which are indisputably part of Plaintiff's case.

## II.     Plaintiff is Entitled to Partial Summary Judgment

### a.     Plaintiff's Telephone Number Ending in 4599 is a Cellular Telephone Number.

There is no genuine issue of material fact that Plaintiff's telephone number is a personal
cellular telephone number. [SOF, ¶ 18.]. Section 64.1200(d)'s protections extend to wireless
numbers. 47 C.F.R. § 64.1200(e).

### b.     Plaintiff Received More Than One Call in a 12-Month Period from PU.

There is no genuine issue of material fact that Plaintiff received more than one call in a 12-
month period from PU. PU's and Plaintiff's records show an August 30, 2017 text, to which
Plaintiff replied, an October 18, 2017 call, on which PU left a voicemail, and January 11, 2018
call, which Plaintiff answered. *Id.* at ¶¶ 23, 31, 45. Plaintiff's records show additional
communications from PU on July 17, 2018 *Id.* at ¶¶ 53-56.

### c.     PU's Calls to Plaintiff Were Telemarketing.

As Plaintiff indicated in her Motion for Class Certification, the purpose of PU's calls to
"Rejected Leads" and "Lost Opportunities" had uniform purposes. [Dkt. 68-1, pp. 22-23.] Plaintiff
now submits that these purposes qualify the calls, including those made to Plaintiff, as
telemarketing.

---

[6] This too was briefed in Plaintiff's Opposition to Defendant's Motion to Dismiss. [Dkt. 71, pp. 12-13.]

i.   <u>Definition of Telemarketing.</u>

Telemarketing is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 CFR § 64.1200(f)(12). The key word is "purpose." "Telemarketing occurs when the context of the call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services." *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015). Whether a call is telemarketing should be approached "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). "The question is whether, viewed through the lens of common sense, one purpose of the defendant in calling the plaintiff was to encourage him to buy goods or services in the future[.]"*Bennett v. Boyd Biloxi, LLC*, Case No. 14-cv-330, 2015 U.S. Dist. LEXIS 59632, *9-10 (S.D. Ala. May 6, 2015).

Indeed, in 2002, the FCC sought comment on "dual purpose" calls "that include information about a product or service but do not immediately solicit a purchase." *2002 NPRM*, 17 FCC Rcd. 17459, 17478 ¶ 31 (F.C.C. 2002). In its ensuing order, the FCC wrote that such calls would constitute advertisements.[7] *2003 TCPA Order*, 18 FCC Rcd. 14014, ¶ 142 (July 3, 2003). It concluded that "[i]f the call is intended to offer property, goods, or services for sale either during the call, or in the future … that call is an advertisement." *Id.* By contrast, the type of calls the FCC considers "purely informational" include calls regarding school closings, bank account balance, credit card fraud alert, and package alerts. 27 FCC Rcd 1830, 1838 ¶ 21 (2012).

That "purpose" is the primary focus in determining whether a call is "telemarketing" is also evident from the definition of "telemarketing", which establishes a call as "telemarketing" on its "initiation". 47 C.F.R. § 64.1200(f)(12).  "[A] person or entity 'initiates' a telephone call when

---

[7] Though the order uses "advertisement", it refers to those making such calls as "telemarketers." *Id.* It is difficult to imagine a call that is an advertisement that is not also telemarketing.

it takes the steps necessary to physically place a telephone call." 28 F.C.C. Rcd. 6574, 6583, ¶ 26 (2013). If a call can be "telemarketing" on its *initiation*, then purpose, not "content", must control.

Courts nationwide have agreed. The Ninth Circuit held that "[n]either the [TCPA] nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro*, 705 F.3d at 918. It continued that whether a call is telemarketing should be approached "with a measure of common sense." *Id.* The court found that prerecorded messages from Best Buy informing customers that their "Reward Zone" certificates were about to expire were informational *and* telemarketing, because the calls urged the recipient to redeem the RewardZone points before they expired. 705 F.3d at 918. The court concluded that "[b]ecause the calls encouraged recipients to engage in future purchasing activity, they … constituted telemarketing under [§ 64.1200(f)(12)]." *Id.* at 918.

The Eighth Circuit found the same. *Golan*, 788 F.3d 814. In *Golan*, defendant left a message stating: "Liberty. This is a public survey call. We may call back later." *Id.* at 819. Defendant argued that its message was neither an advertisement nor telemarketing. The court wrote that "[w]hile the content of the calls controlled whether they were 'advertisements,' their purpose controlled whether they were 'telemarketing.'" *Id.* at 820. It found that the calls were part of a campaign to promote a movie. *Id.* Accordingly, the calls were telemarketing.

Courts in the Eleventh Circuit have adopted the same approach. In *Bennett*, *supra at* 11, the court wrote that "in determining the purpose of the defendant's calls, a court does not passively accept a defendant's tortured explanation but uses common sense to assess what the defendant was truly seeking to accomplish." *Bennett*, 2015 U.S. Dist. LEXIS at *9. The court wrote that a caller's purpose need not be an immediate sale in order to qualify as telemarketing. *Id.* Instead, the inquiry is "whether, viewed through the lens of common sense, one purpose of the defendant in calling the

13

plaintiff was to encourage him to buy goods or services in the future[.]" *Id.* at *9-10. Similarly, the Southern District of Florida held that a benign text message "may … constitute telemarketing where it ultimately leads to the promotion of goods or services[.]" *Mittelmark v. Yoga Joint South, LLC*, Case No. 18-cv-62138, 2018 U.S. Dist. LEXIS 211620, *8 (S.D. Fla. Dec. 14, 2018).

     ii.   <u>PU's Calls to "Rejected Leads" and "Lost Opportunities."</u>

As discussed, PU categorizes prospective students as "Leads" and "Opportunities." *Id.* at ¶ 9. PU makes telephone calls to "Leads" and "Opportunities". *Id.* at ¶ 61. These calls are part of its sales process and are made to encourage these "Leads" and "Opportunities" to enroll at PU. *Id.* at ¶¶ 61-64. PU also calls "Rejected Leads" and "Lost Opportunities." *Id.* at ¶ 65. These were once prospective students who PU came to believe, for various reasons, were no longer interested or able to attend. *Id.* at ¶¶ 14-15. PU nevertheless considered "Rejected Leads" and "Lost Opportunities" to be a potential source of new enrollments. *Id.* at ¶ 66.

PU's calls to "Rejected Leads" were to see if they had interest in purchasing PU's education services and to convert them into enrolled students. *Id.* at ¶¶ 67-70. It testified:

> Q. So the goal of calling a rejected lead was to … engage with the process outlined in 16?[8]
>
> A. The goal of calling a rejected lead is to see if a prospective student that had once filled out a request for information about going to school with us, that we were unable to connect to in a timely manner in the past, due to reasons we were unable to identify, to see if now is the better time.
>
> Q. To see if they are still interested; correct?
>
> A. Correct.
>
> Q. In purchasing education services from Post; correct?
>
> A. In moving forward with their education with Post, correct.
>
> ***

---

[8] "16" is the enrollment process, attached to the Glapion Declaration as Exhibit A.

Q. Was one of the purposes of the calls to rejected leads to convert them ultimately into an enrolled student?

A. Yes.

*Id.* (Post Depo. Tr. 167:23-168:16, 187:9-12).

PU calls to "Lost Opportunities" were similarly part of its efforts to enroll students and to get them back into its enrollment/sales process. *Id.* at ¶¶ 71-74. It testified.

Q. …Is every call made to a lost opportunity made with one of the purposes of that call being to reestablish a relationship with Post University?

A. Not every call.

***

Q. The vast majority of calls?

A. Yes.

Q. Would you say 90 percent of the calls?

A. Yes

***

A. The majority, the majority of calls that are made to a closed opportunity or a closed lead would be to see if someone is interested, if now is a better time for someone to move forward with their education with us.

***

Q. The 90 percent plus majority were part Post's efforts to enroll students; is that correct?

A. Correct.

***

Q. I'm asking now about lost and closed opportunities. Almost always the calls were – one of the goals of the calls were to get them back onto the process in Exhibit 16 [Glapion Decl., Ex. A]; is that fair to say?

A. Yes.

15

*Id.* (Post Depo. Tr. 164:23-165:16, 192:23-25, 195-8:12).

In addition, the enrollment/sales process characterizes each stage in the enrollment/sales process as a "Sales Stage" and "Sales Category". *Id.* at ¶ 4 (Ex. A.)  It begins with "Sales Category: Qualify/Sales Stage: Interviewing" and ends with "Sales Category: Attend/Sales Stage: Closed/Won." *Id.* (Ex. A.)

The testimony and declarations of three other witnesses support these purposes. Victoria Meehan testified that Post would call "Closed Opportunities" because that person could change their mind. *Id.* at ¶¶ 71-72 (Meehan Depo. Tr. 85:9-13). Both declarants swore that the only reason to call persons marked as "Rejected Leads" or "Lost Opportunities" would be to re-engage them and to convince them to attend Post. *Id.* at ¶¶ 71-72, 74 (Markham Decl., ¶ 44; Shigo Decl., ¶ 50.)

As for those purported "non-enrollment" related calls to "Lost Opportunities", PU agreed that were made only in "relatively … extreme and unique circumstances" and testified that these calls were outliers. *Id.* at ¶ 75. It clarified that "ten percent" was probably too high and that the calls were extremely infrequent *Id.* It also clarified that the sole *trained* reason for calls to "Lost Opportunities" was to get them back into the enrollment/sales process. *Id.* at ¶ 76. PU also did not provide any specific examples of such calls.[9] PU generally described such calls as calls to "check up on someone" and "to see if someone is interested and maybe if this is a better time for them in their personal life to move forward[.]" *Id.* at ¶ 78.

iii.    PU's Calls to "Rejected Leads" and "Lost Opportunities" are Telemarketing.

The purposes described above qualify PU's calls to "Rejected Leads" and "Lost Opportunities" as telemarketing. The calls were to "see if now is a better time" for someone to

---

[9] The "example" PU's witness provided of personally making such a call was a non-sequitur that involved calls to an enrolled student's grandmother after the student had passed away. *Id.* at ¶ 77. PU's witness acknowledged that this story did not align with the question and could not think of any other examples. *Id.*

move forward with enrolling at Post, to get them back into PU's enrollment/sales process, and to convert them into enrolled students. Accordingly, these calls were part of efforts to encourage "Rejected Leads" and "Lost Opportunities" to purchase PU's educational services (either immediately or in the future). They were thus telemarketing.

Approaching the calls "with a measure of common sense" yields the same conclusion. *Chesbro*, 705 F.3d at 918; *Bennett*, 2015 U.S. Dist. LEXIS 59632 at *9. What possible purpose could PU have had for calling persons no longer in its enrollment/sales pipeline other than to get those persons back into that pipeline? *See Bennett*, 2015 U.S. Dist. LEXIS 59632 at *10. Rational businesses do not make telephone calls to provide information on their services without hoping that the person they are calling might purchase those services. *Cf. id.* at *13.

The logic is equally applicable to the calls to "Lost Opportunities" that PU claimed were non-enrollment related. It testified that such "checkup" calls were "rapport building" calls that PU considers to be a "big piece of this sales experience[.]" *Id.* at ¶ 78 (Post Depo. Tr. 157:8-158:1). When asked if such a "checkup" call to a "Lost Opportunity" would be considered a personal call, PU testified that it would not be, because the "Lost Opportunity" is a former prospect. *Id.* (Post Depo. Tr. 163:4-13.) When Plaintiff's counsel followed up by asking "[b]ut it's not a prospect when the call is made; correct?", PU tellingly responded "[w]ho's to say?" *Id.* PU also failed to provide any specific examples of non-enrollment related calls to "Lost Opportunities." *Id.* at ¶ 77.

This speculative, hypothetical testimony cannot defeat summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). Piecing together PU's testimony on the "checkup" calls and viewing those calls

through the lens of common sense shows those calls were made with at least one of the goals being to encourage the purchase of its services, immediately or in the future. They were telemarketing.

    iv.   <u>PU's Calls to Plaintiff.</u>

PU marked Plaintiff's file as a "Lost Opportunity" in its CRM system on August 16, 2017. *Id.* at ¶ 21. Accordingly, the calls to Plaintiff after that point had the telemarketing purposes described above. *Id.* at ¶ 79. Common sense suggests the same: PU had no reason to contact Plaintiff after she was marked as a "Lost Opportunity" other than to encourage her enrollment.

The context and content of the calls to Plaintiff reinforces this conclusion. For example, the August 30th text stated

> Post University has not received your 2017/2018 FAFSA. You can access this financial aid application at fafsa.ed.gov (school code: 001401). Class begins this week, so if you need assistance, please call us at 203-568-1652.

PU has sought to characterize this message as an attempt "to keep [Plaintiff] informed of deadlines associated with the admission process she began." [Def.'s Motion to Dismiss, Dkt. 70-1, p. 3.] But this text was sent two weeks after Plaintiff had already been marked in PU's system as a "Lost Opportunity", indicating PU no longer considered her to be in its enrollment/sales process. [SOF at ¶ 15.] (Post Depo. Tr. 119:13-22). *Of course*, then, it had not received Plaintiff's FAFSA. This text is the equivalent of security stopping you on your way out of a store empty handed, handing you the latest iPhone, saying "you forgot to pay for that", and directing you to the checkout counter.

In other words, the August 30th message's *purpose* was not to remind Plaintiff to continue an enrollment/sales process she was already in, but to re-enter the enrollment/sales process PU knew or believed she had left and was not going to complete. It was to remind Plaintiff of PU's product (classes) and to encourage her to take a necessary step (filling out a FAFSA) toward purchasing that product. *Id.* at ¶¶ 3, 41.

The context of the October 18 and January 11 calls shows similarly. Immediately before or after these calls, PU sent emails to Plaintiff encouraging her enrollment in an upcoming class session. On October 18, 2017, PU called Plaintiff at her telephone number ending in 4599 and left a voicemail. *Id.* at ¶ 31. A few hours later, PU's Assistant Director of Admissions followed up by email with the subject line "It's Not Too Late *Please Reply*" and invited Plaintiff to reply to get started in Post's October 23 class session. *Id.* at ¶ 32.

On January 4, 2018, PU, through Victoria Meehan, sent Plaintiff an email offering to help Plaintiff complete her FAFSA, because "[c]ompleting your FAFSA is a very important step in the admissions process and we don't want you to miss out on classes that start on January 8, 2018!" *Id.* PU called Plaintiff the following week. *Id.* at ¶ 45.

The content of the July 17, 2018 text messages shows the same. These messages stated, in part, "Are you still interested in earning a Bachelor's degree …?" and "We'd love to help you get back on track towards your educational and career goals. Reply back to this text message to enrollment options for Fall 2018." *Id.* at ¶¶ 53-55 (MD000001-4). This is telemarketing.

Plaintiff also swears that all communications she received from PU after she asked PU to close her file were geared toward gauging her interest and getting her to enroll in an upcoming class session. [Davis Decl., ¶ 28.] This aligns with PU's own testimony and common sense. PU knew that Plaintiff was no longer in its enrollment/sales process, so why else would it have called her? It is simply not credible for PU to claim that the above calls and texts were not intended to encourage Plaintiff to purchase its educational services. No reasonable jury will find otherwise. PU's calls to Plaintiff after she was marked as "Lost Opportunity" were telemarketing.

## **CONCLUSION**

Plaintiff respectfully requests that her Motion for Partial Summary Judgment be granted. There is no genuine issue of material fact that Plaintiff's phone is a cellular telephone, she received

more than one call from PU in a 12-month period, and that PU's calls were telemarketing. The lone issues left for trial are whether PU implemented each of the required policies and procedures prior to making its telemarketing calls to Plaintiff and, if it did not, damages.

**Dated:** July 19, 2019

s/ Bradford R. Sohn_____
Bradford R. Sohn
Fla. Bar. No. 98788
**THE BRAD SOHN LAW FIRM PLLC**
2600 South Douglas Rd, Suite 1007
Coral Gables, Florida 33134
Tel: 786.708.9750
Fax: 305.397.0650
brad@sohn.com

s/ Jeremy M. Glapion_____
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com
(*Pro Hac Vice*)