Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3    -----------------------------)

 4    MELANIE DAVIS,                )   CASE NO.:

 5            Plaintiff,            )   18-81004-CIV

 6        vs.                       )

 7    POST UNIVERSITY, INC.,        )

 8            Defendant.            )

 9    -----------------------------)

10

11

12        DEPOSITION OF SEAN COOLEY, INDIVIDUALLY

13    AND AS DESIGNATED REPRESENTATIVE OF POST UNIVERSITY

14                 DATE:  APRIL 11, 2019

15                     HELD AT:

16                  WYNDHAM SOUTHBURY

17                 1284 Strongtown Road

18                Southbury, Connecticut

19

20

21

22

23

24    Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

25
```

Page 41

1   exceed expectations?

2        A.     No.

3        Q.     You can set these aside now.   We are done

4   with those.

5               Is Post University a for-profit university

6   or nonprofit?

7        A.     For profit.

8        Q.     What does that mean for Post to be a

9   for-profit university?

10       A.     It means that we need to hold ourselves to

11  a higher standard.

12       Q.     Are you saying nonprofit universities

13  don't hold themselves to a higher standard?

14       A.     No.

15       Q.     Are you saying that Post has to hold

16  itself to a higher standard than, say, Harvard?

17       A.     In some ways, I believe so.

18       Q.     Does it also mean that the business side

19  of Post is -- excuse me, the business motivations at

20  Post are different than a nonprofit?

21       A.     I don't feel that way.

22       Q.     I'm not asking what you feel at this time.

23  I'm asking, does Post's business model as a

24  for-profit university differ from a nonprofit

25  university?

Page 45

1   an educational service?

2       A.    Yes.

3       Q.    Does Post currently generate revenue?

4       A.    Yes.

5       Q.    What are its primary sources of revenue

6   generation?

7       A.    Title IV funding.  That's --

8       Q.    Are -- I apologize, continue.

9       A.    That's federal aid.  Tuition assistance,

10  GI Bill.

11      Q.    Are those what you would consider to be

12  the big -- so essentially tuition would be Post's

13  largest source of revenue; is that fair?

14      A.    Cash as well.

15      Q.    Cash.  So these sources of revenue all

16  essentially relate to the payment of tuition and

17  fees to Post; correct?

18      A.    Correct.

19      Q.    And when a student pays tuition to Post,

20  they might get federal aid; correct?

21              MR. BOWSER:  Objection to form,

22  foundation.

23      Q.    You can answer that question.

24      A.    Can you repeat it, please.

25      Q.    When a student pays tuition to Post, they

Page 46

```
 1   may get federal aid for that, to help with that
 2   tuition?
 3        A.    Yes.
 4        Q.    And they may get tuition assistance to
 5   help pay for that tuition; correct?
 6        A.    They may, yes.
 7        Q.    And they may get help through the GI Bill;
 8   correct?
 9        A.    They may, yes.
10        Q.    Or they may just pay cash; correct?
11        A.    Correct.
12        Q.    And students do pay tuition to Post;
13   correct?  Excuse me, enrolling students and enrolled
14   students continue to pay?
15        A.    If you are a student at Post University
16   taking classes, you pay tuition, yes.
17        Q.    And when a student pays tuition to Post,
18   they are essentially paying for Post's educational
19   services; correct?
20        A.    Correct.
21        Q.    And compared to another transaction, a
22   student is essentially purchasing educational
23   services from Post; is that accurate?
24        A.    They are purchasing an experience.
25   Education is delivered throughout that experience.
```

Page 47

1      Q.      But they are purchasing something, and

2   whether it be an experience or we call it an

3   educational service, they are purchasing something

4   from Post; correct?

5      A.      Correct.

6      Q.      Under its current business model, could

7   Post stay in business without new students

8   continuing to enroll?

9      A.      I can't say for certain.

10      Q.      If no students enrolled at Post anymore,

11   could Post stay in business with its current

12   business model?

13      A.      I don't believe so.

14      Q.      And could Post stay in business without

15   students continuing to purchase education services

16   from Post?

17      A.      No.

18      Q.      And so it's necessary then that for Post

19   to stay in business that students continue to pay

20   Post, whether with financial aid or otherwise;

21   correct?

22      A.      Correct.

23      Q.      Is Post profitable?

24      A.      Yes.

25      Q.      Do you know what Post's revenue was last

Page 287

1   education services provided by Post?

2       A.    Yes.

3       Q.    So these education services are offered by

4   Post; correct?

5       A.    Yes.

6       Q.    And they are offered for a fee; correct?

7       A.    The tuition is the fee.

8       Q.    Correct.  And so the tuition is payment

9   for the education services; is that correct?

10      A.    Correct.

11      Q.    So these are prospective students who

12  become enrolled students bought education services;

13  is that correct?

14      A.    Yes.

15      Q.    And those education services were offered

16  to those students by Post; is that correct?

17      A.    Yes.

18      Q.    And as part of this process shown on 16,

19  and as part of the enrollment process -- well, we

20  will take it piece by piece.

21           As part of this process shown on 16, Post

22  makes outbound telephone calls; is that correct?

23      A.    It depends, but yes.

24      Q.    We discussed before that the primary

25  source of outreach was telephone calls; is that

Page 82

1   student to enroll at Post or a prospective student?

2        A.    Yes, a system funnel.

3        Q.    What do you mean by "system funnel"?

4        A.    These are the different system stages and

5   categories to get from prospective student to start.

6        Q.    And when you say "system," are you talking

7   the CRM system?

8        A.    Yes.

9        Q.    So these are different tags, if you will,

10  of the various stages throughout that system;

11  correct?

12       A.    Yes.

13       Q.    But this outlines the process from a new

14  lead arriving to finally being a participating and

15  attending student; correct?

16       A.    Correct.

17       Q.    And this, as you testified to a moment

18  ago, outlines the enrollment process.

19             Want some water?

20       A.    Yeah, if you don't mind.  Thank you.

21                  (Pause.)

22  BY MR. GLAPION:

23       Q.    So this document, as you testified a

24  moment ago, outlines the enrollment process?

25       A.    Yes.

Page 83

1      Q.    And this is the process that every

2   prospective student must follow; correct?

3      A.    Yes.

4      Q.    And this is the process for purchasing

5   educational services from Post; correct?

6      A.    Repeat the question.

7      Q.    And this is the process for purchasing

8   education services from Post; correct?

9      A.    Yes.

10     Q.    So anyone who purchases education services

11  from Post has to go through each of these steps;

12  correct?

13               MR. BOWSER:   Objection, compound.

14     Q.    You can answer.

15     A.    It depends.

16     Q.    You said a moment ago, and maybe my

17  interpretation --

18     A.    I'm looking at this.  This speaks to the

19  undergrad population.  It doesn't seem to -- there

20  is different steps for military students.  A lot of

21  them don't require a FAFSA, so this is more of an

22  overview of the common, the majority population.

23     Q.    So we will focus there and then we will

24  narrow it down a little bit.  So the majority of the

25  population that this deals with, this is how the

1    they could pay; correct?

2         A.    Correct.

3         Q.    Is this document an accurate reflection of

4    the enrollment process between July 30th, 2014 and

5    July 30th, 2018?

6         A.    No.

7         Q.    Can you elaborate on that?

8         A.    I'm not sure when the cutoff was, but we

9    referenced ITE before, and we moved away from that,

10   and that's not reflected in this document.

11        Q.    So where in this would ITE fall?  Would it

12   be between the green and the yellow, after the

13   yellow, etcetera, approximately?

14        A.    It would live with the -- in the

15   application area.

16        Q.    So it would be once you are already --

17        A.    An interview had been conducted.

18        Q.    So you are not a lead anymore; it's after

19   being a lead?

20        A.    Correct.

21        Q.    So you are in the blue pretty much?

22        A.    ITE, when it was in circulation, captured

23   the pipeline.

24        Q.    I understand.  Does this --

25        A.    Which in this document application would.

Page 86

 1        Q.    Do you remember when ITE became
 2   application?
 3        A.    There was always an application.   There
 4   was just an ITE as well.
 5        Q.    Do you remember when the ITE stopped being
 6   used?
 7        A.    I can't say for certain.
 8        Q.    Do you remember a year?
 9        A.    2015 or '16.   In-between that time frame
10   would be my best guess.
11        Q.    Why don't we go back to -- and I dread it,
12   but I want to go back to the discussion of the sales
13   categories and sales stages.
14              Who came up with -- who determined to call
15   them sales categories?
16        A.    I don't know.
17        Q.    Who determined to call them sale stages?
18        A.    I don't know.   That is how the system was
19   always -- it was always designed that way; it was
20   always there from when I began using it.
21        Q.    So it was difficult, but we established
22   that Post sells education services to students;
23   correct?
24        A.    Yes.
25        Q.    And we also established that this is the

1   When a student moved further down the funnel, they

2   systemically could be in a pipeline, but they were

3   referred to in different categories, registered,

4   ability to pay.

5       Q.    It's a different category, you said;

6   correct?

7       A.    Correct.

8       Q.    But are those categories within the

9   prospective student pipeline, we'll call it?

10      A.    Those categories live within the

11  opportunity file.

12      Q.    So when -- actually, we will make this

13  easier.

14            Let's look at -- I've got to give it to

15  you.

16            MR. GLAPION:  Can we mark this as

17  Exhibit 16 once I find it?

18                 THE REPORTER:  Sure.

19                 (Exhibit 16, Document bearing

20                 Bates Number PU00011106, marked for

21                 identification.)

22  BY MR. GLAPION:

23      Q.    Have you seen this document before?

24      A.    I believe so.

25      Q.    Did you review this document in

Page 71

1  preparation for this deposition?

2      A.    I can't be certain.

3      Q.    Take a moment to look over this document,

4  get familiar with it.  Let me know when you've had a

5  chance to or when you have an understanding of what

6  the document is.

7      A.    I have an understanding of what it is.

8      Q.    Does this document capture what we've been

9  calling the pipeline?

10     A.    It captures part.  It captures a lot more

11 than that.

12     Q.    The term "pipeline" does you mean or the

13 document does?

14     A.    This document.

15     Q.    Which parts of this document are not

16 considered to be part of the pipeline, or which

17 categories of this document?

18     A.    Anything that says Lead.

19     Q.    So the green?

20     A.    Green.  I'm just reviewing to see when it

21 becomes a pipeline, so just give me a moment.

22           Right in the middle of the page where it

23 says Receive Application, Sales Category:

24 Documents, at that point it becomes a pipeline.

25     Q.    So if this doesn't depict the pipeline,

1    what does this depict?

2       A.    If what doesn't depict the pipeline?

3       Q.    If this document depicts more than what

4    you are describing as the pipeline, then what is

5    this document depicting?

6       A.    It depicts the operational journey from

7    inquiry to participation.

8       Q.    So the enrollment process?

9       A.    The enrollment process.

10      Q.    Throughout it mentions categories and

11   stages.

12            Do you see that?

13      A.    Yes.

14      Q.    So under the first blue box, it says Sales

15   Category:  Qualify.

16            Do you see that?

17      A.    Yes.

18      Q.    And Sales Stage:  Interviewing.

19            Do you see that?

20      A.    Yes.

21      Q.    And all throughout this, from the first

22   blue box to the last yellow box, they are divided

23   into Sales Category and Sales Stage; correct?

24      A.    Correct.

25      Q.    So the last stage is the Sales Stage:

Page 78

1    sale could be a discount at Best Buy; correct?

2         A.    Correct.

3         Q.    And that's not what is being used in here;

4    correct?

5         A.    Correct.

6         Q.    What is another definition of sales that

7    may fit into this document?

8         A.    Selling a product.

9         Q.    Or in Post's case a service; correct?

10        A.    Correct.

11        Q.    And we've established earlier that

12   students purchase a service, educational services

13   from Post; correct?

14        A.    Yes.

15        Q.    And the corollary of that is that Post

16   sells educational services to students; correct?

17        A.    Post provides education.

18        Q.    For free?

19        A.    They provide a service, they provide

20   education, and that has a monetary fee to it.

21        Q.    Is there a difference between what you

22   just said and what I said when I said that Post

23   sells educational services to students?

24        A.    I don't know.

25        Q.    You rephrased it and used a phrase much

1   more complex than Post sells educational services to

2   students, so I'm presuming it has a meaning given

3   your self-evaluation of how good you are with your

4   oral presentation, so I am curious about what the

5   difference is in what you said versus what I said.

6           MR. BOWSER:  Objection to form.

7       Q.   You can answer.

8       A.   I believe you had a negative undertone to

9   it.

10      Q.   The tone of my voice or the phrase?

11      A.   Right.

12      Q.   I'm not sure.  Let me ask you directly

13  again:  Does Post sell educational services to

14  students?

15          MR. BOWSER:  Objection, compound.

16      Q.   Or excuse me.  Does Post sell educational

17  services to prospective students?

18      A.   Post provides education; they provide a

19  service.  That service costs money.

20      Q.   When you provide a service for a fee, is

21  that called selling something?

22      A.   Yes.

23      Q.   So when you say that Post provides

24  education; they provide a service and that service

25  costs money, what you are saying is that Post sells

Page 80

1   education services; correct?

2       A.    I am saying that Post provides education

3   to students that are interested in moving forward

4   with their education.

5       Q.    For a fee?

6       A.    For a fee.

7       Q.    Tell me which part of the sentence Post

8   sells education services to students you disagree

9   with.

10      A.    I don't feel like that is what we do on a

11  day-to-day.

12      Q.    This is your testimony on behalf of Post,

13  not your subjective feelings.

14            What -- well, it is.  I apologize.  I

15  asked for which part of the sentence Post sells

16  education services to students that you disagree

17  with.  So which part of that sentence -- I'm not

18  talking about my tone; I'm not talking about

19  undercurrents or subjectively.  I'm asking for what

20  part of that sentence do you disagree with.

21      A.    Sells.

22      Q.    So what is the difference between selling

23  educational services and providing educational

24  services for a fee?

25      A.    I guess -- I guess there isn't.

1    Q.    So then it's fair to say, with your

2    disagreement as to the phrasing noted, but with

3    having established the synonyms that Post sells

4    education services to students?

5    A.    Yes.

6    Q.    And at what point does Post stop selling

7    educational services to prospective students in

8    terms of looking at this 11106 pipeline; at what

9    point does that sales process stop?

10   A.    When they are no longer a student.

11   Q.    So the last category says Sales Category:

12   Attend, Sales Stage: Closed/Won, so there seems to

13   be -- is there a transition there from, now that

14   they are attending, there is a different sort of

15   pipeline and flowchart of how those students are

16   dealt with?

17   A.    Yes.  This is an admissions document.

18   Q.    So this only deals with prospective

19   students?

20   A.    Correct.

21   Q.    And when Post is dealing with the

22   prospective student, this document outlines the

23   process for that student to enroll in Post; correct?

24   A.    Yes.  These are system processes.

25   Q.    Correct.  This is the process for a

1    student to enroll at Post or a prospective student?

2         A.    Yes, a system funnel.

3         Q.    What do you mean by "system funnel"?

4         A.    These are the different system stages and

5    categories to get from prospective student to start.

6         Q.    And when you say "system," are you talking

7    the CRM system?

8         A.    Yes.

9         Q.    So these are different tags, if you will,

10   of the various stages throughout that system;

11   correct?

12        A.    Yes.

13        Q.    But this outlines the process from a new

14   lead arriving to finally being a participating and

15   attending student; correct?

16        A.    Correct.

17        Q.    And this, as you testified to a moment

18   ago, outlines the enrollment process.

19              Want some water?

20        A.    Yeah, if you don't mind.  Thank you.

21                        (Pause.)

22   BY MR. GLAPION:

23        Q.    So this document, as you testified a

24   moment ago, outlines the enrollment process?

25        A.    Yes.

Page 83

1      Q.    And this is the process that every

2   prospective student must follow; correct?

3      A.    Yes.

4      Q.    And this is the process for purchasing

5   educational services from Post; correct?

6      A.    Repeat the question.

7      Q.    And this is the process for purchasing

8   education services from Post; correct?

9      A.    Yes.

10     Q.    So anyone who purchases education services

11  from Post has to go through each of these steps;

12  correct?

13              MR. BOWSER:   Objection, compound.

14     Q.    You can answer.

15     A.    It depends.

16     Q.    You said a moment ago, and maybe my

17  interpretation --

18     A.    I'm looking at this.   This speaks to the

19  undergrad population.   It doesn't seem to -- there

20  is different steps for military students.   A lot of

21  them don't require a FAFSA, so this is more of an

22  overview of the common, the majority population.

23     Q.    So we will focus there and then we will

24  narrow it down a little bit.   So the majority of the

25  population that this deals with, this is how the

Page 84

1    majority of the population purchases education

2    services from Post; correct?

3         A.    This is how they go through to the funnel

4    to go from the lead stage to beginning with us,

5    starting with us, classes with us, yes.

6         Q.    I don't want to go through this debate

7    over meanings again.  Is there a difference between

8    going from the lead stage to beginning with us and

9    purchasing education services from Post?

10        A.    No.

11        Q.    And you said that other populations may

12   not have to deal with all of these steps.  For

13   example, you said military may not need the FAFSA;

14   correct?

15        A.    Correct.

16        Q.    So after Receive Application, the various

17   FAFSA arrows coming off of that would be different.

18   They would be GI bills, something like that;

19   correct?

20        A.    A lot of these would be the same.  There

21   would be slight deviations based on population.

22        Q.    It's generally very similar; correct?

23        A.    Correct.

24        Q.    And conceptually it's similar in terms of

25   you get the application and then you determine if

1       Q.    Do you remember when ITE became

2    application?

3       A.    There was always an application.  There

4    was just an ITE as well.

5       Q.    Do you remember when the ITE stopped being

6    used?

7       A.    I can't say for certain.

8       Q.    Do you remember a year?

9       A.    2015 or '16.  In-between that time frame

10   would be my best guess.

11      Q.    Why don't we go back to -- and I dread it,

12   but I want to go back to the discussion of the sales

13   categories and sales stages.

14           Who came up with -- who determined to call

15   them sales categories?

16      A.    I don't know.

17      Q.    Who determined to call them sale stages?

18      A.    I don't know.  That is how the system was

19   always -- it was always designed that way; it was

20   always there from when I began using it.

21      Q.    So it was difficult, but we established

22   that Post sells education services to students;

23   correct?

24      A.    Yes.

25      Q.    And we also established that this is the

Page 87

1    enrollment process; correct?

2        A.    Yes.

3        Q.    Is it fair to characterize this as the

4    sales process as well?

5        A.    I don't believe so.

6        Q.    So at Post, is there another process by

7    which --

8        A.    This is the enrollment process; that's

9    what this is.

10       Q.    So everything Post does with respect to

11   selling education services to students is

12   encapsulated in this document for the majority of

13   the population?

14       A.    Repeat the question, I apologize.

15       Q.    So the steps Post takes to sell

16   educational services to students is captured in this

17   document; correct?  For the majority of the

18   population; correct?

19       A.    Yes.

20       Q.    So if Post sells education services to

21   students, this is that process by which they sell

22   those education services; correct?

23       A.    That's semantics, but yes.

24       Q.    So then is it fair to say this is the

25   sales process for the majority of prospective

1    students?

2        A.      I see this and I see the enrollment

3    process from lead to start.

4        Q.      But someone at Post saw it as involving

5    sales; can we agree on that?

6        A.      Yes.

7        Q.      And you have no understanding of who

8    drafted this document?

9        A.      I don't know who drafted it.  I can say

10   with -- I'm pretty confident it's someone in the

11   admissions department, since this is the enrollment

12   process for the admissions team.

13       Q.      What is a KPI?  Have you heard the term

14   "KPI"?

15       A.      I have.

16       Q.      What is a KPI?  What does the acronym

17   stand for?

18       A.      Key performance indicator.

19       Q.      We are going to be referring back to 11106

20   quite a bit so don't let it go too far.

21              MR. GLAPION:  Can you please mark

22   this as Exhibit 17 I believe and hand it to the

23   witness.

24              (Exhibit 17, Post University - End

25              of MOD Assessment, Bates Numbers PU

Page 151

```
1    without a seller of something, of a product?
2         A.    Can you have a buyer --
3         Q.    Sure.  It might some like unreal, but I'm
4    curious.  If someone buys something, can you buy
5    something without there being a seller?
6         A.    No, by definition.
7         Q.    Okay.  So we've established then that this
8    process is the process by which a prospective
9    student purchases education services from Post;
10   correct?
11              MR. BOWSER:  Objection, compound.
12        Q.    Is that correct?
13        A.    That's subjective, but yes.
14        Q.    It's a simple yes or no question.  Is this
15   the process by which the majority of the population
16   purchases education services from Post?
17        A.    It depends.
18        Q.    What does it depend on?  We said the
19   majority of the population.  I restricted this to
20   the majority of the population.  I'm not talking
21   about the GI Bill; I'm talking about the majority of
22   the population.
23              Is it encapsulated on that document the
24   process by which they purchase education services
25   from Post?
```

Page 152

1      A.      Yes.

2      Q.      So by corollary, this is also the process

3   by which Post sells to the majority of the

4   population?

5      A.      Yes.

6      Q.      So then this, as much as you hate the

7   term, is the sales process?

8      A.      That's your definition, but yes.

9      Q.      Does Post enroll students without speaking

10   to them first?  When I say "speaking," I include

11   email in that.

12      A.      No.

13      Q.      And Post speaks with students via

14   telephone, text message and email, we established;

15   correct?

16      A.      Correct.

17      Q.      And Post on those calls with prospective

18   students provides information about Post; correct?

19      A.      Correct.

20      Q.      And we've established that providing

21   information has a marketing aspect to it; correct?

22              MR. BOWSER:  Objection, compound.

23      Q.      This was your testimony, that's not me

24   making it up.

25      A.      That depends.  I think that providing

Page 83

1        Q.    And this is the process that every

2    prospective student must follow; correct?

3        A.    Yes.

4        Q.    And this is the process for purchasing

5    educational services from Post; correct?

6        A.    Repeat the question.

7        Q.    And this is the process for purchasing

8    education services from Post; correct?

9        A.    Yes.

10        Q.    So anyone who purchases education services

11    from Post has to go through each of these steps;

12    correct?

13                MR. BOWSER:   Objection, compound.

14        Q.    You can answer.

15        A.    It depends.

16        Q.    You said a moment ago, and maybe my

17    interpretation --

18        A.    I'm looking at this.  This speaks to the

19    undergrad population.  It doesn't seem to -- there

20    is different steps for military students.  A lot of

21    them don't require a FAFSA, so this is more of an

22    overview of the common, the majority population.

23        Q.    So we will focus there and then we will

24    narrow it down a little bit.  So the majority of the

25    population that this deals with, this is how the

Page 84

1    majority of the population purchases education

2    services from Post; correct?

3        A.    This is how they go through to the funnel

4    to go from the lead stage to beginning with us,

5    starting with us, classes with us, yes.

6        Q.    I don't want to go through this debate

7    over meanings again.  Is there a difference between

8    going from the lead stage to beginning with us and

9    purchasing education services from Post?

10       A.    No.

11       Q.    And you said that other populations may

12   not have to deal with all of these steps.  For

13   example, you said military may not need the FAFSA;

14   correct?

15       A.    Correct.

16       Q.    So after Receive Application, the various

17   FAFSA arrows coming off of that would be different.

18   They would be GI bills, something like that;

19   correct?

20       A.    A lot of these would be the same.  There

21   would be slight deviations based on population.

22       Q.    It's generally very similar; correct?

23       A.    Correct.

24       Q.    And conceptually it's similar in terms of

25   you get the application and then you determine if

1    they could pay; correct?

2         A.    Correct.

3         Q.    Is this document an accurate reflection of

4    the enrollment process between July 30th, 2014 and

5    July 30th, 2018?

6         A.    No.

7         Q.    Can you elaborate on that?

8         A.    I'm not sure when the cutoff was, but we

9    referenced ITE before, and we moved away from that,

10   and that's not reflected in this document.

11        Q.    So where in this would ITE fall?  Would it

12   be between the green and the yellow, after the

13   yellow, etcetera, approximately?

14        A.    It would live with the -- in the

15   application area.

16        Q.    So it would be once you are already --

17        A.    An interview had been conducted.

18        Q.    So you are not a lead anymore; it's after

19   being a lead?

20        A.    Correct.

21        Q.    So you are in the blue pretty much?

22        A.    ITE, when it was in circulation, captured

23   the pipeline.

24        Q.    I understand.  Does this --

25        A.    Which in this document application would.

Page 279

1   still considers them to be a lost opportunity;

2   correct?

3       A.    Correct.

4               MR. GLAPION:  I'm going to just tidy

5   up one last section.  A lot of it was presumably

6   asked and answered, just sort of spread all over the

7   place.  So I'll give you a standing

8   asked-and-answered objection to save your voice and

9   save you from doing it.

10              MR. BOWSER:  Is this about sales?

11              MR. GLAPION:  It's about sales, I'm

12  sorry.  I'm sorry, I have to do it.

13  BY MR. GLAPION:

14      Q.    Okay.  So just follow this with me and

15  I'll try to break it down in a way that's relatively

16  agreeable.  I know it took a little while.

17              So prospective students, one way or

18  another, reach out to Post; correct?

19      A.    Correct.

20      Q.    And at that point, they become leads?

21      A.    Correct.

22      Q.    And those leads by going through the

23  process in --

24      A.    16.

25      Q.    -- in 16, ultimately that's the process

Page 280

1   they follow to enroll at Post; correct?

2       A.     Correct.

3       Q.     And that's for the majority of

4   students with --

5       A.     The majority of the undergraduate

6   population.

7       Q.     The difference is primarily relating to

8   how the prospective student is ATP'd; correct?

9       A.     Yeah, how the student --

10      Q.     Pays.

11      A.     -- provides their method of payment.

12  Sometimes the student doesn't pay at all.   Sometimes

13  the GI Bill or tuition assistance will cover all of

14  the tuition.   We have a senior discount where a Pell

15  Grant -- which is part of the tuition assistance,

16  part of Title IV funding, federal student aid.

17  People are eligible for grant money, and sometimes

18  that grant money, especially with our senior

19  discount, it will cover the entirety of the

20  student's tuition, so there are no fees for them, so

21  they are not paying anything.

22      Q.     So the main difference for the majority

23  population and other various populations of

24  prospective students relates to how they are

25  ultimately going to afford their education?

Page 281

1         A.      Excuse me?

2         Q.      The main difference from what you see in

3    Exhibit 16, which you said is the majority

4    population, to other populations, primarily relates

5    to how they are going to pay?

6         A.      Right.

7         Q.      And I recognize your --

8                    MR. BOWSER:   Object to the form.

9         Q.      -- testimony that they may not pay;

10   correct?   Because -- is that correct?

11        A.      Right.

12        Q.      Because a third party such as the

13   government may pay for them; correct?

14        A.      So to actually circle back to your

15   question, can you have a buyer without a seller, in

16   those situations, you almost can.

17        Q.      That's such a minor side quest at this

18   point.   Come on, let's keep this flowing; we're

19   almost done.

20                This is the process, though, for the

21   majority of students and generally for all

22   prospective students on how they would enroll at

23   Post?

24        A.      For the majority of the population, that's

25   the enrollment process that they go through.

Page 282

1    Q.    And the enrollment process, and this is

2   what I was just trying to establish, the enrollment

3   process difference with respect to say military, the

4   difference comes into play in terms of how they pay?

5    A.    The primary difference would be the method

6   of payment.

7    Q.    And this process to enroll at Post, when a

8   prospective student follows this process and enrolls

9   at Post, Post generates revenue from that; correct?

10    A.    It depends.

11    Q.    What does that depend on?

12    A.    If a student begins classes and

13   participates and decides during that first week that

14   this is not something that they are wanting to do,

15   we don't charge them for the class.  We give them

16   that opportunity.  We give them that grace period.

17    Q.    Would they be moved into the closed/won

18   state of Exhibit 16?

19    A.    If they participated, they would be moved

20   into closed/won, but there is other identifiers that

21   would help back them out of that systemically.

22    Q.    But this is the process if a person is

23   going to buy or, excuse me, enroll at Post

24   University, for the majority of the population, this

25   is the process that's followed?

Page 128

1      A.    Yes.

2      Q.    The same way, you would change the --

3  essentially a toggle would it be?

4      A.    There is a couple of additional steps, but

5  it follows the same logic.

6      Q.    And you said closed and lost are the same

7  thing, so I won't carry it down further.

8              MR. GLAPION:  Do you want to go off

9  the record for a minute, please.

10     (Recess taken from 11:38 a.m. to 11:49 a.m.)

11  BY MR. GLAPION:

12     Q.    Before I asked, and I don't recall your

13  answer and I couldn't find it in the realtime, so

14  I'll ask again, are closed opportunities considered

15  part of the pipeline that we discussed previously?

16     A.    No.

17     Q.    And rejected leads, if I recall, you said

18  are not part of that pipeline because they were

19  never in that pipeline; correct?

20     A.    Correct.

21     Q.    And we've established that Post makes

22  outbound telephone calls to prospective students;

23  correct?

24     A.    Yes.

25     Q.    And which employee groups are primarily

Page 129

1   responsible for making those telephone calls?

2        A.    To prospective students?

3        Q.    Yes.

4        A.    Admissions.

5        Q.    So that would be admissions counselors;

6   correct?

7        A.    Correct.

8        Q.    And team leads; correct?

9        A.    It depends.

10       Q.    But team leads could and would on occasion

11  pitch in to make calls; correct?

12       A.    Correct.

13       Q.    Would assistant directors of admissions?

14       A.    Yes.

15       Q.    When I say "telephone calls," unless I

16  break it out, for convenience, I'm referring to both

17  calls and text messages, so if I say "does Post make

18  telephone calls" and it doesn't include texts, if

19  you could just let me know on that.  But in this

20  scenario they do make text messages; correct?

21       A.    Correct.

22       Q.    Would you consider outbound telephone

23  calls to be the main outreach to prospective

24  students?

25       A.    It depends.

1  students?

2       A.    I see this and I see the enrollment

3  process from lead to start.

4       Q.    But someone at Post saw it as involving

5  sales; can we agree on that?

6       A.    Yes.

7       Q.    And you have no understanding of who

8  drafted this document?

9       A.    I don't know who drafted it.  I can say

10 with -- I'm pretty confident it's someone in the

11 admissions department, since this is the enrollment

12 process for the admissions team.

13      Q.    What is a KPI?  Have you heard the term

14 "KPI"?

15      A.    I have.

16      Q.    What is a KPI?  What does the acronym

17 stand for?

18      A.    Key performance indicator.

19      Q.    We are going to be referring back to 11106

20 quite a bit so don't let it go too far.

21            MR. GLAPION:   Can you please mark

22 this as Exhibit 17 I believe and hand it to the

23 witness.

24                    (Exhibit 17, Post University - End

25                    of MOD Assessment, Bates Numbers PU

Page 89

1                    00000038 through 39, marked for

2                    identification.)

3    BY MR. GLAPION:

4        Q.     So this is a two-page document.   Let me

5    know when you've had a chance to take a look at it.

6        A.     Yeah -- yes, I've seen it.

7        Q.     What does this document appear to be?

8        A.     It appears to be an end of a module

9    assessment.

10        Q.     Who would be the assessees for this

11    document?

12        A.     The admissions counselors.

13        Q.     And who would be the supervisors?   What

14    role are the supervisors?

15        A.     They are assistant directors.

16        Q.     So it wouldn't be team leads; it would be

17    the assistant directors?

18        A.     I don't know.   This is a fairly newer

19    document.   It could have been conducted by team

20    leads, ADs, a collaborative.

21        Q.     Just so I understand, I think I sort of

22    assumed this from previous depositions, but I'll get

23    it here, is the hierarchy within the admissions

24    department: there are admissions counselors; there

25    are team leads; there are assistant director of

1   admissions, and then there are director of

2   admissions?

3        A.    Yes.

4        Q.    And then who is after that again, the vice

5   president of admissions; is that correct?

6        A.    Correct.

7        Q.    And who does the vice president of

8   admissions report to?

9        A.    Chief officer of operations.

10       Q.    Which would be Reese?

11       A.    Correct.

12       Q.    And you will see top left of this document

13   Key Performance Indicators; correct?

14       A.    Yes.

15       Q.    And when I asked about KPI, that's what

16   KPI stands for; correct?  KPI stands for that, key

17   performance indicators?

18       A.    Yes.

19       Q.    What is meant by key performance

20   indicators?

21       A.    On this document or in general?

22       Q.    In general, yes.

23       A.    Metrics that are looked at to see

24   benchmarks towards goals, run rates, things of that

25   nature, key performance indicators.  Those are

1    things that are reviewed that have a weight on one's

2    success.

3        Q.    So there is six of them; correct?

4        A.    Yes.

5        Q.    And so it's fair to characterize what you

6    just said as those are six metrics by which

7    admissions counselors would be evaluated?

8        A.    Correct.

9        Q.    And we are going to jump back and forth

10   between 11106 and this document; you might want them

11   side by side just for convenience.

12           You will see the first key performance

13   indicator is Lead to PCAS.

14           Do you see that?

15       A.    Yes.

16       Q.    What is P-C-A-S or PCAS?

17       A.    It is a Professional College Advisory

18   Session.

19       Q.    Is that an interview?

20       A.    That's an interview.

21       Q.    So on 11106, the first blue arrow says

22   Interview and Opportunity Assessment.

23           Is that the PCAS?

24       A.    Yes, it is.

25       Q.    So the first green box is Lead and then

Page 99

1        A.    Correct.

2        Q.    So when we talk about the evaluation of

3   admissions counselors according to these KPIs, Post

4   is really looking at how they are moving people

5   along from one category to another; is that

6   accurate?

7        A.    How they are moving down the funnel, yes.

8        Q.    So the leads that come into an admissions

9   counselor that they are handling, it's looking at

10  how well that admissions counselor is moving these

11  leads into the opportunity stage and throughout this

12  process?

13       A.    Yes.

14       Q.    And when I say "this process," I'm talking

15  about the one on 11106 just to be clear.

16             And with the exception of the lead stage,

17  all of the stages, as we just discussed, PCAS to APP

18  all the way down to ATP to Start, all have, at least

19  in this document, sales categories and sales --

20  sales categories and/or sale stages attached;

21  correct?

22       A.    Yeah, I believe we've covered that, yes.

23       Q.    So the evaluation for the key performance

24  indicators is evaluating how well prospective

25  students are moved through the various sales

Page 100

1   categories and stages; correct?

2       A.      Admissions, when they are looking at a

3   pipeline of a student, an opportunity file,

4   application, FAFSA, ATP, those are the metrics that

5   they look at.  Those are the metrics that they speak

6   to.  These categories and stages are

7   behind-the-scene systemic triggers.  I just want

8   that to be clear.

9       Q.      I understand.  But they do have -- whether

10  you agree or disagree that they should -- they do

11  have something attached to each of these stages that

12  is either a sales category --

13      A.      Yes, the word "sales" is appended to

14  "category" and "stage" throughout this entire chart,

15  yes.

16      Q.      So when we are talking about evaluating

17  admissions counselors on going through these various

18  stages, it's at least whoever wrote this document

19  and whoever programmed the system, it's moving

20  them -- according to them, it's moving through

21  various sales stages and sales categories; correct?

22      A.      Yes.

23      Q.   Does Post conduct marketing -- and we can

24  set these documents aside for a moment.  Again, we

25  will come back to 11106.

Page 106

```
 1        A.    Yes.

 2        Q.    And you said, I believe, that previously

 3   your CRM system was Oracle On Demand?

 4        A.    Yes.

 5        Q.    And now it is CampusNexus Management?

 6        A.    Yes.

 7        Q.    Have you ever heard the term -- and I know

 8   you have because you mentioned it -- but the term

 9   "opportunity"?

10        A.    Yes.

11        Q.    What is an opportunity?

12        A.    An opportunity in Oracle is a lead that

13   someone has spoken to and expressed interest.  At

14   that point, they are converted from a lead into an

15   opportunity.

16        Q.    And that's reflected on 11106 that we

17   talked about --

18        A.    Correct.

19        Q.    -- where Contact Made, Interest Confirmed,

20   Lead is Converted to an opportunity; correct?

21        A.    Yes.  It's right before they become

22   qualified, in that middle area, that's where the

23   opportunity begins.

24        Q.    So the lead stops and opportunity begins

25   after that down green arrow Contact Made, Interest
```

1    Confirmed, Lead is Converted; correct?

2        A.    That's when they become an opportunity.

3        Q.    That's what I'm asking.

4        A.    Correct.

5        Q.    So the difference then between a lead and

6    an opportunity is that a lead hadn't yet confirmed

7    their interest and an opportunity had?

8        A.    Correct.

9        Q.    What is a rejected lead?

10               MR. BOWSER:   Objection, compound.

11       Q.    You can answer.

12       A.    It could be many different things.

13       Q.    But what is it?  Not the reasons for a

14   rejected lead, but I'm asking, what is a rejected

15   lead?  Have you heard the term before?

16       A.    Of course.

17       Q.    So what is a rejected lead?

18       A.    It is a lead that has been rejected.

19       Q.    And what are some of the reasons a lead

20   could be rejected?

21       A.    There are many reasons.

22       Q.    We've got a while.

23       A.    It could be -- the most common is 10

24   attempts.  We will reject a lead if -- definitely if

25   they've expressed that they are not interested; if

1     Q.    Did Post add references to the CRM system?

2     A.    Yes.

3     Q.    Did Post add references to the CRM system

4  in any way that -- let me rephrase this question.

5          Did Post add references to the CRM system

6  with their own entry?

7     A.    Can you expand on what that means?

8     Q.    The CRM system, correct me if I'm wrong --

9  we will take it piece by piece.

10         The CRM system has essentially files for

11 each lead; is that correct?

12    A.    Yes.

13    Q.    When Post received a reference, did it

14 create a file for the reference in that CRM system?

15              MR. BOWSER:  Objection, compound.

16    A.    There was an area within the original

17 inquiries record to add that reference's information

18 so that they can review it to call upon it.  They

19 didn't always speak to them at first attempt of

20 outreach.

21    Q.    The question was:  Did Post create a file

22 for the reference in the CRM system?  Did it?

23    A.    It could.

24    Q.    But I'm not asking if it could or I'm not

25 asking were there fields to do it.  I'm asking, when

Page 246

1      A.    Yes.

2      Q.    Excuse me, the audit trail?

3      A.    Yes.

4            MR. GLAPION:  I'm going to hand you

5      what will be marked as Exhibit 31.

6            (Exhibit 31, Opportunity Detail,

7            Bates Numbers PU00005403 through

8            5405, marked for identification.)

9      BY MR. GLAPION:

10     Q.    Do you recognize this document?

11     A.    Yes.

12     Q.    What do you recognize this document to be?

13     A.    Ms. Davis's opportunity record in CRM.

14     Q.    And if you look --

15     A.    Oracle CRM.

16     Q.    This is the old CRM; correct?

17     A.    Correct.

18     Q.    The one that was during the time period?

19     A.    Correct.

20     Q.    If you look at the last page of this

21     document marked 5405, at the bottom you will see

22     something that says Audit Trail; correct?

23     A.    Yes.

24     Q.    Above that, you will see something that

25     says -- excuse me, below that, you will see

1      A.    Yes.

2      Q.    And you said, I believe, that previously

3  your CRM system was Oracle On Demand?

4      A.    Yes.

5      Q.    And now it is CampusNexus Management?

6      A.    Yes.

7      Q.    Have you ever heard the term -- and I know

8  you have because you mentioned it -- but the term

9  "opportunity"?

10     A.    Yes.

11     Q.    What is an opportunity?

12     A.    An opportunity in Oracle is a lead that

13  someone has spoken to and expressed interest.  At

14  that point, they are converted from a lead into an

15  opportunity.

16     Q.    And that's reflected on 11106 that we

17  talked about --

18     A.    Correct.

19     Q.    -- where Contact Made, Interest Confirmed,

20  Lead is Converted to an opportunity; correct?

21     A.    Yes.  It's right before they become

22  qualified, in that middle area, that's where the

23  opportunity begins.

24     Q.    So the lead stops and opportunity begins

25  after that down green arrow Contact Made, Interest

Page 107

1    Confirmed, Lead is Converted; correct?

2        A.    That's when they become an opportunity.

3        Q.    That's what I'm asking.

4        A.    Correct.

5        Q.    So the difference then between a lead and

6    an opportunity is that a lead hadn't yet confirmed

7    their interest and an opportunity had?

8        A.    Correct.

9        Q.    What is a rejected lead?

10            MR. BOWSER:   Objection, compound.

11       Q.    You can answer.

12       A.    It could be many different things.

13       Q.    But what is it?  Not the reasons for a

14   rejected lead, but I'm asking, what is a rejected

15   lead?  Have you heard the term before?

16       A.    Of course.

17       Q.    So what is a rejected lead?

18       A.    It is a lead that has been rejected.

19       Q.    And what are some of the reasons a lead

20   could be rejected?

21       A.    There are many reasons.

22       Q.    We've got a while.

23       A.    It could be -- the most common is 10

24   attempts.  We will reject a lead if -- definitely if

25   they've expressed that they are not interested; if

Page 107

1    Confirmed, Lead is Converted; correct?

2         A.    That's when they become an opportunity.

3         Q.    That's what I'm asking.

4         A.    Correct.

5         Q.    So the difference then between a lead and

6    an opportunity is that a lead hadn't yet confirmed

7    their interest and an opportunity had?

8         A.    Correct.

9         Q.    What is a rejected lead?

10                    MR. BOWSER:   Objection, compound.

11        Q.    You can answer.

12        A.    It could be many different things.

13        Q.    But what is it?  Not the reasons for a

14   rejected lead, but I'm asking, what is a rejected

15   lead?  Have you heard the term before?

16        A.    Of course.

17        Q.    So what is a rejected lead?

18        A.    It is a lead that has been rejected.

19        Q.    And what are some of the reasons a lead

20   could be rejected?

21        A.    There are many reasons.

22        Q.    We've got a while.

23        A.    It could be -- the most common is 10

24   attempts.  We will reject a lead if -- definitely if

25   they've expressed that they are not interested; if

1    the number is not in service for an extended period

2    of time, which happens; sometimes people are unaware

3    that education isn't free, and they are not happy

4    with the idea of needing to use federal aid, so

5    there is a reject reason for that.

6        Q.    And those are the most prominent reject

7    reasons you can think of at the moment?

8        A.    Yeah.  I mean, the big --

9        Q.    I'm not trying a trick question here; I'm

10   just making sure we get through the list.

11       A.    There is a lot, so --

12       Q.    Have you ever heard the term "lost

13   opportunity"?

14       A.    Yes.

15       Q.    Is it properly called within Post lost or

16   closed opportunity?

17       A.    It's closed lost.

18       Q.    So it's closed/lost?

19       A.    Closed/lost in Oracle is the stage

20   closed/lost.

21       Q.    What's your preferred nomenclature on

22   that?

23       A.    Closed/lost.

24       Q.    Closed/lost, okay.  We will do

25   closed/lost.

1    A.    Closed/lost is fine.

2    Q.    If I ever slip and say lost and not closed

3 or closed and not lost, treat it as closed/lost,

4 please.

5    A.    I'll know what you mean, yeah.

6    Q.    Under what circumstances, give me again

7 the top five let's say, would a certain opportunity

8 be closed/lost?

9    A.    If a prospect goes unresponsive; if

10 someone determines that they are not ready to move

11 forward at that time; if someone can't complete

12 their method of payment; someone is unhappy with

13 their transfer evaluation; any sort of familial

14 issues, anything mitigating.  There is a multitude

15 of different reject reasons that capture all of

16 those things as well.

17    Q.    Going back to 11106, there is only --

18 there is a red box in the bottom right that says

19 Sales Category:  Lost, Manually Change Sales Stage

20 Action to Closed/Lost.

21         Do you see that?

22    A.    Yes.

23    Q.    There are only three arrows feeding into

24 that; correct?

25    A.    Yes.

Page 119

1      A.    Yes.

2      Q.    What is the technically proper way that

3 Melanie Davis's file should have been marked after

4 this email was received?

5      A.    Closed/deferred I would think, but again,

6 anything, closed/lost.

7      Q.    I understand your testimony that

8 closed/lost was primarily used, but based on the

9 wording of this email, the technically proper way,

10 your testimony is that it would be closed/deferred;

11 correct?

12     A.    Yes.

13     Q.    Is it fair to categorize rejected leads

14 and lost/closed opportunities as people who were

15 once in the enrollment pipeline and are no longer in

16 the enrollment pipeline?

17     A.    For closed opportunities?

18     Q.    Closed opportunities, yes.

19     A.    Yes.

20     Q.    And the same for rejected leads?

21     A.    The leads never made it to the pipeline,

22 but yes.

23     Q.    When a lead or opportunity expressed

24 disinterest when you -- actually, let's do a lead.

25          When a lead said, you know what, I'm no

Page 109

1      A.    Closed/lost is fine.

2      Q.    If I ever slip and say lost and not closed

3   or closed and not lost, treat it as closed/lost,

4   please.

5      A.    I'll know what you mean, yeah.

6      Q.    Under what circumstances, give me again

7   the top five let's say, would a certain opportunity

8   be closed/lost?

9      A.    If a prospect goes unresponsive; if

10  someone determines that they are not ready to move

11  forward at that time; if someone can't complete

12  their method of payment; someone is unhappy with

13  their transfer evaluation; any sort of familial

14  issues, anything mitigating.  There is a multitude

15  of different reject reasons that capture all of

16  those things as well.

17     Q.    Going back to 11106, there is only --

18  there is a red box in the bottom right that says

19  Sales Category:  Lost, Manually Change Sales Stage

20  Action to Closed/Lost.

21           Do you see that?

22     A.    Yes.

23     Q.    There are only three arrows feeding into

24  that; correct?

25     A.    Yes.

Page 249

```
 1              (Exhibit 33, Emails, Bates Numbers
 2              MD000396 through 398, marked for
 3              identification.)
 4    BY MR. GLAPION:
 5       Q.    This appears to be an email chain between
 6    Victoria Meehan and someone at the email address
 7    mdspecialist21@gmail.com; correct?
 8       A.    Yes.
 9       Q.    And the email is initially from Ms. Meehan
10    to mdspecialist; correct?
11       A.    Yes.
12       Q.    And I'll represent to you that
13    mdspecialist21@gmail.com is Melanie Davis's email
14    address just so we don't have to call her
15    mdspecialist for the rest of this segment.
16       A.    Fair enough.
17       Q.    If you look at the page marked MD397, it
18    appears to be a response email from Melanie Davis to
19    Victoria Meehan.
20             Do you see that?
21       A.    I do.
22       Q.    In that email, Melanie Davis writes,
23    Please stop emailing, texting, SMS, calls and
24    voicemail.
25             Do you see that?
```

Page 250

1      A.     I do.

2      Q.     Does Post consider that to be a Do Not

3   Call request?

4      A.     Yes.

5      Q.     Would you consider this to be a Do Not

6   Call request?

7      A.     Yes.

8      Q.     According to your previous testimony, how

9   should this email have been treated?   Excuse me.

10  According to your previous testimony, how should the

11  request made in this email have been treated?

12     A.     Records should have been rejected as Not

13  Interested, Remove From List and all of the other

14  detail that follows.

15     Q.     And if we go to -- and actually if you

16  look at the dates of this email, it appears to be on

17  October 11, 2017; correct?

18     A.     Pardon me?

19     Q.     This email exchange happened on

20  October 11, 2017; correct?

21     A.     Yes.

22     Q.     And if we look at 17440, which is the

23  expanded audit trail, does this appear as you would

24  expect an expanded audit trail to look?

25     A.     Yes.

Page 251

1      Q.    And it has columns with headers such as

2  User Sign In, ID, The Operation, Field Modified, Old

3  Value, New Value, and Date.

4            Do you see that?

5      A.    I do.

6      Q.    It also has columns for Last Name and

7  First Name of what seems to be Post employees;

8  correct?

9      A.    Yes.

10     Q.    And generally speaking, is that how an

11 audit trail works, it logs which employee takes

12 which action with respect to a file?

13     A.    Yes.

14     Q.    And I will scroll to the right to show the

15 columns Field Modified, Old Value and New Value.

16 Excuse me, I'll scroll to Old Value and New Value,

17 because Old Value and New Value, those would reflect

18 what it was and what it was changed to; correct?

19     A.    Correct.

20     Q.    So if Ms. Davis was marked as Remove From

21 List, it would reflect in an old value becoming --

22 one of the old values becoming Remove From List; is

23 that accurate?

24     A.    Yes.

25     Q.    And if we look at the rightmost column,

Page 252

1    Date, we established that this email exchange was

2    dated October 11, 2017.

3            Do you see any old values or new values or

4    any indication that Ms. Davis was marked as Remove

5    From List on October 11, 2017?  And I can scroll

6    left or right as needed.

7        A.    No.  I see that Ms. Davis's FAFSA arrived.

8    That's the --

9        Q.    Which time stamp is that, if you don't

10   mind?

11       A.    12:35, FAFSA is here, mail merge 1011 V.

12   So that would suggest that Ms. Davis filled out her

13   free application for federal student aid, put our

14   school code on it, and we received it, which is why

15   V reached out to her via email.  That's what I would

16   deduce from that.

17       Q.    Correct.  This email that we discussed

18   that is marked Exhibit 33, the subject is Your FAFSA

19   is here.

20            Do you see that?

21       A.    Yes.

22       Q.    So this email, the field you just

23   mentioned that said FAFSA is here, mail merge

24   corresponds with this email; is that --

25       A.    Yes.

1    Q.    So it would have been after this email was

2    sent on October 11 that Ms. Davis, per your

3    testimony, should have been marked as Remove From

4    List; correct?

5    A.    Well, there is a notation of the fact that

6    the FAFSA is here, so she sent an email to let her

7    know -- Ms. Davis know that her FAFSA was here, and

8    it takes one to two days to fill out a FAFSA, and

9    you need to put a specific school code, specific to

10   each institution.  So within two days, Ms. Davis had

11   filled out her FAFSA and put our school code on it.

12   Q.    My question though is nothing about what

13   Ms. Davis did or didn't do with the school code.  My

14   question is, based on your testimony that Ms. Davis

15   should have been marked as Remove From List, among

16   other things, and I'm asking if in this audit trail

17   do you see on October 11th Ms. Davis being marked as

18   Remove From List?

19   A.    I do not.

20   Q.    And I'm going to hand you another exhibit,

21   if I can find it.

22        MR. GLAPION:  If we can mark this as

23   Exhibit 34, please.

24        (Exhibit 34, Emails, Bates Numbers

25        MD000308 through 311, marked for

Page 254

1                identification.)

2     BY MR. GLAPION:

3         Q.    Before I ask about this document, if

4     Ms. Davis had been marked as Remove From List, it

5     would reflect on this audit trail; correct?

6         A.    Yes.

7         Q.    Is there any way to manually delete

8     entries from the audit trail?

9         A.    No.

10        Q.    Why would Ms. Davis not have been marked

11    as Remove From List after emailing Victoria Meehan?

12        A.    Victoria more than likely missed this

13    email response.

14        Q.    And then if we look at the exhibit that

15    you were just handed, Exhibit 34, this appears to be

16    another email, but this time between Kimberly

17    Williams and Melanie Davis; correct?

18        A.    Correct.

19        Q.    And the front page email is dated

20    November 8, 2017; correct?

21        A.    Pardon me?

22        Q.    The email is dated November 8, 2017;

23    correct?

24        A.    Correct.

25        Q.    And if you turn to the page marked MD310,

Page 255

1    at the bottom, you see a response from Melanie Davis

2    to Kimberly Williams.

3              Do you see that?

4    A.     I do.

5    Q.     And in that email, Ms. Davis writes, I've

6    asked you and your colleagues to stop calling me and

7    emailing -- excuse me, to stop calling and emailing

8    me.  I was once interested and have had to change my

9    mind.  I am no longer interested in applying to

10   attend Post University.  Please let this be my last

11   communication regarding your school.

12             Does Post consider this to be a Do Not

13   Call request?

14   A.     I would say that this falls into that

15   category, yes.

16   Q.     And therefore, according to your previous

17   testimony, Ms. Davis should have been marked as

18   Remove From List in response to this request;

19   correct?

20   A.     Yes.

21   Q.     And if we go back to the audit trail, do

22   you see anything on or about November 8th, 2017 that

23   indicates that Ms. Davis was marked as Remove From

24   List?

25   A.     No.

Page 256

1    Q.    And why would that be?

2    A.    I believe this response was missed by

3  Kimberly Williams.

4                MR. GLAPION:  This could be marked as

5  Exhibit 35, please.

6                (Exhibit 35, Emails, Bates Numbers

7                MD000247 through 248, marked for

8                identification.)

9  BY MR. GLAPION:

10   Q.    From the fact that you're looking at the

11 exhibit, I think you know where the line of

12 questioning is going, but we will work through it.

13            This appears to be an email from Victoria

14 Meehan to Melanie Davis; correct?

15   A.    Yes.

16   Q.    Dated January 4, 2018, at 9:24 a.m.?

17   A.    Correct.

18   Q.    On the second page of the exhibit, there

19 appears to be a response from Melanie Davis to

20 Victoria Meehan.

21            Do you see that?

22   A.    Yes.

23   Q.    And in this response Ms. Davis writes,

24 Please stop contacting me, not interested.

25            Do you see that?

Page 257

1        A.      Yes.

2        Q.      Does Post consider this to be a Do Not

3    Call request?

4        A.      It depends.

5        Q.      Do you consider this to be a Do Not Call

6    request?

7        A.      It's not very explicit.

8        Q.      Is it your testimony that it depends on

9    whether Post treats the phrase "Please stop

10   contacting me" as a Do Not Call list -- excuse me.

11           Is it your testimony that Post considers

12   "Please stop contacting me" to be ambiguous?

13       A.      This would warrant our Do Not Call policy

14   as well.

15       Q.      So Post would consider this to be a Do Not

16   Call request?

17       A.      Yes.

18       Q.      And again, per your testimony, this should

19   have been marked as Remove From List; correct?

20       A.      Yes.

21       Q.      And do you see anything on the audit trail

22   on our about January 4th, 2018 marking Ms. Davis as

23   Remove From List?

24       A.      Can you scroll to the left?

25           No.

1      Q.     I apologize if you were still looking.

2  Does that scroll look right there?

3      A.     Yes.

4      Q.     And do you see anything marking her as

5  Remove From List?

6      A.     No.

7      Q.     And you see that Ms. Davis's response,

8  Please stop contacting me, not interested, was sent

9  according to this at 10:53 a.m.?

10     A.     Yes.

11     Q.     Four minutes later, it appears that

12  there's two entries made on January 4, 2018 at

13  10:57.

14         Do you see that?  There's four entries

15  made, but there are two that appear to involve

16  reject reasons.

17     A.     Yes.

18     Q.     And I'm going to scroll to the left, and

19  it appears that those entries were made by Victoria

20  Meehan.

21         Do you see that?

22     A.     Yes.

23     Q.     And those entries were for the fields

24  Reason Lost and Reason Lost Detail.

25         Do you see that?

Page 259

1      A.      Yes.

2      Q.      And the Reason Lost provided the new value

3  was technical.

4              Do you see that?

5      A.      Yes.

6      Q.      And then Reason Lost Detail was duplicate

7  opportunity.

8              Do you see that?

9      A.      Yes.

10     Q.      So why would Ms. Meehan not have marked

11  this as a Remove From List?

12     A.      I can't say.

13     Q.      It appears though that from the time stamp

14  of this action that she likely saw this email.

15              Do you agree with that?

16     A.      I can't say.

17     Q.      This email was sent at 10:53 and then

18  Ms. Meehan took action on the reject reason at

19  10:57.

20              Do you believe that could be a

21  coincidence?

22     A.      I can't say with certainty.

23     Q.      What was the reject reason -- excuse me.

24              What was the Reason Lost technical tag

25  intended to be used for?

1      Q.    And it's the same thing with respect to

2   lost opportunities; correct?  There's a lot of

3   questions I asked so let me try again.

4           A lost opportunity is reached; an

5   admissions counselor is gauging if they are

6   interested or capable of now continuing the process

7   that they previously started; correct?

8      A.    Most of the times, yes.

9      Q.    That's the 90 plus percent versus the

10  small subset we discussed; correct?

11     A.    Yes.

12     Q.    And those admissions counselors then, they

13  take sort of the same role as we just discussed;

14  they nurture those prospective students through the

15  process in 16?

16     A.    Yes.

17     Q.    Between July 30th, 2014 and July 30th,

18  2018, did Post have a written Do Not Call policy?

19     A.    No.

20     Q.    Between July 30th 2014 and July 30, 2018

21  if someone requested Post's written Do Not Call

22  policy, what would be provided?

23     A.    I don't know.  I'm not certain.

24     Q.    Did anyone ever request -- to the best of

25  your knowledge, did anyone ever request the Do Not

Page 210

1    Call policy from Post University?

2        A.    Outside of this, not to my knowledge.

3        Q.    When you say "outside of this," are you

4    saying outside of my client's request?

5        A.    Correct.

6        Q.    And when my client requested a written Do

7    Not Call policy, what was provided?

8        A.    I can't recall exactly what was provided.

9        Q.    Did my client's request get discussed

10   internally at Post?

11       A.    Yes.

12       Q.    Excluding any communications with your

13   lawyers, I'm talking strictly after my client made

14   the request, did Post University employees and

15   officers discuss how to respond to the request?

16       A.    Just the lawyer or the lawyer and --

17       Q.    No, I'm excluding -- Adam, I'm sorry to

18   exclude you -- but no, I don't want to know any

19   communication with the lawyers.

20             Before the lawsuit, my client requested

21   the policy.  When my client requested the policy,

22   was it discussed on how to respond?

23       A.    There were a couple of communications as

24   to, is there something that can be provided.  Adam

25   was on the call.

Page 101

1          But does Post conduct any marketing to
2     advertise Post to prospective students?
3          A.    Yes.
4          Q.    What kind of marketing?
5          A.    TV commercials, radio ads, billboards,
6     AdWords on Google, things of that nature.
7          Q.    What's the point of that marketing?
8          A.    To capture people that are interested in
9     going back to school, and if they were unaware that
10    Post existed, hopefully that they will be driven
11    towards us so that we can have a PCAS with them and
12    see if we are the right choice for them.
13         Q.    What is the goal of that marketing from
14    Post's perspective?
15         A.    I believe I just answered that.
16         Q.    Is one of the goals of that marketing to
17    increase enrollment?
18         A.    Yes.  That's how prospective students come
19    to us.
20         Q.    Through --
21         A.    As you had mentioned, we are not Harvard.
22         Q.    It's through your marketing that they come
23    to you; correct?
24         A.    Correct, sir.
25         Q.    And does Post conduct outreach to

1    prospective students as part of efforts to increase

2    enrollment?

3        A.    Yes.

4        Q.    Are outbound telephone calls included in

5    that?

6        A.    Yes.

7        Q.    Text messages?

8        A.    Yes.

9        Q.    Emails?

10       A.    Yes.

11       Q.    And so as you said, I don't want to

12   mischaracterize, but the marketing is done basically

13   to attract potential students to Post; correct?

14       A.    It's to provide brand awareness and

15   attract, let people know that we are here.

16       Q.    And the hope of that obviously is to get

17   people to hopefully come here or come to Post;

18   correct?

19       A.    Correct.

20       Q.    How does Post find out about interested

21   prospective students?

22            MR. BOWSER:  Objection, compound.

23       A.    Many different ways.

24       Q.    Does it find out -- I guess I'm not asking

25   about specific vendors you work with; I'm more

Page 132

1      Q.    So were the calls -- I'll ask again just

2   because I want to clarify the testimony -- were the

3   calls made to prospective students in the lead stage

4   considered to be marketing?

5                  MR. BOWSER:  Objection, legal

6   conclusion, compound.

7      A.    I guess it depends.

8      Q.    Is television advertisement -- did you say

9   Post does television advertisements?

10      A.    Yes.

11      Q.    Is that marketing?

12      A.    Yes.

13      Q.    Does Post do radio advertisements?

14      A.    Yes.

15      Q.    Is that marketing?

16      A.    Yes.

17      Q.    So you, again, have an understanding of

18   what marketing is; correct?

19      A.    Correct.

20      Q.    So to you, what does marketing mean?

21      A.    Bringing awareness to something, the act

22   of bringing awareness to something.

23      Q.    And when we talked previously about

24   marketing, I believe we established that part of the

25   goal of Post's marketing was to increase enrollment;

1    correct?

2        A.    They provide -- help us obtain resources,

3    but the end goal, yes.

4        Q.    So the end goal of the marketing was, or

5    at least one of the end goals of the marketing was

6    to increase enrollment; correct?

7        A.    One of, yes.

8        Q.    So were the telephone calls to leads

9    intended to increase enrollment?

10                   MR. BOWSER:   Objection, compound.

11       A.    The intention is to respond to somebody

12   that's requested more information.  That's the

13   intention of reaching out to -- we are speaking on

14   the admissions level, and we are speaking about

15   phone calls, that phone call on the lead level is to

16   respond to someone that has requested, through

17   filling out an RFI, that they would like to receive

18   more information via text, email and phone, as all

19   are advised have TCPA language within them.  So to

20   answer your question, that is the intention of the

21   call.

22                   So I would say no, it's not marketing.

23   It's response.   It could be considered marketing in

24   the way of we are providing information about the

25   school when we speak to someone.

Page 134

1      Q.    And to what end is that information being

2  provided from Post's perspective?

3      A.    Within the context of the conversation

4  that the admissions counselor is having with the

5  prospect at that juncture?

6      Q.    Admission counselors are instructed as

7  part of their job to call leads; correct?

8      A.    Correct.  They are responding to that

9  request for information, yes.

10      Q.    And when they call those leads, regardless

11  of -- when they call those leads to respond to their

12  request for information, what is Post's goal with

13  respect to calling those leads?

14            MR. BOWSER:  Objection, asked and

15  answered.

16      Q.    You can answer.

17      A.    I believe I've answered that.

18      Q.    Well, I would like you to answer again,

19  because I don't believe you have.

20      A.    Can you repeat the question.

21      Q.    When Post places calls to leads, even if

22  you are saying that the lead requested information,

23  what are Post's goals in making those calls?

24      A.    Post is returning a request for

25  information, that is what the admissions counselor

Page 135

1   is going through the motion of when they call, text

2   and/or email a lead.  They are calling to provide

3   that person who has requested information,

4   information about Post University.

5       Q.     Were these calls part of an effort to

6   encourage enrollment in Post?

7       A.     Throughout the cadence of the PCAS, should

8   the conversation shift into that, the admissions job

9   is to enroll students at Post University.

10      Q.     How many admissions counselors are

11  employed at Post?

12      A.     I can give you a rough number.

13      Q.     Rough number is fine.

14      A.     130.

15      Q.     And between 2014 and 2018, did that --

16      A.     Pause.  Forgive me, that's 130 undergrad.

17  If we are factoring in all departments, I just want

18  it to be clear, it's probably closer to 160 all

19  encompassing.

20      Q.     And between 2014 and 2018, did that number

21  stay approximately stable?

22      A.     I don't know.

23      Q.     Do you know, is an admissions counselor

24  hourly or salaried?

25      A.     Hourly.

Page 137

1    said multiple times, not to your understanding, but

2    also that it could be marketing.

3           So what definition are you using of

4    marketing that includes television, radio ads, but

5    does not include the outbound telephone calls?

6       A.    Because -- I'll explain.  The phone call

7    is replying to a request for information; we've

8    covered that.  I also consider providing

9    information, as I had mentioned before, to be a part

10   of marketing, providing information about something.

11   That is what transpires within a phone call.  So the

12   act of making a phone call isn't necessarily an act

13   of marketing by my definition, but I do feel like it

14   is a conduit to marketing because information is

15   then provided once a connection has been made.

16      Q.    Got it.  That's actually helpful because I

17   can sort of figure out where the issue is coming in

18   in terms of our communication.

19           So when Post reaches a lead and the lead

20   actually gets on the phone, Post then, its admission

21   counselors or whoever is making phone calls,

22   provides information; correct?

23      A.    Correct.

24      Q.    And that has a marketing component to it;

25   correct?

Page 138

1      A.      We are providing information about the

2   university, so yes.

3      Q.      And in Post's perspective that has a

4   marketing --

5                    MR. BOWSER:  Objection, calls for a

6   legal conclusion.

7      Q.      Does Post consider that to have a

8   marketing element to it?

9      A.      That's my opinion.

10      Q.      I'm asking about how Post views the

11   purpose of these calls.

12                    Does it have a marketing element to them?

13      A.      The call is to provide information.

14      Q.      And does Post view providing information

15   as part of a marketing function?

16      A.      I don't -- I don't know.

17                    MR. GLAPION:  Can you mark this, what

18   are we on, 19?

19                    THE REPORTER:  Yes.

20                    MR. GLAPION:  Thank you.  These can

21   be 19 and 20.

22                    (Exhibit 19, Post University

23                    Position Description, December 1,

24                    2016, Bates Number PU00000005, marked

25                    for identification.)

Page 141

1    have the same -- or excuse me, PU 29, Exhibit 20,

2    where it says, in the first paragraph, You will need

3    excellent communication, listening, customer service

4    and sales skills.

5            So admissions counselors needed sales

6    skills; correct, in Post's view?

7        A.    You need the ability to build rapport,

8    which is considered a sales skill.

9        Q.    Is it your testimony that admissions

10   counselors were not involved in any sales?

11       A.    No.

12       Q.    That's not your testimony.  So, okay, so

13   then if --

14       A.    Define sales, since we went round and

15   round with that.

16       Q.    Sure.   The definition I'm using of sales

17   in the context of Post University, and you can tell

18   me if you disagree, is that Post University provides

19   its education services for a fee.

20       A.    If by that definition of sales, then yes,

21   and an admissions counselor is involved in that

22   process, yes.

23       Q.    And these phone calls that the admissions

24   counselors make, even if responding to a request for

25   information, are part of that sales process, using

1    the definition we just established; correct?

2        A.    Yes.

3        Q.    And on this document -- we are still on

4    Exhibit 20, third to last bullet point -- it says

5    that an admissions counselor is expected to

6    participate in weekly team and floor-wide meetings

7    to address sales tactics.

8            Do you see that?

9        A.    Where are we?

10       Q.    Third to last bullet point on Exhibit 20,

11   on the top section, I apologize.

12       A.    Yes, I see that.

13       Q.    So again, one of the expectations of an

14   admissions counselor was to be in meetings where

15   they talk about tactics to sell; correct?

16       A.    Yeah, well, whenever anybody is providing

17   a product to someone, you should understand how to

18   deliver that product.

19       Q.    So they would meet, and tell me if you

20   disagree with this characterization, when they say

21   "weekly team and floor-wide meetings to address

22   sales tactics," that's talking about how best to

23   sell Post University?

24       A.    It's how best to build rapport or

25   objection overcoming, as we've discussed before.

Page 153

1    information is a form of marketing.  Marketing is

2    providing information.  That's a personal feeling.

3    So if that is a Post testimony, then I would like to

4    retract it.

5         Q.    I mean, ultimately you were designated to

6    be deposed by Post.  I recognize what you are saying

7    about that is your own personal testimony.  If you

8    are not prepared to answer that question on behalf

9    of Post, again, that's something that can be dealt

10   with later, but I understand what you are saying in

11   terms of your testimony that it is on your own

12   personal behalf on that particular question.

13            Is one of the goals when an admissions

14   counselor first places a call -- let's start with a

15   lead, they first place a call to a lead, is one of

16   the goals to ultimately enroll that student in Post?

17        A.    Yes.

18        Q.    And when you enroll in Post, again, we've

19   established, though we don't necessarily like to

20   agree on the terminology, enrollment in Post and

21   purchasing Post educational services are the same

22   thing.

23        A.    Yes.

24        Q.    And there are multiple steps from inquiry

25   to enrollment; correct?

Page 156

1    A.    If the lead picks up the phone.

2    Q.    That appears to me though to be captured

3    in the red arrow to the right, that you are

4    attempting to contact the lead.

5         So the attempt to contact the lead starts

6    the process of that; correct?

7    A.    Yes.

8    Q.    And then reaching the lead starts the

9    actual status process in qualifying, qualify,

10   qualified, etcetera?

11   A.    Correct.

12   Q.    So although the prospective student may

13   not enroll on that very first call, that very first

14   call to a lead starts that process that could

15   potentially lead to enrollment; correct?

16   A.    Yes.

17   Q.    And when an opportunity is called, is it

18   fair to characterize a goal of that call to an

19   opportunity to move the -- help move the opportunity

20   move through the process outlined in Exhibit 16?

21   A.    Yes -- well, it depends.  It's not -- not

22   every call is designed to move a person through the

23   funnel.  There are calls to check up on someone.

24   There's calls -- personal relationship calls that

25   are established to see how someone's soccer game

Page 288

1    correct?

2         A.    Telephone and text.

3         Q.    And text?

4         A.    Which you combined.

5         Q.    I apologize.  Okay.  So as part of this

6    process, Post makes telephone calls and text

7    messages to prospective students?

8         A.    Correct.

9         Q.    And it does so to leads; correct?

10         A.    Yes.

11         Q.    And it does so to opportunities; correct?

12         A.    Yes.

13         Q.    And Post also calls, as we discussed, some

14    categories of rejected leads; correct?

15         A.    Pardon me?

16         Q.    Post also calls some categories of

17    rejected leads; correct?

18         A.    Correct.

19         Q.    And the purpose for the calls of those

20    rejected leads is to move them back into this

21    process or a similar process, like the one described

22    in Exhibit 16?

23         A.    The purpose of calling these rejected

24    leads is to provide them with the information that

25    they had requested when filling out the RFI, when we

Page 290

1    Q.    Which is part of the process?

2    A.    Which is part of the process.

3    Q.    And same with respect to opportunities,

4  lost opportunities, Post calls or texts some

5  categories of lost opportunities; correct?

6    A.    Correct.

7    Q.    And the goal with contacting those

8  categories of lost opportunities is to get them into

9  or back into this process, correct, for the

10  majority, the vast majority of those calls?

11    A.    Correct.

12    Q.    And as part of the communication with

13  rejected leads, one of the roles is to encourage or,

14  excuse me, your word was "nurture," is to nurture

15  them through this process; correct?

16    A.    Correct.

17    Q.    And part of nurturing those rejected leads

18  or now converted leads through this process is to

19  encourage them at the various steps; correct?

20    A.    Yes.

21    Q.    And with respect to opportunities and lost

22  opportunities, once they enter back into this

23  process, the goal is to continue to nurture them

24  through this process; correct?

25    A.    Correct.

Page 117

1      Q.    I'm asking at the time a lead is rejected,
2   are they still considered a potential new enrollment
3   by Post?
4      A.    I guess I don't understand the question.
5      Q.    There are a lot of rejected leads; is that
6   fair to say?
7      A.    Yes.
8      Q.    In that lot of rejected leads, does Post
9   view those as still an avenue to potentially obtain
10  new enrollments?
11     A.    Yes.
12     Q.    Same question with respect to lost/closed
13  and lost opportunities.  After they are marked as
14  closed/lost, are they still considered a potential
15  avenue for new enrollments?
16     A.    Yes.
17              MR. GLAPION:  Can we mark this as --
18  what are we on -- 18, and please hand it to the
19  witness when you can.
20                  (Exhibit 18, Emails, Bates Numbers
21                  PU00000062 through 64, marked for
22                  identification.)
23  BY MR. GLAPION:
24     Q.    Have you seen this document before?  If
25  you need time to look at it still, that's fine.

Page 167

1              MR. GLAPION:  I don't remember -- I

2      can't remember anything.  That's why I have the

3      realtime.

4      BY MR. GLAPION:

5          Q.    In terms of rejected leads, because we've

6      been focused on opportunities, would rejected leads

7      be called by the admissions department?

8          A.    It depends which ones.

9          Q.    But at least some of the rejected leads

10     would be called by the admissions department;

11     correct?

12         A.    Correct.

13         Q.    And the calls to the rejected leads, did

14     they have that same purpose we discussed with --

15     excuse me -- did the majority of them have the same

16     purpose we discussed with lost opportunity, to

17     reengage them with the sales process, or excuse

18     me --

19         A.    It should be probably all of them because

20     if they never made it to the opportunity phase, then

21     there was no conversation that transpired, so how

22     could rapport be established at that juncture.

23         Q.    So the goal of calling a rejected lead was

24     to --

25         A.    To see if --

1    Q.    -- I don't even want to say reengage, to

2    engage them with the process outlined in 16?

3    A.    The goal of calling a rejected lead is to

4    see if a prospective student that had once filled

5    out a request for information about going to school

6    with us, that we were unable to connect to in a

7    timely manner in the past, due to reasons we were

8    unable to identify, to see if now is the better

9    time.

10    Q.    To see if they are still interested;

11    correct?

12    A.    Correct.

13    Q.    In purchasing education services from

14    Post; correct?

15    A.    In moving forward with their education

16    with Post, correct.

17    Q.    Is there a difference between what you

18    said and I said?

19         I know we keep fighting on this, I don't

20    like it either, but is there a difference between

21    what you said and I said besides the words?

22    A.    We are providing a service and the service

23    has a fee attached to it so, we can call it whatever

24    we'd like.

25    Q.    So when you say it's correct that the

1      A.    Correct.

2      Q.    So these calls are necessarily then part

3   of an effort to enroll students?

4      A.    Yes.

5      Q.    And was one of the purposes to convert

6   someone who was previously rejected into an enrolled

7   student?

8      A.    Yes.  I'm confused.

9      Q.    Was one of the purposes of the calls to

10  rejected leads to convert them ultimately into an

11  enrolled student?

12     A.    Yes.

13     Q.    Did Post track rejected leads that were

14  subsequently converted into enrolled students?

15     A.    Not to the granularity that they probably

16  should.

17     Q.    Did you track rejected leads that were

18  converted into enrolled students?

19     A.    No.

20            MR. BOWSER:  Can we go off the record

21  for a second?

22            MR. GLAPION:  Sure.

23     (Recess taken from 1:07 p.m. to 1:09 p.m.)

24  BY MR. GLAPION:

25     Q.    Before the break, I asked if you had

Page 207

1      Q.      And there are multiple stages in general

2   in the admissions process at Post; correct?

3      A.      Correct.

4      Q.      So once a rejected lead now moves into the

5   process on Exhibit 16, would you characterize one of

6   the roles of an admission counselor to encourage

7   them to complete the steps necessary to move through

8   those steps?

9      A.      I would use the word "nurture" them versus

10  encourage, but yes, that is the objective.

11     Q.      Is nurture to you broader or narrower than

12  encourage?

13     A.      Again, the admissions counselors' scope of

14  their job is outside of just the documentation.

15  It's to provide the information to the student,

16  conduct a PCAS, and then help them, nurture them

17  through the additional steps that are needed in

18  order to complete their enrollment file.

19     Q.      And nurture also could or does nurture

20  also include encouragement, hey, complete this step

21  or you are close, do this step, that kind of thing?

22     A.      Sure, yes.

23     Q.      So there is an encouragement element to

24  nurturing would you say?

25     A.      Absolutely.

```
                                                     Page 3
```

1                          INDEX
2     EXAMINATION
3     Witness Name                              Page
4     Sean Cooley
5         Direct By Mr. Glapion .................... 7
6
7
8                         REQUEST
9         Request ................................. 113
10
11
12                  PLAINTIFF'S EXHIBITS
13               (Marked For Identification)
14                                              Page
15    Exhibit 12 Marked .......................... 7
      Notice of Deposition of designated
16    representative of Post University and Notice
      of Deposition of Sean Cooley
17
      Exhibit 13 Marked .......................... 20
18    Post University Performance Appraisal Reviews
      re Sean Cooley, Bates Numbers PU00017449
19    through 17470
20    Exhibit 14 Marked .......................... 50
      Email, Bates Numbers PU00004476 through 4481
21
      Exhibit 15 Marked .......................... 66
22    Post University Performance Appraisal Review
      Form, Bates Numbers PU00000134 through 150
23
      Exhibit 16 Marked .......................... 70
24    Document bearing Bates Number PU00011106
25

```

1    experience is like being a Post University eagle.

2        Q.    Okay.

3        A.    That is what I deduce from this email.

4        Q.    Fair enough.  Going back to what we

5    discussed -- we are done with this document for

6    now -- I believe you said that with respect to

7    rejected leads, all of the calls to rejected lead

8    would be an attempt to begin the process outlined in

9    Exhibit 16; is that accurate?  We are talking about

10   rejected leads.

11       A.    Yes.

12       Q.    And this process is -- I'm not going to

13   ask that again, I don't even want to go there again.

14           These calls then were ultimately part of

15   efforts by Post to enroll students at Post

16   University; is that fair?

17       A.    These efforts were put in place to provide

18   information to a prospective student that had

19   requested information that we were unable at that

20   point -- up until that point to provide them with.

21       Q.    To begin this process?

22       A.    To begin that process.  I just wanted to

23   preface it with that first part.

24       Q.    And this process is the process by which

25   students are enrolled?

```
 1              AFTERNOON SESSION

 2                    2:04 P.M.

 3

 4    S E A N    C O O L E Y,

 5        having been previously duly sworn, resumed the

 6        stand, testifying further on his oath as

 7        follows:

 8

 9    DIRECT EXAMINATION BY MR. GLAPION (continued):

10        Q.    I want to circle back to the calls to

11    rejected leads.  We established that the calls to

12    rejected leads were primarily, if not exclusively,

13    to -- the goal was to get them back onto the process

14    outlined in Exhibit 16; correct?

15        A.    Yes.

16        Q.    So essentially the first question, if a

17    rejected lead was reached would be some variation

18    of, are you still interested; is that a fair

19    characterization?

20        A.    Yes.

21        Q.    And if the rejected lead expressed

22    interest, would the next stage in that process be to

23    encourage them to -- excuse me.  What would the next

24    stage in that process be?

25        A.    To provide them the information that they
```

1    were unable to do so when they originally requested,

2    and we are hoping to catch them and provide them

3    with that information regarding our institution like

4    they had originally asked for.

5         Q.    But that is captured on this chart;

6    correct?

7         A.    I don't understand the question.

8         Q.    That providing information to a rejected

9    lead or -- excuse me, providing information that was

10   requested is captured on the flowchart in

11   Exhibit 16; correct?

12        A.    If we are calling the interview part of

13   that providing the information, which I think we

14   discovered before, then yes, that is captured on the

15   chart.

16        Q.    I believe your testimony was that

17   providing the information is part of the PCAS.

18        A.    Yes.

19        Q.    So that's captured on this chart?

20        A.    Correct.

21        Q.    So the goal when contacting rejected leads

22   is to put them back into this process; correct?

23        A.    The goal is to provide -- yes, to put them

24   back in this process so that we can provide the

25   information that they had requested, yes.

Page 164

1    record.  Post is a for-profit business; correct?

2        A.    Correct.

3        Q.    And your testimony right now is that Post

4    would place telephone calls to people that are no

5    longer in the pipeline, don't have potential in the

6    pipeline, out of the goodness of its heart?

7                 MR. BOWSER:  Objection to form.

8        Q.    You can answer.  Is that your testimony?

9        A.    What I had mentioned is that not every

10   call that's placed to a closed opportunity is made

11   with the sole intention of bringing that person back

12   into the Exhibit 16 funnel.

13       Q.    Okay, good.  Now we have a lot to unpack

14   with that answer.

15             Does every call made to a lost opportunity

16   include the intention of reestablishing a

17   relationship with that lost opportunity, not the

18   sole opportunity, is that one of the purposes of the

19   call to a lost opportunity?

20                 MR. BOWSER:  Objection to form.

21       A.    I'm sorry, you began with is that the

22   only.

23       Q.    I didn't, but I'll correct it.  Is every

24   call made to a lost opportunity made with one of the

25   purposes of that call being to reestablish a

Page 165

1   relationship with Post University?

2       A.   Not every call.

3       Q.   Would you say the majority of calls?

4       A.   Yes.

5       Q.   The vast majority of calls?

6       A.   Yes.

7       Q.   Would you say 90 percent of the calls?

8       A.   Yes.

9       Q.   95 percent of the calls?

10      A.   I can't say with certainty, but --

11      Q.   But on occasion someone will --

12      A.   The majority, the majority of calls that

13  are made to a closed opportunity or a closed lead

14  would be to see if someone is interested, if now is

15  a better time for someone to move forward with their

16  education with us.

17      Q.   And we established that a closed

18  opportunity was no longer in that process we talked

19  about in Exhibit 16; correct?

20      A.   Correct.

21      Q.   So when you say to see if someone is

22  interested, if now is a better time for someone to

23  move forward with their education with us, to see if

24  you can get them back into that enrollment process;

25  is that correct?

Page 166

1       A.    Correct.

2       Q.    And I know you can't give me an exact

3    figure, but on occasion, it seems to be a very small

4    on occasion, someone who developed a really strong

5    relationship just might call to say, hey, how are

6    you, but I want to be clear that the expected use of

7    those calls to lost opportunities was to attempt to

8    reengage them with the enrollment process; is that

9    correct?

10      A.    The ones that they are reaching out to,

11   because again, that's contingent on why they were

12   rejected, but yes, that's the majority purpose of

13   attempting to make contact.

14      Q.    And you said upwards probably of

15   90 percent; is that fair?

16      A.    That's fair.

17      Q.    In terms of rejected leads, because we've

18   been focused on opportunities, would rejected leads

19   continue to be called?  Excuse me.  Let me rephrase.

20      A.    Excuse me, pardon me.

21      Q.    Do you need more water?

22      A.    I might actually.

23                    (Pause.)

24            THE WITNESS:  I'm not sure if you

25   asked a question.

Page 192

1    that email or, excuse me, this information?

2         A.    I'm assuming that he did.

3         Q.    But you don't actually remember, you are

4    assuming just because of who you sent it to;

5    correct?

6         A.    Correct.

7         Q.    You don't remember what is meant by

8    converted in this email; correct?

9         A.    Right.  It could be any number of those

10   things.  It's probably converted into opportunity

11   or -- yeah, I mean, I can't say with any certainty,

12   so it would only be speculatory.

13        Q.    I asked a moment ago whether the purpose

14   of calling rejected leads were part of Post's

15   efforts to enroll students, and I think we agreed

16   that because it's to start them on the process that

17   it was?

18        A.    Of course.

19        Q.    And same with respect to lost/closed

20   opportunities, I know you said there were some calls

21   that were more checkup calls, but --

22        A.    The majority.

23        Q.    The 90 percent plus majority were part of

24   Post's efforts to enroll students; is that correct?

25        A.    Correct.

1    Q.    And to essentially reengage those lost

2    opportunities with Post, I'm talking about the

3    90 percent for now; is that fair?

4    A.    That's fair.

5    Q.    And with respect to the 10 percent of

6    calls, was there any business purpose to those

7    10 percent of calls?  And I'm saying 10 percent, I

8    know it's fuzzy there, but just for ease of

9    communication, for those 10 percent of calls, was

10   there any business purpose for Post just calling a

11   student or, excuse me, a former prospective student

12   just to check up on them?

13   A.    A former opportunity?

14   Q.    Let me say that again.  Was there any

15   business purpose to calling a lost opportunity in

16   those 10 percent of calls you said were just to

17   check up on them?

18   A.    I'm sorry, can you rephrase that.

19   Q.    Was there any business purposes to calling

20   a lost opportunity for those small subset of calls

21   which we said was probably 10 percent or less that

22   was just to sort of check up on them?

23   A.    No.

24   Q.    No business purpose?

25   A.    Right.  The 10 percent is probably high,

1  calls?

2      A.    Right.  They are the outliers for sure.

3      Q.    And I know you can't give me an exact

4  number, and I wouldn't expect you to give me an

5  exact number; you thought 10 percent -- you said

6  might be high.  I mean, how many calls does Post's

7  admissions counselors make in a given day?

8      A.    I am not certain.  I don't have those

9  figures.  I mean, making an outreach to a once open

10 opportunity that was now closed because something

11 mitigating happened in their life and you are

12 checking up on them, it's not an everyday

13 occurrence.  It's not an every admissions counselor

14 occurrence.  It's just something that some people do

15 based on the unique circumstance of the prospect.

16     Q.    Okay.  I think we've established sort of

17 what I was trying to in terms of, there is always

18 going to be outliers in any call?

19     A.    Of course.

20     Q.    Theoretically, a rejected lead you can

21 have an outlier where someone placed --

22     A.    The original question, the reason why I

23 answered it as such is you said, is the only reason

24 to make a contact an opportunity, which is why we

25 arrived here, is with the intention of reengaging

1    them and bringing them back into this process, and I

2    wanted to provide you that that is not the sole

3    reason for an outreach to a closed opportunity.

4        Q.    Is that the sole trained reason?

5        A.    Yes.

6        Q.    Were all rejected leads intended to be

7    called again?

8        A.    No.

9        Q.    And similarly, were all lost or closed

10   opportunities intended to be called again?

11       A.    No.

12       Q.    Between July 30th, 2014 and July 30th,

13   2018, were admissions counselors permitted to use

14   third-party services in connection with their

15   communication with the leads and opportunities?

16       A.    Can you provide the dates for me once more

17   please.

18       Q.    July 30, 2014 and July 30, 2018.

19       A.    Yes.

20       Q.    Did this include Google Voice?

21       A.    Yes.

22       Q.    What about TextNow?

23       A.    Yes.

24       Q.    Are there any others that you can think of

25   in that vein?

Page 164

1   record.  Post is a for-profit business; correct?

2       A.    Correct.

3       Q.    And your testimony right now is that Post

4   would place telephone calls to people that are no

5   longer in the pipeline, don't have potential in the

6   pipeline, out of the goodness of its heart?

7               MR. BOWSER:  Objection to form.

8       Q.    You can answer.  Is that your testimony?

9       A.    What I had mentioned is that not every

10  call that's placed to a closed opportunity is made

11  with the sole intention of bringing that person back

12  into the Exhibit 16 funnel.

13      Q.    Okay, good.  Now we have a lot to unpack

14  with that answer.

15            Does every call made to a lost opportunity

16  include the intention of reestablishing a

17  relationship with that lost opportunity, not the

18  sole opportunity, is that one of the purposes of the

19  call to a lost opportunity?

20              MR. BOWSER:  Objection to form.

21      A.    I'm sorry, you began with is that the

22  only.

23      Q.    I didn't, but I'll correct it.  Is every

24  call made to a lost opportunity made with one of the

25  purposes of that call being to reestablish a

Page 165

1    relationship with Post University?

2        A.    Not every call.

3        Q.    Would you say the majority of calls?

4        A.    Yes.

5        Q.    The vast majority of calls?

6        A.    Yes.

7        Q.    Would you say 90 percent of the calls?

8        A.    Yes.

9        Q.    95 percent of the calls?

10       A.    I can't say with certainty, but --

11       Q.    But on occasion someone will --

12       A.    The majority, the majority of calls that

13   are made to a closed opportunity or a closed lead

14   would be to see if someone is interested, if now is

15   a better time for someone to move forward with their

16   education with us.

17       Q.    And we established that a closed

18   opportunity was no longer in that process we talked

19   about in Exhibit 16; correct?

20       A.    Correct.

21       Q.    So when you say to see if someone is

22   interested, if now is a better time for someone to

23   move forward with their education with us, to see if

24   you can get them back into that enrollment process;

25   is that correct?

Page 209

1      Q.    And it's the same thing with respect to

2  lost opportunities; correct?  There's a lot of

3  questions I asked so let me try again.

4           A lost opportunity is reached; an

5  admissions counselor is gauging if they are

6  interested or capable of now continuing the process

7  that they previously started; correct?

8      A.    Most of the times, yes.

9      Q.    That's the 90 plus percent versus the

10  small subset we discussed; correct?

11      A.    Yes.

12      Q.    And those admissions counselors then, they

13  take sort of the same role as we just discussed;

14  they nurture those prospective students through the

15  process in 16?

16      A.    Yes.

17      Q.    Between July 30th, 2014 and July 30th,

18  2018, did Post have a written Do Not Call policy?

19      A.    No.

20      Q.    Between July 30th 2014 and July 30, 2018

21  if someone requested Post's written Do Not Call

22  policy, what would be provided?

23      A.    I don't know.  I'm not certain.

24      Q.    Did anyone ever request -- to the best of

25  your knowledge, did anyone ever request the Do Not

Page 3

 1                         INDEX
 2     EXAMINATION
 3     Witness Name                              Page
 4     Sean Cooley
 5         Direct By Mr. Glapion .................... 7
 6
 7
 8                        REQUEST
 9         Request ................................. 113
10
11
12                  PLAINTIFF'S EXHIBITS
13                (Marked For Identification)
14                                               Page
15     Exhibit 12 Marked ........................... 7
       Notice of Deposition of designated
16     representative of Post University and Notice
       of Deposition of Sean Cooley
17
       Exhibit 13 Marked ........................... 20
18     Post University Performance Appraisal Reviews
       re Sean Cooley, Bates Numbers PU00017449
19     through 17470
20     Exhibit 14 Marked ........................... 50
       Email, Bates Numbers PU00004476 through 4481
21
       Exhibit 15 Marked ........................... 66
22     Post University Performance Appraisal Review
       Form, Bates Numbers PU00000134 through 150
23
       Exhibit 16 Marked ........................... 70
24     Document bearing Bates Number PU00011106
25

Page 165

1    relationship with Post University?

2        A.    Not every call.

3        Q.    Would you say the majority of calls?

4        A.    Yes.

5        Q.    The vast majority of calls?

6        A.    Yes.

7        Q.    Would you say 90 percent of the calls?

8        A.    Yes.

9        Q.    95 percent of the calls?

10       A.    I can't say with certainty, but --

11       Q.    But on occasion someone will --

12       A.    The majority, the majority of calls that

13   are made to a closed opportunity or a closed lead

14   would be to see if someone is interested, if now is

15   a better time for someone to move forward with their

16   education with us.

17       Q.    And we established that a closed

18   opportunity was no longer in that process we talked

19   about in Exhibit 16; correct?

20       A.    Correct.

21       Q.    So when you say to see if someone is

22   interested, if now is a better time for someone to

23   move forward with their education with us, to see if

24   you can get them back into that enrollment process;

25   is that correct?

Page 166

1    A.    Correct.

2    Q.    And I know you can't give me an exact

3  figure, but on occasion, it seems to be a very small

4  on occasion, someone who developed a really strong

5  relationship just might call to say, hey, how are

6  you, but I want to be clear that the expected use of

7  those calls to lost opportunities was to attempt to

8  reengage them with the enrollment process; is that

9  correct?

10   A.    The ones that they are reaching out to,

11 because again, that's contingent on why they were

12 rejected, but yes, that's the majority purpose of

13 attempting to make contact.

14   Q.    And you said upwards probably of

15 90 percent; is that fair?

16   A.    That's fair.

17   Q.    In terms of rejected leads, because we've

18 been focused on opportunities, would rejected leads

19 continue to be called?  Excuse me.  Let me rephrase.

20   A.    Excuse me, pardon me.

21   Q.    Do you need more water?

22   A.    I might actually.

23              (Pause.)

24         THE WITNESS:  I'm not sure if you

25 asked a question.

Page 195

1      Q.    I'm off of this document, I'm sorry.

2      A.    Okay, I'm still looking at this; I'm

3  trying to put the pieces together.

4      Q.    I'm just back to those particular calls to

5  opportunities now, because we've established that

6  calls to rejected leads were part of getting them on

7  to this Exhibit 16 process.

8           I'm asking now about lost and closed

9  opportunities.  Almost always the calls were -- one

10  of the goals of the calls were to get them back onto

11  the process in Exhibit 16; is that fair to say?

12     A.    Yes.

13     Q.    Very infrequently is the process you just

14  described where there was a call without that

15  intent; correct?

16           MR. BOWSER:  Objection, asked and

17  answered.

18     A.    Yes.

19     Q.    And that those infrequent calls, that was

20  not a trained policy?  I'm just trying to establish

21  whether they were trained to do that or if it was

22  something sort of an admissions counselor did on

23  their own.

24     A.    To my knowledge, it wasn't part of the

25  training process whatsoever.

Page 200

1    calls?

2        A.    Right.  They are the outliers for sure.

3        Q.    And I know you can't give me an exact

4    number, and I wouldn't expect you to give me an

5    exact number; you thought 10 percent -- you said

6    might be high.  I mean, how many calls does Post's

7    admissions counselors make in a given day?

8        A.    I am not certain.  I don't have those

9    figures.  I mean, making an outreach to a once open

10   opportunity that was now closed because something

11   mitigating happened in their life and you are

12   checking up on them, it's not an everyday

13   occurrence.  It's not an every admissions counselor

14   occurrence.  It's just something that some people do

15   based on the unique circumstance of the prospect.

16       Q.    Okay.  I think we've established sort of

17   what I was trying to in terms of, there is always

18   going to be outliers in any call?

19       A.    Of course.

20       Q.    Theoretically, a rejected lead you can

21   have an outlier where someone placed --

22       A.    The original question, the reason why I

23   answered it as such is you said, is the only reason

24   to make a contact an opportunity, which is why we

25   arrived here, is with the intention of reengaging

Page 201

1   them and bringing them back into this process, and I

2   wanted to provide you that that is not the sole

3   reason for an outreach to a closed opportunity.

4       Q.    Is that the sole trained reason?

5       A.    Yes.

6       Q.    Were all rejected leads intended to be

7   called again?

8       A.    No.

9       Q.    And similarly, were all lost or closed

10  opportunities intended to be called again?

11      A.    No.

12      Q.    Between July 30th, 2014 and July 30th,

13  2018, were admissions counselors permitted to use

14  third-party services in connection with their

15  communication with the leads and opportunities?

16      A.    Can you provide the dates for me once more

17  please.

18      Q.    July 30, 2014 and July 30, 2018.

19      A.    Yes.

20      Q.    Did this include Google Voice?

21      A.    Yes.

22      Q.    What about TextNow?

23      A.    Yes.

24      Q.    Are there any others that you can think of

25  in that vein?

Page 209

1      Q.    And it's the same thing with respect to

2   lost opportunities; correct?   There's a lot of

3   questions I asked so let me try again.

4            A lost opportunity is reached; an

5   admissions counselor is gauging if they are

6   interested or capable of now continuing the process

7   that they previously started; correct?

8      A.    Most of the times, yes.

9      Q.    That's the 90 plus percent versus the

10  small subset we discussed; correct?

11     A.    Yes.

12     Q.    And those admissions counselors then, they

13  take sort of the same role as we just discussed;

14  they nurture those prospective students through the

15  process in 16?

16     A.    Yes.

17     Q.    Between July 30th, 2014 and July 30th,

18  2018, did Post have a written Do Not Call policy?

19     A.    No.

20     Q.    Between July 30th 2014 and July 30, 2018

21  if someone requested Post's written Do Not Call

22  policy, what would be provided?

23     A.    I don't know.  I'm not certain.

24     Q.    Did anyone ever request -- to the best of

25  your knowledge, did anyone ever request the Do Not

Page 290

1      Q.    Which is part of the process?

2      A.    Which is part of the process.

3      Q.    And same with respect to opportunities,

4  lost opportunities, Post calls or texts some

5  categories of lost opportunities; correct?

6      A.    Correct.

7      Q.    And the goal with contacting those

8  categories of lost opportunities is to get them into

9  or back into this process, correct, for the

10  majority, the vast majority of those calls?

11      A.    Correct.

12      Q.    And as part of the communication with

13  rejected leads, one of the roles is to encourage or,

14  excuse me, your word was "nurture," is to nurture

15  them through this process; correct?

16      A.    Correct.

17      Q.    And part of nurturing those rejected leads

18  or now converted leads through this process is to

19  encourage them at the various steps; correct?

20      A.    Yes.

21      Q.    And with respect to opportunities and lost

22  opportunities, once they enter back into this

23  process, the goal is to continue to nurture them

24  through this process; correct?

25      A.    Correct.

Page 192

1    that email or, excuse me, this information?

2        A.    I'm assuming that he did.

3        Q.    But you don't actually remember, you are

4    assuming just because of who you sent it to;

5    correct?

6        A.    Correct.

7        Q.    You don't remember what is meant by

8    converted in this email; correct?

9        A.    Right.  It could be any number of those

10   things.  It's probably converted into opportunity

11   or -- yeah, I mean, I can't say with any certainty,

12   so it would only be speculatory.

13       Q.    I asked a moment ago whether the purpose

14   of calling rejected leads were part of Post's

15   efforts to enroll students, and I think we agreed

16   that because it's to start them on the process that

17   it was?

18       A.    Of course.

19       Q.    And same with respect to lost/closed

20   opportunities, I know you said there were some calls

21   that were more checkup calls, but --

22       A.    The majority.

23       Q.    The 90 percent plus majority were part of

24   Post's efforts to enroll students; is that correct?

25       A.    Correct.

Page 209

1      Q.    And it's the same thing with respect to

2   lost opportunities; correct?  There's a lot of

3   questions I asked so let me try again.

4          A lost opportunity is reached; an

5   admissions counselor is gauging if they are

6   interested or capable of now continuing the process

7   that they previously started; correct?

8      A.    Most of the times, yes.

9      Q.    That's the 90 plus percent versus the

10   small subset we discussed; correct?

11      A.    Yes.

12      Q.    And those admissions counselors then, they

13   take sort of the same role as we just discussed;

14   they nurture those prospective students through the

15   process in 16?

16      A.    Yes.

17      Q.    Between July 30th, 2014 and July 30th,

18   2018, did Post have a written Do Not Call policy?

19      A.    No.

20      Q.    Between July 30th 2014 and July 30, 2018

21   if someone requested Post's written Do Not Call

22   policy, what would be provided?

23      A.    I don't know.  I'm not certain.

24      Q.    Did anyone ever request -- to the best of

25   your knowledge, did anyone ever request the Do Not

Page 193

1      Q.    And to essentially reengage those lost

2  opportunities with Post, I'm talking about the

3  90 percent for now; is that fair?

4      A.    That's fair.

5      Q.    And with respect to the 10 percent of

6  calls, was there any business purpose to those

7  10 percent of calls?  And I'm saying 10 percent, I

8  know it's fuzzy there, but just for ease of

9  communication, for those 10 percent of calls, was

10  there any business purpose for Post just calling a

11  student or, excuse me, a former prospective student

12  just to check up on them?

13      A.    A former opportunity?

14      Q.    Let me say that again.  Was there any

15  business purpose to calling a lost opportunity in

16  those 10 percent of calls you said were just to

17  check up on them?

18      A.    I'm sorry, can you rephrase that.

19      Q.    Was there any business purposes to calling

20  a lost opportunity for those small subset of calls

21  which we said was probably 10 percent or less that

22  was just to sort of check up on them?

23      A.    No.

24      Q.    No business purpose?

25      A.    Right.  The 10 percent is probably high,

1    but no.  Again, it's a checkup call, it's the

2    minority.

3        Q.    Did admissions counselors have discretion

4    on when to just do one of those checkup calls?

5        A.    Again, it was extremely infrequent.  It's

6    nothing outlined in any of the process.

7        Q.    Was it encouraged for them to make these

8    checkup calls to those lost opportunities that they

9    did not intend or hope to enroll?

10       A.    I can't speak to that.  I don't know.

11       Q.    Were they trained to do that?

12       A.    No.

13       Q.    So it's sort of -- it wasn't a policy to

14    do that is what you are saying; correct?

15       A.    Was calling an old -- a closed opportunity

16    because something mitigating happened in their life

17    and a rapport was established and you are calling

18    them to see how they are doing, not necessarily with

19    the intent of moving them through Exhibit 16 again,

20    is that a trained process?  No.

21       Q.    And that process you just described where

22    a call is made to a closed opportunity without an

23    intent of moving them through Exhibit 16 happened

24    very infrequently, as you said?

25       A.    Yes.  These are leads more than likely.

Page 199

1   I'm asking, and that's why I want to parse through

2   it because my question is related to calling lost

3   opportunities, and the story you gave was about

4   calling an enrolled student and then getting someone

5   who had never requested information.

6       A.    I know and I appreciate that they are not

7   perfectly aligned.  My story that I provided for you

8   does not completely align with your original ask,

9   and I understand what your original ask was, but

10  that was -- it's been a long time since I've been in

11  that position, so I can't really give you any other

12  real examples of me doing that besides making a

13  story up.  That one resonated with me, so I can

14  reflect on it as if it was last month rather than

15  eight years ago.

16      Q.    I understand.

17      A.    So that's why I went in that direction.

18      Q.    I appreciate that.  And it's sort of these

19  relatively unique circumstances, I guess I'll call

20  them, that in your opinion would lead to

21  non-enrollment related calls to lost opportunities;

22  is that fair?

23      A.    Forgive me.

24      Q.    These are relatively sort of extreme and

25  unique circumstances that would necessitate those

Page 200

1    calls?

2        A.    Right.   They are the outliers for sure.

3        Q.    And I know you can't give me an exact

4    number, and I wouldn't expect you to give me an

5    exact number; you thought 10 percent -- you said

6    might be high.   I mean, how many calls does Post's

7    admissions counselors make in a given day?

8        A.    I am not certain.   I don't have those

9    figures.   I mean, making an outreach to a once open

10   opportunity that was now closed because something

11   mitigating happened in their life and you are

12   checking up on them, it's not an everyday

13   occurrence.   It's not an every admissions counselor

14   occurrence.   It's just something that some people do

15   based on the unique circumstance of the prospect.

16       Q.    Okay.   I think we've established sort of

17   what I was trying to in terms of, there is always

18   going to be outliers in any call?

19       A.    Of course.

20       Q.    Theoretically, a rejected lead you can

21   have an outlier where someone placed --

22       A.    The original question, the reason why I

23   answered it as such is you said, is the only reason

24   to make a contact an opportunity, which is why we

25   arrived here, is with the intention of reengaging

1   but no.  Again, it's a checkup call, it's the

2   minority.

3       Q.   Did admissions counselors have discretion

4   on when to just do one of those checkup calls?

5       A.   Again, it was extremely infrequent.  It's

6   nothing outlined in any of the process.

7       Q.   Was it encouraged for them to make these

8   checkup calls to those lost opportunities that they

9   did not intend or hope to enroll?

10       A.   I can't speak to that.  I don't know.

11       Q.   Were they trained to do that?

12       A.   No.

13       Q.   So it's sort of -- it wasn't a policy to

14   do that is what you are saying; correct?

15       A.   Was calling an old -- a closed opportunity

16   because something mitigating happened in their life

17   and a rapport was established and you are calling

18   them to see how they are doing, not necessarily with

19   the intent of moving them through Exhibit 16 again,

20   is that a trained process?  No.

21       Q.   And that process you just described where

22   a call is made to a closed opportunity without an

23   intent of moving them through Exhibit 16 happened

24   very infrequently, as you said?

25       A.   Yes.  These are leads more than likely.

Page 195

1    Q.    I'm off of this document, I'm sorry.

2    A.    Okay, I'm still looking at this; I'm

3  trying to put the pieces together.

4    Q.    I'm just back to those particular calls to

5  opportunities now, because we've established that

6  calls to rejected leads were part of getting them on

7  to this Exhibit 16 process.

8          I'm asking now about lost and closed

9  opportunities.  Almost always the calls were -- one

10  of the goals of the calls were to get them back onto

11  the process in Exhibit 16; is that fair to say?

12    A.    Yes.

13    Q.    Very infrequently is the process you just

14  described where there was a call without that

15  intent; correct?

16          MR. BOWSER:   Objection, asked and

17  answered.

18    A.    Yes.

19    Q.    And that those infrequent calls, that was

20  not a trained policy?  I'm just trying to establish

21  whether they were trained to do that or if it was

22  something sort of an admissions counselor did on

23  their own.

24    A.    To my knowledge, it wasn't part of the

25  training process whatsoever.

Page 200

1    calls?

2        A.    Right.  They are the outliers for sure.

3        Q.    And I know you can't give me an exact

4    number, and I wouldn't expect you to give me an

5    exact number; you thought 10 percent -- you said

6    might be high.  I mean, how many calls does Post's

7    admissions counselors make in a given day?

8        A.    I am not certain.  I don't have those

9    figures.  I mean, making an outreach to a once open

10   opportunity that was now closed because something

11   mitigating happened in their life and you are

12   checking up on them, it's not an everyday

13   occurrence.  It's not an every admissions counselor

14   occurrence.  It's just something that some people do

15   based on the unique circumstance of the prospect.

16       Q.    Okay.  I think we've established sort of

17   what I was trying to in terms of, there is always

18   going to be outliers in any call?

19       A.    Of course.

20       Q.    Theoretically, a rejected lead you can

21   have an outlier where someone placed --

22       A.    The original question, the reason why I

23   answered it as such is you said, is the only reason

24   to make a contact an opportunity, which is why we

25   arrived here, is with the intention of reengaging

Page 201

1   them and bringing them back into this process, and I

2   wanted to provide you that that is not the sole

3   reason for an outreach to a closed opportunity.

4       Q.    Is that the sole trained reason?

5       A.    Yes.

6       Q.    Were all rejected leads intended to be

7   called again?

8       A.    No.

9       Q.    And similarly, were all lost or closed

10  opportunities intended to be called again?

11      A.    No.

12      Q.    Between July 30th, 2014 and July 30th,

13  2018, were admissions counselors permitted to use

14  third-party services in connection with their

15  communication with the leads and opportunities?

16      A.    Can you provide the dates for me once more

17  please.

18      Q.    July 30, 2014 and July 30, 2018.

19      A.    Yes.

20      Q.    Did this include Google Voice?

21      A.    Yes.

22      Q.    What about TextNow?

23      A.    Yes.

24      Q.    Are there any others that you can think of

25  in that vein?

Page 196

1    Q.    Did you ever make such calls?

2    A.    Yes.

3    Q.    And in what circumstances?   Was it just

4    that you had developed a strong rapport with the

5    person; is that when you would sort of --

6    A.    When I was an admissions counselor back in

7    2014, maybe before then even, maybe 2012 -- I wasn't

8    an admissions counselor for long -- I was working

9    with a student who was young, 17.   Classes began.

10   He lived with his grandmother.   And I was in

11   constant communication with him up until the day

12   that classes began, and I was unable to make contact

13   with him for that week of when classes were

14   beginning, and I was calling, calling, calling,

15   calling, unable to make contact.   I finally got

16   ahold of his grandmother, and he had died in a car

17   accident the night before.

18   Q.    That's a shame.

19   A.    It is.   So I had kept in contact with her

20   for a little bit and checked up on her -- this was a

21   very long time ago -- just to see how she was doing.

22   Q.    Sounds very nice of you, and I'm sure she

23   appreciated that.

24   A.    That wasn't a taught practice in any of

25   the training sessions, but those sort of things -- I

Page 197

1    don't know about to that level, I hope not, that

2    other people have those kinds of experiences, but

3    when you are dealing with a lot of people, stories

4    like this come up.  And so I know that people have

5    done things like that in the past, checked up on

6    people to see how they are without the intention

7    of -- my intention was not to get his grandmother

8    started for classes.

9         Q.    Gotcha.  And I hate to use this story to

10   segue because it's obviously an impactful story.  In

11   that scenario though, the grandmother was not a

12   lead; correct?

13        A.    Correct, but anybody could be interested

14   in going to school if we tell them about the

15   university and provide information.

16        Q.    So I'm sorry to ask a question about this

17   story.

18        A.    No, I provided the story, so if you have

19   to --

20        Q.    And I will try to be sensitive to the

21   story because it's an emotional story.  When you

22   were calling the grandmother to just check up on

23   her, she was not a lead at that time?

24        A.    No.

25        Q.    She could potentially become a lead or --

1      A.     She could have become.

2      Q.     But she wasn't when you were calling her;

3   correct?

4      A.     Yeah.

5      Q.     And the grandson that you were

6   communicating with, while you were communicating

7   with him, do you recall if he was a lost or closed

8   opportunity or an open opportunity?

9      A.     He was a registered student when I was

10  communicating with him.

11     Q.     I understand, okay.  That makes sense and

12  I apologize for misunderstanding that.  So you said

13  that anyone could become a lead, so recognizing that

14  your primary concern was with her well-being and

15  mental state, did you nonetheless provide

16  information to her about Post?

17     A.     I didn't provide any information to her

18  about Post.

19     Q.     But in that scenario and in that story,

20  the opportunity that you were communicating with --

21     A.     Everybody is unique.

22     Q.     I understand.

23     A.     Every situation is unique.

24     Q.     I just want to make sure because that

25  scenario doesn't exactly match up with the question

Page 199

1    I'm asking, and that's why I want to parse through

2    it because my question is related to calling lost

3    opportunities, and the story you gave was about

4    calling an enrolled student and then getting someone

5    who had never requested information.

6         A.    I know and I appreciate that they are not

7    perfectly aligned.  My story that I provided for you

8    does not completely align with your original ask,

9    and I understand what your original ask was, but

10   that was -- it's been a long time since I've been in

11   that position, so I can't really give you any other

12   real examples of me doing that besides making a

13   story up.  That one resonated with me, so I can

14   reflect on it as if it was last month rather than

15   eight years ago.

16        Q.    I understand.

17        A.    So that's why I went in that direction.

18        Q.    I appreciate that.  And it's sort of these

19   relatively unique circumstances, I guess I'll call

20   them, that in your opinion would lead to

21   non-enrollment related calls to lost opportunities;

22   is that fair?

23        A.    Forgive me.

24        Q.    These are relatively sort of extreme and

25   unique circumstances that would necessitate those

1   went.  Not every call has a system-driven intention

2   behind it, so I just wanted to add that layer of

3   clarity.

4        Q.    And let's break that down.  So you said

5   there are calls to opportunities that are to check

6   up on someone; correct?

7        A.    Uh-huh.

8        Q.    And when you say "check up on someone,"

9   are you talking about -- what do you mean by "check

10  up on someone"?

11       A.    As I mentioned, a big piece of this sales

12  experience that we were referencing earlier is

13  rapport building.  Throughout that and throughout a

14  PCAS, that could last upwards of an hour; I've seen

15  them last for 90 minutes.  A lot of times, a lot of

16  information is shared, and that relationship that's

17  established between the admissions counselor and the

18  prospect sometimes is a very tight bond.

19            A lot of our prospects don't have a lot of

20  support in their personal life, so when they find

21  that support in our admissions counselor, a bond is

22  built there occasionally.  So the calls that are

23  placed to the people that they've spoken with and

24  have expressed interest, they are not always with a

25  school-driven intent behind it, so I just wanted to

Page 158

1    add that layer of distinction.

2        Q.    Are admissions counselors permitted to

3    make personal calls while working?

4        A.    Yes.

5        Q.    And I can show you the training document.

6    I just want to clarify.  I believe the training

7    document says that no cell phones are allowed on the

8    floor, but --

9        A.    Do you mean on the clock or while they are

10   at the job?

11       Q.    While they are working on the clock, are

12   Post admissions counselors permitted to make

13   personal calls?

14       A.    While you are on the clock, you should not

15   be making personal phone calls.

16       Q.    So it's fair to say then that if an

17   admissions counselor is doing their job while on the

18   clock, the calls that they make are on behalf of

19   Post University?

20       A.    Yes.

21       Q.    So when someone places a telephone call to

22   check up on a prospective student, and I think we

23   are talking about opportunities now, that's not

24   considered to be a personal call?

25       A.    Absolutely not.

Page 161

1     Q.    So these building-rapport calls are to

2   place calls to rejected leads to build rapport?

3     A.    No, you never said rejected opportunities.

4     Q.    So you will place calls to rejected

5   opportunities to build rapport?

6     A.    If a bond has been made between an

7   admissions counselor and a once prospective student,

8   admissions counselors will occasionally still keep

9   in contact to see how everything is going on, to see

10  if someone is interested and maybe if this is a

11  better time for them in their personal life to move

12  forward or if something mitigating happened in their

13  life.

14         There is a lot of stories that we hear,

15  some really heartbreaking stories that come about,

16  and throughout that PCAS or that eight-week time

17  frame where they were, you know, kind of building

18  that camaraderie and relationship, people want to

19  make sure that our former prospects are doing okay.

20  It's part of -- again, part of our culture.  So that

21  happens, you know, probably less frequently, but to

22  answer your question, I want it to be full

23  disclosure.

24     Q.    Within that answer, you mentioned that if

25  a bond has been made between an admissions counselor

Page 162

1    and a once prospective student, they may check in to

2    see if it might be a better time for them; correct?

3        A.    Uh-huh.

4        Q.    And the other reasons were similar to

5    that, has whatever was affecting you before resolved

6    kind of questions?

7        A.    Of course.

8        Q.    In those scenarios, would you agree that

9    though the person was marked as opportunity lost,

10   the admissions counselor making those calls had

11   reason to believe that they may be able to get that

12   opportunity back into Post?

13       A.    It depends.

14       Q.    Are you aware of admissions counselors

15   being permitted to make telephone calls to lost

16   opportunities that there was no basis for belief

17   that the lost opportunity might be converted into an

18   enrolled student?

19       A.    I believe I just gave you an example.

20       Q.    What you said was --

21       A.    To check up on somebody, see how they were

22   doing.

23       Q.    To see if it is a better time in their

24   personal life to move forward.

25       A.    That's one example.

Page 163

1      Q.     Okay.  And --

2      A.     That could be a reason.

3      Q.     So --

4      A.     Not every outbound call made to a lost

5   opportunity is made with the intention of moving

6   that student back into Exhibit 16.

7      Q.     Wouldn't that be a personal call then?

8      A.     No.

9      Q.     Why not?

10      A.     Because this was a former prospect.

11      Q.     But it's not a prospect when the call is

12   made; correct?

13      A.     Who's to say?

14      Q.     I'm asking you.  You just said that --

15      A.     I'm saying they didn't make the call with

16   the intention, every call.

17      Q.     But were these calls made only to those

18   that were considered prospects or that could be

19   turned back into a prospect?

20      A.     And I said no.

21      Q.     And I'm asking then how is that not a

22   personal call?

23      A.     Because at that point they were part of

24   the Post family.

25      Q.     So I want to get this very clear on the

Page 193

1      Q.    And to essentially reengage those lost

2   opportunities with Post, I'm talking about the

3   90 percent for now; is that fair?

4      A.    That's fair.

5      Q.    And with respect to the 10 percent of

6   calls, was there any business purpose to those

7   10 percent of calls?  And I'm saying 10 percent, I

8   know it's fuzzy there, but just for ease of

9   communication, for those 10 percent of calls, was

10  there any business purpose for Post just calling a

11  student or, excuse me, a former prospective student

12  just to check up on them?

13     A.    A former opportunity?

14     Q.    Let me say that again.  Was there any

15  business purpose to calling a lost opportunity in

16  those 10 percent of calls you said were just to

17  check up on them?

18     A.    I'm sorry, can you rephrase that.

19     Q.    Was there any business purposes to calling

20  a lost opportunity for those small subset of calls

21  which we said was probably 10 percent or less that

22  was just to sort of check up on them?

23     A.    No.

24     Q.    No business purpose?

25     A.    Right.  The 10 percent is probably high,

1  but no.  Again, it's a checkup call, it's the

2  minority.

3      Q.    Did admissions counselors have discretion

4  on when to just do one of those checkup calls?

5      A.    Again, it was extremely infrequent.  It's

6  nothing outlined in any of the process.

7      Q.    Was it encouraged for them to make these

8  checkup calls to those lost opportunities that they

9  did not intend or hope to enroll?

10     A.    I can't speak to that.  I don't know.

11     Q.    Were they trained to do that?

12     A.    No.

13     Q.    So it's sort of -- it wasn't a policy to

14  do that is what you are saying; correct?

15     A.    Was calling an old -- a closed opportunity

16  because something mitigating happened in their life

17  and a rapport was established and you are calling

18  them to see how they are doing, not necessarily with

19  the intent of moving them through Exhibit 16 again,

20  is that a trained process?  No.

21     Q.    And that process you just described where

22  a call is made to a closed opportunity without an

23  intent of moving them through Exhibit 16 happened

24  very infrequently, as you said?

25     A.    Yes.  These are leads more than likely.

Page 271

1    That's all we can do right now.  I have the Do Not

2    Call list but have no way to scrub those names

3    against it.  Correct?

4        A.    Correct.

5        Q.    Do you have any reason to believe that

6    this is not accurate with respect to the Do Not Call

7    list and Post University's use of it in July 2016?

8        A.    It seems accurate.  I have no reason to

9    believe otherwise.

10        Q.    Did admissions department employees have

11    company emails?

12        A.    Yes.

13        Q.    And were those email addresses meant to be

14    monitored by the employee that has that email

15    address?

16        A.    Monitored as in --

17        Q.    Are they meant to check their inbox?

18        A.    Yes.

19        Q.    And do they communicate through email?

20        A.    Yes.

21        Q.    Were they permitted to delete emails?

22        A.    For space reasons, yes.

23        Q.    Were there any restrictions on their

24    ability to delete emails?

25        A.    Well, I know that when Mrs. Davis filed

Page 272

1    her case, there was a litigation hold put on

2    anything regarding --

3        Q.    So the case was filed on July 30th, 2018,

4    so let's talk about July 30th, 2018 up until before

5    the case was filed -- just before the case was

6    filed.

7        A.    Right.  We tried to make the best practice

8    archiving records rather than deleting them, but not

9    everybody was brought up to speed on that, and there

10   was -- at that point in time, our Outlook had very

11   limited space available.

12       Q.    So it was possible that during that time

13   then that emails would need to be deleted for space

14   reasons; correct?

15       A.    That's a possibility.

16       Q.    And while you said it was best practices

17   to archive instead of delete, was there any training

18   on doing so?

19       A.    I can't say if there was training done on

20   scale.

21       Q.    When you say "on scale," what do you mean?

22       A.    As part of a training session or process,

23   I can't speak to that.

24       Q.    Were there any repercussions for deleting

25   an email prior to the litigation hold?

Page 273

1      A.     I know that our space had greatly
2    increased even before that hold.
3      Q.     That's what I get for a vague question.
4    Let me try again.
5             Did anyone get punished for deleting an
6    email?
7      A.     Not to my knowledge.
8      Q.     Were there any policies or procedures in
9    place that would call for punishment for deleting
10   certain emails?
11     A.     Not to my knowledge.
12     Q.     And were deleted emails or the action of
13   deleting emails audited or reviewed in any way?
14     A.     I can't say.
15     Q.     Who is Keypath or what is Keypath?
16     A.     Keypath is our marketing agency.
17     Q.     I thought that was Thruline.
18     A.     They were formerly Keypath.
19     Q.     So that's the same entity?
20     A.     Correct.
21     Q.     And what are Keypath's responsibilities,
22   broad strokes, with respect to Post?
23     A.     They work hand in hand with our CMO and
24   they help with brand awareness and obtain our
25   inquiries, our leads for us.

# SEAN COOLEY
# FULL CONDENSED DEPOSITION TRANSCRIPT

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3    ------------------------------)

 4    MELANIE DAVIS,                 )   CASE NO.:

 5            Plaintiff,             )   18-81004-CIV

 6        vs.                        )

 7    POST UNIVERSITY, INC.,         )

 8             Defendant.            )

 9    ------------------------------)

10

11

12         DEPOSITION OF SEAN COOLEY, INDIVIDUALLY

13    AND AS DESIGNATED REPRESENTATIVE OF POST UNIVERSITY

14               DATE:  APRIL 11, 2019

15                   HELD AT:

16              WYNDHAM SOUTHBURY

17              1284 Strongtown Road

18              Southbury, Connecticut

19

20

21

22

23

24    Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

25
```

Page 2

```
1  A P P E A R A N C E S:
2
3  For the Plaintiff:
4     GLAPION LAW FIRM
5     1704 Maxwell Drive
6     Wall, New Jersey  07719
7     732.455.9737
8     BY:  JEREMY M. GLAPION, ESQ.
9        jmg@glapionlaw.com
10
11  For the Defendant:
12     ARENT FOX LLP
13     1717 K Street, NW
14     Washington, DC  20036-5342
15     202.857.6000
16     BY:  ADAM D. BOWSER, ESQ.
17        adam.bowser@arentfox.com
18
19
20
21
22
23
24
25
```

Page 4

```
1          INDEX (continued)
2  Exhibit 17 Marked ........................... 88
   Post University - End of MOD Assessment, Bates
3  Numbers PU 00000038 through 39
4  Exhibit 18 Marked ........................... 117
   Emails, Bates Numbers PU00000062 through 64
5
   Exhibit 19 Marked ........................... 138
6  Post University Position Description,
   December 1, 2016, Bates Number PU00000005
7
   Exhibit 20 Marked ........................... 139
8  Post University Position Description,
   July 1, 2016, Bates Number PU00000029
9
10 Email, Bates Number PU00008459
   Exhibit 21 Marked ........................... 169
11 Exhibit 22 Marked ........................... 188
   Email, Bates Number PU00014123
12
   Exhibit 23 Marked ........................... 211
13 Emails, Bates Numbers PU00011779 through 11780
14 Exhibit 24 Marked ........................... 213
   Post University New Hire Training Manual,
15 Bates Numbers PU00017405 through 17432
16 Exhibit 25 Marked ........................... 221
   Email, Bates Number PU00013017 through 13020
17
   Exhibit 26 Marked ........................... 227
18 Emails, Bates Numbers PU00001470 through 1473
19 Exhibit 27 Marked ........................... 228
   Emails, Bates Numbers PU00001525 through 1527
20
   Exhibit 28 Marked ........................... 228
21 Emails, Bates Numbers PU00001795 through 1797
22 Exhibit 29 Marked ........................... 228
   Email, Bates Number PU00005519 and attachment
23
   Exhibit 30 Marked ........................... 228
24 Conversation with Theisen, Greg, Bates Numbers
   PU00006298 through 6300
25
```

Page 3

```
1          INDEX
2  EXAMINATION
3  Witness Name                 Page
4  Sean Cooley
5     Direct By Mr. Glapion ................... 7
6
7
8          REQUEST
9  Request .................................. 113
10
11
12     PLAINTIFF'S EXHIBITS
13     (Marked For Identification)
14                              Page
15 Exhibit 12 Marked ............................ 7
   Notice of Deposition of designated
16 representative of Post University and Notice
   of Deposition of Sean Cooley
17
   Exhibit 13 Marked ........................... 20
18 Post University Performance Appraisal Reviews
   re Sean Cooley, Bates Numbers PU00017449
19 through 17470
20 Exhibit 14 Marked ........................... 50
   Email, Bates Numbers PU00004476 through 4481
21
   Exhibit 15 Marked ........................... 66
22 Post University Performance Appraisal Review
   Form, Bates Numbers PU00000134 through 150
23
   Exhibit 16 Marked ........................... 70
24 Document bearing Bates Number PU00011106
25
```

Page 5

```
1          INDEX (continued)
2  Exhibit 31 Marked ........................... 246
   Opportunity Detail, Bates Numbers PU00005403
3  through 5405
4  Exhibit 32 Marked ........................... 247
   Document, Bates Numbers PU00017440
5
   Exhibit 33 Marked ........................... 249
6  Emails, Bates Numbers MD000396 through 398
7  Exhibit 34 Marked ........................... 253
   Emails, Bates Numbers MD000308 through 311
8
   Exhibit 35 Marked ........................... 256
9  Emails, Bates Numbers MD000247 through 248
10 Exhibit 36 Marked ........................... 260
   Document headed Activities List, Bates Number
11 PU00000003
12
13
14
15
16
17
18
19
20
21
22
23
24 (Exhibits were attached to transcript.)
25
```

2 (Pages 2 - 5)

Page 6

1          S T I P U L A T I O N S
2          It is stipulated by counsel for the
3    parties that all objections are reserved until the
4    time of trial, except those objections as are
5    directed to the form of the question.
6          It is stipulated and agreed between
7    counsel for the parties that motions to strike are
8    reserved until the time of trial.
9          It is further stipulated that the witness
10   does not waive reading and signing of the deposition
11   transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          (Deposition commenced at 9:00 a.m.)
2          (Exhibit 12, Notice of Deposition
3          of designated representative of Post
4          University and Notice of Deposition
5          of Sean Cooley, marked for
6          identification.)
7          THE REPORTER:
8
9    S E A N   C O O L E Y,
10       being first duly sworn and/or affirmed, was
11       examined, and testified on his oath as follows:
12
13          THE REPORTER:  Any stipulations for
14   the record?
15          MR. GLAPION:  I think just that this
16   is being taken pursuant to the Federal Rules of
17   Civil Procedure and the Local Rules of the Southern
18   District of Florida.
19          MR. BOWSER:  I agree.
20          THE REPORTER:  Thank you.
21
22       DIRECT EXAMINATION BY MR. GLAPION:
23   Q.   It is morning.  Good morning, Mr. Cooley.
24   A.   Good morning.
25   Q.   Have you ever been deposed before?

Page 8

1    A.   Pardon me?
2    Q.   Have you ever been deposed before?
3    A.   No.
4    Q.   Are you aware that you are under oath
5    right now?
6    A.   Yes.
7    Q.   And that it's the same oath that you would
8    be under if we were in a courtroom?
9    A.   Yes.
10   Q.   If I ask you a question -- well, I will
11   ask you a question -- if you answer the question, I
12   will assume that you understood it.  If you don't
13   understand my question, certainly ask me to clarify;
14   is that fair?
15   A.   Yes.
16   Q.   If you need a break, let me know.
17   Certainly we're all going to need breaks at some
18   point, this will probably be lengthy, but I ask that
19   if a question is a pending or if a line of
20   questioning is in the middle or finishing up that we
21   finish that question or line of questioning first;
22   is that okay?
23   A.   Yes.
24   Q.   Your attorney may object to some of my
25   questions.  Unless he instructs you not to answer,

Page 9

1    you may still and should still answer the question;
2    okay?
3    A.   Yes.
4    Q.   Is there anything that you can think of
5    that would prevent you from testifying truthfully
6    today?
7    A.   No.
8    Q.   Anything that would prevent you from
9    testifying to the best of your recollection today?
10   A.   No.
11   Q.   Are you aware that you are here to testify
12   on behalf of Post University?
13   A.   Yes.
14   Q.   Are you aware that you are also noticed to
15   testify in your individual capacity?
16   A.   Yes.
17   Q.   I'm handing you what has been marked as
18   Plaintiff's Exhibit 12, and this is both of the
19   deposition notices stapled together.
20          Have you seen these notices before?
21   A.   Yes.
22   Q.   And with respect to the Notice of 30(b)(6)
23   deposition, do you see that there is a list of
24   topics?
25   A.   Yes.

3 (Pages 6 - 9)

Page 10

1    Q.   Are you prepared to testify on those
2  topics today?
3    A.   Yes.
4    Q.   And while I understand it can get
5  confusing that you are noticed both in your
6  individual capacity and in your capacity -- or
7  excuse me, on behalf of Post, the best way I can
8  explain it is that you are primarily here to testify
9  on behalf of Post.  There may be things where I ask
10 for your subjective opinion or something that your
11 attorney believes to be outside the scope, and we
12 either agree on that or can agree on that, where I
13 nonetheless would like your response, in those
14 scenarios you should testify in your own personal
15 capacity.
16      Do you understand that?
17   A.   I do.
18   Q.   Moving forward I will do my best to
19 simplify it, and unless I say something like "in
20 your personal capacity" or "in your opinion," it
21 should be testimony on behalf of Post University; is
22 that fair?
23   A.   Yes.
24   Q.   Did you meet with anyone to prepare for
25 this deposition?

Page 11

1    A.   Yes.
2    Q.   Who did you meet with?
3    A.   I met with Adam and Elaine Neely.
4    Q.   Who is Elaine Neely?
5    A.   She is our chief compliance officer.
6    Q.   Was anyone else present in this meeting?
7    A.   Our COO was in there.
8    Q.   Who is the COO?
9    A.   Bobby Reese.  He was in there for a
10 moment.
11   Q.   Anyone else?
12   A.   Jeff Olsen.
13   Q.   Who is Jeff Olsen?
14   A.   He is our vice president of enrollment.
15   Q.   And you said Reese was the COO?
16   A.   Correct.
17   Q.   And Jeff Olsen is VP of enrollment?
18   A.   Correct.
19   Q.   Did you review any documents in
20 preparation for this deposition?
21   A.   Yes.
22   Q.   Did you bring any documents with you
23 today?
24   A.   No.
25   Q.   In the individual notice, which is part of

Page 12

1  Exhibit 12, you were asked to bring or provide in
2  advance of this deposition all documents reflecting
3  your training, guidelines or expectations in your
4  role at Post.
5      MR. GLAPION:  I believe that was what
6  you provided yesterday, Adam?
7      MR. BOWSER:  Correct.
8    Q.   And you were also asked to bring any other
9  nonprivileged documents shown to or given to you in
10 preparation for your deposition.
11      You testified that you reviewed documents,
12 but you didn't bring those documents to this
13 deposition?
14   A.   No.
15   Q.   What were those documents?  What was the
16 nature of those documents?
17   A.   A collection of emails and screenshots,
18 some seeming to pertain to the case and some in my
19 opinion outside of the scope, but it was a large
20 collection of documents.
21   Q.   I understand.
22      MR. GLAPION:  And, Adam, I'll just
23 ask you, I know you are not being deposed, but do
24 you know if any of the documents that he reviewed
25 were not already produced?

Page 13

1      MR. BOWSER:  Just to clarify, so what
2  we reviewed were all the documents that you asked
3  about.
4      MR. GLAPION:  In paragraph 46?
5      MR. BOWSER:  Yes.  So they are going
6  to be the answer, all the discovery responses, and
7  all the documents that you identified.
8      MR. GLAPION:  So there is nothing
9  that was not produced to me?
10      MR. BOWSER:  No.
11      MR. GLAPION:  Okay.
12 BY MR. GLAPION:
13   Q.   What is your title at Post University?
14   A.   Director of marketing analytics and
15 automation.
16   Q.   How long have you had that title?
17   A.   About two weeks.
18   Q.   Congratulations.
19   A.   Thank you.
20   Q.   You said it was director of marketing
21 analytics and automation?
22   A.   Correct.
23   Q.   Have you held any other titles --
24   A.   Yes.
25   Q.   -- while at Post?

4 (Pages 10 - 13)

Page 14

1    What titles?
2    A.   Right before this, strategic enrollment
3 and marketing analyst.  That's a mouthful.  Before
4 that, I was an assistant director of admissions.
5 Before that, I was a team lead of admissions.  And
6 before that, I was an admissions counselor.
7    Q.   How long have you been at Post?
8    A.   Nine years, roughly.
9    Q.   That's quite a progression in nine years,
10 congratulations on that as well.
11    A.   Thank you.
12    Q.   We will work with your current title and
13 work our way backwards.
14    What are your responsibilities?  How would
15 you characterize your responsibilities as director
16 of marketing analytics and automation?
17    A.   So I could probably answer the first and
18 second title at the beginning of this first answer.
19 I work closely with our marketing agency on various
20 things regarding our -- various ways that we market
21 Post University, branding.  I work with our CMO
22 regarding our resources and how we obtain them.  I
23 work very closely with the enrollment team, with the
24 operations of their business and act as a bridge
25 between the two.  And that would satisfy the job

Page 15

1 requirement for the second position as well.
2    The additional piece is the automation,
3 which is, we recently implemented a new system, and
4 within that system it has the capabilities to have
5 campaigns to make a lot of our communication more
6 autonomous.
7    Q.   When you say "new system," are you talking
8 about a new --
9    A.   CRM.
10    Q.   -- CRM system?
11    A.   Correct.
12    Q.   Who provides the CRM system?
13    A.   CampusNexus Management.
14    Q.   Have you ever heard of Five9?
15    A.   Yes.
16    Q.   Who is Five9?
17    A.   It is a call system that gets implemented
18 into organizations to help make their outreach more
19 autonomous and can provide prescriptive analytics
20 based on this information.
21    Q.   Do you use Five9 -- excuse me, does Post
22 use Five9?
23    A.   No.
24    Q.   So CampusNexus Management, when did that
25 CRM system start being used?

Page 16

1    A.   December 3rd of 2018.
2    Q.   Prior to that, what was the CRM system?
3    A.   Oracle On Demand.
4    Q.   Was that the CRM system in place as of
5 July 30th, 2014?
6    A.   Yes.
7    Q.   In your current role, do you supervise any
8 employees or employment groups?
9    A.   No.
10    Q.   In your role as strategic enrollment and
11 marketing analyst, did you supervise any employees
12 or employment groups?
13    A.   No.
14    Q.   What about as assistant director of
15 admissions?
16    A.   Yes.
17    Q.   What -- I don't want to ask for specific
18 employees, but generally speaking, what groups of
19 employees were you supervising?
20    A.   Admissions counselors and one team lead.
21    Q.   So you were assigned to one particular
22 team essentially; is that accurate?
23    A.   That team was assigned to me, yes.
24    Q.   I apologize, yes.  You were supervising
25 one particular team.  Who was the team lead for that

Page 17

1 team?
2    A.   Over the course of my time as an assistant
3 director, I had two team leads, one was Victoria
4 Meehan and before her was Emily Hernandez.
5    Q.   What years were you an assistant director
6 of admissions?  Or more specifically, if you have
7 actual dates, you can say that.
8    A.   I can say it was roughly three years.
9 Three to four years.  And that ranged from 2014 to
10 2017.  I don't know those dates for certain.
11    Q.   I understand.
12    A.   That's speculatory.
13    Q.   Do you remember approximately when in 2017
14 you were promoted to strategic enrollment and
15 marketing analyst?  Was it later in 2017, beginning?
16 Any approximation would be fine.
17    A.   I don't recall with any certainty.
18    Q.   So as an assistant director of admission,
19 you said you supervised Victoria Meehan?
20    A.   Correct.
21    Q.   Is Victoria Meehan in your opinion
22 considered to be a good employee?
23    A.   Absolutely.
24    Q.   Does she have an understanding of her
25 expectations at Post University?

5 (Pages 14 - 17)

Page 18

1    A.    Yes.
2    Q.    And did you ever have any issues with her
3  performance in her duties as a team lead while you
4  were supervising her?
5    A.    Not to my recollection.
6    Q.    Who do you report to as director of
7  marketing analytics and automation?
8    A.    Rich Schechter.
9    Q.    And who is Rich Schechter?
10   A.    Our CMO.
11   Q.    "CMO" being chief marketing officer?
12   A.    Correct.
13   Q.    And who does Rich Schechter report to?
14   A.    John Hopkins.
15   Q.    Is that the CEO?
16   A.    It is.
17   Q.    And as a strategic enrollment and
18  marketing analyst, was the reporting for you the
19  same?
20   A.    The reporting hierarchy?
21   Q.    Yes.
22   A.    No.
23   Q.    What changed about the hierarchy?
24   A.    I did report to Jeff Olsen.
25   Q.    And then Jeff Olsen would have been who

Page 19

1  reported to Rich Schechter in that scenario?
2    A.    No.
3    Q.    Who did Jeff Olsen report to?
4    A.    Bobby Reese.
5    Q.    And Bobby Reese reported to John Hopkins?
6    A.    Correct.
7    Q.    And as an assistant director of
8  admissions, who did you -- well, actually, what role
9  did you report to?
10   A.    Forgive me.
11   Q.    As an assistant director of admissions,
12  was there a director of admissions that you reported
13  to?
14   A.    Yes.
15   Q.    Who was that or if there were multiple
16  people, who were they during your time?
17   A.    Jeanna Sinn.
18   Q.    And do you know who Jeanna Sinn reported
19  to?
20   A.    I believe that fluctuated.
21   Q.    Are directors of admissions and assistant
22  directors of admissions considered to be part of
23  marketing?
24   A.    No.
25   Q.    What department are they?

Page 20

1    A.    Admissions.
2    Q.    And is admissions, is that a separate
3  group than marketing?
4    A.    Yes.
5    Q.    And what about the admissions counselors,
6  are they part of marketing or are they part of
7  admissions?
8    A.    Admissions.
9         MR. GLAPION:  Can this be marked as
10  Exhibit 13, please.
11        MR. GLAPION:  Sorry, I just
12  dog-eared; I lost my stapler last night.
13        (Exhibit 13, Post University
14        Performance Appraisal Reviews re Sean
15        Cooley, Bates Numbers PU00017449
16        through 17470, marked for
17        identification.)
18  BY MR. GLAPION:
19   Q.    Take a moment to look at it.  I will first
20  tell you that you will see at the bottom there are
21  numbers that begin or a sequence of numbers and
22  letters that begins PU000, etcetera.
23   A.    Uh-huh.
24   Q.    And just going forward, when you want to
25  answer yes or no, it has to be "yes" or "no" rather

Page 21

1  than "uh-huh" or "uh-uh," just because it may not --
2    A.    Absolutely.
3    Q.    -- be captured correctly.
4         MR. GLAPION:  So I believe I emailed
5  you last night, Adam.  I assume that people weren't
6  in the office to take care of it.  The Bates
7  numbering had duplicated, so what I did is I
8  manually wrote in what should be the correct Bates
9  Number, and then we can just adjust it afterwards,
10  because the last document that you provided before
11  this stopped at 17445, and then -- or 17444, and so
12  the first document that you produced as 17436 should
13  have been 17445.  So I just crossed stuff out and
14  continued.
15        MR. BOWSER:  All right.
16  BY MR. GLAPION:
17   Q.    So once you've had a chance to take a look
18  at this, let me know.
19        (Pause.)
20   Q.    Have you seen enough of this document to
21  recognize it?
22   A.    Yes.
23   Q.    Do you recognize these documents?
24   A.    Yes.
25   Q.    And what do you recognize these documents

6 (Pages 18 - 21)

Page 22

1 to be?
2     A.    Performance reviews.
3     Q.    Starting at what I crossed out and is now
4 17449 at the bottom, it's PU00017449, it's dated
5 December 11th 2015.
6         Do you see that?
7     A.    Yes.
8     Q.    And it says that you were in department
9 OEI Admissions.
10        Do you see that?
11    A.    Yes.
12    Q.    What does OEI stand for?
13    A.    Online Education Institute or Institution.
14    Q.    And looking through this first page, it
15 has a section for Self-Rating/Comments.
16        Do you see that?
17    A.    Yes.
18    Q.    And that also continues on to what is
19 marked as 17451 or what is written in as 17451.
20        Do you see that?
21    A.    Yes.
22    Q.    So it looks like you -- did you fill out
23 this self-rating and comment section?
24    A.    Yes.
25    Q.    It looks like you gave yourself all 5s

Page 23

1 except for one that you put 4/5; is that correct?
2     A.    Yes. It's blurry, but yes.
3     Q.    I apologize; that's how it was produced.
4         So is it fair to say you consider yourself
5 a good employee then?
6     A.    Yes.
7     Q.    And at the time you considered yourself to
8 be a model employee?
9     A.    Yes.
10    Q.    Your supervisor at the time was Jeanna
11 Sinn you said; is that correct?
12    A.    Yes.
13    Q.    And Jeanna Sinn presumably filled in the
14 supervisor rating; correct?
15    A.    Yes.
16    Q.    And she gave you all 4s.
17        Do you see that?
18    A.    Yes.
19    Q.    Do you have an understanding of what that
20 disagreement was in terms of you giving yourself all
21 5s and your supervisor giving you 4s?
22    A.    I can't say for certain.
23    Q.    Did you ever talk to Jeanna Sinn about
24 that?
25    A.    I can't recall.

Page 24

1     Q.    Is that something you would have talked to
2 Jeanna Sinn about?
3     A.    Perhaps.
4     Q.    And in the Goal 4 role, you wrote, I am an
5 integral part of the OEI Petitions Board.
6         Do you see that?
7     A.    Yes.
8     Q.    What is or was the OEI petitions board?
9     A.    Was.
10    Q.    What was the OEI petitions board?
11    A.    Students will petition their grades that
12 they received or -- for two different things.  They
13 will either petition scholastically or monetarily,
14 and they will submit a document that gets reviewed
15 by a panel.  And at that point, I was on that panel.
16    Q.    And the panel decides essentially the
17 outcome of the student's petition; is that correct?
18    A.    They provided their recommendation to be
19 escalated.
20    Q.    To who?
21    A.    I believe the provost was involved, but I
22 can't say for certain who it was escalated to.
23    Q.    In the following sentence, you wrote that
24 we convene -- "we" referring to the OEI petitions
25 board -- and deliberate twice a month and

Page 25

1 collectively make decisions that are responsible for
2 hundreds of thousands of annual revenue.
3         What kind of decisions were being made
4 that were responsible for hundreds of thousands of
5 annual revenue?
6     A.    I can't recall.
7     Q.    Was the OEI petitions board responsible
8 for generating hundreds of thousands of annual
9 revenue?
10        MR. BOWSER:  Objection, misstates the
11 document.
12    Q.    Were the decisions -- I'll restate the
13 question.
14        Were the decisions that the OEI petitions
15 board made while you were on the OEI petitions board
16 responsible for hundreds of thousands of annual
17 revenue?
18    A.    I can't recall.  I can't say with any
19 certainty.
20    Q.    Is it fair to characterize the OEI
21 petitions board as -- I mean, petitions board seems
22 self-explanatory, but it's almost like an appeal
23 board in a sense.
24        Is that a fair characterization?
25    A.    Yes.

7 (Pages 22 - 25)

Page 26

1   Q.   So how could an appeal board, and this is
2 in your judgment and your opinion, how could an
3 appeal board be responsible for hundreds of
4 thousands of annual revenue?
5   A.   I don't know.  It was a long time ago that
6 I put that information down.
7   Q.   And as we sit here today, can you think of
8 any decision you made with the OEI petitions board
9 that generated any revenue?
10   A.   People petitioned certain fees that -- not
11 fees, pardon me -- balances that they had and we
12 worked with them to try to come to a middle ground
13 while keeping the students' best interests in mind.
14   Q.   And what do you mean by "middle ground" in
15 that scenario?
16   A.   If someone had a balance on classes that
17 were taken and they were multiple classes and there
18 were mitigating circumstances that took place in
19 their life that precluded them from continuing the
20 class, that panel would gather and see what we can
21 do to help reconcile those issues.  Some of that
22 would be payment for one class versus two and
23 providing a student with a late W versus an F to try
24 to help them continue their educational journey with
25 us rather than have a larger balance and discontinue

Page 27

1 their education.
2   Q.   So if I'm understanding correctly, a
3 student who may have disagreed or thought there was
4 a reason that they should not have to pay the amount
5 they were obligated to pay, that's something that
6 the petitions board would hear; correct?
7   A.   Correct.
8   Q.   And what you are saying, and I apologize
9 if I mischaracterize, you can let me know, is that
10 the petitions board would attempt to work with that
11 student to see if there was a fair accommodation
12 that could be made in terms of that payment that was
13 obligated?
14   A.   Yes.
15   Q.   But if they were already obligated to pay
16 that amount, how did that decision generate revenue
17 for Post University?
18       MR. BOWSER:  Objection.
19       Do you see "generate" somewhere?
20 BY MR. GLAPION:
21   Q.   How would that decision -- I'll rephrase.
22       How would that decision be responsible for
23 revenue for Post University?
24   A.   If someone had a balance that extended for
25 the payment of multiple courses and were unable --

Page 28

1 felt as if they needed leeway due to a mitigating
2 circumstance, the panel would review that situation
3 on a case by case and see if possibly one of those
4 classes can be removed from their balance due to
5 those mitigating circumstances and work with them on
6 developing payment plans and structures for the
7 other class.  What that does in the way of
8 generating revenue would be that is the alternative
9 to them having a balance and potentially going into
10 a bad debt situation.
11   Q.   So just to simplify it, it generates
12 revenue by keeping them at Post rather than
13 potentially leaving if they can't pay the balance;
14 correct?
15   A.   It helps work with the student in order
16 for them to continue moving forward with their
17 education.
18   Q.   If the student stays at Post, Post
19 generates revenue; correct?
20   A.   Correct.
21   Q.   So that's one way -- I'm not trying to be
22 tricky here -- that's one way it generates revenue
23 is if you help a student to stay at Post; correct?
24   A.   Correct.
25   Q.   The second paragraph of Goal 4 says, I

Page 29

1 recently have become an official part of the
2 invaluable marketing meeting that takes place once a
3 week.
4       Do you see that?
5   A.   Yes.
6   Q.   When this was written, were you an
7 assistant director of admissions?
8   A.   Yes.
9   Q.   You said the assistant director of
10 admissions was not part of marketing; correct?
11   A.   Correct.
12   Q.   So why were you involved in the marketing
13 meeting?
14   A.   Well, I said that role is not part of
15 marketing.
16   Q.   Okay.  But while you wrote this, you were
17 in the role of assistant director of admissions;
18 correct?
19   A.   Correct.
20   Q.   And while you were an assistant director
21 of admissions, you wrote that you became part of the
22 marketing meeting?
23   A.   Right.  I believe you asked, are those
24 roles part of admissions, to which I answered they
25 are not.

8 (Pages 26 - 29)

Page 30

1    Q.   And now I'm asking if the assistant
2  director of admissions role is not part of
3  marketing, why were you as an assistant director of
4  admissions in a marketing meeting?
5    A.   I was in the process of transitioning into
6  my new position.  There was value that was seen in
7  me to bring an admissions perspective to the
8  marketing meeting.
9    Q.   You testified previously that you were an
10  assistant director of admissions from 2014 to 2017;
11  correct?
12    A.   Correct.
13    Q.   And what years were you a strategic
14  enrollment and marketing analyst?
15    A.   2017 to a couple of weeks ago.  I don't
16  know with any certainty what those exact dates are.
17    Q.   I understand.  So your testimony, and I'm
18  having trouble following this, is that you were
19  transitioning into a new position?
20    A.   I was not transitioning.
21    Q.   A moment ago you testified "I was in the
22  process of transitioning into my new position.
23  There was value that was seen in me to bring an
24  admissions perspective to the marketing meeting."
25        What new position were you transitioning

Page 31

1  into as of December 11, 2015?
2    A.   I misspoke when I said "transitioning."
3    Q.   Okay.
4    A.   I guess I felt internally I was in the
5  process of transitioning because I wanted to move up
6  in the company, and there was value seen in my
7  marketing prowess, so they brought me in to add an
8  admissions perspective.  So "transitioning" was the
9  wrong word at that juncture.
10    Q.   I understand and appreciate the
11  clarification, but while you were considered by Post
12  to be an assistant director of admissions, Post
13  involved you, as an assistant director of
14  admissions, in the marketing meeting; correct?
15    A.   Me and me alone.
16    Q.   Well, the meeting had multiple people.
17        Do you mean within the admissions
18  department?
19    A.   In the admissions department, correct.
20    Q.   Are you aware of any other assistant
21  director of admissions who had been part of the
22  marketing meeting between 2014 and today?
23    A.   No.
24    Q.   Does this marketing meeting still take
25  place once a week?

Page 32

1    A.   Yes.
2    Q.   Does it have an admissions representative
3  in the marketing meeting?
4    A.   Yes.
5    Q.   What role is that admissions
6  representative that is in the marketing meeting?
7    A.   Vice president of admissions, director of
8  admissions.
9    Q.   Who is that?
10    A.   The current vice president is Jeanna Sinn,
11  and the current director is Jennifer Scholler.
12    Q.   You said Jeanna Sinn was VP of admissions?
13    A.   She is currently.
14    Q.   And --
15    A.   At the time she was director.
16    Q.   Got you.  And the current director is --
17    A.   Jennifer Scholler.
18    Q.   -- Jennifer Scholler.
19    A.   But at the time in question.
20    Q.   I understand.  Are you aware -- strike
21  that.
22        The marketing meeting, to the best of your
23  knowledge, is it always intended to include a
24  representative from admissions?
25    A.   Yes.

Page 33

1    Q.   So at Post, there is not like a hard
2  divider between admissions and marketing in terms of
3  how they interact; correct?
4        MR. BOWSER:  Objection to form.
5    Q.   I mean, it seems like a marketing meeting
6  is still soliciting input from admissions; correct?
7    A.   Yes.
8    Q.   So while they may not be organizationally
9  categorized as marketing, the admissions department
10  and certain personnel in the admissions department
11  still have input into marketing; is that correct?
12    A.   Yes.
13    Q.   If you flip over to 17451, you wrote, I
14  represent OEI admissions and welcome all new
15  employees during their new hire orientation.
16        Do you see that?
17    A.   Yes.
18    Q.   What does a new hire orientation entail?
19    A.   Meet and greet for new associates.
20    Q.   And I just want to clarify.  When I don't
21  specify a date and I say what does it entail, I'm
22  limiting it to between July 30th, 2014 and
23  July 30th, 2018; is that fair?
24    A.   Yes.
25    Q.   All right.  I know I've asked a few

9 (Pages 30 - 33)

Page 34

1 questions, but can you think of any of your answers
2 that would change given that date range limitation?
3      A.   With everything that we've spoken about,
4 that it falls within '14 and '18?
5      Q.   Yes, correct.
6      A.   I'd have to -- I think when I was
7 answering a lot of these questions, it seemed
8 specific to this time frame.
9      Q.   I understand.  And that falls within the
10 2014 to 2018 time frame so we're good.
11      A.   This particular document was 2014 -- this
12 was 2015, correct?
13      Q.   2015, correct.
14      A.   Right.
15      Q.   Were you involved with training of new
16 hires?
17      A.   Occasionally.
18      Q.   And when you were involved with the
19 training of the new hires, what was your
20 involvement?
21      A.   I spoke to them about the admissions
22 process.
23      Q.   If you look at the bottom of 17451, it
24 starts to get into performance factors, the first
25 one being job knowledge.

Page 35

1      Do you see that?
2      A.   Yes.
3      Q.   And you wrote, I am not only aware of the
4 newest practices -- excuse me, the newest of
5 practices in all departments, I am usually involved
6 or conferred with on the creation of them.
7      Did you write that?
8      A.   Yes.
9      Q.   Does that remain true to this day, that
10 you are aware of the newest practices in all
11 departments?
12      A.   No.
13      Q.   Are you today usually involved in on the
14 creation of new practices in all departments?
15      A.   I wouldn't say in all departments.  I am
16 conferred with on occasion.
17      Q.   At the time you wrote this, however, this
18 was true; correct?
19      A.   Yes.
20      Q.   And if you look to the 17452, at the
21 bottom is Communications Skills.
22      Do you see that?
23      A.   Yes.
24      Q.   And you wrote, My written and oral
25 abilities to clearly and convincingly convey my

Page 36

1 thoughts, facts or ideas are unparalleled.
2      Do you see that?
3      A.   Yes.
4      Q.   Do you still believe that to be true
5 today?
6      A.   It's subjective, but yes.
7      Q.   I'm asking for your subjective opinion.
8      And it's fair to say though that you are
9 confident in your written and oral abilities;
10 correct?
11      A.   Yes.
12      Q.   And if you look at 17453, there is a
13 judgment rating, and do you see that you rated
14 yourself as outstanding?
15      A.   Yes.
16      Q.   And your supervisor rated you as
17 commendable; correct?
18      A.   Correct.
19      Q.   And in your employee comments, you wrote,
20 I possess impeccable judgment.
21      Do you see that?
22      A.   Yes.
23      Q.   Is that still accurate today?
24      A.   I think so.
25      Q.   And in the -- actually, let's jump ahead a

Page 37

1 little bit to 17461.  This is a little bit of an
2 older evaluation.  You can see on 17457 that it's
3 dated October 22nd, 2014.
4      A.   Where are we?
5      Q.   Go to 17457.
6      A.   17457.  I'm sorry.
7      Q.   It's all right.  I did the same thing last
8 time.  That's why I brought a binder this time.
9      A.   Here we are.
10      Q.   We will be flipping back to the first set,
11 so don't lose track of them too much.
12      A.   Okay.
13      Q.   So 17457 appears to be another performance
14 appraisal; correct?
15      A.   Yes.
16      Q.   And this one at the top is dated
17 October 22nd, 2014.
18      Do you see that?
19      A.   Yes.
20      Q.   So this was before the one we were just
21 discussing, which was December 11, 2015; correct?
22      A.   Correct.
23      Q.   And if you can jump ahead to 17461 now.
24      A.   I got mixed up.
25      Q.   That's okay.

10 (Pages 34 - 37)

Page 38

1   A.   17461?
2   Q.   Correct.
3        THE WITNESS:  Do you have that?  I'm
4   sorry.
5        MR. BOWSER:  Here, let's switch.
6        THE WITNESS:  All right.  Got all
7   over the place.
8   Q.   To be fair, I do see that you wrote that
9   organization would be your area in need of most
10  attention.
11       Under Judgment on 17461, you again rated
12  yourself outstanding on this earlier evaluation.
13       Do you see that?
14  A.   Yes.
15  Q.   And your supervisor rated you outstanding.
16       Do you see that?
17  A.   I do.
18  Q.   And you again wrote, I possess impeccable
19  judgment.
20       Do you see that?
21  A.   Yes.
22  Q.   And you wrote, They know that I only relay
23  accurate information, emphasis on only, which I will
24  go to no lengths to ascertain.
25       Do you see that?

Page 39

1   A.   Yes.
2   Q.   I'm presuming that meant you would go to
3   great lengths; correct?
4   A.   (Nodding in the affirmative.)
5   Q.   Yes or no?
6   A.   Yes.
7   Q.   And is it still accurate that you only
8   relay accurate information?
9   A.   Yes.
10  Q.   And in this evaluation for judgment, this
11  2014 evaluation, your supervisor rated you
12  outstanding.
13       We just established that; correct?
14  A.   Yes.
15  Q.   But in the 2015 evaluation, your
16  supervisor rated you commendable with respect to
17  judgment.
18       Do you have any understanding of why her
19  opinion of your judgment would have dropped in the
20  year between these two evaluations?
21  A.   No.
22  Q.   Would you have asked about that?
23  A.   I can't say for certain.
24  Q.   Okay.  We are going to go back now to the
25  first 2015 evaluation and look at page 17453.

Page 40

1        MR. BOWSER:  Jeremy, one moment.  I'm
2   going to hand him back the reorganized copy, so we
3   don't mix them up.
4        MR. GLAPION:  Okay.
5        THE WITNESS:  Thank you.
6   A.   17453?
7   Q.   Yes, sir.  Are you there?
8   A.   I am.
9   Q.   You'll see initiative, dependability and
10  reliability, you rated yourself outstanding.
11       Do you see that?
12  A.   Yes.
13  Q.   And your supervisor rated you meets
14  expectations.
15       Do you see that?
16  A.   Yes.
17  Q.   That to me is a bigger discrepancy than
18  outstanding and commendable.
19       Do you have an understanding of why that
20  discrepancy existed?
21  A.   No.
22  Q.   Did you have any sense that there were
23  issues, or did you have any sense from your
24  supervisor, apart from this evaluation, that your
25  initiative, dependability and reliability did not

Page 41

1   exceed expectations?
2   A.   No.
3   Q.   You can set these aside now.  We are done
4   with those.
5        Is Post University a for-profit university
6   or nonprofit?
7   A.   For profit.
8   Q.   What does that mean for Post to be a
9   for-profit university?
10  A.   It means that we need to hold ourselves to
11  a higher standard.
12  Q.   Are you saying nonprofit universities
13  don't hold themselves to a higher standard?
14  A.   No.
15  Q.   Are you saying that Post has to hold
16  itself to a higher standard than, say, Harvard?
17  A.   In some ways, I believe so.
18  Q.   Does it also mean that the business side
19  of Post is -- excuse me, the business motivations at
20  Post are different than a nonprofit?
21  A.   I don't feel that way.
22  Q.   I'm not asking what you feel at this time.
23  I'm asking, does Post's business model as a
24  for-profit university differ from a nonprofit
25  university?

11 (Pages 38 - 41)

1   A.   Not to my recollection -- not to my
2 knowledge.
3   Q.   Are you aware of how for-profit
4 corporations generally function?
5   A.   Can you expand on that?
6   Q.   Sure.  My understanding of a for-profit
7 company is that their goal is to generate profit for
8 its owners and shareholders.
9       Do you agree?
10   A.   Yes.
11   Q.   Is that part -- one of Post University's
12 goals as a for-profit university?
13   A.   Yes.
14   Q.   And it's fair to say then that the actions
15 Post takes are generally taken in hopes that they
16 will lead to some sort of increased revenue or
17 increased profits?
18       MR. BOWSER:  Objection, compound.
19   A.   There is many reasons.
20   Q.   Sure.  But can you think of a decision
21 Post made between 2014 and 2018 that was not taken
22 in hopes that it would lead to increased revenue?
23   A.   Can you repeat the question?
24   Q.   My first question that you said there is
25 many reasons, and I'll ask that again, any action

1 Post takes is taken in hope, at least in part, that
2 it will lead to increased revenue?
3   A.   The actions that Post takes are to
4 increase a robust student experience.
5   Q.   Is a robust student experience --
6   A.   Revenue could be a byproduct of that.
7   Q.   That's what I was asking.  A robust
8 student experience would presumably increase
9 enrollment; correct?
10   A.   One would hope.
11   Q.   And when you say "one would hope," you
12 mean Post would hope?
13   A.   Post would hope.
14   Q.   And a robust student experience would
15 increase retention; correct, in theory?
16   A.   In theory, yes.
17   Q.   And that increased retention would
18 generate revenue; correct?
19   A.   Correct.
20   Q.   And that increased enrollment from a
21 robust student experience would increase revenue;
22 correct?
23   A.   It should.
24   Q.   And so generally speaking, Post wants to
25 take actions that will, at least indirectly,

1 increase revenue; correct?
2   A.   Post wants to take actions --
3   Q.   Yes.
4   A.   -- to provide a fantastic student
5 experience from start to finish through alumni.
6 Revenue is a byproduct of that.
7   Q.   Is the goal -- is Post's goal to -- excuse
8 me.
9       Is increasing the student experience the
10 end goal of improving the student experience?  Is
11 that it?  Do they do it for the sake of doing it?
12   A.   In my opinion.
13   Q.   I'm not asking for your opinion.  I'm
14 asking from a business perspective at Post
15 University, does it take actions to improve the
16 student experience for no other reason than to
17 improve the student experience?
18   A.   It's a combination of improving the
19 student experience and helping to generate revenue.
20   Q.   Does Post offer a service?  Generally
21 speaking, businesses often offer goods or services
22 for sale.  Does Post offer a service?
23   A.   Yes.
24   Q.   How would you characterize that service
25 that Post offers?  Is it fair to characterize it as

1 an educational service?
2   A.   Yes.
3   Q.   Does Post currently generate revenue?
4   A.   Yes.
5   Q.   What are its primary sources of revenue
6 generation?
7   A.   Title IV funding.  That's --
8   Q.   Are -- I apologize, continue.
9   A.   That's federal aid.  Tuition assistance,
10 GI Bill.
11   A.   Are those what you would consider to be
12 the big -- so essentially tuition would be Post's
13 largest source of revenue; is that fair?
14   A.   Cash as well.
15   Q.   Cash.  So these sources of revenue all
16 essentially relate to the payment of tuition and
17 fees to Post; correct?
18   A.   Correct.
19   Q.   And when a student pays tuition to Post,
20 they might get federal aid; correct?
21       MR. BOWSER:  Objection to form,
22 foundation.
23   Q.   You can answer that question.
24   A.   Can you repeat it, please.
25   Q.   When a student pays tuition to Post, they

Page 46

1 may get federal aid for that, to help with that
2 tuition?
3     A.   Yes.
4     Q.   And they may get tuition assistance to
5 help pay for that tuition; correct?
6     A.   They may, yes.
7     Q.   And they may get help through the GI Bill;
8 correct?
9     A.   They may, yes.
10    Q.   Or they may just pay cash; correct?
11    A.   Correct.
12    Q.   And students do pay tuition to Post;
13 correct? Excuse me, enrolling students and enrolled
14 students continue to pay?
15    A.   If you are a student at Post University
16 taking classes, you pay tuition, yes.
17    Q.   And when a student pays tuition to Post,
18 they are essentially paying for Post's educational
19 services; correct?
20    A.   Correct.
21    Q.   And compared to another transaction, a
22 student is essentially purchasing educational
23 services from Post; is that accurate?
24    A.   They are purchasing an experience.
25 Education is delivered throughout that experience.

Page 47

1     Q.   But they are purchasing something, and
2 whether it be an experience or we call it an
3 educational service, they are purchasing something
4 from Post; correct?
5     A.   Correct.
6     Q.   Under its current business model, could
7 Post stay in business without new students
8 continuing to enroll?
9     A.   I can't say for certain.
10    Q.   If no students enrolled at Post anymore,
11 could Post stay in business with its current
12 business model?
13    A.   I don't believe so.
14    Q.   And could Post stay in business without
15 students continuing to purchase education services
16 from Post?
17    A.   No.
18    Q.   And so it's necessary then that for Post
19 to stay in business that students continue to pay
20 Post, whether with financial aid or otherwise;
21 correct?
22    A.   Correct.
23    Q.   Is Post profitable?
24    A.   Yes.
25    Q.   Do you know what Post's revenue was last

Page 48

1 year?
2     A.   Yes.
3     Q.   What was Post's revenue?
4     A.   ████████.
5     Q.   ████████?
6     A.   Yes.
7     Q.   And that's for fiscal year 2018?
8     A.   I'm not 100 percent; I believe so.
9     Q.   Okay. Do you know what Post's profit was
10 last year?
11    A.   No.
12    Q.   Do you know what Post's revenue was in
13 2014?
14    A.   No.
15    Q.   2015?
16    A.   No.
17    Q.   Do you know what its revenue to date is in
18 2019?
19    A.   No.
20    Q.   I don't know if I asked this, so I
21 apologize, do you know what, if any, amount was
22 profit on that ████████?
23    A.   No.
24    Q.   Do you have a sense of what kind of
25 judgment Post could pay in this case while still

Page 49

1 remaining in business?
2     A.   No.
3     Q.   Could Post pay $5 million?
4     A.   I don't know.
5     Q.   Could Post pay $15 million?
6     A.   I don't know.
7     Q.   Is there an upper limit somewhere?
8 Could Post pay $100 million?
9     A.   I can't imagine so, no.
10    Q.   So somewhere up to 100 million,
11 potentially?
12    A.   No.
13    Q.   Where do you think that line is of what
14 Post could pay based on your understanding of its
15 finances?
16        MR. BOWSER: I'm just going to, for
17 the record, say this is outside the scope.
18        MR. GLAPION: I asked about, and I
19 think we talked about on our call, that I would be
20 asking this line of questioning about judgment and
21 what kind of judgment it could pay.
22        MR. BOWSER: You are talking about --
23 the actual verbiage of the topic is sources of
24 revenue.
25        MR. GLAPION: I'm just going to

13 (Pages 46 - 49)

Page 50

1 note -- actually, can we go off the record for a
2 moment.
3        (Off-the-record discussion.)
4            MR. GLAPION:  We can go back on the
5 record.
6            Can you please mark this as
7 Exhibit 14 and hand it to the witness when it's
8 marked.
9            (Exhibit 14, Email, Bates Numbers
10           PU00004476 through 4481, marked for
11           identification.)
12 BY MR. GLAPION:
13    Q.   Is this one of the documents you reviewed
14 in preparation for this deposition?
15    A.   I believe so.  There was a lot.
16    Q.   I understand.  And John Hopkins, you said,
17 is the CEO; correct?
18    A.   Correct.
19    Q.   And does this appear to be an email from
20 John Hopkins?
21    A.   It does.
22    Q.   And it seems to be an email to Vicki
23 Whisenhant.
24        Do you see that?
25    A.   Yes.

Page 51

1    Q.   Who is Vicki Whisenhant?
2    A.   She is our chief associate experience.
3    Q.   And it appears to be -- if you look at the
4 subject, Forward Post update, there seems to be
5 something that was forwarded to Vicki Whisenhant;
6 correct?
7    A.   It appears to be so, yes.
8    Q.   And what appears to be forwarded is
9 another email from John Hopkins.
10        Do you see that?
11        Directly below where it says Attachments,
12 there is another From, on the front page.
13    A.   On the front page?
14    Q.   Correct.  So there is Attachments and then
15 below it, it says From.
16    A.   Yes.
17    Q.   And it's to a bunch of different names,
18 Alton Barron, Connia Nelson, Brad Palmer, etcetera,
19 etcetera.
20        Do you see that?
21    A.   Yes.
22    Q.   Do you know who those people are?
23    A.   No.
24    Q.   Does Post University have a board?
25    A.   Yes.

Page 52

1    Q.   Could those persons be board members or
2 trustees?
3    A.   They could be.
4    Q.   And the email begins -- the forwarded
5 begins with Dear Trustees.
6        Do you see that?
7    A.   I do.
8    Q.   And if you skip ahead to immediately after
9 4480 --
10    A.   4480?
11    Q.   After 4480, correct, there is a document
12 that at the top is Eagle Eye.
13    A.   Yes.
14        MR. GLAPION:  This document is 4481,
15 just for tracking purposes for you and I, Adam, but
16 because it was an Excel spreadsheet, there is not
17 really a way to note on the document what its Bates
18 Number was, but it's 4481.
19    Q.   Are you familiar with the Eagle Eye?
20    A.   Yes.
21    Q.   What is the Eagle Eye?
22    A.   It is a high level overview of different
23 areas and departments within the business and how
24 they are functioning.
25    Q.   If you look at the very first page of the

Page 53

1 Eagle Eye, under the Online Admissions - Undergrad,
2 it says, We are still coming in short on the UG
3 Online by 1,034 inquiries.
4        Do you see that?
5    A.   Yes.
6    Q.   What does that mean?
7    A.   We try to pace to a certain amount of
8 inquiries to hopefully hit the goal.
9    Q.   Let's parse that out a little bit.  What
10 is meant by "inquiries" in your last answer?
11    A.   Inquiries are prospective students that
12 have filled out requests for information about going
13 to school.
14    Q.   And you said "to hopefully hit the goal."
15        To what goal are you referring?
16    A.   The goal of students that would like to
17 attend Post for the upcoming module.
18    Q.   So the goal of students who would like to
19 attend Post or students who do attend Post?
20    A.   Students that attend Post.
21    Q.   So it's just saying it's not a subjective
22 I want to go, it's more of a realization of them
23 actually attending Post that the goal is; correct?
24    A.   Students don't attend Post that don't want
25 to.

14 (Pages 50 - 53)

Page 54

1    Q.   Correct.  But the goal from Post's
2  perspective is not to make people want to go to
3  Post; it's to actually get people to go to Post;
4  correct?
5    A.   Whose goal?
6    Q.   Post's.
7    A.   Post's goal is to have students attending
8  Post.  That's --
9    Q.   So the goal that you referred to is
10  student attendance, students attending Post;
11  correct?
12    A.   This regarding inquiries, it would be a
13  student starting for the upcoming module.
14    Q.   I'm referring back to your answer where
15  you said "to meet the goal."  And I just want to
16  make sure that the goal you are discussing is the
17  goal of enrollments.
18    A.   Correct.
19    Q.   If you look at the second paragraph, it
20  says, We are on pace to hit 385 enrollments.
21       Do you see that?
22    A.   Yes.
23    Q.   Is that the goal that you were just
24  talking about?
25    A.   It could be.

Page 55

1    Q.   And it says, Against a run rate of 385.
2       Do you see that?
3    A.   Yes.
4    Q.   What does that mean?
5    A.   I don't know.
6    Q.   Have you heard the term "run rate"?
7    A.   Yes.
8    Q.   What does "run rate" mean?
9    A.   I believe run rate is what you're going to
10  be finishing at a particular goal.
11    Q.   So the sentence, We are on pace to hit 385
12  enrollments against a run rate of 385, can you
13  explain that sentence to me?
14    A.   We are on pace to hit our goal, or
15  whatever the 385 is, against a run rate of 385.  So
16  it's aligning; the two things are aligning.
17    Q.   Is it your interpretation of "against a
18  run rate of 385" that 385 is the goal?
19    A.   Yes.
20    Q.   If you look at the second line of that
21  second paragraph, all the way on the right, it
22  begins, We have 447 students in the pipeline that
23  have the potential to be moved to ATP within the
24  next week of enrollment period.
25       Do you see that?

Page 56

1    A.   Yes.
2    Q.   What does ATP mean?
3    A.   Ability to pay.
4    Q.   So with that in mind, can you explain what
5  that sentence means?
6    A.   That there are 447 students that have
7  completed an application and have also completed
8  some form of method of payment.
9    Q.   So basically students who have applied and
10  have demonstrated that they can actually pay?
11    A.   Correct.
12    Q.   The last sentence says, Still working to
13  generate new enrollments with the readmit list and
14  reference to referrals.
15       Do you see that?
16    A.   Yes.
17    Q.   What does that mean?
18    A.   2016.  "The readmit list" are students
19  that have withdrawn from the university for various
20  reasons that we are looking to see if they are
21  interested in coming back to Post.  And "reference
22  to referrals" were at the time when we spoke with
23  students, we asked for a reference to see if they
24  were a good candidate for our program.
25    Q.   So what does "reference to referrals"

Page 57

1  mean?
2    A.   Occasionally those references would -- to
3  be interested in moving forward with their education
4  at Post University.
5    Q.   So Post would ask prospective students for
6  references; correct?
7    A.   Correct.
8    Q.   And it would then inquire with respect to
9  those references whether they were interested in
10  attending Post?
11       MR. BOWSER:  Objection, foundation.
12    Q.   You can answer.
13    A.   Can you repeat the question?
14    Q.   Would Post inquire with respect to the
15  references that you just mentioned, would it inquire
16  of the references whether they were interested in
17  attending Post?
18    A.   We would ask the references if they felt
19  that the person that conducted a PCAS was a good fit
20  for online education, and through that conversation,
21  we would see if that student was interested in
22  taking classes as well.  Or that reference, pardon
23  me.
24    Q.   So in the conversation with the reference,
25  you would check to see if the reference was

1 interested in attending Post; correct?
2    A.   We would talk to the reference about the
3 person that a PCAS was conducted and occasionally
4 that conversation would turn into a PCAS itself, if
5 the reference had expressed interest in hearing more
6 about the university as well.
7    Q.   Who conducted these telephone calls for
8 the references?  What employee group?
9    A.   Admissions counselors.
10    Q.   Were admission counselors taught or
11 trained to initiate the conversation with references
12 about whether they would like to attend Post?
13    A.   They were instructed to ask for a
14 reference.  If the conversation shifted towards them
15 wanting to get more information about that, they
16 were trained to handle that transition.
17    Q.   I'm only asking about the conversation
18 with the references.  So you've already got a
19 reference from the prospective student, and the
20 admissions counselor is on the phone with the
21 reference.
22         Were the admissions counselors trained to
23 initiate the part of the conversation you just said
24 about whether a reference would be interested in
25 attending Post?

1         MR. BOWSER:  Objection, asked and
2 answered.
3    Q.   You can answer.
4    A.   They were trained to handle that
5 transition should the interest be brought up.
6    Q.   Were they ever trained to initiate the
7 transition?
8    A.   Not to my knowledge.
9    Q.   Were they trained not to initiate the
10 transition?
11    A.   No.
12    Q.   And so when in this Eagle Eye report it
13 says still working to generate new enrollments with
14 reference to referrals -- I'm skipping the readmit
15 part because we already addressed that -- what does
16 that mean?
17    A.   Again, occasionally when speaking with
18 these references, the conversation would shift to
19 that reference being interested in attending Post.
20    Q.   Did Post view references as a lead?
21    A.   No.
22    Q.   Did Post treat references as a lead?
23    A.   Did they treat it as a lead?
24    Q.   Did they treat references as a lead?
25    A.   Not to my knowledge.

1    Q.   Did Post add references to the CRM system?
2    A.   Yes.
3    Q.   Did Post add references to the CRM system
4 in any way that -- let me rephrase this question.
5         Did Post add references to the CRM system
6 with their own entry?
7    A.   Can you expand on what that means?
8    Q.   The CRM system, correct me if I'm wrong --
9 we will take it piece by piece.
10         The CRM system has essentially files for
11 each lead; is that correct?
12    A.   Yes.
13    Q.   When Post received a reference, did it
14 create a file for the reference in that CRM system?
15         MR. BOWSER:  Objection, compound.
16    A.   There was an area within the original
17 inquiries record to add that reference's information
18 so that they can review it to call upon it.  They
19 didn't always speak to them at first attempt of
20 outreach.
21    Q.   The question was:  Did Post create a file
22 for the reference in the CRM system?  Did it?
23    A.   It could.
24    Q.   But I'm not asking if it could or I'm not
25 asking were there fields to do it.  I'm asking, when

1 a reference came in, was a file created for that
2 reference?
3    A.   When a reference came in?
4    Q.   When a reference was provided.
5    A.   No.
6    Q.   At what point would a file be created in
7 the CRM system?
8    A.   If that reference had expressed interest.
9    Q.   Did Post view references as a potential
10 source of new enrollments?
11    A.   If they had expressed interest and they
12 became a file, yes.
13    Q.   I'm not asking about if they had expressed
14 interest and if they became a file.  I'm talking
15 about, you have references; Post University has
16 references from prospective students.  Were those
17 references considered to be a potential source of
18 new enrollments?
19    A.   At the reference stage, no.
20    Q.   So when -- do you know who wrote the Eagle
21 Eye report actually?
22    A.   No.
23    Q.   Would it have been John Hopkins?
24    A.   No.
25    Q.   Would it have been Richard Schechter?

16 (Pages 58 - 61)

Page 62

1    A.   No, I can't imagine.
2    Q.   So when whoever wrote this report, which
3  was sent to the board of trustees, so presumably it
4  was someone with authority to speak to the board of
5  trustees --
6    A.   It might have been John Hopkins; I don't
7  know who wrote this.
8    Q.   So whoever wrote this report, when they
9  wrote still working to generate new enrollments with
10 reference to referrals, I'm misinterpreting it if I
11 read that to say that references were viewed as a
12 source of leads; is that correct?
13   A.   If a reference expressed interest, at that
14 point, it became a lead and viewed as such.
15   Q.   So I think maybe my confusion at least is
16 coming in with the phrase "reference to referrals."
17        Are you testifying now that "reference to
18 referrals" means references who expressed interest?
19 Is that what that phrase means, "reference to
20 referrals"?
21   A.   Correct.
22   Q.   Gotcha.  I want to look -- we are going to
23 jump around a little bit, and I apologize, but there
24 is just a lot of documents to get to.
25        Jumping up to the Student Finance page,

Page 63

1  which is the second to last page of the Eagle Eye
2  report.
3    A.   Same document?
4    Q.   Same document, correct.  The first
5  sentence for Online says, Currently we have 1,127
6  students approved for ability to pay status against
7  a start forecast of 1,600.
8        Do you see that?
9    A.   I do.
10   Q.   What does that mean?
11   A.   The forecast of starts was 1,600, and they
12 are currently pacing or they currently have 1,127
13 students that have the ability to pay for classes.
14   Q.   So on multiple occasions throughout this
15 document that we discussed, there seems to be a
16 forecast being made of enrollments; correct?
17   A.   Yes.
18   Q.   And there are numbers being compared
19 against that forecast.  For example, we just talked
20 about 1,127 students approved for ability to pay
21 against a forecast of 1,600.
22        Do you see that?
23   A.   Yes.
24   Q.   So the metric or a metric by which Post
25 evaluated itself, if you will, was enrollments;

Page 64

1  correct?
2    A.   Can you repeat the question?  I apologize.
3    Q.   Was one of the metrics by which Post
4  evaluated itself or set its goals enrollments?
5    A.   Yes.
6    Q.   Was that the primary metric that Post
7  used?
8    A.   I don't believe so, no.
9    Q.   What do you believe to be the primary
10 metric?
11   A.   Overall census.
12   Q.   When you say "overall census," do you mean
13 the number of students currently enrolled and
14 attending Post?
15   A.   Active students.
16   Q.   Active students, that's what you meant
17 when you said "overall census"?
18   A.   Correct.
19   Q.   And if you look at the bottom of the
20 Online paragraph, it says, We have 447 students
21 currently in the pipeline.
22        Do you see that?
23   A.   Yes.
24   Q.   I only read that because I keep seeing the
25 word "pipeline" come up, and we will come back to

Page 65

1  it, but what does 447 students currently in the
2  pipeline mean?
3    A.   I believe we touched on it before, but
4  that would be 447 students that have filled out our
5  application.
6    Q.   If you flip to the next page, if you look
7  at the first column -- excuse me, the second column,
8  that says Actual FY 16/17 to date.
9        Do you see that?
10   A.   Yes.
11   Q.   And it says gross receipts were about
12   ███████
13        Do you see that?
14   A.   Yes.
15   Q.   What is meant by gross receipts?
16   A.   I don't know.
17   Q.   Do you know if gross receipts are
18 different from revenue?
19   A.   I don't know.
20   Q.   The ending balance at the bottom says
21   ███████
22        Do you see that?
23   A.   Yes.
24   Q.   Has Post revenue decreased since 2016?
25   A.   I don't know.

17 (Pages 62 - 65)

1         MR. BOWSER:  Objection.
2         Can we go off the record for a
3  second?
4         MR. GLAPION:  Sure.
5         (Off-the-record discussion.)
6         MR. GLAPION:  We are back on.
7  BY MR. GLAPION:
8     Q.   Off the record, we spoke about something
9  you testified to earlier that may have been a
10 misstatement regarding the ██████.
11        Can you clarify?
12    A.   Yes.  That was ██ profit, not revenue.
13    Q.   Do you know what revenue was last year?
14    A.   I do not.
15    Q.   And is that ██ █████ profit consistent
16 with previous years?
17    A.   I don't know.
18        THE REPORTER:  Can we do a quick
19 restroom break if you're switching topics?
20        MR. GLAPION:  We can take a quick
21 break, sure.
22    (Recess taken from 10:17 a.m. to 10:21 a.m.)
23        MR. GLAPION:  Can you please mark
24 this as Exhibit 15.
25        (Exhibit 15, Post University

1         Performance Appraisal Review Form,
2         Bates Numbers PU00000134 through 150,
3         marked for identification.)
4         MR. GLAPION:  And we are back on the
5  record, correct?
6         THE REPORTER:  Yes.
7  BY MR. GLAPION:
8     Q.   I actually only have one question about
9  this document for now, so we can jump right through
10 it.  On the bottom, it says PU 142.
11    A.   I'm there.
12    Q.   And it says Supervisor Name: Sean Cooley;
13 is that you?
14    A.   Yes.
15    Q.   And the employee was Nicole Sciascia?
16    A.   Close, Sciascia.
17    Q.   I practiced at home, failed.
18        Under Statement of the problem, you
19 wrote -- excuse me, did you write this document?
20    A.   Yes.
21    Q.   And under Statement of the problem, you
22 wrote, You had a total of 27 interviews for
23 MOD4-1314, with 11 converted to the pipeline.
24        Do you see that?
25    A.   Yes.

1     Q.   Is that pipeline reference the same
2  pipeline that we were discussing in the previous
3  document?
4     A.   Yes.
5     Q.   At the bottom, under Interview
6  Presentation, and this is under the section that
7  says Summary of corrective action, you wrote, Focus
8  and improve upon closing technique, overcoming
9  objections, urgency in interview.
10        Do you see that?
11    A.   Yes.
12    Q.   And on the very next page, there is a
13 section or subsection titled Pipeline Assessment.
14        Do you see that?
15    A.   Yes.
16    Q.   Is that the same pipeline that we were
17 discussing?
18    A.   Yes.
19    Q.   It says, We will assess every ITE in your
20 pipeline.
21        Do you see that?
22    A.   Yes.
23    Q.   What does ITE mean?
24    A.   Intent to enroll.
25    Q.   Are those still used?

1     A.   No.
2     Q.   And again, the reference to the same
3  pipeline; correct?
4     A.   Yes.
5     Q.   And it says, We will focus on doing what
6  is necessary to get your students to the enroll
7  stage and ultimately to the close/won stage.
8         Do you see that?
9     A.   Yes.
10    Q.   Are those stages within the pipeline?
11    A.   The pipeline speaks to, at that point, a
12 student within ITE, so those are stages within a
13 student file.
14    Q.   If the student is in the enroll page, is
15 the student part of the pipeline?
16    A.   Yes.
17    Q.   And you say ultimately to the close/won
18 stage.
19        Is the close/won stage, w-o-n, the end of
20 the pipeline?
21    A.   Yes.
22    Q.   So is it fair to characterize the pipeline
23 as having multiple stages throughout?
24    A.   The term "pipeline" was specific to
25 someone that had at that point an intent to enroll.

18 (Pages 66 - 69)

Page 70

1 When a student moved further down the funnel, they
2 systemically could be in a pipeline, but they were
3 referred to in different categories, registered,
4 ability to pay.
5    Q.   It's a different category, you said;
6 correct?
7    A.   Correct.
8    Q.   But are those categories within the
9 prospective student pipeline, we'll call it?
10    A.   Those categories live within the
11 opportunity file.
12    Q.   So when -- actually, we will make this
13 easier.
14         Let's look at -- I've got to give it to
15 you.
16         MR. GLAPION:  Can we mark this as
17 Exhibit 16 once I find it?
18         THE REPORTER:  Sure.
19         (Exhibit 16, Document bearing
20         Bates Number PU00011106, marked for
21         identification.)
22 BY MR. GLAPION:
23    Q.   Have you seen this document before?
24    A.   I believe so.
25    Q.   Did you review this document in

Page 71

1 preparation for this deposition?
2    A.   I can't be certain.
3    Q.   Take a moment to look over this document,
4 get familiar with it.  Let me know when you've had a
5 chance to or when you have an understanding of what
6 the document is.
7    A.   I have an understanding of what it is.
8    Q.   Does this document capture what we've been
9 calling the pipeline?
10    A.   It captures part.  It captures a lot more
11 than that.
12    Q.   The term "pipeline" do you mean or the
13 document does?
14    A.   This document.
15    Q.   Which parts of this document are not
16 considered to be part of the pipeline, or which
17 categories of this document?
18    A.   Anything that says Lead.
19    Q.   So the green?
20    A.   Green.  I'm just reviewing to see when it
21 becomes a pipeline, so just give me a moment.
22         Right in the middle of the page where it
23 says Receive Application, Sales Category:
24 Documents, at that point it becomes a pipeline.
25    Q.   So if this doesn't depict the pipeline,

Page 72

1 what does this depict?
2    A.   If what doesn't depict the pipeline?
3    Q.   If this document depicts more than what
4 you are describing as the pipeline, then what is
5 this document depicting?
6    A.   It depicts the operational journey from
7 inquiry to participation.
8    Q.   So the enrollment process?
9    A.   The enrollment process.
10    Q.   Throughout it mentions categories and
11 stages.
12         Do you see that?
13    A.   Yes.
14    Q.   So under the first blue box, it says Sales
15 Category:  Qualify.
16         Do you see that?
17    A.   Yes.
18    Q.   And Sales Stage:  Interviewing.
19         Do you see that?
20    A.   Yes.
21    Q.   And all throughout this, from the first
22 blue box to the last yellow box, they are divided
23 into Sales Category and Sales Stage; correct?
24    A.   Correct.
25    Q.   So the last stage is the Sales Stage:

Page 73

1 Closed/Won.
2         Do you see that, the last yellow box?
3    A.   Yes.
4    Q.   And when you referenced close/won in the
5 previous document we reviewed, that's what you were
6 referring to, that step; right?
7    A.   Yes.
8    Q.   And we just said that this document is the
9 enrollment process; correct?
10    A.   Correct.
11    Q.   And also, is it fair to characterize this
12 as the sales process?
13         MR. BOWSER:  Objection to form.
14    A.   I don't understand the question.
15    Q.   Throughout this document every step --
16    A.   It's the enrollment process.
17    Q.   Is it also a sales process?
18    A.   I don't believe so.
19    Q.   So do you know who wrote this document?
20    A.   No.
21    Q.   Is this a document you had seen before
22 this deposition?
23    A.   It looks familiar, yes.
24    Q.   Do you remember in what context you saw
25 this document before this deposition?

19 (Pages 70 - 73)

Page 74

1    A.   No.
2    Q.   Is this a document you ever referenced in
3 your day-to-day job?
4    A.   I can't say for certain.
5    Q.   Are you aware that this document was
6 produced by Post in this lawsuit?
7    A.   Yes.
8    Q.   And this document, which we said is the
9 enrollment process, categorizes everywhere except
10 the first green box as a sales category and sales
11 stage?
12    A.   Yes.
13    Q.   So if Post did not consider this to be the
14 sales process or a sales process, why were the
15 categories and stages labeled as sales categories
16 and sales stages?
17    A.   Arbitrary definitions.  They were used for
18 system triggers.  A lot of this was not vernacular
19 that was part of the operational language.
20    Q.   What definitions in here are arbitrary?
21 You said arbitrary definitions; I want to know what
22 you are referring to.
23    A.   Well, the word "sales" in general, the
24 operations didn't come up with definitions in the
25 system, IT did.

Page 75

1    Q.   And so you are saying, this is a document
2 that was created by IT?
3    A.   No.
4    Q.   But the categories and stages here say
5 sales; correct?
6    A.   Yes.
7    Q.   So someone else besides IT viewed these as
8 sales categories and sales stages; correct?
9    A.   I can't say for certain.
10    Q.   On the document right in front of you.
11    A.   The words are there, yes.
12    Q.   Why didn't it say enrollment category and
13 enrollment stage?
14    A.   I did not label these categories and
15 stages.
16    Q.   You were specifically asked to prepare and
17 specifically to prepare with respect to this
18 document, and it's your testimony now you don't know
19 who created this document?
20    A.   I don't know who created the document.
21    Q.   You don't know when you've seen this
22 document outside of the context of this deposition?
23    A.   I've seen it before this deposition.
24    Q.   Do you know what it's used for?
25    A.   It's used for the admissions team.  I

Page 76

1 believe --
2    Q.   How does the admissions team -- let me
3 actually just take that -- I cut you off, I
4 apologize.
5         I'm not asking for what you believe, and
6 I'm sorry if I'm getting a little frustrated here.
7 I'm asking for what it is actually.  I'm not asking
8 for your subjective opinion.
9         Who used it?
10    A.   I answered that it's an outline of the
11 enrollment process.
12    Q.   And the enrollment process --
13    A.   From lead to start.
14    Q.   And you are telling me that the sales
15 references in the -- the references to sales in this
16 document don't mean anything?  Am I misunderstanding
17 your testimony on that?
18    A.   They are stages within the enrollment
19 process.
20    Q.   Have you ever heard the term "sales"
21 before in your life?
22    A.   Yes.
23    Q.   Do you have an understanding of what sales
24 means?
25    A.   Yes.

Page 77

1    Q.   What is your understanding of what sales
2 means?
3    A.   In what context?
4    Q.   I'm asking for your understanding of the
5 term "sales."  If you have multiple contexts that
6 you think it means something different, feel free to
7 define it in multiple ways.
8    A.   A sales could be a discount at Best Buy.
9    Q.   And are you giving discounts to
10 prospective students when you are qualifying them in
11 Sales Category: Qualify?
12    A.   No.
13    Q.   Can we agree that that is probably not
14 referring to a sale at Best Buy?
15    A.   Agreed.
16    Q.   Let's look at the context of this
17 document, Sales Category, Sales Stage.
18         Do you have an understanding of what sales
19 might mean in that scenario?
20    A.   I don't know why it's called Sales.
21    Q.   I'm not asking if you know why it's called
22 Sales.  I'm asking if you have an understanding of
23 what sales means as used throughout this document.
24    A.   No.
25    Q.   So we've established one definition of a

20 (Pages 74 - 77)

Page 78

1 sale could be a discount at Best Buy; correct?
2    A.    Correct.
3    Q.    And that's not what is being used in here;
4 correct?
5    A.    Correct.
6    Q.    What is another definition of sales that
7 may fit into this document?
8    A.    Selling a product.
9    Q.    Or in Post's case a service; correct?
10    A.    Correct.
11    Q.    And we've established earlier that
12 students purchase a service, educational services
13 from Post; correct?
14    A.    Yes.
15    Q.    And the corollary of that is that Post
16 sells educational services to students; correct?
17    A.    Post provides education.
18    Q.    For free?
19    A.    They provide a service, they provide
20 education, and that has a monetary fee to it.
21    Q.    Is there a difference between what you
22 just said and what I said when I said that Post
23 sells educational services to students?
24    A.    I don't know.
25    Q.    You rephrased it and used a phrase much

Page 79

1 more complex than Post sells educational services to
2 students, so I'm presuming it has a meaning given
3 your self-evaluation of how good you are with your
4 oral presentation, so I am curious about what the
5 difference is in what you said versus what I said.
6         MR. BOWSER:  Objection to form.
7    Q.    You can answer.
8    A.    I believe you had a negative undertone to
9 it.
10    Q.    The tone of my voice or the phrase?
11    A.    Right.
12    Q.    I'm not sure.  Let me ask you directly
13 again:  Does Post sell educational services to
14 students?
15         MR. BOWSER:  Objection, compound.
16    Q.    Or excuse me.  Does Post sell educational
17 services to prospective students?
18    A.    Post provides education; they provide a
19 service.  That service costs money.
20    Q.    When you provide a service for a fee, is
21 that called selling something?
22    A.    Yes.
23    Q.    So when you say that Post provides
24 education; they provide a service and that service
25 costs money, what you are saying is that Post sells

Page 80

1 education services; correct?
2    A.    I am saying that Post provides education
3 to students that are interested in moving forward
4 with their education.
5    Q.    For a fee?
6    A.    For a fee.
7    Q.    Tell me which part of the sentence Post
8 sells education services to students you disagree
9 with.
10    A.    I don't feel like that is what we do on a
11 day-to-day.
12    Q.    This is your testimony on behalf of Post,
13 not your subjective feelings.
14         What -- well, it is.  I apologize.  I
15 asked for which part of the sentence Post sells
16 education services to students that you disagree
17 with.  So which part of that sentence -- I'm not
18 talking about my tone; I'm not talking about
19 undercurrents or subjectively.  I'm asking for what
20 part of that sentence do you disagree with.
21    A.    Sells.
22    Q.    So what is the difference between selling
23 educational services and providing educational
24 services for a fee?
25    A.    I guess -- I guess there isn't.

Page 81

1    Q.    So then it's fair to say, with your
2 disagreement as to the phrasing noted, but with
3 having established the synonyms that Post sells
4 education services to students?
5    A.    Yes.
6    Q.    And at what point does Post stop selling
7 educational services to prospective students in
8 terms of looking at this 11106 pipeline; at what
9 point does that sales process stop?
10    A.    When they are no longer a student.
11    Q.    So the last category says Sales Category:
12 Attend, Sales Stage: Closed/Won, so there seems to
13 be -- is there a transition there from, now that
14 they are attending, there is a different sort of
15 pipeline and flowchart of how those students are
16 dealt with?
17    A.    Yes.  This is an admissions document.
18    Q.    So this only deals with prospective
19 students?
20    A.    Correct.
21    Q.    And when Post is dealing with the
22 prospective student, this document outlines the
23 process for that student to enroll in Post; correct?
24    A.    Yes.  These are system processes.
25    Q.    Correct.  This is the process for a

21 (Pages 78 - 81)

Page 82

1 student to enroll at Post or a prospective student?
2    A.   Yes, a system funnel.
3    Q.   What do you mean by "system funnel"?
4    A.   These are the different system stages and
5 categories to get from prospective student to start.
6    Q.   And when you say "system," are you talking
7 the CRM system?
8    A.   Yes.
9    Q.   So these are different tags, if you will,
10 of the various stages throughout that system;
11 correct?
12    A.   Yes.
13    Q.   But this outlines the process from a new
14 lead arriving to finally being a participating and
15 attending student; correct?
16    A.   Correct.
17    Q.   And this, as you testified to a moment
18 ago, outlines the enrollment process.
19         Want some water?
20    A.   Yeah, if you don't mind.  Thank you.
21         (Pause.)
22 BY MR. GLAPION:
23    Q.   So this document, as you testified a
24 moment ago, outlines the enrollment process?
25    A.   Yes.

Page 83

1    Q.   And this is the process that every
2 prospective student must follow; correct?
3    A.   Yes.
4    Q.   And this is the process for purchasing
5 educational services from Post; correct?
6    A.   Repeat the question.
7    Q.   And this is the process for purchasing
8 education services from Post; correct?
9    A.   Yes.
10    Q.   So anyone who purchases education services
11 from Post has to go through each of these steps;
12 correct?
13         MR. BOWSER:  Objection, compound.
14    Q.   You can answer.
15    A.   It depends.
16    Q.   You said a moment ago, and maybe my
17 interpretation --
18    A.   I'm looking at this.  This speaks to the
19 undergrad population.  It doesn't seem to -- there
20 is different steps for military students.  A lot of
21 them don't require a FAFSA, so this is more of an
22 overview of the common, the majority population.
23    Q.   So we will focus there and then we will
24 narrow it down a little bit.  So the majority of the
25 population that this deals with, this is how the

Page 84

1 majority of the population purchases education
2 services from Post; correct?
3    A.   This is how they go through to the funnel
4 to go from the lead stage to beginning with us,
5 starting with us, classes with us, yes.
6    Q.   I don't want to go through this debate
7 over meanings again.  Is there a difference between
8 going from the lead stage to beginning with us and
9 purchasing education services from Post?
10    A.   No.
11    Q.   And you said that other populations may
12 not have to deal with all of these steps.  For
13 example, you said military may not need the FAFSA;
14 correct?
15    A.   Correct.
16    Q.   So after Receive Application, the various
17 FAFSA arrows coming off of that would be different.
18 They would be GI bills, something like that;
19 correct?
20    A.   A lot of these would be the same.  There
21 would be slight deviations based on population.
22    Q.   It's generally very similar; correct?
23    A.   Correct.
24    Q.   And conceptually it's similar in terms of
25 you get the application and then you determine if

Page 85

1 they could pay; correct?
2    A.   Correct.
3    Q.   Is this document an accurate reflection of
4 the enrollment process between July 30th, 2014 and
5 July 30th, 2018?
6    A.   No.
7    Q.   Can you elaborate on that?
8    A.   I'm not sure when the cutoff was, but we
9 referenced ITE before, and we moved away from that,
10 and that's not reflected in this document.
11    Q.   So where in this would ITE fall?  Would it
12 be between the green and the yellow, after the
13 yellow, etcetera, approximately?
14    A.   It would live with the -- in the
15 application area.
16    Q.   So it would be once you are already --
17    A.   An interview had been conducted.
18    Q.   So you are not a lead anymore; it's after
19 being a lead?
20    A.   Correct.
21    Q.   So you are in the blue pretty much?
22    A.   ITE, when it was in circulation, captured
23 the pipeline.
24    Q.   I understand.  Does this --
25    A.   Which in this document application would.

22 (Pages 82 - 85)

Page 86

1    Q.   Do you remember when ITE became
2    application?
3    A.   There was always an application.  There
4 was just an ITE as well.
5    Q.   Do you remember when the ITE stopped being
6 used?
7    A.   I can't say for certain.
8    Q.   Do you remember a year?
9    A.   2015 or '16.  In-between that time frame
10 would be my best guess.
11    Q.   Why don't we go back to -- and I dread it,
12 but I want to go back to the discussion of the sales
13 categories and sales stages.
14         Who came up with -- who determined to call
15 them sales categories?
16    A.   I don't know.
17    Q.   Who determined to call them sale stages?
18    A.   I don't know.  That is how the system was
19 always -- it was always designed that way; it was
20 always there from when I began using it.
21    Q.   So it was difficult, but we established
22 that Post sells education services to students;
23 correct?
24    A.   Yes.
25    Q.   And we also established that this is the

Page 87

1 enrollment process; correct?
2    A.   Yes.
3    Q.   Is it fair to characterize this as the
4 sales process as well?
5    A.   I don't believe so.
6    Q.   So at Post, is there another process by
7 which --
8    A.   This is the enrollment process; that's
9 what this is.
10    Q.   So everything Post does with respect to
11 selling education services to students is
12 encapsulated in this document for the majority of
13 the population?
14    A.   Repeat the question, I apologize.
15    Q.   So the steps Post takes to sell
16 educational services to students is captured in this
17 document; correct?  For the majority of the
18 population; correct?
19    A.   Yes.
20    Q.   So if Post sells education services to
21 students, is that process by which they sell
22 those education services; correct?
23    A.   That's semantics, but yes.
24    Q.   So then is it fair to say this is the
25 sales process for the majority of prospective

Page 88

1 students?
2    A.   I see this and I see the enrollment
3 process from lead to start.
4    Q.   But someone at Post saw it as involving
5 sales; can we agree on that?
6    A.   Yes.
7    Q.   And you have no understanding of who
8 drafted this document?
9    A.   I don't know who drafted it.  I can say
10 with -- I'm pretty confident it's someone in the
11 admissions department, since this is the enrollment
12 process for the admissions team.
13    Q.   What is a KPI?  Have you heard the term
14 "KPI"?
15    A.   I have.
16    Q.   What is a KPI?  What does the acronym
17 stand for?
18    A.   Key performance indicator.
19    Q.   We are going to be referring back to 11106
20 quite a bit so don't let it go too far.
21         MR. GLAPION:  Can you please mark
22 this as Exhibit 17 I believe and hand it to the
23 witness.
24         (Exhibit 17, Post University - End
25         of MOD Assessment, Bates Numbers PU

Page 89

1         00000038 through 39, marked for
2         identification.)
3 BY MR. GLAPION:
4    Q.   So this is a two-page document.  Let me
5 know when you've had a chance to take a look at it.
6    A.   Yeah -- yes, I've seen it.
7    Q.   What does this document appear to be?
8    A.   It appears to be an end of a module
9 assessment.
10    Q.   Who would be the assessees for this
11 document?
12    A.   The admissions counselors.
13    Q.   And who would be the supervisors?  What
14 role are the supervisors?
15    A.   They are assistant directors.
16    Q.   So it wouldn't be team leads; it would be
17 the assistant directors?
18    A.   I don't know.  This is a fairly newer
19 document.  It could have been conducted by team
20 leads, ADs, a collaborative.
21    Q.   Just so I understand, I think I sort of
22 assumed this from previous depositions, but I'll get
23 it here, is the hierarchy within the admissions
24 department: there are admissions counselors; there
25 are team leads; there are assistant director of

23 (Pages 86 - 89)

Page 90

1 admissions, and then there are director of
2 admissions?
3    A.   Yes.
4    Q.   And then who is after that again, the vice
5 president of admissions; is that correct?
6    A.   Correct.
7    Q.   And who does the vice president of
8 admissions report to?
9    A.   Chief officer of operations.
10    Q.   Which would be Reese?
11    A.   Correct.
12    Q.   And you will see top left of this document
13 Key Performance Indicators; correct?
14    A.   Yes.
15    Q.   And when I asked about KPI, that's what
16 KPI stands for; correct?  KPI stands for that, key
17 performance indicators?
18    A.   Yes.
19    Q.   What is meant by key performance
20 indicators?
21    A.   On this document or in general?
22    Q.   In general, yes.
23    A.   Metrics that are looked at to see
24 benchmarks towards goals, run rates, things of that
25 nature, key performance indicators.  Those are

Page 91

1 things that are reviewed that have a weight on one's
2 success.
3    Q.   So there is six of them; correct?
4    A.   Yes.
5    Q.   And so it's fair to characterize what you
6 just said as those are six metrics by which
7 admissions counselors would be evaluated?
8    A.   Correct.
9    Q.   And we are going to jump back and forth
10 between 11106 and this document; you might want them
11 side by side just for convenience.
12       You will see the first key performance
13 indicator is Lead to PCAS.
14       Do you see that?
15    A.   Yes.
16    Q.   What is P-C-A-S or PCAS?
17    A.   It is a Professional College Advisory
18 Session.
19    Q.   Is that an interview?
20    A.   That's an interview.
21    Q.   So on 11106, the first blue arrow says
22 Interview and Opportunity Assessment.
23       Is that the PCAS?
24    A.   Yes, it is.
25    Q.   So the first green box is Lead and then

Page 92

1 you go down to Lead Becomes Opportunity once the
2 contact is made, interest confirmed, and then they
3 do the PCAS; is that accurate, just looking at the
4 flowchart?
5    A.   Yes.
6    Q.   And in the key performance indicator,
7 that's captured in Lead to PCAS; correct?
8    A.   Yes.
9    Q.   And then you have PCAS to APP, I'm
10 assuming A-P-P stands for application; correct?
11    A.   Correct.
12    Q.   And on 11106, you can follow what we said,
13 Interview, which was PCAS, to Sales Category:
14 Qualify, and the down arrow says Send Application.
15       Do you see that?
16    A.   Yes.
17    Q.   And does that capture that key performance
18 indicator PCAS to APP?
19    A.   No.
20    Q.   What was incorrect about my statement?
21    A.   It would go from Qualified to Receive
22 Application.
23    Q.   So it would be --
24    A.   It would bypass the arrow.
25    Q.   So it would go from Interview Opportunity

Page 93

1 Assessment, all the way down to Receive Application,
2 Sales Category:  Documents; correct?
3    A.   Correct.
4    Q.   And then the third key performance
5 indicator is APP to FAFSA, and that would cover
6 Receive Application, Sales Category:  Documents, and
7 the four arrows coming off of that; correct?
8    A.   Yes.
9    Q.   And it would actually presumably cover the
10 Sales Stage:  Financial Plan Determined; correct?
11    A.   After FAFSA?
12    Q.   Yes.
13    A.   No.
14    Q.   So after FAFSA stops with those arrows;
15 correct?
16    A.   Yes.
17    Q.   And then FAFSA to ATP starts with the
18 Sales Category:  Documents, Sales Stage:  Financial
19 Plan Determined, and the down arrow to Sales
20 Category:  Enroll; correct?
21    A.   For the sake of accuracy in this document,
22 it would bypass that blue and go right into the
23 yellow, so it would be the FAFSA received to the
24 enroll stage, to ATP.  So yes.
25    Q.   That's a good point, I appreciate that

24 (Pages 90 - 93)

Page 94

1  because I do want to clarify.  It's possible to go
2  directly from APP to ATP without the FAFSA; correct?
3      A.   If you can provide another method of
4  payment.
5      Q.   If a student demonstrates they can pay
6  cash, you'll go right from APP to ATP?
7      A.   You can, yes.
8      Q.   So APP to FAFSA and FAFSA to ATP can be
9  rolled together; correct?  You may not even need a
10  FAFSA?
11      A.   Again, this document is an undergrad
12  specific, it appears to be, and the majority of that
13  population uses Title IV, which would be a FAFSA.
14      Q.   But in the event that it was a different
15  population that didn't use Title IV, you may not
16  need the FAFSA, say, for example, APP to GI Bill?
17      A.   Correct.
18      Q.   Or APP to cash?
19      A.   Sure.
20      Q.   But really the process is, it's getting
21  from application to demonstrated ability to pay is
22  the important metric there; correct?
23      A.   Yes.
24      Q.   So then Receive Application to All Info
25  Comes In and Student is ATP'd, regardless of the

Page 95

1  intervening steps of how they got ATP'd, that's
2  captured in the APP to FAFSA and FAFSA to ATP part;
3  correct?
4      A.   Correct.
5      Q.   And then ATP to Start runs from the blue
6  arrow that says All Info Comes In and Student is
7  ATP'd, all the way to Sales Category: Attend, Sales
8  Stage:  Closed/Won; correct?
9      A.   Yes.
10      Q.   And then Start to Persistence presumably
11  is while they are enrolled, how you support the
12  student; correct?
13      A.   Yes.
14      Q.   So these key performance indicators are
15  all captured on the process, the enrollment or sales
16  process that we discussed a moment ago; correct?
17      A.   Yes.
18      Q.   And the metric Lead to PCAS is -- let me
19  back up actually.
20          The green arrow on the 11106, there is no
21  sales stage there; correct?
22      A.   Correct.
23      Q.   And there is no sales category; correct?
24      A.   Correct.
25      Q.   But on the first down arrow, or excuse me,

Page 96

1  on the first blue box after the green down arrow,
2  there is Sales Category and a Sales Stage; correct?
3      A.   Correct.
4      Q.   So the first step Lead to PCAS involves
5  taking a lead into a category -- taking a lead from
6  a category that does not have a sales stage attached
7  into one that does have a sales stage attached;
8  correct?
9      A.   Opportunities have categories and stages,
10  leads do not.
11      Q.   Correct.  So when you go from a lead to a
12  PCAS -- scratch that.
13          Do you do a PCAS of a lead?
14      A.   Yes.  You can also do a PCAS of an
15  opportunity.
16      Q.   And we will get to the difference between
17  leads and opportunities in a moment, but here on
18  this flowchart, the PCAS that we discussed comes
19  after the person -- the lead becomes an opportunity.
20          Do you see that?
21      A.   Yes.
22      Q.   So was the expected method to only do
23  PCAS's with respect to opportunities?
24      A.   If a PCAS is conducted when you get a
25  prospective student on the phone at the lead stage,

Page 97

1  systemically you have to convert them and then check
2  a box to say that a PCAS is being completed.  So
3  this is mechanical.
4      Q.   I understand the distinction you are
5  drawing.  So you are basically saying, correct me if
6  I'm wrong, you get a lead on the phone; they are
7  really interested, want to go forward, want to keep
8  talking to you, jump right into the PCAS?
9      A.   Correct.
10      Q.   Even though they weren't marked as
11  opportunity in the system yet?
12      A.   Because that's a manual thing that needs
13  to be done.
14      Q.   Correct.  But they were treated
15  essentially as an opportunity; they just hadn't been
16  marked yet?
17      A.   Right.  Like when Ms. Davis called in, she
18  went right from, you know, lead to opportunity, that
19  was arbitrary, because when she called in the PCAS
20  was conducted immediately and the application filled
21  out shortly thereafter.
22      Q.   Correct.  So while she may not have been
23  marked or a prospective student may not be marked in
24  the system as an opportunity at the time the PCAS is
25  conducted, after you hang up, that will all be

25 (Pages 94 - 97)

1 documented; correct, or should all be documented?
2   A.   Correct.
3   Q.   So when you go Lead to PCAS, you are
4 essentially moving from something that has no sales
5 category or sales stage attached into something that
6 does have a sales category and sales stage attached;
7 correct?
8   A.   Yes.
9   Q.   And then when you go from PCAS to
10 Application, you are moving from one sales category
11 into a different sales category, which goes from
12 Qualified to Documents; correct?
13   A.   Yes.
14   Q.   And when you go from APP to ATP, you are
15 jumping through the same sales category but
16 different sales stages, so you go from Sales
17 Category: Documents to Sales Category: Documents,
18 plus Sales Stage: Financial Plan Determined;
19 correct?
20   A.   Yes.
21   Q.   And then when you go ATP to Start, you are
22 again going from one sales category, sales stage to
23 a different sales category, sales stage, several
24 different ones that are shown in the yellow;
25 correct?

1   A.   Correct.
2   Q.   So when we talk about the evaluation of
3 admissions counselors according to these KPIs, Post
4 is really looking at how they are moving people
5 along from one category to another; is that
6 accurate?
7   A.   How they are moving down the funnel, yes.
8   Q.   So the leads that come into an admissions
9 counselor that they are handling, it's looking at
10 how well that admissions counselor is moving these
11 leads into the opportunity stage and throughout this
12 process?
13   A.   Yes.
14   Q.   And when I say "this process," I'm talking
15 about the one on 11106 just to be clear.
16        And with the exception of the lead stage,
17 all of the stages, as we just discussed, PCAS to APP
18 all the way down to ATP to Start, all have, at least
19 in this document, sales categories and sales --
20 sales categories and/or sale stages attached;
21 correct?
22   A.   Yeah, I believe we've covered that, yes.
23   Q.   So the evaluation for the key performance
24 indicators is evaluating how well prospective
25 students are moved through the various sales

1 categories and stages; correct?
2   A.   Admissions, when they are looking at a
3 pipeline of a student, an opportunity file,
4 application, FAFSA, ATP, those are the metrics that
5 they look at. Those are the metrics that they speak
6 to. These categories and stages are
7 behind-the-scene systemic triggers. I just want
8 that to be clear.
9   Q.   I understand. But they do have -- whether
10 you agree or disagree that they should -- they do
11 have something attached to each of these stages that
12 is either a sales category --
13   A.   Yes, the word "sales" is appended to
14 "category" and "stage" throughout this entire chart,
15 yes.
16   Q.   So when we are talking about evaluating
17 admissions counselors on going through these various
18 stages, it's at least whoever wrote this document
19 and whoever programmed the system, it's moving
20 them -- according to them, it's moving through
21 various sales stages and sales categories; correct?
22   A.   Yes.
23   Q.   Does Post conduct marketing -- and we can
24 set these documents aside for a moment. Again, we
25 will come back to 11106.

1        But does Post conduct any marketing to
2 advertise Post to prospective students?
3   A.   Yes.
4   Q.   What kind of marketing?
5   A.   TV commercials, radio ads, billboards,
6 AdWords on Google, things of that nature.
7   Q.   What's the point of that marketing?
8   A.   To capture people that are interested in
9 going back to school, and if they were unaware that
10 Post existed, hopefully that they will be driven
11 towards us so that we can have a PCAS with them and
12 see if we are the right choice for them.
13   Q.   What is the goal of that marketing from
14 Post's perspective?
15   A.   I believe I just answered that.
16   Q.   Is one of the goals of that marketing to
17 increase enrollment?
18   A.   Yes. That's how prospective students come
19 to us.
20   Q.   Through --
21   A.   As you had mentioned, we are not Harvard.
22   Q.   It's through your marketing that they come
23 to you; correct?
24   A.   Correct, sir.
25   Q.   And does Post conduct outreach to

Page 102

1 prospective students as part of efforts to increase
2 enrollment?
3   A.   Yes.
4   Q.   Are outbound telephone calls included in
5 that?
6   A.   Yes.
7   Q.   Text messages?
8   A.   Yes.
9   Q.   Emails?
10   A.   Yes.
11   Q.   And so as you said, I don't want to
12 mischaracterize, but the marketing is done basically
13 to attract potential students to Post; correct?
14   A.   It's to provide brand awareness and
15 attract, let people know that we are here.
16   Q.   And the hope of that obviously is to get
17 people to hopefully come here or come to Post;
18 correct?
19   A.   Correct.
20   Q.   How does Post find out about interested
21 prospective students?
22       MR. BOWSER:  Objection, compound.
23   A.   Many different ways.
24   Q.   Does it find out -- I guess I'm not asking
25 about specific vendors you work with; I'm more

Page 103

1 asking phone, email, automated kind of -- anything
2 like that.  What is the process by which Post --
3   A.   What does a prospective student need to do
4 in order to reach our plate?
5   Q.   We talked about leads before; correct?
6 The very first box in 11106 was leads.
7   A.   Correct.
8   Q.   How does Post find out about leads?
9       MR. BOWSER:  Objection, compound.
10   Q.   You can answer.
11   A.   There is multiple different ways.
12   Q.   What are the most prominent ways?
13   A.   What I had mentioned before.
14   Q.   Which is what?
15   A.   Marketing, brand awareness, AdWords on
16 search engine, search engine optimization, and a
17 prospective student, someone who is interested in
18 going to school, fills out a request for
19 information.  They provide their personal
20 information within that form.  That form, that
21 inquiry is then provided to us.
22   Q.   And these are the leads that are
23 mentioned; correct?
24   A.   Leads, inquiries, yes.
25   Q.   And what is Post -- from a marketing

Page 104

1 perspective, what is Post's biggest source of leads,
2 if you will?  Where do most of the leads come in
3 from?
4       Let me try that again, because I can
5 understand why that question can be confusing.
6       Does Post get most of its leads through
7 websites -- its website?
8   A.   No.
9   Q.   Where then would you say that Post gets
10 most of its leads from?
11   A.   The majority of our leads come from
12 aggregators.
13   Q.   What is an aggregator?
14   A.   They are vendors that when people are
15 looking for education, they can put in their
16 information, and that could be driven to a Post RFI
17 where that information is filled out, but RFIs are
18 filled out with every -- with every lead or inquiry
19 that we receive.
20   Q.   And when Post receives a new lead, is a
21 file created for this lead in the CRM system?
22   A.   Yes.
23   Q.   And is this done through an automated
24 process, or is it a manual process to create this
25 file?

Page 105

1   A.   That lead is received by our marketing
2 department first and then sent to us.  And that's an
3 automated process; it's not a manual entry.
4   Q.   When you say "sent to us," what do you
5 mean by "sent to us"?
6       You said "that lead is received by our
7 marketing department first and then sent to us."  So
8 who is the "us" in that sentence?
9   A.   Post University.  It's from our marketing
10 agency; it's put into our CRM system.
11   Q.   So from -- is it a third-party marketing
12 agency you are talking about?
13   A.   Pardon me?
14   Q.   Are you talking about a third-party
15 marketing department?
16   A.   Yeah.
17   Q.   Okay.  And then that third-party marketing
18 department enters the lead information into Post's
19 CRM?
20   A.   Our marketing agency Thruline is what
21 provides that lead into the CRM.  When somebody
22 fills out an RFI on our website, on our micro sites,
23 that information is captured and then delivered.
24   Q.   And it's put into the CRM as a file for
25 each lead essentially that comes in; correct?

27 (Pages 102 - 105)

Page 106

1    A.   Yes.
2    Q.   And you said, I believe, that previously
3 your CRM system was Oracle On Demand?
4    A.   Yes.
5    Q.   And now it is CampusNexus Management?
6    A.   Yes.
7    Q.   Have you ever heard the term -- and I know
8 you have because you mentioned it -- but the term
9 "opportunity"?
10   A.   Yes.
11   Q.   What is an opportunity?
12   A.   An opportunity in Oracle is a lead that
13 someone has spoken to and expressed interest.  At
14 that point, they are converted from a lead into an
15 opportunity.
16   Q.   And that's reflected on 11106 that we
17 talked about --
18   A.   Correct.
19   Q.   -- where Contact Made, Interest Confirmed,
20 Lead is Converted to an opportunity; correct?
21   A.   Yes.  It's right before they become
22 qualified, in that middle area, that's where the
23 opportunity begins.
24   Q.   So the lead stops and opportunity begins
25 after that down green arrow Contact Made, Interest

Page 107

1 Confirmed, Lead is Converted; correct?
2    A.   That's when they become an opportunity.
3    Q.   That's what I'm asking.
4    A.   Correct.
5    Q.   So the difference then between a lead and
6 an opportunity is that a lead hadn't yet confirmed
7 their interest and an opportunity had?
8    A.   Correct.
9    Q.   What is a rejected lead?
10        MR. BOWSER:  Objection, compound.
11   Q.   You can answer.
12   A.   It could be many different things.
13   Q.   But what is it?  Not the reasons for a
14 rejected lead, but I'm asking, what is a rejected
15 lead?  Have you heard the term before?
16   A.   Of course.
17   Q.   So what is a rejected lead?
18   A.   It is a lead that has been rejected.
19   Q.   And what are some of the reasons a lead
20 could be rejected?
21   A.   There are many reasons.
22   Q.   We've got a while.
23   A.   It could be -- the most common is 10
24 attempts.  We will reject a lead if -- definitely if
25 they've expressed that they are not interested; if

Page 108

1 the number is not in service for an extended period
2 of time, which happens; sometimes people are unaware
3 that education isn't free, and they are not happy
4 with the idea of needing to use federal aid, so
5 there is a reject reason for that.
6    Q.   And those are the most prominent reject
7 reasons you can think of at the moment?
8    A.   Yeah.  I mean, the big --
9    Q.   I'm not trying a trick question here; I'm
10 just making sure we get through the list.
11   A.   There is a lot, so --
12   Q.   Have you ever heard the term "lost
13 opportunity"?
14   A.   Yes.
15   Q.   Is it properly called within Post lost or
16 closed opportunity?
17   A.   It's closed lost.
18   Q.   So it's closed/lost?
19   A.   Closed/lost in Oracle is the stage
20 closed/lost.
21   Q.   What's your preferred nomenclature on
22 that?
23   A.   Closed/lost.
24   Q.   Closed/lost, okay.  We will do
25 closed/lost.

Page 109

1    A.   Closed/lost is fine.
2    Q.   If I ever slip and say lost and not closed
3 or closed and not lost, treat it as closed/lost,
4 please.
5    A.   I'll know what you mean, yeah.
6    Q.   Under what circumstances, give me again
7 the top five let's say, would a certain opportunity
8 be closed/lost?
9    A.   If a prospect goes unresponsive; if
10 someone determines that they are not ready to move
11 forward at that time; if someone can't complete
12 their method of payment; someone is unhappy with
13 their transfer evaluation; any sort of familial
14 issues, anything mitigating.  There is a multitude
15 of different reject reasons that capture all of
16 those things as well.
17   Q.   Going back to 11106, there is only --
18 there is a red box in the bottom right that says
19 Sales Category:  Lost, Manually Change Sales Stage
20 Action to Closed/Lost.
21        Do you see that?
22   A.   Yes.
23   Q.   There are only three arrows feeding into
24 that; correct?
25   A.   Yes.

28 (Pages 106 - 109)

Page 110

1    Q.   You just gave multiple reasons that are
2 not captured on here, so it's your testimony then
3 that there are other ways to get into that lost
4 category than what's captured on this document?
5    A.   Getting into the closed/lost category or
6 lost category, closed/lost stage, is a click of a
7 button, so that could happen at any point.
8    Q.   Correct, but I'm talking about the
9 appropriate reasons for doing so.  There are only
10 three captured on this form.
11       Do you see that?
12    A.   Again, this is the enrollment process, the
13 enrollment journey, so this is showing you from lead
14 to start and if someone has identified that they
15 want to be closed.  And to be perfectly honest, this
16 appears as if it was designed possibly not even to
17 hand out as a training document.
18    Q.   I didn't ask about training documents.
19 I'm just asking what's captured on this document.
20    A.   The reason why -- to answer your question,
21 the reason why there could be other arrows that get
22 you here is this looks like it's something --
23 because a lot of these categories and stages are
24 something that are not used by the enrollment team.
25 Again, these are the key metrics, the key

Page 111

1 performance indicators, that's what they are using.
2 This looks like it's something for maybe even the
3 marketing department to use to see behind the scenes
4 as to what stage a particular email might be sent to
5 a prospect to help them nurture through the journey
6 of the enrollment process.
7    Q.   So then this is a marketing department
8 document; correct?
9    A.   It very well could be.
10    Q.   And if it is in fact a marketing
11 department document, it's the marketing department
12 then that views these as sales categories and sales
13 stages; correct?
14    A.   The system categorizes these categories
15 and stages as sales.
16    Q.   Did the system automatically create this
17 document?
18    A.   No.
19    Q.   So --
20    A.   Someone used this to provide to someone.
21 I can't say with certainty, but this is the
22 enrollment process, but it's a system enrollment
23 process.
24    Q.   So these are the stages that are in the
25 system is what you are saying?

Page 112

1    A.   Yes.
2    Q.   So you said that this seems to be a
3 document that may not have been intended to provide
4 for training purposes; correct?
5    A.   Correct.
6    Q.   Is there a similar document to this that
7 you have seen provided for training purposes?
8    A.   At some point, I'm sure.  But this does --
9 yeah, this doesn't appear to be necessarily for
10 training purposes per se.
11    Q.   When admissions counselors are trained,
12 are they presented with any document that is similar
13 to this in -- let's start with design, the flowchart
14 design.
15    A.   I can't say with certainty.  I would
16 believe so.
17    Q.   One of the categories you were designated
18 to testify on is the training process.  I'm
19 paraphrasing; I can find the exact topic if you need
20 to.
21       So your testimony is that you don't know
22 if a flowchart similar to this is provided to
23 admissions counselors in training?
24    A.   I can't say similar to this.  I know that
25 there are -- there is a flowchart that is provided

Page 113

1 about the admissions process, I believe it is the
2 documents that are provided to the admissions during
3 that training process.
4    Q.   Is it your understanding of this flowchart
5 that it captures the enrollment process?  Sorry, not
6 this 11106.
7       Is it your understanding of the flowchart
8 that's provided to admissions counselors that that
9 flowchart captures the admissions process?
10    A.   Right.  And I believe a lot of these
11 categories and stages would be omitted from that
12 because it's not part of their topical lens on what
13 they are looking at in a student during the Oracle
14 time.
15       MR. GLAPION:  And I'll ask you,
16 Adam, because that has not been produced.  We've
17 asked for all training documents multiple times so
18 if there is a flowchart that reflects something that
19 is provided in training, I would like that provided
20 fairly soon.
21       MR. BOWSER:  Okay, we can look.
22 BY MR. GLAPION:
23    Q.   Have you ever heard the term "deferred
24 opportunity"?
25    A.   Yes.

29 (Pages 110 - 113)

Page 114

1    Q.   Under what circumstances would an
2  opportunity be deferred?
3    A.   It was just another way to close a student
4  in the system.  It was intended to be used for when
5  somebody had expressed interest at a later time,
6  deferring them to another -- for another time, but
7  Closed/Lost was the common practice which is why
8  it's not even on here.
9    Q.   Were admissions counselors trained on best
10  practices in terms of marking an opportunity
11  lost/closed or deferred?
12    A.   I think that was probably on a case by
13  case, by I know that closed/lost was the common
14  practice.  Closed/deferred was seldom used,
15  regardless of the student suggesting that they might
16  move forward at another juncture.
17    Q.   I recognize your testimony that it was
18  seldom used.  What was the proper way to mark
19  someone who expressed interest at a later date?
20    A.   Close/deferred.
21    Q.   But it just -- you know, as things
22  happened, it became sort of practice to just
23  lost/close everything is what you are saying;
24  correct?
25    A.   Right.

Page 115

1    Q.   So what is the proper way to mark someone
2  who is an opportunity that said they are not
3  currently interested, but Post could continue to
4  contact them because they may be interested in the
5  future?
6    A.   I'm sorry, can you repeat the question?
7    Q.   Sure.  What is the proper way to mark an
8  opportunity that says the following:  I am not
9  currently interested, but you can continue to
10  contact me because I may be interested in the
11  future?
12    A.   I believe there would be a reject reason
13  available for that in the closed/reject code.
14    Q.   Would they be properly marked as
15  lost/closed or lost/deferred?
16    A.   Closed.  Yeah, they would be
17  closed/deferred, yes.  But they could be closed/lost
18  as well.
19    Q.   But the technically proper way is
20  closed/deferred?
21    A.   The technically proper way would be
22  closed/deferred.
23    Q.   Are closed and -- don't mind me while I
24  find another exhibit -- but are closed and lost
25  opportunities considered part of the pipeline that

Page 116

1  we discussed previously?
2    A.   No.
3    Q.   Are rejected leads considered to be part
4  of the pipeline that we discussed previously?
5    A.   No.
6    Q.   Are rejected leads considered, even after
7  rejected, potential new enrollments?
8    A.   They could be.
9    Q.   I'm asking not whether they could end up
10  as new enrollments; I'm asking are they considered a
11  category from which new enrollments could be mined,
12  if you will?
13    A.   Is the question could?
14    Q.   Did Post view rejected leads as a category
15  of potential new enrollments even after they were
16  marked as rejected?
17    A.   They could, yes.
18    Q.   Who could?
19    A.   You can procure an enrollment out of a
20  rejected lead.
21    Q.   I understand.  I'm trying to clarify your
22  answer.
23         So you are saying a rejected lead could
24  eventually become an enrolled student?
25    A.   Yes.

Page 117

1    Q.   I'm asking at the time a lead is rejected,
2  are they still considered a potential new enrollment
3  by Post?
4    A.   I guess I don't understand the question.
5    Q.   There are a lot of rejected leads; is that
6  fair to say?
7    A.   Yes.
8    Q.   In that lot of rejected leads, does Post
9  view those as still an avenue to potentially obtain
10  new enrollments?
11    A.   Yes.
12    Q.   Same question with respect to lost/closed
13  and lost opportunities.  After they are marked as
14  closed/lost, are they still considered a potential
15  avenue for new enrollments?
16    A.   Yes.
17         MR. GLAPION:  Can we mark this as --
18  what are we on -- 18, and please hand it to the
19  witness when you can.
20         (Exhibit 18, Emails, Bates Numbers
21         PU00000062 through 64, marked for
22         identification.)
23  BY MR. GLAPION:
24    Q.   Have you seen this document before?  If
25  you need time to look at it still, that's fine.

30 (Pages 114 - 117)

Page 118

```
1    A.   Yes.
2    Q.   What is this email or, excuse me, what
3 does this document appear to be?
4    A.   An email.
5    Q.   From who?
6    A.   From Melanie Davis.
7    Q.   To whom?
8    A.   Carissa Valluzzo.
9    Q.   Who is Carissa Valluzzo?
10   A.   Admissions counselor at Post.
11   Q.   Is she still an admissions counselor at
12 Post.
13   A.   Yes.
14   Q.   The email you see at PU 62 from Melanie
15 Davis to Carissa Valluzzo states, Thank you for
16 following up with me.  I am unable to attend school
17 at time -- I believe that was a typo -- but at time.
18 I was very interested at the time I contacted your
19 school.  Shortly afterwards, my life was interrupted
20 by unpleasant events and I am no longer able to
21 continue my plan for school.
22       Do you see that?
23   A.   Yes.
24   Q.   And then it says, You may close my file.
25       Do you see that?
```

Page 119

```
1    A.   Yes.
2    Q.   What is the technically proper way that
3 Melanie Davis's file should have been marked after
4 this email was received?
5    A.   Closed/deferred I would think, but again,
6 anything, closed/lost.
7    Q.   I understand your testimony that
8 closed/lost was primarily used, but based on the
9 wording of this email, the technically proper way,
10 your testimony is that it would be closed/deferred;
11 correct?
12   A.   Yes.
13   Q.   Is it fair to categorize rejected leads
14 and lost/closed opportunities as people who were
15 once in the enrollment pipeline and are no longer in
16 the enrollment pipeline?
17   A.   For closed opportunities?
18   Q.   Closed opportunities, yes.
19   A.   Yes.
20   Q.   And the same for rejected leads?
21   A.   The leads never made it to the pipeline,
22 but yes.
23   Q.   When a lead or opportunity expressed
24 disinterest when you -- actually, let's do a lead.
25       When a lead said, you know what, I'm no
```

Page 120

```
1 longer interested, something like that, did Post
2 push back at all on that disinterest?
3    A.   They might ask what changed.
4    Q.   And I want to be clear, when I say did
5 Post push back, and I think it's probably
6 self-explanatory, but in case it isn't, I'm talking
7 about the admissions counselors, the people making
8 the calls.
9    A.   The individuals on --
10   Q.   Right, correct.
11   A.   The individuals that --
12   Q.   Correct, right.
13       THE REPORTER:  I'm sorry.
14       MR. GLAPION:  I apologize.
15       THE REPORTER:  I lost you both.
16       MR. GLAPION:  It's okay.  We were
17 just -- I was just babbling.
18   Q.   So when a lead expressed disinterest, did
19 the Post employee on the call, were they trained to
20 push back at all?
21   A.   It depends.  You originally said if they
22 said that they are not interested.
23   Q.   Yes.
24   A.   So is this on the lead level, on the
25 opportunity level?
```

Page 121

```
1    Q.   I'm on the lead level.
2    A.   You're on the lead level.  They were
3 trained to ask what changed since their request for
4 information was received by us with their number and
5 their email and their program of interest.
6    Q.   Have you ever heard the phrase "overcoming
7 objections"?
8    A.   Yes.
9    Q.   What does "overcoming objections" mean?
10   A.   Pertaining to this?
11   Q.   Just your understanding of the term as
12 it's used in connection with Post University.
13   A.   Going to school is a big step for a lot of
14 people, especially people who have been out of
15 school for a while.  So sometimes there were
16 roadblocks that came in, people got cold feet.  So
17 we were trained, the staff, as to how to help
18 overcome these objections and help nurture a
19 student.
20   Q.   And that's what we were talking about a
21 moment ago when I asked if Post employees were
22 trained to push back when someone is not interested,
23 is that when overcoming objection would be?
24   A.   If somebody expressed that they are not
25 interested, there is no pushback there.  Again, I
```

31 (Pages 118 - 121)

Page 122

1 said that they might ask what changed.  But it would
2 be a waste of time for there to be pushback on
3 someone that had expressed that they are not
4 interested.
5    Q.   Is there any --
6    A.   There is a lot of people that are
7 interested in the way of leads and RFIs that are
8 filled out.  So if someone has vehemently expressed
9 that they are not interested, there wouldn't be
10 pushback.  They would just ask why and what changed.
11    Q.   And I know we are sort of getting into a
12 little bit of hypothetical, and I don't want to go
13 too far into it, but I know you said vehemently, you
14 said not interested, so I want to focus on that
15 characterization because I think that goes further
16 than I wanted it to.
17    A.   Well --
18    Q.   I'm just talking, does the training --
19    A.   I retract "vehement."
20    Q.   Let me ask a different question then.
21 Does how hard, if you will, an admissions counselor
22 is trained to overcome an objection or push back
23 depend on how vehement the objection is?
24        MR. BOWSER:  Objection, form,
25 compound.

Page 123

1    Q.   You can answer.
2    A.   I guess it depends on the situation.
3    Q.   I'm asking about what they are trained to
4 do.  Are they trained to gauge how vehement or
5 wishy-washy an objection might be before
6 objecting -- or excuse me, before trying to overcome
7 it?
8    A.   No.  If -- I mean, there are certain
9 things that you don't push back on whatsoever, and
10 "pushback" is your word.  But for overcoming
11 objections, if someone has expressed that they are
12 not interested, they would ask why, what has changed
13 in their life, since usually that happens pretty
14 closely related to when the lead was received, and
15 there is usually not much room for overcoming an
16 objection if someone has expressed that they are not
17 interested.
18    Q.   So you said that they would ask why,
19 "they" presumably being the admissions counselors --
20    A.   Correct.
21    Q.   -- and they would ask what has changed in
22 their life.
23    A.   Since we received your RFI 5 minutes ago
24 or 15 minutes ago or something.
25    Q.   And if the response to that question by

Page 124

1 the prospective student was something that Post
2 could either fix or was based on a misconception by
3 that student, would Post then -- the employee, would
4 they then try to -- trained to try to fix it?
5    A.   Absolutely.  There is always
6 misconceptions that people have, so they were
7 trained as to how to overcome misconceptions.
8 That's really where the central thesis of overcoming
9 objections lies is misconceptions or concerns,
10 because they're not properly informed, so their job
11 was to provide them with that information to help
12 put them at ease.
13    Q.   I'm going to use another example.  A lead
14 says, I'm not really interested right now.  Your
15 admissions counselor says why, what changed?  The
16 lead says, you guys call me too much.
17        At that point, would the admissions
18 counselor make any offers in terms of calling less
19 or communicating in different forms?
20    A.   I can't say --
21    Q.   Were they trained to do so?
22    A.   -- what an admissions counselor would say.
23 That's a very unique situation.  I would probably
24 think that they would ask if there is a different
25 cadence of outreach if someone said that I'm calling

Page 125

1 too much; is there a preferred outreach and a
2 preferred cadence to that.  If someone were to say
3 the cadence should be shut off altogether, they
4 would reject the lead accordingly.
5    Q.   I guess what I'm just trying to get at,
6 and we can shortcut a lot of this because I don't
7 like hypotheticals in depositions; they are not fun.
8        Admissions counselors weren't trained to
9 just hear an I'm-not-interested response and then
10 say, okay, bye, and hang up kind of thing; correct?
11    A.   Pardon me?
12    Q.   Admissions counselors didn't hear someone
13 say I'm not interested, and say, okay, no problem,
14 bye, and hang up; correct?
15    A.   Yeah.  They were not trained to do that,
16 no.
17    Q.   So there was always, at least according to
18 training, an attempt to ascertain why that person is
19 not interested; correct?
20    A.   Yes.
21    Q.   And offer solutions, if there is a
22 conceivable solution, to perhaps address those
23 concerns that led to them not being interested;
24 correct?
25    A.   Yes.

32 (Pages 122 - 125)

Page 126

1    Q.   Was there an overcoming objection training
2 session?
3    A.   Yes.
4    Q.   Do you know what that training session
5 entailed?
6    A.   No.
7    Q.   Do you know who conducted this training
8 session between July 2014 and July 2018?
9    A.   I do not.
10    Q.   Do you know who conducts this training
11 today?
12    A.   I do not.
13    Q.   Do you know if this training uses any
14 documents?
15    A.   I don't know with any certainty.
16    Q.   Do you know if there are any documents
17 that document how to and when to overcome
18 objections?
19    A.   I'm unaware.
20    Q.   Have you seen any?
21    A.   Not to my recollection.
22    Q.   Could a rejected lead be unrejected?  And
23 I think I am talking systematically so in the CRM
24 system --
25    A.   No.

Page 127

1    Q.   So if a lead is rejected --
2    A.   Yes, it can be systemically.  It's been a
3 while since we've been involved in Oracle, but yes.
4    Q.   And same with an opportunity --
5    A.   But the reject code remains static.  So
6 you can turn a rejected lead into a converted lead
7 and the status would change from rejected to
8 converted and an opportunity is generated.  But
9 within that lead, the reject code is static.
10    Q.   So when a lead becomes an opportunity, is
11 that within the same file in the CRM system, under
12 the Oracle CRM system?
13    A.   It doesn't live within there, but there is
14 hyperlinks that can get you to go embedded within
15 it.
16    Q.   What I'm trying to get at, and this is
17 just more of a technical consideration, when a lead
18 converts to an opportunity, is a separate
19 opportunity file created for that lead?
20    A.   Yes.
21    Q.   So there is two files for each person who
22 becomes an opportunity?
23    A.   Yes.
24    Q.   Okay.  And could a lost opportunity be
25 found, unlost?

Page 128

1    A.   Yes.
2    Q.   The same way, you would change the --
3 essentially a toggle would it be?
4    A.   There is a couple of additional steps, but
5 it follows the same logic.
6    Q.   And you said closed and lost are the same
7 thing, so I won't carry it down further.
8        MR. GLAPION:  Do you want to go off
9 the record for a minute, please.
10   (Recess taken from 11:38 a.m. to 11:49 a.m.)
11 BY MR. GLAPION:
12    Q.   Before I asked, and I don't recall your
13 answer and I couldn't find it in the realtime, so
14 I'll ask again, are closed opportunities considered
15 part of the pipeline that we discussed previously?
16    A.   No.
17    Q.   And rejected leads, if I recall, you said
18 are not part of that pipeline because they were
19 never in that pipeline; correct?
20    A.   Correct.
21    Q.   And we've established that Post makes
22 outbound telephone calls to prospective students;
23 correct?
24    A.   Yes.
25    Q.   And which employee groups are primarily

Page 129

1 responsible for making those telephone calls?
2    A.   To prospective students?
3    Q.   Yes.
4    A.   Admissions.
5    Q.   So that would be admissions counselors;
6 correct?
7    A.   Correct.
8    Q.   And team leads; correct?
9    A.   It depends.
10    Q.   But team leads could and would on occasion
11 pitch in to make calls; correct?
12    A.   Correct.
13    Q.   Would assistant directors of admissions?
14    A.   Yes.
15    Q.   When I say "telephone calls," unless I
16 break it out, for convenience, I'm referring to both
17 calls and text messages, so if I say "does Post make
18 telephone calls" and it doesn't include texts, if
19 you could just let me know on that.  But in this
20 scenario they do make text messages; correct?
21    A.   Correct.
22    Q.   Would you consider outbound telephone
23 calls to be the main outreach to prospective
24 students?
25    A.   It depends.

33 (Pages 126 - 129)

Page 130

1    Q.   What does it depend on?
2    A.   Are we on the lead level still?
3    Q.   Let's start with the lead level, sure.
4         On the lead level, is phone the main
5 outreach?
6    A.   Phone and text is primary.
7    Q.   And in addition to phone and text, there
8 is also email communication; correct?
9    A.   Of course.
10   Q.   And when a lead reaches the opportunity
11 stage, is the main source of outreach still phone?
12   A.   That depends.
13   Q.   What does that depend on?
14   A.   The relationship with the prospect and the
15 admissions counselor.
16   Q.   Gotcha.  We discussed before that the
17 admissions counselors and the admissions team do not
18 fall under the marketing department; correct?
19   A.   Yes.
20   Q.   Are the calls that they make considered to
21 be part of marketing?
22        MR. BOWSER:  Objection to the extent
23 you are calling for a legal conclusion.
24   Q.   Have you heard the term "marketing" --
25 first, you can answer the question, if you

Page 131

1 understand it.
2    A.   Can you repeat the question?
3    Q.   Are the calls that the admissions
4 counselors make to leads considered to be marketing?
5        MR. BOWSER:  Same objection.
6    A.   Not to my understanding of that at all.
7    Q.   Are calls the admissions counselors make
8 to opportunities considered to be marketing?
9    A.   No.
10   Q.   When you said "not to my understanding of
11 that at all" --
12   A.   I guess I was confused.
13   Q.   You have heard the term "marketing"
14 before; correct?
15   A.   Of course.
16   Q.   And one of your titles is director of
17 marketing analytics; correct?
18   A.   Correct.
19   Q.   And previously it was strategic marketing
20 analyst, and I'm shortening it, but strategic
21 marketing analyst; correct?
22   A.   Correct.
23   Q.   So you have an understanding of what
24 marketing is; correct?
25   A.   Absolutely.

Page 132

1    Q.   So were the calls -- I'll ask again just
2 because I want to clarify the testimony -- were the
3 calls made to prospective students in the lead stage
4 considered to be marketing?
5        MR. BOWSER:  Objection, legal
6 conclusion, compound.
7    A.   I guess it depends.
8    Q.   Is television advertisement -- did you say
9 Post does television advertisements?
10   A.   Yes.
11   Q.   Is that marketing?
12   A.   Yes.
13   Q.   Does Post do radio advertisements?
14   A.   Yes.
15   Q.   Is that marketing?
16   A.   Yes.
17   Q.   So you, again, have an understanding of
18 what marketing is; correct?
19   A.   Correct.
20   Q.   So to you, what does marketing mean?
21   A.   Bringing awareness to something, the act
22 of bringing awareness to something.
23   Q.   And when we talked previously about
24 marketing, I believe we established that part of the
25 goal of Post's marketing was to increase enrollment;

Page 133

1 correct?
2    A.   They provide -- help us obtain resources,
3 but the end goal, yes.
4    Q.   So the end goal of the marketing was, or
5 at least one of the end goals of the marketing was
6 to increase enrollment; correct?
7    A.   One of, yes.
8    Q.   So were the telephone calls to leads
9 intended to increase enrollment?
10        MR. BOWSER:  Objection, compound.
11   A.   The intention is to respond to somebody
12 that's requested more information.  That's the
13 intention of reaching out to -- we are speaking on
14 the admissions level, and we are speaking about
15 phone calls, that phone call on the lead level is to
16 respond to someone that has requested, through
17 filling out an RFI, that they would like to receive
18 more information via text, email and phone, as all
19 are advised have TCPA language within them.  So to
20 answer your question, that is the intention of the
21 call.
22        So I would say no, it's not marketing.
23 It's response.  It could be considered marketing in
24 the way of we are providing information about the
25 school when we speak to someone.

34 (Pages 130 - 133)

Page 134

1    Q.   And to what end is that information being
2 provided from Post's perspective?
3    A.   Within the context of the conversation
4 that the admissions counselor is having with the
5 prospect at that juncture?
6    Q.   Admission counselors are instructed as
7 part of their job to call leads; correct?
8    A.   Correct.  They are responding to that
9 request for information, yes.
10    Q.   And when they call those leads, regardless
11 of -- when they call those leads to respond to their
12 request for information, what is Post's goal with
13 respect to calling those leads?
14        MR. BOWSER:  Objection, asked and
15 answered.
16    Q.   You can answer.
17    A.   I believe I've answered that.
18    Q.   Well, I would like you to answer again,
19 because I don't believe you have.
20    A.   Can you repeat the question.
21    Q.   When Post places calls to leads, even if
22 you are saying that the lead requested information,
23 what are Post's goals in making those calls?
24    A.   Post is returning a request for
25 information, that is what the admissions counselor

Page 135

1 is going through the motion of when they call, text
2 and/or email a lead.  They are calling to provide
3 that person who has requested information,
4 information about Post University.
5    Q.   Were these calls part of an effort to
6 encourage enrollment in Post?
7    A.   Throughout the cadence of the PCAS, should
8 the conversation shift into that, the admissions job
9 is to enroll students at Post University.
10    Q.   How many admissions counselors are
11 employed at Post?
12    A.   I can give you a rough number.
13    Q.   Rough number is fine.
14    A.   130.
15    Q.   And between 2014 and 2018, did that --
16    A.   Pause.  Forgive me, that's 130 undergrad.
17 If we are factoring in all departments, I just want
18 it to be clear, it's probably closer to 160 all
19 encompassing.
20    Q.   And between 2014 and 2018, did that number
21 stay approximately stable?
22    A.   I don't know.
23    Q.   Do you know, is an admissions counselor
24 hourly or salaried?
25    A.   Hourly.

Page 136

1    Q.   Do you know how much they get paid per
2 hour to start?
3    A.   I do not.
4    Q.   Do you know if it's above minimum wage?
5    A.   I believe so.
6    Q.   And these admissions counselors, is it
7 their primary job to interface with prospective
8 students?
9    A.   Yes.
10    Q.   And that primary job, does that relate to
11 Post's business goal of increasing enrollment?
12    A.   One of Post's goals is to increase
13 enrollment throughout that conversation of providing
14 information and conducting a professional college
15 advisory session.  Part of that is to help a student
16 throughout the admissions process and begin classes
17 and start.
18    Q.   So I actually want to back up.
19        So you were able to determine that
20 television is marketing; correct?
21    A.   Correct.
22    Q.   And that radio ads are marketing; correct?
23    A.   Yes.
24    Q.   But you've sort of hedged on whether you
25 consider Post's calls to be marketing.  I think you

Page 137

1 said multiple times, not to your understanding, but
2 also that it could be marketing.
3        So what definition are you using of
4 marketing that includes television, radio ads, but
5 does not include the outbound telephone calls?
6    A.   Because -- I'll explain.  The phone call
7 is replying to a request for information; we've
8 covered that.  I also consider providing
9 information, as I had mentioned before, to be a part
10 of marketing, providing information about something.
11 That is what transpires within a phone call.  So the
12 act of making a phone call isn't necessarily an act
13 of marketing by my definition, but I do feel like it
14 is a conduit to marketing because information is
15 then provided once a connection has been made.
16    Q.   Got it.  That's actually helpful because I
17 can sort of figure out where the issue is coming in
18 in terms of our communication.
19        So when Post reaches a lead and the lead
20 actually gets on the phone, Post then, its admission
21 counselors or whoever is making phone calls,
22 provides information; correct?
23    A.   Correct.
24    Q.   And that has a marketing component to it;
25 correct?

35 (Pages 134 - 137)

Page 138

1    A.   We are providing information about the
2  university, so yes.
3    Q.   And in Post's perspective that has a
4  marketing --
5         MR. BOWSER:  Objection, calls for a
6  legal conclusion.
7    Q.   Does Post consider that to have a
8  marketing element to it?
9    A.   That's my opinion.
10    Q.   I'm asking about how Post views the
11  purpose of these calls.
12         Does it have a marketing element to them?
13    A.   The call is to provide information.
14    Q.   And does Post view providing information
15  as part of a marketing function?
16    A.   I don't -- I don't know.
17         MR. GLAPION:  Can you mark this, what
18  are we on, 19?
19         THE REPORTER:  Yes.
20         MR. GLAPION:  Thank you.  These can
21  be 19 and 20.
22         (Exhibit 19, Post University
23          Position Description, December 1,
24          2016, Bates Number PU00000005, marked
25          for identification.)

Page 139

1         (Exhibit 20, Post University
2          Position Description, July 1, 2016,
3          Bates Number PU00000029, marked for
4          identification.)
5  BY MR. GLAPION:
6    Q.   Have you seen these documents before?
7    A.   Yes.
8    Q.   And correct me if I'm wrong, they appear
9  to be job descriptions for two different positions,
10  the first, Exhibit 19, being graduate admissions
11  counselor, ADP, and the second one being for
12  admissions counselor, ADP.
13         Do you see that?
14    A.   Yes.
15    Q.   When it's admissions counselor, ADP by
16  itself, does that presume to refer to undergraduate
17  admissions counselor?
18    A.   Yes.
19    Q.   And within 5 -- excuse me, it's
20  Exhibit 19, document marked as PU 5, the first
21  paragraph, under Job Summary, says in the last
22  sentence, You will need excellent communication,
23  listening, customer service and sales skills to
24  excel in this high-volume, customer-driven position.
25         Do you see that?

Page 140

1    A.   Yes.
2    Q.   Why would a graduate admissions counselor
3  need sales skill?
4    A.   Because making your educational decision,
5  especially online, is a very big decision, so sales
6  skills are personality skills, rapport building,
7  things that are needed in order to make someone --
8  help someone feel comfortable over the phone,
9  because ADP is the online department, so it's hard
10  to build rapport over the phone with somebody, you
11  know, in 30 minutes that you've never spoken to
12  before, so that's what that is alluding to.
13    Q.   So is it fair to say then that they need
14  to have the skills to be able to sell to someone?
15    A.   They need to have rapport-building skills,
16  absolutely.
17    Q.   This doesn't say rapport-building skills,
18  it says sales skills.  This job summary, a graduate
19  ADP -- excuse me, graduate admissions counselor, ADP
20  needs sales skills; is that what the document says?
21    A.   Yes.
22    Q.   So according to this document, you need
23  the skills to sell to someone; correct?
24    A.   Yes.
25    Q.   And it's the same question on 29 where you

Page 141

1  have the same -- or excuse me, PU 29, Exhibit 20,
2  where it says, in the first paragraph, You will need
3  excellent communication, listening, customer service
4  and sales skills.
5         So admissions counselors needed sales
6  skills; correct, in Post's view?
7    A.   You need the ability to build rapport,
8  which is considered a sales skill.
9    Q.   Is it your testimony that admissions
10  counselors were not involved in any sales?
11    A.   No.
12    Q.   That's not your testimony.  So, okay, so
13  then if --
14    A.   Define sales, since we went round and
15  round with that.
16    Q.   Sure.  The definition I'm using of sales
17  in the context of Post University, and you can tell
18  me if you disagree, is that Post University provides
19  its education services for a fee.
20    A.   If by that definition of sales, then yes,
21  and an admissions counselor is involved in that
22  process, yes.
23    Q.   And these phone calls that the admissions
24  counselors make, even if responding to a request for
25  information, are part of that sales process, using

36 (Pages 138 - 141)

Page 142

1 the definition we just established; correct?
2    A.   Yes.
3    Q.   And on this document -- we are still on
4 Exhibit 20, third to last bullet point -- it says
5 that an admissions counselor is expected to
6 participate in weekly team and floor-wide meetings
7 to address sales tactics.
8        Do you see that?
9    A.   Where are we?
10   Q.   Third to last bullet point on Exhibit 20,
11 on the top section, I apologize.
12   A.   Yes, I see that.
13   Q.   So again, one of the expectations of an
14 admissions counselor was to be in meetings where
15 they talk about tactics to sell; correct?
16   A.   Yeah, well, whenever anybody is providing
17 a product to someone, you should understand how to
18 deliver that product.
19   Q.   So they would meet, and tell me if you
20 disagree with this characterization, when they say
21 "weekly team and floor-wide meetings to address
22 sales tactics," that's talking about how best to
23 sell Post University?
24   A.   It's how best to build rapport or
25 objection overcoming, as we've discussed before.

Page 143

1    Q.   In order to do what?
2    A.   In order to provide a delivery of
3 information and break down walls of any
4 misconceptions that one might have that has
5 requested for more information about going back to
6 our school.
7    Q.   For what purpose are you breaking down
8 walls?
9    A.   To help them start the enrollment process
10 and become a Post University eagle.
11   Q.   "The enrollment process" being the process
12 by which they go from prospective student to actual
13 student; correct?
14   A.   Correct.
15   Q.   Which is the process through which they
16 purchase Post educational services; correct?
17   A.   Correct.
18   Q.   So these phone calls or, excuse me, these
19 meetings to address sales tactics are addressing
20 tactics to help a person purchase education services
21 from Post; is that a fair characterization?
22   A.   Can you repeat that once more?
23   Q.   These meetings to address sales tactics
24 are meetings discussing tactics to help a person
25 purchase education services from Post; is that a

Page 144

1 fair characterization?
2    A.   That's a very roundabout way of -- the
3 meetings are there to help the staff make sure that
4 they are comfortable with their rapport building,
5 comfortable with overcoming objections that are --
6 that should be attempted to overcome and to make
7 sure that they are delivering the information in the
8 best possible way that the person has requested --
9 the prospect has requested.  If that answer gets you
10 to what you were looking for, then --
11   Q.   Mr. Cooley, it's funny you say "roundabout
12 way."  I really don't want to go through these
13 roundabout ways.  My questions are simple, and I can
14 tell that you've been well-prepared, which is why we
15 are going in these roundabout ways.
16        You are fighting me on the definition of
17 sales repeatedly throughout this deposition, which
18 is fine, we can do that, but if we want to cut to
19 brass tacks, these meetings, isn't it fair to
20 characterize them as meetings to discuss the best
21 way to sell Post educational services?
22   A.   It is the best way to overcome objections
23 and build rapport and deliver the information in the
24 best possible way for someone that has requested our
25 information.  That is my take on that.

Page 145

1    Q.   And we will come back to that, but the
2 second bullet point under Knowledge, Skills and
3 Abilities requests experience with a consultive
4 sales approach.
5        Do you see that?
6    A.   I apologize, you'll have to direct me once
7 more.
8    Q.   The second bullet point under Knowledge,
9 Skills and Abilities, it says Experience in a higher
10 education admissions and/or recruiting position with
11 a consultive sales approach.
12       Do you see that?
13   A.   I do see that.
14   Q.   And the next knowledge, skills and
15 abilities is prior call center, customer service,
16 marketing and/or sales experience.
17       Do you see that?
18   A.   Yes.
19   Q.   Do you know who writes the position
20 descriptions?
21   A.   No.
22   Q.   Is this an accurate position description
23 for an admissions counselor?
24   A.   I would need to -- that section?  Or do
25 you want me to reread the entire document before I

37 (Pages 142 - 145)

Page 146

1 answer?
2    Q.    Did you read this document in preparation
3 for this deposition?
4    A.    Yes, but I would need to read it again
5 fully right now before I can provide that answer
6 with confidence but --
7    Q.    We don't need to do that right now.
8    A.    Okay.
9    Q.    Or if we do, we can go off the record and
10 have you do it, but it's not going to count against
11 the time on this deposition because that was one of
12 the specified documents to prepare for.
13    A.    Yeah, I've read the document before.
14    Q.    And I'm simply asking if the document is
15 an accurate reflection of the position description
16 for an admissions counselor.
17    A.    I would say that from my experience --
18 again, this is 2016 -- it seems like a fair
19 assessment.
20    Q.    So according to this, there is at some
21 level an admissions counselor in some level involved
22 in Post's sales process?
23    A.    We've covered that, that there is an
24 aspect to sales.  It's just the definition of sales
25 varies mine against yours, but yes.

Page 147

1    Q.    Well, I thought we agreed.  Sales in the
2 context of Post, Post sells its education services;
3 people purchase education services from Post?
4    A.    That's an act of selling, yes.
5    Q.    So we agree with that definition.  When we
6 say "sales" in the context of Post, I'm not talking
7 about what Post --
8    A.    We are talking about sales in the context
9 of this job description.
10    Q.    No, I'm talking now about the definition
11 of sales, because you said we disagree on the
12 definition, so I want to establish that we agree on
13 the definition.
14         In the context of Post, Post providing its
15 education services for a fee, do you agree that we
16 can use that definition of sales?
17    A.    Yes.
18    Q.    And in turn, prospective students purchase
19 education services from Post; correct?
20    A.    Correct.
21    Q.    When I talk about the sales process, I'm
22 talking about the process by which Post sells its
23 education services to prospective students who then
24 buy those services?
25    A.    But we were just discussing --

Page 148

1    Q.    And I apologize if I've confused you by
2 moving from that document, but I'm now just
3 establishing the definition of sales.
4    A.    Okay, that's where the disconnect
5 happened.
6    Q.    Well, let's establish a definition of
7 sales that I just said.
8    A.    I agree with what you just outlined.
9    Q.    And would you agree that the sales, Post's
10 sales, it's a process; correct?
11    A.    Is the act of --
12    Q.    This is a sales process at Post
13 University; correct?
14         MR. BOWSER:  Objection, form.
15    A.    There is a sales process?  I guess I'm
16 confused by --
17    Q.    Sure.
18    A.    Are we referring to the enrollment
19 process?
20    Q.    We might be.  Is there a different process
21 by which people purchase services from Post?
22    A.    We discussed Exhibit 16 as the enrollment
23 process that I defined multiple times that you said
24 could be considered a sales process, so if we are
25 referring to this as a sales process, then yes.

Page 149

1    Q.    So let's piece this out and let's
2 establish where we are agreeing and disagreeing.
3         We agree that Post providing its education
4 services for a fee is sales; correct?
5    A.    Post providing --
6    Q.    Post provides educational services to
7 prospective students which they purchase, that's
8 sales; correct?
9    A.    When they are a student, yes.
10    Q.    I'm asking about Post --
11    A.    That definition.
12    Q.    When I say "sales" in the context of Post,
13 Post offering and providing education services for a
14 fee is sales; do you agree?
15    A.    It is a form of sales.
16    Q.    Okay, so we agree.  Is there another
17 process besides which is documented on 11106, which
18 I believe was Exhibit 16, by which someone may
19 purchase Post educational services?  Is there any
20 other process besides that which is outlined on that
21 document through which prospective students purchase
22 what Post is selling?
23    A.    We covered there is additional fees.
24 There is the GI Bill, tuition assistance, cash.
25 These are not outlined on here.

38 (Pages 146 - 149)

Page 150

1    Q.   Correct.  But generally speaking, that's
2 the flow of the process by which --
3    A.   This is the ebb and flow of the majority
4 of the population.
5    Q.   So this is the ebb and flow and with
6 respect to the other populations, the differences
7 are, I think we established, are sort of minor,
8 technical with respect to how the ATP is in play?
9    A.   A couple of different avenues that one
10 might go down in order to arrive at the same --
11   Q.   Correct.  So if this is the document by
12 which people purchase documents -- excuse me --
13 purchase services from Post -- let me start the
14 question again.
15       If this document outlines the process by
16 which people purchase education services from Post,
17 isn't this also by corollary the sales process?
18   A.   I don't -- I mean, I'm not sure if we are
19 going to agree on that.  I think this is the
20 enrollment process.  You said there is aspects of
21 sales in there.  If you would like to call this a
22 sales process as well because of some of the
23 identifiers that you've outlined, we can do that for
24 the sake of moving forward.
25   Q.   In your opinion, can you have a buyer

Page 151

1 without a seller of something, of a product?
2    A.   Can you have a buyer --
3    Q.   Sure.  It might seem like unreal, but I'm
4 curious.  If someone buys something, can you buy
5 something without there being a seller?
6    A.   No, by definition.
7    Q.   Okay.  So we've established then that this
8 process is the process by which a prospective
9 student purchases education services from Post;
10 correct?
11       MR. BOWSER:  Objection, compound.
12   Q.   Is that correct?
13   A.   That's subjective, but yes.
14   Q.   It's a simple yes or no question.  Is this
15 the process by which the majority of the population
16 purchases education services from Post?
17   A.   It depends.
18   Q.   What does it depend on?  We said the
19 majority of the population.  I restricted this to
20 the majority of the population.  I'm not talking
21 about the GI Bill; I'm talking about the majority of
22 the population.
23       Is it encapsulated on that document the
24 process by which they purchase education services
25 from Post?

Page 152

1    A.   Yes.
2    Q.   So by corollary, this is also the process
3 by which Post sells to the majority of the
4 population?
5    A.   Yes.
6    Q.   So then this, as much as you hate the
7 term, is the sales process?
8    A.   That's your definition, but yes.
9    Q.   Does Post enroll students without speaking
10 to them first?  When I say "speaking," I include
11 email in that.
12   A.   No.
13   Q.   And Post speaks with students via
14 telephone, text message and email, we established;
15 correct?
16   A.   Correct.
17   Q.   And Post on those calls with prospective
18 students provides information about Post; correct?
19   A.   Correct.
20   Q.   And we've established that providing
21 information has a marketing aspect to it; correct?
22       MR. BOWSER:  Objection, compound.
23   Q.   This was your testimony, that's not me
24 making it up.
25   A.   That depends.  I think that providing

Page 153

1 information is a form of marketing.  Marketing is
2 providing information.  That's a personal feeling.
3 So if that is a Post testimony, then I would like to
4 retract it.
5    Q.   I mean, ultimately you were designated to
6 be deposed by Post.  I recognize what you are saying
7 about that is your own personal testimony.  If you
8 are not prepared to answer that question on behalf
9 of Post, again, that's something that can be dealt
10 with later, but I understand what you are saying in
11 terms of your testimony that it is on your own
12 personal behalf on that particular question.
13       Is one of the goals when an admissions
14 counselor first places a call -- let's start with a
15 lead, they first place a call to a lead, is one of
16 the goals to ultimately enroll that student in Post?
17   A.   Yes.
18   Q.   And when you enroll in Post, again, we've
19 established, though we don't necessarily like to
20 agree on the terminology, enrollment in Post and
21 purchasing Post educational services are the same
22 thing.
23   A.   Yes.
24   Q.   And there are multiple steps from inquiry
25 to enrollment; correct?

39 (Pages 150 - 153)

Page 154

1    A.   Can you expand on that?
2    Q.   From the first time a lead inquires, there
3  are multiple steps the lead must go through before
4  they can actually enroll in Post; correct?
5    A.   Correct.
6    Q.   And the first step in that process is to
7  confirm that the person is interested; correct?
8    A.   Correct.
9    Q.   And if they are still interested or if
10 they are interested, then you next move to determine
11 if they are qualified; correct?
12   A.   Define "qualified" in this context.
13   Q.   I'm using it as used on 11106, which moves
14 you into Sales Stage:  Qualified.
15   A.   Okay.
16   Q.   And so after you've confirmed the lead's
17 interest, is the next stage to qualify that person?
18   A.   Right.  So again, that's a systemic
19 terminology or nomenclature.
20   Q.   Does Post undertake any evaluation of
21 whether a prospective student is qualified to attend
22 Post?
23   A.   Of course, but I guess you said the next
24 stage is, are they qualified?  And the next stage
25 after discovering the interest still resides within

Page 155

1  the inquiry or lead; that's when a PCAS is
2  conducted.  Within the PCAS, we could identify
3  whether someone is qualified or not.
4    Q.   So the interview process is not only
5  providing information about Post, but determining
6  qualifications of or whether the prospective student
7  is qualified to attend; correct?
8    A.   Right.  I just want to make sure I'm
9  crystal clear.
10   Q.   I understand; that's fine.
11   A.   So yes, the PCAS would be next,
12 systemically the qualified category is there, but
13 within the context of the PCAS is where that
14 discovery is made.
15   Q.   Is it fair to say then that the goal of
16 the very first call to a lead is to begin the
17 process outlined -- I'm not going to give it a name
18 because we keep fighting on it -- the process
19 outlined on 11106 or Exhibit 16?
20   A.   I'm sorry, may you repeat the question
21 once more.
22   Q.   Sure.  The first call to a lead begins the
23 process outlined in Exhibit 16; is that correct?
24   A.   It depends.
25   Q.   What does it depend on?

Page 156

1    A.   If the lead picks up the phone.
2    Q.   That appears to me though to be captured
3  in the red arrow to the right, that you are
4  attempting to contact the lead.
5       So the attempt to contact the lead starts
6  the process of that; correct?
7    A.   Yes.
8    Q.   And then reaching the lead starts the
9  actual status process in qualifying, qualify,
10 qualified, etcetera?
11   A.   Correct.
12   Q.   So although the prospective student may
13 not enroll on that very first call, that very first
14 call to a lead starts that process that could
15 potentially lead to enrollment; correct?
16   A.   Yes.
17   Q.   And when an opportunity is called, is it
18 fair to characterize a goal of that call to an
19 opportunity to move the -- help move the opportunity
20 move through the process outlined in Exhibit 16?
21   A.   Yes -- well, it depends.  It's not -- not
22 every call is designed to move a person through the
23 funnel.  There are calls to check up on someone.
24 There's calls -- personal relationship calls that
25 are established to see how someone's soccer game

Page 157

1  went.  Not every call has a system-driven intention
2  behind it, so I just wanted to add that layer of
3  clarity.
4    Q.   And let's break that down.  So you said
5  there are calls to opportunities that are to check
6  up on someone; correct?
7    A.   Uh-huh.
8    Q.   And when you say "check up on someone,"
9  are you talking about -- what do you mean by "check
10 up on someone"?
11   A.   As I mentioned, a big piece of this sales
12 experience that we were referencing earlier is
13 rapport building.  Throughout that and throughout a
14 PCAS, that could last upwards of an hour; I've seen
15 them last for 90 minutes.  A lot of times, a lot of
16 information is shared, and that relationship that's
17 established between the admissions counselor and the
18 prospect sometimes is a very tight bond.
19       A lot of our prospects don't have a lot of
20 support in their personal life, so when they find
21 that support in our admissions counselor, a bond is
22 built there occasionally.  So the calls that are
23 placed to the people that they've spoken with and
24 have expressed interest, they are not always with a
25 school-driven intent behind it, so I just wanted to

Page 158

1 add that layer of distinction.
2  Q. Are admissions counselors permitted to
3 make personal calls while working?
4  A. Yes.
5  Q. And I can show you the training document.
6 I just want to clarify. I believe the training
7 document says that no cell phones are allowed on the
8 floor, but --
9  A. Do you mean on the clock or while they are
10 at the job?
11  Q. While they are working on the clock, are
12 Post admissions counselors permitted to make
13 personal calls?
14  A. While you are on the clock, you should not
15 be making personal phone calls.
16  Q. So it's fair to say then that if an
17 admissions counselor is doing their job while on the
18 clock, the calls that they make are on behalf of
19 Post University?
20  A. Yes.
21  Q. So when someone places a telephone call to
22 check up on a prospective student, and I think we
23 are talking about opportunities now, that's not
24 considered to be a personal call?
25  A. Absolutely not.

Page 159

1  Q. It's considered to be a call that's part
2 of building a rapport with that student or
3 prospective student; correct?
4  A. Absolutely.
5  Q. And that part of building rapport is part
6 of making the student feel comfortable with Post; is
7 that one reason, would you say?
8  A. Yeah.
9  Q. And that comfort is part -- does Post
10 consider building rapport with students, or excuse
11 me, with prospective students to be important to
12 ultimately getting that student to enroll at Post?
13  A. I think it depends.
14  Q. What does it depend on? Let me try to
15 reask the question again, because I'm not really
16 following how that answer meshes.
17  Does Post consider building a rapport with
18 a prospective student important to converting that
19 student into an enrolled student?
20  A. Post believes that building rapport with a
21 student --
22  Q. Prospective student?
23  A. A prospective student -- thank you for the
24 clarification -- that perhaps hasn't had any higher
25 education learning before or has been out of school

Page 160

1 for a very long time or has a lot of things going on
2 in their lives but they know that they want to make
3 a change, Post feels that it is -- the student
4 deserves a personal experience and to feel as if
5 someone is there with them because they do not have
6 that support a lot of times in their own personal
7 life. So that is something that we instill in our
8 culture, and that is something that we instill in
9 our admissions staff.
10  Q. Does Post University do -- does the
11 admissions department place calls to rejected leads?
12  A. Yes.
13  Q. Does Post place calls to rejected leads
14 just to see how they are doing?
15  A. I don't -- no.
16  Q. So when these calls that you talked about
17 are being made to prospective students, we will call
18 them building-rapport calls; is that fair? The one
19 that you were talking about before, building-rapport
20 calls.
21  A. Sure.
22  Q. These building-rapport calls, they are
23 only made to students who are active leads or active
24 opportunities; is that fair to say?
25  A. No.

Page 161

1  Q. So these building-rapport calls are to
2 place calls to rejected leads to build rapport?
3  A. No, you never said rejected opportunities.
4  Q. So you will place calls to rejected
5 opportunities to build rapport?
6  A. If a bond has been made between an
7 admissions counselor and a once prospective student,
8 admissions counselors will occasionally still keep
9 in contact to see how everything is going on, to see
10 if someone is interested and maybe if this is a
11 better time for them in their personal life to move
12 forward or if something mitigating happened in their
13 life.
14  There is a lot of stories that we hear,
15 some really heartbreaking stories that come about,
16 and throughout that PCAS or that eight-week time
17 frame where they were, you know, kind of building
18 that camaraderie and relationship, people want to
19 make sure that our former prospects are doing okay.
20 It's part of -- again, part of our culture. So that
21 happens, you know, probably less frequently, but to
22 answer your question, I want it to be full
23 disclosure.
24  Q. Within that answer, you mentioned that if
25 a bond has been made between an admissions counselor

41 (Pages 158 - 161)

Page 162

1 and a once prospective student, they may check in to
2 see if it might be a better time for them; correct?
3    A.    Uh-huh.
4    Q.    And the other reasons were similar to
5 that, has whatever was affecting you before resolved
6 kind of questions?
7    A.    Of course.
8    Q.    In those scenarios, would you agree that
9 though the person was marked as opportunity lost,
10 the admissions counselor making those calls had
11 reason to believe that they may be able to get that
12 opportunity back into Post?
13    A.    It depends.
14    Q.    Are you aware of admissions counselors
15 being permitted to make telephone calls to lost
16 opportunities that there was no basis for belief
17 that the lost opportunity might be converted into an
18 enrolled student?
19    A.    I believe I just gave you an example.
20    Q.    What you said was --
21    A.    To check up on somebody, see how they were
22 doing.
23    Q.    To see if it is a better time in their
24 personal life to move forward.
25    A.    That's one example.

Page 163

1    Q.    Okay.  And --
2    A.    That could be a reason.
3    Q.    So --
4    A.    Not every outbound call made to a lost
5 opportunity is made with the intention of moving
6 that student back into Exhibit 16.
7    Q.    Wouldn't that be a personal call then?
8    A.    No.
9    Q.    Why not?
10    A.    Because this was a former prospect.
11    Q.    But it's not a prospect when the call is
12 made; correct?
13    A.    Who's to say?
14    Q.    I'm asking you.  You just said that --
15    A.    I'm saying they didn't make the call with
16 the intention, every call.
17    Q.    But were these calls made only to those
18 that were considered prospects or that could be
19 turned back into a prospect?
20    A.    And I said no.
21    Q.    And I'm asking then how is that not a
22 personal call?
23    A.    Because at that point they were part of
24 the Post family.
25    Q.    So I want to get this very clear on the

Page 164

1 record.  Post is a for-profit business; correct?
2    A.    Correct.
3    Q.    And your testimony right now is that Post
4 would place telephone calls to people that are no
5 longer in the pipeline, don't have potential in the
6 pipeline, out of the goodness of its heart?
7        MR. BOWSER:  Objection to form.
8    Q.    You can answer.  Is that your testimony?
9    A.    What I had mentioned is that not every
10 call that's placed to a closed opportunity is made
11 with the sole intention of bringing that person back
12 into the Exhibit 16 funnel.
13    Q.    Okay, good.  Now we have a lot to unpack
14 with that answer.
15        Does every call made to a lost opportunity
16 include the intention of reestablishing a
17 relationship with that lost opportunity, not the
18 sole opportunity, is that one of the purposes of the
19 call to a lost opportunity?
20        MR. BOWSER:  Objection to form.
21    A.    I'm sorry, you began with is that the
22 only.
23    Q.    I didn't, but I'll correct it.  Is every
24 call made to a lost opportunity made with one of the
25 purposes of that call being to reestablish a

Page 165

1 relationship with Post University?
2    A.    Not every call.
3    Q.    Would you say the majority of calls?
4    A.    Yes.
5    Q.    The vast majority of calls?
6    A.    Yes.
7    Q.    Would you say 90 percent of the calls?
8    A.    Yes.
9    Q.    95 percent of the calls?
10    A.    I can't say with certainty, but --
11    Q.    But on occasion someone will --
12    A.    The majority, the majority of calls that
13 are made to a closed opportunity or a closed lead
14 would be to see if someone is interested, if now is
15 a better time for someone to move forward with their
16 education with us.
17    Q.    And we established that a closed
18 opportunity was no longer in that process we talked
19 about in Exhibit 16; correct?
20    A.    Correct.
21    Q.    So when you say to see if someone is
22 interested, if now is a better time for someone to
23 move forward with their education with us, to see if
24 you can get them back into that enrollment process;
25 is that correct?

42 (Pages 162 - 165)

Page 166

1    A.   Correct.
2    Q.   And I know you can't give me an exact
3  figure, but on occasion, it seems to be a very small
4  on occasion, someone who developed a really strong
5  relationship just might call to say, hey, how are
6  you, but I want to be clear that the expected use of
7  those calls to lost opportunities was to attempt to
8  reengage them with the enrollment process; is that
9  correct?
10   A.   The ones that they are reaching out to,
11 because again, that's contingent on why they were
12 rejected, but yes, that's the majority purpose of
13 attempting to make contact.
14   Q.   And you said upwards probably of
15 90 percent; is that fair?
16   A.   That's fair.
17   Q.   In terms of rejected leads, because we've
18 been focused on opportunities, would rejected leads
19 continue to be called?  Excuse me.  Let me rephrase.
20   A.   Excuse me, pardon me.
21   Q.   Do you need more water?
22   A.   I might actually.
23        (Pause.)
24        THE WITNESS:  I'm not sure if you
25 asked a question.

Page 167

1        MR. GLAPION:  I don't remember -- I
2  can't remember anything.  That's why I have the
3  realtime.
4  BY MR. GLAPION:
5    Q.   In terms of rejected leads, because we've
6  been focused on opportunities, would rejected leads
7  be called by the admissions department?
8    A.   It depends which ones.
9    Q.   But at least some of the rejected leads
10 would be called by the admissions department;
11 correct?
12   A.   Correct.
13   Q.   And the calls to the rejected leads, did
14 they have that same purpose we discussed with --
15 excuse me -- did the majority of them have the same
16 purpose we discussed with lost opportunity, to
17 reengage them with the sales process, or excuse
18 me --
19   A.   It should be probably all of them because
20 if they never made it to the opportunity phase, then
21 there was no conversation that transpired, so how
22 could rapport be established at that juncture.
23   Q.   So the goal of calling a rejected lead was
24 to --
25   A.   To see if --

Page 168

1    Q.   -- I don't even want to say reengage, to
2  engage them with the process outlined in 16?
3    A.   The goal of calling a rejected lead is to
4  see if a prospective student that had once filled
5  out a request for information about going to school
6  with us, that we were unable to connect to in a
7  timely manner in the past, due to reasons we were
8  unable to identify, to see if now is the better
9  time.
10   Q.   To see if they are still interested;
11 correct?
12   A.   Correct.
13   Q.   In purchasing education services from
14 Post; correct?
15   A.   In moving forward with their education
16 with Post, correct.
17   Q.   Is there a difference between what you
18 said and I said?
19        I know we keep fighting on this, I don't
20 like it either, but is there a difference between
21 what you said and I said besides the words?
22   A.   We are providing a service and the service
23 has a fee attached to it so, we can call it whatever
24 we'd like.
25   Q.   So when you say it's correct that the

Page 169

1  calls were to see if they are still interested, is
2  it fair to say you are seeing if they are still
3  interested in obtaining the service that Post
4  provides that has a fee attached to it?
5    A.   Yes.
6    Q.   Thank you.  It's A little tortured, but we
7  got there.
8        Who is Kimberly Williams?
9    A.   She is now an assistant director in the
10 admissions department.
11   Q.   Does Post consider her to be a good
12 employee?
13   A.   Yes.
14   Q.   And do you believe or does Post believe,
15 excuse me, that she has an understanding of her
16 expectations in her job?
17   A.   Absolutely.
18   Q.   And personally, do you believe she is a
19 good employee?
20   A.   Yes.
21        MR. GLAPION:  Can this be marked as
22 Exhibit 21 please.
23        (Exhibit 21, Email, Bates Number
24        PU00008459, marked for
25        identification.)

43 (Pages 166 - 169)

Page 170

1 BY MR. GLAPION:
2    Q.   Let me know when you've had a chance to
3 review this document.
4    A.   Yeah, I've reviewed it.
5    Q.   And this, do you agree that this is an
6 email from Kimberly Williams --
7    A.   Yes.
8    Q.   -- to a variety of people?  I won't name
9 them all.  Brian DeToma, do you know who Brian
10 DeToma is?
11    A.   I do.
12    Q.   Scratch that.  What is Brian DeToma's role
13 at Post?
14    A.   Admissions counselor.
15    Q.   And Constance Reilly?
16    A.   The same.
17    Q.   Skipping around, Mary Yatcko?
18    A.   The same, everybody on this list.
19    Q.   Is an admissions counselor?
20    A.   Besides Kimberly Williams.
21    Q.   And Victoria Meehan; correct?
22    A.   Correct.
23    Q.   What about Tashina McInerney?
24    A.   Yes.
25    Q.   She is an admissions counselor?

Page 171

1    A.   Correct.
2    Q.   Have you worked with any of these
3 admission counselors?
4    A.   Yes.
5    Q.   Have you worked with, I'll pick names at
6 random, Mary Yatcko?
7    A.   No.
8    Q.   Do you have any familiarity with Mary
9 Yatcko?
10    A.   Yes.
11    Q.   Is she a good employee?
12    A.   Yes.
13    Q.   Do you believe her to be well-trained?
14    A.   Yes.
15    Q.   Know her expectations as an admissions
16 counselor?
17    A.   Yes.
18    Q.   Turning to the body of the email -- by the
19 way, it's dated, do you see, April 17, 2018.
20        Do you see that?
21    A.   I do.
22    Q.   I was going to say a few short months ago,
23 then I realized we are in April 2019, so a year ago.
24 Time flies.
25    A.   Better check that too then.

Page 172

1    Q.   You're right.  It is '19.  Time flies when
2 you have a six-month old.
3        The first sentence is, I know some of you
4 leave at 5 or earlier; we need to pick up these
5 calls.  The second sentence is what I want to look
6 at first.  It says, We are not in the business of
7 getting one app, or one PCAS, or one regi, r-e-g-i,
8 and calling it a day.
9        Do you see that?
10    A.   Correct.
11    Q.   Do you know what Kimberly Williams would
12 have meant by "regi"?
13    A.   I can't say for certain.
14    Q.   What is your personal guess?
15    A.   My personal guess would be registration.
16    Q.   Would registration be an enrollment?
17    A.   Yes.
18    Q.   So when Kimberly Williams says we are not
19 in the business of getting one app, one PCAS or one
20 regi, what does that mean?
21    A.   What I take from this, you would need to
22 read the second sentence or the third sentence as
23 well, the following sentence, which is, We are in
24 the business of changing as many lives as possible
25 and helping as many students as possible.

Page 173

1        So I believe what that is really enforcing
2 is knocking down that misconception that we are in
3 this just to get an app or a PCAS or a regi on the
4 day.  That's not what this is about.  That's what I
5 would take from this.
6    Q.   So I want to be clear on your
7 interpretation, that Kimberly Williams is saying,
8 it's more of a rallying cry; she is saying, look, we
9 are not just about getting the application; we are
10 about changing lives.
11        Is that a fair characterization?
12    A.   Yes.
13    Q.   If that's the case, then why in the next
14 sentence does she seemingly criticize low-call
15 volume, high-talk time when she says, it's amazing,
16 but we have to connect with as many students as
17 possible.
18        Do you see that?
19    A.   Uh-huh.
20    Q.   Why does she say that, given your meaning,
21 how would that make sense here?
22    A.   Well, she first commended the high-talk
23 time, which is great.  That means that we are
24 engaging with the people that we have engaged with
25 and having meaningful conversations, which is always

44 (Pages 170 - 173)

Page 174

1 a good thing.
2      The secondary piece, I would say is we
3 need to connect with as many students as possible,
4 as we receive a lot of requests for information, and
5 we want to make sure that they are all getting the
6 proper attention that they deserve.
7      Q.   Is it not a better interpretation of this
8 email, and you can tell me if you disagree, that the
9 email is more, we shouldn't just be getting one
10 application or one PCAS and one registration and be
11 done, we should be getting more?  Is that not a
12 better interpretation?
13      A.   I don't feel that way at all.
14      Q.   Because then if we look at the last
15 sentence, it says -- excuse me, after the saturate
16 our resources, the next clause, if we do not call
17 our leads and opportunities, other schools will call
18 them and assist them in going back to school.
19      Do you see that?
20      A.   I do.
21      Q.   Why does that matter if it's just about
22 helping students and changing lives?
23      A.   Because we believe in Post's product; we
24 believe in our culture; we believe in the quality of
25 our education; we believe in the personal feel that

Page 175

1 we deliver to our students, and we want to make sure
2 that our prospects have an opportunity to hear that
3 out.  And if we are not reaching them in a timely
4 manner, somebody else might.
5      Q.   Post competitors; correct?
6      A.   Other institutions that are --
7      Q.   Competing with Post for the same students.
8      A.   That are providing online education.
9      Q.   So it's saying then, if we don't call our
10 leads and opportunities, our competitors will
11 essentially; correct?  I'm not strictly reading from
12 the document; I'm asking if that's how you
13 characterize it.
14      A.   I just wanted to read it once more before
15 I answered.
16      Q.   I understand.
17           (Pause.)
18      A.   Can you repeat your question now, please.
19      Q.   Sure.  So when Kimberly Williams says If
20 we do not call our leads and opps, other schools
21 will call them, essentially she is saying if we
22 don't, other people will?
23      A.   And the rest of the sentence is, And
24 assist them in going back to school, and we all know
25 nobody does it like Post U, we make it personal.

Page 176

1      Q.   I can read.  I'm asking about your
2 characterization of --
3      A.   I wanted to read the full sentence before
4 I kind of took the context out of it.
5      Q.   I understand.
6      A.   So what that is saying to me is that if we
7 are not reaching out to our other RFIs, other
8 prospect students that have requested for
9 information that we were unable to make contact with
10 at that point, then there is a possibility that
11 another online institution will have made contact
12 with them, and we will miss our opportunity to tell
13 them about the wonderful experience that they will
14 have at Post University.  So that's what we are
15 really trying to --
16      Q.   And is it correct that Post would also --
17 this is the opportunity then to enroll that student;
18 correct?
19      A.   It depends.
20      Q.   What would that depend on?  If Post misses
21 the opportunity to talk to a student and your
22 testimony before was that Post doesn't enroll
23 students without talking to them, then if Post does
24 not talk to a student, then Post does not enroll a
25 student; correct?

Page 177

1      A.   You could always speak to them at another
2 point down the road, so there is always margin, but
3 yeah, if we are not reaching out to our many RFIs
4 and giving them the attention and responding to them
5 in a timely manner, because they've asked for the
6 information, there is a possibility that they might
7 be speaking to somebody else and not hear us out.
8      Q.   And enroll with that competitor; correct?
9      A.   There is a possibility for that as well.
10      Q.   And so one of the concerns then, is it
11 fair to say, of another school assisting them in
12 going back to school is that Post is not able to
13 enroll that student?  Is that a concern?
14      A.   We believe that we have the best, most
15 personal online program available, and we really
16 pride ourselves on our culture and we pride
17 ourselves on making it personal for our students,
18 and we really feel that every student that is
19 embarking on online education can sometimes feel
20 isolated, that they are delivered that
21 personalization.
22      Q.   Does it also matter for Post's revenue
23 generation?
24      A.   Does what matter?
25      Q.   A prospective student enrolling with

45 (Pages 174 - 177)

Page 178

1 another school rather than Post, if the prospective
2 student was considering both Post and another
3 school.
4     A.    If a student starts at another school and
5 does not start with Post, then they are not starting
6 with Post.
7     Q.    And them not starting with Post, Post is
8 not generating revenue from that student; correct?
9     A.    We cannot generate any revenue from
10 someone that is not attending our university.
11     Q.    So is one of the concerns that Post had
12 with -- excuse me, let me scratch that.
13         Does a student, prospective student
14 enrolling with a school other than Post reflect a
15 concern of Post?
16     A.    No.
17     Q.    Does Post believe it has competitors?
18     A.    Of course.
19     Q.    Is Post concerned about prospective
20 students enrolling with its competitors?
21     A.    No.
22     Q.    Post is completely fine if someone chooses
23 its competitor over Post?
24     A.    If that student feels like they found a
25 better fit somewhere, all the best.

Page 179

1     Q.    And it does not matter if -- you are
2 telling me it doesn't matter if -- scratch that.
3         So Post is not concerned if in a
4 competition for the same student that student goes
5 elsewhere?
6     A.    Define "Concerned."
7     Q.    Have you heard the term "concerned"?
8     A.    Of course.
9     Q.    Do you have a general understanding of
10 what "concerned" means?
11     A.    Absolutely.
12     Q.    Using your understanding of what
13 "concerned" means, is Post concerned when a
14 prospective student enrolls at another school rather
15 than Post, when that prospective student had been
16 considering Post?
17     A.    No.
18     Q.    You testified a moment ago that Post has
19 competitors; correct?
20     A.    There are other online programs available.
21     Q.    And does Post view itself as competing for
22 students with those other online programs?
23     A.    No.
24     Q.    So when another online -- let's say
25 another online program popped up and no one enrolled

Page 180

1 with Post, they all enrolled at this new online
2 school, would Post be concerned?
3     A.    Yes.
4     Q.    So at some level, there is a concern with
5 students enrolling at a school other than Post?
6     A.    On some level, yes.
7     Q.    So if students, multiple students begin
8 enrolling with another school rather than Post,
9 would Post be concerned?
10     A.    That depends.
11     Q.    Does it matter -- does it affect Post's
12 revenue -- excuse me.
13         Does Post generate revenue from a
14 prospective student that enrolls with another school
15 other than Post?
16     A.    You've covered that.
17     Q.    And I'll ask it again and you can answer
18 it again.
19     A.    No.
20     Q.    And you are testifying that, but otherwise
21 Post doesn't really care if a student goes somewhere
22 else; is that correct?
23     A.    I didn't say that.
24     Q.    You said they are not concerned.  Does
25 Post care if a student goes somewhere else?

Page 181

1     A.    I believe the question was, does Post care
2 if a student enrolls with another university after
3 they've expressed interest in Post --
4     Q.    Correct.
5     A.    -- to which I retorted, no.
6     Q.    Okay.  So what is the difference between
7 what I just asked, which is that Post doesn't care
8 if a student goes somewhere else, and what you said
9 is that Post doesn't care if a student enrolls
10 somewhere else?  I'm not seeing the difference.
11     A.    Maybe we crossed our lines.
12     Q.    Sure.
13     A.    I believe that we landed on, does Post
14 care if all students stop enrolling at Post, to
15 which I responded yes, and then you said -- you gave
16 some vague number.
17     Q.    Sure.  I said there is some level that
18 Post would start to care; correct?
19     A.    Of course.
20     Q.    And would it begin to care if Post's
21 revenue was hurt by enrollment elsewhere?
22     A.    Can you repeat the question.
23     Q.    Sure.  Is the trigger for when Post would
24 begin to care about students enrolling elsewhere
25 when it happened when its revenue becomes impacted?

46 (Pages 178 - 181)

Page 182

1       MR. BOWSER:  Objection, compound.
2    A.   I guess that really -- that depends.
3    Q.   And I think you were specifying with one
4  specific student.  If one specific student enrolls
5  elsewhere, Post isn't going to lose sleep over that
6  essentially; correct?
7    A.   Correct.
8    Q.   I know Post doesn't sleep, but you get
9  what I'm saying.
10       This email from Kimberly Williams talks
11  about leads and opps, plural, being assisted by
12  other schools other than Post; correct?
13    A.   Yes.  That is what the email says.
14    Q.   So if multiple students began enrolling at
15  other schools rather than Post when they were
16  considering Post, would that be a concern of Post?
17    A.   That depends on the scale of multiple.
18    Q.   What is the trigger point?  What --
19    A.   I don't understand.
20    Q.   What takes it from not caring to caring?
21  What metric is used to determine whether they should
22  care?
23    A.   I guess it depends.
24    Q.   I just want to be extra clear that your
25  testimony of this email is she is saying we are not

Page 183

1  in the business of getting application, PCAS and
2  registration; we are in the business of changing
3  lives.  That's your interpretation of this email?
4    A.   I mean, that's what it says verbatim
5  almost.
6    Q.   Sure.  It also has the words "one app."
7  If she were just talking about changing as many
8  lives as possible, why would she specify we are in
9  not in the business of getting one app or one PCAS
10  or one regi?
11    A.   I didn't write the email, so I don't know
12  exactly where --
13    Q.   Reading this --
14    A.   I didn't get caught up on that.
15    Q.   Sure.  Reading this as you, as Sean
16  Cooley, if you read this, would you take this as a
17  we need to change lives or getting one application,
18  one PCAS or one registration is not enough?
19    A.   I'm reading this as we are not in the
20  business of getting business as in -- pardon me.
21    Q.   It's okay.
22    A.   Business of the individual.  We are not in
23  the business of, I received an application today so
24  I don't have to be concerned with still outreaching
25  the people that have requested more information

Page 184

1  about our university that we have yet to make
2  contact with.  So just because one had a good
3  conversation or one had an application on the day or
4  one had a regi, as it's written within this email,
5  that doesn't mean that we should necessarily call it
6  a day.  There are still people that are looking for
7  information.  There still lives to be changed.
8  That is what I take from this email.
9    Q.   In short then, it's saying we should be
10  trying -- even if you got one, you should be trying
11  to get more; is that fair?
12    A.   That's not what I said.
13    Q.   You said "We are not in the business of, I
14  received an application today so I don't have to be
15  concerned with still outreaching the people that
16  have requested more information about our
17  university."
18       So when I characterize that as being,
19  well, even if you got one, you should be trying to
20  get more, what is the difference?
21    A.   I said more than that.
22    Q.   You did, but it's all roughly in that
23  vein.
24       Tell me what you disagree with, with my
25  characterization of the email then.  If I

Page 185

1  characterize this email as Kimberly Williams saying
2  even if you got one app, one PCAS or one regi, you
3  should continue to reach out to try to get more,
4  what do you disagree with in that sentence?
5    A.   I disagree that, as I explained, that even
6  if one of these admissions counselors had a good
7  conversation or PCAS, received a prospective
8  student's application to the institution, was able
9  to assist in registering one of their prospective
10  students for classes, just because that happened in
11  their day doesn't necessarily mean that their day
12  has concluded, because there are other prospective
13  students that have requested for information that we
14  have been unable to make contact with and tell them
15  about Post, and that is what I deduce from this
16  email.
17    Q.   So just because you got one of these
18  things, you should still continue to reach out to
19  prospective students; is that better?
20    A.   Just because you had an application or a
21  great conversation in a PCAS or helped someone
22  through the enrollment process and got them
23  registered into courses doesn't mean that you should
24  neglect the other prospective students that have
25  requested for more information about what the

47 (Pages 182 - 185)

Page 186

1 experience is like being a Post University eagle.
2    Q.   Okay.
3    A.   That is what I deduce from this email.
4    Q.   Fair enough.  Going back to what we
5 discussed -- we are done with this document for
6 now -- I believe you said that with respect to
7 rejected leads, all of the calls to rejected lead
8 would be an attempt to begin the process outlined in
9 Exhibit 16; is that accurate?  We are talking about
10 rejected leads.
11    A.   Yes.
12    Q.   And this process is -- I'm not going to
13 ask that again, I don't even want to go there again.
14        These calls then were ultimately part of
15 efforts by Post to enroll students at Post
16 University; is that fair?
17    A.   These efforts were put in place to provide
18 information to a prospective student that had
19 requested information that we were unable at that
20 point -- up until that point to provide them with.
21    Q.   To begin this process?
22    A.   To begin that process.  I just wanted to
23 preface it with that first part.
24    Q.   And this process is the process by which
25 students are enrolled?

Page 187

1    A.   Correct.
2    Q.   So these calls are necessarily then part
3 of an effort to enroll students?
4    A.   Yes.
5    Q.   And was one of the purposes to convert
6 someone who was previously rejected into an enrolled
7 student?
8    A.   Yes.  I'm confused.
9    Q.   Was one of the purposes of the calls to
10 rejected leads to convert them ultimately into an
11 enrolled student?
12    A.   Yes.
13    Q.   Did Post track rejected leads that were
14 subsequently converted into enrolled students?
15    A.   Not to the granularity that they probably
16 should.
17    Q.   Did you track rejected leads that were
18 converted into enrolled students?
19    A.   No.
20        MR. BOWSER:  Can we go off the record
21 for a second?
22        MR. GLAPION:  Sure.
23    (Recess taken from 1:07 p.m. to 1:09 p.m.)
24 BY MR. GLAPION:
25    Q.   Before the break, I asked if you had

Page 188

1 tracked rejected leads that were converted into
2 enrolled students and you answered no; is that
3 correct?
4    A.   Yes.
5        MR. GLAPION:  I want to introduce
6 Exhibit 22.  If you can mark this, please, as 22 and
7 hand it to the witness.
8        (Exhibit 22, Email, Bates Number
9        PU00014123, marked for
10        identification.)
11 BY MR. GLAPION:
12    Q.   Is this you in the signature, Sean Cooley,
13 Assistant Director of ADP Admissions?
14    A.   Yes.
15    Q.   As of March 2017 -- March 15, 2017, that
16 was still your title; correct?
17    A.   Correct.
18    Q.   That sort of helps us narrow down the
19 timeline of the title?
20    A.   Right.
21    Q.   This is to Bobby Reese, who you testified
22 is the COO; is that correct?
23    A.   Yes.
24    Q.   The subject is MOD4, Rejected Converts.
25        Do you see that?

Page 189

1    A.   Yes.
2    Q.   And there is a table included in here that
3 includes Gross Reject, Net Reject, Converted After
4 Reject and Percent Converted After Reject, and those
5 are the column headers.
6    A.   Yes.
7    Q.   The row headers are 10 Attempts, Not In
8 Service and Wrong Phone Number.
9        Do you remember sending this email?
10    A.   I do not.
11    Q.   This email appears to track a gross number
12 of rejected leads, I'm presuming; is that correct?
13    A.   Yeah.  I mean, I could only assume that
14 that's what it's showing.
15    Q.   You wrote this email; correct?
16    A.   In March of 2017, yes.
17    Q.   And if you use the term "gross reject"
18 with the --
19    A.   At that number it should be a lead.
20    Q.   So this is, as you can tell, the gross
21 number of rejected leads for those given categories;
22 correct, 10 Attempts, Not In Service, Wrong Phone
23 Number?
24    A.   Yes.
25    Q.   And then you have another column Converted

48 (Pages 186 - 189)

Page 190

1 After Reject which gives a raw number.
2      Do you see that?
3   A.   Right.
4   Q.   So this appears to be, you can correct me
5 if I'm wrong, you tracking the number of rejected
6 leads in those categories who are ultimately
7 converted; is that correct?
8   A.   It appears to be that, yes.
9   Q.   And a moment ago you testified that you
10 didn't track this?
11   A.   Again, this is probably something that I
12 did by ask on one occasion back in March of 2017, so
13 it's not something that is an ongoing thing that we
14 monitor, although as I testified earlier, it's
15 something that we should be keeping a better track
16 on.
17      I also can't speak to what that converted
18 means, again, because of the infrequency of this
19 exercise and the time lapse from when it was
20 conducted.  But that converted could be converted
21 into an opportunity from a previously rejected 10
22 attempt.
23   Q.   How --
24   A.   I have no way of determining.
25   Q.   Well, you wrote it, so what does converted

Page 191

1 mean in your --
2   A.   Three years ago.
3   Q.   Two.
4   A.   Two years ago.
5   Q.   What does converted mean in your ordinary
6 usage in the context of your job at Post University?
7   A.   It has multiple different meanings.
8   Q.   And what are those meanings?
9   A.   Converted to an opportunity, converted to
10 an application, converted to a registered student,
11 converted to a student that has started taking
12 classes.
13   Q.   Why would Bobby Reese be interested in
14 this information?
15   A.   He is our COO.
16   Q.   Why specifically would he be interested in
17 the conversion rate on rejected leads?
18   A.   I can't say with any certainty.
19   Q.   So you don't remember writing this email;
20 correct?
21   A.   Correct.
22   Q.   You don't remember why you wrote this
23 email?
24   A.   I do not.
25   Q.   You don't remember if Bobby asked you for

Page 192

1 that email or, excuse me, this information?
2   A.   I'm assuming that he did.
3   Q.   But you don't actually remember, you are
4 assuming just because of who you sent it to;
5 correct?
6   A.   Correct.
7   Q.   You don't remember what is meant by
8 converted in this email; correct?
9   A.   Right.  It could be any number of those
10 things.  It's probably converted into opportunity
11 or -- yeah, I mean, I can't say with any certainty,
12 so it would only be speculatory.
13   Q.   I asked a moment ago whether the purpose
14 of calling rejected leads were part of Post's
15 efforts to enroll students, and I think we agreed
16 that because it's to start them on the process that
17 it was?
18   A.   Of course.
19   Q.   And same with respect to lost/closed
20 opportunities, I know you said there were some calls
21 that were more checkup calls, but --
22   A.   The majority.
23   Q.   The 90 percent plus majority were part of
24 Post's efforts to enroll students; is that correct?
25   A.   Correct.

Page 193

1   Q.   And to essentially reengage those lost
2 opportunities with Post, I'm talking about the
3 90 percent for now; is that fair?
4   A.   That's fair.
5   Q.   And with respect to the 10 percent of
6 calls, was there any business purpose to those
7 10 percent of calls?  And I'm saying 10 percent, I
8 know it's fuzzy there, but just for ease of
9 communication, for those 10 percent of calls, was
10 there any business purpose for Post just calling a
11 student or, excuse me, a former prospective student
12 just to check up on them?
13   A.   A former opportunity?
14   Q.   Let me say that again.  Was there any
15 business purpose to calling a lost opportunity in
16 those 10 percent of calls you said were just to
17 check up on them?
18   A.   I'm sorry, can you rephrase that.
19   Q.   Was there any business purposes to calling
20 a lost opportunity for those small subset of calls
21 which we said was probably 10 percent or less that
22 was just to sort of check up on them?
23   A.   No.
24   Q.   No business purpose?
25   A.   Right.  The 10 percent is probably high,

49 (Pages 190 - 193)

Page 194

1 but no.  Again, it's a checkup call, it's the
2 minority.
3    Q.   Did admissions counselors have discretion
4 on when to just do one of those checkup calls?
5    A.   Again, it was extremely infrequent.  It's
6 nothing outlined in any of the process.
7    Q.   Was it encouraged for them to make these
8 checkup calls to those lost opportunities that they
9 did not intend or hope to enroll?
10    A.   I can't speak to that.  I don't know.
11    Q.   Were they trained to do that?
12    A.   No.
13    Q.   So it's sort of -- it wasn't a policy to
14 do that is what you are saying; correct?
15    A.   Was calling an old -- a closed opportunity
16 because something mitigating happened in their life
17 and a rapport was established and you are calling
18 them to see how they are doing, not necessarily with
19 the intent of moving them through Exhibit 16 again,
20 is that a trained process?  No.
21    Q.   And that process you just described where
22 a call is made to a closed opportunity without an
23 intent of moving them through Exhibit 16 happened
24 very infrequently, as you said?
25    A.   Yes.  These are leads more than likely.

Page 195

1    Q.   I'm off of this document, I'm sorry.
2    A.   Okay, I'm still looking at this; I'm
3 trying to put the pieces together.
4    Q.   I'm just back to those particular calls to
5 opportunities now, because we've established that
6 calls to rejected leads were part of getting them on
7 to this Exhibit 16 process.
8       I'm asking now about lost and closed
9 opportunities.  Almost always the calls were -- one
10 of the goals of the calls were to get them back onto
11 the process in Exhibit 16; is that fair to say?
12    A.   Yes.
13    Q.   Very infrequently is the process you just
14 described where there was a call without that
15 intent; correct?
16       MR. BOWSER:  Objection, asked and
17 answered.
18    A.   Yes.
19    Q.   And that those infrequent calls, that was
20 not a trained policy?  I'm just trying to establish
21 whether they were trained to do that or if it was
22 something sort of an admissions counselor did on
23 their own.
24    A.   To my knowledge, it wasn't part of the
25 training process whatsoever.

Page 196

1    Q.   Did you ever make such calls?
2    A.   Yes.
3    Q.   And in what circumstances?  Was it just
4 that you had developed a strong rapport with the
5 person; is that when you would sort of --
6    A.   When I was an admissions counselor back in
7 2014, maybe before then even, maybe 2012 -- I wasn't
8 an admissions counselor for long -- I was working
9 with a student who was young, 17.  Classes began.
10 He lived with his grandmother.  And I was in
11 constant communication with him up until the day
12 that classes began, and I was unable to make contact
13 with him for that week of when classes were
14 beginning, and I was calling, calling, calling,
15 calling, unable to make contact.  I finally got
16 ahold of his grandmother, and he had died in a car
17 accident the night before.
18    Q.   That's a shame.
19    A.   It is.  So I had kept in contact with her
20 for a little bit and checked up on her -- this was a
21 very long time ago -- just to see how she was doing.
22    Q.   Sounds very nice of you, and I'm sure she
23 appreciated that.
24    A.   That wasn't a taught practice in any of
25 the training sessions, but those sort of things -- I

Page 197

1 don't know about to that level, I hope not, that
2 other people have those kinds of experiences, but
3 when you are dealing with a lot of people, stories
4 like this come up.  And so I know that people have
5 done things like that in the past, checked up on
6 people to see how they are without the intention
7 of -- my intention was not to get his grandmother
8 started for classes.
9    Q.   Gotcha.  And I hate to use this story to
10 segue because it's obviously an impactful story.  In
11 that scenario though, the grandmother was not a
12 lead; correct?
13    A.   Correct, but anybody could be interested
14 in going to school if we tell them about the
15 university and provide information.
16    Q.   So I'm sorry to ask a question about this
17 story.
18    A.   No, I provided the story, so if you have
19 to --
20    Q.   And I will try to be sensitive to the
21 story because it's an emotional story.  When you
22 were calling the grandmother to just check up on
23 her, she was not a lead at that time?
24    A.   No.
25    Q.   She could potentially become a lead or --

50 (Pages 194 - 197)

Page 198

1    A.   She could have become.
2    Q.   But she wasn't when you were calling her;
3 correct?
4    A.   Yeah.
5    Q.   And the grandson that you were
6 communicating with, while you were communicating
7 with him, do you recall if he was a lost or closed
8 opportunity or an open opportunity?
9    A.   He was a registered student when I was
10 communicating with him.
11   Q.   I understand, okay.  That makes sense and
12 I apologize for misunderstanding that.  So you said
13 that anyone could become a lead, so recognizing that
14 your primary concern was with her well-being and
15 mental state, did you nonetheless provide
16 information to her about Post?
17   A.   I didn't provide any information to her
18 about Post.
19   Q.   But in that scenario and in that story,
20 the opportunity that you were communicating with --
21   A.   Everybody is unique.
22   Q.   I understand.
23   A.   Every situation is unique.
24   Q.   I just want to make sure because that
25 scenario doesn't exactly match up with the question

Page 199

1 I'm asking, and that's why I want to parse through
2 it because my question is related to calling lost
3 opportunities, and the story you gave was about
4 calling an enrolled student and then getting someone
5 who had never requested information.
6    A.   I know and I appreciate that they are not
7 perfectly aligned.  My story that I provided for you
8 does not completely align with your original ask,
9 and I understand what your original ask was, but
10 that was -- it's been a long time since I've been in
11 that position, so I can't really give you any other
12 real examples of me doing that besides making a
13 story up.  That one resonated with me, so I can
14 reflect on it as if it was last month rather than
15 eight years ago.
16   Q.   I understand.
17   A.   So that's why I went in that direction.
18   Q.   I appreciate that.  And it's sort of these
19 relatively unique circumstances, I guess I'll call
20 them, that in your opinion would lead to
21 non-enrollment related calls to lost opportunities;
22 is that fair?
23   A.   Forgive me.
24   Q.   These are relatively sort of extreme and
25 unique circumstances that would necessitate those

Page 200

1 calls?
2    A.   Right.  They are the outliers for sure.
3    Q.   And I know you can't give me an exact
4 number, and I wouldn't expect you to give me an
5 exact number; you thought 10 percent -- you said
6 might be high.  I mean, how many calls does Post's
7 admissions counselors make in a given day?
8    A.   I am not certain.  I don't have those
9 figures.  I mean, making an outreach to a once open
10 opportunity that was now closed because something
11 mitigating happened in their life and you are
12 checking up on them, it's not an everyday
13 occurrence.  It's not an every admissions counselor
14 occurrence.  It's just something that some people do
15 based on the unique circumstance of the prospect.
16   Q.   Okay.  I think we've established sort of
17 what I was trying to in terms of, there is always
18 going to be outliers in any call?
19   A.   Of course.
20   Q.   Theoretically, a rejected lead you can
21 have an outlier where someone placed --
22   A.   The original question, the reason why I
23 answered it as such is you said, is the only reason
24 to make a contact an opportunity, which is why we
25 arrived here, is with the intention of reengaging

Page 201

1 them and bringing them back into this process, and I
2 wanted to provide you that that is not the sole
3 reason for an outreach to a closed opportunity.
4    Q.   Is that the sole trained reason?
5    A.   Yes.
6    Q.   Were all rejected leads intended to be
7 called again?
8    A.   No.
9    Q.   And similarly, were all lost or closed
10 opportunities intended to be called again?
11   A.   No.
12   Q.   Between July 30th, 2014 and July 30th,
13 2018, were admissions counselors permitted to use
14 third-party services in connection with their
15 communication with the leads and opportunities?
16   A.   Can you provide the dates for me once more
17 please.
18   Q.   July 30, 2014 and July 30, 2018.
19   A.   Yes.
20   Q.   Did this include Google Voice?
21   A.   Yes.
22   Q.   What about TextNow?
23   A.   Yes.
24   Q.   Are there any others that you can think of
25 in that vein?

51 (Pages 198 - 201)

Page 202

1    A.   TrueDialog.
2    Q.   Any others?
3    A.   Not to my recollection, no.
4    Q.   When an admissions counselor -- and I'm
5  saying admissions counselor and I'm using that
6  interchangeably with admissions department -- made a
7  telephone call to a prospective student, were they
8  trained to log that call in the CRM system?
9    A.   Absolutely.
10   Q.   And when they send a text to a prospective
11 student, same thing?
12   A.   Yes.
13   Q.   Any outreach to a prospective student was
14 supposed to be logged; is that correct?
15   A.   Any outreach and/or documentation of
16 correspondence is to be housed in the CRM system.
17   Q.   Is there any way to monitor -- does Post
18 have any way to monitor compliance with that
19 requirement?
20   A.   Can you expand on that, please.
21   Q.   Did Post have any way to determine whether
22 admissions counselors or other admissions department
23 members making phone calls and outreach were
24 actually logging that outreach into the CRM system?
25   A.   Not at scale.

Page 203

1    Q.   And I'm assuming that means that you could
2  spot-check, but you didn't have like a systematic
3  way to do it; correct?
4    A.   It would be a very laborious process in
5  order to run that audit.
6    Q.   And with respect to Google Voice, did Post
7  have access to Google Voice accounts of admissions
8  counselors who used Google Voice to outreach to
9  prospective students?
10   A.   No.
11   Q.   Did Post have access to the TextNow
12 accounts of students?
13   A.   No.
14   Q.   What about TrueDialog -- not of students,
15 I apologize, of admissions counselors.
16   A.   I understood what you meant.  No to the
17 first two still, TextNow and Google Voice.  Yes to
18 TrueDialog.
19        MR. GLAPION:  I think we can take a
20 lunch break for now.  I think we can go off the
21 record.
22        (Whereupon, the witness was excused
23 and a luncheon recess was taken at 1:29 p.m.)
24
25

Page 204

1        AFTERNOON SESSION
2            2:04 P.M.
3
4  S E A N   C O O L E Y,
5    having been previously duly sworn, resumed the
6    stand, testifying further on his oath as
7    follows:
8
9  DIRECT EXAMINATION BY MR. GLAPION (continued):
10   Q.   I want to circle back to the calls to
11 rejected leads.  We established that the calls to
12 rejected leads were primarily, if not exclusively,
13 to -- the goal was to get them back onto the process
14 outlined in Exhibit 16; correct?
15   A.   Yes.
16   Q.   So essentially the first question, if a
17 rejected lead was reached would be some variation
18 of, are you still interested; is that a fair
19 characterization?
20   A.   Yes.
21   Q.   And if the rejected lead expressed
22 interest, would the next stage in that process be to
23 encourage them to -- excuse me.  What would the next
24 stage in that process be?
25   A.   To provide them the information that they

Page 205

1  had originally requested when they had filled out
2  the RFI.
3    Q.   And once that information was provided,
4  would the admissions counselor attempt to do the
5  admissions interview or, excuse me, the PCAS?
6    A.   Well, the information that they provided
7  or that they -- the information that they had
8  requested should be delivered within that of the
9  interview or PCAS, as we refer to it as.
10   Q.   So interview and PCAS, interview is more
11 of a lay term, PCAS is --
12   A.   Correct.
13   Q.   So with respect to calling a rejected
14 lead, you call, they say they are interested, and
15 then the admissions counselor would attempt to
16 conduct the interview at that point?
17   A.   After they've expressed interest, then
18 yes, they would begin the interview or PCAS, should
19 that be a time that worked for the prospect, if they
20 were able to get onto the phone.
21   Q.   And if it didn't work for them, the
22 admissions counselor presumably would try to
23 schedule a time that worked better; correct?
24   A.   At a later date, correct.
25   Q.   And the admissions counselor, would you

52 (Pages 202 - 205)

Page 206

1 characterize that her goal or his goal was to
2 encourage them to complete the PCAS?
3    A.   If someone --
4    Q.   If they are interested?
5    A.   If someone is interested.
6    Q.   Would the admissions counselor encourage
7 them to complete the PCAS?
8    A.   If they had expressed that now is not a
9 good time or --
10    Q.   In general.
11    A.   In general, yes.
12    Q.   So the next step after getting interest
13 would be to encourage them, let's do a PCAS?
14    A.   The next step after confirming interest
15 would be to conduct a PCAS or interview.
16    Q.   As this process plays out through
17 Exhibit 16, admissions counselors, would you
18 characterize part of their responsibility to
19 encourage the prospective student to complete the
20 steps necessary at each stage?
21    A.   Can you repeat the question, I'm sorry.
22    Q.   Sure. As the process in Exhibit 16 plays
23 out -- there are multiple stages in Exhibit 16;
24 correct?
25    A.   Yes.

Page 207

1    Q.   And there are multiple stages in general
2 in the admissions process at Post; correct?
3    A.   Correct.
4    Q.   So once a rejected lead now moves into the
5 process on Exhibit 16, would you characterize one of
6 the roles of an admission counselor to encourage
7 them to complete the steps necessary to move through
8 those steps?
9    A.   I would use the word "nurture" them versus
10 encourage, but yes, that is the objective.
11    Q.   Is nurture to you broader or narrower than
12 encourage?
13    A.   Again, the admissions counselors' scope of
14 their job is outside of just the documentation.
15 It's to provide the information to the student,
16 conduct a PCAS, and then help them, nurture them
17 through the additional steps that are needed in
18 order to complete their enrollment file.
19    Q.   And nurture also could or does nurture
20 also include encouragement, hey, complete this step
21 or you are close, do this step, that kind of thing?
22    A.   Sure, yes.
23    Q.   So there is an encouragement element to
24 nurturing would you say?
25    A.   Absolutely.

Page 208

1    Q.   And not only is there encouragement, there
2 is actual help with the actual documentation and
3 helping to fill it out; correct?
4    A.   That depends.
5    Q.   If they have questions about how to do
6 something, the admissions counselor is there to
7 help?
8    A.   That depends.
9    Q.   So admissions counselors are there really
10 to confirm interest to start; correct?
11    A.   (Nodding in the affirmative.)
12    Q.   Yes?
13    A.   Sorry, yes.
14    Q.   The court reporter cannot get head nods.
15        And then sort of, as you said, nurture
16 them through the process once the interest is
17 confirmed; correct?
18    A.   Yes.
19    Q.   And part of that may include assisting
20 with questions; correct?
21    A.   Yes.
22    Q.   And part of that includes encouragement to
23 complete the various steps required at each stage;
24 correct?
25    A.   Correct.

Page 209

1    Q.   And it's the same thing with respect to
2 lost opportunities; correct?  There's a lot of
3 questions I asked so let me try again.
4        A lost opportunity is reached; an
5 admissions counselor is gauging if they are
6 interested or capable of now continuing the process
7 that they previously started; correct?
8    A.   Most of the times, yes.
9    Q.   That's the 90 plus percent versus the
10 small subset we discussed; correct?
11    A.   Yes.
12    Q.   And those admissions counselors then, they
13 take sort of the same role as we just discussed;
14 they nurture those prospective students through the
15 process in 16?
16    A.   Yes.
17    Q.   Between July 30th, 2014 and July 30th,
18 2018, did Post have a written Do Not Call policy?
19    A.   No.
20    Q.   Between July 30th 2014 and July 30, 2018
21 if someone requested Post's written Do Not Call
22 policy, what would be provided?
23    A.   I don't know.  I'm not certain.
24    Q.   Did anyone ever request -- to the best of
25 your knowledge, did anyone ever request the Do Not

53 (Pages 206 - 209)

Page 210

1 Call policy from Post University?
2    A.   Outside of this, not to my knowledge.
3    Q.   When you say "outside of this," are you
4 saying outside of my client's request?
5    A.   Correct.
6    Q.   And when my client requested a written Do
7 Not Call policy, what was provided?
8    A.   I can't recall exactly what was provided.
9    Q.   Did my client's request get discussed
10 internally at Post?
11    A.   Yes.
12    Q.   Excluding any communications with your
13 lawyers, I'm talking strictly after my client made
14 the request, did Post University employees and
15 officers discuss how to respond to the request?
16    A.   Just the lawyer or the lawyer and --
17    Q.   No, I'm excluding -- Adam, I'm sorry to
18 exclude you -- but no, I don't want to know any
19 communication with the lawyers.
20        Before the lawsuit, my client requested
21 the policy.  When my client requested the policy,
22 was it discussed on how to respond?
23    A.   There were a couple of communications as
24 to, is there something that can be provided.  Adam
25 was on the call.

Page 211

1    Q.   I don't want to know about any
2 communications with Adam.  I'll orient us, just so
3 you sort of have an idea of the time frame, and I
4 don't want to implicate privilege issues.
5        MR. GLAPION:  Can you mark this as
6 Exhibit 23, please.
7        (Exhibit 23, Emails, Bates Numbers
8        PU00011779 through 11780, marked for
9        identification.)
10 BY MR. GLAPION:
11    Q.   Is this an email you sent on July 18,
12 2018?
13    A.   Yes.
14    Q.   And it looks like you are responding to an
15 email where Elaine Neely asks, Do we have a written
16 policy?
17        Do you see that?
18    A.   Yes.
19    Q.   And Elaine Neely is, you said, the chief
20 compliance officer?
21    A.   Yes.
22    Q.   And you responded that you are deferring
23 that question to Rich; correct?
24    A.   Yes.
25    Q.   Do you recall Rich's response, not

Page 212

1 verbatim, but the approximation?
2    A.   I don't recall.  I think he was -- this is
3 speculation.  I believe he inquired from our
4 marketing agency if there was something in place,
5 but I can't say with any certainty.
6    Q.   Ultimately, however, the conclusion was
7 that there was no written policy to send; correct?
8    A.   To my knowledge, yes.
9    Q.   And right now, you testified a moment ago
10 that there is no written -- there was no written
11 policy during that time period?
12    A.   Right.
13    Q.   Did Post, during that same time period,
14 July 30th, 2014 through July 30th, 2018, did Post
15 train its employees on any written Do Not Call
16 policy?
17    A.   Train its employees on any written?
18    Q.   Correct.
19    A.   Well, there was no written, so no.
20    Q.   And the question I think you wanted to
21 answer is, did Post train its employees on how to
22 handle Do Not Call requests?
23    A.   Yes.
24    Q.   And I am going to show you Exhibit 24.
25        MR. GLAPION:  If you can mark that as

Page 213

1 Exhibit 24.
2        (Exhibit 24, Post University New
3        Hire Training Manual, Bates Numbers
4        PU00017405 through 17432, marked for
5        identification.)
6 BY MR. GLAPION:
7    Q.   While you look at this, when you said Post
8 employees were trained on how to handle Do Not Call
9 requests, did that occur in the new hire training?
10    A.   Yes.
11    Q.   And do you recognize the document that was
12 marked as Exhibit 24 and just provided to you?
13    A.   Yes.
14    Q.   What do you recognize that to be?
15    A.   The New Hire Training Manual.
16    Q.   Within this document -- and I understand
17 it's a lengthy document, did you review this
18 document before the deposition?
19    A.   I did.
20    Q.   Where in this document does it indicate
21 any training on how to handle Do Not Call requests?
22    A.   I did not see it.
23    Q.   So nothing in this document specifically
24 indicates training on a Do Not Call request; is that
25 accurate?

54 (Pages 210 - 213)

Page 214

1    A.   There is not a -- from my recollection of
2 the document, again, it's lengthy and there was a
3 lot of documents that I did review, there was
4 nothing specifically outlined focusing solely on
5 that piece.
6    Q.   Between July 30th, 2014 and July 30th,
7 2018, did Post maintain a Do Not Call list?
8    A.   Maintain a Do Not Call list?
9    Q.   A list or database or whatever
10 characterization you want to give it of people who
11 had requested not to be called.
12    A.   There were reject reasons that captured
13 that population. I'm not sure if it goes all the
14 way back to 2014, but there were reject reasons that
15 were put in place to capture the population of
16 people that were not interested.
17    Q.   Do you know if those reject reasons began
18 in 2018 -- excuse me, the reject reasons for Do Not
19 Call, did it start in 2018?
20    A.   It began definitely before that, 20 -- it
21 could date back to 2014. I don't know with any
22 certainty.
23    Q.   If someone made a Do Not Call request, how
24 were admissions representatives trained to document
25 that request?

Page 215

1    A.   So the first thing that they would do is
2 they would reject -- if it was a lead or an
3 opportunity, again, it varies depending on the
4 situation. Every situation is unique, but the
5 practice is the same. On the lead level, you go and
6 you reject the lead as Not Interested, Remove From
7 List.
8        The next step is to look up that lead's
9 information via email and phone number, which are
10 common nomenclatures that you can tie back to an
11 individual. So essentially what you are looking for
12 is any like records, because duplicates can happen
13 in the system.
14       The next step would then be to find all
15 like records, reject them accordingly for Not
16 Interested, Remove From List.
17       If you begin on the opportunity level, you
18 do the same thing and find any like leads or
19 opportunities that might fit those -- have the
20 common credentials that would tie those records to
21 the same individual to ensure that, you know, it
22 might not sneak through one record saying don't
23 call, but the same record because they had inquired
24 at another juncture is not coded that way.
25    Q.   So that process that you described seems

Page 216

1 relatively thorough; correct?
2    A.   Yes.
3    Q.   And that's the process that, your
4 testimony is that at the new hire training the
5 admissions representatives were trained on; correct?
6    A.   They should have -- I know that it was
7 reinforced 100 percent on the floor when everybody
8 was in there, and it's supposed to be part of the
9 new hire training as well; I just don't see it
10 outlined in here.
11    Q.   Are you sure it is part of the new hire
12 training?
13    A.   It's supposed to be part of the new hire
14 training.
15    Q.   As you sit here today, are you sure that
16 it is part of the new hire training?
17    A.   I know that it is -- I don't see it
18 outlined in here.
19    Q.   Are you familiar with the new hire
20 training process?
21    A.   Yes.
22    Q.   And as is --
23    A.   I haven't sat through a new hire training.
24    Q.   And I'm not asking what is supposed to be
25 included; I am asking about what is included.

Page 217

1        Is the process you just outlined included
2 in new hire training?
3    A.   Yes.
4    Q.   And on what basis do you have that
5 knowledge?
6    A.   Well, I had originally said that it's
7 supposed to be part of here. I don't see it
8 outlined in here. I haven't sat through the new
9 hire training personally, but I have spoken to
10 people that have gone through this. They said that
11 they understand what the Do Not Call policy is, and
12 I know that part of the process in those first few
13 weeks, when an admissions counselor gets assigned to
14 a team, the ADs and team leads revisit these sort of
15 things with them to follow. It's part of their best
16 practices.
17    Q.   So correct me if I'm characterizing wrong,
18 your testimony is that it's supposed to be part of
19 the new hire training; correct? That's part of your
20 testimony; correct?
21    A.   Yes.
22    Q.   And as far it actually being part of the
23 new hire training, do you have any firsthand
24 knowledge that it's actually part of the new hire
25 training?

55 (Pages 214 - 217)

Page 218

1    A.   I've not sat through a new hire training.
2    Q.   So that your position -- your testimony,
3  excuse me, that it's part of the new hire training
4  comes from talking with other people essentially;
5  correct?
6    A.   Correct.
7    Q.   You testified before that the code for Do
8  Not Call was Remove From List?
9    A.   NI, colon, Remove From List.
10   Q.   And how long has Remove From List been
11  used for Do Not Call tracking?
12   A.   It's always been used for both Do Not Call
13  tracking and for people that have expressed that
14  they are not interested in going to school.  We kind
15  of did that as a safeguard.  Everybody is aware that
16  you do not reach out to anybody that has been coded
17  as such, and it would be a waste of time for us
18  to -- first of all, we want to make sure that we are
19  acknowledging everyone's request to not be
20  interested, avoid situations like this, and we
21  certainly don't need to be exhausting our time
22  reaching out to people that have expressed that they
23  are not interested.  So we kind of pile that all
24  together, everybody knows NI, Remove From List is to
25  be followed as such.

Page 219

1    Q.   With respect to Not Interesteds being a
2  Remove From List, is there a specific type of Not
3  Interested request besides Do Not Call that is
4  marked as --
5    A.   As available as a reject code?
6    Q.   I'm just trying to understand.  Are there
7  multiple reasons to mark someone as Not Interested?
8    A.   Systemically?
9    Q.   Yes.
10   A.   I believe that there is Not Interested --
11  I don't remember what.  I believe that there is
12  another one or two NI's and then a colon, maybe Not
13  Interested, Job Inquiry.  I'd have to -- there is a
14  lot of documents; I'd have to review it again.
15   Q.   And we are talking the time period that we
16  discussed, July 30, 2014 --
17   A.   Yes.
18   Q.   Okay.  The Remove From List designation
19  then was not exclusively used when a student or,
20  excuse me, a prospective student made a Do Not Call
21  request; is that correct?
22   A.   Not exclusively?
23   Q.   Correct.
24   A.   Correct.
25   Q.   And essentially your testimony is that

Page 220

1  it's a list of -- Remove From List is used in those
2  situations where the admissions counselor, whoever
3  spoke to the prospective student, determined that
4  the person should not be called again; correct?
5    A.   One of the reasons, yes.
6    Q.   And there were no other codes that were
7  used when a Do Not Call request was made; correct?
8    A.   No additional reject codes, no.
9    Q.   I guess I worded that poorly.  I'm just
10  trying to establish that the exclusive way to mark
11  someone who made a Do Not Call request would be
12  using the Remove From List designation; correct?
13   A.   Not exclusively.  That's the exclusively
14  way to reject them.
15   Q.   Correct.  I know the Remove From List is
16  not exclusively used for that, but when a student
17  makes a Do Not Call request --
18   A.   That's not the -- I think we were correct,
19  we were on the same page.  In addition to also
20  coding that, people would go within the opportunity
21  record and also explicitly write that in kind of
22  like a free text --
23   Q.   Kind of like a manual entry?
24   A.   Correct.  So kind of like a double
25  safeguard, you know, this is something topical that

Page 221

1  can be pulled at scale.  This is -- if you happen to
2  make it into the record and this was an oversight,
3  you also see in mid-caps don't call this person,
4  they've asked to not be contacted.
5         That practice wasn't followed every time,
6  but that was something that some admissions
7  counselors did as an extra measure.
8    Q.   The manual entry?
9    A.   In addition to the drop-down.
10        MR. GLAPION:  If you can mark that as
11  Exhibit 25 and hand it to the witness, please.
12        (Exhibit 25, Email, Bates Number
13         PU00013017 through 13020, marked for
14         identification.)
15  BY MR. GLAPION:
16   Q.   I apologize that this has been cut off on
17  the right side.  Again, this is how it was produced.
18        I don't need you to review every entry in
19  the chart --
20   A.   I'm just rereading the top part here.
21   Q.   Of course.
22        (Pause.)
23   A.   Okay.  I've reviewed.
24   Q.   Who is Emelinda Lugo?
25   A.   I believe she is an admissions counselor.

56 (Pages 218 - 221)

Page 222

1    Q.    Is she a team lead or anything like that?
2    A.    Not to my knowledge.
3    Q.    What about Amanda Rylander?
4    A.    She is a team lead.
5    Q.    And this appears to be an email from
6  Emelinda Lugo to Amanda Rylander, the top part;
7  correct?
8    A.    Yes.
9    Q.    And it appears to include, almost like a
10  forward, an email that Amanda Rylander had sent to
11  what appears to be a list of admissions counselors;
12  correct?
13          MR. BOWSER:  Objection to form.
14    A.    Yeah.
15    Q.    And the spelling on Rylander is
16  R-y-l-a-n-d-e-r.  And Emelinda is E-m-e-l-i-n-d-a.
17          In the email from Amanda Rylander, she
18  writes, Go through your students from last mod, this
19  is our closed pipe and I know some of these were
20  unresponsive.
21          Do you see that?
22    A.    I do.
23    Q.    And then she writes, Let's see if there is
24  anyone here we can reengage.
25          Do you see that?

Page 223

1    A.    I do.
2    Q.    And if you jump down to her next
3  paragraph, it's one sentence that says, Who wants to
4  volunteer to call Siennas?
5          Do you see that?
6    A.    Yes.
7    Q.    My understanding of this email, which you
8  can correct if I'm wrong, is that this is a list of
9  closed opportunities that Amanda Rylander was asking
10  her admissions counselor to call; correct?
11    A.    Yes.
12    Q.    And if you look at the second page of the
13  list, 13018 --
14    A.    Okay.
15    Q.    -- about halfway down, there are two
16  leads, Gabriel Credit and Shanice Johnson.
17          Do you see that?  One is an Emelinda Lugo
18  lead and the other is a lead for Emily Chatey.
19    A.    Yes.
20    Q.    And the column that you see all the way on
21  the right that's not cut off is the Reason Lost
22  column; correct?
23    A.    Correct.
24    Q.    And there, for those two leads, the reason
25  lost is Remove From List.

Page 224

1          Do you see that?
2    A.    I do.
3    Q.    So if Remove From List was known not to be
4  called, why would they be included in the list of
5  people to call?
6          MR. BOWSER:  Objection, form.
7    Q.    You can answer.
8    A.    I can't say for certain.
9    Q.    It was not protocol though; is that
10  correct?
11    A.    Well, this is a list of closed pipeline
12  opportunities from the prior mod.
13    Q.    Correct.
14    A.    This does not say anywhere on here that
15  this is a vetted list of pipeline students, so what
16  I would say is that this was pulled at scale,
17  delivered in this fashion.  There's additional
18  information not available, but the reason why that
19  Reason Lost column is there is so that the
20  admissions counselor can review that before they
21  determine whether they are going to be making
22  outreach to the student.
23    Q.    Whose job is it to vet a list such as this
24  that's provided to the admissions counselors to
25  call?

Page 225

1    A.    If the column is available, the reason why
2  it was rejected, it should be on the admissions
3  counselor to review that before outreach is made, in
4  addition to the fact that you need to go into each
5  one of these records in order to even make a call.
6  You can't export the phone -- a phone number from an
7  opportunity record, so you would need to go into
8  each one of these.
9    Q.    So it was on the admissions counselor to
10  not call the ones that were marked Remove From List?
11    A.    It's on the admissions counselor to, from
12  my understanding of this document that I am not a
13  part of, but this is the practice, to go in, find
14  your name, find your records of students, look up
15  those students and make an outreach, if that seems
16  to be the direction from Amanda, from what I can
17  gather from this email.  And as you see, the
18  majority are unresponsive.  So at that point you
19  determine whether that particular student -- I think
20  she said it's a bigger list, but you know your
21  students.  I included closed/lost reason for a quick
22  reference.
23          So she outlines that that sentence was
24  left out, but that's definitely outlined in the
25  email.  So she is putting that responsibility on the

57 (Pages 222 - 225)

Page 226

1 admissions counselor, which she outlines, to review
2 that reject reason before making outreach, and you
3 cannot make outreach from this list because, again,
4 you cannot export in a column a phone number because
5 it lives in a subset of an opportunity record.  So
6 each one of these records would -- if they didn't
7 see the reject reason here before they looked it up,
8 which they should, they would see it front and
9 center when they open up the opportunity file before
10 they went into a subset layer where the phone number
11 was located.
12      Q.   But why include Remove From List
13 opportunities at all in this list?
14      A.   She -- I'm assuming she did an export at
15 scale of all closed pipeline students from mod 6,
16 18, 19.  That's what -- that's what she expresses in
17 the email as well.
18      Q.   And you are making a lot of assumptions
19 and I understand that there was a lot to prepare
20 for, but I specifically asked that you be prepared
21 to testify about the document, not guess about this
22 document, not sort of recreate what this document
23 might mean.  I asked that you be prepared to testify
24 about what this document means.
25      Are you telling me -- do you have a

Page 227

1 definitive answer as to why --
2      A.   She exported a list of closed pipeline
3 students for the previous module.
4      Q.   And in that list, at least two Remove From
5 List are included; correct?
6      A.   That's what this would suggest, yes.
7      Q.   And your testimony is that despite that
8 being included in this list, it was on the
9 admissions counselor to know better than to call
10 those people; is that correct?
11      A.   Yes.  That's why that Reason Lost field
12 was available in there, and again, they would need
13 to go into each record.  They would need to see that
14 reject reason, then go into the record before they
15 can even make a call to that student, because that's
16 where the phone number is harbored.
17      MR. GLAPION: I'm going to hand you a
18 few exhibits now which I'll let you know which to
19 mark them as.  Just give me a moment to pull them.
20      Can this be marked as Exhibit 26.
21      (Exhibit 26, Emails, Bates Numbers
22      PU00001470 through 1473, marked for
23      identification.)
24      MR. GLAPION: Can you mark this as
25 Exhibit 27.

Page 228

1      (Exhibit 27, Emails, Bates Numbers
2      PU00001525 through 1527, marked for
3      identification.)
4      MR. GLAPION:  Will you mark this as
5 Exhibit 28.
6      (Exhibit 28, Emails, Bates Numbers
7      PU00001795 through 1797, marked for
8      identification.)
9      MR. GLAPION:  If you can mark this as
10 Exhibit 29.
11      (Exhibit 29, Email, Bates Number
12      PU00005519 and attachment, marked for
13      identification.)
14      MR. GLAPION:  If you can mark this as
15 Exhibit 30, please.
16      (Exhibit 30, Conversation with
17      Theisen, Greg, Bates Numbers
18      PU00006298 through 6300, marked for
19      identification.)
20 BY MR. GLAPION:
21      Q.   You don't need to review all of those
22 right now.  I will review them document by document.
23 I just wanted to save some time.
24      Let's look at Exhibit 26, please.  Do you
25 know who Sanjeev Srinivas is?

Page 229

1      A.   Yes.
2      Q.   S-r-i-n-i-v-a-s.
3      Who is Sanjeev?
4      A.   He is currently the director of IT,
5 integration and analytics.  I can't say with
6 certainty, but he works in the IT department.
7      Q.   What about Megan Deines, D-e-i-n-e-s.
8      A.   Megan I do not know.
9      Q.   And Richard Schechter you testified is the
10 chief marketing officer?
11      A.   Correct.
12      Q.   Was he the chief marketing officer in June
13 of 2016?
14      A.   It would appear so, yes.
15      Q.   And what about Daniel DeBlasio?
16      A.   I am unfamiliar with Daniel DeBlasio.
17      Q.   This appears to be an email chain;
18 correct?
19      A.   Yes.
20      Q.   And if you look back to the page marked as
21 1471 at the bottom --
22      A.   Yes.
23      Q.   -- at the bottom of this, there is an
24 email from Megan who appears to work for Keypath.
25      Do you see that?  Her email address is --

58 (Pages 226 - 229)

Page 230

1     A.   1471?
2     Q.   Yes.
3     A.   Yes, I see it.
4     Q.   And it's to, among others, Richard
5 Schechter.
6          Do you see that?
7     A.   Yes, I do.
8     Q.   And there Megan writes, I think we
9 discussed the opt-out list on a call and that our
10 recommendation would be that this is maintained
11 through the CMS.
12         Do you see that?
13    A.   Yes.
14    Q.   And then on the first page of this
15 document, Megan mentions to Sanjeev, We were
16 thinking this was something that could be managed in
17 the CMS with additional development work.
18         Do you see that?
19    A.   Yes.
20    Q.   And Sanjeev writes back, I assume you mean
21 CRM.
22         Do you see that?
23    A.   Yes.
24    Q.   And he wrote that it could be a
25 possibility; correct?

Page 231

1     A.   Yes.
2     Q.   And the subject of this email is Dan:
3 Don't forget the Do Not Call Resistry -- I think he
4 meant to say registry, but it's a typo.
5     A.   I agree that's probably what it
6 meant.
7     Q.   And then if we look at the document marked
8 as 27, this appears to be another email chain;
9 correct?
10    A.   Yes.
11    Q.   And if you jump to page 1527 of this email
12 chain, you see an email from Richard Schechter to
13 Mike Statmore among others; correct?
14    A.   Yes.
15    Q.   Who is Mike Statmore?
16    A.   Statmore.  He was the former CITO, I
17 believe.
18    Q.   And who is Christopher Medeiros?
19 M-e-d-e-i-r-o-s.
20    A.   Medeiros.  He worked in IT as well.  I
21 don't recall what his title was.
22    Q.   And Richard writes to those two
23 individuals, Mike/Chris, I need to speak with you
24 about opt-out suppression, Do Not Call Registry.
25         Do you see that?

Page 232

1     A.   Yes.
2     Q.   And then Mike on page 1526 replies to the
3 email at the bottom, and let me know when you're
4 there.
5     A.   I'm there.
6     Q.   And it says, Rich, we'd love to talk to
7 you about this.  Sanjeev needs to be a part of this
8 as it will most likely involve data and possible
9 changes to CRM.
10         Do you see that?
11    A.   Yes.
12    Q.   And then if we look at Exhibit 28, this is
13 another email chain.
14         Do you see that?
15    A.   Yes.
16    Q.   And on 1796 of this document, there is an
17 email from an individual named Liz White at
18 Buzzback.
19         Do you see that?
20    A.   Yes, I do.
21    Q.   What is Buzzback or who is Buzzback; do
22 you know?
23    A.   I do not know.
24    Q.   And in this email, Liz writes, We want to
25 kick off recruitment for the telephone interviews

Page 233

1 ASAP and our field manager had a question upon
2 seeing the list you sent through.  Have any of these
3 folks specifically said anywhere through any of the
4 documentation process, communications, etcetera,
5 that they do not want to be contacted?
6          Do you see that?
7     A.   Yes.
8     Q.   And the next paragraph begins, If they
9 have opted out of any communication from the
10 university at any point, we just need to know that
11 so we don't reach out in the screening.
12         Do you see that?
13    A.   Yes.
14    Q.   And she acknowledges in the concluding
15 sentence that's where we could get into trouble with
16 the rules and regulations; correct?
17    A.   Correct.
18    Q.   And then that email, on the first page,
19 appears to be forwarded to Rich Schechter.
20         Do you see that?
21    A.   Yes.
22    Q.   And Lee Rogan asks Rich, Is this
23 information available?
24         Do you see that?
25    A.   I do.

59 (Pages 230 - 233)

Page 234

1    Q.   And Richard Schechter says, We don't have
2 this in place yet, but we will soon.
3        Do you see that?
4    A.   I do.
5    Q.   And partway down, halfway through the
6 paragraph, he writes, Thanks them sincerely,
7 apologize for the bother and inconvenience, and then
8 move on.  That's all we can do right now.
9        Do you see that?
10   A.   Yes.
11   Q.   And then he writes, I have the Do Not Call
12 list, but have no way to scrub those names against
13 it.
14       Do you see that?
15   A.   Yes.
16   Q.   And then if we look at Exhibit 29, this
17 appears to be an email with attachments from Jeremi
18 Bauer.
19       Do you see that?
20   A.   Yes.
21   Q.   Who is Jeremi Bauer?
22   A.   He is the dean of School of Arts.
23   Q.   Have you ever heard the term "parking lot
24 tracking list"?
25   A.   Parking lot tracking list?

Page 235

1    Q.   If you look at the subject of the email,
2 "parking lot tracking list," had you heard that term
3 before?
4    A.   Yes, I have.
5    Q.   What is a parking lot tracking list?
6    A.   Those are outstanding items.
7    Q.   A to-do list; correct?
8    A.   Correct.
9    Q.   Per the internal Post team?
10   A.   Yes.
11   Q.   And attached to this email is a parking
12 lot tracking list with a date 2/12/18.
13       Do you see that?  Just looking at the
14 attachments.
15   A.   At the subject?
16   Q.   Yes and the attachments below it, they are
17 identical.
18   A.   Yes.
19   Q.   And on this attachment, I'll represent
20 just for the record that this was a multi-tabbed
21 Excel sheet.  This is only one of the tabs from the
22 Excel sheet.
23       If you look at Item 23 in the left column,
24 let me know when you are there, the action item is
25 Find out how we handle Do Not Call list.

Page 236

1        Do you see that?
2    A.   Yes.
3    Q.   And there is nothing in the notes
4 comments; correct?
5    A.   Correct.
6    Q.   Notes/Comments; correct?
7    A.   Correct.
8    Q.   And there is nothing in the
9 Update/Resolution; correct?
10   A.   Correct.
11   Q.   And then if we go to -- actually, looking
12 at this, I'm sorry, this was dated February 12,
13 2018, this email; correct?
14   A.   Right.  This is part of the implementation
15 of our new CRM process, new CRM system.
16   Q.   And we'll get there.  And 6298, which is
17 Exhibit 30, this appears to me to be a chat, and you
18 can let me know if you have a different
19 understanding.
20   A.   That's what it appears to me as well.
21   Q.   Who is Greg Theisen?
22   A.   He is our current CITO.
23   Q.   Do you recall when he began as a CITO?
24   A.   18 months ago.
25   Q.   Is January 2017 a good approximation?

Page 237

1    A.   Yeah.
2    Q.   And who is David Aldarondo?
3    A.   He works in IT.
4    Q.   If you skip ahead to the page marked 6300
5 at the bottom, Greg Theisen writes, Lots of changes
6 coming with the new CRM, i.e., Unsubscribe --
7    Q.   I'm sorry, where are you?
8    Q.   I apologize, the first chat from Greg
9 Theisen on 6300.
10   A.   Okay, gotcha.
11   Q.   And he says, Lots of changes coming with
12 the new CRM, i.e., Unsubscribe, Do Not Call,
13 etcetera.
14       Do you see that?
15   A.   Yes.
16   Q.   Your testimony was, as was Ms. Meehan's
17 testimony, that Remove From List was used as
18 essentially a Do Not Call list.
19       If that is accurate, why in none of these
20 documents or chats or emails didn't someone just
21 say, yeah, we use Remove From List for that purpose?
22       MR. BOWSER:  Objection, compound.
23 You have five documents before the witness.
24   Q.   In any of those documents, is the term
25 "Remove From List" mentioned?

60 (Pages 234 - 237)

Page 238

1    A.   None of these people are in the -- on this
2 that are in the admissions department so they were
3 probably speaking to something on a higher level
4 scrubbing against a Do Not Call list that was not in
5 place until Rich became the CMO.
6    Q.   Rich said specifically on multiple
7 occasions, for example, in Exhibit 28, that he does
8 not have the ability to track Do Not Call requests
9 or that Post did not have the ability to track Do
10 Not Call requests.
11    A.   I know there was a time that we weren't
12 scrubbing against the Do Not Call, DNC, Registry and
13 that was something that he made sure we put back
14 into place, I believe 2017.
15    Q.   The request to Rich in Exhibit 28 was
16 about whether anyone had said that they do not want
17 to be contacted, and Rich's response was we don't
18 have this in place yet, but we will soon.
19       If there were a Do Not Call policy in
20 place, such as using Remove From List, would Richard
21 Schechter have known about it?
22    A.   Rich Schechter worked in marketing; that
23 was an admissions process.  And there is nobody in
24 admissions on any of these threads.  I can say that
25 when he implemented the Do Not Call Registry, over

Page 239

1 time we did realize that since all of our
2 Thruline-obtained inquiries filled out a written
3 opt-in on their RFI with our TCPA language, that
4 they didn't necessarily need to be scrubbed against
5 any Do Not Call because every lead that we obtained
6 had gone through that written process.  They were a
7 written EBR.
8    Q.   I want to be clear that right now I'm only
9 talking about the Do Not Call list that your
10 testimony was that Post maintained by using the
11 Remove From List function.
12    A.   That function, correct.
13    Q.   And there are multiple occasions, as Adam
14 just said, you have five documents in front of you,
15 that all seem to discuss, in some aspect, whether
16 and how Do Not Call requests are tracked; correct?
17 Do you agree with that characterization?
18    A.   Yes.
19    Q.   And in not one of those documents does
20 anyone mention that Remove From List is used for Do
21 Not Call tracking; correct?
22    A.   That's correct.
23    Q.   And even in the chat with Greg Theisen,
24 and you said Greg Theisen is your -- he runs IT, is
25 that correct, or chief --

Page 240

1    A.   Greg Theisen is our CITO, yes.
2    Q.   And your CITO knows presumably what the
3 functions available in the CRM system are; correct?
4       MR. BOWSER:  Objection, asked and
5 answered.
6    Q.   You can answer.
7    A.   Greg understands the functionalities of
8 CRM, yes.
9    Q.   And so when Greg writes that lots of
10 changes coming with the new CRM and specifically
11 includes Unsubscribe and Do Not Call, do you
12 interpret that as an indication that he did not
13 think Unsubscribe and Do Not Call were possible in
14 the existing CRM?
15    A.   He is speaking to something more
16 autonomous and handled systemically rather than
17 being relying on somebody manual.
18    Q.   And this new CRM mentioned is the --
19    A.   CampusNexus.
20    Q.   CampusNexus, correct, converting over from
21 Oracle?
22    A.   Correct.
23    Q.   But again, despite several requests and
24 tracking items about how the Do Not Call list was
25 handled, no one mentioned Remove From List in these

Page 241

1 documents; correct?
2    A.   No one in these documents were on the
3 admissions team, so they were unfamiliar with what
4 we were doing manually to manage these resources.
5 The only mention of things on the horizon, as I had
6 just testified to, was Greg speaking to the systemic
7 autonomous way of handling these resources so that
8 we weren't reliant on manual entries and inputs.
9    Q.   Are you aware of any document created
10 between July 30th, 2014 and July 30th, 2018 that
11 describes how to use the Remove From List code?
12    A.   Not to my recollection.
13    Q.   So the only evidence that Remove From
14 List -- that you can provide that Remove From List
15 was used for the Do Not Call list, essentially the
16 internal Do Not Call list, is your word.
17       MR. BOWSER:  Objection.
18    Q.   Correct?
19       MR. BOWSER:  Misstates the record.
20    Q.   Are there any documents that document this
21 process?
22    A.   There is nothing that you have here that
23 would suggest otherwise.
24    Q.   I'm not asking you what I have here.
25       Are you aware of any document in the

61 (Pages 238 - 241)

Page 242

1 entirety of Post University, any file, any folder,
2 anywhere that mentions that Remove From List is
3 meant to be used when someone says Do Not Call?
4    A.   Not to my knowledge.
5    Q.   Have you ever seen one?
6    A.   Not that I can recall.
7    Q.   Have you ever created one?
8    A.   Not that I can recall.
9    Q.   Have you ever emailed about the purpose of
10 Remove From List?
11   A.   I can't say with certainty if I've emailed
12 or not emailed regarding this topic.
13   Q.   Have you ever received an email about
14 Remove From List?
15   A.   Perhaps.
16   Q.   But you can't say for sure; is that
17 correct?
18   A.   I cannot say with 100 percent certainty.
19   Q.   Are you aware of what this lawsuit is
20 about?
21   A.   Yes.
22   Q.   Are you aware that Post -- among other
23 things, the lawsuit alleges that Post did not have a
24 written Do Not Call list in place at the time of the
25 calls to Mrs. Davis; correct?

Page 243

1    A.   Yes.
2    Q.   And did not have a Do Not Call policy in
3 place at the time of the calls to Mrs. Davis;
4 correct?  That's the allegation.
5    A.   I'm aware that that's the allegation, yes.
6    Q.   Correct.  And despite those allegations
7 and despite the nature of this lawsuit, are you
8 aware that not a single document has been produced
9 that indicates that Remove From List is intended to
10 be used for a Do Not Call list?
11   A.   Am I aware that a document --
12   Q.   Not a single document has been produced,
13 are you aware of that?
14   A.   The question is, am I aware that not a
15 single document has been produced?
16   Q.   Correct.
17   A.   I am aware of that, yes.
18   Q.   If Post had such a document, would you
19 agree that such a document describing how Remove
20 From List is used is relevant to these allegations
21 that I just detailed to you?
22   A.   I can see how that document would be
23 relevant, yes.
24   Q.   And if my client requested all documents
25 that reflect Post's Do Not Call policy, do you agree

Page 244

1 that a document explaining how to use Remove From
2 List would be responsive?
3        MR. BOWSER:  Objection, calling for a
4 legal conclusion or whether it falls within a
5 document request.
6    A.   Can you repeat the question?
7    Q.   If my client requested all documents that
8 reflect Post's Do Not Call policy, do you agree that
9 a document that talks about how Remove From List is
10 meant to be used at least in part for a Do Not Call
11 list is relevant to that request for all such
12 documents?
13   A.   It could be.
14   Q.   So if it's not produced, if such a
15 document hasn't been produced, does it exist?
16   A.   A written policy?
17   Q.   Anything written that you are aware of, as
18 testifying on behalf of Post University, as you as
19 Post University, is there any document at Post
20 University that explains that Remove From List is
21 meant to be used for the Do Not Call list?
22   A.   I cannot say with any certainty that there
23 is nothing written about it anywhere ever.
24   Q.   But to the best of your knowledge, as you
25 sit here today, there is no such document?

Page 245

1    A.   Correct.
2    Q.   And is there anything that I could show
3 you that would refresh your recollection on whether
4 such a document exists?
5    A.   I can't say what you might be able to show
6 me.
7    Q.   Is there any document you can think of,
8 any -- excuse me.
9        Is there anyone you can speak to that
10 would refresh your recollection on whether such a
11 document exists?
12   A.   Not that I can think of.
13   Q.   Are you familiar with the term "audit
14 trail" when it comes to an opportunity file in the
15 CRM system?
16   A.   Yes.
17   Q.   What is an audit trail?
18   A.   An audit trail lives within the student's
19 lead and opportunity record both, and within there
20 is the ability to perform free text.  When you
21 document free text, it lives there in addition to
22 any system that triggers.
23   Q.   If someone were to make a change to the
24 status of a lead or an opportunity, would that show
25 in the audit field?

62 (Pages 242 - 245)

Page 246

1   A.   Yes.
2   Q.   Excuse me, the audit trail?
3   A.   Yes.
4        MR. GLAPION:  I'm going to hand you
5   what will be marked as Exhibit 31.
6        (Exhibit 31, Opportunity Detail,
7        Bates Numbers PU00005403 through
8        5405, marked for identification.)
9   BY MR. GLAPION:
10  Q.   Do you recognize this document?
11  A.   Yes.
12  Q.   What do you recognize this document to be?
13  A.   Ms. Davis's opportunity record in CRM.
14  Q.   And if you look --
15  A.   Oracle CRM.
16  Q.   This is the old CRM; correct?
17  A.   Correct.
18  Q.   The one that was during the time period?
19  A.   Correct.
20  Q.   If you look at the last page of this
21  document marked 5405, at the bottom you will see
22  something that says Audit Trail; correct?
23  A.   Yes.
24  Q.   Above that, you will see something that
25  says -- excuse me, below that, you will see

Page 247

1   something that says Show Full List under the source
2   IP addresses.
3   A.   Yes.
4   Q.   I'm going to hand you that expanded audit
5   trail, and we will be referring back to that once I
6   could find it.
7        MR. GLAPION:  This will be marked as
8   Exhibit 32, please.
9        THE WITNESS:  You said we will be
10  referring back to this?
11       MR. GLAPION:  Yes.  We are going to
12  hop back and forth between this, the one I'm going
13  to give you, and a sequence of documents.
14       (Exhibit 32, Document, Bates
15       Numbers PU00017440, marked for
16       identification.)
17  BY MR. GLAPION:
18  Q.   I recognize that this is a very tiny
19  document.  This is, again, how it was produced.
20       Are you confident in your ability to make
21  out what the categories, the fields are?
22       MR. BOWSER:  I definitely can't make
23  it out.
24       MR. GLAPION:  I'm sorry, I did not
25  give you one.  (Handing.)

Page 248

1        Can we go off the record for a
2   second.
3        (Recess taken from 3:05 p.m. to 3:09 p.m.)
4   BY MR. GLAPION:
5   Q.   If we could just let the record show that
6   while I've given the witness a physical copy of the
7   exhibit, given how it printed, we are using a
8   computer monitor to read the document.
9        And before we get to this document, which
10  I know we are all very excited to get to, who is
11  Victoria Meehan?
12  A.   She is the director of main campus
13  admissions.
14  Q.   Director or assistant director?
15  A.   She is director of main campus admissions.
16  Q.   And is she a good employee?
17  A.   Yes.
18  Q.   Does she understand her job
19  responsibilities?
20  A.   Yes.
21  Q.   Does she execute them to Post's
22  expectations?
23  A.   Yes.
24       MR. GLAPION:  If you could mark this
25  as Exhibit 33, please.

Page 249

1        (Exhibit 33, Emails, Bates Numbers
2        MD000396 through 398, marked for
3        identification.)
4   BY MR. GLAPION:
5   Q.   This appears to be an email chain between
6   Victoria Meehan and someone at the email address
7   mdspecialist21@gmail.com; correct?
8   A.   Yes.
9   Q.   And the email is initially from Ms. Meehan
10  to mdspecialist; correct?
11  A.   Yes.
12  Q.   And I'll represent to you that
13  mdspecialist21@gmail.com is Melanie Davis's email
14  address just so we don't have to call her
15  mdspecialist for the rest of this segment.
16  A.   Fair enough.
17  Q.   If you look at the page marked MD397, it
18  appears to be a response email from Melanie Davis to
19  Victoria Meehan.
20       Do you see that?
21  A.   I do.
22  Q.   In that email, Melanie Davis writes,
23  Please stop emailing, texting, SMS, calls and
24  voicemail.
25       Do you see that?

Page 250

1  A.  I do.
2  Q.  Does Post consider that to be a Do Not
3  Call request?
4  A.  Yes.
5  Q.  Would you consider this to be a Do Not
6  Call request?
7  A.  Yes.
8  Q.  According to your previous testimony, how
9  should this email have been treated?  Excuse me.
10  According to your previous testimony, how should the
11  request made in this email have been treated?
12  A.  Records should have been rejected as Not
13  Interested, Remove From List and all of the other
14  detail that follows.
15  Q.  And if we go to -- and actually if you
16  look at the dates of this email, it appears to be on
17  October 11, 2017; correct?
18  A.  Pardon me?
19  Q.  This email exchange happened on
20  October 11, 2017; correct?
21  A.  Yes.
22  Q.  And if we look at 17440, which is the
23  expanded audit trail, does this appear as you would
24  expect an expanded audit trail to look?
25  A.  Yes.

Page 251

1  Q.  And it has columns with headers such as
2  User Sign In, ID, The Operation, Field Modified, Old
3  Value, New Value, and Date.
4  Do you see that?
5  A.  I do.
6  Q.  It also has columns for Last Name and
7  First Name of what seems to be Post employees;
8  correct?
9  A.  Yes.
10  Q.  And generally speaking, is that how an
11  audit trail works, it logs which employee takes
12  which action with respect to a file?
13  A.  Yes.
14  Q.  And I will scroll to the right to show the
15  columns Field Modified, Old Value and New Value.
16  Excuse me, I'll scroll to Old Value and New Value,
17  because Old Value and New Value, those would reflect
18  what it was and what it was changed to; correct?
19  A.  Correct.
20  Q.  So if Ms. Davis was marked as Remove From
21  List, it would reflect in an old value becoming --
22  one of the old values becoming Remove From List; is
23  that accurate?
24  A.  Yes.
25  Q.  And if we look at the rightmost column,

Page 252

1  Date, we established that this email exchange was
2  dated October 11, 2017.
3  Do you see any old values or new values or
4  any indication that Ms. Davis was marked as Remove
5  From List on October 11, 2017?  And I can scroll
6  left or right as needed.
7  A.  No.  I see that Ms. Davis's FAFSA arrived.
8  That's the --
9  Q.  Which time stamp is that, if you don't
10  mind?
11  A.  12:35, FAFSA is here, mail merge 1011 V.
12  So that would suggest that Ms. Davis filled out her
13  free application for federal student aid, put our
14  school code on it, and we received it, which is why
15  V reached out to her via email.  That's what I would
16  deduce from that.
17  Q.  Correct.  This email that we discussed
18  that is marked Exhibit 33, the subject is Your FAFSA
19  is here.
20  Do you see that?
21  A.  Yes.
22  Q.  So this email, the field you just
23  mentioned that said FAFSA is here, mail merge
24  corresponds with this email; is that --
25  A.  Yes.

Page 253

1  Q.  So it would have been after this email was
2  sent on October 11 that Ms. Davis, per your
3  testimony, should have been marked as Remove From
4  List; correct?
5  A.  Well, there is a notation of the fact that
6  the FAFSA is here, so she sent an email to let her
7  know -- Ms. Davis that her FAFSA was here, and
8  it takes one to two days to fill out a FAFSA, and
9  you need to put a specific school code, specific to
10  each institution.  So within two days, Ms. Davis had
11  filled out her FAFSA and put our school code on it.
12  Q.  My question though is nothing about what
13  Ms. Davis did or didn't do with the school code.  My
14  question is, based on your testimony that Ms. Davis
15  should have been marked as Remove From List, among
16  other things, and I'm asking if in this audit trail
17  do you see on October 11th Ms. Davis being marked as
18  Remove From List?
19  A.  I do not.
20  Q.  And I'm going to hand you another exhibit,
21  if I can find it.
22  MR. GLAPION:  If we can mark this as
23  Exhibit 34, please.
24  (Exhibit 34, Emails, Bates Numbers
25  MD000308 through 311, marked for

64 (Pages 250 - 253)

Page 254

1        identification.)
2  BY MR. GLAPION:
3     Q.   Before I ask about this document, if
4  Ms. Davis had been marked as Remove From List, it
5  would reflect on this audit trail; correct?
6     A.   Yes.
7     Q.   Is there any way to manually delete
8  entries from the audit trail?
9     A.   No.
10    Q.   Why would Ms. Davis not have been marked
11 as Remove From List after emailing Victoria Meehan?
12    A.   Victoria more than likely missed this
13 email response.
14    Q.   And then if we look at the exhibit that
15 you were just handed, Exhibit 34, this appears to be
16 another email, but this time between Kimberly
17 Williams and Melanie Davis; correct?
18    A.   Correct.
19    Q.   And the front page email is dated
20 November 8, 2017; correct?
21    A.   Pardon me?
22    Q.   The email is dated November 8, 2017;
23 correct?
24    A.   Correct.
25    Q.   And if you turn to the page marked MD310,

Page 255

1  at the bottom, you see a response from Melanie Davis
2  to Kimberly Williams.
3        Do you see that?
4     A.   I do.
5     Q.   And in that email, Ms. Davis writes, I've
6  asked you and your colleagues to stop calling me and
7  emailing -- excuse me, to stop calling and emailing
8  me.  I was once interested and have had to change my
9  mind.  I am no longer interested in applying to
10 attend Post University.  Please let this be my last
11 communication regarding your school.
12       Does Post consider this to be a Do Not
13 Call request?
14    A.   I would say that this falls into that
15 category, yes.
16    Q.   And therefore, according to your previous
17 testimony, Ms. Davis should have been marked as
18 Remove From List in response to this request;
19 correct?
20    A.   Yes.
21    Q.   And if we go back to the audit trail, do
22 you see anything on or about November 8th, 2017 that
23 indicates that Ms. Davis was marked as Remove From
24 List?
25    A.   No.

Page 256

1     Q.   And why would that be?
2     A.   I believe this response was missed by
3  Kimberly Williams.
4        MR. GLAPION:  This could be marked as
5  Exhibit 35, please.
6           (Exhibit 35, Emails, Bates Numbers
7           MD000247 through 248, marked for
8           identification.)
9  BY MR. GLAPION:
10    Q.   From the fact that you're looking at the
11 exhibit, I think you know where the line of
12 questioning is going, but we will work through it.
13       This appears to be an email from Victoria
14 Meehan to Melanie Davis; correct?
15    A.   Yes.
16    Q.   Dated January 4, 2018, at 9:24 a.m.?
17    A.   Correct.
18    Q.   On the second page of the exhibit, there
19 appears to be a response from Melanie Davis to
20 Victoria Meehan.
21       Do you see that?
22    A.   Yes.
23    Q.   And in this response Ms. Davis writes,
24 Please stop contacting me, not interested.
25       Do you see that?

Page 257

1     A.   Yes.
2     Q.   Does Post consider this to be a Do Not
3  Call request?
4     A.   It depends.
5     Q.   Do you consider this to be a Do Not Call
6  request?
7     A.   It's not very explicit.
8     Q.   Is it your testimony that it depends on
9  whether Post treats the phrase "Please stop
10 contacting me" as a Do Not Call list -- excuse me.
11       Is it your testimony that Post considers
12 "Please stop contacting me" to be ambiguous?
13    A.   This would warrant our Do Not Call policy
14 as well.
15    Q.   So Post would consider this to be a Do Not
16 Call request?
17    A.   Yes.
18    Q.   And again, per your testimony, this should
19 have been marked as Remove From List; correct?
20    A.   Yes.
21    Q.   And do you see anything on the audit trail
22 on our about January 4th, 2018 marking Ms. Davis as
23 Remove From List?
24    A.   Can you scroll to the left?
25       No.

65 (Pages 254 - 257)

Page 258

1    Q.   I apologize if you were still looking.
2  Does that scroll look right there?
3    A.   Yes.
4    Q.   And do you see anything marking her as
5  Remove From List?
6    A.   No.
7    Q.   And you see that Ms. Davis's response,
8  Please stop contacting me, not interested, was sent
9  according to this at 10:53 a.m.?
10   A.   Yes.
11   Q.   Four minutes later, it appears that
12 there's two entries made on January 4, 2018 at
13 10:57.
14        Do you see that?  There's four entries
15 made, but there are two that appear to involve
16 reject reasons.
17   A.   Yes.
18   Q.   And I'm going to scroll to the left, and
19 it appears that those entries were made by Victoria
20 Meehan.
21        Do you see that?
22   A.   Yes.
23   Q.   And those entries were for the fields
24 Reason Lost and Reason Lost Detail.
25        Do you see that?

Page 259

1    A.   Yes.
2    Q.   And the Reason Lost provided the new value
3  was technical.
4        Do you see that?
5    A.   Yes.
6    Q.   And then Reason Lost Detail was duplicate
7  opportunity.
8        Do you see that?
9    A.   Yes.
10   Q.   So why would Ms. Meehan not have marked
11 this as a Remove From List?
12   A.   I can't say.
13   Q.   It appears though that from the time stamp
14 of this action that she likely saw this email.
15        Do you agree with that?
16   A.   I can't say.
17   Q.   This email was sent at 10:53 and then
18 Ms. Meehan took action on the reject reason at
19 10:57.
20        Do you believe that could be a
21 coincidence?
22   A.   I can't say with certainty.
23   Q.   What was the reject reason -- excuse me.
24        What was the Reason Lost technical tag
25 intended to be used for?

Page 260

1    A.   If there was a duplicate, the most common
2  usage is for duplicate opportunities being created
3  in the system.
4        MR. GLAPION:  If we could mark this
5  as Exhibit 36.
6        (Exhibit 36, Document headed
7        Activities List, Bates Number
8        PU00000003, marked for
9        identification.)
10 BY MR. GLAPION:
11   Q.   Do you recognize this document?
12   A.   Yes.
13   Q.   What do you recognize this document to be?
14   A.   This is the activities list.
15   Q.   How does an activities list differ from an
16 audit trail, if it does differ?
17   A.   This is where one can go to another place
18 to go to document certain things.  Free text and
19 audit trail should capture everything, even system
20 triggers.
21   Q.   So an activities list can be manually
22 edited; is that fair?
23   A.   Yes.  The Do Not Call, Not Interested,
24 some of them are our system texts that are in here.
25 Some of them are free text fields.

Page 261

1    Q.   Is the Do Not Call, Not Interested, is
2  that a --
3    A.   That's a free text.
4    Q.   That's a free text.  And that entry was
5  made on January 11th, 2018?
6    A.   Correct.
7    Q.   I do have a question about the completed
8  date, first created date.  For example, if you look
9  at the third row, it says, The completed date is
10 August 16, 2017, but the created date is August 15,
11 2017.
12        Can you explain to me why there is a
13 discrepancy between those dates?
14   A.   So the created date and completed date,
15 there is a day discrepancy between the two of the
16 third line down?
17   Q.   Correct, and it's throughout but --
18   A.   It's because they are system driven so
19 another action needs to be taken.  The Do Not Call,
20 Not Interested are the voicemail, that should have
21 been entered and completed within the same motion,
22 which is why there is no time lapse.
23   Q.   So when the system creates one of these
24 and then the responsible party goes in and completes
25 whatever the system is telling you to do, that would

66 (Pages 258 - 261)

Page 262

1 be the completed date?
2   A.   That would be the difference between the
3 created and the completed date.
4   Q.   The created date is when the system puts
5 it in this --
6   A.   The created date is for both system
7 activities and manual activities.
8   Q.   But when there is a discrepancy between
9 created and completed --
10   A.   When there is a discrepancy, that would
11 suggest that it is -- like you can create an
12 activity and not complete it while you are creating
13 it, but that's not usually the practice.  That's not
14 how Oracle CRM was used.
15   Q.   So you will see the top entry that says Do
16 Not Call, Not Interested, and that appears to be
17 created on January 11, 2018; correct?
18   A.   Correct.
19   Q.   And that was created by Rita Francisco?
20   A.   Correct.
21   Q.   Who is Rita Francisco?
22   A.   She is a former admissions counselor.
23   Q.   When did she leave?
24   A.   I'm not quite certain.  It predated --
25   Q.   We can move on.

Page 263

1   A.   I don't really know.
2   Q.   It's a minor detail.  At this point then,
3 it seems that something caused Rita to realize that
4 Ms. Davis did not want to be called.
5   A.   That's what this would suggest, yes.
6   Q.   And if we look back to this audit trail,
7 are there any entries on or about January 11th, 2018
8 that indicate she was marked as Remove From List, if
9 you look at the audit trail that's on the screen?
10   A.   No.
11   Q.   So in this scenario, even though someone
12 clearly got the message that Ms. Davis didn't want
13 to be called, she was still not marked as Remove
14 From List; correct?
15   A.   That appears to be an oversight.
16   Q.   But that's what happened?
17   A.   Correct.
18   Q.   In fact, if we look at this audit trail,
19 the only entry for Remove From List happened on
20 April 4th, 2018.
21       Do you see that?
22   A.   Yes.
23   Q.   And there are no further entries after
24 that April 4th, 2018 entry; correct?
25   A.   Correct.

Page 264

1   Q.   If Ms. Davis received a text message from
2 Post University after April 4th, 2018, can you think
3 of any reason why that would not be logged on --
4 show up on the audit trail?
5   A.   No.
6   Q.   Is it possible that the sender of the text
7 just failed or forgot to enter it?
8   A.   Who's to say?
9   Q.   I'm asking what's possible.  Is that a
10 possible explanation?
11   A.   Certainly.
12   Q.   Because when you log a call, if you look
13 at PU3 --
14   A.   All of these logs are manual.
15   Q.   Correct.  So a call would be logged
16 manually?
17   A.   Some interactions like that would be
18 logged manually.
19   Q.   So it could be human error, for example,
20 as one of the reasons that it's not logged?
21   A.   That is a possibility, yes.
22   Q.   So just to wrap this segment up, I do want
23 to make sure I understand, to the best of your
24 knowledge, is there any document that evidences
25 Post's Do Not Call policy?

Page 265

1   A.   Excuse me?
2   Q.   Is there any document that evidences
3 Post's Do Not Call policy?
4       We are done with these documents; you can
5 put them down.
6   A.   Not to my knowledge.
7   Q.   Is there any document that describes the
8 training of Post employees with respect to how to
9 honor Do Not Call requests?
10   A.   I can't say for certain.
11   Q.   As you sit here today, can you think of
12 any documents?
13   A.   Nothing is coming to immediate
14 recollection.
15   Q.   Is there any person you could talk to that
16 would refresh your recollection on that?
17   A.   Not that I could think of at this moment.
18   Q.   Once again, you were designated
19 specifically to testify on Post's policies.  I'm
20 asking you as Post University, not in your personal
21 capacity, is there any document that evidences
22 Post's Do Not Call policy?
23   A.   Not to our recollection.
24   Q.   And the same question, again, you as Post
25 University, testifying on behalf of Post University,

67 (Pages 262 - 265)

Page 266

1 is there a document that describes Post's Do Not
2 Call training?
3     A.   Not that I can recall.
4     Q.   What I don't want to happen and what I'm
5 trying to avoid is -- do not recall is a cagey
6 answer because you can recall it after the
7 deposition.
8          So I'm asking, you were designated to
9 testify on behalf of Post University.  Does Post
10 University have any document that describes Post's
11 Do Not Call training?  It's a yes or no.
12     A.   To my knowledge, there has been nothing
13 written.
14     Q.   And that knowledge is despite preparing
15 for the topics that you were designated on; correct?
16     A.   Yes.
17     Q.   Did you look for a Do Not Call policy
18 prior to this deposition?  Did you look for a copy
19 of a Do Not Call policy?
20     A.   Yes.
21     Q.   Did you look for a copy of Post's Do Not
22 Call training?
23     A.   Excuse me?
24     Q.   Did you look for any document that
25 describes Post's Do Not Call training?

Page 267

1     A.   Do Not Call training or the training
2 material --
3     Q.   The Do Not Call training specifically, did
4 you look for any document that described that
5 training?
6     A.   Yes.
7     Q.   Did you find anything for that training?
8     A.   I did not.
9     Q.   Did you find anything for the Do Not Call
10 policy?
11     A.   No.
12     Q.   Is there any document that describes the
13 use of Remove From List for Do Not Call purposes?
14     A.   Not that I was able to locate.
15     Q.   And as you sit here today, do you recall
16 ever seeing a document that describes using Remove
17 From List for Do Not Call purposes?
18     A.   Not that I can recall.
19     Q.   So to the best of your knowledge, that was
20 never put into writing?
21     A.   To the best of my knowledge, I was not
22 able to locate any of that in writing.
23     Q.   And to the best of your knowledge as the
24 designee of Post, none of this was ever put into
25 writing?

Page 268

1     A.   To the best of my knowledge, no.
2     Q.   Between July 30th, 2014 and July 30th,
3 2018, did Post maintain access to the National Do
4 Not Call list?  We're moving from what Post
5 maintained internally to accessing the National
6 third-party-kept Do Not Call list.
7     A.   What were the date ranges again?
8     Q.   The usual date range, July 30, 2014 to
9 July 30th, 2018.
10     A.   I believe we got back onto the Do Not Call
11 Registry when Rich Schechter became the CMO.  I
12 think we were lapse on it.  He implemented the Do
13 Not Call Registry.  We came to find -- again, I
14 believe I mentioned this earlier -- that because all
15 of the resources, all of the leads that we obtained
16 meet the TCPA guidelines, there was no need for that
17 DNC Registry.
18     Q.   Did Post establish any written policies on
19 how to comply with the National Do Not Call list?
20     A.   I'm not certain.
21     Q.   Have you ever seen any written documents
22 describing how to comply with the National Do Not
23 Call rules?
24     A.   I can't say for certain.
25     Q.   You were designated on the topic, so did

Page 269

1 you look for such documents?
2     A.   For documents that --
3     Q.   That explain any written procedures or
4 establish any written procedures to comply with the
5 National Do Not Call rules.
6     A.   I mean, we have a place on our website
7 that talks about opt-out things that kind of directs
8 you to that.
9     Q.   Were --
10     A.   That's what I've seen internally.
11     Q.   I apologize for interrupting.
12          Were Post employees trained on how to use
13 the National Do Not Call list?
14     A.   Not to my knowledge, no.
15     Q.   Were they trained on how to access the
16 National Do Not Call list?
17     A.   I can't say for certain.
18     Q.   Did Post have any process to
19 cross-reference telephone numbers to which it was
20 making calls with telephone numbers on the National
21 Do Not Call list?
22     A.   Not throughout that entire time.
23     Q.   And that entire time, we are still talking
24 July 30, 2014 to '18?
25     A.   Correct.

68 (Pages 266 - 269)

Page 270

1    Q.    So there was no process or ability to
2    cross-reference those numbers; correct?
3    A.    Not throughout that entire time, no.
4    Q.    During the time period, Post did have
5    access to the Do Not Call policy during certain
6    intervals; is that accurate?
7    A.    Yes.
8         MR. BOWSER:  Object to the form.
9    Q.    When it had access to the Do Not Call
10   policy -- excuse me, the Do Not Call list.  I want
11   to correct that previous question.
12        During the time period, Post did have
13   access to the National Do Not Call list at certain
14   points during that July 30th, 2014 to 2018; correct?
15   A.    To my recollection, yes.
16   Q.    And when it had access to that list, did
17   it make any use of the list that you are aware of?
18   A.    I believe so; I can't say for certain.
19   Q.    If we look back at -- you'll have to dig
20   it out -- it's Exhibit 28, somewhere in there.  And
21   this is that email we discussed from July 2016 from
22   Richard Schechter to Lee Rogan; correct?
23   A.    Correct.
24   Q.    If you look down to the middle of the
25   email, beginning on the right-hand side, it says,

Page 271

1    That's all we can do right now.  I have the Do Not
2    Call list but have no way to scrub those names
3    against it.  Correct?
4    A.    Correct.
5    Q.    Do you have any reason to believe that
6    this is not accurate with respect to the Do Not Call
7    list and Post University's use of it in July 2016?
8    A.    It seems accurate.  I have no reason to
9    believe otherwise.
10   Q.    Did admissions department employees have
11   company emails?
12   A.    Yes.
13   Q.    And were those email addresses meant to be
14   monitored by the employee that has that email
15   address?
16   A.    Monitored as in --
17   Q.    Are they meant to check their inbox?
18   A.    Yes.
19   Q.    And do they communicate through email?
20   A.    Yes.
21   Q.    Were they permitted to delete emails?
22   A.    For space reasons, yes.
23   Q.    Were there any restrictions on their
24   ability to delete emails?
25   A.    Well, I know that when Mrs. Davis filed

Page 272

1    her case, there was a litigation hold put on
2    anything regarding --
3    Q.    So the case was filed on July 30th, 2018,
4    so let's talk about July 30th, 2018 up until before
5    the case was filed -- just before the case was
6    filed.
7    A.    Right.  We tried to make the best practice
8    archiving records rather than deleting them, but not
9    everybody was brought up to speed on that, and there
10   was -- at that point in time, our Outlook had very
11   limited space available.
12   Q.    So it was possible that during that time
13   then that emails would need to be deleted for space
14   reasons; correct?
15   A.    That's a possibility.
16   Q.    And while you said it was best practices
17   to archive instead of delete, was there any training
18   on doing so?
19   A.    I can't say if there was training done on
20   scale.
21   Q.    When you say "on scale," what do you mean?
22   A.    As part of a training session or process,
23   I can't speak to that.
24   Q.    Were there any repercussions for deleting
25   an email prior to the litigation hold?

Page 273

1    A.    I know that our space had greatly
2    increased even before that hold.
3    Q.    That's what I get for a vague question.
4    Let me try again.
5         Did anyone get punished for deleting an
6    email?
7    A.    Not to my knowledge.
8    Q.    Were there any policies or procedures in
9    place that would call for punishment for deleting
10   certain emails?
11   A.    Not to my knowledge.
12   Q.    And were deleted emails or the action of
13   deleting emails audited or reviewed in any way?
14   A.    I can't say.
15   Q.    Who is Keypath or what is Keypath?
16   A.    Keypath is our marketing agency.
17   Q.    I thought that was Thruline.
18   A.    They were formerly Keypath.
19   Q.    So that's the same entity?
20   A.    Correct.
21   Q.    And what are Keypath's responsibilities,
22   broad strokes, with respect to Post?
23   A.    They work hand in hand with our CMO and
24   they help with brand awareness and obtain our
25   inquiries, our leads for us.

69 (Pages 270 - 273)

Page 274

1    Q.   Are you aware that Post has an employee
2  search directory on its website?
3    A.   Yes.
4    Q.   Are you aware that it no longer works?
5    A.   No.
6    Q.   Are you aware that it was within the past
7  two months that it stopped working?
8    A.   No.
9    Q.   Do you have any idea why it stopped
10  working?
11    A.   No.
12    Q.   Has anyone been told to disable the
13  employee search function of Post's online directory?
14    A.   No.
15    Q.   And is that to the best of your knowledge
16  or are you sure of that?
17    A.   To the best of my knowledge, there should
18  be no reason to disable that feature.  We are
19  constantly making website adjustments, but nothing
20  that would coincide with shutting down an employee
21  search feature.
22    Q.   I only asked -- and I can pull it up on
23  there during a break.  If you search any employee
24  now, it just comes back with no employees found, and
25  that happened within the past month, so I just

Page 275

1  wanted to find out if you knew why.
2    A.   I have no reason -- I have no knowledge on
3  that even being something that's happening.
4           MR. GLAPION:  If we want to take a --
5  go off the record, that would be great.
6     (Recess taken from 3:48 p.m. to 4:02 p.m.)
7  BY MR. GLAPION:
8    Q.   Does Post currently maintain access to the
9  National Do Not Call list?
10    A.   I don't believe so, because again, we
11  identified that our resources meet the criteria of
12  not needing to be scrubbed.
13    Q.   And is the policy at Post still to use
14  Remove From List for Do Not Call requests?
15    A.   Yes.
16    Q.   Does the new CRM system have any Do Not
17  Call marking or toggle other than Remove From List?
18    A.   There is Not Interested, Remove From List.
19    Q.   And that's the only thing that --
20    A.   There is also Not Interested Right Now.
21    Q.   But there is nothing that just looking at
22  what it says would appear to be specific to Do Not
23  Call; correct?
24    A.   No.  That is what that segregation should
25  be more so repurposing.

Page 276

1    Q.   So the policy in terms of using the Remove
2  From List that you testified to is still the same?
3    A.   Correct.
4    Q.   And I tried to word this next question in
5  a way that made sense, I may have failed, so let's
6  try to work through it.
7           After a call is made to a rejected lead
8  and that rejected lead remains a rejected lead after
9  that call, is it safe to assume that whatever
10  happened on that call did not provide a reason to
11  move the lead out of the reject state?
12           MR. BOWSER:  Objection, compound.
13    A.   Depends.
14    Q.   If one were to call a rejected lead and
15  find out information or something happened to turn
16  them into a, I guess viable lead we will call them,
17  would they be moved out of the reject status?
18    A.   If someone -- if a rejected lead had been
19  called based off of the reject codes that were
20  called upon, some were not, based off the ones that
21  are, if at that point contact is made and the
22  prospective student expresses interest in moving
23  forward with the next steps of the enrollment
24  process, mostly beginning with the PCAS or
25  scheduling time for one, at that point the

Page 277

1  admissions representative would move them out of the
2  reject stage and into a converted stage.
3    Q.   So if after a call was made that lead
4  remained rejected, it's safe to assume that that
5  lead did not express interest on that call?
6    A.   Or contact wasn't established.
7    Q.   Or contact wasn't established.  Whatever
8  reason led them to rejected in the first place still
9  stood, is it safe to assume?
10    A.   I mean, that depends.
11    Q.   The protocol though was if a rejected lead
12  was contacted and expressed interest, they would be
13  in the CRM system moved from a rejected state to a I
14  guess active state?
15    A.   The stage of the lead would be converted
16  and then an opportunity would be created.
17    Q.   And then with respect to opportunities,
18  same question, if an opportunity is reached --
19  excuse me, a lost opportunity is reached and
20  expresses interest in attending Post University,
21  would they be moved out of the lost state?
22    A.   Yes.
23    Q.   So it's safe to assume if an
24  opportunity --
25    A.   It depends.  Pardon me, it depends.

70 (Pages 274 - 277)

Page 278

1 Sometimes there are still things that might preclude
2 a student or an opportunity to move forward, if the
3 opportunity was a former student and because of
4 certain reasons they can't come -- they can't move
5 forward with their -- with coming back to Post, at
6 that juncture, we wouldn't reopen that opportunity
7 with that student. But for the sake of this, it
8 would follow that same logic, that we would reopen
9 an opportunity if someone had expressed interest
10 about moving forward with their process again.
11     Q.   So maybe I can simplify it in a different
12 way, and I think we're getting there. It's somewhat
13 confusing and I get that.
14         If a lead remained in the rejected state
15 after a call was made to the rejected lead, is it
16 safe to assume that Post still considers that to be
17 a rejected lead?
18     A.   Yes.
19     Q.   Because the protocol was to move them out
20 of the rejected state if they provided the necessary
21 information to remove them from that state; correct?
22     A.   Correct.
23     Q.   The same with respect to an opportunity,
24 if a lost opportunity remained a lost opportunity
25 after a call is made, it's safe to assume that Post

Page 279

1 still considers them to be a lost opportunity;
2 correct?
3     A.   Correct.
4         MR. GLAPION: I'm going to just tidy
5 up one last section. A lot of it was presumably
6 asked and answered, just sort of spread all over the
7 place. So I'll give you a standing
8 asked-and-answered objection to save your voice and
9 save you from doing it.
10        MR. BOWSER: Is this about sales?
11        MR. GLAPION: It's about sales, I'm
12 sorry. I'm sorry, I have to do it.
13 BY MR. GLAPION:
14     Q.   Okay. So just follow this with me and
15 I'll try to break it down in a way that's relatively
16 agreeable. I know it took a little while.
17         So prospective students, one way or
18 another, reach out to Post; correct?
19     A.   Correct.
20     Q.   And at that point, they become leads?
21     A.   Correct.
22     Q.   And those leads by going through the
23 process in --
24     A.   16.
25     Q.   -- in 16, ultimately that's the process

Page 280

1 they follow to enroll at Post; correct?
2     A.   Correct.
3     Q.   And that's for the majority of
4 students with --
5     A.   The majority of the undergraduate
6 population.
7     Q.   The difference is primarily relating to
8 how the prospective student is ATP'd; correct?
9     A.   Yeah, how the student --
10     Q.   Pays.
11     A.   -- provides their method of payment.
12 Sometimes the student doesn't pay at all. Sometimes
13 the GI Bill or tuition assistance will cover all of
14 the tuition. We have a senior discount where a Pell
15 Grant -- which is part of the tuition assistance,
16 part of Title IV funding, federal student aid.
17 People are eligible for grant money, and sometimes
18 that grant money, especially with our senior
19 discount, it will cover the entirety of the
20 student's tuition, so there are no fees for them, so
21 they are not paying anything.
22     Q.   So the main difference for the majority
23 population and other various populations of
24 prospective students relates to how they are
25 ultimately going to afford their education?

Page 281

1     A.   Excuse me?
2     Q.   The main difference from what you see in
3 Exhibit 16, which you said is the majority
4 population, to other populations, primarily relates
5 to how they are going to pay?
6     A.   Right.
7     Q.   And I recognize your --
8         MR. BOWSER: Object to the form.
9     Q.   -- testimony that they may not pay;
10 correct? Because -- is that correct?
11     A.   Right.
12     Q.   Because a third party such as the
13 government may pay for them; correct?
14     A.   So to actually circle back to your
15 question, can you have a buyer without a seller, in
16 those situations, you almost can.
17     Q.   That's such a minor side quest at this
18 point. Come on, let's keep this flowing; we're
19 almost done.
20         This is the process, though, for the
21 majority of students and generally for all
22 prospective students on how they would enroll at
23 Post?
24     A.   For the majority of the population, that's
25 the enrollment process that they go through.

71 (Pages 278 - 281)

1  Q.   And the enrollment process, and this is
2  what I was just trying to establish, the enrollment
3  process difference with respect to say military, the
4  difference comes into play in terms of how they pay?
5  A.   The primary difference would be the method
6  of payment.
7  Q.   And this process to enroll at Post, when a
8  prospective student follows this process and enrolls
9  at Post, Post generates revenue from that; correct?
10  A.   It depends.
11  Q.   What does that depend on?
12  A.   If a student begins classes and
13  participates and decides during that first week that
14  this is not something that they are wanting to do,
15  we don't charge them for the class.  We give them
16  that opportunity.  We give them that grace period.
17  Q.   Would they be moved into the closed/won
18  state of Exhibit 16?
19  A.   If they participated, they would be moved
20  into closed/won, but there is other identifiers that
21  would help back them out of that systemically.
22  Q.   But this is the process if a person is
23  going to buy or, excuse me, enroll at Post
24  University, for the majority of the population, this
25  is the process that's followed?

1  A.   This is the process that's followed, yes.
2  Q.   And that begins with --
3  A.   But the question you asked was regarding
4  revenue.
5  Q.   Correct.
6  A.   And starts are revenue, and I said it
7  depends, not all starts generate revenue.
8  Q.   But do all closed/wons generate revenue?
9  A.   No.
10  Q.   What closed/wons do not generate revenue?
11  A.   If by chance someone has not completed all
12  of their necessary method of payments, if somebody
13  needs to, you know, complete their master promissory
14  note, which is a big piece of the Title IV funding,
15  somebody needs to complete their entrance loan
16  counseling, that's something that they are
17  responsible for completing.
18      We have a financial aid department that is
19  more than capable and goes above and beyond to try
20  to assist them throughout those processes, but
21  essentially it falls on them to complete all of
22  those necessary things.  So if somebody doesn't, you
23  know, complete their grade within a first term, you
24  know, that funding is sent back to the government.
25  So there is multiple different reasons as to why one

1  would not generate revenue from just a start.
2  Q.   When someone reaches the closed/won stage,
3  do they owe Post money?
4  A.   That depends.
5  Q.   Does Post offer scholarships?
6  A.   I believe -- I can't say with certainty; I
7  believe main campus does.
8  Q.   Does Post offer full scholarships?
9  A.   Not to my knowledge.
10  Q.   Is it fair to say that every student who
11  enrolls at Post at the point they enroll at Post is
12  obligated to pay Post something?
13      MR. BOWSER:  Objection, asked and
14  answered.
15  A.   That depends.
16  Q.   Does anyone attend Post without Post
17  receiving payment for that student's attendance?
18  A.   That depends.
19  Q.   I'm asking, does anyone attend Post
20  without receiving payment for that student's
21  attendance?  That's a yes or no.
22  A.   Does anybody attend Post --
23  Q.   Does anyone who attends Post, who enrolls
24  in Post, attend or enroll without Post receiving
25  payment for that student's attendance?

1  A.   As I've mentioned, the examples I've
2  given, you can attend Post and then things can come
3  up within your first module that would negate that.
4  Q.   Is the expectation that Post has of a
5  student who enrolls at Post that Post will receive
6  some payment for that student's attendance?
7  A.   If a student is attending Post University,
8  there is a tuition associated with their attendance.
9  Q.   So absent a mitigating factor that may
10  release someone from their obligation to pay
11  tuition, the expectation is that when someone
12  enrolls at Post, tuition will be paid by them or on
13  their behalf?
14  A.   Correct, and it's a lot cheaper than
15  Harvard.
16  Q.   Trust me, I know.  Sallie Mae, she knows
17  too.
18      So this process describes that enrollment
19  process through which one would become, without
20  mitigating factors, obligated to pay tuition or have
21  tuition paid on their behalf; correct?
22  A.   If you are attending the university,
23  tuition is part of that.
24  Q.   And this process shows how you get from,
25  for the majority of the students, how you get from a

72 (Pages 282 - 285)

Page 286

1 new lead to a tuition paying or expected student;
2 correct?
3     A.   It shows you how you can become enrolled
4 in Post University's program; that's what this
5 process shows you.
6     Q.   Correct.  And to enroll in Post
7 University's program, you have to pay tuition?
8     A.   Outside of those other circumstances.
9     Q.   Outside of mitigating factors, if you
10 enroll in Post, the expectation from Post, unless
11 something comes up otherwise, is that you will be
12 paying tuition; correct?
13     A.   Tuition --
14          MR. BOWSER:  Objection, asked and
15 answered, misstates the testimony.
16     Q.   Is that correct?
17          MR. GLAPION:  I'm not characterizing
18 his testimony.
19     Q.   I'm asking, outside of mitigating factors,
20 if you enroll in Post is the expectation that unless
21 something comes up otherwise that you will be paying
22 tuition?
23     A.   Tuition will be paid.
24     Q.   And that tuition, as I think we
25 uncontroversially established, is payment for the

Page 287

1 education services provided by Post?
2     A.   Yes.
3     Q.   So these education services are offered by
4 Post; correct?
5     A.   Yes.
6     Q.   And they are offered for a fee; correct?
7     A.   The tuition is the fee.
8     Q.   Correct.  And so the tuition is payment
9 for the education services; is that correct?
10     A.   Correct.
11     Q.   So these are prospective students who
12 become enrolled students bought education services;
13 is that correct?
14     A.   Yes.
15     Q.   And those education services were offered
16 to those students by Post; is that correct?
17     A.   Yes.
18     Q.   And as part of this process shown on 16,
19 and as part of the enrollment process -- well, we
20 will take it piece by piece.
21          As part of this process shown on 16, Post
22 makes outbound telephone calls; is that correct?
23     A.   It depends, but yes.
24     Q.   We discussed before that the primary
25 source of outreach was telephone calls; is that

Page 288

1 correct?
2     A.   Telephone and text.
3     Q.   And text?
4     A.   Which you combined.
5     Q.   I apologize.  Okay.  So as part of this
6 process, Post makes telephone calls and text
7 messages to prospective students?
8     A.   Correct.
9     Q.   And it does so to leads; correct?
10     A.   Yes.
11     Q.   And it does so to opportunities; correct?
12     A.   Yes.
13     Q.   And Post also calls, as we discussed, some
14 categories of rejected leads; correct?
15     A.   Pardon me?
16     Q.   Post also calls some categories of
17 rejected leads; correct?
18     A.   Correct.
19     Q.   And the purpose for the calls of those
20 rejected leads is to move them back into this
21 process or a similar process, like the one described
22 in Exhibit 16?
23     A.   The purpose of calling these rejected
24 leads is to provide them with the information that
25 they had requested when filling out the RFI, when we

Page 289

1 were unable to do so when they originally requested,
2 and we are hoping to catch them and provide them
3 with that information regarding our institution like
4 they had originally asked for.
5     Q.   But that is captured on this chart;
6 correct?
7     A.   I don't understand the question.
8     Q.   That providing information to a rejected
9 lead or -- excuse me, providing information that was
10 requested is captured on the flowchart in
11 Exhibit 16; correct?
12     A.   If we are calling the interview part of
13 that providing the information, which I think we
14 discovered before, then yes, that is captured on the
15 chart.
16     Q.   I believe your testimony was that
17 providing the information is part of the PCAS.
18     A.   Yes.
19     Q.   So that's captured on this chart?
20     A.   Correct.
21     Q.   So the goal when contacting rejected leads
22 is to put them back into this process; correct?
23     A.   The goal is to provide -- yes, to put them
24 back in this process so that we can provide the
25 information that they had requested, yes.

73 (Pages 286 - 289)

1    Q.    Which is part of the process?

2    A.    Which is part of the process.

3    Q.    And same with respect to opportunities,

4 lost opportunities, Post calls or texts some

5 categories of lost opportunities; correct?

6    A.    Correct.

7    Q.    And the goal with contacting those

8 categories of lost opportunities is to get them into

9 or back into this process, correct, for the

10 majority, the vast majority of those calls?

11    A.    Correct.

12    Q.    And as part of the communication with

13 rejected leads, one of the roles is to encourage or,

14 excuse me, your word was "nurture," is to nurture

15 them through this process; correct?

16    A.    Correct.

17    Q.    And part of nurturing those rejected leads

18 or now converted leads through this process is to

19 encourage them at the various steps; correct?

20    A.    Yes.

21    Q.    And with respect to opportunities and lost

22 opportunities, once they enter back into this

23 process, the goal is to continue to nurture them

24 through this process; correct?

25    A.    Correct.

1    Q.    And part of nurturing is encouraging;

2 correct?

3    A.    Where needed, yes.

4    Q.    And that ultimately, encouraging them

5 through this process or nurturing them through this

6 process, will potentially lead to enrollment;

7 correct?

8    A.    It could.

9    Q.    So this process that we are describing

10 that we are nurturing leads and opportunities

11 through, is it fair to say that Post is trying to

12 nurture them from being a new lead into an enrolled

13 student?

14    A.    Yes.

15    Q.    Last couple of questions.  Post does not

16 have a -- excuse me.

17          During the time period July 30, 2014 to

18 July 30, 2018, Post did not have a written Do Not

19 Call policy; correct?

20    A.    To my knowledge, there is not a written Do

21 Not Call policy.

22    Q.    And in your capacity as Post's corporate

23 designee, does Post have a written Do Not Call

24 policy?  Did it -- excuse me, did Post have a

25 written Do Not Call policy between those dates?

1    A.    Not to my knowledge.  There were areas of

2 opting out of things, but not a -- on our websites,

3 on TrueDialog, if you type "Help," there is a giant

4 roll-down of how to opt out of that.  In addition,

5 if you text "Stop," it precludes you from being able

6 to even receive a text message out of the system --

7 out of their system.  So we had those things, but

8 nothing explicitly written just for this.

9    Q.    And that TrueDialog you mentioned is

10 controlled by TrueDialog; correct?

11          The help process, the opt-out process that

12 you just mentioned with respect to TrueDialog,

13 that's TrueDialog's system; correct?

14    A.    It's housed in their database, yes.

15    Q.    And does Post own TrueDialog?

16    A.    No.

17    Q.    So this is a third-party company that has

18 this policy in place; correct?  The policy you just

19 talked about with respect to TrueDialog is a

20 third-party company's policy?

21    A.    Yes.

22    Q.    But to the best of your knowledge, Post

23 itself had no written Do Not Call policy; is that

24 correct?

25    A.    To the best of my knowledge, yes.

1    Q.    And to the best of your knowledge, there

2 is no documentation -- there is no written

3 documentation evidencing training of anyone at Post

4 University on any Do Not Call policy; is that

5 correct?

6    A.    To the best of my knowledge.

7    Q.    And there is nothing to the best of your

8 knowledge describing the use of Remove From List as

9 it pertains to using it as a Do Not Call marker; is

10 that correct?

11          MR. BOWSER:  Objection to the form.

12    A.    I mean -- can you repeat the question,

13 please.

14    Q.    There is nothing to the best of your

15 knowledge that describes the use of Remove From List

16 as a Do Not Call marker; is that correct?

17    A.    Nothing written to the best of my

18 knowledge.

19          I know that there is a -- I mean, there is

20 a place that lives within the very large training

21 manual, New Hire Manual, where, you know, it says

22 teaching how to reject leads.  That's where that

23 information would usually be discussed, the

24 different -- the various reasons of rejecting leads

25 and opportunities; that's where the major focus has

Page 294

1 always been on.
2 Q. But there is nothing written describing
3 that training?
4 A. There is nothing written.
5 Q. Excuse me, there is nothing written
6 describing that policy; is that correct?
7 A. No, it's just always been ingrained in
8 everyone.
9 Q. And it's expected that those who --
10 A. It's more than a best practice. It's a
11 way of handling all leads and opportunities.
12 Q. But without something in writing, is it
13 fair to say that those responsible for abiding by
14 the policy must do so by remembering, simply
15 remembering to abide by that policy; is that
16 correct?
17 A. Not when it's continuously brought up as a
18 practice.
19 Q. Let's try it this way: Is there any
20 document an admissions counselor can refer to when
21 determining how to handle a Do Not Call request
22 between July 30th, 2014 and July 30th, 2018?
23 A. Not to my knowledge.
24 Q. Is there any document an admissions
25 counselor can refer to in terms of how to use Remove

Page 295

1 From List between July 30th, 2014 and July 30th,
2 2018?
3 A. Not to my knowledge.
4 MR. GLAPION: I have no further
5 questions. I think we're good.
6 THE REPORTER: Attorney Bowser, is
7 the witness reading and signing?
8 MR. BOWSER: Yes.
9 THE REPORTER: And are you ordering a
10 copy of the transcript?
11 MR. BOWSER: Yes, please.
12 (Time Noted: 4:28 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 296

1 CERTIFICATE OF DEPONENT
2
3 I, SEAN COOLEY, have read the foregoing
4 transcript of my deposition and except for any corrections
5 or changes noted on the errata sheet, I hereby
6 subscribe to the transcript as an accurate record
7 of the statements made by me.
8
9
  _____
10 SEAN COOLEY
11
12 SUBSCRIBED AND SWORN before and to me
13 this _____ day of _____, 20___.
14
15 _____
  NOTARY PUBLIC
16
17
18
19
20 My Commission expires:
21
22
23
24
25

Page 297

1 C E R T I F I C A T E
2 STATE OF CONNECTICUT
3 I, SANDRA SEMEVOLOS, a Registered Merit
  Reporter and Notary Public within and for the State
4 of Connecticut, do hereby certify that I reported
5 the deposition of SEAN COOLEY on APRIL 11, 2019, at
  WYNDHAM SOUTHBURY, 1284 Strongtown Road,
  Southbury, Connecticut.
6
  I further certify that the above-named
7 deponent was by me first duly sworn to testify to
  the truth, the whole truth and nothing but the truth
8 concerning his knowledge in the matter of the case
  of MELANIE DAVIS vs. POST UNIVERSITY, INC., now
9 pending in the UNITED STATES DISTRICT COURT, for the
  SOUTHERN DISTRICT OF FLORIDA.
10
  I further certify that the within
11 testimony was taken by me stenographically and
  reduced to typewritten form under my direction by
12 means of COMPUTER ASSISTED TRANSCRIPTION; and I
  further certify that said deposition is a true
13 record of the testimony given by said witness.
14 I further certify that I am neither
  counsel for, related to, nor employed by any of the
15 parties to the action in which this deposition was
  taken; and further, that I am not a relative or
16 employee of any attorney or counsel employed by the
  parties hereto, nor financially or otherwise
17 interested in the outcome of the action.
18
  WITNESS my hand this 25th day of April,
19 2019.
20
21
22
23 Sandra Semevolos, RMR, CRR, CRC, CSR #74
  Notary Public
24 My Commission Expires: September 30, 2020
25

75 (Pages 294 - 297)

```
                                           Page 298
 1          ERRATA SHEET
 2  NAME OF CASE: MELANIE DAVIS V. POST UNIVERSITY, INC.,
    DATE OF DEPOSITION: APRIL 11, 2019
 3  NAME OF DEPONENT: SEAN COOLEY
 4  PAGE  LINE(S)   CHANGE       REASON
 5  ___|____|_____|_____
 6  ___|____|_____|_____
 7  ___|____|_____|_____
 8  ___|____|_____|_____
 9  ___|____|_____|_____
10  ___|____|_____|_____
11  ___|____|_____|_____
12  ___|____|_____|_____
13  ___|____|_____|_____
14  ___|____|_____|_____
15  ___|____|_____|_____
16  ___|____|_____|_____
17  ___|____|_____|_____
18  ___|____|_____|_____
19  ___|____|_____|_____
20  ___|____|_____|_____
21        _____
           SEAN COOLEY
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS___DAY OF _____, 20__.
24
    _____  _____
25  (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
```

76 (Page 298)

**[00000038 - 2018]**

**0**

**00000038** 4:3 89:1

**07719** 2:6

**1**

**1** 4:6,8 138:23
139:2
**1,034** 53:3
**1,127** 63:5,12,20
**1,600** 63:7,11,21
■ 48:4,5,22 66:10
66:12,15
**10** 107:23 189:7,22
190:21 193:5,7,7,9
193:16,21,25
200:5
**10.5** 65:12
**100** 48:8 49:8,10
216:7 242:18
**1011** 252:11
**10:17** 66:22
**10:21** 66:22
**10:53** 258:9
259:17
**10:57** 258:13
259:19
**11** 1:14 31:1 37:21
67:23 250:17,20
252:2,5 253:2
262:17 297:4
298:2
**11106** 81:8 88:19
91:10,21 92:12
95:20 99:15
100:25 103:6
106:16 109:17
113:6 149:17
154:13 155:19
**113** 3:9
**117** 4:4

**11780** 4:13 211:8
**11:38** 128:10
**11:49** 128:10
**11th** 22:5 253:17
261:5 263:7
**12** 3:15 7:2 9:18
12:1 236:12
**1284** 1:17 297:5
**12:35** 252:11
**13** 3:17 20:10,13
**130** 135:14,16
**13018** 223:13
**13020** 4:16 221:13
**138** 4:5
**139** 4:7
**14** 3:20 34:4 50:7
50:9
**142** 67:10
**1471** 229:21 230:1
**1473** 4:18 227:22
**15** 3:21 49:5 66:24
66:25 123:24
188:15 261:10
**150** 3:22 67:2
**1526** 232:2
**1527** 4:19 228:2
231:11
**16** 3:23 70:17,19
86:9 148:22
149:18 155:19,23
156:20 163:6
164:12 165:19
168:2 186:9
194:19,23 195:7
195:11 204:14
206:17,22,23
207:5 209:15
261:10 279:24,25
281:3 282:18
287:18,21 288:22
289:11

**16/17** 65:8
**160** 135:18
**169** 4:9
**17** 4:2 88:22,24
171:19 196:9
**1704** 2:5
**1717** 2:13
**17432** 4:15 213:4
**17436** 21:12
**17440** 250:22
**17444** 21:11
**17445** 21:11,13
**17449** 22:4
**17451** 22:19,19
33:13 34:23
**17452** 35:20
**17453** 36:12 39:25
40:6
**17457** 37:2,5,6,13
**17461** 37:1,23 38:1
38:11
**17470** 3:19 20:16
**1796** 232:16
**1797** 4:21 228:7
**18** 4:4 34:4 117:18
117:20 211:11
226:16 236:24
269:24
**18-81004** 1:5
**188** 4:11
**18978** 297:22
**19** 4:5 138:18,21
138:22 139:10,20
172:1 226:16
**1:07** 187:23
**1:09** 187:23
**1:29** 203:23

**2**

**2/12/18** 235:12
**20** 3:17 4:7 138:21
139:1 141:1 142:4

142:10 214:20
296:13 298:23
**20036-5342** 2:14
**2012** 196:7
**2014** 16:5 17:9
30:10 31:22 33:22
34:10,11 37:3,17
39:11 42:21 48:13
85:4 126:8 135:15
135:20 196:7
201:12,18 209:17
209:20 212:14
214:6,14,21
219:16 241:10
268:2,8 269:24
270:14 291:17
294:22 295:1
**2015** 22:5 31:1
34:12,13 37:21
39:15,25 48:15
86:9
**2016** 4:6,8 56:18
65:24 138:24
139:2 146:18
229:13 270:21
271:7
**2017** 17:10,13,15
30:10,15 188:15
188:15 189:16
190:12 236:25
238:14 250:17,20
252:2,5 254:20,22
255:22 261:10,11
**2018** 16:1 33:23
34:10 42:21 48:7
85:5 126:8 135:15
135:20 171:19
201:13,18 209:18
209:20 211:12
212:14 214:7,18
214:19 236:13

241:10 256:16
257:22 258:12
261:5 262:17
263:7,20,24 264:2
268:3,9 270:14
272:3,4 291:18
294:22 295:2
**2019**   1:14 48:18
171:23 297:4,19
298:2
**202.857.6000**   2:15
**2020**   297:24
**21**   4:9 169:22,23
**211**   4:12
**213**   4:14
**22**   4:11 188:6,6,8
**221**   4:16
**227**   4:17
**228**   4:19,20,22,23
**22nd**   37:3,17
**23**   4:12 211:6,7
235:23
**24**   4:14 212:24
213:1,2,12
**246**   5:2
**247**   5:4
**248**   5:9 256:7
**249**   5:5
**25**   4:16 221:11,12
**253**   5:7
**256**   5:8
**25th**   297:18
**26**   4:17 227:20,21
228:24
**260**   5:10
**27**   4:19 67:22
227:25 228:1
231:8
**28**   4:20 228:5,6
232:12 238:7,15
270:20

**29**   4:22 140:25
141:1 228:10,11
234:16
**2:04**   204:2

### 3

**30**   4:23 9:22
140:11 201:18,18
209:20 219:16
228:15,16 236:17
268:8 269:24
291:17,18 297:24
**30th**   16:5 33:22,23
85:4,5 201:12,12
209:17,17,20
212:14,14 214:6,6
241:10,10 268:2,2
268:9 270:14
272:3,4 294:22,22
295:1,1
**31**   5:2 246:5,6
**311**   5:7 253:25
**32**   5:4 247:8,14
**33**   5:5 248:25
249:1 252:18
**34**   5:7 253:23,24
254:15
**35**   5:8 256:5,6
**36**   5:10 260:5,6
**385**   54:20 55:1,11
55:12,15,15,18,18
**39**   4:3 89:1
**398**   5:6 249:2
**3:05**   248:3
**3:09**   248:3
**3:48**   275:6
**3rd**   16:1

### 4

**4**   24:4 28:25
256:16 258:12

**4/5**   23:1
**447**   55:22 56:6
64:20 65:1,4
**4480**   52:9,10,11
**4481**   3:20 50:10
52:14,18
**46**   13:4
**4:02**   275:6
**4:28**   295:12
**4s**   23:16,21
**4th**   257:22 263:20
263:24 264:2

### 5

**5**   49:3 123:23
139:19,20 172:4
**50**   3:20
**5405**   5:3 246:8,21
**5s**   22:25 23:21

### 6

**6**   9:22 226:15
**62**   118:14
**6298**   236:16
**6300**   4:24 228:18
237:4,9
**64**   4:4 117:21
**66**   3:21

### 7

**7**   3:5,15
**7.9**   65:21
**70**   3:23
**732.455.9737**   2:7
**74**   1:24 297:23

### 8

**8**   254:20,22
**88**   4:2
**8th**   255:22

### 9

**90**   157:15 165:7
166:15 192:23
193:3 209:9
**95**   165:9
**9:00**   7:1
**9:24**   256:16

### a

**a.m.**   7:1 66:22,22
128:10,10 256:16
258:9
**abide**   294:15
**abiding**   294:13
**abilities**   35:25
36:9 145:3,9,15
**ability**   56:3 63:6
63:13,20 70:4
94:21 141:7 238:8
238:9 245:20
247:20 270:1
271:24
**able**   118:20
136:19 140:14
162:11 177:12
185:8 205:20
245:5 267:14,22
292:5
**absent**   285:9
**absolutely**   17:23
21:2 124:5 131:25
140:16 158:25
159:4 169:17
179:11 202:9
207:25
**access**   203:7,11
268:3 269:15
270:5,9,13,16
275:8
**accessing**   268:5

accident   196:17
accommodation
  27:11
accounts   203:7,12
accuracy   93:21
accurate   16:22
  36:23 38:23 39:7
  39:8 46:23 85:3
  92:3 99:6 145:22
  146:15 186:9
  213:25 237:19
  251:23 270:6
  271:6,8 296:6
acknowledges
  233:14
acknowledging
  218:19
acronym   88:16
act   14:24 132:21
  137:12,12 147:4
  148:11
action   42:25 68:7
  109:20 235:24
  251:12 259:14,18
  261:19 273:12
  297:15,17
actions   42:14 43:3
  43:25 44:2,15
active   64:15,16
  160:23,23 277:14
activities   5:10
  260:7,14,15,21
  262:7,7
activity   262:12
actual   17:7 49:23
  65:8 143:12 156:9
  208:2,2
adam   2:16 11:3
  12:6,22 21:5
  52:15 113:16
  210:17,24 211:2

239:13
adam.bowser   2:17
add   31:7 60:1,3,5
  60:17 157:2 158:1
addition   130:7
  220:19 221:9
  225:4 245:21
  292:4
additional   15:2
  128:4 149:23
  207:17 220:8
  224:17 230:17
address   125:22
  142:7,21 143:19
  143:23 229:25
  249:6,14 271:15
addressed   59:15
addresses   247:2
  271:13
addressing   143:19
adjust   21:9
adjustments
  274:19
admission   17:18
  58:10 134:6
  137:20 171:3
  207:6
admissions   14:4,5
  14:6 16:15,20
  17:6 19:8,11,12,21
  19:22 20:1,2,5,7,8
  22:9 29:7,10,17,21
  29:24 30:2,4,7,10
  30:24 31:8,12,14
  31:17,19,21 32:2,5
  32:7,8,12,24 33:2
  33:6,9,10,14 34:21
  53:1 58:9,20,22
  75:25 76:2 81:17
  88:11,12 89:12,23
  89:24 90:1,2,5,8

91:7 99:3,8,10
  100:2,17 112:11
  112:23 113:1,2,8,9
  114:9 118:10,11
  120:7 122:21
  123:19 124:15,17
  124:22 125:8,12
  129:4,5,13 130:15
  130:17,17 131:3,7
  133:14 134:4,25
  135:8,10,23 136:6
  136:16 139:10,12
  139:15,17 140:2
  140:19 141:5,9,21
  141:23 142:5,14
  145:10,23 146:16
  146:21 153:13
  157:17,21 158:2
  158:12,17 160:9
  160:11 161:7,8,25
  162:10,14 167:7
  167:10 169:10
  170:14,19,25
  171:15 185:6
  188:13 194:3
  195:22 196:6,8
  200:7,13 201:13
  202:4,5,6,22,22
  203:7,15 205:4,5
  205:15,22,25
  206:6,17 207:2,13
  208:6,9 209:5,12
  214:24 216:5
  217:13 220:2
  221:6,25 222:11
  223:10 224:20,24
  225:2,9,11 226:1
  227:9 238:2,23,24
  241:3 248:13,15
  262:22 271:10
  277:1 294:20,24

adp   139:11,12,15
  140:9,19,19
  188:13
ads   89:20 101:5
  136:22 137:4
  217:14
advance   12:2
advertise   101:2
advertisement
  132:8
advertisements
  132:9,13
advised   133:19
advisory   91:17
  136:15
adwords   101:6
  103:15
affect   180:11
affirmative   39:4
  208:11
affirmed   7:10
afford   280:25
afternoon   204:1
agency   14:19
  105:10,12,20
  212:4 273:16
aggregator   104:13
aggregators
  104:12
ago   26:5 30:15,21
  82:18,24 83:16
  95:16 121:21
  123:23,24 171:22
  171:23 179:18
  190:9 191:2,4
  192:13 196:21
  199:15 212:9
  236:24
agree   7:19 10:12
  10:12 42:9 77:13
  88:5 100:10 147:5

147:12,15 148:8,9
149:3,14,16
150:19 153:20
162:8 170:5 231:5
239:17 243:19,25
244:8 259:15
**agreeable** 279:16
**agreed** 6:6 77:15
147:1 192:15
**agreeing** 149:2
**ahead** 36:25 37:23
52:8 237:4
**ahold** 196:16
**aid** 45:9,20 46:1
47:20 108:4
252:13 280:16
283:18
**aldarondo** 237:2
**align** 199:8
**aligned** 199:7
**aligning** 55:16,16
**allegation** 243:4,5
**allegations** 243:6
243:20
**alleges** 242:23
**allowed** 158:7
**alluding** 140:12
**alternative** 28:8
**altogether** 125:3
**alton** 51:18
**alumni** 44:5
**amanda** 222:3,6
222:10,17 223:9
225:16
**amazing** 173:15
**ambiguous** 257:12
**amount** 27:4,16
48:21 53:7
**analyst** 14:3 16:11
17:15 18:18 30:14
131:20,21

**analytics** 13:14,21
14:16 15:19 18:7
131:17 229:5
**annual** 25:2,5,8,16
26:4
**answer** 8:11,25
9:1 13:6 14:17,18
20:25 45:23 53:10
54:14 57:12 59:3
79:7 83:14 103:10
107:11 110:20
116:22 123:1
128:13 130:25
133:20 134:16,18
144:9 146:1,5
153:8 159:16
161:22,24 164:8
164:14 180:17
212:21 224:7
227:1 240:6 266:6
**answered** 29:24
59:2 76:10 101:15
134:15,17 175:15
188:2 195:17
200:23 240:5
279:6,8 284:14
286:15
**answering** 34:7
**answers** 34:1
**anybody** 142:16
197:13 218:16
284:22
**anymore** 47:10
85:18
**apart** 40:24
**apologize** 16:24
23:3 27:8 45:8
48:21 62:23 64:2
76:4 80:14 87:14
120:14 142:11
145:6 148:1

198:12 203:15
221:16 234:7
237:8 258:1
269:11 288:5
**app** 92:9,18 93:5
94:2,6,8,16,18
95:2 98:14 99:17
172:7,19 173:3
183:6,9 185:2
**appeal** 25:22 26:1
26:3
**appear** 50:19 89:7
112:9 118:3 139:8
229:14 250:23
258:15 275:22
**appears** 37:13
51:3,7,8 89:8
94:12 110:16
156:2 189:11
190:4,8 222:5,9,11
229:17,24 231:8
233:19 234:17
236:17,20 249:5
249:18 250:16
254:15 256:13,19
258:11,19 259:13
262:16 263:15
**appended** 100:13
**application** 56:7
65:5 71:23 84:16
84:25 85:15,25
86:2,3 92:10,14,22
93:1,6 94:21,24
97:20 98:10 100:4
173:9 174:10
183:1,17,23 184:3
184:14 185:8,20
191:10 252:13
**applied** 56:9
**applying** 255:9

**appraisal** 3:18,22
20:14 37:14 67:1
**appreciate** 31:10
93:25 199:6,18
**appreciated**
196:23
**approach** 145:4
145:11
**appropriate** 110:9
**approved** 63:6,20
**approximately**
17:13 85:13
135:21
**approximation**
17:16 212:1
236:25
**april** 1:14 171:19
171:23 263:20,24
264:2 297:4,18
298:2
**arbitrary** 74:17,20
74:21 97:19
**archive** 272:17
**archiving** 272:8
**area** 38:9 60:16
85:15 106:22
**areas** 52:23 292:1
**arentfox.com** 2:17
**arrive** 150:10
**arrived** 200:25
252:7
**arriving** 82:14
**arrow** 91:21 92:14
92:24 93:19 95:6
95:20,25 96:1
106:25 156:3
**arrows** 84:17 93:7
93:14 109:23
110:21
**arts** 234:22

**asap** 233:1
**ascertain** 38:24
  125:18
**aside** 41:3 100:24
**asked** 12:1,8 13:2
  29:23 33:25 39:22
  48:20 49:18 56:23
  59:1 75:16,17
  80:15 90:15
  113:17 121:21
  128:12 134:14
  166:25 177:5
  181:7 187:25
  191:25 192:13
  195:16 209:3
  221:4 226:20,23
  240:4 255:6
  274:22 279:6,8
  283:3 284:13
  286:14 289:4
**asking** 30:1 36:7
  41:22,23 43:7
  44:13,14 49:20
  58:17 60:24,25,25
  61:13 76:5,7,7
  77:4,21,22 80:19
  102:24 103:1
  107:3,14 110:19
  116:9,10 117:1
  123:3 138:10
  146:14 149:10
  163:14,21 175:12
  176:1 195:8 199:1
  216:24,25 223:9
  241:24 253:16
  264:9 265:20
  266:8 284:19
  286:19
**asks** 211:15
  233:22

**aspect** 146:24
  152:21 239:15
**aspects** 150:20
**assess** 68:19
**assessees** 89:10
**assessment** 4:2
  68:13 88:25 89:9
  91:22 93:1 146:19
**assigned** 16:21,23
  217:13
**assist** 174:18
  175:24 185:9
  283:20
**assistance** 45:9
  46:4 149:24
  280:13,15
**assistant** 14:4
  16:14 17:2,5,18
  19:7,11,21 29:7,9
  29:17,20 30:1,3,10
  31:12,13,20 89:15
  89:17,25 129:13
  169:9 188:13
  248:14
**assisted** 182:11
  297:12
**assisting** 177:11
  208:19
**associate** 51:2
**associated** 285:8
**associates** 33:19
**assume** 8:12 21:5
  189:13 230:20
  276:9 277:4,9,23
  278:16,25
**assumed** 89:22
**assuming** 92:10
  192:2,4 203:1
  226:14
**assumptions**
  226:18

**atp** 55:23 56:2
  93:17,24 94:2,6,8
  95:2,5 98:14,21
  99:18 100:4 150:8
**atp'd** 94:25 95:1,7
  280:8
**attached** 5:24 96:6
  96:7 98:5,6 99:20
  100:11 168:23
  169:4 235:11
**attachment** 4:22
  228:12 235:19
**attachments** 51:11
  51:14 234:17
  235:14,16
**attempt** 27:10
  60:19 125:18
  156:5 166:7 186:8
  190:22 205:4,15
**attempted** 144:6
**attempting** 156:4
  166:13
**attempts** 107:24
  189:7,22
**attend** 53:17,19,19
  53:20,24 58:12
  81:12 95:7 118:16
  154:21 155:7
  255:10 284:16,19
  284:22,24 285:2
**attendance** 54:10
  284:17,21,25
  285:6,8
**attending** 53:23
  54:7,10 57:10,17
  58:1,25 59:19
  64:14 81:14 82:15
  178:10 277:20
  285:7,22
**attends** 284:23

**attention** 38:10
  174:6 177:4
**attorney** 8:24
  10:11 295:6
  297:16
**attract** 102:13,15
**audit** 203:5 245:13
  245:17,18,25
  246:2,22 247:4
  250:23,24 251:11
  253:16 254:5,8
  255:21 257:21
  260:16,19 263:6,9
  263:18 264:4
**audited** 273:13
**august** 261:10,10
**authority** 62:4
**automated** 103:1
  104:23 105:3
**automatically**
  111:16
**automation** 13:15
  13:21 14:16 15:2
  18:7
**autonomous** 15:6
  15:19 240:16
  241:7
**available** 115:13
  177:15 179:20
  219:5 224:18
  225:1 227:12
  233:23 240:3
  272:11
**avenue** 117:9,15
**avenues** 150:9
**avoid** 218:20
  266:5
**aware** 8:4 9:11,14
  31:20 32:20 35:3
  35:10 42:3 74:5
  162:14 218:15

241:9,25 242:19
242:22 243:5,8,11
243:13,14,17
244:17 270:17
274:1,4,6
**awareness** 102:14
103:15 132:21,22
273:24

**b**

**b** 9:22
**babbling** 120:17
**back** 37:10 39:24
40:2 50:4 54:14
56:21 64:25 66:6
67:4 86:11,12
88:19 91:9 95:19
100:25 101:9
109:17 120:2,5,20
121:22 122:22
123:9 136:18
143:5 145:1
162:12 163:6,19
164:11 165:24
174:18 175:24
177:12 186:4
190:12 195:4,10
196:6 201:1
204:10,13 214:14
214:21 215:10
229:20 230:20
238:13 247:5,10
247:12 255:21
263:6 268:10
270:19 274:24
278:5 281:14
282:21 283:24
288:20 289:22,24
290:9,22
**backwards** 14:13
**bad** 28:10

**balance** 26:16,25
27:24 28:4,9,13
65:20
**balances** 26:11
**barron** 51:18
**based** 15:20 49:14
84:21 119:8 124:2
200:15 253:14
276:19,20
**basically** 56:9 97:5
102:12
**basis** 162:16 217:4
**bates** 3:18,20,22
3:24 4:2,4,6,8,10
4:11,13,15,16,18
4:19,21,22,24 5:2
5:4,6,7,9,10 20:15
21:6,8 50:9 52:17
67:2 70:20 88:25
117:20 138:24
139:3 169:23
188:8 211:7 213:3
221:12 227:21
228:1,6,11,17
246:7 247:14
249:1 253:24
256:6 260:7
**bauer** 234:18,21
**bearing** 3:24
70:19
**becoming** 251:21
251:22
**began** 86:20
164:21 182:14
196:9,12 214:17
214:20 236:23
**beginning** 14:18
17:15 84:4,8
196:14 270:25
276:24

**begins** 20:22 52:4
52:5 55:22 106:23
106:24 155:22
233:8 282:12
283:2
**behalf** 9:12 10:7,9
10:21 80:12 153:8
153:12 158:18
244:18 265:25
266:9 285:13,21
**belief** 162:16
**believe** 12:5 19:20
21:4 24:21 29:23
36:4 41:17 47:13
48:8 50:15 55:9
64:8,9 65:3 70:24
73:18 76:1,5 79:8
87:5 88:22 99:22
101:15 106:2
112:16 113:1,10
115:12 118:17
132:24 134:17,19
136:5 149:18
158:6 162:11,19
169:14,14,18
171:13 173:1
174:23,24,24,25
177:14 178:17
181:1,13 186:6
212:3 219:10,11
221:25 231:17
238:14 256:2
259:20 268:10,14
270:18 271:5,9
275:10 284:6,7
289:16
**believes** 10:11
159:20
**benchmarks** 90:24
**best** 9:9 10:7,18
26:13 32:22 77:8

77:14 78:1 86:10
114:9 142:22,24
144:8,20,22,24
177:14 178:25
209:24 217:15
244:24 264:23
267:19,21,23
268:1 272:7,16
274:15,17 292:22
292:25 293:1,6,7
293:14,17 294:10
**better** 161:11
162:2,23 165:15
165:22 168:8
171:25 174:7,12
178:25 185:19
190:15 205:23
227:9
**beyond** 283:19
**big** 45:12 108:8
121:13 140:5
157:11 283:14
**bigger** 40:17
225:20
**biggest** 104:1
**bill** 45:10 46:7
94:16 149:24
151:21 280:13
**billboards** 101:5
**bills** 84:18
**binder** 37:8
**bit** 37:1,1 53:9
62:23 83:24 88:20
122:12 196:20
**blue** 72:14,22
85:21 91:21 93:22
95:5 96:1
**blurry** 23:2
**board** 24:5,8,10
24:25 25:7,15,15
25:21,21,23 26:1,3

26:8 27:6,10
51:24 52:1 62:3,4
**bobby** 11:9 19:4,5
188:21 191:13,25
**body** 171:18
**bond** 157:18,21
161:6,25
**bother** 234:7
**bottom** 20:20 22:4
34:23 35:21 64:19
65:20 67:10 68:5
109:18 229:21,23
232:3 237:5
246:21 255:1
**bought** 287:12
**bowser** 2:16 7:19
12:7 13:1,5,10
21:15 25:10 27:18
33:4 38:5 40:1
42:18 45:21 49:16
49:22 57:11 59:1
60:15 66:1 73:13
79:6,15 83:13
102:22 103:9
107:10 113:21
122:24 130:22
131:5 132:5
133:10 134:14
138:5 148:14
151:11 152:22
164:7,20 182:1
187:20 195:16
222:13 224:6
237:22 240:4
241:17,19 244:3
247:22 270:8
276:12 279:10
281:8 284:13
286:14 293:11
295:6,8,11

**box** 72:14,22,22
73:2 74:10 91:25
96:1 97:2 103:6
109:18
**brad** 51:18
**brand** 102:14
103:15 273:24
**branding** 14:21
**brass** 144:19
**break** 8:16 66:19
66:21 129:16
143:3 157:4
187:25 203:20
274:23 279:15
**breaking** 143:7
**breaks** 8:17
**brian** 170:9,9,12
**bridge** 14:24
**bring** 11:22 12:1,8
12:12 30:7,23
**bringing** 132:21
132:22 164:11
201:1
**broad** 273:22
**broader** 207:11
**brought** 31:7 37:8
59:5 272:9 294:17
**build** 140:10 141:7
142:24 144:23
161:2,5
**building** 140:6,15
140:17 144:4
157:13 159:2,5,10
159:17,20 160:18
160:19,22 161:1
161:17
**built** 157:22
**bullet** 142:4,10
145:2,8
**bunch** 51:17

**business** 14:24
41:18,19,23 44:14
47:6,7,11,12,14,19
49:1 52:23 136:11
164:1 172:6,19,24
183:1,2,9,20,20,22
183:23 184:13
193:6,10,15,19,24
**businesses** 44:21
**button** 110:7
**buy** 77:8,14 78:1
147:24 151:4
282:23
**buyer** 150:25
151:2 281:15
**buys** 151:4
**buzzback** 232:18
232:21,21
**bye** 125:10,14
**bypass** 92:24
93:22
**byproduct** 43:6
44:6

**c**

**c** 2:1 7:9 91:16
204:4 297:1,1
**cadence** 124:25
125:2,3 135:7
**cagey** 266:5
**call** 15:17 47:2
49:19 60:18 70:9
86:14,17 120:19
124:16 133:15,21
134:7,10,11 135:1
137:6,11,12
138:13 145:15
150:21 153:14,15
155:16,22 156:13
156:14,18,22
157:1 158:21,24
159:1 160:17

163:4,7,11,15,16
163:22 164:10,15
164:19,24,25
165:2 166:5
168:23 173:14
174:16,17 175:9
175:20,21 184:5
194:1,22 195:14
199:19 200:18
202:7,8 205:14
209:18,21 210:1,7
210:25 212:15,22
213:8,21,24 214:7
214:8,19,23
215:23 217:11
218:8,11,12 219:3
219:20 220:7,11
220:17 221:3
223:4,10 224:5,25
225:5,10 227:9,15
230:9 231:3,24
234:11 235:25
237:12,18 238:4,8
238:10,12,19,25
239:5,9,16,21
240:11,13,24
241:15,16 242:3
242:24 243:2,10
243:25 244:8,10
244:21 249:14
250:3,6 255:13
257:3,5,10,13,16
260:23 261:1,19
262:16 264:12,15
264:25 265:3,9,22
266:2,11,17,19,22
266:25 267:1,3,9
267:13,17 268:4,6
268:10,13,19,23
269:5,13,16,21
270:5,9,10,13

271:2,6 273:9
275:9,14,17,23
276:7,9,10,14,16
277:3,5 278:15,25
291:19,21,23,25
292:23 293:4,9,16
294:21
**called**   77:20,21
79:21 97:17,19
108:15 156:17
166:19 167:7,10
201:7,10 214:11
220:4 224:4 263:4
263:13 276:19,20
**calling**   71:9
124:18,25 130:23
134:13 135:2
167:23 168:3
172:8 192:14
193:10,15,19
194:15,17 196:14
196:14,14,15
197:22 198:2
199:2,4 205:13
244:3 255:6,7
288:23 289:12
**calls**   58:7 102:4
120:8 128:22
129:1,11,15,17,18
129:23 130:20
131:3,7 132:1,3
133:8,15 134:21
134:23 135:5
136:25 137:5,21
138:5,11 141:23
143:18 152:17
156:23,24,24
157:5,22 158:3,13
158:15,18 160:11
160:13,16,18,20
160:22 161:1,2,4

162:10,15 163:17
164:4 165:3,5,7,9
165:12 166:7
167:13 169:1
172:5 186:7,14
187:2,9 192:20,21
193:6,7,9,16,20
194:4,8 195:4,6,9
195:10,19 196:1
199:21 200:1,6
202:23 204:10,11
242:25 243:3
249:23 269:20
287:22,25 288:6
288:13,16,19
290:4,10
**camaraderie**
161:18
**campaigns**   15:5
**campus**   248:12,15
284:7
**campusnexus**
15:13,24 106:5
240:19,20
**candidate**   56:24
**capabilities**   15:4
**capable**   209:6
283:19
**capacity**   9:15 10:6
10:6,15,20 265:21
291:22
**caps**   221:3
**capture**   71:8
92:17 101:8
109:15 214:15
260:19
**captured**   21:3
85:22 87:16 92:7
95:2,15 105:23
110:2,4,10,19
156:2 214:12

289:5,10,14,19
**captures**   71:10,10
113:5,9
**car**   196:16
**care**   21:6 180:21
180:25 181:1,7,9
181:14,18,20,24
182:22
**caring**   182:20,20
**carissa**   118:8,9,15
**carry**   128:7
**case**   1:4 12:18
28:3,3 48:25 78:9
114:12,13 120:6
173:13 272:1,3,5,5
297:8 298:2
**cash**   45:14,15
46:10 94:6,18
149:24
**catch**   289:2
**categories**   70:3,8
70:10 71:17 72:10
74:15,15 75:4,8,14
82:5 86:13,15
96:9 99:19,20
100:1,6,21 110:23
111:12,14 112:17
113:11 189:21
190:6 247:21
288:14,16 290:5,8
**categorize**   119:13
**categorized**   33:9
**categorizes**   74:9
111:14
**category**   70:5
71:23 72:15,23
74:10 75:12 77:11
77:17 81:11,11
92:13 93:2,6,18,20
95:7,23 96:2,5,6
98:5,6,10,11,15,17

98:17,22,23 99:5
100:12,14 109:19
110:4,5,6 116:11
116:14 155:12
255:15
**caught**   183:14
**caused**   263:3
**cell**   158:7
**census**   64:11,12,17
**center**   145:15
226:9
**central**   124:8
**ceo**   18:15 50:17
**certain**   17:10
23:22 24:22 26:10
33:10 39:23 47:9
53:7 71:2 74:4
75:9 86:7 109:7
123:8 172:13
200:8 209:23
224:8 260:18
262:24 265:10
268:20,24 269:17
270:5,13,18
273:10 278:4
**certainly**   8:13,17
218:21 264:11
**certainty**   17:17
25:19 30:16
111:21 112:15
126:15 165:10
191:18 192:11
212:5 214:22
229:6 242:11,18
244:22 259:22
284:6
**certificate**   296:1
**certify**   297:4,6,10
297:12,14
**chain**   229:17
231:8,12 232:13

249:5

**chance**  21:17 71:5
  89:5 170:2 283:11

**change**  34:2
  109:19 127:7
  128:2 160:3
  183:17 245:23
  255:8 298:4

**changed**  18:23
  120:3 121:3 122:1
  122:10 123:12,21
  124:15 184:7
  251:18

**changes**  232:9
  237:5,11 240:10
  296:5

**changing**  172:24
  173:10 174:22
  183:2,7

**characterization**
  25:24 122:15
  142:20 143:21
  144:1 173:11
  176:2 184:25
  204:19 214:10
  239:17

**characterize**  14:15
  25:20 44:24,25
  69:22 73:11 87:3
  91:5 144:20
  156:18 175:13
  184:18 185:1
  206:1,18 207:5

**characterizing**
  217:17 286:17

**charge**  282:15

**chart**  100:14
  221:19 289:5,15
  289:19

**chat**  236:17 237:8
  239:23

**chatey**  223:18

**chats**  237:20

**cheaper**  285:14

**check**  57:25 97:1
  156:23 157:5,8,9
  158:22 162:1,21
  171:25 193:12,17
  193:22 197:22
  203:2 271:17

**checked**  196:20
  197:5

**checking**  200:12

**checkup**  192:21
  194:1,4,8

**chief**  11:5 18:11
  51:2 90:9 211:19
  229:10,12 239:25

**choice**  101:12

**chooses**  178:22

**chris**  231:23

**christopher**
  231:18

**circle**  204:10
  281:14

**circulation**  85:22

**circumstance**  28:2
  200:15

**circumstances**
  26:18 28:5 109:6
  114:1 196:3
  199:19,25 286:8

**cito**  231:16 236:22
  236:23 240:1,2

**civ**  1:5

**civil**  7:17

**clarification**  31:11
  159:24

**clarify**  8:13 13:1
  33:20 66:11 94:1
  116:21 132:2
  158:6

**clarity**  157:3

**class**  26:20,22 28:7
  282:15

**classes**  26:16,17
  28:4 46:16 57:22
  63:13 84:5 136:16
  185:10 191:12
  196:9,12,13 197:8
  282:12

**clause**  174:16

**clear**  99:15 100:8
  120:4 135:18
  155:9 163:25
  166:6 173:6
  182:24 239:8

**clearly**  35:25
  263:12

**click**  110:6

**client**  210:6,13,20
  210:21 243:24
  244:7

**client's**  210:4,9

**clock**  158:9,11,14
  158:18

**close**  67:16 69:7
  69:17,19 73:4
  114:3,20,23
  118:24 207:21

**closed**  73:1 81:12
  95:8 108:16,17,18
  108:19,20,23,24
  108:25 109:1,2,3,3
  109:8,20 110:5,6
  110:15 114:7,11
  114:13,14 115:13
  115:15,16,17,17
  115:20,22,23,24
  117:12,14 119:5,6
  119:8,10,14,17,18
  128:6,14 164:10
  165:13,13,17

**192:19** 194:15,22
  195:8 198:7
  200:10 201:3,9
  222:19 223:9
  224:11 225:21
  226:15 227:2
  282:17,20 283:8
  283:10 284:2

**closely**  14:19,23
  123:14

**closer**  135:18

**closing**  68:8

**cmo**  14:21 18:10
  18:11 238:5
  268:11 273:23

**cms**  230:11,17

**code**  115:13 127:5
  127:9 218:7 219:5
  241:11 252:14
  253:9,11,13

**coded**  215:24
  218:16

**codes**  220:6,8
  276:19

**coding**  220:20

**coincide**  274:20

**coincidence**
  259:21

**cold**  121:16

**collaborative**
  89:20

**colleagues**  255:6

**collection**  12:17
  12:20

**collectively**  25:1

**college**  91:17
  136:14

**colon**  218:9
  219:12

**column**  65:7,7
  189:5,25 223:20

[column - consider]                                                                            Page 10

223:22 224:19
225:1 226:4
235:23 251:25
**columns**  251:1,6
251:15
**combination**
44:18
**combined**  288:4
**come**  26:12 64:25
64:25 74:24 99:8
100:25 101:18,22
102:17,17 104:2
104:11 145:1
161:15 197:4
278:4 281:18
285:2
**comes**  94:25 95:6
96:18 105:25
218:4 245:14
274:24 282:4
286:11,21
**comfort**  159:9
**comfortable**  140:8
144:4,5 159:6
**coming**  53:2 56:21
62:16 84:17 93:7
137:17 237:6,11
240:10 265:13
278:5
**commenced**  7:1
**commendable**
36:17 39:16 40:18
**commended**
173:22
**comment**  22:23
**comments**  22:15
36:19 236:4,6
**commercials**
101:5
**commission**
296:20 297:24

298:25
**common**  83:22
107:23 114:7,13
215:10,20 260:1
**communicate**
271:19
**communicating**
124:19 198:6,6,10
198:20
**communication**
15:5 130:8 137:18
139:22 141:3
193:9 196:11
201:15 210:19
233:9 255:11
290:12
**communications**
35:21 210:12,23
211:2 233:4
**company**  31:6
42:7 271:11
292:17
**company's**  292:20
**compared**  46:21
63:18
**competing**  175:7
179:21
**competition**  179:4
**competitor**  177:8
178:23
**competitors**  175:5
175:10 178:17,20
179:19
**complete**  109:11
206:2,7,19 207:7
207:18,20 208:23
262:12 283:13,15
283:21,23
**completed**  56:7,7
97:2 261:7,9,14,21
262:1,3,9 283:11

**completely**  178:22
199:8
**completes**  261:24
**completing**  283:17
**complex**  79:1
**compliance**  11:5
202:18 211:20
**comply**  268:19,22
269:4
**component**  137:24
**compound**  42:18
60:15 79:15 83:13
102:22 103:9
107:10 122:25
132:6 133:10
151:11 152:22
182:1 237:22
276:12
**computer**  248:8
297:12
**conceivable**
125:22
**conceptually**
84:24
**concern**  177:13
178:15 180:4
182:16 198:14
**concerned**  178:19
179:3,6,7,10,13,13
180:2,9,24 183:24
184:15
**concerning**  297:8
**concerns**  124:9
125:23 177:10
178:11
**concluded**  185:12
**concluding**  233:14
**conclusion**  130:23
132:6 138:6 212:6
244:4

**conduct**  100:23
101:1,25 205:16
206:15 207:16
**conducted**  57:19
58:3,7 85:17
89:19 96:24 97:20
97:25 126:7 155:2
190:20
**conducting**  136:14
**conducts**  126:10
**conduit**  137:14
**conferred**  35:6,16
**confidence**  146:6
**confident**  36:9
88:10 247:20
**confirm**  154:7
208:10
**confirmed**  92:2
106:19 107:1,6
154:16 208:17
**confirming**  206:14
**confused**  131:12
148:1,16 187:8
**confusing**  10:5
104:5 278:13
**confusion**  62:15
**congratulations**
13:18 14:10
**connect**  168:6
173:16 174:3
**connecticut**  1:18
297:2,4,5
**connection**  121:12
137:15 201:14
**connia**  51:18
**consider**  23:4
45:11 74:13
129:22 136:25
137:8 138:7
159:10,17 169:11
250:2,5 255:12

[consider - correct]

257:2,5,15
**consideration**
127:17
**considered** 17:22
19:22 23:7 31:11
61:17 71:16
115:25 116:3,6,10
117:2,14 128:14
130:20 131:4,8
132:4 133:23
141:8 148:24
158:24 159:1
163:18
**considering** 178:2
179:16 182:16
**considers** 257:11
278:16 279:1
**consistent** 66:15
**constance** 170:15
**constant** 196:11
**constantly** 274:19
**consultive** 145:3
145:11
**contact** 92:2
106:19,25 115:4
115:10 156:4,5
161:9 166:13
176:9,11 184:2
185:14 196:12,15
196:19 200:24
276:21 277:6,7
**contacted** 118:18
221:4 233:5
238:17 277:12
**contacting** 256:24
257:10,12 258:8
289:21 290:7
**context** 73:24
75:22 77:3,16
134:3 141:17
147:2,6,8,14

149:12 154:12
155:13 176:4
191:6
**contexts** 77:5
**contingent** 166:11
**continue** 26:24
28:16 45:8 46:14
47:19 115:3,9
118:21 166:19
185:3,18 290:23
**continued** 4:1 5:1
21:14 204:9
**continues** 22:18
**continuing** 26:19
47:8,15 209:6
**continuously**
294:17
**controlled** 292:10
**convene** 24:24
**convenience** 91:11
129:16
**conversation** 4:24
57:20,24 58:4,11
58:14,17,23 59:18
134:3 135:8
136:13 167:21
184:3 185:7,21
228:16
**conversations**
173:25
**conversion** 191:17
**convert** 97:1 187:5
187:10
**converted** 67:23
106:14,20 107:1
127:6,8 162:17
187:14,18 188:1
189:3,4,25 190:7
190:17,20,20,25
191:5,9,9,10,11
192:8,10 277:2,15

290:18
**converting** 159:18
240:20
**converts** 127:18
188:24
**convey** 35:25
**convincingly**
35:25
**coo** 11:7,8,15
188:22 191:15
**cooley** 1:12 3:4,16
3:18 7:5,23 20:15
67:12 144:11
183:16 188:12
296:3,10 297:4
298:3,21
**copy** 40:2 248:6
266:18,21 295:10
**corollary** 78:15
150:17 152:2
**corporate** 291:22
**corporations** 42:4
**correct** 11:16,18
12:7 13:22 15:11
17:20 18:12 19:6
21:8 23:1,11,14
24:17 27:6,7
28:14,19,20,23,24
29:10,11,18,19
30:11,12 31:14,19
33:3,6,11 34:5,12
34:13 35:18 36:10
36:17,18 37:14,21
37:22 38:2 39:3
39:13 43:9,15,18
43:19,22 44:1
45:17,18,20 46:5,8
46:10,11,13,19,20
47:4,5,21,22 50:17
50:18 51:6,14
52:11 53:23 54:1

54:4,11,18 56:11
57:6,7 58:1 60:8
60:11 62:12,21
63:4,16 64:1,18
67:5 69:3 70:6,7
72:23,24 73:9,10
75:5,8 78:1,2,4,5,9
78:10,13,16 80:1
81:20,23,25 82:11
82:15,16 83:2,5,8
83:12 84:2,14,15
84:19,22,23 85:1,2
85:20 86:23 87:1
87:17,18,22 90:5,6
90:11,13,16 91:3,8
92:7,10,11 93:2,3
93:7,10,15,20 94:2
94:9,17,22 95:3,4
95:8,12,16,21,22
95:23,24 96:2,3,8
96:11 97:5,9,14,22
98:1,2,7,12,19,25
99:1,21 100:1,21
101:23,24 102:13
102:18,19 103:5,7
103:23 105:25
106:18,20 107:1,4
107:8 109:24
110:8 111:8,13
112:4,5 114:24
119:11 120:10,12
123:20 125:10,14
125:19,24 128:19
128:20,23 129:6,7
129:8,11,12,20,21
130:8,18 131:14
131:17,18,21,22
131:24 132:18,19
133:1,6 134:7,8
136:20,21,22
137:22,23,25

[correct - create]                                                                Page 12

139:8 140:23
141:6 142:1,15
143:13,14,16,17
147:19,20 148:10
148:13 149:4,8
150:1,11 151:10
151:12 152:15,16
152:18,19,21
153:25 154:4,5,7,8
154:11 155:7,23
156:6,11,15 157:6
159:3 162:2
163:12 164:1,2,23
165:19,20,25
166:1,9 167:11,12
168:11,12,14,16
168:25 170:21,22
171:1 172:10
175:5,11 176:16
176:18,25 177:8
178:8 179:19
180:22 181:4,18
182:6,7,12 187:1
188:3,16,17,22
189:12,15,22
190:4,7 191:20,21
192:5,6,8,24,25
194:14 195:15
197:12,13 198:3
202:14 203:3
204:14 205:12,23
205:24 206:24
207:2,3 208:3,10
208:17,20,24,25
209:2,7,10 210:5
211:23 212:7,18
216:1,5 217:17,19
217:20 218:5,6
219:21,23,24
220:4,7,12,15,18
220:24 222:7,12

223:8,10,22,23
224:10,13 227:5
227:10 229:11,18
230:25 231:9,13
233:16,17 235:7,8
236:4,5,6,7,9,10
236:13 239:12,16
239:21,22,25
240:3,20,22 241:1
241:18 242:17,25
243:4,6,16 245:1
246:16,17,19,22
249:7,10 250:17
250:20 251:8,18
251:19 252:17
253:4 254:5,17,18
254:20,23,24
255:19 256:14,17
257:19 261:6,17
262:17,18,20
263:14,17,24,25
264:15 266:15
269:25 270:2,11
270:14,22,23
271:3,4 272:14
273:20 275:23
276:3 278:21,22
279:2,3,18,19,21
280:1,2,8 281:10
281:10,13 282:9
283:5 285:14,21
286:2,6,12,16
287:4,6,8,9,10,13
287:16,22 288:1,8
288:9,11,14,17,18
289:6,11,20,22
290:5,6,9,11,15,16
290:19,24,25
291:2,7,19 292:10
292:13,18,24
293:5,10,16 294:6

294:16
**corrections** 296:4
**corrective** 68:7
**correctly** 21:3
   27:2
**correspondence**
   202:16
**corresponds**
   252:24
**costs** 79:19,25
**counsel** 6:2,7
   297:14,16
**counseling** 283:16
**counselor** 14:6
   58:20 99:9,10
   118:10,11 122:21
   124:15,18,22
   130:15 134:4,25
   135:23 139:11,12
   139:15,17 140:2
   140:19 141:21
   142:5,14 145:23
   146:16,21 153:14
   157:17,21 158:17
   161:7,25 162:10
   170:14,19,25
   171:16 195:22
   196:6,8 200:13
   202:4,5 205:4,15
   205:22,25 206:6
   207:6 208:6 209:5
   217:13 220:2
   221:25 223:10
   224:20 225:3,9,11
   226:1 227:9
   262:22 294:20,25
**counselors** 16:20
   20:5 58:9,10,22
   89:12,24 91:7
   99:3 100:17
   112:11,23 113:8

114:9 120:7
123:19 125:8,12
129:5 130:17
131:4,7 134:6
135:10 136:6
137:21 141:5,10
141:24 158:2,12
161:8 162:14
171:3 185:6 194:3
200:7 201:13
202:22 203:8,15
206:17 207:13
208:9 209:12
221:7 222:11
224:24
**count** 146:10
**couple** 30:15
   128:4 150:9
   210:23 291:15
**course** 17:2
   107:16 130:9
   131:15 154:23
   162:7 178:18
   179:8 181:19
   192:18 200:19
   221:21
**courses** 27:25
   185:23
**court** 1:1 208:14
   297:9
**courtroom** 8:8
**cover** 93:5,9
   280:13,19
**covered** 99:22
   137:8 146:23
   149:23 180:16
**crc** 1:24 297:23
**create** 60:14,21
   104:24 111:16
   262:11

**created** 61:1,6
  75:2,19,20 104:21
  127:19 241:9
  242:7 260:2 261:8
  261:10,14 262:3,4
  262:6,9,17,19
  277:16
**creates** 261:23
**creating** 262:12
**creation** 35:6,14
**credentials** 215:20
**credit** 223:16
**criteria** 275:11
**criticize** 173:14
**crm** 15:9,10,12,25
  16:2,4 60:1,3,5,8
  60:10,14,22 61:7
  82:7 104:21
  105:10,19,21,24
  106:3 126:23
  127:11,12 202:8
  202:16,24 230:21
  232:9 236:15,15
  237:6,12 240:3,8
  240:10,14,18
  245:15 246:13,15
  246:16 262:14
  275:16 277:13
**cross** 269:19 270:2
**crossed** 21:13 22:3
  181:11
**crr** 1:24 297:23
**cry** 173:8
**crystal** 155:9
**csr** 1:24 297:23
**culture** 160:8
  161:20 174:24
  177:16
**curious** 79:4 151:4
**current** 14:12 16:7
  32:10,11,16 47:6

47:11 236:22
**currently** 32:13
  45:3 63:5,12,12
  64:13,21 65:1
  115:3,9 229:4
  275:8
**customer** 139:23
  139:24 141:3
  145:15
**cut** 76:3 144:18
  221:16 223:21
**cutoff** 85:8

**d**

**d** 2:16 222:16,16
  229:7 231:19
**dan** 231:2
**daniel** 229:15,16
**data** 232:8
**database** 214:9
  292:14
**date** 1:14 33:21
  34:2 48:17 65:8
  114:19 205:24
  214:21 235:12
  251:3 252:1 261:8
  261:8,9,10,14,14
  262:1,3,4,6 268:7
  268:8 298:2
**dated** 22:4 37:3,16
  171:19 236:12
  252:2 254:19,22
  256:16
**dates** 17:7,10
  30:16 201:16
  250:16 261:13
  291:25
**david** 237:2
**davis** 1:4 97:17
  118:6,15 242:25
  243:3 249:18,22
  251:20 252:4,12

253:2,7,10,13,14
  253:17 254:4,10
  254:17 255:1,5,17
  255:23 256:14,19
  256:23 257:22
  263:4,12 264:1
  271:25 297:8
  298:2
**davis's** 119:3
  246:13 249:13
  252:7 258:7
**day** 35:9 74:3,3
  80:11,11 172:8
  173:4 184:3,6
  185:11,11 196:11
  200:7 261:15
  296:13 297:18
  298:23
**days** 253:8,10
**dc** 2:14
**deal** 84:12
**dealing** 81:21
  197:3
**deals** 81:18 83:25
**dealt** 81:16 153:9
**dean** 234:22
**dear** 52:5
**debate** 84:6
**deblasio** 229:15,16
**debt** 28:10
**december** 4:6 16:1
  22:5 31:1 37:21
  138:23
**decides** 24:16
  282:13
**decision** 26:8
  27:16,21,22 42:20
  140:4,5
**decisions** 25:1,3
  25:12,14

**decreased** 65:24
**deduce** 185:15
  186:3 252:16
**defendant** 1:8
  2:11
**deferred** 113:23
  114:2,11,14,20
  115:15,17,20,22
  119:5,10
**deferring** 114:6
  211:22
**define** 77:7 141:14
  154:12 179:6
**defined** 148:23
**definitely** 107:24
  214:20 225:24
  247:22
**definition** 77:25
  78:6 137:3,13
  141:16,20 142:1
  144:16 146:24
  147:5,10,12,13,16
  148:3,6 149:11
  151:6 152:8
**definitions** 74:17
  74:20,21,24
**definitive** 227:1
**deines** 229:7
**delete** 254:7
  271:21,24 272:17
**deleted** 272:13
  273:12
**deleting** 272:8,24
  273:5,9,13
**deliberate** 24:25
**deliver** 142:18
  144:23 175:1
**delivered** 46:25
  105:23 177:20
  205:8 224:17

delivering 144:7
delivery 143:2
demand 16:3
 106:3
demonstrated
 56:10 94:21
demonstrates 94:5
department 19:25
 22:8 31:18,19
 33:9,10 88:11
 89:24 105:2,7,15
 105:18 111:3,7,11
 111:11 130:18
 140:9 160:11
 167:7,10 169:10
 202:6,22 229:6
 238:2 271:10
 283:18
departments 35:5
 35:11,14,15 52:23
 135:17
depend 122:23
 130:1,13 151:18
 155:25 159:14
 176:20 282:11
dependability
 40:9,25
depending 215:3
depends 83:15
 120:21 123:2
 129:9,25 130:12
 132:7 151:17
 152:25 155:24
 156:21 159:13
 162:13 167:8
 176:19 180:10
 182:2,17,23 208:4
 208:8 257:4,8
 276:13 277:10,25
 277:25 282:10
 283:7 284:4,15,18

287:23
depict 71:25 72:1
 72:2
depicting 72:5
depicts 72:3,6
deponent 296:1
 297:7 298:3
deposed 7:25 8:2
 12:23 153:6
deposition 1:12
 3:15,16 6:10 7:1,2
 7:4 9:19,23 10:25
 11:20 12:2,10,13
 50:14 71:1 73:22
 73:25 75:22,23
 144:17 146:3,11
 213:18 266:7,18
 296:4 297:4,12,15
 298:2
depositions 89:22
 125:7
described 194:21
 195:14 215:25
 267:4 288:21
describes 241:11
 265:7 266:1,10,25
 267:12,16 285:18
 293:15
describing 72:4
 243:19 268:22
 291:9 293:8 294:2
 294:6
description 4:6,8
 138:23 139:2
 145:22 146:15
 147:9
descriptions 139:9
 145:20
deserve 174:6
deserves 160:4

design 112:13,14
designated 1:13
 3:15 7:3 112:17
 153:5 265:18
 266:8,15 268:25
designation
 219:18 220:12
designed 86:19
 110:16 156:22
designee 267:24
 291:23
despite 227:7
 240:23 243:6,7
 266:14
detail 5:2 246:6
 250:14 258:24
 259:6 263:2
detailed 243:21
determine 84:25
 136:19 154:10
 182:21 202:21
 224:21 225:19
determined 86:14
 86:17 93:10,19
 98:18 220:3
determines 109:10
determining 155:5
 190:24 294:21
detoma 170:9,10
detoma's 170:12
developed 166:4
 196:4
developing 28:6
development
 230:17
deviations 84:21
died 196:16
differ 41:24
 260:15,16
difference 78:21
 79:5 80:22 84:7

96:16 107:5
 168:17,20 181:6
 181:10 184:20
 262:2 280:7,22
 281:2 282:3,4,5
differences 150:6
different 24:12
 41:20 51:17 52:22
 65:18 70:3,5 77:6
 81:14 82:4,9
 83:20 84:17 94:14
 98:11,16,23,24
 102:23 103:11
 107:12 109:15
 122:20 124:19,24
 139:9 148:20
 150:9 191:7
 236:18 278:11
 283:25 293:24
difficult 86:21
dig 270:19
direct 3:5 7:22
 145:6 204:9
directed 6:5
direction 199:17
 225:16 297:11
directly 51:11
 79:12 94:2
director 13:14,20
 14:4,15 16:14
 17:3,5,18 18:6
 19:7,11,12 29:7,9
 29:17,20 30:2,3,10
 31:12,13,21 32:7
 32:11,15,16 89:25
 90:1 131:16 169:9
 188:13 229:4
 248:12,14,14,15
directors 19:21,22
 89:15,17 129:13

directory 274:2,13
directs 269:7
disable 274:12,18
disagree 80:8,16
  80:20 100:10
  141:18 142:20
  147:11 174:8
  184:24 185:4,5
disagreed 27:3
disagreeing 149:2
disagreement
  23:20 81:2
disclosure 161:23
disconnect 148:4
discontinue 26:25
discount 77:8 78:1
  280:14,19
discounts 77:9
discovered 289:14
discovering
  154:25
discovery 13:6
  155:14
discrepancy 40:17
  40:20 261:13,15
  262:8,10
discretion 194:3
discuss 144:20
  210:15 239:15
discussed 63:15
  95:16 96:18 99:17
  116:1,4 128:15
  130:16 142:25
  148:22 167:14,16
  186:5 209:10,13
  210:9,22 219:16
  230:9 252:17
  270:21 287:24
  288:13 293:23
discussing 37:21
  54:16 68:2,17

143:24 147:25
discussion 50:3
  66:5 86:12
disinterest 119:24
  120:2,18
distinction 97:4
  158:1
district 1:1,2 7:18
  297:9,9
divided 72:22
divider 33:2
dnc 238:12 268:17
document 3:24 5:4
  5:10 21:10,12,20
  24:14 25:11 34:11
  52:11,14,17 63:3,4
  63:15 67:9,19
  68:3 70:19,23,25
  71:3,6,8,13,14,15
  71:17 72:3,5 73:5
  73:8,15,19,21,25
  74:2,5,8 75:1,10
  75:18,19,20,22
  76:16 77:17,23
  78:7 81:17,22
  82:23 85:3,10,25
  87:12,17 88:8
  89:4,7,11,19 90:12
  90:21 91:10 93:21
  94:11 99:19
  100:18 110:4,17
  110:19 111:8,11
  111:17 112:3,6,12
  117:24 118:3
  126:17 139:20
  140:20,22 142:3
  145:25 146:2,13
  146:14 148:2
  149:21 150:11,15
  151:23 158:5,7
  170:3 175:12

186:5 195:1
213:11,16,17,18
213:20,23 214:2
214:24 225:12
226:21,22,22,24
228:22,22 230:15
231:7 232:16
241:9,20,25 243:8
243:11,12,15,18
243:19,22 244:1,5
244:9,15,19,25
245:4,7,11,21
246:10,12,21
247:14,19 248:8,9
254:3 260:6,11,13
260:18 264:24
265:2,7,21 266:1
266:10,24 267:4
267:12,16 294:20
294:24
documentation
  202:15 207:14
  208:2 233:4 293:2
  293:3
documented 98:1
  98:1 149:17
documents 11:19
  11:22 12:2,9,11,12
  12:15,16,20,24
  13:2,7 21:23,25
  50:13 62:24 71:24
  93:2,6,18 98:12,17
  98:17 100:24
  110:18 113:2,17
  126:14,16 139:6
  146:12 150:12
  214:3 219:14
  237:20,23,24
  239:14,19 241:1,2
  241:20 243:24
  244:7,12 247:13

265:4,12 268:21
  269:1,2
dog 20:12
doing 44:11 69:5
  110:9 158:17
  160:14 161:19
  162:22 194:18
  196:21 199:12
  241:4 272:18
  279:9
double 220:24
drafted 88:8,9
drawing 97:5
dread 86:11
drive 2:5
driven 101:10
  104:16 139:24
  157:1,25 261:18
drop 221:9
dropped 39:19
due 28:1,4 168:7
duly 7:10 204:5
  297:7
duplicate 259:6
  260:1,2
duplicated 21:7
duplicates 215:12
duties 18:3

e

e 2:1,1 7:9,9 172:7
  204:4,4 222:16,16
  222:16 229:7,7
  231:19,19 297:1,1
eagle 52:12,19,21
  53:1 59:12 61:20
  63:1 143:10 186:1
eared 20:12
earlier 38:12 66:9
  78:11 157:12
  172:4 190:14
  268:14

**ease** 124:12 193:8

**easier** 70:13

**ebb** 150:3,5

**ebr** 239:7

**edited** 260:22

**education** 22:13
27:1 28:17 46:25
47:15 57:3,20
78:17,20 79:18,24
80:1,2,4,8,16 81:4
83:8,10 84:1,9
86:22 87:11,20,22
104:15 108:3
141:19 143:20,25
145:10 147:2,3,15
147:19,23 149:3
149:13 150:16
151:9,16,24
159:25 165:16,23
168:13,15 174:25
175:8 177:19
280:25 287:1,3,9
287:12,15

**educational** 26:24
45:1 46:18,22
47:3 78:12,16,23
79:1,13,16 80:23
80:23 81:7 83:5
87:16 140:4
143:16 144:21
149:6,19 153:21

**effort** 135:5 187:3

**efforts** 102:1
186:15,17 192:15
192:24

**eight** 161:16
199:15

**either** 10:12 24:13
100:12 124:2
168:20

**elaborate** 85:7

**elaine** 11:3,4
211:15,19

**element** 138:8,12
207:23

**eligible** 280:17

**email** 3:20 4:10,11
4:16,22 50:9,19,22
51:9 52:4 103:1
111:4 118:2,4,14
119:4,9 121:5
130:8 133:18
135:2 152:11,14
169:23 170:6
171:18 174:8,9
182:10,13,25
183:3,11 184:4,8
184:25 185:1,16
186:3 188:8 189:9
189:11,15 191:19
191:23 192:1,8
211:11,15 215:9
221:12 222:5,10
222:17 223:7
225:17,25 226:17
228:11 229:17,24
229:25 231:2,8,11
231:12 232:3,13
232:17,24 233:18
234:17 235:1,11
236:13 242:13
249:5,6,9,13,18,22
250:9,11,16,19
252:1,15,17,22,24
253:1,6 254:13,16
254:19,22 255:5
256:13 259:14,17
270:21,25 271:13
271:14,19 272:25
273:6

**emailed** 21:4
242:9,11,12

**emailing** 249:23
254:11 255:7,7

**emails** 4:4,13,18
4:19,21 5:6,7,9
12:17 102:9
117:20 211:7
227:21 228:1,6
237:20 249:1
253:24 256:6
271:11,21,24
272:13 273:10,12
273:13

**embarking** 177:19

**embedded** 127:14

**emelinda** 221:24
222:6,16 223:17

**emily** 17:4 223:18

**emotional** 197:21

**emphasis** 38:23

**employed** 135:11
297:14,16

**employee** 17:22
23:5,8 36:19 58:8
67:15 120:19
124:3 128:25
169:12,19 171:11
248:16 251:11
271:14 274:1,13
274:20,23 297:16

**employees** 16:8,11
16:18,19 33:15
121:21 210:14
212:15,17,21
213:8 251:7 265:8
269:12 271:10
274:24

**employment** 16:8
16:12

**encapsulated**
87:12 151:23

**encompassing**
135:19

**encourage** 135:6
204:23 206:2,6,13
206:19 207:6,10
207:12 290:13,19

**encouraged** 194:7

**encouragement**
207:20,23 208:1
208:22

**encouraging** 291:1
291:4

**enforcing** 173:1

**engage** 168:2

**engaged** 173:24

**engaging** 173:24

**engine** 103:16,16

**enroll** 47:8 68:24
69:6,14,25 81:23
82:1 93:20,24
135:9 152:9
153:16,18 154:4
156:13 159:12
176:17,22,24
177:8,13 186:15
187:3 192:15,24
194:9 280:1
281:22 282:7,23
284:11,24 286:6
286:10,20

**enrolled** 46:13
47:10 64:13 95:11
116:24 159:19
162:18 179:25
180:1 186:25
187:6,11,14,18
188:2 199:4 286:3
287:12 291:12

**enrolling**  46:13
177:25 178:14,20
180:5,8 181:14,24
182:14
**enrollment**  11:14
11:17 14:2,23
16:10 17:14 18:17
30:14 43:9,20
55:24 72:8,9 73:9
73:16 74:9 75:12
75:13 76:11,12,18
82:18,24 85:4
87:1,8 88:2,11
95:15 101:17
102:2 110:12,13
110:24 111:6,22
111:22 113:5
116:19 117:2
119:15,16 132:25
133:6,9 135:6
136:11,13 143:9
143:11 148:18,22
150:20 153:20,25
156:15 165:24
166:8 172:16
181:21 185:22
199:21 207:18
276:23 281:25
282:1,2 285:18
287:19 291:6
**enrollments**  54:17
54:20 55:12 56:13
59:13 61:10,18
62:9 63:16,25
64:4 116:7,10,11
116:15 117:10,15
**enrolls**  179:14
180:14 181:2,9
182:4 282:8
284:11,23 285:5
285:12

**ensure**  215:21
**entail**  33:18,21
**entailed**  126:5
**enter**  264:7 290:22
**entered**  261:21
**enters**  105:18
**entire**  100:14
145:25 269:22,23
270:3
**entirety**  242:1
280:19
**entity**  273:19
**entrance**  283:15
**entries**  241:8
254:8 258:12,14
258:19,23 263:7
263:23
**entry**  60:6 105:3
220:23 221:8,18
261:4 262:15
263:19,24
**errata**  296:5 298:1
**error**  264:19
**escalated**  24:19,22
**especially**  121:14
140:5 280:18
**esq**  2:8,16
**essentially**  16:22
24:16 45:12,16
46:18,22 60:10
97:15 98:4 105:25
128:3 175:11,21
182:6 193:1
204:16 215:11
218:4 219:25
237:18 241:15
283:21
**establish**  147:12
148:6 149:2
195:20 220:10
268:18 269:4

282:2
**established**  39:13
77:25 78:11 81:3
86:21,25 128:21
132:24 142:1
150:7 151:7
152:14,20 153:19
156:25 157:17
165:17 167:22
194:17 195:5
200:16 204:11
252:1 277:6,7
286:25
**establishing**  148:3
**etcetera**  20:22
51:18,19 85:13
156:10 233:4
237:13
**evaluated**  63:25
64:4 91:7
**evaluating**  99:24
100:16
**evaluation**  37:2
38:12 39:10,11,15
39:25 40:24 79:3
99:2,23 109:13
154:20
**evaluations**  39:20
**event**  94:14
**events**  118:20
**eventually**  116:24
**everybody**  170:18
198:21 216:7
218:15,24 272:9
**everyday**  200:12
**everyone's**  218:19
**evidence**  241:13
**evidences**  264:24
265:2,21
**evidencing**  293:3

**exact**  30:16 112:19
166:2 200:3,5
**exactly**  183:12
198:25 210:8
**examination**  3:2
7:22 204:9
**examined**  7:11
**example**  63:19
84:13 94:16
124:13 162:19,25
238:7 261:8
264:19
**examples**  199:12
285:1
**exceed**  41:1
**excel**  52:16 139:24
235:21,22
**excellent**  139:22
141:3
**exception**  99:16
**exchange**  250:19
252:1
**excited**  248:10
**exclude**  210:18
**excluding**  210:12
210:17
**exclusive**  220:10
**exclusively**  204:12
219:19,22 220:13
220:13,16
**excuse**  10:7 15:21
35:4 41:19 44:7
46:13 65:7 67:19
79:16 95:25 118:2
123:6 139:19
140:19 141:1
143:18 150:12
159:10 166:19,20
167:15,17 169:15
174:15 178:12
180:12 192:1

193:11 204:23
205:5 214:18
218:3 219:20
245:8 246:2,25
250:9 251:16
255:7 257:10
259:23 265:1
266:23 270:10
277:19 281:1
282:23 289:9
290:14 291:16,24
294:5
**excused** 203:22
**execute** 248:21
**exercise** 190:19
**exhausting** 218:21
**exhibit** 3:15,17,20
3:21,23 4:2,4,5,7,9
4:11,12,14,16,17
4:19,20,22,23 5:2
5:4,5,7,8,10 7:2
9:18 12:1 20:10
20:13 50:7,9
66:24,25 70:17,19
88:22,24 115:24
117:20 138:22
139:1,10,20 141:1
142:4,10 148:22
149:18 155:19,23
156:20 163:6
164:12 165:19
169:22,23 186:9
188:6,8 194:19,23
195:7,11 204:14
206:17,22,23
207:5 211:6,7
212:24 213:1,2,12
221:11,12 227:20
227:21,25 228:1,5
228:6,10,11,15,16
228:24 232:12

234:16 236:17
238:7,15 246:5,6
247:8,14 248:7,25
249:1 252:18
253:20,23,24
254:14,15 256:5,6
256:11,18 260:5,6
270:20 281:3
282:18 288:22
289:11
**exhibits** 3:12 5:24
227:18
**exist** 244:15
**existed** 40:20
101:10
**existing** 240:14
**exists** 245:4,11
**expand** 42:5 60:7
154:1 202:20
**expanded** 247:4
250:23,24
**expect** 200:4
250:24
**expectation** 285:4
285:11 286:10,20
**expectations** 12:3
17:25 40:14 41:1
142:13 169:16
171:15 248:22
**expected** 96:22
142:5 166:6 286:1
294:9
**experience** 43:4,5
43:8,14,21 44:5,9
44:10,16,17,19
46:24,25 47:2
51:2 145:3,9,16
146:17 157:12
160:4 176:13
186:1

**experiences** 197:2
**expires** 296:20
297:24 298:25
**explain** 10:8 55:13
56:4 137:6 261:12
269:3
**explained** 185:5
**explaining** 244:1
**explains** 244:20
**explanation**
264:10
**explanatory** 25:22
120:6
**explicit** 257:7
**explicitly** 220:21
292:8
**export** 225:6
226:4,14
**exported** 227:2
**express** 277:5
**expressed** 58:5
61:8,11,13 62:13
62:18 106:13
107:25 114:5,19
119:23 120:18
121:24 122:3,8
123:11,16 157:24
181:3 204:21
205:17 206:8
218:13,22 277:12
278:9
**expresses** 226:16
276:22 277:20
**extended** 27:24
108:1
**extent** 130:22
**extra** 182:24 221:7
**extreme** 199:24
**extremely** 194:5
**eye** 52:12,19,21
53:1 59:12 61:21

63:1

**f**

**f** 26:23 297:1
**fact** 111:10 225:4
253:5 256:10
263:18
**factor** 285:9
**factoring** 135:17
**factors** 34:24
285:20 286:9,19
**facts** 36:1
**fafsa** 83:21 84:13
84:17 93:5,11,14
93:17,23 94:2,8,8
94:10,13,16 95:2,2
100:4 252:7,11,18
252:23 253:6,7,8
253:11
**failed** 67:17 264:7
276:5
**fair** 8:14 10:22
23:4 25:20,24
27:11 33:23 36:8
38:8 42:14 44:25
45:13 69:22 73:11
81:1 87:3,24 91:5
117:6 119:13
140:13 143:21
144:1,19 146:18
155:15 156:18
158:16 160:18,24
166:15,16 169:2
173:11 177:11
184:11 186:4,16
193:3,4 195:11
199:22 204:18
249:16 260:22
284:10 291:11
294:13
**fairly** 89:18
113:20

**fall**  85:11 130:18
**falls**  34:4,9 244:4
  255:14 283:21
**familial**  109:13
**familiar**  52:19
  71:4 73:23 216:19
  245:13
**familiarity**  171:8
**family**  163:24
**fantastic**  44:4
**far**  88:20 122:13
  217:22
**fashion**  224:17
**feature**  274:18,21
**february**  236:12
**federal**  7:16 45:9
  45:20 46:1 108:4
  252:13 280:16
**fee**  78:20 79:20
  80:5,6,24 141:19
  147:15 149:4,14
  168:23 169:4
  287:6,7
**feeding**  109:23
**feel**  41:21,22 77:6
  80:10 137:13
  140:8 159:6 160:4
  174:13,25 177:18
  177:19
**feeling**  153:2
**feelings**  80:13
**feels**  160:3 178:24
**fees**  26:10,11
  45:17 149:23
  280:20
**feet**  121:16
**felt**  28:1 31:4
  57:18
**field**  227:11 233:1
  245:25 251:2,15
  252:22

**fields**  60:25
  247:21 258:23
  260:25
**fighting**  144:16
  155:18 168:19
**figure**  137:17
  166:3
**figures**  200:9
**file**  60:14,21 61:1
  61:6,12,14 69:13
  70:11 100:3
  104:21,25 105:24
  118:24 119:3
  127:11,19 207:18
  226:9 242:1
  245:14 251:12
**filed**  271:25 272:3
  272:5,6
**files**  60:10 127:21
**fill**  22:22 208:3
  253:8
**filled**  23:13 53:12
  65:4 97:20 104:17
  104:18 122:8
  168:4 205:1 239:2
  252:12 253:11
**filling**  133:17
  288:25
**fills**  103:18 105:22
**finally**  82:14
  196:15
**finance**  62:25
**finances**  49:15
**financial**  47:20
  93:10,18 98:18
  283:18
**financially**  297:16
**find**  70:17 102:20
  102:24 103:8
  112:19 115:24
  128:13 157:20

215:14,18 225:13
  225:14 235:25
  247:6 253:21
  267:7,9 268:13
  275:1 276:15
**fine**  17:16 109:1
  117:25 135:13
  144:18 155:10
  178:22
**finish**  8:21 44:5
**finishing**  8:20
  55:10
**firm**  2:4
**first**  7:10 8:21
  14:17,18 20:19
  21:12 22:14 34:24
  37:10 39:25 42:24
  52:25 60:19 63:4
  65:7 72:14,21
  74:10 91:12,21,25
  95:25 96:1,4
  103:6 105:2,7
  130:25 139:10,20
  141:2 152:10
  153:14,15 154:2,6
  155:16,22 156:13
  156:13 172:3,6
  173:22 186:23
  203:17 204:16
  215:1 217:12
  218:18 230:14
  233:18 237:8
  251:7 261:8 277:8
  282:13 283:23
  285:3 297:7
**firsthand**  217:23
**fiscal**  48:7
**fit**  57:19 78:7
  178:25 215:19
**five**  109:7 237:23
  239:14

**five9**  15:14,16,21
  15:22
**fix**  124:2,4
**flies**  171:24 172:1
**flip**  33:13 65:6
**flipping**  37:10
**floor**  142:6,21
  158:8 216:7
**florida**  1:2 7:18
  297:9
**flow**  150:2,3,5
**flowchart**  81:15
  92:4 96:18 112:13
  112:22,25 113:4,7
  113:9,18 289:10
**flowing**  281:18
**fluctuated**  19:20
**focus**  68:7 69:5
  83:23 122:14
  293:25
**focused**  166:18
  167:6
**focusing**  214:4
**folder**  242:1
**folks**  233:3
**follow**  83:2 92:12
  217:15 278:8
  279:14 280:1
**followed**  218:25
  221:5 282:25
  283:1
**following**  24:23
  30:18 115:8
  118:16 159:16
  172:23
**follows**  7:11 128:5
  204:7 250:14
  282:8
**forecast**  63:7,11
  63:16,19,21

**foregoing** 296:3
**forget** 231:3
**forgive** 19:10
  135:16 199:23
**forgot** 264:7
**form** 3:22 6:5 33:4
  45:21 56:8 67:1
  73:13 79:6 103:20
  103:20 110:10
  122:24 148:14
  149:15 153:1
  164:7,20 222:13
  224:6 270:8 281:8
  293:11 297:11
**former** 161:19
  163:10 193:11,13
  231:16 262:22
  278:3
**formerly** 273:18
**forms** 124:19
**forth** 91:9 247:12
**forward** 10:18
  20:24 28:16 51:4
  57:3 80:3 97:7
  109:11 114:16
  150:24 161:12
  162:24 165:15,23
  168:15 222:10
  276:23 278:2,5,10
**forwarded** 51:5,8
  52:4 233:19
**found** 127:25
  178:24 274:24
**foundation** 45:22
  57:11
**four** 17:9 93:7
  258:11,14
**fox** 2:12
**frame** 34:8,10
  86:9 161:17 211:3

**francisco** 262:19
  262:21
**free** 77:6 78:18
  108:3 220:22
  245:20,21 252:13
  260:18,25 261:3,4
**frequently** 161:21
**front** 51:12,13
  75:10 226:8
  239:14 254:19
**frustrated** 76:6
**full** 161:22 176:3
  247:1 284:8
**fully** 146:5
**fun** 125:7
**function** 42:4
  138:15 239:11,12
  274:13
**functionalities**
  240:7
**functioning** 52:24
**functions** 240:3
**funding** 45:7
  280:16 283:14,24
**funnel** 70:1 82:2,3
  84:3 99:7 156:23
  164:12
**funny** 144:11
**further** 6:9 70:1
  122:15 128:7
  204:6 263:23
  295:4 297:6,10,12
  297:14,15
**future** 115:5,11
**fuzzy** 193:8
**fy** 65:8

**g**

**g** 172:7
**gabriel** 223:16
**game** 156:25

**gather** 26:20
  225:17
**gauge** 123:4
**gauging** 209:5
**general** 74:23
  90:21,22 179:9
  206:10,11 207:1
**generally** 16:18
  42:4,15 43:24
  44:20 84:22 150:1
  251:10 281:21
**generate** 27:16,19
  42:7 43:18 44:19
  45:3 56:13 59:13
  62:9 178:9 180:13
  283:7,8,10 284:1
**generated** 26:9
  127:8
**generates** 28:11
  28:19,22 282:9
**generating** 25:8
  28:8 178:8
**generation** 45:6
  177:23
**getting** 76:6 94:20
  110:5 122:11
  159:12 172:7,19
  173:9 174:5,9,11
  183:1,9,17,20
  195:6 199:4
  206:12 278:12
**gi** 45:10 46:7
  84:18 94:16
  149:24 151:21
  280:13
**giant** 292:3
**give** 70:14 71:21
  109:6 135:12
  155:17 166:2
  199:11 200:3,4
  214:10 227:19

  247:13,25 279:7
  282:15,16
**given** 12:9 34:2
  79:2 173:20
  189:21 200:7
  248:6,7 285:2
  297:13
**gives** 190:1
**giving** 23:20,21
  77:9 177:4
**glapion** 2:4,8 3:5
  7:15,22 12:5,22
  13:4,8,11,12 20:9
  20:11,18 21:4,16
  27:20 40:4 49:18
  49:25 50:4,12
  52:14 66:4,6,7,20
  66:23 67:4,7
  70:16,22 82:22
  88:21 89:3 113:15
  113:22 117:17,23
  120:14,16 128:8
  128:11 138:17,20
  139:5 167:1,4
  169:21 170:1
  187:22,24 188:5
  188:11 203:19
  204:9 211:5,10
  212:25 213:6
  221:10,15 227:17
  227:24 228:4,9,14
  228:20 246:4,9
  247:7,11,17,24
  248:4,24 249:4
  253:22 254:2
  256:4,9 260:4,10
  275:4,7 279:4,11
  279:13 286:17
  295:4
**glapionlaw.com**
  2:9

**[gmail.com - happens]**

**gmail.com** 249:7
  249:13
**go** 37:5 38:24 39:2
  39:24 50:1,4
  53:22 54:2,3 66:2
  83:11 84:3,4,6
  86:11,12 88:20
  92:1,21,25 93:22
  94:1,6 96:11 97:7
  98:3,9,14,16,21
  122:12 127:14
  128:8 143:12
  144:12 146:9
  150:10 154:3
  186:13 187:20
  203:20 215:5
  220:20 222:18
  225:4,7,13 227:13
  227:14 236:11
  248:1 250:15
  255:21 260:17,18
  275:5 281:25
**goal** 24:4 28:25
  42:7 44:7,7,10
  53:8,14,15,16,18
  53:23 54:1,5,7,9
  54:15,16,17,23
  55:10,14,18
  101:13 132:25
  133:3,4 134:12
  136:11 155:15
  156:18 167:23
  168:3 204:13
  206:1,1 289:21,23
  290:7,23
**goals** 42:12 64:4
  90:24 101:16
  133:5 134:23
  136:12 153:13,16
  195:10

**goes** 98:11 109:9
  122:15 179:4
  180:21,25 181:8
  214:13 261:24
  283:19
**going** 8:17 13:5
  20:24 28:9 39:24
  40:2 49:16,25
  53:12 55:9 62:22
  84:8 88:19 91:9
  98:22 100:17
  101:9 103:18
  109:17 121:13
  124:13 135:1
  143:5 144:15
  146:10 150:19
  155:17 160:1
  161:9 168:5
  171:22 174:18
  175:24 177:12
  182:5 186:4,12
  197:14 200:18
  212:24 218:14
  224:21 227:17
  246:4 247:4,11,12
  253:20 256:12
  258:18 279:4,22
  280:25 281:5
  282:23
**good** 7:23,24
  17:22 23:5 34:10
  56:24 57:19 79:3
  93:25 164:13
  169:11,19 171:11
  174:1 184:2 185:6
  206:9 236:25
  248:16 295:5
**goodness** 164:6
**goods** 44:21
**google** 101:6
  201:20 203:6,7,8

  203:17
**gotcha** 62:22
  130:16 197:9
  237:10
**government**
  281:13 283:24
**grace** 282:16
**grade** 283:23
**grades** 24:11
**graduate** 139:10
  140:2,18,19
**grandmother**
  196:10,16 197:7
  197:11,22
**grandson** 198:5
**grant** 280:15,17
  280:18
**granularity**
  187:15
**great** 39:3 173:23
  185:21 275:5
**greatly** 273:1
**green** 71:19,20
  74:10 85:12 91:25
  95:20 96:1 106:25
**greet** 33:19
**greg** 4:24 228:17
  236:21 237:5,8
  239:23,24 240:1,7
  240:9 241:6
**gross** 65:11,15,17
  189:3,11,17,20
**ground** 26:12,14
**group** 20:3 58:8
**groups** 16:8,12,18
  128:25
**guess** 31:4 80:25
  80:25 86:10
  102:24 117:4
  123:2 125:5
  131:12 132:7

  148:15 154:23
  172:14,15 182:2
  182:23 199:19
  220:9 226:21
  276:16 277:14
**guidelines** 12:3
  268:16
**guys** 124:16

**h**

**halfway** 223:15
  234:5
**hand** 40:2 50:7
  88:22 110:17
  117:18 188:7
  221:11 227:17
  246:4 247:4
  253:20 270:25
  273:23,23 297:18
**handed** 254:15
**handing** 9:17
  247:25
**handle** 58:16 59:4
  212:22 213:8,21
  235:25 294:21
**handled** 240:16,25
**handling** 99:9
  241:7 294:11
**hang** 97:25 125:10
  125:14
**happen** 110:7
  215:12 221:1
  266:4
**happened** 114:22
  148:5 161:12
  181:25 185:10
  194:16,23 200:11
  250:19 263:16,19
  274:25 276:10,15
**happening** 275:3
**happens** 108:2
  123:13 161:21

happy 108:3
harbored 227:16
hard 33:1 122:21
 140:9
harvard 41:16
 101:21 285:15
hate 152:6 197:9
head 208:14
headed 5:10 260:6
headers 189:5,7
 251:1
hear 27:6 125:9,12
 161:14 175:2
 177:7
heard 15:14 55:6
 76:20 88:13 106:7
 107:15 108:12
 113:23 121:6
 130:24 131:13
 179:7 234:23
 235:2
hearing 58:5
heart 164:6
heartbreaking
 161:15
hedged 136:24
held 1:15 13:23
help 15:18 26:21
 26:24 28:23 46:1
 46:5,7 111:5
 121:17,18 124:11
 133:2 136:15
 140:8 143:9,20,24
 144:3 156:19
 207:16 208:2,7
 273:24 282:21
 292:3,11
helped 185:21
helpful 137:16
helping 44:19
 172:25 174:22

208:3
helps 28:15 188:18
hereto 297:16
hernandez 17:4
hey 166:5 207:20
hierarchy 18:20
 18:23 89:23
high 52:22 139:24
 173:15,22 193:25
 200:6
higher 41:11,13,16
 145:9 159:24
 238:3
hire 4:14 33:15,18
 213:3,9,15 216:4,9
 216:11,13,16,19
 216:23 217:2,9,19
 217:23,24 218:1,3
 293:21
hires 34:16,19
hit 53:8,14 54:20
 55:11,14
hold 41:10,13,15
 272:1,25 273:2
home 67:17
honest 110:15
honor 265:9
hop 247:12
hope 43:1,10,11
 43:12,13 102:16
 194:9 197:1
hopefully 53:8,14
 101:10 102:17
hopes 42:15,22
hoping 289:2
hopkins 18:14
 19:5 50:16,20
 51:9 61:23 62:6
horizon 241:5
hour 136:2 157:14

hourly 135:24,25
housed 202:16
 292:14
huh 20:23 21:1
 157:7 162:3
 173:19
human 264:19
hundreds 25:2,4,8
 25:16 26:3
hurt 181:21
hyperlinks 127:14
hypothetical
 122:12
hypotheticals
 125:7

## i

i.e. 237:6,12
idea 108:4 211:3
 274:9
ideas 36:1
identical 235:17
identification 3:13
 7:6 20:17 50:11
 67:3 70:21 89:2
 117:22 138:25
 139:4 169:25
 188:10 211:9
 213:5 221:14
 227:23 228:3,8,13
 228:19 246:8
 247:16 249:3
 254:1 256:8 260:9
identified 13:7
 110:14 275:11
identifiers 150:23
 282:20
identify 155:2
 168:8
imagine 49:9 62:1
immediate 265:13

immediately 52:8
 97:20
impacted 181:25
impactful 197:10
impeccable 36:20
 38:18
implementation
 236:14
implemented 15:3
 15:17 238:25
 268:12
implicate 211:4
important 94:22
 159:11,18
improve 44:15,17
 68:8
improving 44:10
 44:18
inbox 271:17
include 32:23
 129:18 137:5
 152:10 164:16
 201:20 207:20
 208:19 222:9
 226:12
included 102:4
 189:2 216:25,25
 217:1 224:4
 225:21 227:5,8
includes 137:4
 189:3 208:22
 240:11
inconvenience
 234:7
incorrect 92:20
increase 43:4,8,15
 43:21 44:1 101:17
 102:1 132:25
 133:6,9 136:12
increased 42:16
 42:17,22 43:2,17

43:20 273:2
**increasing** 44:9
  136:11
**index** 3:1 4:1 5:1
**indicate** 213:20
  263:8
**indicates** 213:24
  243:9 255:23
**indication** 240:12
  252:4
**indicator** 88:18
  91:13 92:6,18
  93:5
**indicators** 90:13
  90:17,20,25 95:14
  99:24 111:1
**indirectly** 43:25
**individual** 9:15
  10:6 11:25 183:22
  215:11,21 232:17
**individually** 1:12
**individuals** 120:9
  120:11 231:23
**info** 94:24 95:6
**information** 15:20
  26:6 38:23 39:8
  53:12 58:15 60:17
  103:19,20 104:16
  104:17 105:18,23
  121:4 124:11
  133:12,18,24
  134:1,9,12,22,25
  135:3,4 136:14
  137:7,9,10,14,22
  138:1,13,14
  141:25 143:3,5
  144:7,23,25
  152:18,21 153:1,2
  155:5 157:16
  168:5 174:4 176:9
  177:6 183:25

184:7,16 185:13
  185:25 186:18,19
  191:14 192:1
  197:15 198:16,17
  199:5 204:25
  205:3,6,7 207:15
  215:9 224:18
  233:23 276:15
  278:21 288:24
  289:3,8,9,13,17,25
  293:23
**informed** 124:10
**infrequency**
  190:18
**infrequent** 194:5
  195:19
**infrequently**
  194:24 195:13
**ingrained** 294:7
**initially** 249:9
**initiate** 58:11,23
  59:6,9
**initiative** 40:9,25
**input** 33:6,11
**inputs** 241:8
**inquire** 57:8,14,15
**inquired** 212:3
  215:23
**inquires** 154:2
**inquiries** 53:3,8,10
  53:11 54:12 60:17
  103:24 239:2
  273:25
**inquiry** 72:7
  103:21 104:18
  153:24 155:1
  219:13
**instill** 160:7,8
**institute** 22:13
**institution** 22:13
  176:11 185:8

253:10 289:3
**institutions** 175:6
**instructed** 58:13
  134:6
**instructs** 8:25
**integral** 24:5
**integration** 229:5
**intend** 194:9
**intended** 32:23
  112:3 114:4 133:9
  201:6,10 243:9
  259:25
**intent** 68:24 69:25
  157:25 194:19,23
  195:15
**intention** 133:11
  133:13,20 157:1
  163:5,16 164:11
  164:16 197:6,7
  200:25
**interact** 33:3
**interactions**
  264:17
**interchangeably**
  202:6
**interest** 58:5 59:5
  61:8,11,14 62:13
  62:18 92:2 106:13
  106:19,25 107:7
  114:5,19 121:5
  154:17,25 157:24
  181:3 204:22
  205:17 206:12,14
  208:10,16 276:22
  277:5,12,20 278:9
**interested** 56:21
  57:3,9,16,21 58:1
  58:24 59:19 80:3
  97:7 101:8 102:20
  103:17 107:25
  115:3,4,9,10

118:18 120:1,22
  121:22,25 122:4,7
  122:9,14 123:12
  123:17 124:14
  125:9,13,19,23
  154:7,9,10 161:10
  165:14,22 168:10
  169:1,3 191:13,16
  197:13 204:18
  205:14 206:4,5
  209:6 214:16
  215:6,16 218:14
  218:20,23 219:3,7
  219:10,13 250:13
  255:8,9 256:24
  258:8 260:23
  261:1,20 262:16
  275:18,20 297:17
**interesteds** 219:1
**interests** 26:13
**interface** 136:7
**internal** 235:9
  241:16
**internally** 31:4
  210:10 268:5
  269:10
**interpret** 240:12
**interpretation**
  55:17 83:17 173:7
  174:7,12 183:3
**interrupted**
  118:19
**interrupting**
  269:11
**intervals** 270:6
**intervening** 95:1
**interview** 68:5,9
  85:17 91:19,20,22
  92:13,25 155:4
  205:5,9,10,10,16
  205:18 206:15

289:12
**interviewing**
72:18
**interviews** 67:22
232:25
**introduce** 188:5
**invaluable** 29:2
**involve** 232:8
258:15
**involved** 24:21
29:12 31:13 34:15
34:18 35:5,13
127:3 141:10,21
146:21
**involvement** 34:20
**involves** 96:4
**involving** 88:4
**ip** 247:2
**isolated** 177:20
**issue** 137:17
**issues** 18:2 26:21
40:23 109:14
211:4
**ite** 68:19,23 69:12
85:9,11,22 86:1,4
86:5
**item** 235:23,24
**items** 235:6
240:24
**iv** 45:7 94:13,15
280:16 283:14

**j**

**january** 236:25
256:16 257:22
258:12 261:5
262:17 263:7
**jeanna** 19:17,18
23:10,13,23 24:2
32:10,12
**jeff** 11:12,13,17
18:24,25 19:3

**jennifer** 32:11,17
32:18
**jeremi** 234:17,21
**jeremy** 2:8 40:1
**jersey** 2:6
**jmg** 2:9
**job** 14:25 34:25
74:3 124:10 134:7
135:8 136:7,10
139:9,21 140:18
147:9 158:10,17
169:16 191:6
207:14 219:13
224:23 248:18
**john** 18:14 19:5
50:16,20 51:9
61:23 62:6
**johnson** 223:16
**journey** 26:24
72:6 110:13 111:5
**judgment** 26:2
36:13,20 38:11,19
39:10,17,19 48:25
49:20,21
**july** 4:8 16:5 33:22
33:23 85:4,5
126:8,8 139:2
201:12,12,18,18
209:17,17,20,20
211:11 212:14,14
214:6,6 219:16
241:10,10 268:2,2
268:8,9 269:24
270:14,21 271:7
272:3,4 291:17,18
294:22,22 295:1,1
**jump** 36:25 37:23
62:23 67:9 91:9
97:8 223:2 231:11
**jumping** 62:25
98:15

**juncture** 31:9
114:16 134:5
167:22 215:24
278:6
**june** 229:12

**k**

**k** 2:13
**keep** 64:24 97:7
155:18 161:8
168:19 281:18
**keeping** 26:13
28:12 190:15
**kept** 196:19 268:6
**key** 88:18 90:13
90:16,19,25 91:12
92:6,17 93:4
95:14 99:23
110:25,25
**keypath** 229:24
273:15,15,16,18
**keypath's** 273:21
**kick** 232:25
**kimberly** 169:8
170:6,20 172:11
172:18 173:7
175:19 182:10
185:1 254:16
255:2 256:3
**kind** 25:3 48:24
49:21 101:4 103:1
125:10 161:17
162:6 176:4
207:21 218:14,23
220:21,23,24
269:7
**kinds** 197:2
**knew** 275:1
**knocking** 173:2
**know** 8:16 12:23
12:24 17:10 19:18
21:18 26:5 27:9

30:16 33:25 38:22
47:25 48:9,12,17
48:20,21 49:4,6
51:22 55:5 61:20
62:7 65:16,17,19
65:25 66:13,17
71:4 73:19 74:21
75:18,20,21,24
77:20,21 78:24
86:16,18 88:9
89:5,18 97:18
102:15 106:7
109:5 112:21,24
114:13,21 119:25
122:11,13 126:4,7
126:10,13,15,16
129:19 135:22,23
136:1,4 138:16
140:11 145:19
160:2 161:17,21
166:2 168:19
170:2,9 171:15
172:3,11 175:24
182:8 183:11
192:20 193:8
194:10 197:1,4
199:6 200:3
209:23 210:18
211:1 214:17,21
215:21 216:6,17
217:12 220:15,25
222:19 225:20
227:9,18 228:25
229:8 232:3,22,23
233:10 235:24
236:18 238:11
248:10 253:7,7
256:11 263:1
271:25 273:1
279:16 283:13,23
283:24 285:16

293:19,21
**knowledge** 32:23
34:25 42:2 59:8
59:25 145:2,8,14
195:24 209:25
210:2 212:8 217:5
217:24 222:2
242:4 244:24
264:24 265:6
266:12,14 267:19
267:21,23 268:1
269:14 273:7,11
274:15,17 275:2
284:9 291:20
292:1,22,25 293:1
293:6,8,15,18
294:23 295:3
297:8
**known** 224:3
238:21
**knows** 218:24
240:2 285:16
**kpi** 88:13,14,16
90:15,16,16
**kpis** 99:3

**l**

**l** 6:1 7:9 204:4
222:16,16
**label** 75:14
**labeled** 74:15
**laborious** 203:4
**landed** 181:13
**language** 74:19
133:19 239:3
**lapse** 190:19
261:22 268:12
**large** 12:19 293:20
**larger** 26:25
**largest** 45:13
**late** 26:23

**law** 2:4
**lawsuit** 74:6
210:20 242:19,23
243:7
**lawyer** 210:16,16
**lawyers** 210:13,19
**lay** 205:11
**layer** 157:2 158:1
226:10
**lead** 14:5 16:20,25
18:3 42:16,22
43:2 59:20,22,23
59:24 60:11 62:14
71:18 76:13 82:14
84:4,8 85:18,19
88:3 91:13,25
92:1,7 95:18 96:4
96:5,5,11,13,19,25
97:6,18 98:3
99:16 104:18,20
104:21 105:1,6,18
105:21,25 106:12
106:14,20,24
107:1,5,6,9,14,15
107:17,18,19,24
110:13 116:20,23
117:1 119:23,24
119:25 120:18,24
121:1,2 123:14
124:13,16 125:4
126:22 127:1,6,6,9
127:10,17,19
130:2,3,4,10 132:3
133:15 134:22
135:2 137:19,19
153:15,15 154:2,3
155:1,16,22 156:1
156:4,5,8,14,15
165:13 167:23
168:3 186:7
189:19 197:12,23

197:25 198:13
199:20 200:20
204:17,21 205:14
207:4 215:2,5,6
222:1,4 223:18,18
239:5 245:19,24
276:7,8,8,11,14,16
276:18 277:3,5,11
277:15 278:14,15
278:17 286:1
289:9 291:6,12
**lead's** 154:16
215:8
**leads** 17:3 62:12
89:16,20,25 96:10
96:17 99:8,11
103:5,6,8,22,24
104:1,2,6,10,11
116:3,6,14 117:5,8
119:13,20,21
122:7 128:17
129:8,10 131:4
133:8 134:7,10,11
134:13,21 160:11
160:13,23 161:2
166:17,18 167:5,6
167:9,13 174:17
175:10,20 182:11
186:7,10 187:10
187:13,17 188:1
189:12,21 190:6
191:17 192:14
194:25 195:6
201:6,15 204:11
204:12 215:18
217:14 223:16,24
268:15 273:25
279:20,22 288:9
288:14,17,20,24
289:21 290:13,17
290:18 291:10

293:22,24 294:11
**learning** 159:25
**leave** 172:4 262:23
**leaving** 28:13
**led** 125:23 277:8
**lee** 233:22 270:22
**leeway** 28:1
**left** 90:12 225:24
235:23 252:6
257:24 258:18
**legal** 130:23 132:5
138:6 244:4
**lengths** 38:24 39:3
**lengthy** 8:18
213:17 214:2
**lens** 113:12
**letters** 20:22
**level** 52:22 120:24
120:25 121:1,2
130:2,3,4 133:14
133:15 146:21,21
180:4,6 181:17
197:1 215:5,17
238:3
**lies** 124:9
**life** 26:19 76:21
118:19 123:13,22
157:20 160:7
161:11,13 162:24
194:16 200:11
**limit** 49:7
**limitation** 34:2
**limited** 272:11
**limiting** 33:22
**line** 8:19,21 49:13
49:20 55:20
256:11 261:16
298:4
**lines** 181:11
**list** 5:10 9:23
56:13,18 108:10

170:18 214:7,8,9
215:7,16 218:8,9
218:10,24 219:2
219:18 220:1,1,12
220:15 222:11
223:8,13,25 224:3
224:4,11,15,23
225:10,20 226:3
226:12,13 227:2,4
227:5,8 230:9
233:2 234:12,24
234:25 235:2,5,7
235:12,25 237:17
237:18,21,25
238:4,20 239:9,11
239:20 240:24,25
241:11,14,14,15
241:16 242:2,10
242:14,24 243:9
243:10,20 244:2,9
244:11,20,21
247:1 250:13
251:21,22 252:5
253:4,15,18 254:4
254:11 255:18,24
257:10,19,23
258:5 259:11
260:7,14,15,21
263:8,14,19
267:13,17 268:4,6
268:19 269:13,16
269:21 270:10,13
270:16,17 271:2,7
275:9,14,17,18
276:2 293:8,15
295:1
**listening**   139:23
141:3
**litigation**   272:1,25
**little**   37:1,1 53:9
62:23 76:6 83:24

122:12 169:6
196:20 279:16
**live**   70:10 85:14
127:13
**lived**   196:10
**lives**   160:2 172:24
173:10 174:22
183:3,8,17 184:7
226:5 245:18,21
293:20
**liz**   232:17,24
**llp**   2:12
**loan**   283:15
**local**   7:17
**locate**   267:14,22
**located**   226:11
**log**   202:8 264:12
**logged**   202:14
264:3,15,18,20
**logging**   202:24
**logic**   128:5 278:8
**logs**   251:11 264:14
**long**   13:16 14:7
26:5 160:1 196:8
196:21 199:10
218:10
**longer**   81:10
118:20 119:15
120:1 164:5
165:18 255:9
274:4
**look**   20:19 21:17
34:23 35:20 36:12
39:25 51:3 52:25
54:19 55:20 62:22
64:19 65:6 70:14
71:3 77:16 89:5
100:5 113:21
117:25 172:5
173:8 174:14
213:7 215:8

223:12 225:14
228:24 229:20
231:7 232:12
234:16 235:1,23
246:14,20 249:17
250:16,22,24
251:25 254:14
258:2 261:8 263:6
263:9,18 264:12
266:17,18,21,24
267:4 269:1
270:19,24
**looked**   90:23
226:7
**looking**   22:14
56:20 81:8 83:18
92:3 99:4,9 100:2
104:15 113:13
144:10 184:6
195:2 215:11
235:13 236:11
256:10 258:1
275:21
**looks**   22:22,25
73:23 110:22
111:2 211:14
**lose**   37:11 182:5
**lost**   20:12 108:12
108:15,17,18,19
108:20,23,24,25
109:1,2,3,8,19
109:20 110:3,5,6,6
114:7,11,13,23
115:15,15,17,24
117:12,13,14
119:6,8,14 120:15
127:24 128:6
162:9,15,17 163:4
164:15,17,19,24
166:7 167:16
192:19 193:1,15

193:20 194:8
195:8 198:7 199:2
199:21 201:9
209:2,4 223:21,25
224:19 225:21
227:11 258:24,24
259:2,6,24 277:19
277:21 278:24,24
279:1 290:4,5,8,21
**lot**   15:5 34:7 50:15
62:24 71:10 74:18
83:20 84:20
108:11 110:23
113:10 117:5,8
121:13 122:6
125:6 157:15,15
157:19,19 160:1,6
161:14 164:13
174:4 197:3 209:2
214:3 219:14
226:18,19 234:23
234:25 235:2,5,12
279:5 285:14
**lots**   237:5,11 240:9
**love**   232:6
**low**   173:14
**lugo**   221:24 222:6
223:17
**lunch**   203:20
**luncheon**   203:23

| m |
|---|

**m**   2:8 222:16
231:19
**mae**   285:16
**mail**   252:11,23
**main**   129:23 130:4
130:11 248:12,15
280:22 281:2
284:7
**maintain**   214:7,8
268:3 275:8

**maintained**
230:10 239:10
268:5
**major** 293:25
**majority** 83:22,24
84:1 87:12,17,25
94:12 104:11
150:3 151:15,19
151:20,21 152:3
165:3,5,12,12
166:12 167:15
192:22,23 225:18
280:3,5,22 281:3
281:21,24 282:24
285:25 290:10,10
**making** 108:10
120:7 129:1
134:23 137:12,21
140:4 152:24
158:15 159:6
162:10 177:17
199:12 200:9
202:23 224:21
226:2,18 269:20
274:19
**manage** 241:4
**managed** 230:16
**management**
15:13,24 106:5
**manager** 233:1
**manner** 168:7
175:4 177:5
**manual** 4:14 97:12
104:24 105:3
213:3,15 220:23
221:8 240:17
241:8 262:7
264:14 293:21,21
**manually** 21:8
109:19 241:4
254:7 260:21

264:16,18
**march** 188:15,15
189:16 190:12
**margin** 177:2
**mark** 50:6 66:23
70:16 88:21
114:18 115:1,7
117:17 138:17
188:6 211:5
212:25 219:7
220:10 221:10
227:19,24 228:4,9
228:14 248:24
253:22 260:4
**marked** 3:13,15
3:17,20,21,23 4:2
4:4,5,7,9,11,12,14
4:16,17,19,20,22
4:23 5:2,4,5,7,8,10
7:5 9:17 20:9,16
22:19 50:8,10
67:3 70:20 89:1
97:10,16,23,23
115:14 116:16
117:13,21 119:3
138:24 139:3,20
162:9 169:21,24
188:9 211:8 213:4
213:12 219:4
221:13 225:10
227:20,22 228:2,7
228:12,18 229:20
231:7 237:4 246:5
246:8,21 247:7,15
249:2,17 251:20
252:4,18 253:3,15
253:17,25 254:4
254:10,25 255:17
255:23 256:4,7
257:19 259:10
260:8 263:8,13

**marker** 293:9,16
**market** 14:20
**marketing** 13:14
13:20 14:3,16,19
16:11 17:15 18:7
18:11,18 19:23
20:3,6 29:2,10,12
29:15,22 30:3,4,8
30:14,24 31:7,14
31:22,24 32:3,6,22
33:2,5,9,11 100:23
101:1,4,7,13,16,22
102:12 103:15,25
105:1,7,9,11,15,17
105:20 111:3,7,10
111:11 130:18,21
130:24 131:4,8,13
131:17,19,21,24
132:4,11,15,18,20
132:24,25 133:4,5
133:22,23 136:20
136:22,25 137:2,4
137:10,13,14,24
138:4,8,12,15
145:16 152:21
153:1,1 212:4
229:10,12 238:22
273:16
**marking** 114:10
257:22 258:4
275:17
**mary** 170:17
171:6,8
**master** 283:13
**match** 198:25
**material** 267:2
**matter** 174:21
177:22,24 179:1,2
180:11 297:8
**maxwell** 2:5

**mcinerney** 170:23
**md000247** 5:9
256:7
**md000308** 5:7
253:25
**md000396** 5:6
249:2
**md310** 254:25
**md397** 249:17
**mdspecialist**
249:10,15
**mdspecialist21**
249:7,13
**mean** 25:21 26:14
31:17 33:5 41:8
41:18 43:12 53:6
55:4,8 56:2,17
57:1 59:16 63:10
64:12 65:2 68:23
71:12 76:16 77:19
82:3 105:5 108:8
109:5 121:9 123:8
132:20 150:18
153:5 157:9 158:9
172:20 183:4
184:5 185:11,23
189:13 191:1,5
192:11 200:6,9
226:23 230:20
269:6 272:21
277:10 293:12,19
**meaning** 79:2
173:20
**meaningful**
173:25
**meanings** 84:7
191:7,8
**means** 41:10 56:5
60:7 62:18,19
76:24 77:2,6,23
173:23 179:10,13

190:18 203:1
226:24 297:12
**meant**  39:2 53:10
64:16 65:15 90:19
172:12 192:7
203:16 231:4,6
242:3 244:10,21
271:13,17
**measure**  221:7
**mechanical**  97:3
**medeiros**  231:18
231:20
**meehan**  17:4,19
17:21 170:21
248:11 249:6,9,19
254:11 256:14,20
258:20 259:10,18
**meehan's**  237:16
**meet**  10:24 11:2
33:19 54:15
142:19 268:16
275:11
**meeting**  11:6 29:2
29:13,22 30:4,8,24
31:14,16,22,24
32:3,6,22 33:5
**meetings**  142:6,14
142:21 143:19,23
143:24 144:3,19
144:20
**meets**  40:13
**megan**  229:7,8,24
230:8,15
**melanie**  1:4 118:6
118:14 119:3
249:13,18,22
254:17 255:1
256:14,19 297:8
298:2
**members**  52:1
202:23

**mental**  198:15
**mention**  239:20
241:5
**mentioned**  57:15
101:21 103:13,23
106:8 137:9
157:11 161:24
164:9 237:25
240:18,25 252:23
268:14 285:1
292:9,12
**mentions**  72:10
230:15 242:2
**merge**  252:11,23
**merit**  297:3
**meshes**  159:16
**message**  152:14
263:12 264:1
292:6
**messages**  102:7
129:17,20 288:7
**met**  11:3
**method**  56:8 94:3
96:22 109:12
280:11 282:5
283:12
**metric**  63:24,24
64:6,10 94:22
95:18 182:21
**metrics**  64:3 90:23
91:6 100:4,5
110:25
**micro**  105:22
**mid**  221:3
**middle**  8:20 26:12
26:14 71:22
106:22 270:24
**mike**  231:13,15,23
232:2
**military**  83:20
84:13 282:3

▓▓▓▓▓▓  48:4,5,22
49:3,5,8,10 65:12
65:21 66:10,15
**mind**  26:13 56:4
82:20 115:23
252:10 255:9
**mine**  146:25
**mined**  116:11
**minimum**  136:4
**minor**  150:7 263:2
281:17
**minority**  194:2
**minute**  128:9
**minutes**  123:23,24
140:11 157:15
258:11
**mischaracterize**
27:9 102:12
**misconception**
124:2 173:2
**misconceptions**
124:6,7,9 143:4
**misinterpreting**
62:10
**missed**  254:12
256:2
**misses**  176:20
**misspoke**  31:2
**misstatement**
66:10
**misstates**  25:10
241:19 286:15
**misunderstanding**
76:16 198:12
**mitigating**  26:18
28:1,5 109:14
161:12 194:16
200:11 285:9,20
286:9,19
**mix**  40:3

**mixed**  37:24
**mod**  4:2 88:25
222:18 224:12
226:15
**mod4**  188:24
**mod4-1314**  67:23
**model**  23:8 41:23
47:6,12
**modified**  251:2,15
**module**  53:17
54:13 89:8 227:3
285:3
**moment**  11:10
20:19 30:21 40:1
50:2 71:3,21
82:17,24 83:16
95:16 96:17
100:24 108:7
121:21 179:18
190:9 192:13
212:9 227:19
265:17
**monetarily**  24:13
**monetary**  78:20
**money**  79:19,25
280:17,18 284:3
**monitor**  190:14
202:17,18 248:8
**monitored**  271:14
271:16
**month**  24:25
172:2 199:14
274:25
**months**  171:22
236:24 274:7
**morning**  7:23,23
7:24
**motion**  135:1
261:21
**motions**  6:7

**motivations**  41:19
**mouthful**  14:3
**move**  31:5 109:10
  114:16 154:10
  156:19,19,20,22
  161:11 162:24
  165:15,23 207:7
  234:8 262:25
  276:11 277:1
  278:2,4,19 288:20
**moved**  55:23 70:1
  85:9 99:25 276:17
  277:13,21 282:17
  282:19
**moves**  154:13
  207:4
**moving**  10:18
  28:16 57:3 80:3
  98:4,10 99:4,7,10
  100:19,20 148:2
  150:24 163:5
  168:15 194:19,23
  268:4 276:22
  278:10
**multi**  235:20
**multiple**  19:15
  26:17 27:25 31:16
  63:14 69:23 77:5
  77:7 103:11 110:1
  113:17 137:1
  148:23 153:24
  154:3 180:7
  182:14,17 191:7
  206:23 207:1
  219:7 238:6
  239:13 283:25
**multitude**  109:14

**n**

**n**  2:1 6:1 7:9 69:19
  204:4 222:16,16
  229:2,7

**name**  3:3 67:12
  155:17 170:8
  225:14 251:6,7
  298:2,3
**named**  232:17
  297:6
**names**  51:17 171:5
  234:12 271:2
**narrow**  83:24
  188:18
**narrower**  207:11
**national**  268:3,5
  268:19,22 269:5
  269:13,16,20
  270:13 275:9
**nature**  12:16
  90:25 101:6 243:7
**necessarily**  112:9
  137:12 153:19
  184:5 185:11
  187:2 194:18
  239:4
**necessary**  47:18
  69:6 206:20 207:7
  278:20 283:12,22
**necessitate**  199:25
**need**  8:16,17 38:9
  41:10 84:13 94:9
  94:16 103:3
  112:19 117:25
  139:22 140:3,13
  140:15,22 141:2,7
  145:24 146:4,7
  166:21 172:4,21
  174:3 183:17
  218:21 221:18
  225:4,7 227:12,13
  228:21 231:23
  233:10 239:4
  253:9 268:16
  272:13

**needed**  28:1 140:7
  141:5 207:17
  252:6 291:3
**needing**  108:4
  275:12
**needs**  97:12
  140:20 232:7
  261:19 283:13,15
**neely**  11:3,4
  211:15,19
**negate**  285:3
**negative**  79:8
**neglect**  185:24
**neither**  297:14
**nelson**  51:18
**net**  189:3
**never**  119:21
  128:19 140:11
  161:3 167:20
  199:5 267:20
**new**  2:6 4:14 15:3
  15:7,8 30:6,19,22
  30:25 33:14,15,18
  33:19 34:15,19
  35:14 47:7 56:13
  59:13 61:10,18
  62:9 82:13 104:20
  116:7,10,11,15
  117:2,10,15 180:1
  213:2,9,15 216:4,9
  216:11,13,16,19
  216:23 217:2,8,19
  217:23,24 218:1,3
  236:15,15 237:6
  237:12 240:10,18
  251:3,15,16,17
  252:3 259:2
  275:16 286:1
  291:12 293:21
**newer**  89:18

**newest**  35:4,4,10
**ni**  218:9,24
**ni's**  219:12
**nice**  196:22
**nicole**  67:15
**night**  20:12 21:5
  196:17
**nine**  14:8,9
**nodding**  39:4
  208:11
**nods**  208:14
**nomenclature**
  108:21 154:19
**nomenclatures**
  215:10
**non**  199:21
**nonprivileged**
  12:9
**nonprofit**  41:6,12
  41:20,24
**notary**  296:15
  297:3,23 298:25
**notation**  253:5
**note**  50:1 52:17
  283:14
**noted**  81:2 295:12
  296:5
**notes**  236:3,6
**notice**  3:15,16 7:2
  7:4 9:22 11:25
**noticed**  9:14 10:5
**notices**  9:19,20
**november**  254:20
  254:22 255:22
**number**  3:24 4:6,8
  4:10,11,16,22 5:10
  21:9 52:18 64:13
  70:20 108:1 121:4
  135:12,13,20
  138:24 139:3
  169:23 181:16

188:8 189:8,11,19
189:21,23 190:1,5
192:9 200:4,5
215:9 221:12
225:6 226:4,10
227:16 228:11
260:7
**numbering** 21:7
**numbers** 3:18,20
3:22 4:3,4,13,15
4:18,19,21,24 5:2
5:4,6,7,9 20:15,21
20:21 50:9 63:18
67:2 88:25 117:20
211:7 213:3
227:21 228:1,6,17
246:7 247:15
249:1 253:24
256:6 269:19,20
270:2
**nurture** 111:5
121:18 207:9,11
207:16,19,19
208:15 209:14
290:14,14,23
291:12
**nurturing** 207:24
290:17 291:1,5,10
**nw** 2:13

**o**

**o** 6:1 7:9,9 69:19
204:4,4 231:19
**oath** 7:11 8:4,7
204:6
**object** 8:24 270:8
281:8
**objecting** 123:6
**objection** 25:10
27:18 33:4 42:18
45:21 57:11 59:1
60:15 66:1 73:13

79:6,15 83:13
102:22 103:9
107:10 121:23
122:22,23,24
123:5,16 126:1
130:22 131:5
132:5 133:10
134:14 138:5
142:25 148:14
151:11 152:22
164:7,20 182:1
195:16 222:13
224:6 237:22
240:4 241:17
244:3 276:12
279:8 284:13
286:14 293:11
**objections** 6:3,4
68:9 121:7,9,18
123:11 124:9
126:18 144:5,22
**objective** 207:10
**obligated** 27:5,13
27:15 284:12
285:20
**obligation** 285:10
**obtain** 14:22 117:9
133:2 273:24
**obtained** 239:2,5
268:15
**obtaining** 169:3
**obviously** 102:16
197:10
**occasion** 35:16
129:10 165:11
166:3,4 190:12
**occasionally** 34:17
57:2 58:3 59:17
157:22 161:8
**occasions** 63:14
238:7 239:13

**occur** 213:9
**occurrence** 200:13
200:14
**october** 37:3,17
250:17,20 252:2,5
253:2,17
**oei** 22:9,12 24:5,8
24:10,24 25:7,14
25:15,20 26:8
33:14
**offer** 44:20,21,22
125:21 284:5,8
**offered** 287:3,6,15
**offering** 149:13
**offers** 44:25
124:18
**office** 21:6
**officer** 11:5 18:11
90:9 211:20
229:10,12
**officers** 210:15
**official** 29:1
**okay** 8:22 9:2
13:11 29:16 31:3
37:12,25 39:24
40:4 48:9 105:17
108:24 113:21
120:16 125:10,13
127:24 141:12
146:8 148:4
149:16 151:7
154:15 161:19
163:1 164:13
181:6 183:21
186:2 195:2
198:11 200:16
219:18 221:23
223:14 237:10
279:14 288:5
**old** 172:2 194:15
246:16 251:2,15

251:16,17,21,22
252:3
**older** 37:2
**olsen** 11:12,13,17
18:24,25 19:3
**omitted** 113:11
**once** 21:17 29:2
31:25 70:17 85:16
92:1 119:15
137:15 143:22
145:6 155:21
161:7 162:1 168:4
175:14 200:9
201:16 205:3
207:4 208:16
247:5 255:8
265:18 290:22
**one's** 91:1
**ones** 98:24 166:10
167:8 225:10
276:20
**ongoing** 190:13
**online** 22:13 53:1
53:3 57:20 63:5
64:20 140:5,9
175:8 176:11
177:15,19 179:20
179:22,24,25
180:1 274:13
**open** 198:8 200:9
226:9
**operation** 251:2
**operational** 72:6
74:19
**operations** 14:24
74:24 90:9
**opinion** 10:10,20
12:19 17:21 26:2
36:7 39:19 44:12
44:13 76:8 138:9
150:25 199:20

opportunities 96:9
96:17,23 115:25
117:13 119:14,17
119:18 128:14
131:8 157:5
158:23 160:24
161:3,5 162:16
166:7,18 167:6
174:17 175:10
192:20 193:2
194:8 195:5,9
199:3,21 201:10
201:15 209:2
215:19 223:9
224:12 226:13
260:2 277:17
288:11 290:3,4,5,8
290:21,22 291:10
293:25 294:11
opportunity 5:2
70:11 91:22 92:1
92:25 96:15,19
97:11,15,18,24
99:11 100:3 106:9
106:11,12,15,20
106:23,24 107:2,6
107:7 108:13,16
109:7 113:24
114:2,10 115:2,8
119:23 120:25
127:4,8,10,18,19
127:22,24 130:10
156:17,19,19
162:9,12,17 163:5
164:10,15,17,18
164:19,24 165:13
165:18 167:16,20
175:2 176:12,17
176:21 190:21
191:9 192:10
193:13,15,20

194:15,22 198:8,8
198:20 200:10,24
201:3 209:4 215:3
215:17 220:20
225:7 226:5,9
245:14,19,24
246:6,13 259:7
277:16,18,19,24
278:2,3,6,9,23,24
278:24 279:1
282:16
opps 175:20
182:11
opt 230:9 231:24
239:3 269:7 292:4
292:11
opted 233:9
optimization
103:16
opting 292:2
oracle 16:3 106:3
106:12 108:19
113:13 127:3,12
240:21 246:15
262:14
oral 35:24 36:9
79:4
order 28:15 103:4
140:7 143:1,2
150:10 203:5
207:18 225:5
ordering 295:9
ordinary 191:5
organization 38:9
organizationally
33:8
organizations
15:18
orient 211:2
orientation 33:15
33:18

original 60:16
199:8,9 200:22
originally 120:21
205:1 217:6 289:1
289:4
outbound 102:4
128:22 129:22
137:5 163:4
287:22
outcome 24:17
297:17
outlier 200:21
outliers 200:2,18
outline 76:10
outlined 148:8
149:20,25 150:23
155:17,19,23
156:20 168:2
186:8 194:6
204:14 214:4
216:10,18 217:1,8
225:24
outlines 81:22
82:13,18,24
150:15 225:23
226:1
outlook 272:10
outreach 15:18
60:20 101:25
124:25 125:1
129:23 130:5,11
200:9 201:3
202:13,15,23,24
203:8 224:22
225:3,15 226:2,3
287:25
outreaching
183:24 184:15
outside 10:11
12:19 49:17 75:22
207:14 210:2,3,4

286:8,9,19
outstanding 36:14
38:12,15 39:12
40:10,18 235:6
overall 64:11,12
64:17
overcome 121:18
122:22 123:6
124:7 126:17
144:6,22
overcoming 68:8
121:6,9,23 123:10
123:15 124:8
126:1 142:25
144:5
oversight 221:2
263:15
overview 52:22
83:22
owe 284:3
owners 42:8

**p**

p 2:1,1 6:1 91:16
92:10,10
p.m. 187:23,23
203:23 204:2
248:3,3 275:6,6
295:12
pace 53:7 54:20
55:11,14
pacing 63:12
page 3:3,14 22:14
39:25 51:12,13
52:25 62:25 63:1
65:6 68:12 69:14
71:22 89:4 220:19
223:12 229:20
230:14 231:11
232:2 233:18
237:4 246:20
249:17 254:19,25

256:18 298:4

**paid**   136:1 285:12
285:21 286:23

**palmer**   51:18

**panel**   24:15,15,16
26:20 28:2

**paragraph**   13:4
28:25 54:19 55:21
64:20 139:21
141:2 223:3 233:8
234:6

**paraphrasing**
112:19

**pardon**   8:1 26:11
57:22 105:13
125:11 166:20
183:20 250:18
254:21 277:25
288:15

**parking**   234:23,25
235:2,5,11

**parse**   53:9 199:1

**part**   11:25 19:22
20:6,6 24:5 29:1
29:10,14,21,24
30:2 31:21 42:11
43:1 58:23 59:15
69:15 71:10,16
74:19 80:7,15,17
80:20 95:2 102:1
113:12 115:25
116:3 128:15,18
130:21 132:24
134:7 135:5
136:15 137:9
138:15 141:25
159:1,5,5,9 161:20
161:20 163:23
186:14,23 187:2
192:14,23 195:6
195:24 206:18

208:19,22 216:8
216:11,13,16
217:7,12,15,18,19
217:22,24 218:3
221:20 222:6
225:13 232:7
236:14 244:10
272:22 280:15,16
285:23 287:18,19
287:21 288:5
289:12,17 290:1,2
290:12,17 291:1

**participate**   142:6

**participated**
282:19

**participates**
282:13

**participating**
82:14

**participation**   72:7

**particular**   16:21
16:25 34:11 55:10
111:4 153:12
195:4 225:19

**parties**   6:3,7
297:15,16

**parts**   71:15

**partway**   234:5

**party**   105:11,14
105:17 201:14
261:24 268:6
281:12 292:17,20

**pause**   21:19 82:21
135:16 166:23
175:17 221:22

**pay**   27:4,5,15
28:13 46:5,10,12
46:14,16 47:19
48:25 49:3,5,8,14
49:21 56:3,10
63:6,13,20 70:4

85:1 94:5,21
280:12 281:5,9,13
282:4 284:12
285:10,20 286:7

**paying**   46:18
280:21 286:1,12
286:21

**payment**   26:22
27:12,25 28:6
45:16 56:8 94:4
109:12 280:11
282:6 284:17,20
284:25 285:6
286:25 287:8

**payments**   283:12

**pays**   45:19,25
46:17 280:10

**pcas**   57:19 58:3,4
91:13,16,23 92:3,7
92:9,13,18 95:18
96:4,12,13,14,18
96:24 97:2,8,19,24
98:3,9 99:17
101:11 135:7
155:1,2,11,13
157:14 161:16
172:7,19 173:3
174:10 183:1,9,18
185:2,7,21 205:5,9
205:10,11,18
206:2,7,13,15
207:16 276:24
289:17

**pcas's**   96:23

**pell**   280:14

**pending**   8:19
297:9

**people**   19:16 21:5
26:10 31:16 51:22
54:2,3 99:4 101:8
102:15,17 104:14

108:2 119:14
120:7 121:14,14
121:16 122:6
124:6 147:3
148:21 150:12,16
157:23 161:18
164:4 170:8
173:24 175:22
183:25 184:6,15
197:2,3,4,6 200:14
214:10,16 217:10
218:4,13,22
220:20 224:5
227:10 238:1
280:17

**percent**   48:8 165:7
165:9 166:15
189:4 192:23
193:3,5,7,7,9,16
193:21,25 200:5
209:9 216:7
242:18

**perfectly**   110:15
199:7

**perform**   245:20

**performance**   3:18
3:22 18:3 20:14
22:2 34:24 37:13
67:1 88:18 90:13
90:17,19,25 91:12
92:6,17 93:4
95:14 99:23 111:1

**period**   55:24
108:1 212:11,13
219:15 246:18
270:4,12 282:16
291:17

**permitted**   158:2
158:12 162:15
201:13 271:21

**persistence** 95:10
**person** 57:19 58:3
  96:19 125:18
  127:21 135:3
  143:20,24 144:8
  154:7,17 156:22
  162:9 164:11
  196:5 220:4 221:3
  265:15 282:22
**personal** 10:14,20
  103:19 153:2,7,12
  156:24 157:20
  158:3,13,15,24
  160:4,6 161:11
  162:24 163:7,22
  172:14,15 174:25
  175:25 177:15,17
  265:20
**personality** 140:6
**personalization**
  177:21
**personally** 169:18
  217:9
**personnel** 33:10
**persons** 52:1
**perspective** 30:7
  30:24 31:8 44:14
  54:2 101:14 104:1
  134:2 138:3
**pertain** 12:18
**pertaining** 121:10
**pertains** 293:9
**petition** 24:11,13
  24:17
**petitioned** 26:10
**petitions** 24:5,8,10
  24:24 25:7,14,15
  25:21,21 26:8
  27:6,10
**phase** 167:20

**phone** 58:20 96:25
  97:6 103:1 130:4
  130:6,7,11 133:15
  133:15,18 137:6
  137:11,12,20,21
  140:8,10 141:23
  143:18 156:1
  158:15 189:8,22
  202:23 205:20
  215:9 225:6,6
  226:4,10 227:16
**phones** 158:7
**phrase** 62:16,19
  78:25 79:10 121:6
  257:9
**phrasing** 81:2
**physical** 248:6
**pick** 171:5 172:4
**picks** 156:1
**piece** 15:2 60:9,9
  149:1 157:11
  174:2 214:5
  283:14 287:20,20
**pieces** 195:3
**pile** 218:23
**pipe** 222:19
**pipeline** 55:22
  64:21,25 65:2
  67:23 68:1,2,13,16
  68:20 69:3,10,11
  69:15,20,22,24
  70:2,9 71:9,12,16
  71:21,24,25 72:2,4
  81:8,15 85:23
  100:3 115:25
  116:4 119:15,16
  119:21 128:15,18
  128:19 164:5,6
  224:11,15 226:15
  227:2

**pitch** 129:11
**place** 16:4 26:18
  29:2 31:25 38:7
  153:15 160:11,13
  161:2,4 164:4
  186:17 212:4
  214:15 234:2
  238:5,14,18,20
  242:24 243:3
  260:17 269:6
  273:9 277:8 279:7
  292:18 293:20
**placed** 157:23
  164:10 200:21
**places** 134:21
  153:14 158:21
**plaintiff** 1:5 2:3
**plaintiff's** 3:12
  9:18
**plan** 93:10,19
  98:18 118:21
**plans** 28:6
**plate** 103:4
**play** 150:8 282:4
**plays** 206:16,22
**please** 20:10 45:24
  50:6 66:23 88:21
  109:4 117:18
  128:9 169:22
  175:18 188:6
  201:17 202:20
  211:6 221:11
  228:15,24 247:8
  248:25 249:23
  253:23 255:10
  256:5,24 257:9,12
  258:8 293:13
  295:11
**plural** 182:11
**plus** 98:18 192:23
  209:9

**point** 8:18 24:15
  61:6 62:14 69:11
  69:25 71:24 81:6
  81:9 93:25 101:7
  106:14 110:7
  112:8 124:17
  142:4,10 145:2,8
  163:23 176:10
  177:2 182:18
  186:20,20 205:16
  225:18 233:10
  263:2 272:10
  276:21,25 279:20
  281:18 284:11
**points** 270:14
**policies** 265:19
  268:18 273:8
**policy** 194:13
  195:20 209:18,22
  210:1,7,21,21
  211:16 212:7,11
  212:16 217:11
  238:19 243:2,25
  244:8,16 257:13
  264:25 265:3,22
  266:17,19 267:10
  270:5,10 275:13
  276:1 291:19,21
  291:24,25 292:18
  292:18,20,23
  293:4 294:6,14,15
**poorly** 220:9
**popped** 179:25
**population** 83:19
  83:22,25 84:1,21
  87:13,18 94:13,15
  150:4 151:15,19
  151:20,22 152:4
  214:13,15 280:6
  280:23 281:4,24
  282:24

**populations** 84:11
150:6 280:23
281:4
**position** 4:6,8 15:1
30:6,19,22,25
138:23 139:2,24
145:10,19,22
146:15 199:11
218:2
**positions** 139:9
**possess** 36:20
38:18
**possibility** 176:10
177:6,9 230:25
264:21 272:15
**possible** 94:1
144:8,24 172:24
172:25 173:17
174:3 183:8 232:8
240:13 264:6,9,10
272:12
**possibly** 28:3
110:16
**post** 1:7,13 3:16
3:18,22 4:2,6,8,14
7:3 9:12 10:7,9,21
12:4 13:13,25
14:7,21 15:21
17:25 20:13 27:17
27:23 28:12,18,18
28:23 31:11,12
33:1 41:5,8,15,19
41:20 42:11,15,21
43:1,3,12,13,24
44:2,14,20,22,25
45:3,17,19,25
46:12,15,17,23
47:4,7,10,11,14,16
47:18,20,23 48:25
49:3,5,8,14 51:4
51:24 53:17,19,19

53:20,23,24 54:3,3
54:8,10 56:21
57:4,5,10,14,17
58:1,12,25 59:19
59:20,22 60:1,3,5
60:13,21 61:9,15
63:24 64:3,6,14
65:24 66:25 74:6
74:13 78:13,15,17
78:22 79:1,13,16
79:18,23,25 80:2,7
80:12,15 81:3,6,21
81:23 82:1 83:5,8
83:11 84:2,9
86:22 87:6,10,15
87:20 88:4,24
99:3 100:23 101:1
101:2,10,25
102:13,17,20
103:2,8,25 104:6,9
104:16,20 105:9
108:15 115:3
116:14 117:3,8
118:10,12 120:1,5
120:19 121:12,21
124:1,3 128:21
129:17 132:9,13
134:21,24 135:4,6
135:9,11 137:19
137:20 138:7,10
138:14,22 139:1
141:17,18 142:23
143:10,16,21,25
144:21 147:2,2,3,6
147:7,14,14,19,22
148:12,21 149:3,5
149:6,10,12,13,19
149:22 150:13,16
151:9,16,25 152:3
152:9,13,17,18
153:3,6,9,16,18,20

153:21 154:4,20
154:22 155:5
158:12,19 159:6,9
159:12,17,20
160:3,10,13
162:12 163:24
164:1,3 165:1
168:14,16 169:3
169:11,14 170:13
175:5,7,25 176:14
176:16,20,22,23
176:24 177:12
178:1,2,5,6,7,7,11
178:14,15,17,19
178:22,23 179:3
179:13,15,16,18
179:21 180:1,2,5,8
180:9,13,15,21,25
181:1,3,7,9,13,14
181:18,23 182:5,8
182:12,15,16,16
185:15 186:1,15
186:15 187:13
191:6 193:2,10
198:16,18 202:17
202:21 203:6,11
207:2 209:18
210:1,10,14
212:13,14,21
213:2,7 214:7
235:9 238:9
239:10 242:1,22
242:23 243:18
244:18,19,19
250:2 251:7
255:10,12 257:2,9
257:11,15 264:2
265:8,20,24,25
266:9,9 267:24
268:3,4,18 269:12
269:18 270:4,12

271:7 273:22
274:1 275:8,13
277:20 278:5,16
278:25 279:18
280:1 281:23
282:7,9,9,23 284:3
284:5,8,11,11,12
284:16,16,19,22
284:23,24,24
285:2,4,5,5,7,12
286:4,6,10,10,20
287:1,4,16,21
288:6,13,16 290:4
291:11,15,18,23
291:24 292:15,22
293:3 297:8 298:2
**post's** 41:23 44:7
45:12 46:18 47:25
48:3,9,12 54:1,6,7
78:9 101:14 104:1
105:18 132:25
134:2,12,23
136:11,12,25
138:3 141:6
146:22 148:9
174:23 177:22
180:11 181:20
192:14,24 200:6
209:21 243:25
244:8 248:21
264:25 265:3,19
265:22 266:1,10
266:21,25 274:13
291:22
**potential** 55:23
61:9,17 102:13
116:7,15 117:2,14
164:5
**potentially** 28:9
28:13 49:11 117:9
156:15 197:25

291:6
practice   114:7,14
  114:22 196:24
  215:5 221:5
  225:13 262:13
  272:7 294:10,18
practiced   67:17
practices   35:4,5
  35:10,14 114:10
  217:16 272:16
preclude   278:1
precluded   26:19
precludes   292:5
predated   262:24
preface   186:23
preferred   108:21
  125:1,2
preparation   11:20
  12:10 50:14 71:1
  146:2
prepare   10:24
  75:16,17 146:12
  226:19
prepared   10:1
  144:14 153:8
  226:20,23
preparing   266:14
prescriptive   15:19
present   11:6
presentation   68:6
  79:4
presented   112:12
president   11:14
  32:7,10 90:5,7
presumably   23:13
  43:8 62:3 93:9
  95:10 123:19
  205:22 240:2
  279:5
presume   139:16

presuming   39:2
  79:2 189:12
pretty   85:21 88:10
  123:13
prevent   9:5,8
previous   66:16
  68:2 73:5 89:22
  227:3 250:8,10
  255:16 270:11
previously   30:9
  106:2 116:1,4
  128:15 131:19
  132:23 187:6
  190:21 204:5
  209:7
pride   177:16,16
primarily   10:8
  119:8 128:25
  204:12 280:7
  281:4
primary   45:5 64:6
  64:9 130:6 136:7
  136:10 198:14
  282:5 287:24
printed   248:7
prior   16:2 145:15
  224:12 266:18
  272:25
privilege   211:4
probably   8:18
  14:17 77:13
  114:12 120:5
  124:23 135:18
  161:21 166:14
  167:19 187:15
  190:11 192:10
  193:21,25 231:5
  238:3
problem   67:18,21
  125:13

procedure   7:17
procedures   269:3
  269:4 273:8
process   30:5,22
  31:5 34:22 72:8,9
  73:9,12,16,17 74:9
  74:14,14 76:11,12
  76:19 81:9,23,25
  82:13,18,24 83:1,4
  83:7 85:4 87:1,4,6
  87:8,21,25 88:3,12
  94:20 95:15,16
  99:12,14 103:2
  104:24,24 105:3
  110:12 111:6,22
  111:23 112:18
  113:1,3,5,9 136:16
  141:22,25 143:9
  143:11,11,15
  146:22 147:21,22
  148:10,12,15,19
  148:20,23,24,25
  149:17,20 150:2
  150:15,17,20,22
  151:8,8,15,24
  152:2,7 154:6
  155:4,17,18,23
  156:6,9,14,20
  165:18,24 166:8
  167:17 168:2
  185:22 186:8,12
  186:21,22,24,24
  192:16 194:6,20
  194:21 195:7,11
  195:13,25 201:1
  203:4 204:13,22
  204:24 206:16,22
  207:2,5 208:16
  209:6,15 215:25
  216:3,20 217:1,12
  233:4 236:15

238:23 239:6
241:21 269:18
270:1 272:22
276:24 278:10
279:23,25 281:20
281:25 282:1,3,7,8
282:22,25 283:1
285:18,19,24
286:5 287:18,19
287:21 288:6,21
288:21 289:22,24
290:1,2,9,15,18,23
290:24 291:5,6,9
292:11,11
processes   81:24
  283:20
procure   116:19
produced   12:25
  13:9 21:12 23:3
  74:6 113:16
  221:17 243:8,12
  243:15 244:14,15
  247:19
product   78:8
  142:17,18 151:1
  174:23
professional   91:17
  136:14
profit   41:5,7,9,24
  42:3,6,7,12 48:9
  48:22 66:12,15
  164:1
profitable   47:23
profits   42:17
program   56:24
  121:5 177:15
  179:25 286:4,7
programmed
  100:19
programs   179:20
  179:22

progression 14:9
prominent 103:12
 108:6
promissory
 283:13
promoted 17:14
proper 114:18
 115:1,7,19,21
 119:2,9 174:6
properly 108:15
 115:14 124:10
prospect 109:9
 111:5 130:14
 134:5 144:9
 157:18 163:10,11
 163:19 176:8
 200:15 205:19
prospective 53:11
 57:5 58:19 61:16
 70:9 77:10 79:17
 81:7,18,22 82:1,5
 83:2 87:25 96:25
 97:23 99:24 101:2
 101:18 102:1,21
 103:3,17 124:1
 128:22 129:2,23
 132:3 136:7
 143:12 147:18,23
 149:7,21 151:8
 152:17 154:21
 155:6 156:12
 158:22 159:3,11
 159:18,22,23
 160:17 161:7
 162:1 168:4
 177:25 178:1,13
 178:19 179:14,15
 180:14 185:7,9,12
 185:19,24 186:18
 193:11 202:7,10
 202:13 203:9

206:19 209:14
219:20 220:3
276:22 279:17
280:8,24 281:22
282:8 287:11
288:7
prospects 157:19
 161:19 163:18
 175:2
protocol 224:9
 277:11 278:19
provide 12:1
 15:19 44:4 78:19
 78:19 79:18,20,24
 94:3 102:14
 103:19 111:20
 112:3 124:11
 133:2 135:2
 138:13 143:2
 146:5 186:17,20
 197:15 198:15,17
 201:2,16 204:25
 207:15 241:14
 276:10 288:24
 289:2,23,24
provided 12:6
 21:10 24:18 61:4
 103:21 112:7,22
 112:25 113:2,8,19
 113:19 134:2
 137:15 197:18
 199:7 205:3,6
 209:22 210:7,8,24
 213:12 224:24
 259:2 278:20
 287:1
provides 15:12
 78:17 79:18,23
 80:2 105:21
 137:22 141:18
 149:6 152:18

169:4 280:11
providing 26:23
 80:23 133:24
 136:13 137:8,10
 138:1,14 142:16
 147:14 149:3,5,13
 152:20,25 153:2
 155:5 168:22
 175:8 289:8,9,13
 289:17
provost 24:21
prowess 31:7
pu 4:3 67:10 88:25
 118:14 139:20
 141:1
pu000 20:22
pu00000003 5:11
 260:8
pu00000005 4:6
 138:24
pu00000029 4:8
 139:3
pu00000062 4:4
 117:21
pu00000134 3:22
 67:2
pu00001470 4:18
 227:22
pu00001525 4:19
 228:2
pu00001795 4:21
 228:7
pu00004476 3:20
 50:10
pu00005403 5:2
 246:7
pu00005519 4:22
 228:12
pu00006298 4:24
 228:18

pu00008459 4:10
 169:24
pu00011106 3:24
 70:20
pu00011779 4:13
 211:8
pu00013017 4:16
 221:13
pu00014123 4:11
 188:9
pu00017405 4:15
 213:4
pu00017440 5:4
 247:15
pu00017449 3:18
 20:15 22:4
pu3 264:13
public 296:15
 297:3,23 298:25
pull 227:19 274:22
pulled 221:1
 224:16
punished 273:5
punishment 273:9
purchase 47:15
 78:12 143:16,20
 143:25 147:3,18
 148:21 149:7,19
 149:21 150:12,13
 150:16 151:24
purchases 83:10
 84:1 151:9,16
purchasing 46:22
 46:24 47:1,3 83:4
 83:7 84:9 153:21
 168:13
purpose 138:11
 143:7 166:12
 167:14,16 192:13
 193:6,10,15,24
 237:21 242:9

288:19,23
**purposes** 52:15
112:4,7,10 164:18
164:25 187:5,9
193:19 267:13,17
**pursuant** 7:16
**push** 120:2,5,20
121:22 122:22
123:9
**pushback** 121:25
122:2,10 123:10
**put** 23:1 26:6
104:15 105:10,24
124:12 186:17
195:3 214:15
238:13 252:13
253:9,11 265:5
267:20,24 272:1
289:22,23
**puts** 262:4
**putting** 225:25

**q**

**qualifications**
155:6
**qualified** 92:21
98:12 106:22
154:11,12,14,21
154:24 155:3,7,12
156:10
**qualify** 72:15
77:11 92:14
154:17 156:9
**qualifying** 77:10
156:9
**quality** 174:24
**quest** 281:17
**question** 6:5 8:10
8:11,11,13,19,21
9:1 25:13 32:19
42:23,24 45:23
57:13 60:4,21

64:2 67:8 73:14
83:6 87:14 104:5
108:9 110:20
115:6 116:13
117:4,12 122:20
123:25 130:25
131:2 133:20
134:20 140:25
150:14 151:14
153:8,12 155:20
159:15 161:22
166:25 175:18
181:1,22 197:16
198:25 199:2
200:22 204:16
206:21 211:23
212:20 233:1
243:14 244:6
253:12,14 261:7
265:24 270:11
273:3 276:4
277:18 281:15
283:3 289:7
293:12
**questioning** 8:20
8:21 49:20 256:12
**questions** 8:25
34:1,7 144:13
162:6 208:5,20
209:3 291:15
295:5
**quick** 66:18,20
225:21
**quite** 14:9 88:20
262:24

**r**

**r** 2:1 172:7 222:16
222:16 229:2
231:19 297:1
**radio** 101:5
132:13 136:22

137:4
**rallying** 173:8
**random** 171:6
**range** 34:2 268:8
**ranged** 17:9
**ranges** 268:7
**rapport** 140:6,10
140:15,17 141:7
142:24 144:4,23
157:13 159:2,5,10
159:17,20 160:18
160:19,22 161:1,2
161:5 167:22
194:17 196:4
**rate** 55:1,6,8,9,12
55:15,18 191:17
**rated** 36:13,16
38:11,15 39:11,16
40:10,13
**rates** 90:24
**rating** 22:15,23
23:14 36:13
**raw** 190:1
**reach** 103:4 185:3
185:18 218:16
233:11 279:18
**reached** 204:17
209:4 252:15
277:18,19
**reaches** 130:10
137:19 284:2
**reaching** 133:13
156:8 166:10
175:3 176:7 177:3
218:22
**read** 62:11 64:24
146:2,4,13 172:22
175:14 176:1,3
183:16 248:8
296:3

**reading** 6:10
175:11 183:13,15
183:19 295:7
**readmit** 56:13,18
59:14
**ready** 109:10
**real** 199:12
**realization** 53:22
**realize** 239:1
263:3
**realized** 171:23
**really** 52:17 94:20
97:7 99:4 124:8
124:14 144:12
159:15 161:15
166:4 173:1
176:15 177:15,18
180:21 182:2
199:11 208:9
263:1
**realtime** 128:13
167:3
**reask** 159:15
**reason** 27:4 44:16
108:5 110:20,21
115:12 159:7
162:11 163:2
200:22,23 201:3,4
223:21,24 224:18
224:19 225:1,21
226:2,7 227:11,14
258:24,24 259:2,6
259:18,23,24
264:3 271:5,8
274:18 275:2
276:10 277:8
298:4
**reasons** 42:19,25
56:20 107:13,19
107:21 108:7
109:15 110:1,9

162:4 168:7
214:12,14,17,18
219:7 220:5
258:16 264:20
271:22 272:14
278:4 283:25
293:24
**recall** 17:17 23:25
25:6,18 128:12,17
198:7 210:8
211:25 212:2
231:21 236:23
242:6,8 266:3,5,6
267:15,18
**receipts** 65:11,15
65:17
**receive** 71:23
84:16 92:21 93:1
93:6 94:24 104:19
133:17 174:4
285:5 292:6
**received** 24:12
60:13 93:23 105:1
105:6 119:4 121:4
123:14,23 183:23
184:14 185:7
242:13 252:14
264:1
**receives** 104:20
**receiving** 284:17
284:20,24
**recess** 66:22
128:10 187:23
203:23 248:3
275:6
**recognize** 21:21
21:23,25 114:17
153:6 213:11,14
246:10,12 247:18
260:11,13 281:7

**recognizing**
198:13
**recollection** 9:9
18:5 42:1 126:21
202:3 214:1
241:12 245:3,10
265:14,16,23
270:15
**recommendation**
24:18 230:10
**reconcile** 26:21
**record** 7:14 49:17
50:1,3,5 60:17
66:2,5,8 67:5
128:9 146:9 164:1
187:20 203:21
215:22,23 220:21
221:2 225:7 226:5
227:13,14 235:20
241:19 245:19
246:13 248:1,5
275:5 296:6
297:13
**records** 215:12,15
215:20 225:5,14
226:6 250:12
272:8
**recreate** 226:22
**recruiting** 145:10
**recruitment**
232:25
**red** 109:18 156:3
**reduced** 297:11
**reengage** 166:8
167:17 168:1
193:1 222:24
**reengaging** 200:25
**reese** 11:9,15 19:4
19:5 90:10 188:21
191:13

**reestablish** 164:25
**reestablishing**
164:16
**refer** 139:16 205:9
294:20,25
**reference** 56:14,21
56:23,25 57:22,24
57:25 58:2,5,14,19
58:21,24 59:14,19
60:13,14,22 61:1,2
61:3,4,8,19 62:10
62:13,16,17,19
68:1 69:2 225:22
269:19 270:2
**reference's** 60:17
**referenced** 73:4
74:2 85:9
**references** 57:2,6
57:9,15,16,18 58:8
58:11,18 59:18,20
59:22,24 60:1,3,5
61:9,15,16,17
62:11,18 76:15,15
**referencing**
157:12
**referrals** 56:14,22
56:25 59:14 62:10
62:16,18,20
**referred** 54:9 70:3
**referring** 24:24
53:15 54:14 73:6
74:22 77:14 88:19
129:16 148:18,25
247:5,10
**reflect** 178:14
199:14 243:25
244:8 251:17,21
254:5
**reflected** 85:10
106:16

**reflecting** 12:2
**reflection** 85:3
146:15
**reflects** 113:18
**refresh** 245:3,10
265:16
**regarding** 14:20
14:22 54:12 66:10
242:12 255:11
272:2 283:3 289:3
**regardless** 94:25
114:15 134:10
**regi** 172:7,12,20
173:3 183:10
184:4 185:2
**registered** 70:3
185:23 191:10
198:9 297:3
**registering** 185:9
**registration**
172:15,16 174:10
183:2,18
**registry** 231:4,24
238:12,25 268:11
268:13,17
**regulations** 233:16
**reilly** 170:15
**reinforced** 216:7
**reject** 107:24
108:5,6 109:15
115:12,13 125:4
127:5,9 189:3,3,4
189:4,17 190:1
214:12,14,17,18
215:2,6,15 219:5
220:8,14 226:2,7
227:14 258:16
259:18,23 276:11
276:17,19 277:2
293:22

**rejected** 107:9,14
107:14,17,18,20
116:3,6,7,14,16,20
116:23 117:1,5,8
119:13,20 126:22
127:1,6,7 128:17
160:11,13 161:2,3
161:4 166:12,17
166:18 167:5,6,9
167:13,23 168:3
186:7,7,10 187:6
187:10,13,17
188:1,24 189:12
189:21 190:5,21
191:17 192:14
195:6 200:20
201:6 204:11,12
204:17,21 205:13
207:4 225:2
250:12 276:7,8,8
276:14,18 277:4,8
277:11,13 278:14
278:15,17,20
288:14,17,20,23
289:8,21 290:13
290:17
**rejecting** 293:24
**relate** 45:16
136:10
**related** 123:14
199:2,21 297:14
**relates** 280:24
281:4
**relating** 280:7
**relationship**
130:14 156:24
157:16 161:18
164:17 165:1
166:5
**relative** 297:15

**relatively** 199:19
199:24 216:1
279:15
**relay** 38:22 39:8
**release** 285:10
**relevant** 243:20,23
244:11
**reliability** 40:10
40:25
**reliant** 241:8
**relying** 240:17
**remain** 35:9
**remained** 277:4
278:14,24
**remaining** 49:1
**remains** 127:5
276:8
**remember** 17:13
73:24 86:1,5,8
167:1,2 189:9
191:19,22,25
192:3,7 219:11
**remembering**
294:14,15
**remove** 215:6,16
218:8,9,10,24
219:2,18 220:1,12
220:15 223:25
224:3 225:10
226:12 227:4
237:17,21,25
238:20 239:11,20
240:25 241:11,13
241:14 242:2,10
242:14 243:9,19
244:1,9,20 250:13
251:20,22 252:4
253:3,15,18 254:4
254:11 255:18,23
257:19,23 258:5
259:11 263:8,13

263:19 267:13,16
275:14,17,18
276:1 278:21
293:8,15 294:25
**removed** 28:4
**reopen** 278:6,8
**reorganized** 40:2
**repeat** 42:23 45:24
57:13 64:2 83:6
87:14 115:6 131:2
134:20 143:22
155:20 175:18
181:22 206:21
244:6 293:12
**repeatedly** 144:17
**repercussions**
272:24
**rephrase** 27:21
60:4 166:19
193:18
**rephrased** 78:25
**replies** 232:2
**replying** 137:7
**report** 18:6,13,24
19:3,9 59:12
61:21 62:2,8 63:2
90:8
**reported** 19:1,5,12
19:18 297:4
**reporter** 1:24 7:7
7:13,20 66:18
67:6 70:18 120:13
120:15 138:19
208:14 295:6,9
297:3
**reporting** 18:18
18:20
**represent** 33:14
235:19 249:12
**representative**
1:13 3:16 7:3 32:2

32:6,24 277:1
**representatives**
214:24 216:5
**repurposing**
275:25
**request** 3:8,9
103:18 121:3
134:9,12,24 137:7
141:24 168:5
209:24,25 210:4,9
210:14,15 213:24
214:23,25 218:19
219:3,21 220:7,11
220:17 238:15
244:5,11 250:3,6
250:11 255:13,18
257:3,6,16 294:21
**requested** 133:12
133:16 134:22
135:3 143:5 144:8
144:9,24 176:8
183:25 184:16
185:13,25 186:19
199:5 205:1,8
209:21 210:6,20
210:21 214:11
243:24 244:7
288:25 289:1,10
289:25
**requests** 53:12
145:3 174:4
212:22 213:9,21
238:8,10 239:16
240:23 265:9
275:14
**require** 83:21
**required** 208:23
**requirement** 15:1
202:19
**reread** 145:25

rereading  221:20
reserved  6:3,8
resides  154:25
resistry  231:3
resolution  236:9
resolved  162:5
resonated  199:13
resources  14:22
  133:2 174:16
  241:4,7 268:15
  275:11
respect  9:22 39:16
  57:8,14 75:17
  87:10 96:23
  117:12 134:13
  150:6,8 186:6
  192:19 193:5
  203:6 205:13
  209:1 219:1
  251:12 265:8
  271:6 273:22
  277:17 278:23
  282:3 290:3,21
  292:12,19
respond  133:11,16
  134:11 210:15,22
responded  181:15
  211:22
responding  134:8
  141:24 177:4
  211:14
response  10:13
  123:25 125:9
  133:23 211:25
  238:17 249:18
  254:13 255:1,18
  256:2,19,23 258:7
responses  13:6
responsibilities
  14:14,15 248:19
  273:21

responsibility
  206:18 225:25
responsible  25:1,4
  25:7,16 26:3
  27:22 129:1
  261:24 283:17
  294:13
responsive  244:2
rest  175:23 249:15
restate  25:12
restricted  151:19
restrictions
  271:23
restroom  66:19
resumed  204:5
retention  43:15,17
retorted  181:5
retract  122:19
  153:4
returning  134:24
revenue  25:2,5,9
  25:17 26:4,9
  27:16,23 28:8,12
  28:19,22 42:16,22
  43:2,6,18,21 44:1
  44:6,19 45:3,5,13
  45:15 47:25 48:3
  48:12,17 49:24
  65:18,24 66:12,13
  177:22 178:8,9
  180:12,13 181:21
  181:25 282:9
  283:4,6,7,8,10
  284:1
review  3:22 11:19
  28:2 60:18 67:1
  70:25 170:3
  213:17 214:3
  219:14 221:18
  224:20 225:3
  226:1 228:21,22

reviewed  12:11,24
  13:2 24:14 50:13
  73:5 91:1 170:4
  221:23 273:13
reviewing  71:20
reviews  3:18 20:14
  22:2
revisit  217:14
rfi  104:16 105:22
  123:23 133:17
  205:2 239:3
  288:25
rfis  104:17 122:7
  176:7 177:3
rich  18:8,9,13 19:1
  211:23 232:6
  233:19,22 238:5,6
  238:15,22 268:11
rich's  211:25
  238:17
richard  61:25
  229:9 230:4
  231:12,22 234:1
  238:20 270:22
right  8:5 14:2
  21:15 29:23 33:25
  34:14 37:7 38:6
  55:21 67:9 71:22
  73:6 75:10 79:11
  93:22 94:6 97:8
  97:17,18 101:12
  106:21 109:18
  113:10 114:25
  120:10,12 124:14
  146:5,7 154:18
  155:8 156:3 164:3
  172:1 188:20
  190:3 192:9
  193:25 200:2
  212:9,12 221:17
  223:21 228:22

234:8 236:14
  239:8 251:14
  252:6 258:2
  270:25 271:1
  272:7 275:20
  281:6,11
rightmost  251:25
rita  262:19,21
  263:3
rmr  1:24 297:23
road  1:17 177:2
  297:5
roadblocks  121:16
robust  43:4,5,7,14
  43:21
rogan  233:22
  270:22
role  12:4 16:7,10
  19:8 24:4 29:14
  29:17 30:2 32:5
  89:14 170:12
  209:13
roles  29:24 207:6
  290:13
roll  292:4
rolled  94:9
room  123:15
rough  135:12,13
roughly  14:8 17:8
  184:22
round  141:14,15
roundabout  144:2
  144:11,13,15
row  189:7 261:9
rules  7:16,17
  233:16 268:23
  269:5
run  55:1,6,8,9,12
  55:15,18 90:24
  203:5

**runs** 95:5 239:24
**rylander** 222:3,6
  222:10,15,17
  223:9

**s**

**s** 2:1 6:1,1 7:9
  91:16 204:4 229:2
  229:2,7 231:19
  298:4
**safe** 276:9 277:4,9
  277:23 278:16,25
**safeguard** 218:15
  220:25
**sake** 44:11 93:21
  150:24 278:7
**salaried** 135:24
**sale** 44:22 77:14
  78:1 86:17 99:20
**sales** 71:23 72:14
  72:18,23,23,25
  73:12,17 74:10,10
  74:14,14,15,16,23
  75:5,8,8 76:14,15
  76:20,23 77:1,5,8
  77:11,17,17,18,20
  77:22,23 78:6
  81:9,11,12 86:12
  86:13,15 87:4,25
  88:5 92:13 93:2,6
  93:10,18,18,19
  95:7,7,15,21,23
  96:2,2,6,7 98:4,5,6
  98:6,10,11,15,16
  98:16,17,18,22,22
  98:23,23 99:19,19
  99:20,25 100:12
  100:13,21,21
  109:19,19 111:12
  111:12,15 139:23
  140:3,5,18,20
  141:4,5,8,10,14,16

141:20,25 142:7
142:22 143:19,23
144:17 145:4,11
145:16 146:22,24
146:24 147:1,6,8
147:11,16,21
148:3,7,9,10,12,15
148:24,25 149:4,8
149:12,14,15
150:17,21,22
152:7 154:14
157:11 167:17
279:10,11
**sallie** 285:16
**sandra** 1:24 297:3
  297:23
**sanjeev** 228:25
  229:3 230:15,20
  232:7
**sat** 216:23 217:8
  218:1
**satisfy** 14:25
**saturate** 174:15
**save** 228:23 279:8
  279:9
**saw** 73:24 88:4
  259:14
**saying** 27:8 41:12
  41:15 53:21 75:1
  79:25 80:2 97:5
  111:25 114:23
  116:23 134:22
  153:6,10 163:15
  173:7,8 175:9,21
  176:6 182:9,25
  184:9 185:1 193:7
  194:14 202:5
  210:4 215:22
**says** 22:8 28:25
  51:11,15 53:2
  54:20 55:1 56:12

59:13 63:5 64:20
65:8,11,20 67:10
67:12 68:7,19
69:5 71:18,23
72:14 81:11 91:21
92:14 95:6 109:18
115:8 118:24
124:14,15,16
139:21 140:18,20
141:2 142:4 145:9
158:7 172:6,18
173:15 174:15
175:19 182:13
183:4 223:3 232:6
234:1 237:11
242:3 246:22,25
247:1 261:9
262:15 270:25
275:22 293:21
**scale** 182:17
  202:25 221:1
  224:16 226:15
  272:20,21
**scenario** 19:1
  26:15 77:19
  129:20 197:11
  198:19,25 263:11
**scenarios** 10:14
  162:8
**scene** 100:7
**scenes** 111:3
**schechter** 18:8,9
  18:13 19:1 61:25
  229:9 230:5
  231:12 233:19
  234:1 238:21,22
  268:11 270:22
**schedule** 205:23
**scheduling** 276:25
**scholarships** 284:5
  284:8

**scholastically**
  24:13
**scholler** 32:11,17
  32:18
**school** 53:13 101:9
  103:18 118:16,19
  118:21 121:13,15
  133:25 143:6
  157:25 159:25
  168:5 174:18
  175:24 177:11,12
  178:1,3,4,14
  179:14 180:2,5,8
  180:14 197:14
  218:14 234:22
  252:14 253:9,11
  253:13 255:11
**schools** 174:17
  175:20 182:12,15
**sciascia** 67:15,16
**scope** 10:11 12:19
  49:17 207:13
**scratch** 96:12
  170:12 178:12
  179:2
**screen** 263:9
**screening** 233:11
**screenshots** 12:17
**scroll** 251:14,16
  252:5 257:24
  258:2,18
**scrub** 234:12
  271:2
**scrubbed** 239:4
  275:12
**scrubbing** 238:4
  238:12
**se** 112:10
**sean** 1:12 3:4,16
  3:18 7:5 20:14
  67:12 183:15

188:12 296:3,10
297:4 298:3,21
**search** 103:16,16
274:2,13,21,23
**second** 14:18 15:1
28:25 54:19 55:20
55:21 63:1 65:7
66:3 139:11 145:2
145:8 172:5,22
187:21 223:12
248:2 256:18
**secondary** 174:2
**section** 22:15,23
68:6,13 142:11
145:24 279:5
**see** 9:23 20:20
22:6,10,16,20
23:17 24:6 26:20
27:11,19 28:3
29:4 33:16 35:1
35:22 36:2,13,21
37:2,18 38:8,13,16
38:20,25 40:9,11
40:15 50:24 51:10
51:20 52:6 53:4
54:21 55:2,25
56:15,20,23 57:21
57:25 63:8,22
64:22 65:9,13,22
67:24 68:10,14,21
69:8 71:20 72:12
72:16,19 73:2
88:2,2 90:12,23
91:12,14 92:15
96:20 101:12
109:21 110:11
111:3 118:14,22
118:25 139:13,25
142:8,12 145:5,12
145:13,17 156:25
160:14 161:9,9

162:2,21,23
165:14,21,23
167:25 168:4,8,10
169:1 171:19,20
172:9 173:18
174:19 188:25
190:2 194:18
196:21 197:6
211:17 213:22
216:9,17 217:7
221:3 222:21,23
222:25 223:5,17
223:20 224:1
225:17 226:7,8
227:13 229:25
230:3,6,12,18,22
231:12,25 232:10
232:14,19 233:6
233:12,20,24
234:3,9,14,19
235:13 236:1
237:14 243:22
246:21,24,25
249:20,25 251:4
252:3,7,20 253:17
255:1,3,22 256:21
256:25 257:21
258:4,7,14,21,25
259:4,8 262:15
263:21 281:2
**seeing** 64:24 169:2
181:10 233:2
267:16
**seemingly** 173:14
**seen** 9:20 21:20
30:6,23 31:6
70:23 73:21 75:21
75:23 89:6 112:7
117:24 126:20
139:6 157:14
242:5 268:21

269:10
**segment** 249:15
264:22
**segregation**
275:24
**segue** 197:10
**seldom** 114:14,18
**self** 22:15,23 25:22
79:3 120:6
**sell** 79:13,16 87:15
87:21 140:14,23
142:15,23 144:21
**seller** 151:1,5
281:15
**selling** 78:8 79:21
80:22 81:6 87:11
147:4 149:22
**sells** 78:16,23 79:1
79:25 80:8,15,21
81:3 86:22 87:20
147:2,22 152:3
**semantics** 87:23
**semevolos** 1:24
297:3,23
**send** 92:14 202:10
212:7
**sender** 264:6
**sending** 189:9
**senior** 280:14,18
**sense** 25:23 40:22
40:23 48:24
173:21 198:11
276:5
**sensitive** 197:20
**sent** 62:3 105:2,4,5
105:7 111:4 192:4
211:11 222:10
233:2 253:2,6
258:8 259:17
283:24

**sentence** 24:23
55:11,13 56:5,12
63:5 80:7,15,17,20
105:8 139:22
172:3,5,22,22,23
173:14 174:15
175:23 176:3
185:4 223:3
225:23 233:15
**separate** 20:2
127:18
**september** 297:24
**sequence** 20:21
247:13
**service** 44:20,22
44:24 45:1 47:3
78:9,12,19 79:19
79:19,20,24,24
108:1 139:23
141:3 145:15
168:22,22 169:3
189:8,22
**services** 44:21
46:19,23 47:15
78:12,16,23 79:1
79:13,17 80:1,8,16
80:23,24 81:4,7
83:5,8,10 84:2,9
86:22 87:11,16,20
87:22 141:19
143:16,20,25
144:21 147:2,3,15
147:19,23,24
148:21 149:4,6,13
149:19 150:13,16
151:9,16,24
153:21 168:13
201:14 287:1,3,9
287:12,15
**session** 91:18
126:2,4,8 136:15

[session - spoke]                                                                Page 43

204:1 272:22
sessions  196:25
set  37:10 41:3 64:4
   100:24
shame  196:18
shanice  223:16
shared  157:16
shareholders  42:8
sheet  235:21,22
   296:5 298:1
shift  59:18 135:8
shifted  58:14
short  53:2 171:22
   184:9
shortcut  125:6
shortening  131:20
shortly  97:21
   118:19
show  158:5 212:24
   245:2,5,24 247:1
   248:5 251:14
   264:4
showing  110:13
   189:14
shown  12:9 98:24
   287:18,21
shows  285:24
   286:3,5
shut  125:3
shutting  274:20
side  41:18 91:11
   91:11 221:17
   270:25 281:17
siennas  223:4
sign  251:2
signature  188:12
   297:22
signing  6:10 295:7
similar  84:22,24
   112:6,12,22,24
   162:4 288:21

similarly  201:9
simple  144:13
   151:14
simplify  10:19
   28:11 278:11
simply  146:14
   294:14
sincerely  234:6
single  243:8,12,15
sinn  19:17,18
   23:11,13,23 24:2
   32:10,12
sir  40:7 101:24
sit  26:7 216:15
   244:25 265:11
   267:15
sites  105:22
situation  28:2,10
   123:2 124:23
   198:23 215:4,4
situations  218:20
   220:2 281:16
six  91:3,6 172:2
skill  140:3 141:8
skills  35:21 139:23
   140:6,6,14,15,17
   140:18,20,23
   141:4,6 145:2,9,14
skip  52:8 237:4
skipping  59:14
   170:17
sleep  182:5,8
slight  84:21
slip  109:2
small  166:3
   193:20 209:10
sms  249:23
sneak  215:22
soccer  156:25
sole  164:11,18
   201:2,4

solely  214:4
soliciting  33:6
solution  125:22
solutions  125:21
somebody  105:21
   114:5 121:24
   133:11 140:10
   162:21 175:4
   177:7 240:17
   283:12,15,22
someone's  156:25
somewhat  278:12
soon  113:20 234:2
   238:18
sorry  20:11 37:6
   38:4 76:6 113:5
   115:6 120:13
   155:20 164:21
   193:18 195:1
   197:16 206:21
   208:13 210:17
   236:12 237:7
   247:24 279:12,12
sort  42:16 81:14
   89:21 109:13
   114:22 122:11
   136:24 137:17
   150:7 188:18
   193:22 194:13
   195:22 196:5,25
   199:18,24 200:16
   208:15 209:13
   211:3 217:14
   226:22 279:6
sounds  196:22
source  45:13
   61:10,17 62:12
   104:1 130:11
   247:1 287:25
sources  45:5,15
   49:23

southbury  1:16,18
   297:5,5
southern  1:2 7:17
   297:9
space  271:22
   272:11,13 273:1
speak  60:19 62:4
   100:5 133:25
   177:1 190:17
   194:10 231:23
   245:9 272:23
speaking  16:18
   43:24 44:21 59:17
   133:13,14 150:1
   152:9,10 177:7
   238:3 240:15
   241:6 251:10
speaks  69:11
   83:18 152:13
specific  16:17 34:8
   69:24 94:12
   102:25 182:4,4
   219:2 253:9,9
   275:22
specifically  17:6
   75:16,17 191:16
   213:23 214:4
   226:20 233:3
   238:6 240:10
   265:19 267:3
specified  146:12
specify  33:21
   183:8
specifying  182:3
speculation  212:3
speculatory  17:12
   192:12
speed  272:9
spelling  222:15
spoke  34:21 56:22
   66:8 220:3

**spoken** 34:3
106:13 140:11
157:23 217:9
**spot** 203:2
**spread** 279:6
**spreadsheet** 52:16
**srinivas** 228:25
**stable** 135:21
**staff** 121:17 144:3
160:9
**stage** 61:19 69:7,7
69:18,19 72:18,23
72:25,25 74:11
75:13 77:17 81:12
84:4,8 93:10,18,24
95:8,21 96:2,6,7
96:25 98:5,6,18,22
98:23 99:11,16
100:14 108:19
109:19 110:6
111:4 130:11
132:3 154:14,17
154:24,24 204:22
204:24 206:20
208:23 277:2,2,15
284:2
**stages** 69:10,12,23
72:11 74:15,16
75:4,8,15 76:18
82:4,10 86:13,17
96:9 98:16 99:17
99:20 100:1,6,11
100:18,21 110:23
111:13,15,24
113:11 206:23
207:1
**stamp** 252:9
259:13
**stand** 22:12 88:17
204:6

**standard** 41:11,13
41:16
**standing** 279:7
**stands** 90:16,16
92:10
**stapled** 9:19
**stapler** 20:12
**start** 15:25 44:5
63:7 76:13 82:5
88:3 95:5,10
98:21 99:18
110:14 112:13
130:3 136:2,17
143:9 150:13
153:14 178:5
181:18 192:16
208:10 214:19
284:1
**started** 191:11
197:8 209:7
**starting** 22:3
54:13 84:5 178:5
178:7
**starts** 34:24 63:11
93:17 156:5,8,14
178:4 283:6,7
**state** 198:15
276:11 277:13,14
277:21 278:14,20
278:21 282:18
297:2,3
**statement** 67:18
67:21 92:20
**statements** 296:7
**states** 1:1 118:15
297:9
**static** 127:5,9
**statmore** 231:13
231:15,16
**status** 63:6 127:7
156:9 245:24

276:17
**stay** 28:23 47:7,11
47:14,19 135:21
**stays** 28:18
**stenographically**
297:11
**step** 73:6,15 96:4
121:13 154:6
206:12,14 207:20
207:21 215:8,14
**steps** 83:11,20
84:12 87:15 95:1
128:4 153:24
154:3 206:20
207:7,8,17 208:23
276:23 290:19
**stipulated** 6:2,6,9
**stipulations** 7:13
**stood** 277:9
**stop** 81:6,9 181:14
249:23 255:6,7
256:24 257:9,12
258:8 292:5
**stopped** 21:11
86:5 274:7,9
**stops** 93:14 106:24
**stories** 161:14,15
197:3
**story** 197:9,10,17
197:18,21,21
198:19 199:3,7,13
**strategic** 14:2
16:10 17:14 18:17
30:13 131:19,20
**street** 2:13
**strictly** 175:11
210:13
**strike** 6:7 32:20
**strokes** 273:22
**strong** 166:4 196:4

**strongtown** 1:17
297:5
**structures** 28:6
**student** 26:23 27:3
27:11 28:15,18,23
43:4,5,8,14,21
44:4,9,10,16,17,19
45:19,25 46:15,17
46:22 54:10,13
57:21 58:19 62:25
69:12,13,14,15
70:1,9 81:10,22,23
82:1,1,5,15 83:2
94:5,25 95:6,12
96:25 97:23 100:3
103:3,17 113:13
114:3,15 116:24
121:19 124:1,3
136:15 143:12,13
149:9 151:9
153:16 154:21
155:6 156:12
158:22 159:2,3,6
159:12,18,19,19
159:21,22,23
160:3 161:7 162:1
162:18 163:6
168:4 176:17,21
176:24,25 177:13
177:18,25 178:2,4
178:8,13,13,24
179:4,4,14,15
180:14,21,25
181:2,8,9 182:4,4
186:18 187:7,11
191:10,11 193:11
193:11 196:9
198:9 199:4 202:7
202:11,13 206:19
207:15 219:19,20
220:3,16 224:22

225:19 227:15
252:13 276:22
278:2,3,7 280:8,9
280:12,16 282:8
282:12 284:10
285:5,7 286:1
291:13
**student's**  24:17
185:8 245:18
280:20 284:17,20
284:25 285:6
**students**  24:11
26:13 46:12,13,14
47:7,10,15,19
53:11,16,18,19,20
53:24 54:7,10
55:22 56:6,9,18,23
57:5 61:16 63:6
63:13,20 64:13,15
64:16,20 65:1,4
69:6 77:10 78:12
78:16,23 79:2,14
79:17 80:3,8,16
81:4,7,15,19 83:20
86:22 87:11,16,21
88:1 99:25 101:2
101:18 102:1,13
102:21 128:22
129:2,24 132:3
135:9 136:8
147:18,23 149:7
149:21 152:9,13
152:18 159:10,11
160:17,23 172:25
173:16 174:3,22
175:1,7 176:8,23
177:17 178:20
179:22 180:5,7,7
181:14,24 182:14
185:10,13,19,24
186:15,25 187:3

187:14,18 188:2
192:15,24 203:9
203:12,14 209:14
222:18 224:15
225:14,15,21
226:15 227:3
279:17 280:4,24
281:21,22 285:25
287:11,12,16
288:7
**stuff**  21:13
**subject**  51:4
188:24 231:2
235:1,15 252:18
**subjective**  10:10
36:6,7 53:21 76:8
80:13 151:13
**subjectively**  80:19
**submit**  24:14
**subscribe**  296:6
**subscribed**  296:12
298:22
**subsection**  68:13
**subsequently**
187:14
**subset**  193:20
209:10 226:5,10
**success**  91:2
**suggest**  227:6
241:23 252:12
262:11 263:5
**suggesting**  114:15
**summary**  68:7
139:21 140:18
**supervise**  16:7,11
**supervised**  17:19
**supervising**  16:19
16:24 18:4
**supervisor**  23:10
23:14,21 36:16
38:15 39:11,16

40:13,24 67:12
**supervisors**  89:13
89:14
**support**  95:11
157:20,21 160:6
**supposed**  202:14
216:8,13,24 217:7
217:18
**suppression**
231:24
**sure**  42:6,20 54:16
66:4,21 70:18
79:12 85:8 94:19
108:10 112:8
115:7 130:3
141:16 144:3,7
148:17 150:18
151:3 155:8,22
160:21 161:19
166:24 174:5
175:1,19 181:12
181:17,23 183:6
183:15 187:22
196:22 198:24
200:2 206:22
207:22 214:13
216:11,15 218:18
238:13 242:16
264:23 274:16
**switch**  38:5
**switching**  66:19
**sworn**  7:10 204:5
296:12 297:7
298:22
**synonyms**  81:3
**system**  15:3,4,7,10
15:12,17,25 16:2,4
60:1,3,5,8,10,14
60:22 61:7 74:18
74:25 81:24 82:2
82:3,4,6,7,10

86:18 97:11,24
100:19 104:21
105:10 106:3
111:14,16,22,25
114:4 126:24
127:11,12 157:1
202:8,16,24
215:13 236:15
240:3 245:15,22
260:3,19,24
261:18,23,25
262:4,6 275:16
277:13 292:6,7,13
**systematic**  203:2
**systematically**
126:23
**systemic**  100:7
154:18 241:6
**systemically**  70:2
97:1 127:2 155:12
219:8 240:16
282:21

**t**

**t**  6:1,1 297:1,1
**tabbed**  235:20
**table**  189:2
**tabs**  235:21
**tacks**  144:19
**tactics**  142:7,15,22
143:19,20,23,24
**tag**  259:24
**tags**  82:9
**take**  20:19 21:6,17
31:24 43:25 44:2
44:15 60:9 66:20
71:3 76:3 89:5
144:25 172:21
173:5 183:16
184:8 203:19
209:13 275:4
287:20

**taken** 7:16 26:17
42:15,21 43:1
66:22 128:10
187:23 203:23
248:3 261:19
275:6 297:11,15
**takes** 29:2 42:15
43:1,3 87:15
182:20 251:11
253:8
**talk** 23:23 58:2
99:2 142:15
147:21 173:15,22
176:21,24 232:6
265:15 272:4
**talked** 24:1 49:19
63:19 103:5
106:17 132:23
160:16 165:18
292:19
**talking** 15:7 49:22
54:24 61:14 80:18
80:18 82:6 97:8
99:14 100:16
105:12,14 110:8
120:6 121:20
122:18 126:23
142:22 147:6,8,10
147:22 151:20,21
157:9 158:23
160:19 176:23
183:7 186:9 193:2
210:13 218:4
219:15 239:9
269:23
**talks** 182:10 244:9
269:7
**tashina** 170:23
**taught** 58:10
196:24

**tcpa** 133:19 239:3
268:16
**teaching** 293:22
**team** 14:5,23
16:20,22,23,25,25
17:1,3 18:3 75:25
76:2 88:12 89:16
89:19,25 110:24
129:8,10 130:17
142:6,21 217:14
217:14 222:1,4
235:9 241:3
**technical** 127:17
150:8 259:3,24
**technically** 115:19
115:21 119:2,9
**technique** 68:8
**telephone** 58:7
102:4 128:22
129:1,15,18,22
133:8 137:5
152:14 158:21
162:15 164:4
202:7 232:25
269:19,20 287:22
287:25 288:2,6
**television** 132:8,9
136:20 137:4
**tell** 20:20 80:7
141:17 142:19
144:14 174:8
176:12 184:24
185:14 189:20
197:14
**telling** 76:14 179:2
226:25 261:25
**term** 55:6 69:24
71:12 76:20 77:5
88:13 106:7,8
107:15 108:12
113:23 121:11

130:24 131:13
152:7 179:7
189:17 205:11
234:23 235:2
237:24 245:13
283:23
**terminology**
153:20 154:19
**terms** 23:20 27:12
33:2 81:8 84:24
114:10 124:18
137:18 153:11
166:17 167:5
200:17 276:1
282:4 294:25
**testified** 7:11
12:11 30:9,21
66:9 82:17,23
179:18 188:21
190:9,14 212:9
218:7 229:9 241:6
276:2
**testify** 9:11,15
10:1,8,14 112:18
226:21,23 265:19
266:9 297:7
**testifying** 9:5,9
62:17 180:20
204:6 244:18
265:25
**testimony** 10:21
30:17 75:18 76:17
80:12 110:2
112:21 114:17
119:7,10 132:2
141:9,12 152:23
153:3,7,11 164:3,8
176:22 182:25
216:4 217:18,20
218:2 219:25
227:7 237:16,17

239:10 250:8,10
253:3,14 255:17
257:8,11,18 281:9
286:15,18 289:16
297:11,13
**text** 102:17 129:17
129:20 130:6,7
133:18 135:1
152:14 202:10
220:22 245:20,21
260:18,25 261:3,4
264:1,6 288:2,3,6
292:5,6
**texting** 249:23
**textnow** 201:22
203:11,17
**texts** 129:18
260:24 290:4
**thank** 7:20 13:19
14:11 40:5 82:20
118:15 138:20
159:23 169:6
**thanks** 234:6
**theisen** 4:24
228:17 236:21
237:5,9 239:23,24
240:1
**theoretically**
200:20
**theory** 43:15,16
**thesis** 124:8
**thing** 37:7 97:12
125:10 128:7
153:22 174:1
190:13 202:11
207:21 209:1
215:1,18 275:19
**things** 10:9 14:20
24:12 55:16 90:24
91:1 101:6 107:12
109:16 114:21

123:9 140:7 160:1
185:18 192:10
196:25 197:5
217:15 241:5
242:23 253:16
260:18 269:7
278:1 283:22
285:2 292:2,7
**think**   7:15 9:4
26:7 34:1,6 36:24
42:20 49:13,19
62:15 77:6 89:21
108:7 114:12
119:5 120:5
122:15 124:24
126:23 136:25
150:7,19 152:25
158:22 159:13
182:3 192:15
200:16 201:24
203:19,20 212:2
212:20 220:18
225:19 230:8
231:3 240:13
245:7,12 256:11
264:2 265:11,17
268:12 278:12
286:24 289:13
295:5
**thinking**   230:16
**third**   93:4 105:11
105:14,17 142:4
142:10 172:22
201:14 261:9,16
268:6 281:12
292:17,20
**thorough**   216:1
**thought**   27:3
147:1 200:5
273:17

**thoughts**   36:1
**thousands**   25:2,4
25:8,16 26:4
**threads**   238:24
**three**   17:8,9
109:23 110:10
191:2
**thruline**   105:20
239:2 273:17
**tidy**   279:4
**tie**   215:10,20
**tight**   157:18
**time**   6:4,8 17:2
19:16 23:7,10
26:5 32:15,19
34:8,10 35:17
37:8,8 41:22
56:22 86:9 97:24
108:2 109:11
113:14 114:5,6
117:1,25 118:17
118:17,18 122:2
146:11 154:2
160:1 161:11,16
162:2,23 165:15
165:22 168:9
171:24 172:1
173:15,23 190:19
196:21 197:23
199:10 205:19,23
206:9 211:3
212:11,13 218:17
218:21 219:15
221:5 228:23
238:11 239:1
242:24 243:3
246:18 252:9
254:16 259:13
261:22 269:22,23
270:3,4,12 272:10
272:12 276:25

291:17 295:12
**timeline**   188:19
**timely**   168:7 175:3
177:5
**times**   113:17
137:1 148:23
157:15 160:6
209:8
**tiny**   247:18
**title**   13:13,16
14:12,18 45:7
94:13,15 188:16
188:19 231:21
280:16 283:14
**titled**   68:13
**titles**   13:23 14:1
131:16
**today**   9:6,9 10:2
11:23 26:7 31:22
35:13 36:5,23
126:11 183:23
184:14 216:15
244:25 265:11
267:15
**toggle**   128:3
275:17
**told**   274:12
**tone**   79:10 80:18
**top**   37:16 52:12
90:12 109:7
142:11 221:20
222:6 262:15
**topic**   49:23 112:19
242:12 268:25
**topical**   113:12
220:25
**topics**   9:24 10:2
66:19 266:15
**tortured**   169:6
**total**   67:22

**touched**   65:3
**track**   37:11
187:13,17 189:11
190:10,15 238:8,9
**tracked**   188:1
239:16
**tracking**   52:15
190:5 218:11,13
234:24,25 235:2,5
235:12 239:21
240:24
**trail**   245:14,17,18
246:2,22 247:5
250:23,24 251:11
253:16 254:5,8
255:21 257:21
260:16,19 263:6,9
263:18 264:4
**train**   212:15,17,21
**trained**   58:11,16
58:22 59:4,6,9
112:11 114:9
120:19 121:3,17
121:22 122:22
123:3,4 124:4,7,21
125:8,15 171:13
194:11,20 195:20
195:21 201:4
202:8 213:8
214:24 216:5
269:12,15
**training**   4:14 12:3
34:15,19 110:17
110:18 112:4,7,10
112:18,23 113:3
113:17,19 122:18
125:18 126:1,4,7
126:10,13 158:5,6
195:25 196:25
213:3,9,15,21,24
216:4,9,12,14,16

216:20,23 217:2,9
217:19,23,25
218:1,3 265:8
266:2,11,22,25
267:1,1,3,5,7
272:17,19,22
293:3,20 294:3
**transaction** 46:21
**transcript** 5:24
6:11 295:10 296:4
296:6
**transcription**
297:12
**transfer** 109:13
**transition** 58:16
59:5,7,10 81:13
**transitioning** 30:5
30:19,20,22,25
31:2,5,8
**transpired** 167:21
**transpires** 137:11
**treat** 59:22,23,24
109:3
**treated** 97:14
250:9,11
**treats** 257:9
**trial** 6:4,8
**trick** 108:9
**tricky** 28:22
**tried** 272:7 276:4
**trigger** 181:23
182:18
**triggers** 74:18
100:7 245:22
260:20
**trouble** 30:18
233:15
**true** 35:9,18 36:4
297:12
**truedialog** 202:1
203:14,18 292:3,9

292:10,12,15,19
**truedialog's**
292:13
**trust** 285:16
**trustees** 52:2,5
62:3,5
**truth** 297:7,7,7
**truthfully** 9:5
**try** 26:12,23 53:7
104:4 124:4,4
159:14 185:3
197:20 205:22
209:3 273:4 276:6
279:15 283:19
294:19
**trying** 28:21 108:9
116:21 123:6
125:5 127:16
176:15 184:10,10
184:19 195:3,20
200:17 219:6
220:10 266:5
282:2 291:11
**tuition** 45:9,12,16
45:19,25 46:2,4,5
46:12,16,17
149:24 280:13,14
280:15,20 285:8
285:11,12,20,21
285:23 286:1,7,12
286:13,22,23,24
287:7,8
**turn** 58:4 127:6
147:18 254:25
276:15
**turned** 163:19
**turning** 171:18
**tv** 101:5
**twice** 24:25
**two** 13:17 14:25
17:3 24:12 26:22

39:20 55:16 89:4
127:21 139:9
191:3,4 203:17
219:12 223:15,24
227:4 231:22
253:8,10 258:12
258:15 261:15
274:7
**type** 219:2 292:3
**typewritten**
297:11
**typo** 118:17 231:4

**u**

**u** 6:1 175:25
**ug** 53:2
**uh** 20:23 21:1,1,1
157:7 162:3
173:19
**ultimately** 69:7,17
153:5,16 159:12
186:14 187:10
190:6 212:6
279:25 280:25
291:4
**unable** 27:25
118:16 168:6,8
176:9 185:14
186:19 196:12,15
289:1
**unaware** 101:9
108:2 126:19
**uncontroversially**
286:25
**undercurrents**
80:19
**undergrad** 53:1
83:19 94:11
135:16
**undergraduate**
139:16 280:5

**understand** 8:13
10:4,16 12:21
17:11 30:17 31:10
32:20 34:9 50:16
73:14 85:24 89:21
97:4 100:9 104:5
116:21 117:4
119:7 131:1
142:17 153:10
155:10 175:16
176:5 182:19
198:11,22 199:9
199:16 213:16
217:11 219:6
226:19 248:18
264:23 289:7
**understanding**
17:24 23:19 27:2
39:18 40:19 42:6
49:14 71:5,7
76:23 77:1,4,18,22
88:7 113:4,7
121:11 131:6,10
131:23 132:17
137:1 169:15
179:9,12 223:7
225:12 236:19
**understands** 240:7
**understood** 8:12
203:16
**undertake** 154:20
**undertone** 79:8
**unfamiliar** 229:16
241:3
**unhappy** 109:12
**unique** 124:23
198:21,23 199:19
199:25 200:15
215:4
**united** 1:1 297:9

**universities** 41:12
**university** 1:7,13
  3:16,18,22 4:2,6,8
  4:14 7:4 9:12
  10:21 13:13 14:21
  17:25 20:13 27:17
  27:23 41:5,5,9,24
  41:25 42:12 44:15
  46:15 51:24 56:19
  57:4 58:6 61:15
  66:25 88:24 105:9
  121:12 135:4,9
  138:2,22 139:1
  141:17,18 142:23
  143:10 148:13
  158:19 160:10
  165:1 176:14
  178:10 181:2
  184:1,17 186:1,16
  191:6 197:15
  210:1,14 213:2
  233:10 242:1
  244:18,19,20
  255:10 264:2
  265:20,25,25
  266:9,10 277:20
  282:24 285:7,22
  293:4 297:8 298:2
**university's** 42:11
  271:7 286:4,7
**unlost** 127:25
**unpack** 164:13
**unparalleled** 36:1
**unpleasant** 118:20
**unreal** 151:3
**unrejected** 126:22
**unresponsive**
  109:9 222:20
  225:18
**unsubscribe** 237:6
  237:12 240:11,13

**upcoming** 53:17
  54:13
**update** 51:4 236:9
**upper** 49:7
**upwards** 157:14
  166:14
**urgency** 68:9
**usage** 191:6 260:2
**use** 15:21,22 94:15
  108:4 111:3
  124:13 147:16
  166:6 189:17
  197:9 201:13
  207:9 237:21
  241:11 244:1
  267:13 269:12
  270:17 271:7
  275:13 293:8,15
  294:25
**user** 251:2
**uses** 94:13 126:13
**usual** 268:8
**usually** 35:5,13
  123:13,15 262:13
  293:23

**v**

**v** 229:2 252:11,15
  298:2
**vague** 181:16
  273:3
**valluzzo** 118:8,9
  118:15
**value** 30:6,23 31:6
  251:3,3,15,15,16
  251:16,17,17,21
  259:2
**values** 251:22
  252:3,3
**variation** 204:17
**varies** 146:25
  215:3

**variety** 170:8
**various** 14:19,20
  56:19 82:10 84:16
  99:25 100:17,21
  208:23 280:23
  290:19 293:24
**vast** 165:5 290:10
**vehement** 122:19
  122:23 123:4
**vehemently** 122:8
  122:13
**vein** 184:23
  201:25
**vendors** 102:25
  104:14
**verbatim** 183:4
  212:1
**verbiage** 49:23
**vernacular** 74:18
**versus** 26:22,23
  79:5 207:9 209:9
**vet** 224:23
**vetted** 224:15
**viable** 276:16
**vice** 11:14 32:7,10
  90:4,7
**vicki** 50:22 51:1,5
**victoria** 17:3,19,21
  170:21 248:11
  249:6,19 254:11
  254:12 256:13,20
  258:19
**view** 59:20 61:9
  116:14 117:9
  138:14 141:6
  179:21
**viewed** 62:11,14
  75:7
**views** 111:12
  138:10

**voice** 79:10 201:20
  203:6,7,8,17 279:8
**voicemail** 249:24
  261:20
**volume** 139:24
  173:15
**volunteer** 223:4
**vp** 11:17 32:12
**vs** 1:6 297:8

**w**

**w** 26:23 69:19
**wage** 136:4
**waive** 6:10
**wall** 2:6
**walls** 143:3,8
**want** 16:17 20:24
  33:20 53:22,24
  54:2,15 62:22
  74:21 82:19 84:6
  86:12 91:10 94:1
  97:7,7 100:7
  102:11 110:15
  120:4 122:12,14
  128:8 132:2
  135:17 136:18
  144:12,18 145:25
  147:12 155:8
  158:6 160:2
  161:18,22 163:25
  166:6 168:1 172:5
  173:6 174:5 175:1
  182:24 186:13
  188:5 198:24
  199:1 204:10
  210:18 211:1,4
  214:10 218:18
  232:24 233:5
  238:16 239:8
  263:4,12 264:22
  266:4 270:10
  275:4

**wanted** 31:5
122:16 157:2,25
175:14 176:3
186:22 201:2
212:20 228:23
275:1
**wanting** 58:15
282:14
**wants** 43:24 44:2
223:3
**warrant** 257:13
**washington** 2:14
**washy** 123:5
**waste** 122:2
218:17
**water** 82:19
166:21
**way** 10:7 14:13
28:7,21,22 41:21
52:17 55:21 60:4
86:19 93:1 95:7
99:18 114:3,18
115:1,7,19,21
119:2,9 122:7
128:2 133:24
144:2,8,12,21,22
144:24 171:19
174:13 190:24
202:17,18,21
203:3 214:14
215:24 220:10,14
223:20 234:12
241:7 254:7 271:2
273:13 276:5
278:12 279:15,17
294:11,19
**ways** 14:20 41:17
77:7 102:23
103:11,12 110:3
144:13,15

**we've** 34:3 71:8
77:25 78:11 99:22
107:22 113:16
127:3 128:21
137:7 142:25
146:23 151:7
152:20 153:18
166:17 167:5
195:5 200:16
**website** 104:7
105:22 269:6
274:2,19
**websites** 104:7
292:2
**week** 29:3 31:25
55:24 161:16
196:13 282:13
**weekly** 142:6,21
**weeks** 13:17 30:15
217:13
**weight** 91:1
**welcome** 33:14
**went** 97:18 141:14
157:1 199:17
226:10
**whatsoever** 123:9
195:25
**whisenhant** 50:23
51:1,5
**white** 232:17
**wide** 142:6,21
**williams** 169:8
170:6,20 172:11
172:18 173:7
175:19 182:10
185:1 254:17
255:2 256:3
**wishy** 123:5
**withdrawn** 56:19
**witness** 3:3 6:9
38:3,6 40:5 50:7

88:23 117:19
166:24 188:7
203:22 221:11
237:23 247:9
248:6 295:7
297:13,18
**won** 69:7,17,19
73:1,4 81:12 95:8
282:17,20 284:2
**wonderful** 176:13
**wons** 283:8,10
**word** 31:9 64:25
74:23 100:13
123:10 207:9
241:16 276:4
290:14
**worded** 220:9
**wording** 119:9
**words** 75:11
168:21 183:6
**work** 14:12,13,19
14:21,23 27:10
28:5,15 102:25
205:21 229:24
230:17 256:12
273:23 276:6
**worked** 26:12
171:2,5 205:19,23
231:20 238:22
**working** 56:12
59:13 62:9 158:3
158:11 196:8
274:7,10
**works** 229:6 237:3
251:11 274:4
**wrap** 264:22
**write** 35:7 67:19
183:11 220:21
**writes** 145:19
222:18,23 230:8
230:20 231:22

232:24 234:6,11
237:5 240:9
249:22 255:5
256:23
**writing** 191:19
267:20,22,25
294:12
**written** 22:19 29:6
35:24 36:9 184:4
209:18,21 210:6
211:15 212:7,10
212:10,15,17,19
239:2,6,7 242:24
244:16,17,23
266:13 268:18,21
269:3,4 291:18,20
291:23,25 292:8
292:23 293:2,17
294:2,4,5
**wrong** 31:9 60:8
97:6 139:8 189:8
189:22 190:5
217:17 223:8
**wrote** 21:8 24:4,23
29:16,21 33:13
35:3,17,24 36:19
38:8,18,22 61:20
62:2,7,8,9 67:19
67:22 68:7 73:19
100:18 189:15
190:25 191:22
230:24
**wyndham** 1:16
297:5

**y**

**y** 7:9 204:4 222:16
**yatcko** 170:17
171:6,9
**yeah** 82:20 89:6
99:22 105:16
108:8 109:5 112:9

115:16 125:15
142:16 146:13
159:8 170:4 177:3
189:13 192:11
198:4 222:14
237:1,21 280:9
**year**   39:20 48:1,7
48:10 66:13 86:8
171:23
**years**   14:8,9 17:5
17:8,9 30:13
66:16 191:2,4
199:15
**yellow**   72:22 73:2
85:12,13 93:23
98:24
**yesterday**   12:6
**young**   196:9

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination


4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a certified shorthand reporter, the witness shall not sign the deposition. If the officer is not a certified shorthand reporter, then unless reading and signing of the deposition are waived by stipulation of the parties, the officer shall request the deponent to appear at a stated time for the purpose of reading and signing it. At that time or at such later time as the officer and witness agree upon, the deposition shall be submitted to the witness for examination and shall be read to or by the witness, and any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness. If the witness fails to appear at the time stated or if the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the witness' failure or

refusal to sign, together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under R. 4:16-4(d) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.