Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3    _____
      MELANIE DAVIS,                  )Civil Case
 4                                    )No.: 18-cv-81004-RLR
                    Plaintiffs,)
 5                                    )
      v.                              )
 6                                    )
      POST UNIVERSITY, INC.,          )
 7                                    )
                    Defendants.)
 8                                    )
      _____)
 9
10
11         DEPOSITION OF VICTORIA L. MEEHAN
12
13
14
15    DATE:            February 8, 2019
16    TIME:            11:35 a.m.
17    HELD AT:         Wyndham Southbury
                       Southbury, Connecticut
18
19
          By:          Sarah J. Miner, RPR, LSR #238
20
21
22
23
24
25
```

Page 7

1          Q. Your attorney may object to questions that I
2     ask you.  Unless Adam specifically instructs you not
3     to answer, you can answer the question regardless of
4     objections.
5          A. Okay.
6          Q. What is your date of birth?
7          A. 9/18/90.
8          Q. What is your title at Post University?
9          A. Assistant director of admissions.
10         Q. How long have you had that title at Post?
11         A. Going on two years.
12         Q. Have you had any other titles at Post?
13         A. Yes.
14         Q. What were those titles?
15         A. Team lead and admissions counselor.
16         Q. How long have you been at Post?
17         A. Four and a half years.
18         Q. Did you start as an admissions counselor?
19         A. I did.
20         Q. How long were you an admissions counselor?
21         A. 18 months.
22         Q. Then you became a team lead?
23         A. Yes.
24         Q. How long were you a team lead?
25         A. For the difference.

1   not in service, you would have to call it 10 times

2   before rejecting the lead?

3          A. Absolutely not.

4          Q. Are you speaking specifically with respect to

5   your team?

6          A. No.  We would email that lead and call it

7   occasionally to see if the number came back in

8   service.

9          Q. Did you ever tell one of your admissions

10  counselors not to reject a lead because students could

11  change their mind?

12         A. No.  But that is why we would reach out to a

13  closed opportunity that went unresponsive.

14         Q. So when these are sworn affidavits, so they

15  are under penalty of perjury, one of these affiants

16  says the call recipients "do not call" request was not

17  treated as a valid reason to reject the lead because

18  we were often told students could change their minds,

19  is this person lying?

20         A. I think they misunderstood the direction.

21         Q. Is it possible that she was trained

22  differently by a different assistant director of

23  admissions than the way you train your admission

24  counselors?

25         A. It is highly unlikely.

Page 111

1          A. We use Outlook.

2          Q. Do you check your email?

3          A. Yes.

4          Q. Did you send emails?

5          A. Yes.

6          Q. Do you ever use templates in emails?

7          A. Yes.

8          Q. Mail blasts, I guess we call them?

9          A. Yes.

10         Q. What do you call them?

11         A. Mail merges.

12         Q. Mail merges.  Do you use mail merges?

13         A. Yes.

14         Q. Were you ever instructed to keep all of your

15    emails?

16         A. They are archived.  Was I instructed to keep

17    all of my emails?  I don't recall.

18         Q. Were you instructed not to delete your

19    emails?  Setting aside anything counsel may have told

20    you after this lawsuit was filed.

21         A. I don't recall.

22         Q. Did you ever delete emails?

23         A. Yes.

24         Q. In what context would you delete emails?

25         A. Spam, clear that out.

Page 112

1        Q. Of course.

2        A. If -- I can't think of another.  So when

3    sending mail merges, if we are sending a large amount

4    at once, this was a long time ago and our inbox would

5    be full, not just sending mail merges, if our inbox

6    was full, we would have to delete emails to make

7    space.  We have since migrated to larger -- I don't

8    the technical term -- amount of space for emails, so I

9    haven't had to do that for some time.

10       Q. When you say some time, how long would you

11   say?

12       A. Approximately -- I do not know.

13       Q. Whatever archive you mentioned for the email,

14   does that archive delete emails?

15       A. I do not know.

16       Q. Did you ever check your emails while you were

17   at home?

18       A. Yes.

19       Q. Did you have access to the CRM system at

20   home?

21       A. Yes.

22       Q. Does your supervisor have access to the CRM

23   system at home?

24       A. Yes.

25       Q. I want to go through some emails.

Page 113

1          (Exhibit No. 7 marked for identification.)

2    BY MR. GLAPION:

3          Q. Do you see this?  Do you recognize this email

4    at all?

5          A. Yes.

6          Q. Is this a mail merge email that you would

7    have sent out?

8          A. I don't know.

9          Q. Do you see the top left email address

10   VMeehan@Post.edu?  Is that your email address?

11         A. It is.

12         Q. Do you recall sending the email to the email

13   address on the "to" field?

14         A. I send a lot of emails to students, so not

15   specifically, no.

16         Q. Why would this email no longer be in your

17   sent folder?

18         A. If I had to delete it to make space.

19         Q. So it is possible you deleted this email?

20         A. It is possible.

21         Q. Do you recall if you typed this particular

22   email up or would you have used the template to send

23   this email?

24         A. I do not recall.

25         Q. Have you used templates that are similar to

1    merges.

2          Q. Do you recall the body of this email?

3          A. Like I said, I send a lot of emails, so no.

4          Q. Would this have been a mail merge or manually

5    typed?

6          A. This was likely a mail merge.

7          Q. What makes you think that?

8          A. Just the formatting of it.

9          Q. And on the last page of the document, there

10   appears to be a response sent to you.

11          Do you see that?

12   A. Yes.

13          Q. It says, "I am no longer interested.  Please

14   take me off your email list."

15          Do you see that?

16   A. Yes.

17          Q. Do you recall receiving that email?

18   A. I do not.

19          Q. Why would that email no longer be in your

20   inbox?

21   A. I do not know.

22          Q. Is it possible you deleted that email?

23   A. It is.

24          Q. And is it the same for this email being in

25   your sent box, is it possible you deleted it?

```
                                              Page 116
1          A. Possible.

2              (Exhibit No. 9 marked for identification.)

3      BY MR. GLAPION:

4          Q. Have you had a chance to look at this?

5          A. Yes.

6          Q. Do you recognize this email?

7          A. I don't remember sending it, but I recognize

8      it as an email from Post.

9          Q. From your Post account?

10         A. Yes.

11         Q. Have you seen emails that are similar in

12     content to this one?

13         A. Yes.

14         Q. Regarding the FAFSA?

15         A. Yes.

16         Q. Is that usually a mail merge or manual email?

17         A. That would be a mail merge.

18         Q. Do you know if this one is a mail merge?

19         A. I don't know for certain.

20         Q. What is your best guess?

21         A. That it likely was.

22         Q. And you will see that this was sent on

23     October 11th, 2017 at 12:24.  Assuming you were

24     working at work that day in the office, would you have

25     been working at 12:24?
```

Page 117

1        A. Yes.

2        Q. And you would have been -- presumably, if you

3    were working that day, you would have been working in

4    the office at that time?

5        A. Assuming it wasn't a snow day or something

6    along those lines, then yes.

7        Q. The next page marked MD397, do you see the

8    response from Melanie Davis to your email address?

9        A. Yes.

10       Q. It says, "Please stop emailing, texting, SMS

11   calls and voicemail."

12          Do you see that?

13       A. Yes.

14       Q. How do you interpret that request?

15       A. Stop calling, emailing and texting.

16       Q. The next line, "This is the third or fourth

17   time I'm asking to be removed from all your lists."

18          Do you see that?

19       A. Yes.

20       Q. Why would this email not still be in your

21   inbox?

22       A. If I had deleted it.  I don't remember doing

23   so.

24       Q. Is it possible you deleted it?

25       A. It is possible.

Page 119

1   form or -- is the content of this email in line with

2   an email you would have sent?

3        A. Yes.

4        Q. Do you still send emails like this?

5        A. Yes.

6           (Exhibit No. 11 marked for identification.)

7   BY MR. GLAPION:

8        Q. Do you recognize this email discussing being

9   snowed in?

10       A. Yes.

11       Q. You will note that it begins, "Hi, Melanie."

12          Do you see that?

13       A. Yes.

14       Q. Then below "snowed in," it says, "Megan, our

15   FAFSA specialist is available."

16          Do you know if this is a manually typed

17   email?

18       A. I don't recall.

19       Q. If we go to the next page, you will see a

20   response.  It says, "Please stop contacting me.  Not

21   interested."

22          Do you see that?

23       A. Yes.

24       Q. How would you interpret that request?

25       A. Do not call, do not reach out.

```
                                          Page 120
 1        Q. Why would this email no longer be in your
 2   inbox?
 3        A. Same reason for the others.
 4        Q. It's possible you deleted it?
 5        A. It is possible.
 6        Q. It is possible you deleted the email you
 7   sent?
 8        A. Yes.
 9        Q. Why would this request not be documented in
10   the CRM system?
11        A. Same reason, human error.
12        Q. So just to be clear, none of these emails
13   were produced in this case to me.  They all came from
14   my client.  So as a result, they are not in your inbox
15   or sent folder.  Just by way of background.
16        A. Could they be in the archive?
17        Q. I will have to talk to Adam about that.  But
18   your testimony, though, is with each of these emails
19   you went through, it is possible you deleted them?
20        A. It is possible.
21        Q. And that with respect to the two requests
22   that you agreed you would interpret as a "do not call"
23   request, that if it is not in the system, it is due to
24   human error?
25        A. Yes.
```

# VICTORIA MEEHAN
# FULL CONDENSED DEPOSITION TRANSCRIPT

Page 1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3    _____

     MELANIE DAVIS,              )Civil Case

4                                )No.: 18-cv-81004-RLR

                   Plaintiffs,)

5                                )

     v.                          )

6                                )

     POST UNIVERSITY, INC.,      )

7                                )

                   Defendants.)

8                                )

     _____)

9

10

11         DEPOSITION OF VICTORIA L. MEEHAN

12

13

14

15   DATE:          February 8, 2019

16   TIME:          11:35 a.m.

17   HELD AT:       Wyndham Southbury

                    Southbury, Connecticut

18

19

         By:        Sarah J. Miner, RPR, LSR #238

20

21

22

23

24

25

Page 2

1  A P P E A R A N C E S:
2  For the Plaintiffs:
3  Jeremy M. Glapion, Esq.
   The Glapion Law Firm
4  1704 Maxwell Drive
   Suite 102
5  Wall, Connecticut  07719
   jmg@glapionlaw.com
6
7  For the Defendant:
8  Adam D. Bowser, Esq.
   Arent Fox LLP
9  1717 K Street, NW
   Washington, DC  20006-5344
10 adam.bowser@arentfox.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2  WITNESS:                    Page
3  VICTORIA L. MEEHAN
4  Direct Examination by Mr. Glapion    4
5
            E X H I B I T S
6
   Deposition
7  Exhibits    Description        Marked
   Exhibit 4   Copy of Photograph re    11
8              "Happy Birthday"
   Exhibit 5   Guidelines        13
9  Exhibit 6   Post University Performance    104
               Appraisal Review Form
10 Exhibit 7   Email from VMeehan to    113
               MDspecialist21 8/24/17
11 Exhibit 8   Email from VMeehan to    114
               MDspecialist21 10/2/17
12 Exhibit 9   Email from VMeehan to    116
               MDspecialist21 10/11/17
13 Exhibit 10  Email from VMeehan    118
               MDspecialist21 10/18/17
14 Exhibit 11  Email from VMeehan    119
               to MDspecialist21 1/4/18
15
            (The exhibits were included with the
16 original transcript.)
17
18
19
20
21
22
23
24
25

Page 4

1        VICTORIA L. MEEHAN,
2  having first been duly sworn by Sarah J. Miner, LSR, a
3  Notary Public in and for the State of Connecticut, was
4  examined and testified as follows:
5        DIRECT EXAMINATION
6  BY MR. GLAPION:
7  Q. Thank you for being here and waiting
8  patiently during the first leg of this.  Hopefully
9  this will go quickly.
10     Are you aware that you are under oath?
11 A. Yes.
12 Q. The same oath that you would be under if you
13 were in a courtroom.
14 A. Yes.
15 Q. Have you ever been deposed before?
16 A. Yes.
17 Q. How many times?
18 A. A lot.
19 Q. Why?
20 A. I work there.
21 Q. No, I'm sorry.  Not Post.  I said deposed.
22 A. Oh, deposed.  No.  I'm sorry.  I thought you
23 said "at Post."
24 Q. I'm like, wow, most people don't answer "a
25 lot" to that question.

Page 5

1  A. No, never.
2  Q. You have never been deposed?
3  A. No.
4  Q. Just basic overview.  If you don't understand
5  one of my questions, certainly you can ask me to
6  clarify.  Connie asked me a few times to clarify.
7     If you answer, I will assume you understood
8  the question.  Is that fair?
9  A. Yes.
10 Q. If you need to take a break, that is fine.  I
11 am certainly not going to deny anyone breaks.  I would
12 only ask if there is a pending question or if we are
13 in the middle of a line of questioning, that we finish
14 that questioning or that line of questioning before we
15 take a break.  Is that fair?
16 A. Sure.
17 Q. Answers need to be verbal.  Uh-huhs and
18 huh-uhs don't really translate to being transcribed
19 very well.  So yes or no in their scenarios.  Okay?
20 A. Understood.
21 Q. Are you aware of anything today that could
22 impair your ability to testify honestly or truthfully,
23 whether it be medication, drugs, alcohol, mental
24 conditions, anything like that?
25 A. No.

Page 6

1    Q. Did you meet with anyone to discuss your
2  testimony today?
3    A. I met with Adam.
4    Q. I don't want to know the content.
5    A. I met with Adam on Tuesday.
6    Q. For how long did you meet?
7    A. A couple of hours.
8    Q. Was anyone else present?
9    A. Yes.
10   Q. Who?
11   A. Connie, Elaine Neely and Jeff Olsen.
12   Q. Elaine Neely.  Who is Elaine Neely?
13   A. She is our director of compliance, I believe
14  is her title.
15   Q. What was the last name?
16   A. Neely.
17   Q. Sorry.  The last name you gave me, Jeff
18  Olsen?
19   A. Yes.
20   Q. Who is Jeff Olsen?
21   A. He is our VP of enrollment.
22   Q. Are you paying anything for a lawyer today?
23   A. No.
24   Q. Have you agreed to pay anything for a lawyer?
25   A. No.

Page 7

1    Q. Your attorney may object to questions that I
2  ask you.  Unless Adam specifically instructs you not
3  to answer, you can answer the question regardless of
4  objections.
5    A. Okay.
6    Q. What is your date of birth?
7    A. 9/18/90.
8    Q. What is your title at Post University?
9    A. Assistant director of admissions.
10   Q. How long have you had that title at Post?
11   A. Going on two years.
12   Q. Have you had any other titles at Post?
13   A. Yes.
14   Q. What were those titles?
15   A. Team lead and admissions counselor.
16   Q. How long have you been at Post?
17   A. Four and a half years.
18   Q. Did you start as an admissions counselor?
19   A. I did.
20   Q. How long were you an admissions counselor?
21   A. 18 months.
22   Q. Then you became a team lead?
23   A. Yes.
24   Q. How long were you a team lead?
25   A. For the difference.

Page 8

1    Q. I can figure that out from the transcript.
2  What are your job responsibilities as an assistant
3  director of admissions?
4    A. To assist and direct.
5    Q. I would appreciate an elaboration what you do
6  day-to-day.
7    A. I oversee a team of admissions counselors.
8    Q. How do you differ them from a team lead in
9  terms of your responsibilities?
10   A. Team leads also act as admissions counselors.
11   Q. And you do not act as add an admission
12  counselor?
13   A. Not on the scale that team leads do.
14   Q. But in some ways you still take on some of
15  the responsibilities of an admissions counselor?
16   A. Occasionally I am an admissions counsel for
17  a small number of students.
18   Q. So is it fair to say the hierarchy of those
19  three groups in terms of who supervises who would be
20  assistant director of admissions, team lead and then
21  admissions counselors?
22   A. Correct.
23   Q. So on a typical day, walk me through a
24  typical day of an assistant admission director, your
25  specific day?

Page 9

1    A. When I come in, I take a look at the student
2  files, make sure that they are moving through the
3  process of admissions.  I meet with my admissions
4  counselors to make sure they have all of the resources
5  they need to be successful.
6    Q. Are you responsible for evaluations of your
7  admissions counselor?
8    A. I am.
9    Q. On what criteria do you evaluate these
10  admissions counselor?
11   A. We have key performance indicators that we
12  look at that speak to the behaviors.
13   Q. Is -- key performance indicator, is that
14  often shortened to KPI on documents?
15   A. Sometimes.
16   Q. I think we saw some of those documents at the
17  last deposition.  I am going to try to avoid doubling
18  up making you explain piece by piece everything you
19  just went over.
20      Are you familiar with the nature of this
21  lawsuit?
22   A. How do you mean?
23   Q. Are you familiar with what this lawsuit is
24  about?
25   A. Yes.

3 (Pages 6 - 9)

1    Q. What is this lawsuit about, in your
2  understanding?
3    A. Do not call.
4    Q. Can you be more specific in terms of what
5  aspects of do not call are impacted?
6    A. That is my understanding.
7    Q. Did you bring any documents to this
8  deposition?
9    A. No.
10    Q. Are you aware that you were requested to
11  bring documents if you could find certain documents?
12    A. The documents that I was able to obtain, I
13  forwarded to Adam.
14    Q. Did you produce those?
15      MR. BOWSER:  I think part of them would be
16  the training file, would be the same for both.  She
17  did not have any hard copy.
18  BY MR. GLAPION:
19    Q. I am trying to see how I phrased it.  I
20  requested all documents reflecting your training,
21  guidelines or expectations in your role or roles at
22  Post University.
23      Did you look for such documents?
24    A. Yes.
25    Q. The only document that you forwarded to Adam

1  would be the training manual, basically the training
2  manual, PCAS?
3      MR. BOWSER:  Right.  If I can just add that
4  there are other responsive documents we produced
5  previously.
6  BY MR. GLAPION:
7    Q. Understood.  I want this to be Exhibit 4.
8      (Exhibit No. 4 marked for identification.)
9  BY MR. GLAPION:
10    Q. Do you recognize this picture?
11    A. Yes.
12    Q. What is this a picture of?
13    A. Birthday gifts.
14    Q. For who?
15    A. Me.
16    Q. Do you know where this picture -- is this
17  picture posted on any social media page?
18    A. Yes.
19    Q. Are you on Facebook?
20    A. Yes.
21    Q. Is your Facebook name Vic space Toria?
22    A. Yes.
23    Q. I will represent that this picture is from
24  September 14th, 2017.  I believe you said your date of
25  birth is September 18th, '90.  Correct?

1    A. Correct.
2    Q. So this was an early birthday celebration?
3    A. Yes.
4    Q. It is a nice team?
5    A. Yes.
6    Q. Is this a picture -- this is your desk or
7  work space?
8    A. Yes.
9    Q. Or cubicle.  I don't know how it is laid out.
10  I can't tell.  Is it a desk or private office or
11  cubicle?
12    A. It is a cubicle.
13    Q. Is this -- other than the birthday Post-its
14  and the gifts, is this generally how your desk appears
15  today?
16    A. No.
17    Q. Are any of the documents from the back -- I
18  guess we will call it a posterboard no longer there?
19    A. They are not.
20    Q. None of them are?
21    A. No, I no longer have an area where I can hang
22  these.
23    Q. Your desk has changed since then?
24    A. Yes.
25    Q. Got you.  Do you still have -- I want to

1  focus on the document in the top right of the picture.
2  I know you can't read it here.  I have something you
3  will be able to read it.
4      Do you know what that document was at the
5  time?
6    A. Yes.
7    Q. What was that document?  I have a zoomed-in
8  version that I can provide.
9    A. Please.
10    Q. It is a black and white picture.  You are not
11  going to be able to read it there.
12      These combined are -- should be 5.
13      (Exhibit No. 5 marked for identification.)
14  BY MR. GLAPION:
15    Q. So these two -- I will represent to you the
16  first copy that is a little more blurry is simply a
17  zoomed-in and sharpened version of the document in the
18  top right corner.  The second page is a version that
19  used a machine essentially learning to recognize the
20  characters in those.  I think that one has two or
21  three errors that I was able to recognize and I will
22  flag those as we go through these.
23      I read the very first line, and you can
24  certainly tell me if you disagree if it is so
25  illegible that you can't read it, as ADOA Guidelines

4 (Pages 10 - 13)

Page 14

1 and Expectations. I am looking at the sharpened one,
2 not the computer one because that's AGOL. I think
3 that was a mistake on the computer's part.
4      MR. BOWSER: One housekeeping matter. Are we
5 going to mark the second one as an exhibit?
6      MR. GLAPION: I think those are combined
7 should be fine. We can mark them separately, but I
8 think --
9      THE WITNESS: I am sorry. Did you say AGOI?
10 BY MR. GLAPION:
11      Q. I said ADOA Guidelines and Expectations is
12 how I read that document as?
13      A. That would not make sense. I don't know what
14 that would stand for.
15      Q. Do you remember what that -- well, in the
16 context of what you understood this document to be, do
17 you recall what that could be?
18      A. No.
19      Q. Would AGOI make more sense?
20      A. No.
21      Q. ADOA -- what -- your job title you said was
22 assistant director of admissions?
23      A. Yes.
24      Q. Could ADOA simply mean assistant director of
25 admissions guidelines and expectations?

Page 15

1      A. I am not sure.
2      Q. You testified before you are familiar with
3 that document, but you don't recall what the document
4 was?
5      A. I do recall what the document was. I don't
6 recall what the acronym in front of it was.
7      Q. Was it a guidelines and expectations
8 documents?
9      A. Yes, for assistant directors.
10      Q. So you --
11      A. Yes.
12      Q. -- and other people at POST?
13      A. Yes.
14      Q. The first one -- and we can look at either
15 one here. I think the computer got it right here.
16 Says "create in a new calendar to stay on task and
17 update time slots and changes each week."
18      Does that make sense to you?
19      A. Not the time slots.
20      Q. Time sheets?
21      A. Time sheets, yes.
22      Q. The computer did make an error there. What
23 would that mean, "Create a new calendar to stay on
24 task and update changes and time changes each week."
25      A. My boss came and sat with me to create an

Page 16

1 activity calendar to make sure I was fulfilling all of
2 my responsibilities each day.
3      Q. And the header below that says "Daily." Do
4 you agree?
5      A. Yes.
6      Q. And the first is "update tracker"?
7      A. Yes.
8      Q. Do you agree that that is what that says?
9      A. Yes.
10      Q. What does that mean?
11      A. It means that I update our tracker for our
12 KPIs.
13      Q. KPIs being key performance indicators?
14      A. Right.
15      Q. What material or what data was tracked on
16 these trackers?
17      A. Those specific KPIs that we look at.
18      Q. Are you looking at Exhibit 2 there?
19      A. I did glance at it, yes.
20      Q. The items listed under KPI on Exhibit 2,
21 those are what are in the tracker that this refers to?
22      A. Correct.
23      Q. The second item is -- I think the computer
24 made a mistake here. "Check students in register
25 phase - ASC AC outreach make connection to ASC."

Page 17

1      A. That is correct.
2      Q. Does that make sense to you?
3      A. Yes.
4      Q. What does that mean?
5      A. When a student is registered, there are
6 certain documents that they need to submit in order to
7 finalize their file. They need to speak with their
8 academic success counselor and their admissions
9 counselor. So I follow up on that in the student
10 files.
11      Q. What is the difference between an academic
12 success counselor and an admissions counselor?
13      A. Academic success counselor is an advisor that
14 is with the student through to graduation, whereas an
15 admissions counselor works with them through their
16 first term as a student in the recruitment process.
17      Q. The next line, I believe the computer got
18 this right. I read it as "Leads under five attempts
19 look into outreach and address individually."
20      Do you agree?
21      A. Yes.
22      Q. The next line is, "Leads under two attempts
23 over 24 hours redistribute." Do you see that?
24      A. Yes.
25      Q. Do you agree that is the process?

5 (Pages 14 - 17)

Page 18

1    A. Yes.
2    Q. This references leads.  What are leads?
3    A. Student inquiries.
4    Q. Are there any categories of leads that were
5 not student inquiries?
6    A. No.
7    Q. What about referrals?
8    A. A referral is someone who -- well, excuse me.
9 A referral is a student that was recommended to us by
10 another student.
11    Q. That referral didn't inquire?
12    MR. BOWSER:  Objection, foundation.
13 BY MR. GLAPION:
14    Q. Correct?  You can answer.
15    A. It depends on the student.
16    Q. What do you mean it depends on the student?
17    A. So sometimes, for example, if we are working
18 with a student, they will say, "Oh, my sister said she
19 also wants to go to school."  So at that time we will
20 try and speak with the sister to determine if she did
21 want to go to school.  And if she did, then we will
22 create the lead in our system.
23    Q. But that was not an inquiry by, in your
24 example, the system made to Post, it was sort of
25 third-hand information.  Is that correct?

Page 19

1    A. Yes, but we generally don't create a student
2 file for them until we confirm they have requested
3 that information.
4    Q. How would you confirm they requested that
5 information?
6    A. By speaking with them.
7    Q. By calling them?  Is one of the ways you
8 would try to speak with them by calling them?
9    A. That is one way.
10    Q. By text messaging?
11    A. That is one way.
12    Q. By email?
13    A. Yes.
14    Q. Are there any other ways?
15    A. No.  Excuse me.  Yes.  If the referral is
16 present, then the student that we are speaking with
17 sometimes will hand them the phone.
18    Q. Understood.  Who is responsible for calling
19 these referrals prior to the lead file being created?
20    A. The admissions counselor who obtained the
21 referral.
22    Q. Is the admissions counselor supposed to call
23 the referral immediately after the call with the
24 prospective students?
25    A. It depends on the student.

Page 20

1    Q. Were they instructed not to create a new lead
2 file for that referral until they spoke to the lead?
3    A. I am not sure.
4    Q. Did you ever instruct them not to create a
5 lead file for a referral until they confirm the
6 referral's interest?
7    A. I do not recall.
8    Q. Is there anything that would refresh your
9 recollection in that regard, or help you remember, any
10 documents you could think of?
11    A. No.
12    Q. Are there any other categories of prospective
13 students besides lead?
14    A. An opportunity.
15    Q. What is an opportunity?
16    A. An opportunity is someone who has confirmed
17 that they want to learn more about Post University
18 after we have spoken with them.
19    Q. So in what scenario then -- because that
20 sounds a lot like how you would confirm a referral's
21 interest.
22    Would a referral always become an opportunity
23 right out of the gate if they confirm the interest?
24    A. Not until we have spoken with them.
25    Q. You call a referral and they confirm they

Page 21

1 were, in fact, interested in receiving information
2 about Post, would they immediately become an
3 opportunity?
4    A. Yes.
5    Q. In that scenario, they would skip being put
6 in the system just as a lead, they would go right into
7 an opportunity?
8    A. We cannot create an opportunity on its own.
9 We would create the lead and then transition that file
10 to opportunity.
11    Q. You would create a lead file and essentially
12 elevate it to opportunity?
13    A. Correct.
14    Q. I am assuming opportunity is considered more
15 valuable in the pipeline, not value in terms of
16 student, but in terms of what ultimately potential for
17 enrollment I guess is an opportunity is considered
18 more likely at that point than a lead?
19    A. Could you --
20    Q. Sure.  That was a whole bunch of mess.
21    An opportunity has confirmed their interest
22 in attending or receiving information on Post more
23 than a lead has?
24    A. Yes.
25    Q. So they are further along in the process than

6 (Pages 18 - 21)

Page 22

1  a lead?
2      A. Yes.
3      Q. The next line on here says -- actually let me
4  ask.  Are there any other categories aside from leads
5  and opportunities short of being an enrolled student?
6      A. No.
7      Q. The next line on here, I read as, "Run call
8  report, check call volume and call duration, address
9  low, appraise high."
10        Do you agree?
11     A. Yes.
12     Q. Does that make sense in the context of your
13  duties as an assistant director of admissions?
14     A. Yes.
15     Q. So I am going to take these last three bullet
16  points and all my questions are going to spring off of
17  that for the next bit.
18        Are you responsible as an assistant director
19  of admissions for making calls for leads and
20  opportunities?
21     A. Yes.
22     Q. Do you make calls to leads and opportunities
23  daily?
24     A. No.
25     Q. How often would you say you call leads and

Page 23

1  opportunities?
2      A. It depends on the week.
3      Q. In what scenarios would you call a lead or an
4  opportunity?
5      A. I would call an opportunity to follow up on
6  the student file.  If there was an appointment set, I
7  would call a lead if we are trying to saturate our
8  leads and my team needs help doing so.
9      Q. You say "saturate our leads"?
10     A. Yes.  It is a term that we use.
11     Q. What does that mean?
12     A. Calling them, reaching out to them.
13     Q. So essentially if your team wasn't able to
14  call the amount of leads, you would pitch in to help?
15     A. Correct.
16     Q. Was there a minimum call volume that
17  admissions counselors were expected to make to leads?
18     A. No.
19     Q. Were there a minimum number of calls each day
20  that admissions counselors were expected to make?
21     A. No.
22     Q. The first bullet point says, "Leads under
23  five attempts looking to outreach and address
24  individually."
25        If there were no minimum call volume, where

Page 24

1  does the five attempts come from?
2      A. From the outreach to the lead.
3      Q. Correct.  Why are you specifically obligated
4  or expected to look at leads under five attempts?
5      A. Because they are the newest.
6      Q. And it says, "Look into outreach and address
7  individually."
8        What does that mean?
9      A. If an admissions counselor is not reaching
10  out to their leads, I have to find out why.
11     Q. And the next one is, "Leads under two
12  attempts over 24 hours redistribute."
13        Do you see that?
14     A. Yes.
15     Q. What does that mean, what does redistribute
16  mean?
17     A. If a rep is not calling those leads or is not
18  able to because they are out, we will have someone
19  else reach out to them.
20     Q. So then there was an expectation at least for
21  the immediate outreach lead of how many times they
22  would attempt to outreach to that lead.  Is that
23  correct?
24     A. Could you rephrase the question?
25     Q. Sure.  It says leads under two attempts over

Page 25

1  24 hours you would redistribute, so there was an
2  expectation that admission counselors had to attempt
3  to reach a lead at least twice in 24 hours?
4      A. A brand new lead, yes.
5      Q. A brand new lead.  And was there any
6  expectation for how many times a lead was expected to
7  be attempted if the lead didn't answer?
8      A. Ten times.
9      Q. So I still want to go back to this under five
10  attempts under because it seems leads under two
11  attempts would be the newest.  Then you said five
12  attempts would be the newest.  I am sure not clear
13  where that under five leads attempt.
14        If you could clarify why are you looking to
15  outreach under five attempts and for how long a
16  period.  I will ask that first question and then the
17  next question.
18     A. Okay.  What was the first question?
19     Q. Sure.  Why are you responsible or obligated
20  to look at leads under five attempts?
21     A. It is just a bucket of leads that we look at.
22     Q. And five attempts refers to attempts to
23  contact the lead?
24     A. Correct.
25     Q. So if there are fewer than five attempts to

7 (Pages 22 - 25)

Page 26

1  contact a lead, does that flag some sort of issue for
2  you to investigate?
3      A. No.
4      Q. So what then what is meant by looking into
5  outreach -- why are you looking to outreach at that
6  point?
7      A. To make sure it is happening in a timely
8  manner.
9      Q. There is sort of a comparison to be made
10 between leads under five attempts full-stop and leads
11 over two attempts over 24 hours.  There is no time
12 components on this document to leads under five
13 attempts.  Correct?
14     A. Correct.
15     Q. So over how long would those five attempts
16 have to be made before you would look into outreach
17 and you address individually?
18     A. I look into outreach of all the five
19 attempts.
20     Q. So anything that is fewer than five attempts,
21 you would look into -- but obviously not over 24
22 hours.  Correct?
23     A. Correct.
24     Q. Or 48 hours?
25     A. A lead may be outreached five times over

Page 27

1  various time lines.  And there could be any number of
2  reasons for that.
3      Q. If a lead was called three times in 24 hours,
4  are you going to look into that outreach and address
5  individually?
6      A. Yes.
7      Q. Why?
8      A. Because we generally do not outreach our
9  leads more than four hours apart in a day.  So if you
10 were to call a lead at 12 o'clock, you could call them
11 again at 4:00.
12     Q. What is the earliest your admissions
13 counselors that you supervise would call leads?
14     A. Depending on the time zone, 8:30 for each
15 time zone.
16     Q. I may just be being dense here, and I
17 apologize.  I am still not understanding the
18 significance of the five attempts because we already
19 established that two attempts over 24 hours need to be
20 made.  Correct?  So over what period are they expected
21 to make five attempts?
22     A. There is no period for that.
23     Q. So every day you are looking into every
24 single lead with less than five attempts, no matter
25 how new that lead is?

Page 28

1      A. I do not necessarily go into every single
2  lead file, I just look at the overview.  And then if I
3  see something that doesn't seem right, then I will
4  investigate further.
5      Q. That overview shows -- what does that
6  overview show?
7      A. All of the leads that my team has that have
8  not been rejected.  And the number of attempts as well
9  as the date they were created.
10     Q. So this overview that you see each day will
11 tell you basically who the lead is, when they were
12 attempted to be contacted and their status?
13     A. Correct.
14     Q. Looking at run call report, check call report
15 log duration, address low, appraise high.  Was the
16 call report what you were just addressing?
17     A. No.
18     Q. What is a call report?
19     A. A call report is a report we run through our
20 phone system to tell us how many calls a rep has made,
21 how long the calls were and how many they have
22 received as well.
23     Q. Address low, appraise high.  Do you see that?
24     A. Yes.
25     Q. What is considered a low call volume?

Page 29

1      A. It depends how long the rep has been there
2  that day.
3      Q. In an eight our shift, what is the low call
4  volume?
5      A. It is hard to say because it is not the only
6  factor.  So if a rep has a higher call duration then
7  the call volume could be lower and that would still be
8  acceptable behaviors.
9      Q. Is there a call volume at which you would
10 always inquire or address?
11     A. If an admissions counselor has not made any
12 calls.
13     Q. Was there a minimum -- is there any sort of
14 formula that you use to call volume and call duration
15 what they have to be in terms of minimum?
16     A. No.
17     Q. How many calls do your admissions counselors
18 on average make a day, would you say?
19     A. It depends on the number of leads they have,
20 I suppose.
21     Q. Sure.  But go back to the most recent module.
22 What would you say the daily call volume was?
23     A. It is hard to say with certainty.
24     Q. Is it more than 50 per counselor?
25     A. Again, it depends on call value as well.

8 (Pages 26 - 29)

Page 30

1    Q. That is all I am asking about is call volume.
2    A. I'm sorry.  Call duration as well.
3    Q. We are looking at it in hindsight now.
4    A. On average, I would say probably 80.
5    Q. Would have a person's call volume be compared
6 against the average call volume throughout the
7 admissions counselors you supervise?
8    A. No, because it would depend on what the
9 admissions counselor was working on.
10    Q. Did you meet at the end of each module with
11 your admissions counselors?
12    A. Yes.
13    Q. In those meetings, did you discuss the call
14 volumes and call durations for the previous -- for
15 that module that you just ended?
16    A. No.
17    Q. What metrics, if any, were discussed in that
18 meeting?
19    A. Lead PCAS, PCAS application, application to
20 FAFSA, FAFSA to approval.
21    Q. Are you refreshing your recollection from
22 Exhibit 2?
23    A. I know them, but it helps.
24    Q. I just wanted to note that you were looking
25 at that.  I understand.

Page 31

1        Basically everything under KPI is the metrics
2 that were discussed?
3    A. Correct.
4    Q. What was, in your opinion, the most important
5 metric in any given module?
6    A. The most important.
7    Q. Of those under the KPI.
8    A. I would say start to persistence.
9    Q. What is start to persistence?
10    A. Start to persistence is after a student
11 starts their class, if they continue on with Post
12 University.
13    Q. At what point during the KPI did Post get
14 paid, did a student pay tuition?
15        MR. BOWSER:  Objection, foundation.
16        THE WITNESS:  I don't know.
17 BY MR. GLAPION:
18    Q. Did the student pay tuition immediately after
19 completing PCAS?
20    A. No.
21        MR. BOWSER:  Objection.
22 BY MR. GLAPION:
23    Q. Students at Post pay tuition?
24    A. They do.
25    Q. Did the student pay tuition immediately after

Page 32

1 completing application?
2    A. No.
3    Q. Did the student pay tuition after submitting
4 FAFSA if it was relevant to that student?
5    A. No.
6    Q. Did the student pay tuition after providing
7 proof of ability to pay?
8    A. No.
9    Q. Did the student pay tuition after starting?
10    A. Correct.
11    Q. In your opinion, the most important metric
12 for evaluating the teams in that period was start to
13 persistence?
14    A. No.
15    Q. What would you find the most important metric
16 for evaluating your team in any given module?
17    A. They all feed into each other.  It is the
18 full picture of the KPIs that is important.  It is
19 hard to arrange them hierarchically.
20    Q. I understand.  If every lead completed a PCAS
21 but no one completed an application, would that be a
22 successful module?
23    A. No.
24    Q. If every lead filled out an application but
25 no one provided proof of ability to pay, would that be

Page 33

1 considered a successful module?
2    A. No.
3    Q. If every student demonstrated an ability to
4 pay and started, would that be considered a successful
5 module?
6    A. Yes.
7    Q. So the measure of success for a given module
8 ultimately then is how many students start?
9    A. No.  It would be how many students are
10 finalized, cared for and complete.
11    Q. Finalized means start in the scenario.
12 Right?
13    A. No.
14    Q. What does finalized mean?
15    A. It means they have submitted all of their
16 documents.
17    Q. And what does cared for mean?
18    A. That we have provided exceptional student
19 service.
20    Q. And what does complete mean?
21    A. That their student files are complete with
22 transcripts and any documents required for financial
23 aid purposes.
24    Q. If all of the students reached that point
25 where they were cared for, complete -- what was the

9 (Pages 30 - 33)

Page 34

1 first one, finalized?
2    A. Yes.
3    Q. If every student was finalized, cared for and
4 complete, would that be a successful mod?
5    A. If they were finalized, cared for and
6 complete -- I'm sorry, could you repeat the question?
7    Q. If all the students were finalized, cared for
8 and complete, meaning they have submitted all of their
9 documents, they -- you have provided exceptional
10 service and the student files are complete for
11 purposes of financial aid, but none of those students
12 ultimately started, would that be a successful module?
13    A. They wouldn't be able to do that essentially.
14 So if a student file is finalized but they don't
15 start, the student file isn't finalized because
16 participating in class is a part of that. They need
17 to start.
18    Q. I had asked if finalized means start in that
19 that scenario, you said no. So finalized does include
20 starting?
21    A. Their student file is finalized when all of
22 their documents are submitted. The term successful,
23 if they do that and they start and are participating
24 in their classes.
25    Q. Can you have a successful mod -- that is what

Page 35

1 they are called, mods. Correct?
2    A. They were called mods, they now are called
3 terms.
4    Q. This case began on July 30, 2018. I am
5 thinking as of that date.
6    A. Fair.
7    Q. Could you have a successful mod if no student
8 started?
9    A. No.
10    Q. So ultimately, what determines then if a mod
11 is successful necessarily includes whether a
12 particular number of students started?
13    A. Repeat.
14    Q. The success of a given mod necessarily
15 depends at least in part on whether a certain number
16 of students started. Correct?
17    A. In part.
18    Q. That is a necessary part. Correct?
19    A. Correct.
20    Q. During those meetings, would expectations be
21 set in any way for the upcoming mod?
22    A. Yes.
23    Q. What kind of expectations would be addressed?
24    A. The KPIs. We have benchmarks for those.
25    Q. Were there benchmarks for number of calls to

Page 36

1 be made?
2    A. No.
3    Q. Or number of attempts to contact leads?
4    A. No.
5    Q. Were there benchmarks for how many students
6 -- prospective students should become actual students
7 and start?
8    A. There is a goal.
9    Q. What is that goal?
10    A. It depends on the admissions counselor.
11 Their time on the floor essentially. So if a new
12 admissions counselor starts with us halfway through a
13 module, they will not have the same goal as someone
14 who has been there for the entire duration.
15    Q. Is there a team wide goal?
16    A. Yes.
17    Q. What is that goal?
18    A. It depends on the mod and how many admissions
19 reps we have.
20    Q. How are you evaluated as an assistant
21 director of admissions? Do you have an understanding
22 of that?
23    A. Yes. Based on the performance of my
24 admission counselors and what I am doing to helping
25 them to be successful.

Page 37

1    Q. Are those the benchmarks in the KPI?
2    A. Yes.
3    Q. If a call volume and call duration
4 necessitated you addressing low, how would you do
5 that?
6    A. I would ask the rep what they have been
7 working on.
8    Q. And how would you praise high?
9    A. "Good job."
10    Q. Do you ever use your personal cell phone to
11 call or text leads or opportunities?
12    A. Occasionally, I will use Google Voice if
13 working from home, which would then route the call to
14 my cell phone.
15    Q. But it is through Google Voice?
16    A. Correct.
17    Q. Did you instruct your team to use Google
18 Voice?
19    A. Yes.
20    Q. What about TextNow?
21    A. Yes.
22    Q. Do they still have the option to this day to
23 use both?
24    A. Yes.
25    Q. Was Google Voice an option as of July 30th,

10 (Pages 34 - 37)

Page 38

1  2018?
2    A. I believe so.
3    Q. Did anyone instruct you to instruct your
4  admissions counselors to use Google Voice or TextNow?
5    A. Yes.
6    Q. Where does that come from?
7    A. My director.
8    Q. Who is your director?
9    A. Jen -- Jen Zaniewski.  She was just married.
10   Q. Does she oversee or supervise all of the
11 assistant directors?
12   A. Yes.
13   Q. And the directive to use something like
14 Google Voice or TextNow to use leads came from Jen?
15   A. We had another director prior to her.
16   Q. Who was that director?
17   A. Gina Sinn.
18   Q. Jen -- what was Jen's new last name?
19   A. Jen Zaniewski, and I am not sure of the
20 spelling.
21   Q. And Gina what was the last name?
22   A. Sinn, S-I-N-N.
23   Q. Are there any others third-party services
24 like Google Voice or TextNow that admissions counselor
25 uses to contact leads?

Page 39

1    A. TrueDialog is another form of texting that we
2  use.
3    Q. Are you able to evaluate or see calls or
4  texts that were made via one of these third-party
5  platforms?
6    A. Through a recording structure.
7    Q. When you run call reports to check call
8  duration, are Google Voice text and calls or text mail
9  included in that call report?
10   A. Texts are not.  If a rep uses a Google Voice
11 number and it rings to their extension at their desk,
12 yes, that would be included.
13   Q. If it does not ring to their extension to
14 their desk, it would not be included?
15   A. Correct.
16   Q. Do you have access to the Google Voice
17 accounts of your admissions counselors?
18   A. Only if I sit with them while they are logged
19 into it.
20   Q. But you don't have all their user names and
21 passwords?
22   A. No.
23   Q. Were admissions counselors supposed to log in
24 some way when they used Google Voice to reach out to a
25 lead or opportunity?

Page 40

1    A. They are supposed to log whenever they reach
2  out to a lead or an opportunity regardless of the
3  format.
4    Q. Are you aware of circumstances in which an
5  admissions counselor did not document those calls or
6  texts?
7    A. If there was human error.
8    Q. Are you aware of that happening?
9    A. Yes.
10   Q. Have you ever reprimanded or criticized or
11 whatever the case may be a situation in which that
12 happened?
13   A. Yes, notes are extremely important.
14   Q. Did you ever address this issue with Connie?
15   A. No.  Connie is very good at leaving notes.
16   Q. And the instruction to note communication
17 attempts through Google Voice or TextNow, did that
18 come from your director?
19   A. Me, my director, yes.
20   Q. And were they trained to do that?
21   A. Yes.
22   Q. Did you receive training while at -- prior to
23 starting as assistant director, did you receive
24 training specifically for that role, not going back to
25 your time as admissions counselor?

Page 41

1    A. Yes.
2    Q. Was that a formal training?
3    A. No.
4      MR. BOWSER:  Objection, form.
5      THE WITNESS:  What do you mean by "formal
6  training"?
7  BY MR. GLAPION:
8    Q. Were there training documents?
9    A. This Exhibit 5 would be the only one that I
10 can think of.
11   Q. You didn't write this document?
12   A. I did not.
13   Q. Is this a document that was given to all
14 assistant directors, to the best of your knowledge?
15   A. Yes.
16   Q. Do you know who wrote this document?
17   A. It was given to me by Gina Sinn.
18   Q. Do you still have a copy of this document?
19   A. I don't know.  Our office recently moved.  I
20 would have to check.
21   Q. I would only ask whether --
22     MR. GLAPION:  Adam, that this, I think, was
23 responsive to the deposition notice.  So if there is a
24 copy of this floating around somewhere, I would ask
25 that it be produced.  I can certainly serve another

11 (Pages 38 - 41)

Page 42

1 discovery request. I think it was already included in
2 what we asked for in terms of -- as you will see the
3 Facebook picture cut off the bottom part of the
4 document. I only have the top half.
5     MR. BOWSER: We will take a look. Okay.
6     THE WITNESS: Yes.
7 BY MR. GLAPION:
8     Q. I think before you said something about a
9 rejected lead.
10    A. Yes.
11    Q. What is a rejected lead?
12    A. A rejected lead is a lead that we either have
13 not reached or has told us that they do not want to
14 start or that is unqualified to start.
15    Q. Are those the only three categories of leads
16 that would be rejected?
17    A. No. There are several categories of rejected
18 leads.
19    Q. Can you describe those categories?
20    A. There are many. So another one would be
21 invalid phone and email. So if we could not reach the
22 student. If it is a wrong number. I am trying to
23 think if there were any others. I would have to
24 double check the labels in the system, but those are
25 the ones that I can recall offhand.

Page 43

1     Q. Were rejected leads ever called?
2     A. Yes.
3     Q. Under what circumstances?
4         MR. BOWSER: Objection. Compound.
5         THE WITNESS: There are many reasons to call
6 a rejected lead.
7 BY MR. GLAPION:
8     Q. Did you ever instruct your admissions
9 counselors to call any rejected leads?
10    A. Yes.
11    Q. Under what circumstances did you instruct
12 your admissions counselors to call rejected leads?
13        MR. BOWSER: Objection.
14        THE WITNESS: There are many reasons.
15 BY MR. GLAPION:
16    Q. If you can list the reasons you can think of.
17    A. Sometimes we will reach out to rejected leads
18 at 10 attempts that have not been outreached in a
19 while to see if we can get them on the phone.
20    Q. You said you would have to check the system
21 to determine the categories of rejected leads. Is
22 that correct?
23    A. Yes. Oh, there is another one. If they
24 inquire about a program that we do not offer.
25    Q. Is there -- is this in a drop-down?

Page 44

1     A. It is.
2     Q. Is there a specific drop-down for "do not
3 call"? Excuse me. Prior to the new CRM, which I
4 learned about from Connie, was there a specific
5 drop-down for "do not call"?
6     A. Yes.
7     Q. There was?
8     A. Yes.
9     Q. In the Oracle system?
10    A. Yes.
11    Q. What was the label for that.
12    A. "Remove from list," I believe.
13    Q. Was "remove from list" only used for "do not
14 call"?
15    A. Yes.
16    Q. Were the admission counselors instructed
17 prior to the new CRM system to use the "remove from
18 list" only for "do not call"?
19    A. Yes.
20    Q. By who?
21    A. The trainer, myself.
22    Q. When did you instruct the admission
23 counselors to only use "remove from list" for "do not
24 call"?
25    A. When we go over the reject reasons.

Page 45

1     Q. Did you ever put this in writing?
2     A. No.
3     Q. Did you ever send an email discussing the use
4 of "do not call"?
5     A. No.
6     Q. Are you aware of circumstances in which
7 someone was marked as "remove from list" that did not
8 make a "do not call" request?
9     A. The only situation that I could think of
10 would be if the prospective student violated our
11 civility conduct and we did not want to put our
12 admissions counselors at risk of harassment. So if a
13 person was sending lewd photos or something along
14 those lines, we may remove them from the list.
15    Q. If a person said, "I am not interested, stop
16 calling me," how would they be marked?
17    A. "Remove from list."
18    Q. If a person said, "I am not interested," how
19 would they be marked?
20    A. We would try to find out if they are not
21 interested right now or they are not interested at
22 all.
23    Q. Would you try to find out why someone would
24 want you to stop calling if they said "don't call me"?
25 When I say you, for what it is worth, I am referring

12 (Pages 42 - 45)

Page 46

1 to the team you supervise.
2      Would the team you supervise push back or
3 inquire as to why someone wanted them to stop calling?
4      A. We are speaking about leads.  Correct?
5      Q. About leads, yes.
6      A. If a lead said, "I am not interested," we
7 might ask, "What changed your mind," so we could code
8 them appropriately.
9      Q. If a lead said, "Do not call," would you ask
10 "What changed your mind?"
11      A. If a lead said, "Do not call," we might say,
12 "Do you prefer text or email, or do you prefer not to
13 be contacted?"
14      Q. Would there be any inquiry to the reason that
15 they did not want to be called apart from the method
16 of communication?
17      A. One more time.
18      Q. Would there be any inquiry into why the lead
19 was asking not to be called apart from asking whether
20 that you can communicate with them in a different
21 means?
22      A. As I said earlier, we would try to find out
23 the reason so that we could code them appropriately in
24 the system.
25      Q. You said that with respect to not interested,

Page 47

1 and I am just wondering if when someone said "do not
2 call," would they receive the same inquiry as to why
3 they are asking not to be called as someone who is not
4 interested would receive as to why they are not
5 interested?
6      A. Yes.
7      Q. Would your answer change if an you
8 opportunity said "do not call"?
9      A. For an opportunity, no.
10      Q. How would a "do not call" request made by an
11 opportunity be made or be documented?
12      A. We would put a note in the system and change
13 the closed/lost reason.  We reject leads and we close
14 opportunities.
15      Q. Was there a similar drop-down field when you
16 closed an opportunity as there was for when you
17 directed a lead?
18      A. Similar, but they are not the same reasons.
19      Q. Was there a "do not call" field in the closed
20 opportunity drop-down?
21      A. There is.  It is "remove from list."
22      Q. But there is nothing specific to either
23 drop-down in rejected lead or closed opportunity that
24 says "do not recall" in the drop-down?
25      A. Just "remove from list."

Page 48

1      Q. Nothing that says "do not call," "stop
2 calling," anything like that, other than "remove from
3 list"?
4      A. Nothing other than "remove from list."
5      Q. I believe you mentioned that when you were
6 going over the reasons for rejecting the lead you
7 would say that the "remove from list" is only to be
8 used for "do not call."  Has that been the case as
9 long as you have been assistant director of
10 admissions?
11      A. I believe so.
12      Q. Were you trained by someone to only use
13 "remove from list" for "do not call"?
14      A. Yes.
15      Q. Who trained you on that?
16      A. My assistant director when I was an
17 admissions counselor.
18      Q. Were you trained to instruct or were you told
19 to instruct your admissions counselors that they were
20 only to use "remove from list" for "do not call"?
21      A. One more time.
22      Q. Did anyone tell you to tell your admissions
23 counselors to only use "remove from list" for "do not
24 call"?
25      A. Or to prevent harassment of my admissions

Page 49

1 counselors?
2      Q. Correct.
3      A. That is the policy that had, so it has been
4 the same since I was an admissions counselor.  I don't
5 think anyone needed to reiterate it to me when I
6 became an admissions counselor.
7      Q. You say the policy that we have -- is it
8 written somewhere?
9      A. I don't know.
10      Q. Are you aware of any documents whether email,
11 formal, informal Word document, anything that
12 instructs you to only "remove from list" for "do not
13 call" or to avoid harassment?
14      A. I know it is going over in the new hire
15 training.  I don't know if there's a document that
16 lists all the reasons, but it is communicated
17 indicated verbally and reinforced when they get to
18 their teams.
19      Q. We can get to the new hire training and maybe
20 you can find in the new hire training where that is.
21      Does Post have a written "do not call"
22 policy?
23      A. I do not know.
24      Q. Did Post have a written "do not call" policy
25 on or before July 30th, 2018?

13 (Pages 46 - 49)

Page 50

A. I do not know.
Q. If a prospective student asked you for a copy of the Post University "do not call" policy, how would you respond?
A. I would go to my boss to try to find one.
Q. When you go back to your office right now and you go to your desk, do you have access to a written "do not call" policy?
A. I don't know.
Q. Have you ever seen one?
A. Not that I recall.
Q. I want to look at the -- continue down this document. The next line is audit pipeline PCAS notes references 24 average by -- I think it's AC and FAA.
A. AC and FAA.
Q. FAA would be financial aid advisors. Correct?
A. Correct.
Q. What does that section mean, or bullet point?
A. We look at the population of students who have submitted an application to make sure that notes are in the file and that within 24 hours of receiving their application they have been outreached by either their admissions counselor or financial aid adviser.
Q. I am going to skip a couple of bullet points

Page 51

and go to daily power hour.
Do you see that?
A. Yes.
Q. "Send out email." Do you agree that is what that says?
A. Yes.
Q. Does that make sense to you?
A. Yes.
Q. What is a daily power hour?
A. A power hour is an hour designated to making phone calls. We don't necessarily leave voice messages.
Q. How does that differ from the day-to-day of an admissions counselor?
A. An admissions counselor may be working on many things throughout the day. They may be texting or emailing back and forth with students. They could be looking in student files from a previous start or persistence outreach. This is an hour dedicated solely to calls.
Q. Does that include text messages?
A. Generally, no.
Q. What kinds of prospective students were called during these power hours, what categories?
MR. BOWSER: Objection, compound.

Page 52

THE WITNESS: There are very many.
BY MR. GLAPION:
Q. Were rejected leads ever called during power hours?
A. Yes.
Q. Were closed opportunities ever called during power hours?
A. Yes.
Q. Under what scenarios would a rejected lead be called during a power hour?
MR. BOWSER: Objection, compound.
THE WITNESS: Many different ones.
BY MR. GLAPION:
Q. Do you have an example that you can think of when rejected leads were called during a power hour?
A. If we have not outreached our 10 rejected leads in a while, we might call them.
Q. Were rejected leads who had already received their 10 attempts ever called during a power hour?
A. Yes.
Q. Where did the leads to be called during a power hour come from?
A. We pull lists out of CRM.
Q. When you say "we," who do you mean?
A. The team.

Page 53

Q. Who is responsible for pulling the lists out of the CRM?
A. It varies. It could be an admissions counselor. It could be the team lead. It could be myself.
Q. On your team, who is responsible for it?
A. It depends on the day.
Q. When you said pulled the list out of the CRM, how is it provided to the admissions counselors?
A. They have access to CRM and they can create a list, or I can create a list with them.
Q. Do you ever have printed lists of leads to be called?
A. Certainly.
Q. On those printed lists, what categories or what information is shown on the lead?
A. Definitely their name, phone number, the program that they requested information about, and then it depends beyond that point.
Q. It depends on what?
A. It could be many things. So if we are having a power hour of our Connecticut leads, the state might be included. If we are having power hour of 10 attempts rejected leads, that might be included as well.

Page 54

1    Q. Was the reject reason included on the printed
2  form that you would provide admissions counselors,
3  printed list, excuse me?
4    A. It could be.
5    Q. Was it always?
6    A. We are not always calling rejected leads.
7    Q. In those scenarios where you are calling
8  rejected leads, was the rejected reasons always
9  included?
10    A. I can't say with certainty.
11    Q. When you pulled the leads out of CRM, would
12  you include the reject reason?
13    A. It would depend.
14    Q. What would it depend on?
15    A. The day. How many columns. If we were only
16  calling 10 attempts rejected leads, then I might
17  include it so that the reps would know what population
18  we were reaching out to. If we had a huddle prior
19  talking about that is the population we were reaching
20  out to, I might not include it because everyone was
21  given the information verbally.
22    Q. What was the goal on an individual admissions
23  counselor basis that you would expect them when they
24  called during the power hour? What did you except
25  from your admissions counselors?

Page 55

1      MR. BOWSER: Objection, compound.
2      THE WITNESS: The goal is to have a
3  professional college advisory session.
4  BY MR. GLAPION:
5    Q. Would the admissions counselors be expected
6  to call everyone on the list during the power hour?
7    A. No.
8    Q. Were they expected to call as many people on
9  the list as possible during the power hour?
10    A. As many people as possible or connects with
11  someone.
12    Q. Did admissions counselors have discretion to
13  skip any of the leads provided to them during the
14  power hour?
15    A. Of course.
16    Q. You say "of course." What form did that
17  discretion take, like how did they have that
18  discretion?
19    A. We give them a population of students to call
20  or they pull the population of students to call and
21  they call them. They manage that.
22    Q. So there would be no issue from your end if
23  an admissions counselor were just skipping leads that
24  were given to them in a power hour?
25    A. I would ask why.

Page 56

1    Q. So without, I guess, a valid reason, they
2  were not supposed to skip leads. Is that fair?
3    A. I suppose that is fair.
4    Q. Were admissions counselors supposed to look
5  up each lead during a power hour in the CRM system?
6    A. Yes.
7    Q. Were they trained to do so?
8    A. Yes.
9    Q. By who?
10    A. The new hire trainer and then it is
11  reiterated by myself.
12    Q. When you say reiterated by yourself, in what
13  form did that take, was that verbal?
14    A. Yes.
15    Q. In writing at all?
16    A. No.
17    Q. Any emails instructing them to do that?
18    A. No. I show them how.
19    Q. So each lead they would go through they were
20  supposed to look it up, and only then call it after
21  they looked it up?
22    A. Yes, and note the call.
23    Q. Were lost -- were lost opportunities ever
24  called during power hour?
25    A. Yes.

Page 57

1    Q. In what scenario would a lost opportunity be
2  called during a power hour?
3    A. There were many.
4    Q. Do you have an example? I know there are
5  many, and fortunately, we have a little while. So if
6  you have some examples of when a lost opportunity
7  might be called?
8    A. We may reach out to students who have
9  previously submitted a financial aid application.
10  Ones who went unresponsive during the admissions
11  process to see if we can reengage them.
12    Q. Did you ever receive or have the ability to
13  access the national "do not call" list?
14    A. I have never received it. I do not know if I
15  have the ability to access it.
16    Q. Do you have the ability to cross-reference
17  telephone numbers and leads that your admissions
18  counselors are contacting against the national "do not
19  call" list?
20    A. I do not know.
21    Q. When you were an admissions counselor, did
22  you ever cross-reference telephone numbers against the
23  national "do not call" list?
24    A. No.
25    Q. Are you aware of whether your admissions

15 (Pages 54 - 57)

Page 58

1 counselors currently can cross-reference against the
2 national "do not call" list?
3      A. I do not know.
4      Q. You supervise them. Correct?
5      A. Yes, I just -- if I don't know how to access
6 it, I don't know if they know how to access it.
7      Q. Do you know if Post has access to it?
8      A. I don't know.
9      Q. Have you ever seen it?
10      A. No.
11      Q. Have you ever seen Post have any access to
12 it?
13      A. No.
14      Q. Have you ever received training on it?
15      A. No.
16      Q. Have you ever received training on a written
17 "do not call" policy?
18      A. Other than what we previously discussed.
19      Q. I am talking about a written policy. I think
20 your testimony was the instruction to use the "remove
21 from list" was not in writing. Correct?
22      A. I believe there is something written in the
23 new hire training about rejecting leads.
24      Q. Which exhibit is the new hire training? Is
25 it 2, 3?

Page 59

1      MR. BOWSER: 3. Connie's new hire training
2 manual?
3      MS. GLAPION: Yes.
4      MR. BOWSER: 3.
5 BY MR. GLAPION:
6      Q. The witness is being shown what is marked as
7 Exhibit 3. You can flip through it, look at it. If
8 you want to read the whole thing, it is certainly your
9 prerogative.
10      I am curious when you refer to the new hire
11 training manual if that is what you refer to?
12      A. It is.
13      Q. It is your testimony that the new hire
14 training manual that is in front of you, it would be
15 the written document that explains how to use "remove
16 from list"?
17      A. Correct.
18      Q. If it is not in this new hire training
19 manual, there is no written document that explains
20 "remove from list" should only be used for "do not
21 call" or harassment?
22      A. Not that I am aware of.
23      Q. Apart from this new hire training manual, are
24 you of any -- were you ever trained on any written "do
25 not call" policy separate from this policy?

Page 60

1      A. I was trained on the practice of "do not
2 call." I have not seen a written policy, but it was
3 verbally communicated to me that this is how we code
4 people who asked to be removed from list.
5      Q. As an admissions counselor. Correct?
6      A. Yes.
7      Q. How many assistant directors of admissions
8 are there?
9      A. Currently?
10      Q. Yes.
11      A. 12.
12      Q. And how many students do each of those
13 assistant directors of admissions supervise?
14      A. It varies.
15      Q. Is Jennifer Peffers an admissions counselor?
16      A. Yes.
17      Q. Did all you assistant directors of admission
18 undergo a training on how to supervise their
19 admissions counselors?
20      A. I don't know.
21      Q. Did you?
22      A. Yes.
23      Q. How -- were you with any other assistant
24 directors of admissions during that training?
25      A. When I became the assistant director, I was

Page 61

1 the only one promoted at that time. So no. We do
2 have weekly accountability meetings where we go over
3 best practices and how to effectively manage our
4 teams. So in that instance, yes.
5      Q. In the best practices meetings, is the issue
6 of how to use "remove from list" discussed?
7      A. No.
8      Q. Has it ever been discussed in your presence?
9 While you were at one of these meetings, has the issue
10 of how to use "remove from list" been discussed?
11      A. How to use "remove from list" is something
12 that we learn when we first start.
13      Q. You learn that from your assistant director
14 of admissions. Correct?
15      A. And my trainer.
16      Q. Who is your trainer?
17      A. Shannon Madore.
18      Q. Did she train you using this manual?
19      A. No.
20      Q. What -- there was a different manual at the
21 time or was there no manual?
22      A. There was a different manual at the time.
23      Q. You said that was -- was that four and a half
24 years ago?
25      A. Correct.

16 (Pages 58 - 61)

Page 62

1    Q. Do you remember when you started at Post, the
2  month and year?
3    A. June 16th, 2014.
4    Q. Did anyone ever instruct you to instruct your
5  admissions counselors to use "remove from list" only
6  for "do not call"?
7    A. It is my responsibility as an assistant
8  director to make sure that my admissions counselors
9  are doing their jobs correctly. So no one has said
10 that to me directly, but it is a part of my
11 responsibility.
12   Q. And I just want to clarify because I know you
13 said there were two reasons you use "remove from
14 list". I will just reask.
15      Did anyone instruct you to instruct your
16 admissions counselors to use "remove from list" only
17 for "do not call" or avoid harassment?
18   A. Same answer.
19   Q. Did the other assistant directors of
20 admissions instruct their supervised admissions
21 counselors to only use "remove from list" or "do not
22 call" or to avoid harassment?
23   A. I do not know.
24   Q. Was there any centralized training of
25 assistant directors of admissions similar to there is

Page 63

1  a new hire training that went over how to use "remove
2  from list"?
3    A. No. By the time you become an assistant
4  director, you should know that as it is a part of
5  previous training materials.
6    Q. As far as you know, it is possible that the
7  other assistant directors of admissions are not
8  instructing their students or -- excuse me, their
9  admissions counselors to only use "remove from list"
10 for "do not call" or to avoid harassment?
11   A. One more time.
12   Q. As far as you know, it is possible that the
13 other assistant directors of admissions are not
14 similarly instructing their admission counselors on
15 how to use "remove from list"?
16   A. Now, if you were to ask me how many creamers
17 are in that bowl, I would say I can see five creamers.
18 I have not been in the presence when any one assistant
19 director has done that, but that doesn't mean that it
20 is not happening.
21   Q. But it is possible that it is not happening,
22 you don't know one way or another?
23   A. It is highly unlikely.
24   Q. Did Jennifer Peffers instructs her admission
25 counselors how to "remove from list"?

Page 64

1    A. I am sure she did. She's very good.
2    Q. You are sure that she did because you heard
3  her do it?
4    A. No.
5    Q. Have you seen her do it?
6    A. No, we don't sit near each other.
7    Q. Have you read any documents that address
8  this?
9    A. No.
10   Q. Have you read any documents by any other
11 assistant directors of admissions that address this?
12   A. Not that I heard.
13   Q. Have you heard any other directors of
14 admissions instruct their counselors how to use
15 "remove from list"?
16   A. Possibly.
17   Q. Do you recall specific instances?
18   A. Not specific instance, no.
19   Q. Is it possible that you are the only
20 assistant director of admissions who instructs your
21 admission counselors in this way?
22   A. Absolutely not.
23   Q. What basis do you have for being so certain?
24   A. Because all of the admissions counselors
25 receive the same training from our trainer, and then

Page 65

1  that training is reiterated by the assistant
2  directors.
3    Q. That training is -- actually, let's talk
4  about that because if the new hire trainer trained
5  admission counselors on this, why would an assistant
6  director of admissions double up that training?
7    A. If you had a professor who taught you
8  something, would you not go and study?
9    Q. Sure. But what I am saying is, your
10 testimony is essentially that they already know
11 because they are taught by that new trainer. Correct?
12   A. My testimony is that they know this because
13 they are taught by the trainer, but they are given a
14 lot of information in training so it is important to
15 reinforce all of the information that they receive.
16   Q. Were you ever told to reinforce the
17 information they received in training?
18   A. Yes.
19   Q. When were you told that?
20   A. That is a constant part of my job.
21   Q. When were you told to do that?
22   A. Every time I have gotten a new hire.
23   Q. And you are absolutely certain that every --
24 excuse me.
25      You are absolutely certain that you are not

17 (Pages 62 - 65)

1 the only admissions -- assistant director of
2 admissions who instruct their admission counselors on
3 how to use "remove from list" only for "do not call"
4 or to avoid harassment?
5    A. Yes.
6    Q. But you have no specific examples of hearing
7 anyone else instruct them that way?  Are you assuming
8 or do you have specific examples that they are
9 instructing their admissions counselors this way?
10    A. I have definitely heard the assistant
11 directors that are in my immediate vicinity going over
12 training with their new hires.
13    Q. That is not the question.  The question is
14 specifically about the use of "remove from list."
15 Have you specifically heard any other assistant
16 directors instruct their admission counselors on how
17 to use "remove from list"?
18    A. Not that I can recall.
19    Q. Have you seen any documents, emails from
20 other assistant directors that address using "remove
21 from list" in the way you describe "remove from list"
22 should be used?
23    A. Not that I can recall.
24    Q. So your certainty that they are training
25 their admissions counselors in this regard is an

1 assumption.  Is that correct?
2    A. I take issue with the word "assumption."  We
3 are all held to the same standards.  So if I am being
4 held to the standard, then they are as well.
5    Q. Who is holding you to the standard of how you
6 instruct people on how to use "remove from list"?
7    A. My direct supervisor.
8    Q. I believe your testimony was your direct
9 supervisor never told you to instruct them this way?
10    A. My direct supervisor told me to reinforce the
11 training they received, make sure they are doing the
12 job right and that is part of it.
13    Q. And your understanding of the training they
14 received is what is contained in that training manual.
15 Correct?
16    A. Yes.
17    Q. So if you read through that training manual
18 and there was nothing about using "remove from list"
19 to -- only for "do not call" requests and to avoid
20 harassment, is it not then possible that that is not
21 part of the training you were meant to reinforce?
22    A. There the something in here about it.
23    Q. If you can find it.
24    A. Page 6.  And it goes over rejecting leads.
25    Q. Is that Bates -- Bates is the number at the

1 bottom.  Is that 7788?
2    A. Yes.
3    Q. So where does it say to only use "remove from
4 list" when someone says don't call or to avoid
5 harassment?
6    A. There are two questions typed out in the
7 manual, and then this policy is verbally gone over by
8 the trailer.  You can see in Connie's notes it says,
9 "When do we reject leads," and she points to some of
10 the reasons.  One of them being "don't call again."
11    Q. Don't call again as testified to by Connie
12 when it was marked as a wrong number, she was not to
13 call that wrong number again?
14    A. I see.
15    Q. So apart from Connie's notes that are not
16 part of the new hire training manual as it is provided
17 to new hires, is there anything in this manual that
18 discusses how to use "remove from list"?
19    A. It is gone over verbally in this section.
20 And then when the reps get out on the floor and they
21 are applying their knowledge practically, they are
22 shown either by the assistant director or team lead or
23 admissions counsel that they are shadowing how to
24 reject leads based on their reject reasons.
25    Q. When I say "assumption," I mean a conclusion

1 has been drawn without evidence.  Can you agree with
2 that definition?
3    A. Yes.
4    Q. What evidence do you have that other
5 assistant directors of admissions have instructed
6 their admission counselors on how to use "remove from
7 list" in the same way that you have just described
8 that it should be used?
9       MR. BOWSER: Objection, asked and answered.
10 BY MR. GLAPION:
11    Q. You can still answer it.
12    A. I already have.
13    Q. You still have to answer.
14    A. Please refer back to my earlier answer.
15    Q. I will ask this question repeatedly.
16       MR. GLAPION: And Adam, I --
17       MR. BOWSER: You can still answer.  We have
18 been over this, but if you can tell him again.
19 BY MR. GLAPION:
20    Q. I believe my questions previously were:  Had
21 you seen or heard or witnessed any of this
22 instruction.  My question now is much broader, so it
23 is a different question.
24       What evidence of any sort do you have that
25 other assistant directors of admissions have

18 (Pages 66 - 69)

1 instructed their admissions counselors on how to use
2 "remove from list" in the way that you have just
3 described it should be used?
4     A. Occasionally, admissions counselor will swap
5 teams.  I have managed admissions counselors that had
6 worked on other teams, they know how to do this
7 process the same way I have instructed them.
8     Q. Is there any other evidence?
9     A. That is the only thing I can think of right
10 now.
11     Q. And it is your testimony that during the new
12 hire training "remove from list" is gone over
13 verbally?
14     A. Yes.
15     Q. Nothing in writing?
16     A. Not to my knowledge.
17     Q. Is -- the "remove from list" policy as you
18 have described it, do you consider to be an important
19 policy?
20     A. It is an important practice, of course.
21     Q. If someone used "remove from list" for a
22 reason that was not one of those two reasons provided,
23 would they be reprimanded?
24     A. How would we know?  Because we don't reach
25 out to that population.

1     Q. Do you ever inquire as to why a lead was
2 rejected?
3     A. No.
4     Q. Do you ever inquire as to why a lead was
5 removed from a list?
6     A. No.
7     Q. Do you ever inquire as to why opportunity was
8 lost?
9     A. The lost reason is in the file.
10     Q. Do you ever inquire as to why a lost
11 opportunity was flagged as "remove from list"?
12     A. No.
13     Q. You have never inquired into that?
14     A. If they ask to be removed from the list, we
15 remove them from the list.
16     Q. If you have never inquired into that, how do
17 you know that the -- when you swap teams that the
18 admission counselors were following that policy?
19     A. I have seen them reject leads and close
20 opportunities.
21     Q. So you have seen them mark as "remove from
22 list" someone who made a "do not call" request?
23     A. Yes.
24     Q. You have seen them mark as "remove from list"
25 someone who might be harassing them?

1     A. Yes.
2     Q. But did you witness every single use of
3 "remove from list"?
4     A. Of course not.
5     Q. Is it then possible this is being used in
6 ways different than what you are describing?
7     A. There would be no reason to do that.
8     Q. If Connie testified that prior to the new CRM
9 system she essentially used "remove from list" for
10 anything that wasn't another reason in there, would
11 that be against what she was trained to do?
12     A. I would need more context around that
13 example.
14     Q. Sure.  The context is in Connie's testimony
15 earlier.  The testimony was -- I will paraphrase this.
16 We can go back to the realtime if we need to, I hope
17 we don't.  That she -- prior to the new CRM system,
18 which she called new CRM, her use of "remove from
19 list" was for any reject reason that did not fit into
20 one of the other categories.  If that was her
21 testimony, is that against what you have trained her
22 to do?
23     A. So that would be at the discretion of the
24 admissions counselor.  If they could not find a reject
25 reason that was appropriate.  I would have to see a

1 specific example of this.
2     Q. So this is now a third category that could be
3 used for "remove from list," something that does not
4 fit into the other categories.  Is that what I am
5 understanding?
6     A. No, I would have to see a specific example of
7 when an admissions counselor did that and why.
8     Q. But my question actually is pretty simple.
9 If the testimony from Connie was that prior to the new
10 CRM, she said she used "remove from list" for anything
11 that didn't fit into the other drop-down categories,
12 would that be against what she was trained to do?
13     A. I cannot say with certainty.  I would need
14 the context in which she used that to know the reason
15 why she was rejecting that lead.
16     Q. It is a really simple question here.
17     A. And I can't answer it without more
18 information.
19     Q. I think it is a yes or no question.  Your
20 testimony has repeatedly been that "remove from list"
21 and you trained your admissions counselors, you told
22 them, you reinforced the training they had in this new
23 hire training to use "remove from list" only for
24 harassment or "do not call".
25         My question is:  If Connie's testimony was

Page 74

1 that she used it for other reasons, is that against
2 what she was trained to do?
3    A. The admissions counselors are trained to
4 reject leads based on the information they get from
5 the lead.  If I don't what information she has gotten
6 from that lead, I don't know if it was an appropriate
7 use of "remove from list."  Without the context, I
8 cannot give you a yes or no answer.
9    Q. Is your testimony, then, that the options for
10 "remove from list" are harassment, "do not call" or
11 the discretion of the admissions counselor?
12    A. No.
13    Q. So then, I will ask this again.  The sooner
14 we can get through these questions, I am sure we all
15 want to go home.
16    If her testimony was she is used it for
17 reasons that did not fit under the other drop-down as
18 essentially a catch-all, would that be against the
19 training?
20    A. Use of any reject reason as a catch-all is
21 against the training.
22    Q. So then her testimony was that any reason she
23 felt in her discretion are leads that to be rejected
24 and that the reason did not fit immediately under any
25 of the categories that were preselected, she would use

Page 75

1 "remove from list" is against policy?
2    A. If a person asked not to be contacted, says
3 that they cannot go to school and they don't want to
4 hear from us again, that is what we use that for.  If
5 Connie was using it for something else or the student
6 did not say those things, then that would be an
7 incorrect use of that reject reason.
8    Q. Did you ever work with Sarah Markham?
9    MR. BOWSER:  We have been going for an hour
10 and a half.
11    (Recess taken from 1:12 p.m. to 1:17 p.m.)
12 BY MR. GLAPION:
13    Q. Did you ever work with Sara Markham?
14    A. Not that I recall.
15    Q. What about Susanna Shigo?
16    A. I don't recognize that name either.
17    Q. These are admissions counselors and they both
18 have provided affidavits in this case.  I am not going
19 to enter them as an exhibit.
20    MR. GLAPION:  You already have them, Adam.
21 BY MR. GLAPION:
22    Q. And do you disagree with Ms. Markham's sworn
23 affidavit when she says, "As part of my job, I would
24 make 80 to 100 calls per day, which was in line with
25 my understanding of Post's expectations."

Page 76

1    Do you disagree that was Post's expectations?
2    A. In the absence of a Professional College
3 Advisory Session or one of the other measurements or
4 KPIs, FAFSAs received, we look at call volume to see
5 that an admissions counselor was making a concerted
6 effort to get productivity on the day.
7    Q. In that scenario in the absence of a KPI or
8 one of the other measurements, was 80 to 100 calls per
9 day a fair expectation or a fair assessment or
10 expectation of what an admissions counselor should do?
11    A. There is more context than that.  If they
12 were spending their day trying to reach students via
13 email, that would not be the expectation.  Same thing
14 with texting.  Same thing with other parts of our job
15 reaching out to students who have already started
16 making sure they are participating in their class.
17    Q. Do you agree that an admissions counselor's
18 job responsibilities include making telephone calls to
19 encourage and convince prospective students at Post
20 University?
21    A. Encourage and convince?
22    Q. Yes.
23    A. Absolutely not.  We strive to make sure Post
24 is a good fit for the student and the student is a
25 good fit for Post.  So it is very individualized.  We

Page 77

1 actually have a saying that Post makes it personal, we
2 personalize the process based on the individual
3 student needs.
4    Q. Do you agree that part of the responsibility
5 is to encourage students to enroll at Post?
6    A. Only if it is the right thing to do for that
7 student.
8    Q. If that student passes their
9 prequalification, do you agree that it is the job
10 responsibility of an admissions counselor to encourage
11 that student to fill out an application?
12    A. If Post is not the right fit for that
13 student, then it doesn't matter if they met the
14 prequalifying or they answered the prequalifying
15 questions that would say they should be admitted.
16    Q. What would make Post not the right fit?
17    A. There are so many reasons.  For example, if a
18 student was moving and they didn't want to take out
19 student loans because it would affect their credit.
20 That is a reason why we would not have them move
21 forward with the process.  The student didn't have
22 access to a computer, an ability to get to the library
23 or a game plan for success in their courses, that
24 would be a reason.  There are many.
25    Q. Are those part of the prequalification

20 (Pages 74 - 77)

Page 78

1 assessment?
2     A. No, they are part of the PCAS.
3     Q. So after a PCAS is conducted, is there any
4 notation in the CRM system that a student is a fit for
5 Post?
6     A. We include the PCAS notes in the student's
7 files.
8     Q. I am just trying to figure out if there is a
9 way to tell at glance of the CRM file of someone that
10 conducted a PCAS, whether that person is a fit for
11 Post. Is there any way? Is there any fit for POST
12 check box, anything like that?
13     A. Well, if they were unfit, we would close it.
14     Q. So would you agree then that the job
15 responsibility of someone contacting a non-closed or
16 rejected lead or opportunity who had already completed
17 the PCAS was to encourage them to enroll in Post?
18     MR. BOWSER: Objection, compound.
19     THE WITNESS: Again, it is based on the
20 individual needs of the student. So if in the course
21 of that call or conversation, rather, with the student
22 we find that they are unfit for Post, then we will
23 close them, or if Post is unfit for them.
24 BY MR. GLAPION:
25     Q. At any point in an admissions counselor's

Page 79

1 interaction with a prospective student, would you
2 characterize their job as being in part to encourage
3 them to enroll?
4     A. Only if it is the right thing to do for that
5 individual student based on the information that that
6 student has given us.
7     Q. So in the scenario where a new lead comes in.
8 Okay.
9     A. Uh-huh.
10     Q. What is the ideal result of the interactions
11 with a lead from Post or, from your perspective,
12 managing your team?
13     A. To help that person. Sometimes that means
14 rejecting that lead.
15     Q. We discussed before a module was not
16 successful without at least in part some students
17 starting. Correct?
18     A. Yes.
19     Q. So would it -- would a module be considered
20 the most successful module possible if every lead
21 started?
22     A. If every lead was a good fit for Post.
23     Q. Regardless of whether they were a good fit or
24 not?
25     A. That is the most important criteria.

Page 80

1     Q. If you get to the end of a module and you are
2 reviewing the numbers and every single lead got in
3 started at Post, would you consider that to be a
4 successful module?
5     A. The measurement of success at Post University
6 is if our students get what they need and graduate.
7 So if we were to enroll every lead but they did not
8 graduate, they didn't, you know, go forward in their
9 classes and be successful, then we would not be
10 successful. The success of this university depends on
11 the success of the students.
12     Q. At the point -- at the end of the module when
13 you are looking at your leads and going through the
14 KPIs, if the ATP to start was 100 percent -- excuse
15 me, if all of these were 100 percent down to ATP to
16 start, would you consider that a successful module?
17     A. That is wildly unrealistic, so I would have
18 to do some more digging to figure out why that was.
19     Q. But if it happened, would you consider that
20 to be successful?
21     A. It shouldn't happen.
22     Q. I understand. I don't like hypotheticals
23 that much either. In the scenario where it does,
24 would that be considered a successful module?
25     A. If every single student was qualified and

Page 81

1 Post was meeting their needs and they were
2 participating in their class, then yes.
3     Q. Do you know how Post makes money?
4     MR. BOWSER: Objection, foundation.
5     THE WITNESS: Do I know how Post makes money?
6 BY MR. GLAPION:
7     Q. Do you know how Post generates revenue?
8     A. Not really. I mean, it is kind of outside of
9 my role.
10     Q. I understand. Do you agree or disagree with
11 the following: There was no "do not call" policy
12 written or otherwise at the company?
13     A. I cannot say that with certainty. I have not
14 seen one. And that is all I can speak to.
15     Q. Do you disagree or agree with the following:
16 There is no way to filter out leads that were asked
17 not to be called or were not on the national "do not
18 call" list?
19     MR. BOWSER: If you are asking her to confirm
20 or review certain language, it would be helpful to
21 have it in front of her.
22     MR. GLAPION: Right. This is all not going
23 to be relevant, frankly. The only copy I have is
24 highlighted copy. There is not going to be a lot of
25 these.

21 (Pages 78 - 81)

Page 82

1    MR. BOWSER: I think the last one she didn't
2 hear the written or unwritten part of the last.
3    MR. GLAPION: This is the first of them, I am
4 okay with it. Sort of a speaking objection. I would
5 ask that those aren't made, but I will reask that
6 question.
7 BY MR. GLAPION:
8    Q. Do you agree or disagree with the statement
9 -- I will break it up into parts so it is not compound
10 just to be fair -- there was no written "do not call"
11 policy at Post?
12    A. I have not seen one. That doesn't mean it
13 doesn't exist.
14    Q. Do you agree or disagree that there was no
15 "do not call" policy at Post?
16    A. There is a "do not call" policy. I don't
17 know if it is written, but if a student asks not to be
18 called, we do not call them.
19    Q. I don't want to go back to this one. What is
20 the genesis of that "do not call" policy if not
21 something written?
22    A. It is verbally communicated to us and we are
23 shown how to do it in the system.
24    Q. Other than your recollection of a verbal --
25 verbally being told about this policy or -- excuse me,

Page 83

1 told how to honor "do not call" requests, do you have
2 any evidence that this policy exists?
3    A. The practice of it. The fact that I
4 reinforce it with my team.
5    Q. Do you disagree or agree with the statement
6 that: If an admissions counselor wanted to flag a
7 lead as "do not call," we can do this by typing "do
8 not call" into the notes for that call?
9    A. Notes are important and we are supposed to
10 check notes anytime we outreach, but that is not the
11 way to reject a lead or close an opportunity. So if
12 we are filtering for that in a list, it would be
13 difficult.
14    Q. What is an ITE?
15    A. An intent to enroll.
16    Q. Where in the process does an intent to enroll
17 form come into play?
18    A. It does not anymore. It is a very outdated
19 practice.
20    Q. When did it stop being used?
21    A. I can't say with certainty, but some time
22 ago.
23    Q. Past year?
24    A. More than that, I believe.
25    Q. Who is Christine Hagan-Cappiello?

Page 84

1    A. She is a team lead.
2    Q. Are you aware or did you ever send out a call
3 report each day containing metrics such as the number
4 of outbound calls made by your admissions counselors?
5    A. Not each day, but I have sent it out.
6    Q. Was there a white board in the office that
7 tracked these statistics?
8    A. Not to my knowledge.
9    Q. Was an employee ever reprimanded for not
10 hitting the target number of calls?
11    A. Certainly not on my team.
12    Q. What about enrollment?
13    A. If an admissions counselor is not meeting
14 their benchmarks, we discern why.
15    Q. So are these benchmarks contextual then?
16    A. Yes, absolutely.
17    Q. So if an admissions counselor did not hit
18 their benchmarks and their stated reason was none of
19 these people were the right fit for Post, how would
20 that be handled?
21    A. Why were they not a right fit for Post? We
22 would talk through each of the files. And then if the
23 admissions counselor is correct, they are not a good
24 fit for Post, then we say "good job."
25    Q. Do you agree or disagree even if a number was

Page 85

1 not in service, you would have to call it 10 times
2 before rejecting the lead?
3    A. Absolutely not.
4    Q. Are you speaking specifically with respect to
5 your team?
6    A. No. We would email that lead and call it
7 occasionally to see if the number came back in
8 service.
9    Q. Did you ever tell one of your admissions
10 counselors not to reject a lead because students could
11 change their mind?
12    A. No. But that is why we would reach out to a
13 closed opportunity that went unresponsive.
14    Q. So when these are sworn affidavits, so they
15 are under penalty of perjury, one of these affiants
16 says the call recipients "do not call" request was not
17 treated as a valid reason to reject the lead because
18 we were often told students could change their minds,
19 is this person lying?
20    A. I think they misunderstood the direction.
21    Q. Is it possible that she was trained
22 differently by a different assistant director of
23 admissions than the way you train your admission
24 counselors?
25    A. It is highly unlikely.

22 (Pages 82 - 85)

Page 86

1   Q. Is it possible?
2   A. Trained by the trainer, no.
3   Q. Is it possible that other assistant directors
4 of admissions told their admission counselors not to
5 reject leads for a "do not call" request because those
6 leads could change their minds?
7   A. I doubt that.
8   Q. But do you know for sure?
9   A. Based on the fact that all of the assistant
10 directors are held to the same standard, I would say
11 with certainty that is not possible.
12   Q. That is -- again, what evidence is there for
13 that?  Just that they were held to the same standard?
14 Is that the evidence?
15   A. Yes.
16   Q. So when this is said, the affiant was either
17 lying or mistaken?
18   A. Quite possibly mistaken.  I don't like to
19 call people liars if I don't know them.
20   Q. Is it possible that other teams -- and I am
21 going to refer to who was being supervised by each
22 group of assistant directors as a team, that other
23 teams were trained under or instructed in a way
24 differently than the way you instruct your teams with
25 respect to "do not call" requests?

Page 87

1   A. It should not be.
2   Q. But it could be?  What I am getting at is
3 there are three options here, both of these affiants
4 were lying, both of these affiants were mistaken, or
5 these affiants were trained differently.  Am I wrong
6 -- do you disagree that those are the three categories
7 here?
8   A. I do not.
9   Q. So it is possible that they are not mistaken
10 or lying, but instead they were trained by a different
11 assistant director of admissions in the way that they
12 have sworn that they were trained?
13   A. But they all received the same training from
14 our trainer, Shannon.
15   Q. I am talking about what assistant directors
16 of admissions were instructed on how they are
17 instructing their teams.  Is it possible they were
18 instructed or taught differently by their assistant
19 directors of admissions?
20   A. I don't have definitive proof that it is
21 impossible, but based on everything I know about my
22 peers and my supervisor, I am willing to venture that
23 it is very, very unlikely that that is the case.
24   Q. One of the affiants also stated if a lead
25 said "do not call" within the first 10 calls, we were

Page 88

1 expected to call that lead until we hit 10 calls?
2   A. Absolutely not.
3   Q. Why do you say absolutely not?
4   A. Because there are multiple reject votes for a
5 reason.
6   Q. Correct.  We are specifically talking about a
7 lead saying "do not call" within the first 10 calls.
8 The sworn testimony is that they were -- this
9 admission counselor was expected to call that lead
10 until 10 calls.  I will tell you this is not one of
11 your admissions counselors.
12   A. Oh, I know that.
13   Q. Is it possible that this person was
14 instructed in that way?  If you can't say it is
15 impossible, I mean to be pedantic a little bit, it is
16 possible then?  I know you don't want to throw anyone
17 under the bus, and I'm not trying to make you do that.
18 I am simply asking whether it's possible you don't
19 have evidence to the contrary?
20   A. The evidence that I have to the contrary, I
21 have stated already.
22   Q. How are you evaluated relative to your peers?
23   A. How do you mean?
24   Q. Were you -- when you were being evaluated --
25 were you evaluated?

Page 89

1   A. So I have one-on-ones with my director.  Both
2 directors Gina Sinn and Jen Zaniewski has come and sit
3 with our teams to hear how we are managing and give us
4 feedback on that.  They meet with our reps to find out
5 what is going on and give us feedback as well.
6   Q. Were you formally evaluated?
7   A. I have not had a formal performance
8 evaluation, but I meet with my director at the end of
9 each term and occasionally throughout the term.
10   Q. You have never had a formal performance
11 evaluation?
12     MR. BOWSER:  Objection, ambiguous.
13 BY MR. GLAPION:
14   Q. As an assistant director of admissions, have
15 you ever had a formal performance evaluation?
16   A. So at the end of each term, we do meet to
17 discuss performance.
18   Q. Is this written?
19   A. I have not seen it written.
20   Q. I believe -- I don't know that I have that as
21 an exhibit, but there was one produced.  You were --
22 were you assistant director of admissions in 2015?
23   A. No.
24   Q. You became a team lead in 2015?
25   A. Yes, so I was either an admissions counselor

23 (Pages 86 - 89)

Page 90

1 or team leader.
2     Q. Was Sean Cooley a supervisor?
3     A. Yes, he was my assistant director.
4     Q. While you were team lead, he was your
5 assistant director?
6     A. Yes, and admissions counselor, yes.
7     Q. Do you receive bonuses as part of --
8     A. Yes.
9     Q. Do you receive any raises?
10     A. I have received a merit raise and I believe a
11 cost of living one early on.
12     Q. So a merit raise, do you know the factors
13 that went into you receiving a merit raise?
14     A. No.
15     Q. Do you know if your peers received a merit
16 raise?
17     A. Yes.
18     Q. Did they all receive merit raises?
19     A. That, I do not know.
20     Q. Do you know if one of the factors that went
21 into you receiving a merit raise is how many of your
22 leads ultimately started?
23     A. That would not be one.
24     Q. And how many of your leads graduated?
25     A. That would not be one either.  It would be

Page 91

1 behavioral.
2     Q. When you say it would be behavioral, what did
3 you mean by that in regards to your merit raise?
4     A. So when my admissions counselor received
5 merit raises, we discussed their behaviors, not their
6 KPI.  So if someone always shows up early, always
7 strives to provide extraordinary service, these are
8 the behaviors that would merit a merit increase, among
9 others.
10     Q. Whenever you have had a chance to look, let
11 me know.
12     A. Okay.
13     Q. If you look at the first sentence of the
14 opening paragraph below "Post makes it personal.  The
15 purpose of this notice is to bring your attention
16 ongoing deficiencies" -- it omitted the word "to" --
17 or "bring to your attention ongoing deficiencies" --
18 excuse me -- "in your conduct and performance."
19     Do you see that?
20     A. Yes.
21     Q. So we talked about behavioral before, but
22 this indicates that it is regarding deficiencies in
23 performance.  Correct?
24     A. Performance is a direct result of one's
25 behavior.

Page 92

1     Q. It says "conduct and performance" as in both.
2 Correct?
3     A. It should say "and/or."
4     Q. But it doesn't, it says "and"?
5     A. Correct.
6     Q. As part of this, it says that, "Failure to
7 improve in the stated areas may result in disciplinary
8 action, including termination of employment."
9     Do you see that?
10     A. I don't.  Sorry.  The last one.  Yes.
11     Q. And these four categories here, KPI,
12 behaviors, behavior benchmarks and actuals.  Do you
13 see those?
14     A. Yes.
15     Q. Is behavioral benchmark the expectation for
16 an admissions counselor at this time?
17     A. One more time.
18     Q. Does the behavioral benchmark indicate Post's
19 expectation of admissions counselor as of the date of
20 this mutual commitment to success document?
21     A. Yes.
22     Q. Next to that you see "actual."  Do you see
23 that?
24     A. Yes.
25     Q. And actual, does that reflect Connie Reilly's

Page 93

1 performance in those areas on this date?
2     A. Yes.
3     Q. Who sent these benchmarks?
4     A. I am not sure.
5     Q. Did you write this document?
6     A. I wrote underneath the statement of the
7 problem, underneath the prior discussions.  I input
8 her name, my own, the date, her actual metrics and
9 then underneath the summary of corrected action.
10     Q. But you did not fill in the behavioral
11 benchmark?
12     A. No.
13     Q. You don't know who did that?
14     A. No.  This is a template that I was given.
15     Q. Who gave it to you?
16     A. James Heffner, one of our trainers.
17     Q. Was it your testimony before that an
18 evaluation was only based on conduct on a call?
19     A. How do you mean?
20     Q. I think you testified that it was about
21 behavior or conduct, not necessarily results?
22     A. Correct.
23     Q. So what would be the reason to include the
24 benchmark and the comparison actual results?  If --
25     A. Because -- if what?

24 (Pages 90 - 93)

Page 94

1    Q. I was going to say if conduct were the only
2  relevant inquiry.
3    A. Because these KPIs are indicators of
4  behaviors.
5    Q. In the statement of the problem, you wrote,
6  "Her overall conversation rate for the module was 1.5
7  percent and it should be between 3.5 to 4 percent."
8      Do you see that?
9  A. Yes.
10   Q. Did you meet with Connie before providing
11  this mutual commitment to success?
12   A. That is listed in the prior discussions,
13  reportings about behaviors.  There are several
14  one-on-ones.
15   Q. In those meetings, did you discuss her
16  conversion rate?
17   A. I can't recall those specific one-on-ones.
18  What we talked about -- I meet with my admissions
19  counselors pretty regularly.  Conversion rate is
20  something that we discussed.
21   Q. When it says her overall conversion rate is
22  1.5 percent and it should be between 3.5 and 4
23  percent, where does than 3.5 and 4 percent number come
24  from?
25   A. My director.

Page 95

1    Q. Your director is who?
2    A. Jen Zaniewski, or at the time of this it
3  might have been Gina Sinn.
4    Q. What was the reason for comparing her
5  conversion rate to the expected conversion rate?
6    A. The same reason for comparing her actual KPIs
7  to the behavioral benchmarks.
8    Q. Is it fair if I call this a write-up?
9    A. No.  This is a mutual commitment to success.
10  This is a development plan.
11   Q. It seems to be a write-up.  It says, "The
12  file notice will be placed in your personnel file and
13  you could be terminated if you don't follow it."
14      So we can call it mutual commitment to
15  success or we can simplify it to write-up for the
16  purposes of discussion.
17   A. Well, no, because it is a development plan.
18  A mutual commitment to success means that we are both
19  working to make sure that she gets to where she needs
20  to be.  This is not the last step before termination.
21  After this would be an action plan.
22   Q. But it gets put in her file.  Correct?
23   A. Yes.  Any documentation on an associate
24  would.
25   Q. If she doesn't improve, it is possible she

Page 96

1  would be fired?
2    A. If she doesn't improve, the next step would
3  be an action plan.  But I would like to clarify that.
4  If she is taking feedback, applying it and practicing
5  our desired behaviors, then even if her benchmarks did
6  not meet the behavioral benchmarks, we would continue
7  to work with her.
8    Q. It says that if she doesn't improve, she
9  could be fired.  Are you disagreeing with the document
10  in that regard?
11   A. I am stating that there is a larger process.
12   Q. Reading this, would you agree that someone
13  who reads this would believe that they were at risk of
14  being fired if they didn't improve?
15   A. Well, that is why we have a meeting with them
16  to discuss it.
17   Q. Was part of the reason for this mutual
18  commitment for success that the conversion rate was
19  1.5 percent and should be between 3.5 and 4 percent?
20   A. Repeat the question for me.
21   Q. Was part of the reason for this mutual
22  commitment to success that Connie's overall conversion
23  rate was 1.5 percent and should be between 3.5 and 4
24  percent?
25   A. No.

Page 97

1    Q. Why did you put that in the statement as a
2  problem?
3    A. Because that is an indicator of the right
4  behaviors.  It is not a reason.  It is an indicator.
5    Q. Does it say that her overall conversion rate
6  when taking into her account her behaviors was only
7  1.5 percent or should be between 3.5 and 4 percent
8  when taking into account her behaviors?
9    A. Does it say that?
10   Q. Does it say that?
11   A. No.
12   Q. Does it say anything like that?
13   A. No.
14   Q. It seems to me to be a pretty straightforward
15  comparison to what her conversion rate was and what
16  the expected conversion rate was.  Do you agree?
17   A. Yes.
18   Q. And is the expected conversion rate
19  contingent upon -- are there excuses for not hitting
20  that 3.5 to 4 percent?
21   A. Absolutely.
22   Q. Were those -- did you address the reasons for
23  that low rate prior to this mutual commitment to
24  success?
25   A. During it.  When we met and then afterwards.

25 (Pages 94 - 97)

1    Q. Which you met prior to this mutual commitment
2 for success, did you go over the reason for each of
3 the 399 leads that did not convert?
4    A. Not for each of the 399 leads.
5    Q. How many of them?
6    A. I cannot say with certainty a number, but we
7 did discuss that.
8    Q. Was the goal as part of this mutual
9 commitment of success to increase -- to improve her
10 conversion rate?
11    A. No.
12    Q. Again, why was it mentioned in the statement
13 of problem?
14    A. Because it is an indicator of a larger
15 behavioral issue.
16    Q. Correcting that behavioral issue would have
17 what result?
18    A. It may not directly impact the conversion
19 rate.
20    Q. Is that the -- one of the goals of improving
21 the behavior is increasing the conversion rate?
22    A. To increase the benchmarks, the behavioral
23 benchmarks.
24    Q. The benchmarks are not specific to Connie,
25 are they?

1    A. They are behavioral benchmarks for an
2 admission counselor and the actuals are hers.
3    Q. It would be to improve the actual?
4    A. Correct.
5    Q. Although not listed under actual, it is
6 listed under statement of problem one of the numbers
7 -- the actuals is 1.5 percent, and the benchmark is
8 3.5 to 4 percent?
9    A. Correct.
10    Q. So one of the goals of improving her behavior
11 is to increase the conversion rate?
12    A. The goal of a mutual commitment to success is
13 to provide an admissions counselor with the tools that
14 they need in order to do their job effectively.
15    Q. To what end? What is the end goal?
16    A. Help the student.
17    Q. Help the student. They are not a student
18 yet. They are a prospective student. What is the
19 goal with respect to a prospective student?
20    MR. BOWSER: Objection, asked and answered.
21    THE WITNESS: Help the prospective student.
22 BY MR. GLAPION:
23    Q. Help the prospective student to do what?
24    A. Whatever is right for them.
25    Q. So the conversion rate is irrelevant?

1    A. Again, it is an indicator of behaviors. If
2 an admissions counselor is doing right by their
3 students and prospective students, if they are making
4 sure that they are either a good fit for Post and Post
5 is a good fit for them or otherwise, then conversion
6 rate is irrelevant, because what matters is that they
7 help the student.
8    Q. If her conversion rate was 6 percent, would
9 she have received a mutual commitment for success if
10 every other number was the same?
11    A. Okay. Well, that math wouldn't work out.
12    Q. How would it not work out?
13    A. Because --
14    Q. We don't have to do a math problem. If her
15 conversion rate was in line with the expected
16 conversion rate, would she still receive a mutual
17 commitment to success document if some of the other
18 numbers were lower than the behavioral benchmarks?
19    A. I am sorry. I am confused.
20    Q. If some of the actual lead PCAS, for example,
21 was 12 percent and all the other numbers were exactly
22 the same, but her conversion rate was in line with the
23 benchmark, would she receive a mutual commitment to
24 success?
25    A. Connie was put on a mutual commitment for

1 success because of her behaviors. If you are asking
2 if I have put other reps on mutual commitments to
3 success who hit the behavioral benchmarks, I have, but
4 based on their behaviors they were not meeting our
5 values and standards.
6    Q. That is not what I am asking. Let's do it
7 this way because I feel like behaviors is really
8 masking what this is. And it sounds like double
9 speak.
10    So let's talk one by one the KPI. Part of
11 the reason Connie got put on a mutual commitment to
12 success or filled out this mutual commitment to
13 success was because she was below the behavioral
14 benchmarks at getting a lead to partake in PCAS?
15    A. No.
16    Q. Her being 10 percent was not being part of
17 the reason?
18    A. No, it is an indicator of what she was doing
19 on a daily basis.
20    Q. Right. And the indicator is that her actual
21 is lower than the benchmark. Correct?
22    A. Yes.
23    Q. So then part of the reason is that her actual
24 percentage was lower than the benchmark percentage?
25    A. But you can hit that benchmark percentage and

26 (Pages 98 - 101)

Page 102

1 still have behaviors that would put you on a mutual
2 commitment to success.
3    Q. Have you ever put someone on a mutual
4 commitment for success who hit ever single benchmark?
5    A. I would have to review the mutual commitments
6 to success that I have put somebody on, but I can tell
7 you that the behavioral benchmarks are just
8 reflections of what admissions counselors do every
9 day.
10    Q. Do you have a specific recollection of
11 putting someone on a mutual commitment for success who
12 hit every single behavior benchmark in the module?
13    A. I would have to look at one mutual commitment
14 to success in particular to see if they hit every
15 single behavioral benchmark, but there is a possible,
16 yes, to that question. I just have to review the
17 files.
18    Q. Do you have a specific recollection of it
19 happening?
20    A. I have to check. I don't remember everyone's
21 behavioral benchmarks from term to term.
22    Q. As you sit here right now, do you remember
23 ever putting someone on a mutual commitment to success
24 whose actual numbers met the benchmarks?
25    A. I believe so. I have to double check.

Page 103

1    Q. So is that a -- as you sit here, you don't
2 remember?
3    A. As I sit here, I remember putting an
4 admissions counselor on a mutual commitment to success
5 whose behavioral benchmarks were meeting -- or whose
6 actuals were good, but her behaviors were not in line
7 with our values and what we want out of our admissions
8 counselors.
9    Q. And is that the only potential example you
10 can think of right now?
11    A. Yes. I have not done a lot of these.
12    Q. How many admissions counselors do you
13 currently supervise?
14    A. Seven.
15    Q. And over your time as assistant director of
16 admissions, how many unique admissions counselors
17 would you say you have supervised?
18    A. Approximately, I am not 100 percent sure, but
19 maybe 25.
20    Q. Second page mentions that Connie will attend
21 an overcoming objections training session?
22    A. Yes.
23    Q. What was that?
24    A. That was a training session conducted by an
25 assistant director.

Page 104

1    Q. Did you conduct any of those?
2    A. No.
3    Q. Do you know what those sessions entailed?
4    A. I did not attend it.
5    Q. Do you know if there was written material in
6 those sessions?
7    A. I do not know.
8    Q. What is meant by "objections"?
9      MR. BOWSER:  Objection.
10      THE WITNESS:  It could be any number --
11 BY MR. GLAPION:
12    Q. The context of overcoming objections, what is
13 meant by "objections"?
14    A. I would feel more comfortable finding that
15 out from the assistant director who conducted the
16 training. As I was not there, I do not want to speak
17 to it.
18      (Exhibit No. 6 marked for identification.)
19 BY MR. GLAPION:
20    Q. Just let me know when you have had a chance
21 to look at that.
22    A. All right.
23    Q. Is this your appraisal in 2014, 2015?
24    A. Yes.
25    Q. Done by Sean Cooley, who you mentioned

Page 105

1 before?
2    A. Yes.
3    Q. And you were an admissions counselor at this
4 time?
5    A. Correct.
6    Q. You see the chart below that has goals,
7 measurement outcomes, self-rating comments,
8 supervising rating?
9    A. Yes.
10    Q. Field one is goal. Did you write what the
11 goal was there?
12    A. I did not.
13    Q. That came prefilled?
14    A. Yes.
15    Q. And the measurement outcome, did you write
16 what the measurement outcome was?
17    A. I do not recall.
18    Q. Well, the second one --
19    A. The self-rating and comments, I wrote.
20    Q. In terms of measurement outcome, let's look
21 at column 2 -- so row 2. Excuse me.
22      "Have a conversion rate at or above 3.5
23 percent." That is under goals and that came
24 prefilled.
25    A. I believe so, yes.

27 (Pages 102 - 105)

Page 106

1    Q. Then the next column, measurement column,
2  says, "My conversion rate."
3      A. Well, you'll have to forgive me.  This was
4  years ago.
5      Q. I know it was a while ago.
6      A. I can't say with certainty.  I know that I
7  wrote the self-rating.  The other two columns I might
8  have written, but I don't remember.
9      Q. So in the first goal, it says, "Enroll at
10  least 10 students who participate in their classes per
11  module."
12      Do you see that?
13  A. Yes.
14      Q. Does it mention anything about behaviors?
15      A. At the time when this performance review was
16  conducted, we had different leadership in place at the
17  university.
18      Q. At what point did that leadership change?
19      A. Approximately three years ago.
20      Q. This is approximately three years ago?
21      A. So shortly after this, then.
22      Q. And the measurement/outcome was number of
23  closed/won students.
24      Do you see that?
25      A. Yes.

Page 107

1      Q. So according to this, one of the measurements
2  for your performance appraisal was how many students
3  you closed.  Correct?
4      A. I am sorry.  One more time.
5      Q. According to this performance appraisal, one
6  of the areas in which you were measured how many
7  students you closed/won.  Correct?
8      MR. BOWSER:  Objection, foundation.
9      THE WITNESS:  I am not sure how to answer
10  that.
11  BY MR. GLAPION:
12      Q. Do you see where it says "number of
13  closed/won students"?
14      A. Yes.
15      Q. One of the measurements for goal one was how
16  many students were closed or won by you?
17      A. Because the goal was to enroll 10 students,
18  so the measurement would be the number of students.
19      Q. Correct.  It doesn't say anything about good
20  behaviors?
21      A. Again, that came in with new leadership.
22      Q. What leadership changed?
23      A. Our executive leadership team as well as the
24  director of my department.
25      Q. Who was the director of your department?

Page 108

1      A. Jennifer Montalvo.
2      Q. Who is the new director of your department?
3      A. Gina Sinn.
4      Q. You said the executive team?
5      A. Executive leadership, yes.
6      Q. Did the CEO change?
7      A. Yes.
8      Q. So we can sort of skip the song and dance
9  with this.
10      Is it your testimony essentially it is
11  outdated?
12      A. Absolutely.
13      Q. The expectations of you when you were an
14  admissions counselor were more metric driven.  Would
15  you agree with that?
16      MR. BOWSER:  Objection, foundation.
17  BY MR. GLAPION:
18      Q. I am trying to skip through this document, if
19  we don't have to go through it.
20      A. So metrics have always been the way we
21  measure what people are doing on a day-to-day basis.
22  If you are practicing the desired behaviors, then it
23  should show in the metrics.  But if after a
24  conversation with your manager we find that -- it is a
25  fluke, maybe you just got unlucky.  That is okay.

Page 109

1      Q. If someone consistently practiced good
2  behaviors but it did not manifest in meeting the
3  benchmark number we discussed previously, would they
4  be put on any sort of action plan?
5      A. We would try to find out why.  And, again, it
6  is a mutual commitment to success prior to action
7  plan, which is a development plan.  It is not
8  disciplinary.  It is meant to help the admissions
9  counselor.
10      Q. So if the behaviors are good, but the
11  benchmarks -- but the actuals are lower than the
12  benchmark, would they be put on a mutual commitment
13  for success?
14      A. It depends on the context.  We find out why.
15      Q. What it is consistent across an entire year
16  of modules would they be put on a mutual commitment of
17  success?
18      A. It depends on why.
19      Q. You find out why before putting them on the
20  mutual commitment for success?
21      A. Yes.
22      Q. Do you make the hiring and firing decisions?
23      A. I do not make the hiring decisions.
24      Q. Do you make the firing decisions?
25      A. They have to be approved by my director, but

28 (Pages 106 - 109)

Page 110

1  I can make a recommendation.
2      Q. Can your director fire someone without your
3  recommendation?
4      A. I don't know.
5      Q. Has your director ever fired someone without
6  your recommendation?
7      A. Not to my knowledge.
8      Q. Has your director, to your knowledge, ever
9  fired anyone -- any admissions counselor without the
10  recommendation of that admissions counselor's
11  assistant director of admissions?
12      A. Not to my knowledge.
13      Q. In the home stretch.
14          Do you have access to company email address
15  at Post?
16      A. Yes.
17      Q. Do you still have access to the company email
18  address?
19      A. What do you mean by the "company email
20  address," one provided to me?
21      Q. Yes.
22      A. Yes.
23      Q. What is that address?
24      A. VMeehan@post.edu.
25      Q. Who is the email provider?

Page 111

1      A. We use Outlook.
2      Q. Do you check your email?
3      A. Yes.
4      Q. Did you send emails?
5      A. Yes.
6      Q. Do you ever use templates in emails?
7      A. Yes.
8      Q. Mail blasts, I guess we call them?
9      A. Yes.
10      Q. What do you call them?
11      A. Mail merges.
12      Q. Mail merges.  Do you use mail merges?
13      A. Yes.
14      Q. Were you ever instructed to keep all of your
15  emails?
16      A. They are archived.  Was I instructed to keep
17  all of my emails?  I don't recall.
18      Q. Were you instructed not to delete your
19  emails?  Setting aside anything counsel may have told
20  you after this lawsuit was filed.
21      A. I don't recall.
22      Q. Did you ever delete emails?
23      A. Yes.
24      Q. In what context would you delete emails?
25      A. Spam, clear that out.

Page 112

1      Q. Of course.
2      A. If -- I can't think of another.  So when
3  sending mail merges, if we are sending a large amount
4  at once, this was a long time ago and our inbox would
5  be full, not just sending mail merges, if our inbox
6  was full, we would have to delete emails to make
7  space.  We have since migrated to larger -- I don't
8  the technical term -- amount of space for emails, so I
9  haven't had to do that for some time.
10      Q. When you say some time, how long would you
11  say?
12      A. Approximately -- I do not know.
13      Q. Whatever archive you mentioned for the email,
14  does that archive delete emails?
15      A. I do not know.
16      Q. Did you ever check your emails while you were
17  at home?
18      A. Yes.
19      Q. Did you have access to the CRM system at
20  home?
21      A. Yes.
22      Q. Does your supervisor have access to the CRM
23  system at home?
24      A. Yes.
25      Q. I want to go through some emails.

Page 113

1          (Exhibit No. 7 marked for identification.)
2  BY MR. GLAPION:
3      Q. Do you see this?  Do you recognize this email
4  at all?
5      A. Yes.
6      Q. Is this a mail merge email that you would
7  have sent out?
8      A. I don't know.
9      Q. Do you see the top left email address
10  VMeehan@Post.edu?  Is that your email address?
11      A. It is.
12      Q. Do you recall sending the email to the email
13  address on the "to" field?
14      A. I send a lot of emails to students, so not
15  specifically, no.
16      Q. Why would this email no longer be in your
17  sent folder?
18      A. If I had to delete it to make space.
19      Q. So it is possible you deleted this email?
20      A. It is possible.
21      Q. Do you recall if you typed this particular
22  email up or would you have used the template to send
23  this email?
24      A. I do not recall.
25      Q. Have you used templates that are similar to

29 (Pages 110 - 113)

Page 114

1 this email or is this something you would usually type
2 up an email like this?
3     A. I don't know what you mean.  Okay.  Similar
4 in what way?
5     Q. Well, this form of email following up
6 regarding your request for information in this form.
7 Is this something that you typically typed up manually
8 or would you use a mail merge for something like this?
9     A. It could have been either.
10     (Exhibit No. 8 marked for identification.)
11 BY MR. GLAPION:
12     Q. You notice the last page is redacted.  That
13 is just for privilege reasons because it was forwarded
14 to me by my client.
15         Is that your email address on the top left?
16     A. It is.
17     Q. The subject is, "Make fall count, classes
18 starts in less than three weeks."
19         Do you see that?
20     A. Yes.
21     Q. Do you recall sending that email?
22     A. No.
23     Q. Do you recall ever sending a mail merge with
24 that subject?
25     A. I don't recall the subjects of all of my mail

Page 115

1 merges.
2     Q. Do you recall the body of this email?
3     A. Like I said, I send a lot of emails, so no.
4     Q. Would this have been a mail merge or manually
5 typed?
6     A. This was likely a mail merge.
7     Q. What makes you think that?
8     A. Just the formatting of it.
9     Q. And on the last page of the document, there
10 appears to be a response sent to you.
11         Do you see that?
12     A. Yes.
13     Q. It says, "I am no longer interested.  Please
14 take me off your email list."
15         Do you see that?
16     A. Yes.
17     Q. Do you recall receiving that email?
18     A. I do not.
19     Q. Why would that email no longer be in your
20 inbox?
21     A. I do not know.
22     Q. Is it possible you deleted that email?
23     A. It is.
24     Q. And is it the same for this email being in
25 your sent box, is it possible you deleted it?

Page 116

1     A. Possible.
2     (Exhibit No. 9 marked for identification.)
3 BY MR. GLAPION:
4     Q. Have you had a chance to look at this?
5     A. Yes.
6     Q. Do you recognize this email?
7     A. I don't remember sending it, but I recognize
8 it as an email from Post.
9     Q. From your Post account?
10     A. Yes.
11     Q. Have you seen emails that are similar in
12 content to this one?
13     A. Yes.
14     Q. Regarding the FAFSA?
15     A. Yes.
16     Q. Is that usually a mail merge or manual email?
17     A. That would be a mail merge.
18     Q. Do you know if this one is a mail merge?
19     A. I don't know for certain.
20     Q. What is your best guess?
21     A. That it likely was.
22     Q. And you will see that this was sent on
23 October 11th, 2017 at 12:24.  Assuming you were
24 working at work that day in the office, would you have
25 been working at 12:24?

Page 117

1     A. Yes.
2     Q. And you would have been -- presumably, if you
3 were working that day, you would have been working in
4 the office at that time?
5     A. Assuming it wasn't a snow day or something
6 along those lines, then yes.
7     Q. The next page marked MD397, do you see the
8 response from Melanie Davis to your email address?
9     A. Yes.
10     Q. It says, "Please stop emailing, texting, SMS
11 calls and voicemail."
12         Do you see that?
13     A. Yes.
14     Q. How do you interpret that request?
15     A. Stop calling, emailing and texting.
16     Q. The next line, "This is the third or fourth
17 time I'm asking to be removed from all your lists."
18         Do you see that?
19     A. Yes.
20     Q. Why would this email not still be in your
21 inbox?
22     A. If I had deleted it.  I don't remember doing
23 so.
24     Q. Is it possible you deleted it?
25     A. It is possible.

30 (Pages 114 - 117)

Page 118

1    Q. If you received an email like this at 6:42
2 p.m., when I say a typical workday, would you still be
3 in the office at that time?
4    A. Yes.
5    Q. How would you respond or react to an email
6 like this?
7    A. Go into the file and make the adjustment.
8    Q. If I were to represent to you that there was
9 no notation on the file on October 11, 2017 on a "do
10 not call" request, why would that be?
11    A. Human error.
12    Q. Which means?
13    A. Which means that I made the mistake of not
14 going in.
15    Q. So you forgot or something like that?
16    A. Possibly.
17    (Exhibit No. 10 marked for identification.)
18 BY MR. GLAPION:
19    Q. Is it possible that you deleted this email
20 from your sent folder?
21    A. It is possible.
22    Q. Do you recognize this email?
23    A. Yes. I mean, not this specific email. I
24 recognize that it came from me labeled as Post.
25    Q. Sure. I understand. Do you -- is this a

Page 119

1 form or -- is the content of this email in line with
2 an email you would have sent?
3    A. Yes.
4    Q. Do you still send emails like this?
5    A. Yes.
6    (Exhibit No. 11 marked for identification.)
7 BY MR. GLAPION:
8    Q. Do you recognize this email discussing being
9 snowed in?
10    A. Yes.
11    Q. You will note that it begins, "Hi, Melanie."
12    Do you see that?
13    A. Yes.
14    Q. Then below "snowed in," it says, "Megan, our
15 FAFSA specialist is available."
16    Do you know if this is a manually typed
17 email?
18    A. I don't recall.
19    Q. If we go to the next page, you will see a
20 response. It says, "Please stop contacting me. Not
21 interested."
22    Do you see that?
23    A. Yes.
24    Q. How would you interpret that request?
25    A. Do not call, do not reach out.

Page 120

1    Q. Why would this email no longer be in your
2 inbox?
3    A. Same reason for the others.
4    Q. It's possible you deleted it?
5    A. It is possible.
6    Q. It is possible you deleted the email you
7 sent?
8    A. Yes.
9    Q. Why would this request not be documented in
10 the CRM system?
11    A. Same reason, human error.
12    Q. So just to be clear, none of these emails
13 were produced in this case to me. They all came from
14 my client. So as a result, they are not in your inbox
15 or sent folder. Just by way of background.
16    A. Could they be in the archive?
17    Q. I will have to talk to Adam about that. But
18 your testimony, though, is with each of these emails
19 you went through, it is possible you deleted them?
20    A. It is possible.
21    Q. And that with respect to the two requests
22 that you agreed you would interpret as a "do not call"
23 request, that if it is not in the system, it is due to
24 human error?
25    A. Yes.

Page 121

1    Q. But it is also your testimony that you have
2 trained your admissions counselors to document these
3 "do not call" requests as a "remove from list."
4 Correct?
5    A. Yes.
6    Q. These scenarios, if indeed it was human error
7 that led to it not being marked, you didn't follow
8 that policy yourself?
9    A. People make mistakes. I do a lot of things
10 in the course of a day.
11    Q. Correct. With these two emails, they just --
12 excuse me. They are both potentially deleted.
13 Correct?
14    A. (Nods head.)
15    Q. And they both are "do not call" requests.
16 Correct?
17    A. Yes.
18    Q. The first -- sorry. Let's go do that again
19 because you nodded the first time.
20    So they are potentially deleted. Correct?
21    A. Yes.
22    Q. And they are "do not call" requests.
23 Correct?
24    A. Yes.
25    Q. And none of them are documented in the

31 (Pages 118 - 121)

Page 122

1 system.  Correct?
2      A. I do not know that.  I would have to review
3 the file.
4      Q. If they are not documented in the system,
5 that would be human error?
6      A. Yes.
7      Q. Do you have any sense of how much human error
8 happened with your admission counselors when it comes
9 to documenting similar requests?
10      A. My admissions counselors, no.  When I got my
11 first job at Panera Bread, I recall them saying one
12 either 12 or 12 turkey sandwiches was made without
13 turkey.
14      Q. How many?
15      A. So people -- like one in 12 or one in 25.
16      Q. I thought you said 12 in 25, that's like half
17 of the turkey sandwiches.
18      A. Right.  No, but people make mistakes.  I
19 don't know on what scale.
20      Q. Well, my concern here is we have two emails,
21 two "do not call" requests, both of them are not
22 documented, if -- I am representing to you they are
23 not documented.  Correct?
24      A. Uh-huh.
25      Q. That is 100 percent of the "do not call"

Page 123

1 requests that were made to you by email by this
2 client.  Correct?
3      MR. BOWSER:  Objection, foundation.
4 BY MR. GLAPION:
5      Q. Fair enough.  If these are the only "do not
6 call" requested that my client made via email to you,
7 then that would be human error with respect to 100
8 percent of the call requests that she made to you?
9      A. I would have to review the file to make sure
10 that there was no further context to that.
11      MS. GLAPION:  Off the record.
12      (Off-the-record discussion.)
13 BY MR. GLAPION:
14      Q. When you receive a "do not call" request, how
15 quickly do you believe that that should be noted in
16 the CRM system?
17      A. As soon as I see it.
18      Q. And do you instruct your team leads or do you
19 instruct your admissions counselors the same way?
20      A. Yes.
21      Q. So when -- as soon as you saw these "do not
22 call" requests, why would they not have been
23 documented?
24      A. I don't know.
25      Q. Do you know why a call to a lead may not be

Page 124

1 documented in the CRM system?
2      A. Human error.
3      Q. And why a text message to a lead might not be
4 documented in the CRM system?
5      A. Same reason.
6      Q. As an assistant directors of admissions -- I
7 am going to get that right at some point in this
8 deposition.
9      As an assistant director of admissions, did
10 you have any processes in place to screen or otherwise
11 look for human error?
12      A. I do review the files and speak to the
13 admissions counselors.  So if, say, there is a student
14 who submitted an application and still need to submit
15 their FAFSA and there is only one noted outreach over
16 a two-week period in that file, I would ask the
17 admissions counselor why they have not been reaching
18 out to the student.  They might say, "Oh, I did.  I
19 just forgot to note it," which is not okay.
20      Q. Have you ever been reprimanded or put on
21 notice about any failure to document "do not call"
22 requests?
23      A. Not that I can remember.
24      Q. Have you ever reprimanded or put on notice
25 any of your admissions counselor on "do not call"

Page 125

1 requests?
2      A. I don't know.
3      Q. Do you have any specific recollection of
4 doing that?
5      A. Nothing that is coming to mind at the moment.
6      Q. Are you aware of anyone at Post University
7 being reprimanded or otherwise put on notice for
8 failing to honor "do not call" requests?
9      A. I don't know.
10      Q. When you have called a lead or an
11 opportunity, have you ever reached someone who said
12 that they had asked not to be called?
13      A. I don't remember.  I call a lot of students.
14      Q. So it is possible one way or another that
15 that happened --
16      A. Yeah.
17      Q. -- or didn't happen?
18      How many leads do your admission counselors
19 typically field in a given module?
20      A. It fluctuates, but --
21      MR. BOWSER:  Can I just object to ambiguous.
22 BY MR. GLAPION:
23      Q. How many leads do your admission counselors
24 receive in a given module?
25      MR. BOWSER:  Sorry.  I don't mean a speaking

32 (Pages 122 - 125)

Page 126

1 objection. When you say your, are you talking about
2 her team or --
3     MR. GLAPION: Right. Sorry. She is not a
4 30(b)(6) witness.
5 BY MR. GLAPION:
6     Q. I think earlier when I said "your," I am
7 talking about your team.
8         How many leads does your team receive in a
9 given module?
10    A. An admissions counselor can probably expect
11 to receive between 200 and 500 leads a term on a
12 module.
13    Q. Is a term longer than a module?
14    A. No, they are the same.
15    Q. How long is a term/module?
16    A. Eight weeks.
17    Q. How many of them in a year?
18    A. Six.
19    Q. And you said how many leads, 200 to 500?
20    A. Yeah.
21    Q. Is that across the whole team or per
22 counselor?
23    A. That is per counselor.
24    Q. So on a team of seven, you are talking a
25 range every 1,400 to 3,500 leads a term?

Page 127

1    A. Correct.
2    Q. Do you know how many admission counselors
3 that are at Post?
4    A. About 130 in the undergrad department.
5    Q. Are leads spread evenly amongst the teams, as
6 best as possible?
7    A. I believe so, yes.
8    Q. Is each lead -- the initial outreach to each
9 lead expected to be a phone call?
10    A. Depending on the time of day, that could
11 change.
12    Q. Can you elaborate what you mean by that?
13    A. So we don't call students, unless they
14 request that we do, setting an appointment after 8:30,
15 9 o'clock. So those leads might get a text at that
16 time.
17    Q. You don't call students unless they set an
18 appointment?
19    A. No. We don't call students after 8:30 p.m.
20 unless they request an appointment after 8:30 p.m.
21    Q. If a lead comes in after 8:30 p.m., is it
22 expected to be acted on that same night?
23    A. Yes.
24    Q. And how would that be expected to be acted
25 upon?

Page 128

1    A. Text.
2    Q. But during -- I guess I will call them work
3 hours, we will say 9:00 to 5:00, is the initial
4 outreach to a lead expected to be by phone?
5    A. Yes, depending on the time zone.
6    Q. What times could you not call?
7    A. So we would not call a lead that lives in
8 California at 9:00 a.m.
9    Q. Would you call a lead that lives in
10 California 11:00 a.m. Eastern?
11    A. We would call them at 9:00 a.m. their time.
12    Q. So 9:00 a.m. is when the calls would begin.
13 And time would they end?
14    A. Actually it's 8:30 to 8:30.
15    Q. If a lead comes in between the hours of 8:30
16 to 8:30, it's expected the first outreach would be a
17 phone call?
18    A. Yes.
19    Q. You say the majority of your leads come in
20 between 8:30 and 8:30?
21    A. They do.
22    MS. GLAPION: Take five minutes. I think I
23 am done. I want to double check.
24    MR. BOWSER: Okay.
25    MS. GLAPION: I don't have any further

Page 129

1 questions. I want to note we stopped at Exhibit 11 at
2 this deposition, and the plan was continue each
3 deposition, regardless of who is taking it
4 sequentially, from where the last deposition ended.
5    MR. BOWSER: Great.
6    (Whereupon the deposition adjourned at 2:42 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 - 129)

Page 130

1          J-U-R-A-T
2      I, VICTORIA L. MEEHAN, do hereby certify
3 that the foregoing testimony taken on February 8,
4 2019, is true and accurate, including any corrections
5 noted on the corrections page, to the best of my
6 knowledge and belief.
7
8
9          VICTORIA L. MEEHAN
10
11
12    At         in said county of        , this
13 day of       , 2019,    , personally appeared , and
14 she made oath to the truth of the foregoing
15 corrections by her subscribed.
16
17 Before me,        , Notary Public
18 My commission expires:
19
20
21
22
23
24
25

Page 132

1          C E R T I F I C A T E
2      I hereby certify that I am a Notary Public, in
3 and for the State of Connecticut, duly commissioned
4 and qualified to administer oaths.
5      I further certify that the deponent named in the
6 foregoing deposition was by me duly sworn and
7 thereupon testified as appears in the foregoing
8 deposition; that said deposition was taken by me
9 stenographically in the presence of counsel and
10 reduced to typewriting under miy direction, and the
11 foregoing is a true and accurate transcript of the
12 testimony.
13      I further certify that I am neither of counsel
14 nor related to either of the parties to said suit, nor
15 of either counsel in said suit, nor am I interested in
16 the outcome of said cause.
17      Witness my hand and seal as Notary Public the
18 15th day of February, 2019.
19
20
21
22 Notary Public
23 My Commission Expires:
24 November 30, 2022
25

Page 131

1      TRANSCRIPT CORRECTIONS
2 REPORTER:  Sarah J. Miner
3 CASE STYLE:  MELANIE DAVIS v. POST UNIVERSITY, INC.
4
5
6
  DEPONENT:  VICTORIA L. MEEHAN
7
8
9
10 PAGE  LINE  CORRECTION  REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20
21      NAME:
22
23
24
25

34 (Pages 130 - 132)

**[07719 - adam]**                                          Page 1

**0**

**07719**   2:5

**1**

**1,400**   126:25
**1.5**   94:6,22 96:19
  96:23 97:7 99:7
**1/4/18**   3:14
**10**   3:13 43:18
  52:16,19 53:23
  54:16 85:1 87:25
  88:1,7,10 101:16
  106:10 107:17
  118:17
**10/11/17**   3:12
**10/18/17**   3:13
**10/2/17**   3:11
**100**   75:24 76:8
  80:14,15 103:18
  122:25 123:7
**102**   2:4
**104**   3:9
**11**   3:7,14 118:9
  119:6 129:1
**113**   3:10
**114**   3:11
**116**   3:12
**118**   3:13
**119**   3:14
**11:00**   128:10
**11:35**   1:16
**11th**   116:23
**12**   27:10 60:11
  100:21 122:12,12
  122:15,16
**12:24**   116:23,25
**13**   3:8
**130**   127:4
**14th**   11:24
**15th**   132:18

**16th**   62:3
**1704**   2:4
**1717**   2:9
**18**   1:4 7:21
**18978**   132:21
**18th**   11:25
**1:12**   75:11
**1:17**   75:11

**2**

**2**   16:18,20 30:22
  58:25 105:21,21
**200**   126:11,19
**20006-5344**   2:9
**2014**   62:3 104:23
**2015**   89:22,24
  104:23
**2017**   11:24 116:23
  118:9
**2018**   35:4 38:1
  49:25
**2019**   1:15 130:4,13
  132:18
**2022**   132:24
**238**   1:19
**24**   17:23 24:12
  25:1,3 26:11,21
  27:3,19 50:14,22
**25**   103:19 122:15
  122:16
**2:42**   129:6

**3**

**3**   58:25 59:1,4,7
**3,500**   126:25
**3.5**   94:7,22,23
  96:19,23 97:7,20
  99:8 105:22
**30**   35:4 126:4
  132:24
**30th**   37:25 49:25

**399**   98:3,4

**4**

**4**   3:4,7 11:7,8 94:7
  94:22,23 96:19,23
  97:7,20 99:8
**48**   26:24
**4:00**   27:11

**5**

**5**   3:8 13:12,13
  41:9
**50**   29:24
**500**   126:11,19
**5:00**   128:3

**6**

**6**   3:9 67:24 100:8
  104:18 126:4

**7**

**7**   3:10 113:1
**7788**   68:1

**8**

**8**   1:15 3:11 114:10
  130:3
**8/24/17**   3:10
**80**   30:4 75:24 76:8
**81004**   1:4

**9**

**9**   3:12 116:2
  127:15
**9/18/90**   7:7
**90**   11:25
**9:00**   128:3,8,11,12

**a**

**a.m.**   1:16 128:8,10
  128:11,12
**ability**   5:22 32:7
  32:25 33:3 57:12
  57:15,16 77:22

**able**   10:12 13:3,11
  13:21 23:13 24:18
  34:13 39:3
**absence**   76:2,7
**absolutely**   64:22
  65:23,25 76:23
  84:16 85:3 88:2,3
  97:21 108:12
**ac**   16:25 50:14,15
**academic**   17:8,11
  17:13
**acceptable**   29:8
**access**   39:16 50:7
  53:10 57:13,15
  58:5,6,7,11 77:22
  110:14,17 112:19
  112:22
**account**   97:6,8
  116:9
**accountability**
  61:2
**accounts**   39:17
**accurate**   130:4
  132:11
**acronym**   15:6
**act**   8:10,11
**acted**   127:22,24
**action**   92:8 93:9
  95:21 96:3 109:4
  109:6
**activity**   16:1
**actual**   36:6 92:22
  92:25 93:8,24
  95:6 99:3,5
  100:20 101:20,23
  102:24
**actuals**   92:12 99:2
  99:7 103:6 109:11
**adam**   2:8 6:3,5 7:2
  10:13,25 41:22
  69:16 75:20

120:17
adam.bowser 2:10
add 8:11 11:3
address 17:19
22:8 23:23 24:6
26:17 27:4 28:15
28:23 29:10 40:14
64:7,11 66:20
97:22 110:14,18
110:20,23 113:9
113:10,13 114:15
117:8
addressed 35:23
addressing 28:16
37:4
adjourned 129:6
adjustment 118:7
administer 132:4
admission 8:11,24
25:2 36:24 44:16
44:22 60:17 63:14
63:24 64:21 65:5
66:2,16 69:6
71:18 85:23 86:4
88:9 99:2 122:8
125:18,23 127:2
admissions 7:9,15
7:18,20 8:3,7,10
8:15,16,20,21 9:3
9:3,7,10 14:22,25
17:8,12,15 19:20
19:22 22:13,19
23:17,20 24:9
27:12 29:11,17
30:7,9,11 36:10,12
36:18,21 38:4,24
39:17,23 40:5,25
43:8,12 45:12
48:10,17,19,22,25
49:4,6 50:24
51:14,15 53:3,9

54:2,22,25 55:5,12
55:23 56:4 57:10
57:17,21,25 60:5,7
60:13,15,19,24
61:14 62:5,8,16,20
62:20,25 63:7,9,13
64:11,14,20,24
65:6 66:1,2,9,25
68:23 69:5,25
70:1,4,5 72:24
73:7,21 74:3,11
75:17 76:5,10,17
77:10 78:25 83:6
84:4,13,17,23 85:9
85:23 86:4 87:11
87:16,19 88:11
89:14,22,25 90:6
91:4 92:16,19
94:18 99:13 100:2
102:8 103:4,7,12
103:16,16 105:3
108:14 109:8
110:9,10,11 121:2
122:10 123:19
124:6,9,13,17,25
126:10
admitted 77:15
adoa 13:25 14:11
14:21,24
adviser 50:24
advisor 17:13
advisors 50:16
advisory 55:3 76:3
affect 77:19
affiant 86:16
affiants 85:15 87:3
87:4,5,24
affidavit 75:23
affidavits 75:18
85:14

ago 61:24 83:22
106:4,5,19,20
112:4
agoi 14:9,19
agol 14:2
agree 16:4,8 17:20
17:25 22:10 51:4
69:1 76:17 77:4,9
78:14 81:10,15
82:8,14 83:5
84:25 96:12 97:16
108:15
agreed 6:24
120:22
aid 33:23 34:11
50:16,24 57:9
alcohol 5:23
ambiguous 89:12
125:21
amount 23:14
112:3,8
answer 4:24 5:7
7:3,3 18:14 25:7
47:7 62:18 69:11
69:13,14,17 73:17
74:8 107:9
answered 69:9
77:14 99:20
answers 5:17
anymore 83:18
anytime 83:10
apart 27:9 46:15
46:19 59:23 68:15
apologize 27:17
appeared 130:13
appears 12:14
115:10 132:7
application 30:19
30:19 32:1,21,24
50:21,23 57:9
77:11 124:14

applying 68:21
96:4
appointment 23:6
127:14,18,20
appraisal 3:9
104:23 107:2,5
appraise 22:9
28:15,23
appreciate 8:5
appropriate 72:25
74:6
appropriately
46:8,23
approval 30:20
approved 109:25
approximately
103:18 106:19,20
112:12
archive 112:13,14
120:16
archived 111:16
area 12:21
areas 92:7 93:1
107:6
arentfox.com 2:10
arrange 32:19
asc 16:25,25
aside 22:4 111:19
asked 5:6 34:18
42:2 50:2 60:4
69:9 75:2 81:16
99:20 125:12
asking 30:1 46:19
46:19 47:3 81:19
88:18 101:1,6
117:17
asks 82:17
aspects 10:5
assessment 76:9
78:1

assist 8:4
assistant 7:9 8:2
  8:20,24 14:22,24
  15:9 22:13,18
  36:20 38:11 40:23
  41:14 48:9,16
  60:7,13,17,23,25
  61:13 62:7,19,25
  63:3,7,13,18 64:11
  64:20 65:1,5 66:1
  66:10,15,20 68:22
  69:5,25 85:22
  86:3,9,22 87:11,15
  87:18 89:14,22
  90:3,5 103:15,25
  104:15 110:11
  124:6,9
associate 95:23
assume 5:7
assuming 21:14
  66:7 116:23 117:5
assumption 67:1,2
  68:25
atp 80:14,15
attempt 24:22
  25:2,13
attempted 25:7
  28:12
attempts 17:18,22
  23:23 24:1,4,12,25
  25:10,11,12,15,20
  25:22,22,25 26:10
  26:11,13,15,19,20
  27:18,19,21,24
  28:8 36:3 40:17
  43:18 52:19 53:24
  54:16
attend 103:20
  104:4
attending 21:22

attention 91:15,17
attorney 7:1
audit 50:13
available 119:15
average 29:18
  30:4,6 50:14
avoid 9:17 49:13
  62:17,22 63:10
  66:4 67:19 68:4
aware 4:10 5:21
  10:10 40:4,8 45:6
  49:10 57:25 59:22
  84:2 125:6

b
b 3:5 126:4
back 12:17 25:9
  29:21 40:24 46:2
  50:6 51:17 69:14
  72:16 82:19 85:7
background
  120:15
based 36:23 68:24
  74:4 77:2 78:19
  79:5 86:9 87:21
  93:18 101:4
basic 5:4
basically 11:1
  28:11 31:1
basis 54:23 64:23
  101:19 108:21
bates 67:25,25
began 35:4
begins 119:11
behavior 91:25
  92:12 93:21 98:21
  99:10 102:12
behavioral 91:1,2
  91:21 92:15,18
  93:10 95:7 96:6
  98:15,16,22 99:1
  100:18 101:3,13

102:7,15,21 103:5
behaviors 9:12
  29:8 91:5,8 92:12
  94:4,13 96:5 97:4
  97:6,8 100:1
  101:1,4,7 102:1
  103:6 106:14
  107:20 108:22
  109:2,10
belief 130:6
believe 6:13 11:24
  17:17 38:2 44:12
  48:5,11 58:22
  67:8 69:20 83:24
  89:20 90:10 96:13
  102:25 105:25
  123:15 127:7
benchmark 92:15
  92:18 93:11,24
  99:7 100:23
  101:21,24,25
  102:4,12,15 109:3
  109:12
benchmarks 35:24
  35:25 36:5 37:1
  84:14,15,18 92:12
  93:3 95:7 96:5,6
  98:22,23,24 99:1
  100:18 101:3,14
  102:7,21,24 103:5
  109:11
best 41:14 61:3,5
  116:20 127:6
  130:5
beyond 53:19
birth 7:6 11:25
birthday 3:8 11:13
  12:2,13
bit 22:17 88:15
black 13:10

blasts 111:8
blurry 13:16
board 84:6
body 115:2
bonuses 90:7
boss 15:25 50:5
bottom 42:3 68:1
bowl 63:17
bowser 2:8 10:15
  11:3 14:4 18:12
  31:15,21 41:4
  42:5 43:4,13
  51:25 52:11 55:1
  59:1,4 69:9,17
  75:9 78:18 81:4
  81:19 82:1 89:12
  99:20 104:9 107:8
  108:16 123:3
  125:21,25 128:24
  129:5
box 78:12 115:25
brand 25:4,5
bread 122:11
break 5:10,15 82:9
breaks 5:11
bring 10:7,11
  91:15,17
broader 69:22
bucket 25:21
bullet 22:15 23:22
  50:19,25
bunch 21:20
bus 88:17

c
c 2:1 132:1,1
calendar 15:16,23
  16:1
california 128:8
  128:10
call 10:3,5 12:18
  19:22,23 20:25

[call - commitments]

22:7,8,8,25 23:3,5
23:7,14,16,25
27:10,10,13 28:14
28:14,16,18,19,25
29:3,6,7,9,14,14
29:22,25 30:1,2,5
30:6,13,14 37:3,3
37:11,13 39:7,7,9
43:5,9,12 44:3,5
44:14,18,24 45:4,8
45:24 46:9,11
47:2,8,10,19 48:1
48:8,13,20,24
49:13,21,24 50:3,8
52:17 55:6,8,19,20
55:21 56:20,22
57:13,19,23 58:2
58:17 59:21,25
60:2 62:6,17,22
63:10 66:3 67:19
68:4,10,11,13
71:22 73:24 74:10
76:4 78:21 81:11
81:18 82:10,15,16
82:18,20 83:1,7,8
83:8 84:2 85:1,6
85:16,16 86:5,19
86:25 87:25 88:1
88:7,9 93:18 95:8
95:14 111:8,10
118:10 119:25
120:22 121:3,15
121:22 122:21,25
123:6,8,14,22,25
124:21,25 125:8
125:13 127:9,13
127:17,19 128:2,6
128:7,9,11,17
**called**   27:3 35:1,2
35:2 43:1 46:15
46:19 47:3 51:24

52:3,6,10,15,19,21
53:13 54:24 56:24
57:2,7 72:18
81:17 82:18
125:10,12
**calling**   19:7,8,18
23:12 24:17 45:16
45:24 46:3 48:2
54:6,7,16 117:15
**calls**   22:19,22
23:19 28:20,21
29:12,17 35:25
39:3,8 40:5 51:11
51:20 75:24 76:8
76:18 84:4,10
87:25 88:1,7,10
117:11 128:12
**cappiello**   83:25
**cared**   33:10,17,25
34:3,5,7
**case**   1:3 35:4
40:11 48:8 75:18
87:23 120:13
131:3
**catch**   74:18,20
**categories**   18:4
20:12 22:4 42:15
42:17,19 43:21
51:24 53:15 72:20
73:4,11 74:25
87:6 92:11
**category**   73:2
**cause**   132:16
**celebration**   12:2
**cell**   37:10,14
**centralized**   62:24
**ceo**   108:6
**certain**   10:11 17:6
35:15 64:23 65:23
65:25 81:20
116:19

**certainly**   5:5,11
13:24 41:25 53:14
59:8 84:11
**certainty**   29:23
54:10 66:24 73:13
81:13 83:21 86:11
98:6 106:6
**certify**   130:2
132:2,5,13
**chance**   91:10
104:20 116:4
**change**   47:7,12
85:11,18 86:6
106:18 108:6
127:11 131:10
**changed**   12:23
46:7,10 107:22
**changes**   15:17,24
15:24
**characterize**   79:2
**characters**   13:20
**chart**   105:6
**check**   16:24 22:8
28:14 39:7 41:20
42:24 43:20 78:12
83:10 102:20,25
111:2 112:16
128:23
**christine**   83:25
**circumstances**
40:4 43:3,11 45:6
**civil**   1:3
**civility**   45:11
**clarify**   5:6,6 25:14
62:12 96:3
**class**   31:11 34:16
76:16 81:2
**classes**   34:24 80:9
106:10 114:17
**clear**   25:12 111:25
120:12

**client**   114:14
120:14 123:2,6
**close**   47:13 71:19
78:13,23 83:11
**closed**   47:13,16,19
47:23 52:6 78:15
85:13 106:23
107:3,7,13,16
**code**   46:7,23 60:3
**college**   55:3 76:2
**column**   105:21
106:1,1
**columns**   54:15
106:7
**combined**   13:12
14:6
**come**   9:1 24:1 38:6
40:18 52:22 83:17
89:2 94:23 128:19
**comes**   79:7 122:8
127:21 128:15
**comfortable**
104:14
**coming**   125:5
**comments**   105:7
105:19
**commission**
130:18 132:23
**commissioned**
132:3
**commitment**
92:20 94:11 95:9
95:14,18 96:18,22
97:23 98:1,9
99:12 100:9,17,23
100:25 101:11,12
102:2,4,11,13,23
103:4 109:6,12,16
109:20
**commitments**
101:2 102:5

communicate
  46:20
communicated
  49:16 60:3 82:22
communication
  40:16 46:16
company  81:12
  110:14,17,19
compared  30:5
comparing  95:4,6
comparison  26:9
  93:24 97:15
complete  33:10,20
  33:21,25 34:4,6,8
  34:10
completed  32:20
  32:21 78:16
completing  31:19
  32:1
compliance  6:13
components  26:12
compound  43:4
  51:25 52:11 55:1
  78:18 82:9
computer  14:2
  15:15,22 16:23
  17:17 77:22
computer's  14:3
concern  122:20
concerted  76:5
conclusion  68:25
conditions  5:24
conduct  45:11
  91:18 92:1 93:18
  93:21 94:1 104:1
conducted  78:3,10
  103:24 104:15
  106:16
confirm  19:2,4
  20:5,20,23,25
  81:19

confirmed  20:16
  21:21
confused  100:19
connecticut  1:17
  2:5 4:3 53:22
  132:3
connection  16:25
connects  55:10
connie  5:6 6:11
  40:14,15 44:4
  68:11 72:8 73:9
  75:5 92:25 94:10
  98:24 100:25
  101:11 103:20
connie's  59:1 68:8
  68:15 72:14 73:25
  96:22
consider  70:18
  80:3,16,19
considered  21:14
  21:17 28:25 33:1
  33:4 79:19 80:24
consistent  109:15
consistently  109:1
constant  65:20
contact  25:23 26:1
  36:3 38:25
contacted  28:12
  46:13 75:2
contacting  57:18
  78:15 119:20
contained  67:14
containing  84:3
content  6:4 116:12
  119:1
context  14:16
  22:12 72:12,14
  73:14 74:7 76:11
  104:12 109:14
  111:24 123:10

contextual  84:15
contingent  97:19
continue  31:11
  50:12 96:6 129:2
contrary  88:19,20
conversation
  78:21 94:6 108:24
conversion  94:16
  94:19,21 95:5,5
  96:18,22 97:5,15
  97:16,18 98:10,18
  98:21 99:11,25
  100:5,8,15,16,22
  105:22 106:2
convert  98:3
convince  76:19,21
cooley  90:2 104:25
copy  3:7 10:17
  13:16 41:18,24
  50:2 81:23,24
corner  13:18
correct  8:22 11:25
  12:1 16:22 17:1
  18:14,25 21:13
  23:15 24:3,23
  25:24 26:13,14,22
  26:23 27:20 28:13
  31:3 32:10 35:1
  35:16,18,19 37:16
  39:15 43:22 46:4
  49:2 50:17,18
  58:4,21 59:17
  60:5 61:14,25
  65:11 67:1,15
  79:17 84:23 88:6
  91:23 92:2,5
  93:22 95:22 99:4
  99:9 101:21 105:5
  107:3,7,19 121:4
  121:11,13,16,20
  121:23 122:1,23

123:2 127:1
corrected  93:9
correcting  98:16
correction  131:10
corrections  130:4
  130:5,15 131:1
correctly  62:9
cost  90:11
counsel  8:16 68:23
  111:19 132:9,13
  132:15
counselor  7:15,18
  7:20 8:12,15 9:7
  9:10 17:8,9,12,12
  17:13,15 19:20,22
  24:9 29:11,24
  30:9 36:10,12
  38:24 40:5,25
  48:17 49:4,6
  50:24 51:14,15
  53:4 54:23 55:23
  57:21 60:5,15
  70:4 72:24 73:7
  74:11 76:5,10
  77:10 83:6 84:13
  84:17,23 88:9
  89:25 90:6 91:4
  92:16,19 99:2,13
  100:2 103:4 105:3
  108:14 109:9
  110:9 124:17,25
  126:10,22,23
counselor's  76:17
  78:25 110:10
counselors  8:7,10
  8:21 9:4 23:17,20
  25:2 27:13 29:17
  30:7,11 36:24
  38:4 39:17,23
  43:9,12 44:16,23
  45:12 48:19,23

49:1 53:9 54:2,25
55:5,12 56:4
57:18 58:1 60:19
62:5,8,16,21 63:9
63:14,25 64:14,21
64:24 65:5 66:2,9
66:16,25 69:6
70:1,5 71:18
73:21 74:3 75:17
84:4 85:10,24
86:4 88:11 94:19
102:8 103:8,12,16
121:2 122:8,10
123:19 124:13
125:18,23 127:2
**count** 114:17
**county** 130:12
**couple** 6:7 50:25
**course** 55:15,16
70:20 72:4 78:20
112:1 121:10
**courses** 77:23
**court** 1:1
**courtroom** 4:13
**creamers** 63:16,17
**create** 15:16,23,25
18:22 19:1 20:1,4
21:8,9,11 53:10,11
**created** 19:19 28:9
**credit** 77:19
**criteria** 9:9 79:25
**criticized** 40:10
**crm** 44:3,17 52:23
53:2,8,10 54:11
56:5 72:8,17,18
73:10 78:4,9
112:19,22 120:10
123:16 124:1,4
**cross** 57:16,22
58:1

**cubicle** 12:9,11,12
**curious** 59:10
**currently** 58:1
60:9 103:13
**cut** 42:3
**cv** 1:4

**d**

**d** 2:8 3:1
**daily** 16:3 22:23
29:22 51:1,9
101:19
**dance** 108:8
**data** 16:15
**date** 1:15 7:6
11:24 28:9 35:5
92:19 93:1,8
**davis** 1:3 117:8
131:3
**day** 8:6,6,23,24,25
16:2 23:19 27:9
27:23 28:10 29:2
29:18 37:22 51:13
51:13,16 53:7
54:15 75:24 76:6
76:9,12 84:3,5
102:9 108:21,21
116:24 117:3,5
121:10 127:10
130:13 132:18
**dc** 2:9
**decisions** 109:22
109:23,24
**dedicated** 51:19
**defendant** 2:7
**defendants** 1:7
**deficiencies** 91:16
91:17,22
**definitely** 53:17
66:10
**definition** 69:2

**definitive** 87:20
**delete** 111:18,22
111:24 112:6,14
113:18
**deleted** 113:19
115:22,25 117:22
117:24 118:19
120:4,6,19 121:12
121:20
**demonstrated**
33:3
**dense** 27:16
**deny** 5:11
**department**
107:24,25 108:2
127:4
**depend** 30:8 54:13
54:14
**depending** 27:14
127:10 128:5
**depends** 18:15,16
19:25 23:2 29:1
29:19,25 35:15
36:10,18 53:7,19
53:20 80:10
109:14,18
**deponent** 131:6
132:5
**deposed** 4:15,21
4:22 5:2
**deposition** 1:11
3:6 9:17 10:8
41:23 124:8 129:2
129:3,4,6 132:6,8
132:8
**describe** 42:19
66:21
**described** 69:7
70:3,18
**describing** 72:6

**description** 3:7
**designated** 51:10
**desired** 96:5
108:22
**desk** 12:6,10,14,23
39:11,14 50:7
**determine** 18:20
43:21
**determines** 35:10
**development**
95:10,17 109:7
**differ** 8:8 51:13
**difference** 7:25
17:11
**different** 46:20
52:12 61:20,22
69:23 72:6 85:22
87:10 106:16
**differently** 85:22
86:24 87:5,18
**difficult** 83:13
**digging** 80:18
**direct** 3:4 4:5 8:4
67:7,8,10 91:24
**directed** 47:17
**direction** 85:20
132:10
**directive** 38:13
**directly** 62:10
98:18
**director** 6:13 7:9
8:3,20,24 14:22,24
22:13,18 36:21
38:7,8,15,16 40:18
40:19,23 48:9,16
60:25 61:13 62:8
63:4,19 64:20
65:6 66:1 68:22
85:22 87:11 89:1
89:8,14,22 90:3,5
94:25 95:1 103:15

103:25 104:15
107:24,25 108:2
109:25 110:2,5,8
110:11 124:9
**directors**  15:9
38:11 41:14 60:7
60:13,17,24 62:19
62:25 63:7,13
64:11,13 65:2
66:11,16,20 69:5
69:25 86:3,10,22
87:15,19 89:2
124:6
**disagree**  13:24
75:22 76:1 81:10
81:15 82:8,14
83:5 84:25 87:6
**disagreeing**  96:9
**discern**  84:14
**disciplinary**  92:7
109:8
**discovery**  42:1
**discretion**  55:12
55:17,18 72:23
74:11,23
**discuss**  6:1 30:13
89:17 94:15 96:16
98:7
**discussed**  30:17
31:2 58:18 61:6,8
61:10 79:15 91:5
94:20 109:3
**discusses**  68:18
**discussing**  45:3
119:8
**discussion**  95:16
123:12
**discussions**  93:7
94:12
**district**  1:1,2

**document**  10:25
13:1,4,7,17 14:12
14:16 15:3,3,5
26:12 40:5 41:11
41:13,16,18 42:4
49:11,15 50:13
59:15,19 92:20
93:5 96:9 100:17
108:18 115:9
121:2 124:21
**documentation**
95:23
**documented**  47:11
120:9 121:25
122:4,22,23
123:23 124:1,4
**documenting**
122:9
**documents**  9:14
9:16 10:7,11,11,12
10:20,23 11:4
12:17 15:8 17:6
20:10 33:16,22
34:9,22 41:8
49:10 64:7,10
66:19
**doing**  23:8 36:24
62:9 67:11 100:2
101:18 108:21
117:22 125:4
**double**  42:24 65:6
101:8 102:25
128:23
**doubling**  9:17
**doubt**  86:7
**drawn**  69:1
**drive**  2:4
**driven**  108:14
**drop**  43:25 44:2,5
47:15,20,23,24
73:11 74:17

**drugs**  5:23
**due**  120:23
**duly**  4:2 132:3,6
**duration**  22:8
28:15 29:6,14
30:2 36:14 37:3
39:8
**durations**  30:14
**duties**  22:13

**e**

**e**  2:1,1 3:1,5 132:1
132:1
**earlier**  46:22
69:14 72:15 126:6
**earliest**  27:12
**early**  12:2 90:11
91:6
**eastern**  128:10
**effectively**  61:3
99:14
**effort**  76:6
**eight**  29:3 126:16
**either**  15:14 42:12
47:22 50:23 68:22
75:16 80:23 86:16
89:25 90:25 100:4
114:9 122:12
132:14,15
**elaborate**  127:12
**elaboration**  8:5
**elaine**  6:11,12,12
**elevate**  21:12
**email**  3:10,11,12
3:13,14 19:12
42:21 45:3 46:12
49:10 51:4 76:13
85:6 110:14,17,19
110:25 111:2
112:13 113:3,6,9
113:10,12,12,16
113:19,22,23

114:1,2,5,15,21
115:2,14,17,19,22
115:24 116:6,8,16
117:8,20 118:1,5
118:19,22,23
119:1,2,8,17 120:1
120:6 123:1,6
**emailing**  51:17
117:10,15
**emails**  56:17 66:19
111:4,6,15,17,19
111:22,24 112:6,8
112:14,16,25
113:14 115:3
116:11 119:4
120:12,18 121:11
122:20
**employee**  84:9
**employment**  92:8
**encourage**  76:19
76:21 77:5,10
78:17 79:2
**ended**  30:15 129:4
**enroll**  77:5 78:17
79:3 80:7 83:15
83:16 106:9
107:17
**enrolled**  22:5
**enrollment**  6:21
21:17 84:12
**entailed**  104:3
**enter**  75:19
**entire**  36:14
109:15
**error**  15:22 40:7
118:11 120:11,24
121:6 122:5,7
123:7 124:2,11
**errors**  13:21
**esq**  2:3,8

**essentially** 13:19
21:11 23:13 34:13
36:11 65:10 72:9
74:18 108:10
**established** 27:19
**evaluate** 9:9 39:3
**evaluated** 36:20
88:22,24,25 89:6
**evaluating** 32:12
32:16
**evaluation** 89:8,11
89:15 93:18
**evaluations** 9:6
**evenly** 127:5
**everyone's** 102:20
**evidence** 69:1,4,24
70:8 83:2 86:12
86:14 88:19,20
**exactly** 100:21
**examination** 3:4
4:5
**examined** 4:4
**example** 18:17,24
52:14 57:4 72:13
73:1,6 77:17
100:20 103:9
**examples** 57:6
66:6,8
**exceptional** 33:18
34:9
**excuse** 18:8 19:15
44:3 54:3 63:8
65:24 80:14 82:25
91:18 105:21
121:12
**excuses** 97:19
**executive** 107:23
108:4,5
**exhibit** 3:7,8,9,10
3:11,12,13,14 11:7
11:8 13:13 14:5

16:18,20 30:22
41:9 58:24 59:7
75:19 89:21
104:18 113:1
114:10 116:2
118:17 119:6
129:1
**exhibits** 3:7,15
**exist** 82:13
**exists** 83:2
**expect** 54:23
126:10
**expectation** 24:20
25:2,6 76:9,10,13
92:15,19
**expectations**
10:21 14:1,11,25
15:7 35:20,23
75:25 76:1 108:13
**expected** 23:17,20
24:4 25:6 27:20
55:5,8 88:1,9 95:5
97:16,18 100:15
127:9,22,24 128:4
128:16
**expires** 130:18
132:23
**explain** 9:18
**explains** 59:15,19
**extension** 39:11,13
**extraordinary**
91:7
**extremely** 40:13

**f**

**f** 132:1
**faa** 50:14,15,16
**facebook** 11:19,21
42:3
**fact** 21:1 83:3 86:9
**factor** 29:6

**factors** 90:12,20
**fafsa** 30:20,20
32:4 116:14
119:15 124:15
**fafsas** 76:4
**failing** 125:8
**failure** 92:6
124:21
**fair** 5:8,15 8:18
35:6 56:2,3 76:9,9
82:10 95:8 123:5
**fall** 114:17
**familiar** 9:20,23
15:2
**far** 63:6,12
**february** 1:15
130:3 132:18
**feed** 32:17
**feedback** 89:4,5
96:4
**feel** 101:7 104:14
**felt** 74:23
**fewer** 25:25 26:20
**field** 47:15,19
105:10 113:13
125:19
**figure** 8:1 78:8
80:18
**file** 10:16 17:7
19:2,19 20:2,5
21:9,11 23:6 28:2
34:14,15,21 50:22
71:9 78:9 95:12
95:12,22 118:7,9
122:3 123:9
124:16
**filed** 111:20
**files** 9:2 17:10
33:21 34:10 51:18
78:7 84:22 102:17
124:12

**fill** 77:11 93:10
**filled** 32:24 101:12
**filter** 81:16
**filtering** 83:12
**finalize** 17:7
**finalized** 33:10,11
33:14 34:1,3,5,7
34:14,15,18,19,21
**financial** 33:22
34:11 50:16,24
57:9
**find** 10:11 24:10
32:15 45:20,23
46:22 49:20 50:5
67:23 72:24 78:22
89:4 108:24 109:5
109:14,19
**finding** 104:14
**fine** 5:10 14:7
**finish** 5:13
**fire** 110:2
**fired** 96:1,9,14
110:5,9
**firing** 109:22,24
**firm** 2:3
**first** 4:2,8 13:16
13:23 15:14 16:6
17:16 23:22 25:16
25:18 34:1 61:12
82:3 87:25 88:7
91:13 106:9
121:18,19 122:11
128:16
**fit** 72:19 73:4,11
74:17,24 76:24,25
77:12,16 78:4,10
78:11 79:22,23
84:19,21,24 100:4
100:5
**five** 17:18 23:23
24:1,4 25:9,11,13

25:15,20,22,25
26:10,12,15,18,20
26:25 27:18,21,24
63:17 128:22
**flag** 13:22 26:1
83:6
**flagged** 71:11
**flip** 59:7
**floating** 41:24
**floor** 36:11 68:20
**florida** 1:2
**fluctuates** 125:20
**fluke** 108:25
**focus** 13:1
**folder** 113:17
118:20 120:15
**follow** 17:9 23:5
95:13 121:7
**following** 71:18
81:11,15 114:5
**follows** 4:4
**foregoing** 130:3
130:14 132:6,7,11
**forgive** 106:3
**forgot** 118:15
124:19
**form** 3:9 39:1 41:4
54:2 55:16 56:13
83:17 114:5,6
119:1
**formal** 41:2,5
49:11 89:7,10,15
**formally** 89:6
**format** 40:3
**formatting** 115:8
**formula** 29:14
**forth** 51:17
**fortunately** 57:5
**forward** 77:21
80:8

**forwarded** 10:13
10:25 114:13
**foundation** 18:12
31:15 81:4 107:8
108:16 123:3
**four** 7:17 27:9
61:23 92:11
**fourth** 117:16
**fox** 2:8
**frankly** 81:23
**front** 15:6 59:14
81:21
**fulfilling** 16:1
**full** 26:10 32:18
112:5,6
**further** 21:25 28:4
123:10 128:25
132:5,13

**g**

**game** 77:23
**gate** 20:23
**generally** 12:14
19:1 27:8 51:22
**generates** 81:7
**genesis** 82:20
**getting** 87:2
101:14
**gifts** 11:13 12:14
**gina** 38:17,21
41:17 89:2 95:3
108:3
**give** 55:19 74:8
89:3,5
**given** 31:5 32:16
33:7 35:14 41:13
41:17 54:21 55:24
65:13 79:6 93:14
125:19,24 126:9
**glance** 16:19 78:9
**glapion** 2:3,3 3:4
4:6 10:18 11:6,9

13:14 14:6,10
18:13 31:17,22
41:7,22 42:7 43:7
43:15 52:2,13
55:4 59:3,5 69:10
69:16,19 75:12,20
75:21 78:24 81:6
81:22 82:3,7
89:13 99:22
104:11,19 107:11
108:17 113:2
114:11 116:3
118:18 119:7
123:4,11,13
125:22 126:3,5
128:22,25
**glapionlaw.com**
2:5
**go** 4:9 13:22 18:19
18:21 21:6 25:9
28:1 29:21 44:25
50:5,6,7 51:1
56:19 61:2 65:8
72:16 74:15 75:3
80:8 82:19 98:2
108:19 112:25
118:7 119:19
121:18
**goal** 36:8,9,13,15
36:17 54:22 55:2
98:8 99:12,15,19
105:10,11 106:9
107:15,17
**goals** 98:20 99:10
105:6,23
**goes** 67:24
**going** 5:11 7:11
9:17 13:11 14:5
22:15,16 27:4
40:24 48:6 49:14
50:25 66:11 75:9

75:18 80:13 81:22
81:24 86:21 89:5
94:1 118:14 124:7
**good** 37:9 40:15
64:1 76:24,25
79:22,23 84:23,24
100:4,5 103:6
107:19 109:1,10
**google** 37:12,15,17
37:25 38:4,14,24
39:8,10,16,24
40:17
**gotten** 65:22 74:5
**graduate** 80:6,8
**graduated** 90:24
**graduation** 17:14
**great** 129:5
**group** 86:22
**groups** 8:19
**guess** 12:18 21:17
56:1 111:8 116:20
128:2
**guidelines** 3:8
10:21 13:25 14:11
14:25 15:7

**h**

**h** 3:5
**hagan** 83:25
**half** 7:17 42:4
61:23 75:10
122:16
**halfway** 36:12
**hand** 18:25 19:17
132:17
**handled** 84:20
**hang** 12:21
**happen** 80:21
125:17
**happened** 40:12
80:19 122:8
125:15

**happening** 26:7
  40:8 63:20,21
  102:19
**happy** 3:8
**harassing** 71:25
**harassment** 45:12
  48:25 49:13 59:21
  62:17,22 63:10
  66:4 67:20 68:5
  73:24 74:10
**hard** 10:17 29:5
  29:23 32:19
**head** 121:14
**header** 16:3
**hear** 75:4 82:2
  89:3
**heard** 64:2,12,13
  66:10,15 69:21
**hearing** 66:6
**heffner** 93:16
**held** 1:17 67:3,4
  86:10,13
**help** 20:9 23:8,14
  79:13 99:16,17,21
  99:23 100:7 109:8
**helpful** 81:20
**helping** 36:24
**helps** 30:23
**hi** 119:11
**hierarchically**
  32:19
**hierarchy** 8:18
**high** 22:9 28:15,23
  37:8
**higher** 29:6
**highlighted** 81:24
**highly** 63:23 85:25
**hindsight** 30:3
**hire** 49:14,19,20
  56:10 58:23,24
  59:1,10,13,18,23

63:1 65:4,22
  68:16 70:12 73:23
**hires** 66:12 68:17
**hiring** 109:22,23
**hit** 84:17 88:1
  101:3,25 102:4,12
  102:14
**hitting** 84:10
  97:19
**holding** 67:5
**home** 37:13 74:15
  110:13 112:17,20
  112:23
**honestly** 5:22
**honor** 83:1 125:8
**hope** 72:16
**hopefully** 4:8
**hour** 51:1,9,10,10
  51:19 52:10,15,19
  52:22 53:22,23
  54:24 55:6,9,14,24
  56:5,24 57:2 75:9
**hours** 6:7 17:23
  24:12 25:1,3
  26:11,22,24 27:3,9
  27:19 50:22 51:24
  52:4,7 128:3,15
**housekeeping** 14:4
**huddle** 54:18
**huh** 5:18 79:9
  122:24
**huhs** 5:17
**human** 40:7
  118:11 120:11,24
  121:6 122:5,7
  123:7 124:2,11
**hypotheticals**
  80:22

**i**

**ideal** 79:10
**identification** 11:8
  13:13 104:18
  113:1 114:10
  116:2 118:17
  119:6
**illegible** 13:25
**immediate** 24:21
  66:11
**immediately** 19:23
  21:2 31:18,25
  74:24
**impact** 98:18
**impacted** 10:5
**impair** 5:22
**important** 31:4,6
  32:11,15,18 40:13
  65:14 70:18,20
  79:25 83:9
**impossible** 87:21
  88:15
**improve** 92:7
  95:25 96:2,8,14
  98:9 99:3
**improving** 98:20
  99:10
**inbox** 112:4,5
  115:20 117:21
  120:2,14
**include** 34:19
  51:21 54:12,17,20
  76:18 78:6 93:23
**included** 3:15 39:9
  39:12,14 42:1
  53:23,24 54:1,9
**includes** 35:11
**including** 92:8
  130:4
**incorrect** 75:7

**increase** 91:8 98:9
  98:22 99:11
**increasing** 98:21
**indicate** 92:18
**indicated** 49:17
**indicates** 91:22
**indicator** 9:13
  97:3,4 98:14
  100:1 101:18,20
**indicators** 9:11
  16:13 94:3
**individual** 54:22
  77:2 78:20 79:5
**individualized**
  76:25
**individually** 17:19
  23:24 24:7 26:17
  27:5
**informal** 49:11
**information** 18:25
  19:3,5 21:1,22
  53:16,18 54:21
  65:14,15,17 73:18
  74:4,5 79:5 114:6
**initial** 127:8 128:3
**input** 93:7
**inquire** 18:11
  29:10 43:24 46:3
  71:1,4,7,10
**inquired** 71:13,16
**inquiries** 18:3,5
**inquiry** 18:23
  46:14,18 47:2
  94:2
**instance** 61:4
  64:18
**instances** 64:17
**instruct** 20:4
  37:17 38:3,3 43:8
  43:11 44:22 48:18
  48:19 62:4,4,15,15

62:20 64:14 66:2
66:7,16 67:6,9
86:24 123:18,19
**instructed**  20:1
44:16 69:5 70:1,7
86:23 87:16,18
88:14 111:14,16
111:18
**instructing**  56:17
63:8,14 66:9
87:17
**instruction**  40:16
58:20 69:22
**instructs**  7:2 49:12
63:24 64:20
**intent**  83:15,16
**interaction**  79:1
**interactions**  79:10
**interest**  20:6,21,23
21:21
**interested**  21:1
45:15,18,21,21
46:6,25 47:4,5
115:13 119:21
132:15
**interpret**  117:14
119:24 120:22
**invalid**  42:21
**investigate**  26:2
28:4
**irrelevant**  99:25
100:6
**issue**  26:1 40:14
55:22 61:5,9 67:2
98:15,16
**ite**  83:14
**item**  16:23
**items**  16:20

### j

**j**  1:19 4:2 130:1
131:2
**james**  93:16
**jeff**  6:11,17,20
**jen**  38:9,9,14,18
38:19 89:2 95:2
**jen's**  38:18
**jennifer**  60:15
63:24 108:1
**jeremy**  2:3
**jmg**  2:5
**job**  8:2 14:21 37:9
65:20 67:12 75:23
76:14,18 77:9
78:14 79:2 84:24
99:14 122:11
**jobs**  62:9
**july**  35:4 37:25
49:25
**june**  62:3

### k

**k**  2:9
**keep**  111:14,16
**key**  9:11,13 16:13
**kind**  35:23 81:8
**kinds**  51:23
**know**  6:4 11:16
12:9 13:2,4 14:13
30:23 31:16 41:16
41:19 49:9,14,15
49:23 50:1,9
54:17 57:4,14,20
58:3,5,6,6,7,8
60:20 62:12,23
63:4,6,12,22 65:10
65:12 70:6,24
71:17 73:14 74:6
80:8 81:3,5,7
82:17 86:8,19

87:21 88:12,16
89:20 90:12,15,19
90:20 91:11 93:13
104:3,5,7,20 106:5
106:6 110:4
112:12,15 113:8
114:3 115:21
116:18,19 119:16
122:2,19 123:24
123:25 125:2,9
127:2
**knowledge**  41:14
68:21 70:16 84:8
70:7,8,12 130:6
**kpi**  9:14 16:20
31:1,7,13 37:1
76:7 91:6 92:11
101:10
**kpis**  16:12,13,17
32:18 35:24 76:4
80:14 94:3 95:6

### l

**l**  1:11 3:3 4:1
130:2,9 131:6
**label**  44:11
**labeled**  118:24
**labels**  42:24
**laid**  12:9
**language**  81:20
**large**  112:3
**larger**  96:11 98:14
112:7
**law**  2:3
**lawsuit**  9:21,23
10:1 111:20
**lawyer**  6:22,24
**lead**  7:15,22,24
8:8,20 18:22
19:19 20:1,2,5,13
21:6,9,11,18,23
22:1 23:3,7 24:2

24:21,22 25:3,4,5
25:6,7,23 26:1,25
27:3,10,24,25 28:2
28:11 30:19 32:20
32:24 39:25 40:2
42:9,11,12,12 43:6
46:6,9,11,18 47:17
47:23 48:6 52:9
53:4,16 56:5,19
68:22 71:1,4
73:15 74:5,6
78:16 79:7,11,14
79:20,22 80:2,7
83:7,11 84:1 85:2
85:6,10,17 87:24
88:1,7,9 89:24
90:4 100:20
101:14 123:25
124:3 125:10
127:8,9,21 128:4,7
128:9,15
**leader**  90:1
**leadership**  106:16
106:18 107:21,22
107:23 108:5
**leads**  8:10,13
17:18,22 18:2,2,4
22:4,19,22,25 23:8
23:9,14,17,22 24:4
24:10,11,17,25
25:10,13,20,21
26:10,10,12 27:9
27:13 28:7 29:19
36:3 37:11 38:14
38:25 42:15,18
43:1,9,12,17,21
46:4,5 47:13 52:3
52:15,17,18,21
53:12,22,24 54:6,8
54:11,16 55:13,23
56:2 57:17 58:23

67:24 68:9,24
71:19 74:4,23
80:13 81:16 86:5
86:6 90:22,24
98:3,4 123:18
125:18,23 126:8
126:11,19,25
127:5,15 128:19
**learn**  20:17 61:12
61:13
**learned**  44:4
**learning**  13:19
**leave**  51:11
**leaving**  40:15
**led**  121:7
**left**  113:9 114:15
**leg**  4:8
**lewd**  45:13
**liars**  86:19
**library**  77:22
**line**  5:13,14 13:23
17:17,22 22:3,7
50:13 75:24
100:15,22 103:6
117:16 119:1
131:10
**lines**  27:1 45:14
117:6
**list**  43:16 44:12,13
44:18,23 45:7,14
45:17 47:21,25
48:3,4,7,13,20,23
49:12 53:8,11,11
54:3 55:6,9 57:13
57:19,23 58:2,21
59:16,20 60:4
61:6,10,11 62:5,14
62:16,21 63:2,9,15
63:25 64:15 66:3
66:14,17,21,21
67:6,18 68:4,18

69:7 70:2,12,17,21
71:5,11,14,15,22
71:24 72:3,9,19
73:3,10,20,23 74:7
74:10 75:1 81:18
83:12 115:14
121:3
**listed**  16:20 94:12
99:5,6
**lists**  49:16 52:23
53:1,12,15 117:17
**little**  13:16 57:5
88:15
**lives**  128:7,9
**living**  90:11
**llp**  2:8
**loans**  77:19
**log**  28:15 39:23
40:1
**logged**  39:18
**long**  6:6 7:10,16
7:20,24 25:15
26:15 28:21 29:1
48:9 112:4,10
126:15
**longer**  12:18,21
113:16 115:13,19
120:1 126:13
**look**  9:1,12 10:23
15:14 16:17 17:19
24:4,6 25:20,21
26:16,18,21 27:4
28:2 42:5 50:12
50:20 56:4,20
59:7 76:4 91:10
91:13 102:13
104:21 105:20
116:4 124:11
**looked**  56:21
**looking**  14:1 16:18
23:23 25:14 26:4

26:5 27:23 28:14
30:3,24 51:18
80:13
**lost**  47:13 56:23,23
57:1,6 71:8,9,10
**lot**  4:18,25 20:20
65:14 81:24
103:11 113:14
115:3 121:9
125:13
**low**  22:9 28:15,23
28:25 29:3 37:4
97:23
**lower**  29:7 100:18
101:21,24 109:11
**lsr**  1:19 4:2
**lying**  85:19 86:17
87:4,10

## m

**m**  2:3
**machine**  13:19
**madore**  61:17
**mail**  39:8 111:8,11
111:12,12 112:3,5
113:6 114:8,23,25
115:4,6 116:16,17
116:18
**majority**  128:19
**making**  9:18 22:19
51:10 76:5,16,18
100:3
**manage**  55:21
61:3
**managed**  70:5
**manager**  108:24
**managing**  79:12
89:3
**manifest**  109:2
**manner**  26:8
**manual**  11:1,2
59:2,11,14,19,23

61:18,20,21,22
67:14,17 68:7,16
68:17 116:16
**manually**  114:7
115:4 119:16
**mark**  14:5,7 71:21
71:24
**marked**  3:7 11:8
13:13 45:7,16,19
59:6 68:12 104:18
113:1 114:10
116:2 117:7
118:17 119:6
121:7
**markham**  75:8,13
**markham's**  75:22
**married**  38:9
**masking**  101:8
**material**  16:15
104:5
**materials**  63:5
**math**  100:11,14
**matter**  14:4 27:24
77:13
**matters**  100:6
**maxwell**  2:4
**md397**  117:7
**mdspecialist21**
3:10,11,12,13,14
**mean**  9:22 14:24
15:23 16:10 17:4
18:16 23:11 24:8
24:15,16 33:14,17
33:20 41:5 50:19
52:24 63:19 68:25
81:8 82:12 88:15
88:23 91:3 93:19
110:19 114:3
118:23 125:25
127:12

**meaning** 34:8
**means** 16:11 33:11
  33:15 34:18 46:21
  79:13 95:18
  118:12,13
**meant** 26:4 67:21
  104:8,13 109:8
**measure** 33:7
  108:21
**measured** 107:6
**measurement** 80:5
  105:7,15,16,20
  106:1,22 107:18
**measurements**
  76:3,8 107:1,15
**media** 11:17
**medication** 5:23
**meehan** 1:11 3:3
  4:1 130:2,9 131:6
**meet** 6:1,6 9:3
  30:10 89:4,8,16
  94:10,18 96:6
**meeting** 30:18
  81:1 84:13 96:15
  101:4 103:5 109:2
**meetings** 30:13
  35:20 61:2,5,9
  94:15
**megan** 119:14
**melanie** 1:3 117:8
  119:11 131:3
**mental** 5:23
**mention** 106:14
**mentioned** 48:5
  98:12 104:25
  112:13
**mentions** 103:20
**merge** 113:6 114:8
  114:23 115:4,6
  116:16,17,18

**merges** 111:11,12
  111:12 112:3,5
  115:1
**merit** 90:10,12,13
  90:15,18,21 91:3,5
  91:8,8
**mess** 21:20
**message** 124:3
**messages** 51:12,21
**messaging** 19:10
**met** 6:3,5 77:13
  97:25 98:1 102:24
**method** 46:15
**metric** 31:5 32:11
  32:15 108:14
**metrics** 30:17 31:1
  84:3 93:8 108:20
  108:23
**middle** 5:13
**migrated** 112:7
**mind** 46:7,10
  85:11 125:5
**minds** 85:18 86:6
**miner** 1:19 4:2
  131:2
**minimum** 23:16
  23:19,25 29:13,15
**minutes** 128:22
**mistake** 14:3
  16:24 118:13
**mistaken** 86:17,18
  87:4,9
**mistakes** 121:9
  122:18
**misunderstood**
  85:20
**miy** 132:10
**mod** 34:4,25 35:7
  35:10,14,21 36:18
**mods** 35:1,2

**module** 29:21
  30:10,15 31:5
  32:16,22 33:1,5,7
  34:12 36:13 79:15
  79:19,20 80:1,4,12
  80:16,24 94:6
  102:12 106:11
  125:19,24 126:9
  126:12,13,15
**modules** 109:16
**moment** 125:5
**money** 81:3,5
**montalvo** 108:1
**month** 62:2
**months** 7:21
**move** 77:20
**moved** 41:19
**moving** 9:2 77:18
**multiple** 88:4
**mutual** 92:20
  94:11 95:9,14,18
  96:17,21 97:23
  98:1,8 99:12
  100:9,16,23,25
  101:2,11,12 102:1
  102:3,5,11,13,23
  103:4 109:6,12,16
  109:20

**n**

**n** 2:1 3:1 38:22,22
**name** 6:15,17
  11:21 38:18,21
  53:17 75:16 93:8
  131:21
**named** 132:5
**names** 39:20
**national** 57:13,18
  57:23 58:2 81:17
**nature** 9:20
**near** 64:6

**necessarily** 28:1
  35:11,14 51:11
  93:21
**necessary** 35:18
**necessitated** 37:4
**need** 5:10,17 9:5
  17:6,7 27:19
  34:16 72:12,16
  73:13 80:6 99:14
  124:14
**needed** 49:5
**needs** 23:8 77:3
  78:20 81:1 95:19
**neely** 6:11,12,12
  6:16
**neither** 132:13
**never** 5:1,2 57:14
  67:9 71:13,16
  89:10
**new** 15:16,23 20:1
  25:4,5 27:25
  36:11 38:18 44:3
  44:17 49:14,19,20
  56:10 58:23,24
  59:1,10,13,18,23
  63:1 65:4,11,22
  66:12 68:16,17
  70:11 72:8,17,18
  73:9,22 79:7
  107:21 108:2
**newest** 24:5 25:11
  25:12
**nice** 12:4
**night** 127:22
**nodded** 121:19
**nods** 121:14
**non** 78:15
**notary** 4:3 130:17
  132:2,17,22
**notation** 78:4
  118:9

| | | | |
|---|---|---|---|
| **note** 30:24 40:16 47:12 56:22 119:11 124:19 129:1 | 123:3 126:1 **objections** 7:4 103:21 104:8,12 104:13 | **opportunity** 20:14 20:15,16,22 21:3,7 21:8,10,12,14,17 21:21 23:4,5 | **p** |
| **noted** 123:15 124:15 130:5 | **obligated** 24:3 25:19 | 39:25 40:2 47:8,9 47:11,16,20,23 | **p** 2:1,1 **p.m.** 75:11,11 118:2 127:19,20 |
| **notes** 40:13,15 50:13,21 68:8,15 78:6 83:8,9,10 | **obtain** 10:12 **obtained** 19:20 **obviously** 26:21 | 57:1,6 71:7,11 78:16 83:11 85:13 125:11 | 127:21 129:6 **page** 3:2 11:17 13:18 67:24 |
| **notice** 41:23 91:15 95:12 114:12 124:21,24 125:7 | **occasionally** 8:16 37:12 70:4 85:7 89:9 | **option** 37:22,25 **options** 74:9 87:3 **oracle** 44:9 | 103:20 114:12 115:9 117:7 119:19 130:5 |
| **november** 132:24 **number** 8:17 23:19 27:1 28:8 | **october** 116:23 118:9 **offer** 43:24 | **order** 17:6 99:14 **original** 3:16 **outbound** 84:4 | 131:10 **paid** 31:14 **panera** 122:11 |
| 29:19 35:12,15,25 36:3 39:11 42:22 53:17 67:25 68:12 | **offhand** 42:25 **office** 12:10 41:19 50:6 84:6 116:24 | **outcome** 105:15 105:16,20 106:22 132:16 | **paragraph** 91:14 **paraphrase** 72:15 **part** 10:15 14:3 |
| 68:13 84:3,10,25 85:7 94:23 98:6 100:10 104:10 | 117:4 118:3 **oh** 4:22 18:18 43:23 88:12 | **outcomes** 105:7 **outdated** 83:18 108:11 | 34:16 35:15,17,18 42:3 62:10 63:4 65:20 67:12,21 |
| 106:22 107:12,18 109:3 | 124:18 **okay** 5:19 7:5 | **outlook** 111:1 **outreach** 16:25 | 68:16 75:23 77:4 77:25 78:2 79:2 |
| **numbers** 57:17,22 80:2 99:6 100:18 100:21 102:24 | 25:18 42:5 79:8 82:4 91:12 100:11 108:25 114:3 | 17:19 23:23 24:2 24:6,21,22 25:15 26:5,5,16,18 27:4 | 79:16 82:2 90:7 92:6 96:17,21 98:8 101:10,16,23 |
| **nw** 2:9 | 124:19 128:24 **olsen** 6:11,18,20 | 27:8 51:19 83:10 124:15 127:8 | **partake** 101:14 **participate** 106:10 |
| **o** | **omitted** 91:16 **once** 112:4 | 128:4,16 **outreached** 26:25 | **participating** 34:16,23 76:16 |
| **o'clock** 27:10 127:15 | **one's** 91:24 **ones** 42:25 52:12 | 43:18 50:23 52:16 **outside** 81:8 | 81:2 **particular** 35:12 |
| **oath** 4:10,12 130:14 | 57:10 89:1 94:14 94:17 | **overall** 94:6,21 96:22 97:5 | 102:14 113:21 **parties** 132:14 |
| **oaths** 132:4 **object** 7:1 125:21 | **ongoing** 91:16,17 **opening** 91:14 | **overcoming** 103:21 104:12 | **parts** 76:14 82:9 **party** 38:23 39:4 |
| **objection** 18:12 31:15,21 41:4 | **opinion** 31:4 32:11 **opportunities** 22:5 | **oversee** 8:7 38:10 **overview** 5:4 28:2 | **passes** 77:8 **passwords** 39:21 |
| 43:4,13 51:25 52:11 55:1 69:9 | 22:20,22 23:1 37:11 47:14 52:6 | 28:5,6,10 | **patiently** 4:8 **pay** 6:24 31:14,18 |
| 78:18 81:4 82:4 89:12 99:20 104:9 107:8 108:16 | 56:23 71:20 | | 31:23,25 32:3,6,7 32:9,25 33:4 |

**paying** 6:22
**pcas** 11:2 30:19,19
  31:19 32:20 50:13
  78:2,3,6,10,17
  100:20 101:14
**pedantic** 88:15
**peers** 87:22 88:22
  90:15
**peffers** 60:15
  63:24
**penalty** 85:15
**pending** 5:12
**people** 4:24 15:12
  55:8,10 60:4 67:6
  84:19 86:19
  108:21 121:9
  122:15,18
**percent** 80:14,15
  94:7,7,22,23,23
  96:19,19,23,24
  97:7,7,20 99:7,8
  100:8,21 101:16
  103:18 105:23
  122:25 123:8
**percentage** 101:24
  101:24,25
**performance** 3:9
  9:11,13 16:13
  36:23 89:7,10,15
  89:17 91:18,23,24
  92:1 93:1 106:15
  107:2,5
**period** 25:16
  27:20,22 32:12
  124:16
**perjury** 85:15
**persistence** 31:8,9
  31:10 32:13 51:19
**person** 45:13,15
  45:18 75:2 78:10
  79:13 85:19 88:13

**person's** 30:5
**personal** 37:10
  77:1 91:14
**personalize** 77:2
**personally** 130:13
**personnel** 95:12
**perspective** 79:11
**phase** 16:25
**phone** 19:17 28:20
  37:10,14 42:21
  43:19 51:11 53:17
  127:9 128:4,17
**photograph** 3:7
**photos** 45:13
**phrased** 10:19
**picture** 11:10,12
  11:16,17,23 12:6
  13:1,10 32:18
  42:3
**piece** 9:18,18
**pipeline** 21:15
  50:13
**pitch** 23:14
**place** 106:16
  124:10
**placed** 95:12
**plaintiffs** 1:4 2:2
**plan** 77:23 95:10
  95:17,21 96:3
  109:4,7,7 129:2
**platforms** 39:5
**play** 83:17
**please** 13:9 69:14
  115:13 117:10
  119:20
**point** 21:18 23:22
  26:6 31:13 33:24
  50:19 53:19 78:25
  80:12 106:18
  124:7

**points** 22:16 50:25
  68:9
**policy** 49:3,7,22
  49:24 50:3,8
  58:17,19 59:25,25
  60:2 68:7 70:17
  70:19 71:18 75:1
  81:11 82:11,15,16
  82:20,25 83:2
  121:8
**population** 50:20
  54:17,19 55:19,20
  70:25
**possible** 55:9,10
  63:6,12,21 64:19
  67:20 72:5 79:20
  85:21 86:1,3,11,20
  87:9,17 88:13,16
  88:18 95:25
  102:15 113:19,20
  115:22,25 116:1
  117:24,25 118:19
  118:21 120:4,5,6
  120:19,20 125:14
  127:6
**possibly** 64:16
  86:18 118:16
**post** 1:6 3:9 4:21
  4:23 7:8,10,12,16
  10:22 12:13 15:12
  18:24 20:17 21:2
  21:22 31:11,13,23
  49:21,24 50:3
  58:7,11 62:1
  76:19,23,25 77:1,5
  77:12,16 78:5,11
  78:11,17,22,23
  79:11,22 80:3,5
  81:1,3,5,7 82:11
  82:15 84:19,21,24
  91:14 100:4,4

**110:15 116:8,9
  118:24 125:6
  127:3 131:3
**post's** 75:25 76:1
  92:18
**post.edu** 113:10
**post.edu.** 110:24
**posted** 11:17
**posterboard** 12:18
**potential** 21:16
  103:9
**potentially** 121:12
  121:20
**power** 51:1,9,10
  51:24 52:3,7,10,15
  52:19,22 53:22,23
  54:24 55:6,9,14,24
  56:5,24 57:2
**practically** 68:21
**practice** 60:1
  70:20 83:3,19
**practiced** 109:1
**practices** 61:3,5
**practicing** 96:4
  108:22
**praise** 37:8
**prefer** 46:12,12
**prefilled** 105:13
  105:24
**prequalification**
  77:9,25
**prequalifying**
  77:14,14
**prerogative** 59:9
**preselected** 74:25
**presence** 61:8
  63:18 132:9
**present** 6:8 19:16
**presumably** 117:2
**pretty** 73:8 94:19
  97:14

**prevent** 48:25
**previous** 30:14
  51:18 63:5
**previously** 11:5
  57:9 58:18 69:20
  109:3
**printed** 53:12,15
  54:1,3
**prior** 19:19 38:15
  40:22 44:3,17
  54:18 72:8,17
  73:9 93:7 94:12
  97:23 98:1 109:6
**private** 12:10
**privilege** 114:13
**probably** 30:4
  126:10
**problem** 93:7 94:5
  97:2 98:13 99:6
  100:14
**process** 9:3 17:16
  17:25 21:25 57:11
  70:7 77:2,21
  83:16 96:11
**processes** 124:10
**produce** 10:14
**produced** 11:4
  41:25 89:21
  120:13
**productivity** 76:6
**professional** 55:3
  76:2
**professor** 65:7
**program** 43:24
  53:18
**promoted** 61:1
**proof** 32:7,25
  87:20
**prospective** 19:24
  20:12 36:6 45:10
  50:2 51:23 76:19

  79:1 99:18,19,21
  99:23 100:3
**provide** 13:8 54:2
  91:7 99:13
**provided** 32:25
  33:18 34:9 53:9
  55:13 68:16 70:22
  75:18 110:20
**provider** 110:25
**providing** 32:6
  94:10
**public** 4:3 130:17
  132:2,17,22
**pull** 52:23 55:20
**pulled** 53:8 54:11
**pulling** 53:1
**purpose** 91:15
**purposes** 33:23
  34:11 95:16
**push** 46:2
**put** 21:5 45:1,11
  47:12 95:22 97:1
  100:25 101:2,11
  102:1,3,6 109:4,12
  109:16 124:20,24
  125:7
**putting** 102:11,23
  103:3 109:19

### q

**qualified** 80:25
  132:4
**question** 4:25 5:8
  5:12 7:3 24:24
  25:16,17,18 34:6
  66:13,13 69:15,22
  69:23 73:8,16,19
  73:25 82:6 96:20
  102:16
**questioning** 5:13
  5:14,14

**questions** 5:5 7:1
  22:16 68:6 69:20
  74:14 77:15 129:1
**quickly** 4:9 123:15
**quite** 86:18

### r

**r** 2:1 130:1 132:1
**raise** 90:10,12,13
  90:16,21 91:3
**raises** 90:9,18 91:5
**range** 126:25
**rate** 94:6,16,19,21
  95:5,5 96:18,23
  97:5,15,16,18,23
  98:10,19,21 99:11
  99:25 100:6,8,15
  100:16,22 105:22
  106:2
**rating** 105:7,8,19
  106:7
**reach** 24:19 25:3
  39:24 40:1 42:21
  43:17 57:8 70:24
  76:12 85:12
  119:25
**reached** 33:24
  42:13 125:11
**reaching** 23:12
  24:9 54:18,19
  76:15 124:17
**react** 118:5
**read** 13:2,3,11,23
  13:25 14:12 17:18
  22:7 59:8 64:7,10
  67:17
**reading** 96:12
**reads** 96:13
**really** 5:18 73:16
  81:8 101:7
**realtime** 72:16

**reask** 62:14 82:5
**reason** 46:14,23
  47:13 54:1,12
  56:1 70:22 71:9
  72:7,10,19,25
  73:14 74:20,22,24
  75:7 77:20,24
  84:18 85:17 88:5
  93:23 95:4,6
  96:17,21 97:4
  98:2 101:11,17,23
  120:3,11 124:5
  131:10
**reasons** 27:2 43:5
  43:14,16 44:25
  47:18 48:6 49:16
  54:8 62:13 68:10
  68:24 70:22 74:1
  74:17 77:17 97:22
  114:13
**recall** 14:17 15:3,5
  15:6 20:7 42:25
  47:24 50:11 64:17
  66:18,23 75:14
  94:17 105:17
  111:17,21 113:12
  113:21,24 114:21
  114:23,25 115:2
  115:17 119:18
  122:11
**receive** 40:22,23
  47:2,4 57:12
  64:25 65:15 90:7
  90:9,18 100:16,23
  123:14 125:24
  126:8,11
**received** 28:22
  52:18 57:14 58:14
  58:16 65:17 67:11
  67:14 76:4 87:13
  90:10,15 91:4

[received - responsive]   Page 17

100:9 118:1
receiving 21:1,22
  50:22 90:13,21
  115:17
recess 75:11
recipients 85:16
recognize 11:10
  13:19,21 75:16
  113:3 116:6,7
  118:22,24 119:8
recollection 20:9
  30:21 82:24
  102:10,18 125:3
recommendation
  110:1,3,6,10
recommended
  18:9
record 123:11,12
recording 39:6
recruitment 17:16
redacted 114:12
redistribute 17:23
  24:12,15 25:1
reduced 132:10
reengage 57:11
refer 59:10,11
  69:14 86:21
reference 57:16,22
  58:1
references 18:2
  50:14
referral 18:8,9,11
  19:15,21,23 20:2,5
  20:22,25
referral's 20:6,20
referrals 18:7
  19:19
referring 45:25
refers 16:21 25:22
reflect 92:25

reflecting 10:20
reflections 102:8
refresh 20:8
refreshing 30:21
regard 20:9 66:25
  96:10
regarding 91:22
  114:6 116:14
regardless 7:3
  40:2 79:23 129:3
regards 91:3
register 16:24
registered 17:5
regularly 94:19
reilly's 92:25
reinforce 65:15,16
  67:10,21 83:4
reinforced 49:17
  73:22
reiterate 49:5
reiterated 56:11
  56:12 65:1
reject 44:25 47:13
  54:1,12 68:9,24,24
  71:19 72:19,24
  74:4,20 75:7
  83:11 85:10,17
  86:5 88:4
rejected 28:8 42:9
  42:11,12,16,17
  43:1,6,9,12,17,21
  47:23 52:3,9,15,16
  52:18 53:24 54:6
  54:8,8,16 71:2
  74:23 78:16
rejecting 48:6
  58:23 67:24 73:15
  79:14 85:2
related 132:14
relative 88:22

relevant 32:4
  81:23 94:2
remember 14:15
  20:9 62:1 102:20
  102:22 103:2,3
  106:8 116:7
  117:22 124:23
  125:13
remove 44:12,13
  44:17,23 45:7,14
  45:17 47:21,25
  48:2,4,7,13,20,23
  49:12 58:20 59:15
  59:20 61:6,10,11
  62:5,13,16,21 63:1
  63:9,15,25 64:15
  66:3,14,17,20,21
  67:6,18 68:3,18
  69:6 70:2,12,17,21
  71:11,15,21,24
  72:3,9,18 73:3,10
  73:20,23 74:7,10
  75:1 121:3
removed 60:4 71:5
  71:14 117:17
rep 24:17 28:20
  29:1,6 37:6 39:10
repeat 34:6 35:13
  96:20
repeatedly 69:15
  73:20
rephrase 24:24
report 22:8 28:14
  28:14,16,18,19,19
  39:9 84:3
reporter 131:2
reportings 94:13
reports 39:7
represent 11:23
  13:15 118:8

representing
  122:22
reprimanded
  40:10 70:23 84:9
  124:20,24 125:7
reps 36:19 54:17
  68:20 89:4 101:2
request 42:1 45:8
  47:10 71:22 85:16
  86:5 114:6 117:14
  118:10 119:24
  120:9,23 123:14
  127:14,20
requested 10:10
  10:20 19:2,4
  53:18 123:6
requests 67:19
  83:1 86:25 120:21
  121:3,15,22 122:9
  122:21 123:1,8,22
  124:22 125:1,8
required 33:22
resources 9:4
respect 46:25 85:4
  86:25 99:19
  120:21 123:7
respond 50:4
  118:5
response 115:10
  117:8 119:20
responsibilities
  8:2,9,15 16:2
  76:18
responsibility
  62:7,11 77:4,10
  78:15
responsible 9:6
  19:18 22:18 25:19
  53:1,6
responsive 11:4
  41:23

result  79:10 91:24
  92:7 98:17 120:14
results  93:21,24
revenue  81:7
review  3:9 81:20
  102:5,16 106:15
  122:2 123:9
  124:12
reviewing  80:2
right  11:3 13:1,18
  15:15 16:14 17:18
  20:23 21:6 28:3
  33:12 45:21 50:6
  67:12 70:9 77:6
  77:12,16 79:4
  81:22 84:19,21
  97:3 99:24 100:2
  101:20 102:22
  103:10 104:22
  122:18 124:7
  126:3
ring  39:13
rings  39:11
risk  45:12 96:13
rlr  1:4
role  10:21 40:24
  81:9
roles  10:21
route  37:13
row  105:21
rpr  1:19
run  22:7 28:14,19
  39:7

**s**

s  2:1 3:5 38:22
sandwiches
  122:12,17
sara  75:13
sarah  1:19 4:2
  75:8 131:2

sat  15:25
saturate  23:7,9
saw  9:16 123:21
saying  65:9 77:1
  88:7 122:11
says  15:16 16:3,8
  22:3 23:22 24:6
  24:25 47:24 48:1
  51:5 68:4,8 75:2
  75:23 85:16 92:1
  92:4,6 94:21
  95:11 96:8 106:2
  106:9 107:12
  115:13 117:10
  119:14,20
scale  8:13 122:19
scenario  20:19
  21:5 33:11 34:19
  57:1 76:7 79:7
  80:23
scenarios  5:19
  23:3 52:9 54:7
  121:6
school  18:19,21
  75:3
screen  124:10
seal  132:17
sean  90:2 104:25
second  13:18 14:5
  16:23 103:20
  105:18
section  50:19
  68:19
see  10:19 17:23
  24:13 28:3,10,23
  39:3 42:2 43:19
  51:2 57:11 63:17
  68:8,14 72:25
  73:6 76:4 85:7
  91:19 92:9,13,22
  92:22 94:8 102:14

105:6 106:12,24
  107:12 113:3,9
  114:19 115:11,15
  116:22 117:7,12
  117:18 119:12,19
  119:22 123:17
seen  50:10 58:9,11
  60:2 64:5 66:19
  69:21 71:19,21,24
  81:14 82:12 89:19
  116:11
self  105:7,19 106:7
send  45:3 51:4
  84:2 111:4 113:14
  113:22 115:3
  119:4
sending  45:13
  112:3,3,5 113:12
  114:21,23 116:7
sense  14:13,19
  15:18 17:2 22:12
  51:7 122:7
sent  84:5 93:3
  113:7,17 115:10
  115:25 116:22
  118:20 119:2
  120:7,15
sentence  91:13
separate  59:25
separately  14:7
september  11:24
  11:25
sequentially  129:4
serve  41:25
service  33:19
  34:10 85:1,8 91:7
services  38:23
session  55:3 76:3
  103:21,24
sessions  104:3,6

set  23:6 35:21
  127:17
setting  111:19
  127:14
seven  103:14
  126:24
shadowing  68:23
shannon  61:17
  87:14
sharpened  13:17
  14:1
sheets  15:20,21
shift  29:3
shigo  75:15
short  22:5
shortened  9:14
shortly  106:21
show  28:6 56:18
  108:23
shown  53:16 59:6
  68:22 82:23
shows  28:5 91:6
signature  132:21
significance  27:18
similar  47:15,18
  62:25 113:25
  114:3 116:11
  122:9
similarly  63:14
simple  73:8,16
simplify  95:15
simply  13:16
  14:24 88:18
single  27:24 28:1
  72:2 80:2,25
  102:4,12,15
sinn  38:17,22
  41:17 89:2 95:3
  108:3
sister  18:18,20

[sit - successful]                                                    Page 19

sit  39:18 64:6 89:2
  102:22 103:1,3
situation  40:11
  45:9
six  126:18
skip  21:5 50:25
  55:13 56:2 108:8
  108:18
skipping  55:23
slots  15:17,19
small  8:17
sms  117:10
snow  117:5
snowed  119:9,14
social  11:17
solely  51:20
somebody  102:6
song  108:8
soon  123:17,21
sooner  74:13
sorry  4:21,22 6:17
  14:9 30:2 34:6
  92:10 100:19
  107:4 121:18
  125:25 126:3
sort  18:24 26:1,9
  29:13 69:24 82:4
  108:8 109:4
sounds  20:20
  101:8
southbury  1:17,17
southern  1:2
space  11:21 12:7
  112:7,8 113:18
spam  111:25
speak  9:12 17:7
  18:20 19:8 81:14
  101:9 104:16
  124:12
speaking  19:6,16
  46:4 82:4 85:4

125:25
specialist  119:15
specific  8:25 10:4
  16:17 44:2,4
  47:22 64:17,18
  66:6,8 73:1,6
  94:17 98:24
  102:10,18 118:23
  125:3
specifically  7:2
  24:3 40:24 66:14
  66:15 85:4 88:6
  113:15
spelling  38:20
spending  76:12
spoke  20:2
spoken  20:18,24
spread  127:5
spring  22:16
stand  14:14
standard  67:4,5
  86:10,13
standards  67:3
  101:5
start  7:18 31:8,9
  31:10 32:12 33:8
  33:11 34:15,17,18
  34:23 36:7 42:14
  42:14 51:18 61:12
  80:14,16
started  33:4 34:12
  35:8,12,16 62:1
  76:15 79:21 80:3
  90:22
starting  32:9
  34:20 40:23 79:17
starts  31:11 36:12
  114:18
state  4:3 53:22
  132:3

stated  84:18 87:24
  88:21 92:7
statement  82:8
  83:5 93:6 94:5
  97:1 98:12 99:6
states  1:1
stating  96:11
statistics  84:7
status  28:12
stay  15:16,23
stenographically
  132:9
step  95:20 96:2
stop  26:10 45:15
  45:24 46:3 48:1
  83:20 117:10,15
  119:20
stopped  129:1
straightforward
  97:14
street  2:9
stretch  110:13
strive  76:23
strives  91:7
structure  39:6
student  9:1 17:5,9
  17:14,16 18:3,5,9
  18:10,15,16,18
  19:1,16,25 21:16
  22:5 23:6 31:10
  31:14,18,25 32:3,4
  32:6,9 33:3,18,21
  34:3,10,14,15,21
  35:7 42:22 45:10
  50:2 51:18 75:5
  76:24,24 77:3,7,8
  77:11,13,18,19,21
  78:4,20,21 79:1,5
  79:6 80:25 82:17
  99:16,17,17,18,19
  99:21,23 100:7

124:13,18
student's  78:6
students  8:17
  16:24 19:24 20:13
  31:23 33:8,9,24
  34:7,11 35:12,16
  36:5,6,6 50:20
  51:17,23 55:19,20
  57:8 60:12 63:8
  76:12,15,19 77:5
  79:16 80:6,11
  85:10,18 100:3,3
  106:10,23 107:2,7
  107:13,16,17,18
  113:14 125:13
  127:13,17,19
study  65:8
style  131:3
subject  114:17,24
subjects  114:25
submit  17:6
  124:14
submitted  33:15
  34:8,22 50:21
  57:9 124:14
submitting  32:3
subscribed  130:15
success  17:8,12,13
  33:7 35:14 77:23
  80:5,10,11 92:20
  94:11 95:9,15,18
  96:18,22 97:24
  98:2,9 99:12
  100:9,17,24 101:1
  101:3,12,13 102:2
  102:4,6,11,14,23
  103:4 109:6,13,17
  109:20
successful  9:5
  32:22 33:1,4 34:4
  34:12,22,25 35:7

35:11 36:25 79:16
79:20 80:4,9,10,16
80:20,24
**suit**  132:14,15
**suite**  2:4
**summary**  93:9
**supervise**  27:13
30:7 38:10 46:1,2
58:4 60:13,18
103:13
**supervised**  62:20
86:21 103:17
**supervises**  8:19
**supervising**  105:8
**supervisor**  67:7,9
67:10 87:22 90:2
112:22
**suppose**  29:20
56:3
**supposed**  19:22
39:23 40:1 56:2,4
56:20 83:9
**sure**  5:16 9:2,4
15:1 16:1 20:3
21:20 24:25 25:12
25:19 26:7 29:21
38:19 50:21 62:8
64:1,2 65:9 67:11
72:14 74:14 76:16
76:23 86:8 93:4
95:19 100:4
103:18 107:9
118:25 123:9
**susanna**  75:15
**swap**  70:4 71:17
**sworn**  4:2 75:22
85:14 87:12 88:8
132:6
**system**  18:22,24
21:6 28:20 42:24
43:20 44:9,17

46:24 47:12 56:5
72:9,17 78:4
82:23 112:19,23
120:10,23 122:1,4
123:16 124:1,4

**t**

**t**  3:5 130:1 132:1,1
**take**  5:10,15 8:14
9:1 22:15 42:5
55:17 56:13 67:2
77:18 115:14
128:22
**taken**  75:11 130:3
132:8
**talk**  65:3 84:22
101:10 120:17
**talked**  91:21 94:18
**talking**  54:19
58:19 87:15 88:6
126:1,7,24
**target**  84:10
**task**  15:16,24
**taught**  65:7,11,13
87:18
**team**  7:15,22,24
8:7,8,10,13,20
12:4 23:8,13 28:7
32:16 36:15 37:17
46:1,2 52:25 53:4
53:6 68:22 79:12
83:4 84:1,11 85:5
86:22 89:24 90:1
90:4 107:23 108:4
123:18 126:2,7,8
126:21,24
**teams**  32:12 49:18
61:4 70:5,6 71:17
86:20,23,24 87:17
89:3 127:5
**technical**  112:8

**telephone**  57:17
57:22 76:18
**tell**  12:10 13:24
28:11,20 48:22,22
69:18 78:9 85:9
88:10 102:6
**template**  93:14
113:22
**templates**  111:6
113:25
**ten**  25:8
**term**  17:16 23:10
34:22 89:9,9,16
102:21,21 112:8
126:11,13,15,25
**terminated**  95:13
**termination**  92:8
95:20
**terms**  8:9,19 10:4
21:15,16 29:15
35:3 42:2 105:20
**testified**  4:4 15:2
68:11 72:8 93:20
132:7
**testify**  5:22
**testimony**  6:2
58:20 59:13 65:10
65:12 67:8 70:11
72:14,15,21 73:9
73:20,25 74:9,16
74:22 88:8 93:17
108:10 120:18
121:1 130:3
132:12
**text**  19:10 37:11
39:8,8 46:12
51:21 124:3
127:15 128:1
**texting**  39:1 51:16
76:14 117:10,15

**textnow**  37:20
38:4,14,24 40:17
**texts**  39:4,10 40:6
**thank**  4:7
**thing**  59:8 70:9
76:13,14 77:6
79:4
**things**  51:16 53:21
75:6 121:9
**think**  9:16 10:15
13:20 14:2,6,8
15:15 16:23 20:10
41:10,22 42:1,8,23
43:16 45:9 49:5
50:14 52:14 58:19
70:9 73:19 82:1
85:20 93:20
103:10 112:2
115:7 126:6
128:22
**thinking**  35:5
**third**  18:25 38:23
39:4 73:2 117:16
**thought**  4:22
122:16
**three**  8:19 13:21
22:15 27:3 42:15
87:3,6 106:19,20
114:18
**throw**  88:16
**time**  1:16 13:5
15:17,19,20,21,24
18:19 26:11 27:1
27:14,15 36:11
40:25 46:17 48:21
61:1,21,22 63:3,11
65:22 83:21 92:16
92:17 95:2 103:15
105:4 106:15
107:4 112:4,9,10
117:4,17 118:3

121:19 127:10,16
128:5,11,13
**timely**   26:7
**times**   4:17 5:6
24:21 25:6,8
26:25 27:3 85:1
128:6
**title**   6:14 7:8,10
14:21
**titles**   7:12,14
**today**   5:21 6:2,22
12:15
**told**   42:13 48:18
65:16,19,21 67:9
67:10 73:21 82:25
83:1 85:18 86:4
111:19
**tools**   99:13
**top**   13:1,18 42:4
113:9 114:15
**toria**   11:21
**tracked**   16:15
84:7
**tracker**   16:6,11,21
**trackers**   16:16
**trailer**   68:8
**train**   61:18 85:23
**trained**   40:20
48:12,15,18 56:7
59:24 60:1 65:4
72:11,21 73:12,21
74:2,3 85:21 86:2
86:23 87:5,10,12
121:2
**trainer**   44:21
56:10 61:15,16
64:25 65:4,11,13
86:2 87:14
**trainers**   93:16
**training**   10:16,20
11:1,1 40:22,24

41:2,6,8 49:15,19
49:20 58:14,16,23
58:24 59:1,11,14
59:18,23 60:18,24
62:24 63:1,5
64:25 65:1,3,6,14
65:17 66:12,24
67:11,13,14,17,21
68:16 70:12 73:22
73:23 74:19,21
87:13 103:21,24
104:16
**transcribed**   5:18
**transcript**   3:16
8:1 131:1 132:11
**transcripts**   33:22
**transition**   21:9
**translate**   5:18
**treated**   85:17
**true**   130:4 132:11
**truedialog**   39:1
**truth**   130:14
**truthfully**   5:22
**try**   9:17 18:20
19:8 45:20,23
46:22 50:5 109:5
**trying**   10:19 23:7
42:22 76:12 78:8
88:17 108:18
**tuesday**   6:5
**tuition**   31:14,18
31:23,25 32:3,6,9
**turkey**   122:12,13
122:17
**twice**   25:3
**two**   7:11 13:15,20
17:22 24:11,25
25:10 26:11 27:19
62:13 68:6 70:22
106:7 120:21
121:11 122:20,21

124:16
**type**   114:1
**typed**   68:6 113:21
114:7 115:5
119:16
**typewriting**
132:10
**typical**   8:23,24
118:2
**typically**   114:7
125:19
**typing**   83:7

## u

**u**   130:1
**uh**   5:17 79:9
122:24
**uhs**   5:18
**ultimately**   21:16
33:8 34:12 35:10
90:22
**undergo**   60:18
**undergrad**   127:4
**underneath**   93:6,7
93:9
**understand**   5:4
30:25 32:20 80:22
81:10 118:25
**understanding**
10:2,6 27:17
36:21 67:13 73:5
75:25
**understood**   5:7,20
11:7 14:16 19:18
**unfit**   78:13,22,23
**unique**   103:16
**united**   1:1
**university**   1:6 3:9
7:8 10:22 20:17
31:12 50:3 76:20
80:5,10 106:17
125:6 131:3

**unlucky**   108:25
**unqualified**   42:14
**unrealistic**   80:17
**unresponsive**
57:10 85:13
**unwritten**   82:2
**upcoming**   35:21
**update**   15:17,24
16:6,11
**use**   23:10 29:14
37:10,12,17,23
38:4,13,14 39:2
44:17,23 45:3
48:12,20,23 58:20
59:15 61:6,10,11
62:5,13,16,21 63:1
63:9,15 64:14
66:3,14,17 67:6
68:3,18 69:6 70:1
72:2,18 73:23
74:7,20,25 75:4,7
111:1,6,12 114:8
**user**   39:20
**uses**   38:25 39:10
**usually**   114:1
116:16

## v

**v**   1:5 131:3
**valid**   56:1 85:17
**valuable**   21:15
**value**   21:15 29:25
**values**   101:5 103:7
**varies**   53:3 60:14
**various**   27:1
**venture**   87:22
**verbal**   5:17 56:13
82:24
**verbally**   49:17
54:21 60:3 68:7
68:19 70:13 82:22
82:25

[version - zoomed]                                                            Page 22

| | | |
|---|---|---|
| **version** 13:8,17,18 | 69:7 70:2,7 78:9 | **working** 18:17 |
| **vic** 11:21 | 78:11 81:16 83:11 | 30:9 37:7,13 |
| **vicinity** 66:11 | 85:23 86:23,24 | 51:15 95:19 |
| **victoria** 1:11 3:3 | 87:11 88:14 101:7 | 116:24,25 117:3,3 |
| 4:1 130:2,9 131:6 | 108:20 114:4 | **works** 17:15 |
| **violated** 45:10 | 120:15 123:19 | **worth** 45:25 |
| **vmeehan** 3:10,11 | 125:14 | **wow** 4:24 |
| 3:12,13,14 110:24 | **ways** 8:14 19:7,14 | **write** 41:11 93:5 |
| 113:10 | 72:6 | 95:8,11,15 105:10 |
| **voice** 37:12,15,18 | **week** 15:17,24 | 105:15 |
| 37:25 38:4,14,24 | 23:2 124:16 | **writing** 45:1 56:15 |
| 39:8,10,16,24 | **weekly** 61:2 | 58:21 70:15 |
| 40:17 51:11 | **weeks** 114:18 | **written** 49:8,21,24 |
| **voicemail** 117:11 | 126:16 | 50:7 58:16,19,22 |
| **volume** 22:8 23:16 | **went** 9:19 57:10 | 59:15,19,24 60:2 |
| 23:25 28:25 29:4 | 63:1 85:13 90:13 | 81:12 82:2,10,17 |
| 29:7,9,14,22 30:1 | 90:20 120:19 | 82:21 89:18,19 |
| 30:5,6 37:3 76:4 | **white** 13:10 84:6 | 104:5 106:8 |
| **volumes** 30:14 | **wide** 36:15 | **wrong** 42:22 68:12 |
| **votes** 88:4 | **wildly** 80:17 | 68:13 87:5 |
| **vp** 6:21 | **willing** 87:22 | **wrote** 41:16 93:6 |
| | **witness** 3:2 14:9 | 94:5 105:19 106:7 |
| **w** | 31:16 41:5 42:6 | **wyndham** 1:17 |
| **waiting** 4:7 | 43:5,14 52:1,12 | **x** |
| **walk** 8:23 | 55:2 59:6 72:2 | **x** 3:1,5 |
| **wall** 2:5 | 78:19 81:5 99:21 | |
| **want** 6:4 11:7 | 104:10 107:9 | **y** |
| 12:25 18:21 20:17 | 126:4 132:17 | **yeah** 125:16 |
| 25:9 42:13 45:11 | **witnessed** 69:21 | 126:20 |
| 45:24 46:15 50:12 | **won** 106:23 107:7 | **year** 62:2 83:23 |
| 59:8 62:12 74:15 | 107:13,16 | 109:15 126:17 |
| 75:3 77:18 82:19 | **wondering** 47:1 | **years** 7:11,17 |
| 88:16 103:7 | **word** 49:11 67:2 | 61:24 106:4,19,20 |
| 104:16 112:25 | 91:16 | **z** |
| 128:23 129:1 | **work** 4:20 12:7 | **zaniewski** 38:9,19 |
| **wanted** 30:24 46:3 | 75:8,13 96:7 | 89:2 95:2 |
| 83:6 | 100:11,12 116:24 | **zone** 27:14,15 |
| **wants** 18:19 | 128:2 | 128:5 |
| **washington** 2:9 | **workday** 118:2 | **zoomed** 13:7,17 |
| **way** 19:9,11 35:21 | **worked** 70:6 | |
| 39:24 63:22 64:21 | | |
| 66:7,9,21 67:9 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.