## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-81004-CIV-Altman/Brannon

**MELANIE DAVIS**, on behalf of herself and all
others similarly situated**,**

              **Plaintiff,**

     **v.**

**POST UNIVERSITY, INC.,**

              **Defendant.**

 

## DEFENDANT POST UNIVERSITY, INC.'S
## <u>OPPOSITION TO MOTION FOR CLASS CERTIFICATION</u>

## TABLE OF CONTENTS

**PAGE**

FACTUAL BACKGROUND ................................................................................................ 2

   A.    The University Only Contacts Prospective Students Who Have Provided Their Express Invitation Or Permission ................................................................................ 2

   B.    The Opportunity Stage Is A Complex and Highly Individualized Process ..................... 4

   C.    The University's CRM System And The Relevant Data ................................................. 5

       1.    The Rejected Lead Results ....................................................................................... 8

       2.    The Lost Opportunity Data Results ........................................................................ 9

       3.    The Data Review Process ....................................................................................... 12

   D.    Plaintiff's "Evidence" ................................................................................................. 13

STANDARD OF REVIEW ............................................................................................... 14

ARGUMENT .................................................................................................................... 15

   A.    Plaintiff's Claims Are Not Typical Of The Overwhelming Majority Of The Class ...... 15

   B.    Plaintiff's Class Is Not Administratively Feasible And Thus Not Ascertainable .......... 16

   C.    Plaintiff And The Class Do Not Have Standing To Bring Claims Under Subsection (d) Of The FCC's Rules .................................................................................................. 18

   D.    Plaintiff Is Not An Adequate Representative Of The Class Because She Has Not Proffered Any *Evidence* Of Injury ............................................................................ 22

   E.    Individualized Issues Will Predominate Concerning The Purpose Of The Calls And The University's Relationship To The Call Recipient ........................................................ 24

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF SERVICE ......................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aderhold v. car2go N.A. LLC,*
  668 Fed. Appx. 795 (9th Cir. 2016)......................................................................16

*Aderhold v. Car2Go N.A. LLC,*
  No. 14-35208, 2016 WL 4709873 (9th Cir. Sept. 9, 2016) ....................................24

*Amchem Prods. Inc. v. Windsor,*
  521 U.S. 591 (1997).............................................................................................14

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986).............................................................................................13

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (3d Cir. 2013).................................................................................21

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013)...............................................................................................14

*Ctr. for Indiv. Rts. v. Chevaldina,*
  No. 16-20905-Civ, 2018 WL 2432109 (S.D. Fla. May 30, 2018)...........................23

*Daniel v. Five Stars Loyalty, Inc.,*
  No. 15-cv-03546, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015) ...........................24

*Deposit Guar. Nat'l Bank v. Roper,*
  445 U.S. 326 (1980).............................................................................................20

*Ehren v. Moon, Inc.,*
  No. 09-21222-CIV, 2010 WL 5014712 (S.D. Fla. Dec. 3, 2010)...........................21

*General Telephone Co. v. Falcon,*
  457 U.S. 147 (1982).............................................................................................14

*Gilchrist v. Bolger,*
  733 F.2d 1551 (11th Cir.1984) ............................................................................14

*Hitchman v. Nat'l Enter. Sys., Inc.,*
  No. 12-61043-Civ., 2014 WL 912363 (S.D. Fla. Mar. 10, 2014) ...........................19

*Karhu v. Vital Pharm., Inc.,*
  621 F. App'x 945 (11th Cir. 2015) ........................................................................17

*Lewis v. Casey*,
  518 U.S. 343 (1996)................................................................................20

*Lindsey v. Normet*,
  405 U.S. 56 (1972).............................................................................21, 22

*London v. Wal-Mart Stores*,
  340 F.3d 1246 (11th Cir. 2003) .........................................................14

*MacKinnon v. Hof's Hut Rests., Inc.*,
  No. 2:17-cv-01456, 2017 WL 5754308 (E.D. Cal. Nov. 28, 2017) .......................................16

*Morrison v. Booth*,
  763 F.2d 1366 (11th Cir. 1985) .........................................................14

*Muzaffarr v. Ross Dress For Less, Inc.*,
  CIV No. 11-61996, 2013 WL 1890274 (S.D. Fla. May 7, 2013)...........................................13

*Parrish v. Freightliner, LLC*,
  471 F. Supp. 2d 1262 (M.D. Fla. 2006).................................................23

*Powell v. YouFit Health Clubs LLC*,
  No. 17-CV-62328, 2019 WL 926048 (S.D. Fla. Feb. 22, 2019) ...........................................17

*Powell v. YouFit Health Clubs LLC*,
  No. 17-CV-62328, 2019 WL 926131 (S.D. Fla. Jan. 14, 2019),
  *reconsideration denied*, No. 17-CV-62328, 2019 WL 926048 (S.D. Fla. Feb.
  22, 2019) ......................................................................15, 16

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act
  of 1991*,
  27 F.C.C. Rcd. 15391 (2012) .............................................................18

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act
  of 1991*,
  30 F.C.C. Rcd. 7961 (2015) ...........................................................16, 24

*Rutstein v. Avis Rent-A-Car Sysems, Inc.*,
  211 F.3d 1228 (11th Cir. 2000) .........................................................14

*Saulsberry v. Meridian Fin. Servs., Inc.*,
  No. CV 14-6256, 2016 WL 3456939 (C.D. Cal. Apr. 14, 2016)...........................................19

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010)................................................................21

*Truesdell v. Thomas*,
  No. 5:13-CV-552-OC-10PRL, 2015 WL 12681655 (M.D. Fla. Feb. 13, 2015) ...................21

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ............................................................................20

*Valley Drug v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ...............................................................14

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ...............................................................14

*Wal-Mart Stores, Inc. v Dukes*,
  564 U.S. 338 (2011) ............................................................................18, 21

*Wilson v. Badcock Home Furniture*,
  329 F.R.D. 454 (M.D. Fla. Dec. 19, 2018) .........................................11, 14

**Statutes**

28 U.S.C. § 2072(b) ......................................................................................21

47 U.S.C. § 227(a)(4) ...................................................................................19

47 U.S.C. § 227(c)(1) ...........................................................................1, 15, 19

47 U.S.C. § 227(c)(5) ...................................................................................17

If any case can explain the origin of the maxim "the plural of anecdote is not data," it is this one.  Over the putative class period, the University has designated approximately 150,000 individuals in its CRM system the equivalent of "do-not-call" when that person has either made such a request or stated that they were no longer interested in pursuing an education at the University.  And based on a statistically significant analysis of its records, the University is consistently honoring these requests.  The data does not lie.

This case is thus not about protecting individuals from "telephone solicitations to which they object," the express purpose of the statute at issue.  47 U.S.C. § 227(c)(1).  Instead, this case is about Plaintiff's attempt to weaponize a Congressionally mandated *affirmative defense* related to a written do-not-call policy.  *Id.* ¶ 227(c)(5).  Despite producing no evidence that anyone else was conceivably harmed, Plaintiff seeks to certify a class that would effectively shut down a small university simply because it did not provide one individual a one-paragraph paper explaining how it has trained its admissions counselors to record do-not-call requests.

Indeed, the very fact that Plaintiff's counsel solicits consumers on his website in the same manner as the University solicits students, and was unable to provide a do-not-call policy on demand, should tell the Court all it needs to know: This is not a principled position to protect consumers.[1]  This is a procedural "gotcha game" based on a private right of action that does not exist.  Nothing more, nothing less.  But as detailed below, Plaintiff's attempt to certify the largest no-injury class possible is ultimately self-defeating because her claims are not typical of the unascertainable and incredibly diverse class she seeks to certify.

---

[1]     *See* Ex. 1 at Req. nos. 13, 15, and 17; Ex. 2.  All exhibits referenced in this brief are attached to the Declaration of Adam Bowser.

## FACTUAL BACKGROUND

A.    **The University Only Contacts Prospective Students Who Have Provided Their Express Invitation Or Permission**

This is not a putative class action about unsolicited telephone solicitations.  Instead, the University only contacts prospective students who have expressly authorized the University to do so.  Post Dep.[2] at 53:9-13, *id.* at 102:20-104:22; Cooley Decl.[3] ¶ 3.  In other words, the University does not engage in "cold calling."  Cooley Decl. ¶ 3. Typically, prospective students find information about the University online, and if interested, they will submit a request for information ("RFI") with express instructions for the University to contact them about the academic program in which they are interested.  *Id.* ¶ 4.

After receiving an RFI, a University admissions counselor is assigned to contact the relevant individual, designated a "Lead" in the University's CRM system, and the assigned admissions counselor will then generally attempt to call the individual back to provide the information requested by the prospective student about their program of interest.  *Id.* ¶¶ 5-6.  The University, however, is unable to reach roughly half of the individuals who request information from the University.  *Id.* ¶¶ 22-23.  *If* the admissions counselor can get in touch with the prospective student, they must first inquire whether they are in fact qualified to attend a higher education institution such as Post University.[4]  If an individual is not qualified, the Lead will be

---

[2]    Deposition of Sean Cooley, Individually and as Designated Representative of Post University (Apr. 11, 2019) ("Post Dep.") (Ex. 3).

[3]    Declaration of Sean Cooley in Support of Defendant Post University Inc.'s Opposition to Plaintiff's Motion for Class Certification ("Cooley Decl.")

[4]    Cooley Decl. ¶ 7; Post Dep. 154:6-155:9; 206:12-15; Deposition of Victoria L. Meehan at 76:17-78:2 (Feb. 8, 2019) ("Meehan Dep.")(Ex. 4) (student must not only be qualified, but admissions process will continue "[o]nly if it is the right thing to do for that student."); Deposition of Constance Reilly at 11:23 – 12:6 (Feb. 8, 2019) ("Reilly Dep")(Ex. 5); *see also id.* at 26:21-27:3.

rejected for that reason.  Cooley Decl. ¶¶ 7-9.  Leads, however, can be and are rejected for many different reasons based on the individual circumstances associated with a particular Lead.  *Id.* ¶ 10.  Indeed, there are approximately thirty different "rejection reasons" an admission counselor can select to reject a Lead.[5]

Relevant to the University's recording of do-not-call requests, there is only *one* rejection reason that admissions counselors use to capture and record do-not-call requests: "NI:Remove From List."[6]  This rejection category was instructed to be used liberally, meaning that admissions counselors would also use this category to reject individuals who simply stated they are no longer interested in attending the University so that even these individuals would not be called again, despite not making a do-not-call request.[7]  All of the University's admissions counselors were and are trained on how to record and honor such "NI:Remove From List" rejections.[8]  In fact, the University's records show that even Plaintiff's two declarants who briefly served as

---

[5]     *Id.* ¶ 11; Reilly Dep. at 46:3-47:8; *id.* at 62:3-10; *id.* at 74:6-19 ("there are a hundred reasons to reject a lead."); Meehan Dep. at 42:11-43:24 ("There are several categories of rejected leads"); Post Dep. at 107:5-108:11 ("there are many reasons" leads are rejected, and "the most common is 10 attempts"); *id.* at 109:6-16; Ex. 6 at Response to Interrogatory No. 9 (prospective students' files are closed depending "on the facts and circumstances surrounding the particular prospective student.").

[6]     Cooley Decl. ¶ 12; Reilly Dep. at 49:19-24; *see also* 52:16-22; 53:15-17; Meehan Dep. at 44:2-12; 45:15-22; 47:12-48:11; Post Dep. 214:6-215:24; 220:6-18. "NI" stands for "Not Interested."

[7]     Cooley Decl. ¶ 12-14; Reilly Dep. at 50:4-13; Meehan Dep. at 45:6-13; Post Dep. 218:10-25.

[8]     Reilly Dep. at 81:16-82:19; 83:6-84:9; Meehan Dep. at 44:16-25; 48:18-49:6; 49:14-18; 59:23-60:6; 64:19-65:2; 67:5-68:24; 70:4-14; 71:16-72:1; 82:14-23 ("There is a 'do not call' policy. … [I]f a student asks not to be called, we do not call them . . . . It is verbally communicated to us and we are shown how to do it in the system."); Post Dep. 124:13-125:4 ("If someone were to say the cadence should be shut off altogether, they would reject the lead accordingly."); 212:21-23; 216:15-17; 217:1-3; 293:14-294:11 ("it's just always been ingrained in everyone . . . . It's more than a best practice.  It's a way of handling *all* leads and opportunities.") (emphasis added); Declaration of Marlena Jerzyk in Support of Defendant Post University, Inc.'s Opposition to Plaintiff's Motion for Class Certification ¶¶ 66-72 ("Jerzyk Decl.").

admissions counselors approximately three years ago routinely rejected prospective students as "NI:Remove From List" *and* did not contact these individuals again after doing so.[9]

## B.      The Opportunity Stage Is A Complex and Highly Individualized Process

Only if a Lead is vetted as being qualified to attend a higher education institution, and confirms that they are in fact interested in discussing the information that they requested through their RFI, do they proceed to the next step in the admissions process: the "Opportunity" stage. Cooley Decl. ¶ 32.  The Opportunity stage is a much more complex and involved process because it can potentially involve every aspect of applying to and attending college.  *Id.* ¶ 36. Contact with an individual during the Opportunity stage ranges from guiding the prospective student through the financial aid process, assisting the prospective student in selecting and registering for classes, and many other transactional aspects of attending a university.  *Id.* ¶ 37.[10] Simply put, there is a lot of paperwork to complete.  *Id.*

Similar to the rejection reasons for Rejected Leads, there are numerous reasons why Opportunities are Lost – which is the Opportunity equivalent of rejecting a Lead. *Id.* ¶ 38. Common reasons include that the prospective student's federal financial aid ("FAFSA") application is rejected or is not completed in time for the coming term; employment, family or personal reasons arise that make the individual reconsider or postpone attending the University; and issues specific to veterans and active duty military occur, such as a deployment or GI Bill funding not being timely secured.  *Id.* And just like Rejected Leads, only "NI:Remove From List" is used to capture and record when an Opportunity makes a do-not-call request, or otherwise states that they are not interested.  *Id.* ¶ 39.

---

[9]      Jerzyk Decl. ¶¶ 73-82.
[10]      *See also* Reilly Dep. at 6:14-7:3; 28:1-9; Post Dep. 156:17-158:1; 206:22-207:3.

Central to why analyzing Lost Opportunities is such a highly individualized inquiry, these individuals can be designated "Lost" for any number of reasons, but frequently they still want to pursue an education at the University. *Id.* ¶ 53.[11]  For example, when the University closes an Opportunity for financial aid reasons, it has no connection to the *Opportunity* objecting to additional contact from the University, but rather because the *government* "objected" to their FAFSA application.  *Id.*  Admissions counselors may nevertheless still contact that individual to help guide them through the financial aid process, even though they would still be a "Lost Opportunity" *in the system*.  *Id.*  Indeed, as Post University's corporate designee testified, it all depends on the particular individual.  Post Dep. 276:7-278:10.[12]  As Mr. Cooley succinctly put it, "[e]very situation is unique."  Post. Dep. 198:19-23.

It should also be noted that many individuals re-confirm their express authorization to be called by the University throughout the Opportunity process.  Jerzyk Decl. ¶ 63.  In fact, as detailed more thoroughly below, 22% of the individuals who received two calls from the University after their file was marked as Lost had signed an Intent to Enroll ("ITE") agreement committing themselves to attend the University, including *after* they were marked as Lost – all for reasons that had *nothing* to do with making a do-not-call request.

## C.   The University's CRM System And The Relevant Data

The CRM system utilized by the University during the class period was not designed with TCPA litigation in mind.  Instead, it was designed for the purpose of recording copious amounts

---

[11]     *See also* Post Dep. 114:1-115:18.  Plaintiff therefore falsely asserts that "Deferred Opportunities" – individuals who expressly told the University to call them back at a later date – would not be swept into the class she seeks to certify.  Dkt. No. 68-01 at 9 n.6.

[12]     To be clear, the University may not subjectively consider such individuals who re-engage with the University to still be closed at certain points, but they are still systematically coded as a "Lost Opportunity" in the CRM.  *See, e.g.*, Reilly Dep. 30:21-23; 32:8-12 (one needs to review "a student specific file" to understand what transpired with that individual).

of data on all the unique interactions with individual prospective students.  Jerzyk Decl. ¶ 34.

However, reasonable data manipulation and analysis is possible, as sorting and reviewing the

prospective student data by rejection reason is how the University's admissions counselors are

trained *not* to contact specific categories of individuals.[13]  In fact, as Constance Reilly testified

early in this case, "'Closed/lost opportunity' is the umbrella term.  Underneath that you have the

reason you closed the file.  That is what the student is labeled as. … So never would you call

every closed/lost opportunity.  You would be directed to call a specific group of closed/lost

opportunities."[14]  But never the individuals rejected as "NI: Remove From List," *id.*, as "we

don't reach out to that population."[15]

Indeed, Post University's corporate witness was questioned on the ability to report on the

subcategories of Rejected Leads and Lost Opportunities, as well as documents the University

produced showing the various reasons why Opportunities were closed, including by being

designated as "Remove From List."[16]  Despite this, Plaintiff has always sought to certify the

largest (no-injury) class possible to include all Rejected Leads and Lost Opportunities, regardless

of the reason they were rejected, and even though *only* "NI:Remove From List" captures

---

[13]      *See* Reilly Dep. at 56:13-57:6 ("Were you permitted to call rejected leads?  A. *Some*
rejected leads, yes … Mostly the 10 attempt leads who never answered.") (emphasis added); Post
Dep. at 167:5-12 ("it depends which ones"); *id.* at 201:6-11 (unequivocal denial that *all* rejected
leads or closed opportunities were supposed to be called); *id.* at 227:7-16 (reason the reject code
is present is so that admissions counselors know whether a particular individual should or should
not be contacted).
[14]      Reilly Dep. at 63:19-64:6.
[15]      Meehan Dep. at 70:21-25; 52:9-20; 57:1:7.
[16]      Post Dep. 188:5-190:8; *id.* at 220:23-221:7 ("NI:Remove From List" records "can be
pulled at scale."); *see also* Exs. 7, 8.  It is thus demonstrably false for Plaintiff to assert that the
University did not produce "a single document supporting the existence of this training."  Dkt.
No. 68-01 at 10.  Multiple documents showed that admissions counselors were in fact rejecting
leads as "NI:Remove from List."  Indeed, Victoria Meehan was asked, "do you have any
evidence that this policy exists?  A. The practice of it."  Meehan Dep. at 83:24-84:4.

prospective students who potentially made do-not-call requests.[17]   However, it is simply not possible to query the University's CRM to return the information sought by Plaintiff during the discovery period – the number of Rejected Leads and Lost Opportunities to whom the University *placed* two calls after being rejected in the system (again, for any reason).   *Id.*; *see also* Cooley Decl. ¶¶ 18-20, 40-43.   Instead, providing Plaintiff the information she sought required a manual review of the data – file by file.[18]   The parties therefore agreed that the University would conduct a statistically significant review of 750 randomly selected Rejected Leads and 750 randomly selected Lost Opportunity files to obtain Plaintiff's requested data.[19]

Then, after the close of discovery, even Plaintiff apparently realized that *she* was overreaching by seeking to certify a class conditioned on calls simply being "placed" to any Rejected Lead or Lost Opportunity, when the statute requires that the calls actually be *received* (and be telephone solicitations to which the recipient objected). When Plaintiff's bait-and-switch attempt to get the University to stipulate to a class size by switching "placed" to "received" failed,[20] the University had to re-analyze the randomly selected files according to Plaintiff's instructions to provide "call disposition" results associated with those Rejected Leads and Lost Opportunities.[21] And it is these results on which Plaintiff is basing all of her class claims.  Dkt. No. 68-01 at 15, Dkt. No. 68-24.  Although Plaintiff's curiosity was satisfied by these superficial data results,[22] Plaintiff's analysis barely scratches the surface of the complexity of the

---

[17]      *See* Ex. 9, Plaintiff's Fifth Set of Interrogatories Nos. 13-15.
[18]      *See, generally,* Jerzyk Decl.
[19]      *See* Ex. 10, March 25, 2019 Email from Jeremy Glapion, counsel for Plaintiff, to Adam Bowser, counsel for Post University.
[20]      *See* Ex. 11, Post University's Discovery Dispute Memorandum.
[21]      *See* Ex. 12, June 6, 2019 email from Jeremy Glapion, counsel for Plaintiff, to Adam Bowser, counsel for Post University.
[22]      *See* Ex. 13, June 28, 2019 email from Jeremy Glapion, counsel for Plaintiff, to Adam Bowser, counsel for Post University (conceding that the supplemental data provided by the

University's highly individualized interactions with prospective students.

      **1.**      **The Rejected Lead Results**

Out of the total population of 859,872 Rejected Leads, roughly half were rejected because the University was *never* able to get in touch with the person to provide them the information that they expressly requested.  Cooley Decl. ¶¶ 22-23.  Clearly, the University could never have received a do-not-call request from individuals the University never got in contact with.  Yet the calls to *these* Rejected Leads comprised 93% of the "calls placed" results, and 100% of the "calls received" results, meaning that the "10-attempt" rejections were the only subcategory of Rejected Leads to have received more than one call.  *Id.* ¶¶ 27-31.  This bears repeating: the overwhelmingly majority – over 80%[23] – of individuals who will fall within Plaintiff's proposed class are individuals who the University **never** contacted, despite these individuals expressly requesting that the University do so in order to provide them the information they requested.  Because of this, these are all individuals who the University never vetted to determine whether they were eligible to attend the University, a necessary prerequisite before any discussion about the admissions process could or would occur.[24]

This is in stark contrast to the number of Rejected Leads closed under the "NI:Remove From List" rejection reason used to capture do-not-call requests and individuals who were no

---

University resolved the discovery dispute Plaintiff manufactured after the close of fact discovery).

[23]     The population size of Rejected Leads is 859,872, while the Lost Opportunity population size is roughly one-tenth this size.  Thus, the putative class members will be heavily weighted in the former category, as even Plaintiff concedes.  Dkt. No. 68-01 at 15 (estimating there are approximately five times more putative class members who are Rejected Leads compared to Lost Opportunities).  In other words, roughly 5 in 6, or 83%, of the individuals falling within Plaintiff's proposed class would be a 10-attempt Rejected Lead who the University never got in contact with.

[24]     *See, e.g.*, Ex. 14, Post University, Inc.'s Responses to Plaintiff's First Set of Requests for Admission, Nos. 1 and 16; *see also* Post Dep. 154:6-155:9; *id.* at 206:12-15..

longer interested.  The University's admissions counselors rejected over **145,000** Leads under this rejection category, or approximately 17% of the total Rejected Lead population.  Cooley Decl. ¶ 24.  But as the University's deponents and the data results make clear, as a matter of policy and practice, the University does not "reach out to that population."[25]

### 2. The Lost Opportunity Data Results

The universe of *all* Lost Opportunities with some activity in their file after being designated Lost was **95,383** total individual files.  Dkt. No. 68-01 at 15; Cooley Decl. ¶ 43.  Although Plaintiff did not seek this data, as noted above, one can sort and filter by the rejection reason from this population.  Of the 95,383 total population size, only 2,050 of the Lost Opportunity files that had one *activity* after being designated Lost were rejected as NI:Remove From List, or roughly 2% of the total.[26]

Similar to the Rejected Leads results, however, none of the 73 "calls placed" or 60 "calls received" files that had two or more calls after the file was designated Lost were rejected under "NI:Remove From List."[27] Thus, despite conducting a statistically significant data review of the entire Lost Opportunity population at Plaintiff's counsel's direction – a population that included

---

[25]     Meehan Dep. at 70:21-25; *see also* Jerzyk Decl. ¶ 66-72; Declaration of Mary Yatcko in Support of Defendant Post University, Inc.'s Opposition to Plaintiff's Motion for Class Certification, ¶ 9 ("Yatcko Decl."); Cooley Decl. ¶ 50; Reilly Dep. at 81:16-82:19; 83:6-84:9; Meehan Dep. at 44:16-25; 48:18-49:6; 49:14-18; 59:23-60:6; 64:19-65:2; 67:5-68:24; 70:4-14; 71:16-72:1; 82:14-23.
[26]     There were an additional 2,444 Opportunities that were designated Lost, "NI:Remove From List," who had *no* activity in their file after their file was closed.  Thus, there was a total of 4,494 Lost Opportunities closed under NI:Remove From List.  *Id.*  ¶ 46.  It is important to emphasize, however, that this in no way means that 2,050 Opportunities who were rejected either because they made a do-not-call request, or simply stated that they were no longer interested in attending the University, were in any way contacted after making a DNC request.  It simply means that there was some activity in their file after being designated Lost, "NI:Remove From List."  Cooley Decl. ¶ 47.
[27]     Cooley Decl. ¶ 48.

thousands of individual files that were designated "NI:Remove From List" – there was no evidence of subsequent calls to any Lost Opportunity who *may* have made a do-not-call request.

The Opportunity call data is also *much* more complex and individualized than the Rejected Lead data.  Yet in order to keep her narrative as facile as possible, Plaintiff only wanted the "call disposition" record associated with a contact with the Lost Opportunity recorded in that individual's file.[28]  But Plaintiff's analysis once again just begins to scratch the surface – one must also review the admissions counselors' notes surrounding the call disposition record to understand the *context* of each particular call.  Jerzyk Decl. ¶ 36-60; *see also* Jerzyk Decl. Ex. D. In fact, the activity notes in Lost Opportunities' files reveal that many of the calls recorded as "Spoke with Student" were actually *incoming* calls from the prospective student seeking assistance on some aspect of the admissions process.[29]  One also needs to review the specific context of each call and examine where the prospective student is in the admissions process – because again, individuals can have their files designated "Lost" for any number of reasons that have nothing to do with that person objecting to contact with the University.

For example, the very first Lost Opportunity result from the data review was designated Lost under the "Personal" rejection reason – meaning something personal came up in this person's life which caused the admissions counselor to designate her as "Lost."  *See* Jerzyk Decl. Ex. D. (first entry with telephone number ending in "1969").  Despite being a "Lost Opportunity" in the system, this individual actually contacted her admissions counselor to tell her in November 2016 that "everything is starting to fall into place" and "January might work."  *Id.*  This individual even signed and submitted an ITE agreement on January 3, 2017, and her

---

[28]     *See* Ex. 12.
[29]     Jerzyk Decl. ¶ 41-42 (noting that calls highlighted yellow in Exhibit D are most likely inbound calls).

admissions counselor's conversations with her were clearly transactional in nature and concerned her FAFSA paperwork.  *Id.* ("Will add FSA ID signature today," "follow up on dad's fsa id," "FSA ID issues and how to move forward.").

Another individual (telephone number ending in "9000") had **42 calls** in her file – 6 of which were most likely "SWS" inbound calls to the University – after she signed an ITE and *registered* for classes – but was unable to participate because of a medical issue: "sent text to see how she was doing from her trip to the hospital – still ill."  *Id.*  The prospective student then reengaged and "expressed interest in reopening file, feeling better."  The calls that follow are – again – a series of transactional calls and messages concerning financial aid applications, reviewing her awards, registering for classes, and new student registration.  *Id.*  Under plaintiff's view of the TCPA and her putative class, this person would be potentially entitled to **$63,000** for telephone calls she actively solicited to discuss purely informational aspects of registering for classes she expressly agreed to attend.[30]

These are not isolated examples, as a review of this data reveals.  *See also* Jerzyk Decl. ¶ 60.  In fact, there is a direct correlation between the number of calls recorded for a Lost Opportunity after being designated as Lost and the likelihood that the calls were purely transactional messages concerning the courses the student expressly agreed to attend – and in some cases, did in fact attend.  *See, e.g.*, Jerzyk Decl. Ex. D (Lost Opportunity with telephone number ending with "1093" – 16 calls recorded for student originally closed for "Military" rejection reason who became student).  Indeed, nearly a quarter of the Lost Opportunities who

---

[30]     *See Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 456 (M.D. Fla. Dec. 19, 2018) (refusing to certify TCPA class and finding that due process requires a defendant to challenge individual files with potential damages of $45,000. "A mail-in affidavit for a $45,000 claim is not going to work").

were "hits" in the "calls received" data review signed ITEs agreeing to attend the University. Jerzyk Decl. ¶ 63.[31]  Finally, many of the call notes reveal that someone else answered the phone when the admissions counselor called the telephone number provided by the prospective student, and thus there can be multiple individuals who received different calls at the same telephone number.  Jerzyk Decl. ¶ 60(d).  This would likewise require an individual analysis of the notes surrounding particular call disposition records in each Lost Opportunity's file.

### 3.  The Data Review Process

As indicated above, a manual review of each individual file is required to make even a threshold determination of whether an individual associated with a particular Rejected Lead or Lost Opportunity file would fall within Plaintiff's proposed class.  Cooley Decl. ¶¶ 19-20, 41-42. As thoroughly detailed by Ms. Jerzyk, this process is highly interpretative and a lengthy process, and this was true for even the superficial analysis Plaintiff sought.  Jerzyk Decl. ¶¶ 10-65.

Leaving aside the highly individualized and subjective inquiry reviewing each file would entail, simply ascertaining who falls within Plaintiff's class would be incredibly burdensome. For the Rejected Leads, it would take a reviewer nearly 36 to 72 years to extract all the necessary data to determine whether a Rejected Lead may have received more than one call in a 12-month period after being rejected by an admissions counselor.  *Id.* ¶ 28.  And all of this manual review would need to be performed knowing that the "hit rate" for Rejected Leads that fall into Plaintiff's class is between 1-2%. *Id.* ¶ 61.  And it is a near certainty that the University never got in contact with all of these individuals despite their request that the University do so.  Cooley

---

[31]     44 of the 60 also submitted signed applications that, like Ms. Davis's application, expressly authorized the University to call that individual about enrolling at the University.  This is in addition to the RFIs with additional consent language authorizing the University to contact these individuals submitted.

Decl. ¶¶ 27-31.  For the Lost Opportunities, it would take someone nearly 24 years to extract all of the necessary data to ascertain who falls within the proposed class.  Jerzyk Decl. ¶ 54. And this review would need to be performed knowing there is only an 8% "hit rate" and not a single "NI:Remove From List" rejection was found during the data review.  *Id.* ¶¶ 62-65.

**D.      Plaintiff's "Evidence"**

It is striking how much of a narrative Plaintiff spins from so little cloth.  Plaintiff relies heavily on other individual's allegations contained in unvetted and unrelated complaints that Plaintiff never even asked the University about during discovery.  Dkt. Nos. 68-09, 68-10.  Plaintiff's drive-by character assassination cannot be considered by the Court, however, because allegations are not evidence.[32] Plaintiff also attempts to make a meal out of two colleagues *joking* because one of them was just yelled at by someone who expressly asked the University to contact her, and likely did not know who was calling her.[33]  It is telling that such workplace banter is Plaintiff's  Exhibit A.  Finally, despite the University admittedly producing thousands of documents, Plaintiff can point to only one other document that contains a potential do-not-call issue.  Dkt. No. 68-07.  But Plaintiff fails to appreciate the import of this exchange: it actually proves that the University's admissions counselors were recording do-not-call requests because this is precisely *why* the University's supervisors were able to investigate the student's complaint.  And it shows that the University *voluntarily* took corrective action when this aberrational incident occurred.  Thus, Plaintiff's meager record is self-defeating.

---

[32]      *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("mere allegations" are not evidence); *see also Muzaffarr v. Ross Dress For Less, Inc.*, CIV No. 11-61996, 2013 WL 1890274, at *2 (S.D. Fla. May 7, 2013) ("Factual allegations are not evidence") (citation omitted).
[33]      Yatcko Decl. ¶¶ 3-9.

## STANDARD OF REVIEW

Plaintiff, as the party seeking class certification, bears the burden of proving each of the requirements of Rule 23(a) of the Federal Rules of Civil Procedure and at least one of the requirements of Rule 23(b).  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *see London v. Wal-Mart Stores*, 340 F.3d 1246, 1253 (11th Cir. 2003); *Rutstein v. Avis Rent-A-Car Sysems, Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000).  A class may only be certified "if the trial court is satisfied, after a rigorous analysis," that the requirements of Rule 23 have been met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir.1984).

At the class certification stage, Plaintiff must provide "more than bare allegations that [she satisfies] the requirements of Rule 23."  *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985).  In other words, Rule 23 "does not set forth a mere pleading standard." *Comcast*, 569 U.S. at 33. Rather, Plaintiff must not only prove "'that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation," but she "must also satisfy through *evidentiary proof* at least one of the provisions of Rule 23(b)."  *Id.* (second emphasis added).  Despite Plaintiff's contention—relying on non-binding case law—that this court need not consider the merits of the case in determining whether to certify a class, a court is "required to do so as necessary to resolve a request for class certification." *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 456 n.1 (M.D. Fla. 2018) (citing *Comcast*, 569 U.S. at 34); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) ("trial court can and *should* consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." (emphasis added) (quoting *Valley Drug v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003))).

14

## ARGUMENT

**A.     Plaintiff's Claims Are Not Typical Of The Overwhelming Majority Of The Class**

Plaintiff cannot satisfy the typicality requirement of Rule 23 because the fundamental

legal and factual issues surrounding her claims do not arise from the same pattern or practice as

the overwhelming majority of the class she seeks to represent.  Indeed, "Plaintiff points to no

evidence that any of the purported class members received" telephone calls from the University

"under similar circumstances."  *Powell v. YouFit Health Clubs LLC*, No. 17-CV-62328, 2019

WL 926131, at *5 (S.D. Fla. Jan. 14, 2019), *reconsideration denied*, No. 17-CV-62328, 2019

WL 926048 (S.D. Fla. Feb. 22, 2019) (denying certification in TCPA case where putative class

representative's claims were not typical because she believed she revoked her consent, but class

she sought to represent would include members who never did).

The same reasoning applies here.  Plaintiff's theory of the case is that *every* call to *every*

Rejected Lead or Lost Opportunity shares the same purpose: "to *re-engage* these once-

prospective students and convert them into tuition paying students."  Dkt. No. 68-01 at 9

(emphasis added).  As established above, however, over 80% of the individuals who would fall

within Plaintiff's class have *never* been engaged in the first place.  Cooley Decl. ¶¶ 27-31.

Remarkably, even Plaintiff's counsel stated "*I don't even* want to say reengage, to engage them

with the [enrollment] process."  Post Dep. 167:13-168:9 (emphasis added).  This is not some

minor distinction, but a fundamental difference between Plaintiff and the vast majority of the

putative class members under a statute that is designed to protect individuals "from telephone

solicitations to which they object."  47 U.S.C. § 227(c)(1).

Clearly, the 10-attempt Rejected Leads could not have objected to calls that they *actively*

*solicited* if the University never got in touch with this group in the first place.  Effectively,

Plaintiff is seeking to punish the University for an internal policy of *deprioritizing* certain individuals in terms of getting them the information they requested.  Yet the FCC has ruled that attempting to provide someone with the information they have requested is the "fulfillment of the consumer's request and [] does not constitute a telemarketing communication."[34]  On top of this binding interpretation, only if the University contacts someone *and* confirms that they are eligible to attend the University, will an admissions counselor discuss the admissions process.  These call attempts are therefore not telemarketing on multiple grounds.

While Plaintiff's claims are atypical to over 80% of the class members' "claims" on this ground alone, the same logic holds for all the individuals who were rejected for reasons other than "NI:Remove From List."  As detailed above, many of the calls to Lost Opportunities were likewise solicited calls "whose purpose [was] to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into" and were thus "not advertisements." *Aderhold v. car2go N.A. LLC*, 668 Fed. Appx. 795, 796 (9th Cir. 2016).

"Plaintiff's claim is indeed unique" compared to the class she seeks to represent.  *Powell,* 2019 WL 926131, at *5.  This is precisely why the court in *Powell* denied class certification on typicality grounds alone.  The Court should do the same here.  Plaintiff is in a class of her own.

## B. Plaintiff's Class Is Not Administratively Feasible And Thus Not Ascertainable

Plaintiff "cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in

---

[34] *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, ¶ 104 (2015) ("*2015 TCPA Order*"); *see also MacKinnon v. Hof's Hut Rests., Inc.*, No. 2:17-cv-01456, 2017 WL 5754308, at *2-3 (E.D. Cal. Nov. 28, 2017) (holding that plaintiff making a reservation and receiving restaurant's menu in reply text did not constitute marketing message).

fact useful for identification purposes, and that identification will be administratively feasible."
*Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 948 (11th Cir. 2015); *see also Powell v. YouFit Health Clubs LLC*, No. 17-CV-62328, 2019 WL 926048, at *4 (S.D. Fla. Feb. 22, 2019) ("Powell II").

Yet simply pointing to the University's records to establish that the class is ascertainable is exactly what Plaintiff does here, asserting that the University "has already conducted a small-scale review of its files to determine an estimated Class size, confirming that the necessary data is available." Dkt. No. 68-01 at 20.  Indeed, Plaintiff completely downplays the tremendously burdensome nature of this review – it would either take someone multiple lifetimes to complete, or the University would have to double the size of its Admissions Department, primarily to find one percent of the Rejected Leads it was never able to find in the first place.  Jerzyk Decl. ¶¶ 28, 54.  But Plaintiff simply ignores the inherent subjectivity of interpreting the contact history in each individual's file, particularly that "SWS" means simply and *only* that: an admissions counselor spoke with the prospective student.  This call disposition does not mean the call was necessarily an outbound call, which could only be determined through "significant individual inquiries." *Powell II*, 2019 WL 926048, at *4 (finding that need to review individual member records made class unmanageable, and thus, not ascertainable).[35]

Further, the University's records are in many cases, at best, records of call *attempts*.  Only a putative class member's phone records would definitively demonstrate whether a call or text was received.  Again, this is critical because the statute requires the person to have actually

---

[35]    Of course, one would also have to interpret the context of all the individual calls as well, and the fact that other individuals are receiving calls intended for the prospective student.  Jerzyk Decl. ¶ 60(d).  The Rejected Lead or Lost Opportunity would not be able to claim damages for such calls under the statute.

*received* the call to have a claim, which is the *claimant's* burden to prove.  47 U.S.C. § 227(c)(5).

Yet Plaintiff's own records show that she is trying to collect for a text message she never

received.  Specifically, Plaintiff asserts that the University texted her on August 25, 2017 and

again on August 30, 2017.  Dkt. No. 68-01 at 10-11 ("Plaintiff received these

communications.").  What her records *actually* show is that the two text messages she received

in August 2017 were both received on August 30, 2017, and the second one was an opt-out

confirmation message she received when she texted "STOP" to the earlier message the same day.

Dkt. No. 68-21; *see also* Dkt. No. 67 ¶ 40.  Thus, not only is Plaintiff making false

representations to the Court about receiving messages she never did, the second text message she

did receive is an informational message expressly authorized by the FCC to confirm that an

individual has opted out of a mobile alert program.[36]  At bottom, Plaintiff is either pulling a fast

one to avoid complicating her already untenable narrative that all the University's

communications were "telemarketing," or she is inflating her damages by 20%.  Either way, it

simply proves that accurately assessing liability would require significant individual inquiries.

## C.    Plaintiff And The Class Do Not Have Standing To Bring Claims Under Subsection (d) Of The FCC's Rules

Under Supreme Court precedent, Plaintiff had a duty to demonstrate that the common

contentions she identified are "capable of classwide resolution" and will resolve issues that are

"**central to the validity of each one of the *claims*** in one stroke."  *Wal-Mart Stores, Inc. v*

*Dukes*, 564 U.S. 338, 350 (2011) (emphasis added).  As the University has extensively briefed

already, Plaintiff has *no claim* under Subsection (d) of the FCC's TCPA Rules.[37]  Rather,

---

[36]     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
27 F.C.C. Rcd. 15391, 15391 (2012).
[37]     *See* Dkt. No. 70-1 at 1-6, 16-20; Dkt. No. 74 at 5-7.

pursuant to the plain language of the statute and the FCC's binding interpretation of it, individuals only have a private right of action to seek damages for "violation[s] of the guidelines for making *telephone solicitations*" found in Subsection (c) of the FCC's rules, 47 C.F.R. § 64.1200(c). *See* Dkt. No. 70-1 at 5-6. In other words, to have a viable statutory claim, Plaintiff would actually need to establish that all the University's calls at issue were unsolicited at the outset, or that all the class members made a valid do-not-call request to terminate their express authorization *and* then the University called them.[38]

Plaintiff's view of the TCPA turns a revocation-of-consent case upside down because the plaintiff not only has the burden of establishing that they received the calls, but also that they revoked their consent through reasonable means. *See Hitchman v. Nat'l Enter. Sys., Inc.*, No. 12-61043-Civ., 2014 WL 912363, at *3 (S.D. Fla. Mar. 10, 2014) (placing the burden on plaintiff to establish that she revoked consent for defendant to be liable under the TCPA, and denying summary judgment as a genuine issue of material fact existed as to whether plaintiff revoked consent); *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV 14-6256, 2016 WL 3456939, at *11 (C.D. Cal. Apr. 14, 2016) (class members cannot be presumed to have revoked consent

---

[38]    Plaintiff continues to fail Civics 101 by asserting "Congress and the FCC were therefore capable of allowing for a 'consent' defense yet chose not to do so." Dkt. No. 68-01 at 6. *Congress* enacts statutes, not procedural regulations, and the statute at issue here expressly exempts solicited calls from Subsection (c) by making it applicable only to "telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Indeed, Plaintiff makes much out of a footnote in the FCC's *2003 TCPA Order* in which the FCC stated "[t]he 'established business relationship' … is not an exception to the company-specific do-not-call rules." Dkt. No. 68-01 at 6 (citing *2003 TCPA Order*, n.351). This out-of-context statement, however, expressly does not include the more stringent statutory telephone solicitation carve-out – those calls made "to any person with that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4). In other words, the FCC never subjected this separate category of calls – which legally cannot be telephone solicitations – to its company specific do-not-call rules, but only those where the consumer terminated the EBR by making a valid do-not-call request. And there is no dispute here that the University only contacts individuals with their express authorization through multiple layers of consent.

absent individual evidence to the contrary.").

In the final analysis, Plaintiff's theory is that the University does not have *any* ability to defend itself against *any* class member's claims simply because *one person* was not provided a written do-not-call policy on demand. Indeed, based on the statistically significant data analysis performed by the University, Plaintiff's class would be comprised *exclusively* of individuals who never had any reason to request a do-not-call policy because **they never made a do-not-call request**. In other words, these individuals have never suffered any injury traceable to the University's purported lack of a *written* do-not-call policy.[39]

A class, however, cannot be certified if some class members lack Article III standing. "Article III does not give federal courts the power to order relief to any uninjured plaintiff—class action or not. The Judiciary's role is limited 'to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (quoting *Lewis v. Casey*, 518 U.S. 343, 349 (1996)). Moreover, to certify Plaintiff's "no injury" class would not only violate Rule 23, but it would also violate the Rules Enabling Act and Post University's due process rights. A class action is a procedural device "ancillary to the litigation of substantive claims," *Deposit Guar. Nat'l Bank v.*

---

[39]     The University's publicly available privacy policy instructs anyone who has provided their information to the University that "[i]If you tell us that you do not wish to have this information used as a basis for further contact with you, we will respect your wishes. Please contact Post University to request your name and address be removed from our lists." It further provides specific contact information for individuals to use, including to unsubscribe from communications with the University. *See* https://post.edu/privacy-policy/?utm_referrer=https%3A%2F%2Fwww.google.com%2F. Instead of following the options described on the University's publicly available and generally applicable Privacy Policy, Plaintiff chose to object to communications by responding to mass emails that are not even subject to the TCPA, many of which the University has no record of receiving. Given that approximately 150,000 individuals were able to communicate to the University that they were no longer interested in the University, Plaintiff's experience is highly individualized to say the least.

*Roper*, 445 U.S. 326, 332 (1980), "it leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).  The Rules Enabling Act provides that procedural rules, like Rule 23, "shall not abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), and thus, to apply different rules to a class action lawsuit would violate the Rules Enabling Act.

"A defendant in a class action has a due process right to raise individual challenges and defenses to claims . . . ."  *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013); *see also Lindsey v. Normet*, 405 U.S. 56, 66 (1972).[40]  A class action cannot be certified if doing so would hinder a defendant's due process right to raise individual challenges and defenses.  *Carrera*, 727 F.3d at 307.  Similarly, class certification cannot be used as a tool to hide individual issues.  *Id.* It thus follows that a class may only proceed under Rule 23 if a defendant's claims and defenses against each class member can be fairly adjudicated.  *See WalMart Stores*, 564 U.S. at 367.

Allowing Plaintiff to certify her class, in which many members lack standing, would impermissibly "enlarge" the class members' rights while simultaneously "abridg[ing]" the University's.  *See* 28 U.S.C. § 2072(b).  To do so would further deny University the opportunity to present a meaningful standing defense and allow uninjured class members to obtain crippling statutory damages on claims they could not legally pursue as named individuals.  If injury in fact were to exist solely by common exposure to the same technical violation of a statute, without

---

[40]      In addition, because fairness and due process concerns are part of the "superiority" analysis, courts routinely deny class certification where statutory damages are disproportionate to any actual harm purportedly suffered.  *See, e.g., Truesdell v. Thomas*, No. 5:13-CV-552-OC-10PRL, 2015 WL 12681655, at *10 (M.D. Fla. Feb. 13, 2015), *report and recommendation adopted*, 2015 WL 12698396 (M.D. Fla. Mar. 17, 2015) (no superiority where "even half or a quarter of those [estimated] damages would be enormous and vastly out of proportion to Plaintiff's injury"); *Ehren v. Moon, Inc*., No. 09-21222-CIV, 2010 WL 5014712, at *2 (S.D. Fla. Dec. 3, 2010) (same).

consideration of individualized harm or causation, the requirements of Rule 23 would serve no purpose.  At bottom, a class made up of individuals given automatic standing simply by virtue of the named party does not safeguard a defendant's due process right "to present every available defense." *Lindsey*, 405 U.S. at 66.

**D.      Plaintiff Is Not An Adequate Representative Of The Class Because She Has Not Proffered Any *Evidence* Of Injury**

In a case in which Plaintiff is demanding procedural perfection from the University, or otherwise face $210,000,000 in liability, one would expect Plaintiff to have her own house in order.  The reality, however, is that Plaintiff is throwing rocks from her glass house and she will be an inadequate class representative as a result.

Specifically, the University served Plaintiff with very minimal discovery requests in this case.  Relevant here, the University asked Plaintiff to (1) identify "**each telephone call or text message** YOU received from, or on behalf of, Post University **that you contend violated the TCPA**," and (2) for each purported violation of the TCPA, "IDENTIFY and DESCRIBE in detail **each injury** you claim to have suffered from such violation."[41]  Plaintiff responded by identifying *only* the three calls or text messages that occurred *after* Plaintiff claims to have made do-not-call requests, "[s]pecifically, Plaintiff received actionable calls or texts on October 18, 2017, January 11, 2018, and July 17, 2018."[42]  And tellingly, the only "injury" Plaintiff identified is that she wants money: "Plaintiff seeks only statutory damages at this time."[43]

It should go without saying that Plaintiff had her own telephone records the entire case, and thus necessarily throughout the entire fact discovery period that closed on May 10, 2019.

---

[41]      *See* Ex. 15, at Interrogatory Nos. 1 and 3 (emphasis added).

[42]      *Id.* at Interrogatory No. 1.

[43]      Ex. 15, Plaintiff's Response to Interrogatory No. 3.

Plaintiff therefore made a deliberate decision to exclude the text messages she (in one case, falsely) is claiming to have received prior to purportedly making do-not-call requests.  Further, Plaintiff has never identified *any* injury she has suffered from *any* call or text message Plaintiff received from the University.  Again, the only "evidence" Plaintiff has put forward is that she wants money – but that in no way establishes that she suffered any injury-in-fact, let alone injuries traceable to the University's purported violations of the TCPA.  Despite having every opportunity to supplement her discovery responses at any time before the close of fact discovery, Plaintiff chose not to do so.  Plaintiff's sandbagging is not harmless, particularly because the University had no need to explore any aspect of the pre-DNC messages throughout the discovery period given that she was *not* contending those messages violated the TCPA.

Rule 37(c)(1) – Failure to Disclose or Supplement – states that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1269-71 (M.D. Fla. 2006) (noting party that failed to respond or supplement its discovery answers in a timely manner bears the burden of proving that its failure was substantially justified, and ruling party that failed to supplement its discovery responses during fact discovery, which articulated an entirely different and prior theory of the case, would be precluded from entering such evidence in the case).[44]

A straightforward application of Rule 37(c) requires that Plaintiff be precluded from offering any evidence that the texts prior to her alleged DNC request violated the TCPA, or that

---

[44]    *See Ctr. for Indiv. Rts. v. Chevaldina*, No. 16-20905-Civ, 2018 WL 2432109, at *10-11 (S.D. Fla. May 30, 2018) (precluding party from introducing any evidence of damages incurred or category of damages not timely disclosed).

she suffered any injury from the University's communications.  In short, if the Federal Rules of

Civil Procedure mean what they say, Plaintiff should be precluded from using any information

not disclosed in response to Post University's discovery requests under Rule 37(c).  Because she

should not be allowed to introduce such evidence, Plaintiff will be an inadequate representative

of the class she seeks to represent.

**E.      Individualized Issues Will Predominate Concerning The Purpose Of The Calls And The University's Relationship To The Call Recipient**

Simply put, this case is indistinguishable from Judge Rosenberg's decision in *Newhart v. Quicken Loans, Inc.*  Just like the calls at issue there, the University's "communications varied." No. 9:15-cv-81250, 2016 WL 7118998, at *1 (S.D. Fla. Oct. 13, 2016).  By submitting an RFI, the individual "requested that [the University] call them at that number." *Id.*  "The topics discussed also differed." *Id.*  Indeed, as established above, the University "produced evidence that the purpose of the challenged calls varied from one to the next.  Some calls were made in direct response to written and oral requests" from prospective students. *Id.*, at *4. For example, many calls were made to assist a Lost Opportunity with federal student loan paperwork, review their financial awards, or register for classes, Jerzyk Decl. ¶ D, and thus, these calls "were transactional communications to facilitate, complete, or confirm" their enrollment at the University which the individual "already had elected to pursue." *Newhart*, 2016 WL 7118998, at *4.  As a result, "these calls do not constitute telemarketing." *Id.*  And as detailed above, Judge Rosenberg was simply applying binding FCC precedent.[45]

---

[45]      *See*, *e.g.*, *2015 TCPA Order*, ¶  104; *Aderhold v. Car2Go N.A. LLC*, No. 14-35208, 2016 WL 4709873, at *1 (9th Cir. Sept. 9, 2016) (text "directed . . . to completing the registration process initiated by [the plaintiff] and to validating personal information" was not telemarketing because it did not "contain[ ] content encouraging purchase of [defendant's] services"); *see also Daniel v. Five Stars Loyalty, Inc.*, No. 15-cv-03546, 2015 WL 7454260, at *5 (N.D. Cal. Nov. 24, 2015) (text message sent in response to plaintiff's "inquiry regarding [defendant's]

Even under Plaintiff's theory of the case, *only* telemarketing can be actionable under Subsection (c).  Dkt. No. 68-01 at 22.  Plaintiff counterfactually asserts that *all* calls to Rejected Leads and Lost Opportunities are telemarketing by taking certain deposition testimony out of context, particularly regarding the University's *subjective belief* whether a Lost Opportunity is still a Lost Opportunity at a certain point in time.[46]  Yet Plaintiff is not going to be using the University's subjective beliefs to prove her claims, but the University's actual CRM records. And those records clearly establish that these individuals are receiving – *and placing* – varied transactional telephone calls "while the entry or file *in Defendant's CRM system* associated with that person was marked as, flagged as, or considered a 'Rejected Lead' or 'Opportunity Lost'." Mot.  And *that* evidence "may reveal that there was no telemarketing purpose (because, for example, the [Rejected Lead or Lost Opportunity] requested the call in a prior communication or the call involved a request for documents." *Newhart*, 2016 WL 7118998, *4.

At bottom, reviewing and interpreting the context surrounding every call or text message notated in a Rejected Lead or Lost Opportunity's file would be like describing every snowflake in a blizzard.  "As the challenged calls are not uniform in purpose, the telemarketing issue cannot be resolved by common, classwide evidence . . . . Such individualized inquiries will necessitate a host of mini-trials.  The requisite predominance of common questions of fact is thus lacking." *Id.*  Plaintiff's class cannot be certified as a result.

## **CONCLUSION**

For the foregoing reasons, the University respectfully requests that the Court deny

---

program" was not telemarketing).

[46]     Post Dep. 276:4-279:3.  As Mr. Cooley answers, however, for both Rejected Leads and Lost Opportunities, "it depends" on the specific file.   "Everybody is unique . . . . Every situation is unique."  Post Dep. at 198:19-23.

Plaintiff's Motion for Class Certification.

Dated: July 26, 2019                     Respectfully submitted,

                                         By: */s/ Mary Joanne Dowd*
                                         Mary Joanne Dowd, # 368970
                                         Adam Bowser, (admitted pro hac vice)
                                         Brandi G. Howard, (admitted pro hac vice)
                                         **ARENT FOX LLP**
                                         1717 K Street, N.W.
                                         Washington, DC 20006-5344
                                         (202) 857-6000 (telephone)
                                         (202) 857-6395 (facsimile)
                                         mary.dowd@arentfox.com
                                         adam.bowser@arentfox.com
                                         brandi.howard@arentfox.com

                                         *Attorneys for Post University, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 26, 2019, the foregoing was filed electronically with the Clerk of Court and served by Notice of Electronic Filing from the Court's electronic filing system upon the following:

Bradford R. Sohn
THE BRAD SOHN LAW FIRM PLLC
2600 South Douglas Rd., Suite 1007
Coral Gables, Florida 33134
Tel: (786) 708-9750
Fax: (305) 397-0650
brad@sohn.com

Jeremy M. Glapion
THE GLAPION LAW FIRM, LLC
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: (732) 455-9737
Fax: (732) 709-5150
jmg@glapionlaw.com
*Attorneys for Plaintiff*

/s/ *Mary Joanne Dowd*
Mary Joanne Dowd